IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REPLY MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO CONSOLIDATE ACTIONS

Defendant Robert D. Christ respectfully submits this memorandum of law in further

support of his motion, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, to

consolidate the above-captioned action with Civil Action No. 06-275-GMS, entitled *Robert D.*

*Christ v. Brett J. Cormick, et al.*, currently pending before this Court:

1.      By opposing defendant's attempt to conserve the parties' and the Court's time and

resources, Brett Cormick and his co-conspirators have confirmed that they are interested only in

delaying this proceeding and evading a full and fair adjudication of the parties' claims.  In her

opinion transferring this action to this Court, the Honorable Gene E.K. Pratter of the U.S. District

Court for the Eastern District of Pennsylvania surmised that plaintiff initially filed the action in

Pennsylvania in a bad faith attempt to avoid this Court's jurisdiction.  *See Elan Suisse Ltd. v.*

*Christ*, 2006 WL 3838237, at *4 n.13 (E.D. Pa. Dec. 29, 2006) (Ex. A to Mot. to Cons. Actions).

Plaintiff's opposition to Mr. Christ's motion not only validates Judge Pratter's suspicions, but

disregards her decision to transfer this action for the express purpose of consolidating it with

C.A. No. 06-275-GMS.  *See id.* at *4.

2.    That Mr. Cormick's only motive is to deflect attention away from the merits of this dispute is made clear by his attempt to manufacture an issue out of the identity of the true plaintiff in this action. In doing so, plaintiff misconstrues the admission made by its counsel previously in this action. Contrary to plaintiff's claim, its counsel did not admit "that Elan Suisse Ltd. and Elan Suisse (Pty) Ltd. are the same entity"; rather, in response to questioning by Judge Pratter as to the identity of the parties, plaintiff's counsel stipulated that Elan Suisse (Pty) Ltd., *not* Elan Suisse Ltd., is the actual plaintiff. This judicial admission by plaintiff's counsel, made for the purpose of withdrawing a fact from contention, is fully binding upon plaintiff. *See, e.g., Donald M. Durkin Contracting, Inc. v. City of Newark*, 2006 WL 2724882, at *7 (D. Del. Sept. 22, 2006) (attached hereto as Exhibit A).[1]

3.    Even if plaintiff's counsel had not candidly resolved any confusion about plaintiff's identity, the claims alleged in this action leave no doubt that, in fact, Elan Suisse (Pty) Ltd. is the true party in interest. The complaint in this action alleges that plaintiff "is a corporation formed and organized under the laws of South Africa" (D.I. 1, ¶ 1) and, as plaintiff's opposition makes clear, Elan Suisse (Pty) Ltd., not Elan Suisse Ltd., is a South African corporation. Moreover, Mr. Cormick, in an affidavit submitted previously in this action, testified on behalf of Elan Suisse (Pty) Ltd. as to the alleged harm to that company from Mr. Christ's actions and not once mentioned the U.K. entity. *See* Ex. B hereto. Finally, plaintiff's opposition itself admits that the South African entity, Elan Suisse (Pty) Ltd., is the true plaintiff, arguing

---

[1] *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677 (7th Cir. 2002), cited by plaintiff, does not hold differently. The concurring opinion in *McCaskill* noted only that judicial admissions by counsel are limited to statements of fact rather than counsel's statements of legal opinion. *See* 298 F.3d at 681-82. Here, counsel's statement distinguishing among similarly-named legal entities was one of fact which otherwise would have required evidentiary proof; as such, plaintiff is bound by its counsel's admission. *See id.*

that its claim for commercial disparagement "will likely be determined under South African law, as [plaintiff's] domicile." Plaintiff's Opp. Mem. ¶ 5. In short, there is no dispute that Elan Suisse (Pty) Ltd. is both the plaintiff in this action and a defendant in C.A. No. 06-275-GMS, and any argument to the contrary can only be intended to delay the prompt and efficient resolution of this dispute.

4.    There also is sufficient overlap of factual and legal issues in the two actions to justify consolidation. In fact, Judge Pratter specifically found that, while the specific claims in the two actions are different, "the facts and circumstances surrounding both actions sufficiently align such that consolidation of these actions would be appropriate." 2006 WL 3838237, at *4.[2] Judge Pratter also disposed of plaintiff's unsupported claim that consolidation would somehow "increase discovery costs" and "sacrifice judicial economy," finding that "it should be both more convenient and less burdensome for all parties to litigate these issues on a consolidated basis." *Id.* These findings by the Eastern District of Pennsylvania are the law of the case and cannot now be challenged or ignored by plaintiff; had plaintiff believed Judge Pratter's findings were in error, it could have moved for reargument or appealed but did neither. Plaintiff's opposition to consolidation in the face of this clear mandate from Judge Pratter only further proves that plaintiff's sole objective is to avoid adjudication of the parties' claims at all costs.

5.    Finally, plaintiff's contention that consolidation is "premature" has no merit. As Judge Pratter acknowledged, any parties which may be dismissed from C.A. No. 06-275-GMS

---

2 *Aerotel, Ltd. v. Verizon Communications, Inc.*, 234 F.R.D. 64 (S.D.N.Y. 2005), cited by plaintiff, is inapposite. The *Aerotel* court denied consolidation of two patent actions involving different defendants and different technologies based, in part, on the fact that discovery in one case had progressed much further than in the other. *See id.* at 66-67. Here, discovery has not commenced in either action, a fact which favors consolidation so that the parties may coordinate discovery concerning facts common to the two actions.

will nonetheless be material witnesses in both actions, *see* 2006 WL 3838237, at \*4 n.12, and

accordingly any prospective motion to dismiss the amended complaint in C.A. No. 06-275-GMS

does not, as plaintiff claims, moot the benefits of consolidation. Moreover, if the Court defers

consolidation until it decides whether to dismiss some or all of the claims in C.A. No. 06-275-

GMS, there is a real possibility that discovery in both actions will proceed on separate tracks,

thereby needlessly wasting resources that would be conserved if the cases are consolidated.3

WHEREFORE, for the reasons set forth above and in his Motion to Consolidate Actions,

defendant Robert D. Christ respectfully requests that the Court enter an order consolidating this

action with *Robert D. Christ v. Brett J. Cormick, et al.*, Civil Action No. 06-275-GMS.

REED SMITH LLP

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Defendant

Dated:  March 9, 2007

---

3 Plaintiff's claim that there is no "urgency" to resolve the parties' dispute is ironic since, when
it first initiated this action in the Court of Common Pleas for Montgomery County, Pennsylvania,
it sought emergency injunctive relief against Mr. Christ based on claims of ongoing irreparable
harm. *See* D.I. 1.  Despite this purported harm, plaintiff has *never* renewed its motion for an
injunction in the six months since this action was removed to Federal court, further
demonstrating Mr. Cormick's reluctance to litigate the parties' claims on their merits.

# EXHIBIT A



Slip Copy

Slip Copy, 2006 WL 2724882 (D.Del.)

(Cite as: Slip Copy)

Page 1

**H**

Briefs and Other Related Documents

Donald M. Durkin Contracting, Inc. v. City of Newark D.Del.,2006.Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

DONALD M. DURKIN CONTRACTING, INC., Plaintiff

v.

CITY OF NEWARK, et al., Defendants

andCITY OF NEWARK, et al., Third-Party Plaintiff

v.

DONALD M. DURKIN CONTRACTING, INC., and Federal Insurance Company, Third-Party Defendants

**No. CVIA 04-163 GMS.**

Sept. 22, 2006.

Katharine L. Mayer, McCarter & English, LLP, James S. Green, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE, Paul A. Logan, Powell, Trachtman, Logan, Carrle & Lombardo, P.C., King of Prussia, PA, David T. Bolger, pro hac vice, Patrick R. Kingsley, David M. Burkholder, Stradley, Ronon, Stevens & Young, LLP, Malvern, PA, for Plaintiff/Third-Party Defendants.

Paul Cottrell, Victoria Kathryn Petrone, Tighe, Cottrell & Logan, P.A., Wilmington, DE, for Defendants/Third-Party Plaintiffs.

*MEMORANDUM*

SLEET, J.

## I. INTRODUCTION

*1 Presently before the court is Federal Insurance Company's motion for reconsideration (D.I.136) of the court's April 5, 2006 Order denying summary judgment. Also pending are several related motions in limine (D.I.163, 165, 190). For the reasons that follow, the court will grant the motion for reconsideration and will reconsider, *sua sponte,* related aspects of its September 2, 2004 Order that denied the plaintiff's motion for partial summary judgment. In doing so, the court grants summary judgment to Federal Insurance Company ("Federal"). Durkin's motion for partial summary judgment is granted in part and denied in part.

## II. FACTUAL BACKGROUND

*1 In the summer of 2000, the City of Newark ("City") contracted with URS Corporation ("URS") "for professional services related to the design and construction administration" of a water-supply reservoir. (D.I. 98 ¶ 1.) In April of 2002, the City also contracted with Durkin to perform the actual construction (hereinafter, the "Construction Contract"). Federal provided a Performance Bond (the "Bond") to the City in connection with work to be performed by Durkin. Everything was proceeding more-or-less as expected until late 2003, when Durkin claims to have discovered defects in URS' design. From there, the relationship among the parties deteriorated, and the City eventually terminated Durkin by a letter dated February 3, 2004. In response, Durkin initiated the present action on March 16, 2004, naming as defendants the City, the mayor of Newark, certain members of the Newark City Council, and URS.

*1 With respect to terminating Durkin, the City had contractual obligations under both the Bond and the Construction Contract. Under the terms of Section 15.2 of the Construction Contract between the City and Durkin, the City was required to provide Durkin and its surety, Federal, with seven days written notice of its intention to terminate Durkin for default. (D.I.122, Ex. A, Att.B, Sec.15.2.) The Bond also set forth a series of procedural steps that the City had to take before Federal became obligated under the Performance Bond:

*1 If there is no Owner Default, the Surety's obligation under the Bond shall arise after:

*1 3.1 The Owner has notified the Contractor and the Surety ... that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

*1 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2724882 (D.Del.)
(Cite as: Slip Copy)

Page 2

Contractor and the Surety have received notice as provided in Subparagraph 3.1....
*2 (D.I.122, Ex. A, Att.A.)

*2 The City claims that its letter of November 21, 2003 satisfied the seven-day notice requirement of Section 15.2 of the Construction Contract, as well as its obligation under Paragraph 3.1 of the Bond. The pertinent portion of that letter reads:
*2 On behalf of the City of Newark, Delaware, I am writing to inform you that we are now considering declaring Donald M. Durkin Contracting, Inc. (DMD) in default of Newark Municipal Contract No. 02-02, pertaining to Construction of a Municipal Water Supply Reservoir. This precautionary letter has become necessary following DMD's failure to present a response to a means and methods for continuation of the project in accordance with our contract.
*2 (D.I.122, Ex. A, Att. C.)

*2 After the November 21st letter, Durkin, Federal and the City had a series of communications and interactions, which failed to resolve the ongoing disputes. Finally, the City voted to terminate Durkin. It is undisputed that the City terminated Durkin via a letter dated February 3, 2004, which stated:
*2 Pursuant to the terms of the Contract and the Construction Performance Bond, the City of Newark declares a Contractor default and hereby formally terminates Donald M. Durkin Contracting, Inc.'s ("Durkin") right to complete the contract for the Construction of the City of Newark Water Supply Reservoir. The termination is for cause due to Durkin's refusal to complete the Work. This Default has been declared after notifying both the Surety and Durkin and attending a conference with the Surety and Durkin as the Bond requires.
*2 (D.I.122, Ex. A, Att.F.)

*2 The City of Newark sent another letter to Durkin and Federal, on February 4, 2004, offering to extend the effective date of termination for an additional seven days.

### III. PROCEDURAL BACKGROUND

*2 Durkin moved for partial summary judgment on June 29, 2004 (D.I.36). On September 2, 2004, the court issued an Order (D.I.63) denying Durkin's motion for partial summary judgment (the "September 2nd Order"). On March 14, 2006, Federal

filed a motion for summary judgment (D.I.122). On March 22-23, 2006, Ms. Carol Houck was deposed as the 30(b)(6) designee of the City. On March 24, 2006, the City filed its Answer to Federal's motion for summary judgment (D.I.126). Ms. Houck's deposition continued on March 28, 2006, and again on March 30, 2006. On March 31, 2006, Federal filed a Reply Brief to the City's March 24th Answer, relying for the first time on testimony from Ms. Houck's March 28th deposition. On April 5, 2006, the court issued a Memorandum and Order (D.I.132) denying Federal's motion for summary judgment (the "April 5th Order"). On April 17, 2006, Federal filed a motion for reconsideration (D.I.136) of the court's April 5th Order. Four days after Federal filed its motion for reconsideration, which expressly relies in part on the deposition testimony of Ms. Houck, Ms. Houck executed an errata sheet for her March 23rd deposition, "clarifying" statements she made under oath. On May 2, 2006, Ms. Houck executed an errata sheet for her March 28th deposition, further "clarifying" statements made under oath. On May 3, 2006, the City filed its Answer to Federal's Motion for Reconsideration, in which it relied upon the errata sheets to rebut Federal's position.

*3 In conjunction with the pretrial conference held before the court on September 5, 2006, Durkin and Federal filed motions in limine (D.I.163, 165, 190), which have helped to bring into sharper focus the issues raised in the previous motions for summary judgment.

### IV. STANDARDS OF REVIEW

#### A. Exclusion of Evidence

*3 A court has broad discretion to admit or exclude evidence under the Federal Rules of Evidence. *Gumbs v. Int'l Harvester, Inc.,* 718 F.2d 88, 97 (3d Cir.1983). Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings a 'hard look' to determine if a district court has abused its discretion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                 Page 3
Slip Copy, 2006 WL 2724882 (D.Del.)
**(Cite as: Slip Copy)**

in excluding evidence as unreliable." *Id.* at 750.

### B. Reconsideration

**\*3** As a general rule, motions for reconsideration should be granted only "sparingly." *Tristrata Tech., Inc. v. ICN Pharms., Inc.,* 313 F.Supp.2d 405, 407 (D.Del.2004); *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). Motions for reconsideration should not be used to rehash arguments already briefed. *See Quaker Alloy Casting v. Gulfco Indus., Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988) ("This Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure."). However, a court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result. *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989).

**\*3** A court may grant a motion for reconsideration "if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a manifest injustice." *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999).

### C. Summary Judgment

**\*3** A grant of summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Biener v. Calio,* 361 F.3d 206 (3d Cir.2004). In reviewing summary judgment decisions, the Third Circuit views all evidence and draws all inferences in the light most favorable to the non-movant, affirming if no reasonable jury could find for the non-movant. *See Whiteland Woods, L.P. v. Twp. of West Whiteland,* 193 F.3d 177, 180 (3d Cir.1999). Thus, a

trial court should only grant summary judgment if it determines that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

**\*4** If a moving party has demonstrated the absence of a genuine issue of material fact-meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole-concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Liberty Lobby,* 477 U.S. at 256-57, 106 S.Ct. at 2514 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), 475 U.S. 574, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986).

### V. DISCUSSION

#### A. Motions In Limine

##### 1. Federal's Motion In Limine to Exclude the Deposition Errata Sheets of Carol Houck

**\*4** Federal moves to exclude from admission into evidence at trial the errata sheets for the deposition of Ms. Carol Houck, the City's designated 30(b)(6) witness. Federal argues that the errata sheets provide a narrative substitute for Ms. Houck's sworn testimony and are, therefore, an attempt on the part of the City to create a sham fact issue. Specifically, Federal contends that Ms. Houck admitted in her March 28th deposition that the November 21st letter from the City to Durkin and Federal did not constitute notice under the terms of the Construction Contract. In her May 2nd errata sheet, Ms. Houck writes: "my reply on line 9 is incorrect if it suggests that the November 21, 2003 letter was not the seven-day notice letter."

**\*4** In response, the City argues that Ms. Houck was deposed over four days "in a random and confusing

Slip Copy
Slip Copy, 2006 WL 2724882 (D.Del.)
**(Cite as: Slip Copy)**

manner...." In arguing that Ms. Houck's errata sheet clarifications were appropriate, the City quotes from Ms. Houck's errata sheet regarding her third day of testimony, in which she states:

**\*4** Once again during my deposition there were repeated references to various exhibits, out of order and with, I believe, the intent to confuse. I have now had the opportunity to review the deposition and further clarify that it is my belief that the letter of November 21, 2003 (Exhibit 20) served to ... provide notice of Default and termination to both the Surety (Bond) and Durkin (Contract) ...

**\*4** (D.I. 137, Ex. A, Page 2.)

**\*4** Corrections to deposition testimony are governed by Rule 30(e) of the Federal Rules of Civil Procedure. Rule 30(e) corrections are treated as affidavits. *Burns v. Board of County Comm'rs of Jackson County,* 330 F.3d 1275, 1282 (10th Cir.2003). In *Franks v. Nimmo,* the Tenth Circuit set forth a test for analyzing whether a party's affidavit constitutes an attempt to create sham issues of fact. 796 F.2d 1230 (10th Cir.1986)). Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during her earlier testimony, whether the affiant had access to the pertinent evidence at the time of her earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Franks,* 796 F.2d at 1237 (citing *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364-65 (8th Cir.1983); *Perma Research & Dev. Co. v. The Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969)).

**\*5** Here, Ms. Houck's earlier testimony occurred during a deposition, at which counsel for both the City and Federal were present and able to question the witness. Ms. Houck was not just a fact witness testifying on her personal knowledge; she was also the City's 30(b)(6) designee, and as such, had an affirmative obligation to be prepared on the noticed topics so that she could give complete, knowledgeable, and binding answers on behalf of the party. *See Ierardi v. Lorillard, Inc.,* Civ. A. No. 90-7049, 1991 WL 158911, at \*1 (E.D.Pa.Aug.3, 1991). Ms. Houck's corrections were not based on new evidence, but concerned documents and actions about which she was obviously well acquainted. In her May 2nd errata sheet, Ms. Houck does take issue with the manner in which she was deposed and states that she felt that counsel intended to confuse her. Notably, however, she stops short of saying she was in fact confused. Instead, Ms. Houck, after further review of her testimony, "clarifies" her answers by providing a substitute narrative for an appreciable portion of her deposition. The court can find no indication of confusion in the deposition transcript. In addition, it does not appear that Ms. Houck's attorney recognized any either. There is nothing in the record that suggests any attempt to rehabilitate Ms. Houck during, or immediately after the deposition, or otherwise clarify her statements until after Federal filed its motion for reconsideration.<sup>FN1</sup> Moreover, not only do Ms. Houck's errata sheet "clarifications" alter her answers on key issues in the case, they posit alternative theories and defenses that the City now appears to be preparing to advance at trial-an issue that the court will address below in a related motion in limine.

> FN1. In *Franks,* the Tenth Circuit also found noteworthy the timing of the disputed affidavit in concluding that the conflict between the earlier testimony and the affidavit raised only a sham issue. There, it was offered only after summary judgment had been granted against the party offering the conflicting affidavit. *Franks,* 796 F.2d at 1237.

**\*5** The court recognizes that Fed.R.Civ.P. 30(e) allows a deponent to make changes to deposition testimony in form or substance. Nevertheless, the court finds that Ms. Houck's errata sheets exceed the scope of the type of revisions contemplated by the Rule and serve only to improperly alter what was testified under oath. As has been aptly acknowledged by the Tenth Circuit, a deposition is not a take home exam. *See Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1242 (10th Cir.2002) (quoting *Greenway v. Int'l Paper Co.,* 144 F.R.D. 322, 325 (W.D.La.1992)). The errata sheet "clarifications" in this case are akin to a student who takes her in-class examination home, but submits new answers only after realizing a month later that the import of her original answers could possibly result in a failing grade. The court is troubled by the timing of Ms. Houck's errata sheets as well as their use in the City's responsive briefing on Federal's motion for reconsideration. Nor can the court ignore the fact that Ms. Houck was the City's 30(b)(6) designee, intimately familiar with the facts and issues in this case. Accordingly, the court holds that the errata sheets constitute a sham fact issue under *Franks* and, as such, the errata sheets shall not be admitted as evidence at trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2. Durkin's Motion Regarding the Judicial Admission of the City of Newark Providing Prior Written Notice of Intent to Terminate the Contract**

**\*6** A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding. *Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 61 (1st Cir.1992) (quoting *Bellefonte Re Insurance Co. v. Argonaut Insurance Co.*, 757 F.2d 523, 528 (2d Cir.1985)). If factual matters in issue have been judicially admitted, they are binding on the tendering party. *See, e.g., Parilla v. IAP Worldwide Services, VI, Inc.*, 368 F.3d 269, 275 (3d Cir.2004) (internal citations omitted). An admission in a pleading is a judicial admission, which is binding on the litigant. *See, e.g., Consol. Rail Corp. v. Providence & Worcester Co.*, 540 F.Supp. 1210, 1220 n. 12 (D.Del.1982) (citing *Giannone v. United States Steel Corp.*, 238 F.2d 544, 547 (3d Cir.1956)).

**\*6** With this principle in mind, Durkin moves in limine to preclude the City from arguing or attempting to present any evidence that controverts the City's prior contentions in pleadings that its November 21, 2003 letter from Carl Luft to Durkin and Federal represented the required seven-day written notice to Durkin of the City's intention to terminate the Construction Contract. Durkin contends that the City has maintained throughout this litigation that the November 21st letter gave written notice of its intent to terminate Durkin as required by the Construction Contract. Durkin points to the City's Answer, Counterclaim, and responsive briefs to the following motions: Durkin's Motion for Declaratory Judgment, Durkin's Motion for Partial Summary Judgment, and Federal's Motion for Summary Judgment, as examples of this affirmative representation. The City does not dispute this contention. Durkin contends that this consistently pled position is a judicial admission to which the City must be held. The court agrees.

**\*6** In response to Durkin's motion, the City states: "It is uncontested that Newark's position is that its November 21, 2003 letter provided the requisite seven-day notice required by the Construction Contract termination provision." As to why this consistently pled assertion would not be a judicial admission, the City suggests that the doctrine of judicial admission conflicts with Rule 8(e)(2) of the Federal Rules of Civil Procedure. The City argues

that Rule 8(e)(2) allows a party to set forth inconsistent, alternative and hypothetical pleadings. The City, however, did not *plead* the alternative defense it now seeks to be permitted to argue at trial. Additionally, in the City's Counterclaim, it admits that its November 21st letter constituted written notice of its intent to terminate Durkin. (D.I. 7, Counterclaim ¶ 19.)

**\*6** Although the City pleads that it "further offered to suspend Durkin's termination if it would, in writing, agree to complete construction of the reservoir according to the design," (D.I. 7, Counterclaim ¶ 21), the court can not find an averment by the City that sets forth the contention that the letter dated February 4, 2004, could also satisfy the notice provision of Section 15 of the Construction Contract. Further, the City's reference to a suspension of Durkin's termination in its Counterclaim was not made in the context of an alternative or hypothetical pleading. *See Schott Motorcycle Supply*, 976 F.2d at 61 (citing 5 Wright & Miller, *Federal Practice and Procedure* § 1282 at 525 (2d ed.1990) (generally an alternative claim is drafted in the form of "either-or" and a hypothetical claim is in the form of "if-then")).

**\*7** It would be patently unfair and judicially inefficient to allow the City's defense to be a moving target, after the parties and the Court have relied upon the City's admissions. *See Soo Line R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir.1997) (holding that at summary judgment "judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible."); *Keller v. U.S.*, 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal. Indeed, they are 'not evidence at all but rather have the effect of withdrawing a fact from contention." ' (citations omitted)).

**\*7** The notice requirement of the Construction Contract is one of the central issues in this case, and as a factual matter now judicially admitted by the City, it is binding. The court will, therefore, preclude the City from arguing or presenting evidence at trial that any other writing constituted the seven-day notice required by the Construction Contract.[FN2]

FN2. Federal also moves in limine to

Slip Copy                                                                                                    Page 6
Slip Copy, 2006 WL 2724882 (D.Del.)
(Cite as: Slip Copy)

exclude the February 4th letter and any reference thereto (D.I.165). Federal's argument appears to be most concerned with the possibility that the City may try to use the February 4th letter as alternative proof that the City provided Durkin with a seven-day notice required by the Construction Contract, in the event that the November 21st letter is deemed insufficient to constitute notice under the Construction Contract. For the reasons stated above, the City is limited to the judicial admission that the November 21st letter constituted notice under the Construction Contract. The court, therefore, need not preclude *any* reference to the February 4th letter at trial to assuage Federal's concern. Simply put, it would be impermissible for the City to argue, in the alternative, that the February 4th letter satisfies the notice requirement under the Construction Contract in light of its judicial admission; however, the Court reserves judgment as to whether the letter may be admissible for some other purpose.

### B. Motion for Reconsideration

**\*7** Recognizing that motions for reconsideration are granted only sparingly, the court finds that Federal's motion presents one of those rare occasions. Because Ms. Houck's deposition had not commenced before Federal filed its opening brief in support of its motion for summary judgment, the substance of Ms. Houck's testimony was first introduced in Federal's reply brief. Since the City did not have an opportunity to respond to the use of Ms. Houck's deposition in Federal's reply brief, the court properly disregarded the deposition testimony in its initial consideration of Federal's motion for summary judgment. Accordingly, the court believes it appropriate to reconsider its April 5th Order, now that the issue has been fully briefed with all parties having the opportunity to address the import of Ms. Houck's deposition testimony. *See Chase Manhattan Bank v. Iridium Africa Corp.,* No. Civ. A. 00-564 JJF, 2004 WL 1588295, at \*1 (D.Del. July 08, 2004) ("[A] court should reconsider a prior decision if it overlooked facts or precedent that reasonably would have altered the result."); *see also Pell v. E.I. Dupont de Nemours & Co. Inc.,* 231 F.R.D. 186, 189 (D.Del.2005) (granting motion for reconsideration where evidence was not addressed in the parties' opening and answering briefs). The court's April 5th Order was premised, in part, on what appeared to be a factual dispute as to whether the City satisfied the

provision of the Construction Contract that required the City to give notice of its intent to terminate the contract. That appearance of a factual dispute dissipates when considering the deposition testimony of the City's 30(b)(6) designee, along with the court's rulings on the motions in limine, and the pleadings.

**\*8** In addition, the court's September 2nd Order was premised, in part, on the conclusion that a genuine issue of material fact existed with respect to satisfaction of the seven-day notice requirement in the Construction Contract. Given the court's holding above concerning the Houck deposition, the court believes it appropriate to reconsider its September 2nd Order, *sua sponte.* The September 2nd Order was issued over a year prior to the April 5th Order, on similar grounds, and without the consideration of the deposition testimony of the City's 30(b)(6) witness.

### C. Motion for Summary Judgment on the Notice of Termination Issue

**\*8** The court concludes that, given the City's admission as to the date of the notice of termination, there is no evidentiary basis upon which a reasonable jury could find in favor of the City. Moreover, the City's own 30(b)(6) witness admitted that the November 21st letter was not the required seven-day notice to Durkin and Federal, of the City's intent to terminate.

**\*8** The court is not persuaded by the City's argument that Ms. Houck's deposition testimony taken together with her errata sheets presents evidence of a genuine issue of material fact that should preclude summary judgment. Instead, the court is guided by the Tenth Circuit's reasoning in *Franks.* The Court of Appeals in *Franks* stated, "that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." *Franks, 796* F.2d at 1237 (citing *Camfield Tires, 719* F.2d at 1365).

**\*8** The plain language of the Construction Contract, the Bond and the November 21st letter make clear that, even absent the sworn deposition testimony of Ms. Houck, a reasonable jury could not find in favor of the non-movant City. It appears that the City attempted to follow the conditions of the Bond almost to the letter, but ignored a critical requirement imposed by the Construction Contract. That requirement included an additional procedural step

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7
Slip Copy, 2006 WL 2724882 (D.Del.)
(Cite as: Slip Copy)

prior to termination that the Bond did not; that is, seven-day notice to Durkin and Federal of its intent to terminate. As Federal and Durkin separately point out in their briefs, the November 21st letter neither formally declares Durkin in default, nor does it contain the word "terminate." Indeed, it even states that it is a "precautionary letter."

**\*8** The City argues that the November 21st letter simultaneously satisfied the conditions of the Bond and the conditions of the Construction Contract. Putting aside the fact that the language of the November 21st letter is deficient on its face in declaring Durkin in default or providing a seven-day notice of termination, the City's position might be tenable if the parties to the two contracts were separate, non-overlapping and otherwise unaware of the obligations in both contracts. In this instance, however, it appears that Federal and Durkin were at all times aware of the obligations imposed in both the Construction Contract and the Bond. It is clear that the "considering declaring" provision of the Bond functions to initiate a conflict-resolution process that could potentially obviate a declaration of default.FN3 Further, the parties proceeded to carry out these steps ostensibly to resolve the conflicts. For these reasons, it is unreasonable to suggest that the November 21st letter was notice under Paragraph 3.1 of the Bond, and at the same time, notice under Section 15.2 of the Construction Contract. The procedural requirements of Paragraph 3.1 are expressly before a declaration of default and the requirement of Section 15.2 of the Construction Contract must necessarily be a declaration of default or intent to terminate.

> FN3. This conclusion is supported by the last provision in paragraph 3.1: If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequent to declare a Contractor Default.

**\*9** Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed. Sav. & Loan, Inc. v. Krajl, 968 F.2d 500, 503 (5th Cir.1992).* On the pleadings and exhibits alone, the court holds that it seems unlikely that a reasonable jury could find for the City on the notice of termination issue. Where there may have been some

appearance of a genuine issue on the pleadings before, the deposition testimony of the City's 30(b)(6) witness puts the issue to rest. Thus, taking into consideration the judicial admissions, the admissions of the City's 30(b)(6) witness, and the written record of pleadings and exhibits, the court concludes that a reasonable jury could not find for the non-movant City on the notice issue.

**\*9** As such, the court will vacate its September 2nd Order FN4 and April 5th Order, and will grant summary judgment to Federal and partial summary judgment to Durkin, with respect to the failure to provide seven-day notice to terminate as required by the Construction Contract.

> FN4. The City correctly notes in its Answer to Durkin's Motion for Partial Summary Judgment that Durkin also seeks summary judgment on the issue of whether Newark had actual cause to terminate the Construction Contract. The Court does not grant such relief in this Order. Partial summary judgment in favor of Durkin is limited to the allegation that the City did not satisfy the notice requirement of the Construction Contract before terminating Durkin. Summary judgment is not, however, granted as to the allegation that City lacked the proper legal and factual basis for terminating Durkin or, in the City's view, that Durkin failed to perform. That dispute is not appropriately resolved on summary judgment with this record.

## VI. CONCLUSION

**\*9** For the aforementioned reasons, the court will grant Federal's motion for summary judgment and will grant in part and deny in part Durkin's motion for partial summary judgment on the notice of termination issue.

## *ORDER*

**\*9** For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:
**\*9** 1. Federal's Motion for Reconsideration (D.I.136) is GRANTED.
**\*9** 2. Federal's *Motion in Limine* (D.I.163) to exclude the errata sheets of Ms. Carol Houck is GRANTED.
**\*9** 3. Federal's *Motion in Limine* (D.I.165) to exclude

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2724882 (D.Del.)
(Cite as: Slip Copy)

Page 8

the "February 4th Letter" is GRANTED in part and DENIED in part.

**\*9** 4. Durkin's *Motion in Limine* (D.I.190) regarding the judicial admission of the City of Newark is GRANTED.

**\*9** 5. The Court's September 2, 2004 Order denying plaintiff's partial summary judgment (D.I.63) is VACATED.

**\*9** 6. The Court's April 5, 2006 Order denying summary judgment (D.I.132) is VACATED.

**\*9** 7. Federal's Motion for Summary Judgment (D.I.122) is GRANTED.

**\*9** 8. Durkin's Motion for Partial Summary Judgment (D.I.36) is GRANTED in part and DENIED in part.

D.Del.,2006.
Donald M. Durkin Contracting, Inc. v. City of Newark
Slip Copy, 2006 WL 2724882 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1813932 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants City of Newark, its Mayor and Council in Opposition to Third-Party Defendant Federal Insurance Company's Motion for Reconsideration and Reargument (May 3, 2006) Original Image of this Document (PDF)

• 2006 WL 1182431 (Trial Motion, Memorandum and Affidavit) Answering Brief of Defendants City of Newark, its Mayor and Council in Opposition to Third-Party Defendant Federal Insurance Company's Motion for Summary Judgment (Mar. 24, 2006) Original Image of this Document (PDF)

• 2005 WL 2385642 (Trial Motion, Memorandum and Affidavit) Answer of Donald M. Durkin Contracting, Inc. to the Motion for Protective Order by the City of Newark (Jul. 25, 2005) Original Image of this Document (PDF)

• 1:04cv00163 (Docket) (Mar. 16, 2004)

• 2004 WL 3778009 (Trial Motion, Memorandum and Affidavit) Motion of Third-Party Defendant, Federal Insurance Company, for Summary Judgment (2004) Original Image of this Document (PDF)

• 2004 WL 3778010 (Trial Motion, Memorandum and Affidavit) Opening Brief of Third-Party Defendant, Federal Insurance Company, in Support of its Motion for Summary Judgment (2004) Original Image of this Document (PDF)

• 2004 WL 3778011 (Trial Motion, Memorandum and Affidavit) Reply Brief of Third-Party Defendant, Federal Insurance Company, in Support of its Motion for Summary Judgment (2004) Original Image of this Document (PDF)

• 2004 WL 3822695 (Trial Motion, Memorandum and Affidavit) Opening Brief of Third-Party Defendant, Federal Insurnace Company, in Support of its Motion for Reconsideration and Reargument (2004) Original Image of this Document (PDF)

• 2004 WL 4056030 (Trial Motion, Memorandum and Affidavit) Reply Brief of Third-Party Defendant, Federal Insurance Company, in Support of its Motion for Reconsideration and Reargument (2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**TO ALL TO WHOM** these presents may come, I, **Mark Kober-Smith**, Notary Public, of 6 Carlos Place London W1K 3AP, England duly admitted and sworn

**DO HEREBY CERTIFY** that the attached Affidavit was sworn before me by **BRETT CORMICK**

**IN FAITH AND TESTIMONY** whereof I the said notary have put my name and affixed my seal of office at London this 18th day of May 2006

**KOBER-SMITH & ASSOCIATES – NOTARY PUBLIC**
6, Carlos Place London W1K 3AP
TEL : 020 7499 2605 FAX: 0207 907 9939
WEB: www.notarypublicinlondon.com
EMAIL: notary@notarypublicinlondon.com

## AFFIDAVIT

I, BRETT CORMICK, a Director for the corporation, Elan Suisse, (Pty), Ltd., (hereinafter referred to as "Elan") state the following according to my best information, knowledge and belief.

I am a person with extensive experience and an excellent worldwide reputation in the International Financial Services industry. During the past fifteen (15) years, I was employed by some of the biggest financial firms in the world, owned my own division of a bank and am registered as a fully accredited and licensed international asset manager and financial engineer. I was a managing director of the ABM Amro Bank Group, one of the biggest banks in the world, in their Merchant Banking arm Mees Pierson. I was a consulting Director of Corporate Finance within the Electra Group, one of the largest private equity firms in Europe; the Chairman & CEO of Trust Bank Investment Services and a Director within the Hambros Bank Group, based in London but working in every country in Europe.

I obtained my doctorate in economics, completed post doctoral studies at the Graduate School of the London School of Economics and Political Science Department of Finance and Accounting, where I authored a university text book on Macroeconomics and Political Economic Theory, and have lectured worldwide at business schools and universities in the financial services industry. As such, I have gained vast experience in the creation, development, marketing, licensing and distribution of financial services products. As an Australian citizen, I also attended the Australian Royal Military College, on a full commonwealth scholarship, and served as an officer in the Australian Military for over ten years

I have completed professional studies at Harvard Business School, INSEAD the European Institute for Business Administration, Oxford University, The London School of Economics, CIMA at The London Business School, The Imperial College of Science Technology and Medicine London University and the International Centre for Monetary and Banking Studies in Geneva.

Approximately three (3) years ago, as part of a suite of new investment asset classes and products I had developed, for international investors not able to access these types of assets classes previously, I created an investment product ("the product") that effectively provides a safe investment vehicle for international retail and institutional investors wishing to invest in US dollars, by investing in short duration AAA bonds underwritten by the government of the USA (the investment with the lowest risk one can attain in the international bond market).

The product is one of the trade secrets of Elan . Accordingly, I set up the Elan Suisse Group ("the group") as a structure to facilitate the marketing, engineering, structuring, development, licensing, distribution, administration, management, placement and selling of the product, and others with it. The group consists, in chief, of Elan in South Africa, a

fully registered and licensed asset management company and a similarly named private company in the US. The U.S. company is Elan Suisse International Holdings ( USA, LLC). The intellectual property of Elan, consisting in the main of the product and the customer data base built up from the sale of the product in the South African retail investment market, will be held by the entity registered thereon in the US.

Thus Elan was set up and incorporated during or about July 2003. I also started negotiations with the Financial Services Board of South Africa ("the FSB") in order to ensure that Élan obtain the necessary statutory approval for its proposed activities, and the individual registration of the underlying product bases. The approval was initially granted to myself on the 13th of May 2003 in my personal capacity, as appears from the letter from FSWB to myself attached hereto. Later, during or about September 2004, the same approval was granted to Elan, as appears from an e-mail from the FSB attached hereto. The registration number of Elan with the FSB is 852. I funded the setting up of Elan within the structure as is set out above. By the beginning of 2004, the cost was approximately $1.6 million dollars.

This had resulted in the creation of a national monopoly for Elan on the product for the entire South African finance market, and was subsequently approved for sale and national distribution by some of the largest banks and financial institutions in South Africa entailing well over two years work just to this point. The time came to set up and incorporate the entity in the US as part of the structure as set out above.

I knew Robert Christ (hereinafter "Christ") since 1996, and, in the normal course of correspondence between us, I informed him of the product, its regulatory approval, the subsequent national monopoly on the asset class, its acceptance for distribution by some of the largest and most prestigious financial institutions in South Africa, and the structure for the sale thereof as is set out above.

From the beginning of 2004, several discussions ensued between me and Christ in this regard. The result was that, during or about February 2004, Christ and I agreed that an entity in the form of a corporation would be incorporated in Delaware in the US; and that Christ would invest $350,000.00 in this entity. In return for his said investment in the said entity, Christ would receive 50% of the equity shareholding interest. Christ would represent the said entity in the US and assist with the development thereof by attending to issues such as marketing, completing due diligence on prospective sub managers, managing the investor base, public relations, the intellectual property, and the product would be seated in the said entity as part of the strategy as is set out above. And on the sale of the said entity in the US, Christ would receive a further amount equal to his initial investment and profits therefrom.

These were the terms of the agreement between myself and Christ. Christ traveled to Cape Town, where over a period of several days, we discussed this agreement in complete detail. During said discussion on a day trip to Stellenbosch, approximately during January 2004, I specifically made it clear to Christ that he invests his money in the

entity incorporated in the US alone; he has nothing to do with Elan in its day to day activities, and he receive no equity in Elan. His only link to Elan would be when it is sold, together with the entity incorporated in the US, as part of the aforesaid strategy; and he is only authorized to represent the entity incorporated in the US. It is on the basis of this oral agreement that Christ invested $250,000.00 in the entity that was incorporated in the US as Elan Suisse International Holdings ("Holdings").

As set out above, I have been occupied with the business of Elan and Holdings for the past three (3) years on a full time basis. Christ, as will appear more fully hereunder, repeatedly confirmed his investment. Although he invested less than originally agreed, he confirmed his share as a 36% equity owner which represented the $250,000.00 invested. In a series of e-mails that passed between myself and Christ from the 28th of January 2004 to the 14th of February 2004, I advised Christ and represented that I have spent the previous two (2) years setting up Elan in South Africa as a financial engineering company, with a national network of independent financial advisors ("brokers") and institutions, in South Africa. I had already invested some $1,600,000.00 in setting up the business of Elan and I was looking for an investor to enable me to complete the project from the US end.

The discussion centered around an investment in Holdings, and I explained the entire structure and the exit strategy as is set out above to Christ, who accepted this as an experienced financial person as he holds a CPA qualification. I emphasized that the discussion was not limited to e-mails that passed between myself and Christ, it was supplemented by our oral conversations, resulting in the aforesaid agreement, for which Christ traveled to Stellenbosch specifically to discuss same with me, while visiting Cape Town for personal reasons. From the very beginning, and as was made clear in Stellenbosch, I held out to Christ that his investment is governed by the Articles of Association of Holdings, and I supplied him with a draft copy of same for his review with other supporting documentation including South African financial institutional support for the products, regulatory approval etc. As a CPA, Christ was aware of this and accepted this fully, as appears from his later e-mail of 17 September 2004, copy attached, and his e-mail dated 18 September 2004, copy which is attached, from which he clearly indicates that he knows his investment must be "liquidated" through the sale of his shares.

Sometime in the month of September, Robert Christ started operating a Website "elan suisse.co.za.". He is not authorized by the Elan or Holdings to operate this Website. Since the above date, and at least through April 2006, he has posted extremely defamatory statements on this Website regarding myself, Elan Suisse and associated companies and their investors and employees.

Christ apparently has done this to try and force Holdings and/or Elan to buy out his interest in Holdings. He is attempting to extort money from Elan and blackmail its affiliates, associates and officers. Christ is posting defamatory material on the website in hopes that the Elan Company or its associates will buy out his interest.

Chist's actions in this regard, however, have caused Elan, Holdings and its associates to suffer harm such that if Christ is not stopped from such actions, and the Website shut down, the harm will be irreparable. To date, Christ's actions of posting on the Website have resulted in:

- The collapse and withdrawal from the market after 3 years work of the first Short Duration AAA US Bond Fund ever to receive regulatory approval for launch in South Africa

- The irreparable loss to Elan of a national monopoly of this asset class

- The permanent  destruction of all working relationships formed over a 3 year period with the largest financial institutions and broker networks in South Africa

- The loss to the national retail and institutional markets in South Africa in millions of dollars in investment returns

- The collapse and withdrawal from the market of the first Bio Pharma Investment fund of its kind in the world

- The collapse and withdrawal from the market of the first REIT Fund in South Africa

- The irreparable loss to Elan of an international monopoly of this asset class

- The collapse and withdrawal from the market of the first investment fund of its kind in South Africa to convert South African Rands into hard currency returns

- The complete operational shut down of Elan in South Africa

- The loss of jobs and professional industry credibility and reputation for professional staff who resigned from high ranking positions in industry and finance to work for Elan

- The collapse and withdrawal of the first CDO Fund ever to be launched in South Africa

- Permanent collapse of negotiations with regional governments wishing to participate in the above mentioned product including the governments of Lesotho, Swaziland, Botswana and Seychelles

- The deliberate destruction of Elan as a viable operating entity after millions of dollars of development and years of work

- The deliberate destruction of Elan as an investment for its shareholders (including Christ who has destroyed his own investment and ability to liquidate his stock)

-    The irreparable loss of professional relationships with some of the largest
financial institutions in Europe after 15 years relationship building

18 MAY 2006.

**BRETT CORMICK**
Director for Elan Suisse Group

Sworn to and subscribed

before me this _18th_ day

of _May_____, 2006.
Notary Public

MARK KOBER - SMITH - NOTARY PUBLIC
6 CARLOS PLACE, LONDON W1K 3AP
TEL: 020 7499 2605
notarypublicinlondon.com



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 9, 2007, Defendant's Reply

Memorandum of Law in Support of His Motion to Consolidate Actions was electronically filed

with the Clerk of Court using CM/ECF, which will send notification of such filing to the

following counsel of record:

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE  19801-1155


REED SMITH LLP


*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Defendant

Dated:  March 9, 2007

WILLIB-52250.1