IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

**ANSWERING BRIEF OF ROBERT D. CHRIST REGARDING THE MOTION OF BRETT J. CORMICK, ELAN SUISSE INTERNATIONAL HOLDINGS (USA) LLC AND ELAN SUISSE LTD. TO DETERMINE APPLICABLE LAW**

REED SMITH LLP

Thad J. Bracegirdle (No. 3691)
Katharine V. Jackson (No. 4800)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated:  September 10, 2007

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ...........................................................................1

STATEMENT OF FACTS ..............................................................................2

    A.   The Parties............................................................................2

    B.   Mr. Christ's Claims ................................................................3

    C.   Elan Suisse's Claims .............................................................5

    D.   Mr. Cormick's and Elan Suisse USA's Claims ..............................5

ARGUMENT ...............................................................................................7

I.    ALL CONTRACT CLAIMS SHOULD BE DETERMINED PURSUANT TO DELAWARE LAW ....................................................................7

    A.   The Applicable Standard.........................................................7

    B.   Analysis .............................................................................9

II.    MR. CHRIST'S FRAUD CLAIM SHOULD BE DETERMINED PURSUANT TO DELAWARE LAW ...................................................................12

    A.   The Applicable Standard.........................................................12

    B.   Analysis .............................................................................14

III.    DEFENDANTS' DEFAMATION CLAIMS SHOULD BE DETERMINED PURSUANT TO DELAWARE LAW ................................................15

    A.   The Applicable Standard.........................................................16

        1.   South African Defamation Law ........................................18

        2.   Defamation Law in the United States ...................................20

    B.   Analysis .............................................................................20

CONCLUSION ............................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abadian v. Lee*
    177 F. Supp.2d 481 (D. Md. 2000) ............................................................................. 21

*Assist Stock Mgmt. L.L.C. v. Rosheim*
    753 A.2d 974 (Del. Ch. 2000) ................................................................................ 11

*AT&T Wireless Services, Inc. v. Fed. Ins. Co.*
    2007 WL 1849056 (Del. Super. June 25, 2007) ..................................................... 7, 10

*Bickling v. Kent Gen. Hosp., Inc.*
    872 F. Supp.1299 (D. Del.1994)....................................................................... 16, 18, 19

*Cerullo v. Harper Collins Pubs., Inc.*
    2002 WL 243387 (Del. Super. Feb. 19, 2002) ........................................................... 16

*Christ v. Cormick*
    2007 WL 2022053 ................................................................................................ passim

*Clark v. Kelly*
    1999 WL 458625 (Del. Ch. June 24, 1999) ............................................................... 11

*David B. Lilly Co., Inc. v. Fisher*
    18 F.3d 1112 (3d Cir. 1994) .................................................................................... 7, 12

*Doe v. Cahill*
    884 A.2d 451 (Del. 2005) ............................................................................................ 25

*Douzinas v. American Bureau of Shipping, Inc.*
    888 A.2d 1146 (Del. Ch. 2006) ................................................................................... 12

*Dymond v. Nat'l Broad. Co.*
    559 F. Supp.734 (D. Del. 1983)................................................................................... 16

*Eby v. Thompson*
    2005 WL 1653988 (Del. Super. Apr. 20, 2005) ........................................................ 7, 8

*Elan Suisse Ltd. v. Christ*
    2006 WL 3838237 (E.D. Pa. Dec. 29, 2006).................................................................. 3

*Falkenberg Capital Corp. v. Dakota Cellular, Inc.*
    925 F. Supp. 231 (D. Del. 1996)................................................................................. 7, 8

*Gertz v. Robert Welch, Inc.*
    418 U.S. 323 (1974)..................................................................................................... 20

*Hurst v. Gen. Dynamics Corp.*
    583 A.2d 1334 (Del.Ch. 1990) ................................................................................. 8, 12

*IIT v. Vencap, Ltd.*
    519 F.2d 974 (2d Cir. 1975) ........................................................................................ 15

*Khumalo v. Holomisa*
    2002 (5) SA 401 (CC) (S. Afr.) ............................................................. 18, 20

*Lony v. E.I. DuPont de Nemours & Co.*
    886 F.2d 628 (3d Cir. 1989) ................................................................ 7

*McIntyre v. Ohio Elections Comm'n*
    514 U.S. 334 (1995) ............................................................................ 25

*Milkovich v. Lorain Journal Co.*
    497 U.S. 1 (1990).......................................................................... 20, 22

*Nat'l Media Ltd. v. Bogoshi*
    1998 (4) SA 1076 (CC) (S.Afr.) .......................................................... 19

*Osby v. A&E Television Networks*
    1997 WL 338855 (E.D. Pa. June 17, 1997) ........................................ 21

*Philadelphia Newspapers, Inc. v. Hepps*
    475 U.S. 767 (1986)............................................................................ 20

*Pig Improvement Co., Inc. v. Middle States Holding Co.*
    943 F. Supp. 392 (D. Del. 1996)..................................................... 7, 12

*SEC v. Kasser*
    548 F.2d 109 (3d Cir. 1977) ............................................................... 15

*Spence v. Funk*
    396 A.2d 967 (Del. 1974) ................................................................... 20

*Sumner Sports Inc. v. Remington Arms Co., Inc.*
    1993 WL 67202 (Del.Ch. Mar. 4, 1993) .............................................. 8

*Travelers Indem. Co. v. Lake*
    594 A.2d 38 (Del. 1991) ......................................................... 7, 12, 16

*Zerman v. Sullivan & Cromwell*
    677 F. Supp. 1316 (S.D.N.Y. 1988) ................................................... 17

**Statutes**
6 *Del. C.* § 18-101(7) ........................................................................ 11

**Other Authorities**
Burchell, Jonathan A., *The Law of Defamation in South Africa*
    327 (1985)........................................................................................... 19

Diwan, Mohammed A., Note, *Conflict Between State Legal Norms and Norms Underlying Popular Beliefs: Witchcraft in Africa as a Case Study*
    14 Duke J. Comp. & Int'l L. 351 (2004) ............................................ 19

Docherty, Bonnie, *Defamation Law: Positive Jurisprudence*
    13 Harv. Hum. Rts. J. 263 (2000) ...................................................... 19

du Bois, François and Visser, Daniel, *The Influence of Foreign Law in South Africa*
    13 Transnat'l L. & Contemp. Probs. 593, 644-8 (2004)...................... 19

Futh, Delisa, *DuPlessis v. De Klerk: South Africa's Bill of Rights and the Issue of Horizontal Application*, 22 N.C. J. Int'l L. & Com. Reg. 1009 (1997) ........................ 19

Grimsley, Michael S., Note, *Defamation of Public Figures: Is New York Times Outdated?*
10 Fla. J. Int'l L. 293 (1995) ...................................................................................... 19

Roederer, Christopher, *The Transformation of South African Private Law After Ten Years of Democracy: The Role of Torts (Delict) in the Consolidation of Democracy*
37 Colum. Hum. Rts. L. Rev. 447, 513 (2006) ............................................................ 19

**Treatises**
50 Am. Jur. 2d *Libel and Slander* § 17 ........................................................................ 17

Restatement (Second) of Conflict of Laws .............................................................. passim

## SUMMARY OF ARGUMENT

1.      The contract claims alleged in this action should be resolved according to Delaware law.  Because this Court resolves conflicts of law according to the law of the forum state, it should employ Delaware's "most significant relationship" test to determine the governing law.  An analysis using this test, which includes factors involving both physical contacts and public policy, indicates that Delaware is the forum with the most significant relationship to the parties' contract claims.

2.      Delaware courts likewise employ the "most significant relationship" to analyze choice of law conflicts for tort claims.  Under this test, Delaware law should apply to Mr. Christ's fraud claim.

3.      Delaware law also applies to defendants' defamation claims, which relate to the broadcast of information across international borders via the Internet and, as such, do not implicate one forum more significantly than any other.  Moreover, it is especially important that the Court apply Delaware law to the defamation claims, rather than South African law, because South Africa fails to afford the same respect for and protection of free speech as does the United States.

## STATEMENT OF FACTS

### A.     The Parties.

Robert D. Christ is an individual who currently is a citizen of Louisiana but, at the

time of many of the events giving rise to this litigation, was a citizen of Pennsylvania.

*See* Am. Compl. ¶ 1 (D.I. 29); Affidavit of Robert Christ dated June 23, 2006 ("Christ

Aff.") ¶ 3 (D.I. 22).

Brett J. Cormick is a citizen of Australia who, according to statements he has

made to Mr. Christ and others, resides alternatively in the United Kingdom and in the

Republic of Zimbabwe.  Am. Compl. ¶ 2.  Mr. Cormick also has represented at various

times that he resides in Hermanus, South Africa as well as in Gauteng, near

Johannesburg, South Africa.  Christ Aff. ¶¶ 4-5 & Ex. A ¶ 7.3.  Mr. Cormick claims

currently to be a legal resident of Zimbabwe but now resides in an undisclosed location

outside of that country.  *See* Declaration of Brett J. Cormick dated August 20, 2007

("Cormick Decl.") ¶ 8 (D.I. 52-2).[1]

Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA") is a

Delaware limited liability company.  Am. Compl. ¶ 3; Ans. & Counterclaims ¶ 3 (D.I.

47).  Mr. Cormick is the sole member of Elan Suisse USA.  *Id.*

Elan Suisse Ltd. ("Elan Suisse") is the plaintiff in C.A. No. 07-60-GMS and an

entity which Mr. Cormick alternatively has represented to the Court (depending on the

circumstances and as it suits Mr. Cormick's purposes) as being incorporated under either

---

[1] Interestingly, while Mr. Cormick claims that he has "had to seek residence outside of
Zimbabwe" since his allegedly wrongful arrest in August 2006 (Cormick Decl. ¶ 8), in
March 2007 he submitted a separate affidavit in this action which he executed *in
Zimbabwe*. *See* Declaration of Brett J. Cormick dated March 2, 2007 ¶ 5 (D.I. 20-1 in
C.A. No. 07-60-GMS).

the laws of the United Kingdom or South Africa. For example, the complaint in C.A. No. 07-60-GMS (as verified by Mr. Cormick) identifies Elan Suisse as "a corporation formed and organized under the laws of the Republic of South Africa." Compl. ¶ 1 (D.I. 1 in C.A. No. 07-60-GMS). During oral argument before the U.S. District Court for the Eastern District of Pennsylvania, counsel for Elan Suisse admitted that, in fact, it was the same entity as Elan Suisse (Pty) Ltd., an original defendant in C.A. No. 06-275-GMS, the first action filed in this Court. *See Elan Suisse Ltd. v. Christ*, 2006 WL 3838237, at *3 (E.D. Pa. Dec. 29, 2006). However, after C.A. No. 07-60-GMS was transferred to this Court and Mr. Christ moved to have it consolidated with C.A. No. 06-275-GMS, Mr. Cormick vehemently disclaimed his counsel's statements and affirmed under penalty of perjury that Elan Suisse "is a private limited company organized and existing under the laws of England." Declaration of Brett J. Cormick dated March 2, 2007 ¶ 3 (D.I. 20-1). Now, however, in support of his Motion to Determine Applicable Law, Mr. Cormick has changed tack yet again and states that Elan Suisse "is a South African business entity." Op. Mem. at 2 (D.I. 52).

### B.    Mr. Christ's Claims.

On April 27, 2006, Mr. Christ initiated this litigation by filing the complaint in C.A. No. 06-275-GMS alleging claims of fraud, promissory estoppel, breach of contract and civil conspiracy against Mr. Cormick, Elan Suisse USA, Elan Suisse (Pty) Ltd., Nicogel Ltd. ("Nicogel"), John Walters, Dianne Marshall and Mercari Financial Services (Pty) Ltd. ("Mercari").[2] Mr. Christ alleges, among other things, that in January 2004 he

---

2 On July 10, 2007, the Court granted in part defendants' motion to dismiss C.A. No. 06-275-GMS, holding that Elan Suisse (Pty) Ltd., Nicogel, Mr. Walters, Ms. Marshall and

*(Continued on following page)*

-3-

and Mr. Cormick met in Cape Town, South Africa to discuss Mr. Christ's potential

investment in a purported business opportunity devised by Mr. Cormick.  Am. Compl. ¶

15.  Mr. Christ further alleges that, during January and February 2004, he and Mr.

Cormick exchanged numerous e-mails in which Mr. Cormick made multiple intentional

misrepresentations concerning his credentials and his purported business venture and

through which Mr. Christ and Mr. Cormick negotiated the terms of Mr. Christ's

"investment" in that venture.  *See id.* ¶¶ 16-18.  These negotiations culminated in a

written proposal by Mr. Cormick on February 15, 2004 pursuant to which Mr. Christ,

among other things, would invest cash in exchange for equity interests in Elan Suisse

USA and Elan Suisse (Pty) Ltd.  *Id.* ¶18.  Mr. Christ and Mr. Cormick also discussed Mr.

Christ's purported investment during a face-to-face meeting in London, England in early

March 2004.  *Id.*  In March 2004, in reliance upon Mr. Cormick's multiple

misstatements, Mr. Christ wired an initial investment of $250,000 (in two separate

payments of $125,000 each) to Mr. Cormick's personal bank account in London pursuant

to his instructions.  *Id.* ¶ 19.  However, Mr. Christ never received equity shares of Elan

Suisse USA or Elan Suisse (Pty) Ltd. in exchange for his $250,000 investment.  *Id.* ¶ 20.

Nor has Mr. Cormick complied with an agreement he reached with Mr. Christ in

November 2004 to repay Mr. Christ's $250,000.  *Id.*

---

*(Continued from previous page)*

Mercari were not subject to the Court's personal jurisdiction and dismissing those parties
from this action as well as Mr. Christ's claim for civil conspiracy.  *See Christ v. Cormick*,
2007 WL 2022053 (D. Del. July 10, 2007).

### C.    Elan Suisse's Claims.

Following his discovery of Mr. Cormick's fraudulent scheme, Mr. Christ began to investigate the veracity of Mr. Cormick's claims concerning his personal credentials and the Elan Suisse business venture. *See* Christ Aff. dated Sept. 11, 2006 ¶ 5 (D.I. 2-3 in C.A. No. 07-60-GMS). As a result of that investigation, Mr. Christ learned that Mr. Cormick was a well-traveled and sophisticated con artist who had fabricated virtually all of his academic and professional experience and had defrauded numerous other individuals through similar "investment" schemes. *See id.* In order to notify the public of Mr. Cormick's misdeeds and prevent others from being misled as he had been, Mr. Christ began publishing his findings on a website, *www.elansuisse.co.za. See id.* ¶¶ 4, 6-7.

On June 23, 2006, Elan Suisse filed a complaint against Mr. Christ in the Court of Common Pleas of Montgomery County, Pennsylvania alleging that certain statements posted by Mr. Christ on the *www.elansuisse.co.za* website concerning Mr. Cormick and Elan Suisse were defamatory and constituted commercial disparagement. *See* Compl. ¶ 10. In this action – which subsequently was removed to the U.S. District Court for the Eastern District and later transferred to this Court, where it is styled *Elan Suisse Ltd. v. Christ*, C.A. No. 07-60-GMS – Elan Suisse also alleges that Mr. Christ's use of the *www.elansuisse.co.za* domain name violates Sections 43(a)(1)(A) and 43(d)(1)(A) of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) and 1125(d)(1)(A). *See id.* ¶¶ 19-24.

### D.    Mr. Cormick's and Elan Suisse USA's Claims.

On July 20, 2007, Mr. Cormick and Elan Suisse USA answered Mr. Christ's complaint in C.A. No. 06-275-GMS and asserted counterclaims against Mr. Christ. Among other things, Mr. Cormick and Elan Suisse USA alleged in their counterclaims

that certain statements on the *www.elansuisse.co.za* website are defamatory.  *See* Ans. &

Counterclaims ¶¶ 94-95, 139-44 (D.I. 47).  Elan Suisse USA also seeks monetary and

declaratory relief concerning Mr. Christ's alleged breaches of Elan Suisse USA's

purported operating agreement.  *See id.* ¶¶ 146-53.[3]

---

[3] Mr. Cormick also alleged counterclaims for violation of the Alien Tort Claims Act, for false imprisonment and for intentional infliction of emotional distress.  *See* Ans. & Counterclaims ¶¶ 123-37.  The parties have stipulated, however, as to the law governing each of these claims.  *See* Op. Mem. at 7.

**ARGUMENT**

**I.    ALL CONTRACT CLAIMS SHOULD BE DETERMINED PURSUANT TO DELAWARE LAW.**

The contract claims alleged by Mr. Christ (*i.e.*, promissory estoppel and breach of contract) and Elan Suisse USA (*i.e.*, breach of contract and declaratory judgment) should be adjudicated pursuant to Delaware law because Delaware is the forum that possesses the most significant relationship to those claims.

**A.    The Applicable Standard.**

Where (as here) a federal court's subject matter jurisdiction is based on diversity, it will follow the choice of law rules of the forum in which the court sits. *See, e.g., David B. Lilly Co., Inc. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. 1994); *Lony v. E.I. DuPont de Nemours & Co.*, 886 F.2d 628, 642 (3d Cir. 1989); *Falkenberg Capital Corp. v. Dakota Cellular, Inc.*, 925 F. Supp. 231, 235 (D. Del. 1996). Delaware courts, when determining the law applicable to contract claims, look to the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws (hereinafter the "Restatement"). *See, e.g., Falkenberg*, 925 F. Supp. at 235 (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del. 1991)); *Pig Improvement Co., Inc. v. Middle States Holding Co.*, 943 F. Supp. 392, 396 (D. Del. 1996); *AT&T Wireless Services, Inc. v. Fed. Ins. Co.*, 2007 WL 1849056, at *2 (Del. Super. June 25, 2007); *Eby v. Thompson*, 2005 WL 1653988, at *1 (Del. Super. Apr. 20, 2005).[4]

---

[4] Some Delaware courts have acknowledged an alternative test that considers the place of contract formation; however, more recent and prevalent authority supports using the Restatement approach, recognizing that "[s]tate and national boundaries are of less significance today by reason of the increased mobility of our population and of the increasing tendency of men to conduct their affairs across boundary lines." *Travelers,*

*(Continued on following page)*

The Restatement's most significant relationship test considers five factors:  (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.  Restatement (Second) Conflict of Laws § 188 (1971).  *See also, e.g., Falkenberg*, 925 F. Supp. at 235; *Sumner Sports Inc. v. Remington Arms Co., Inc.*, 1993 WL 67202, at *3 (Del.Ch. Mar. 4, 1993). The Restatement also provides that a court should consider several factors generally relevant to any conflicts of law analysis:

    (1)    the needs of the interstate and international systems;

    (2)    the relevant policies of the forum;

    (3)    the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

    (4)    the protection of justified expectations;

    (5)    certainty, predictability and uniformity of result; and

    (6)    ease in the determination and application of the law to be applied.

Restatement (Second) Conflicts of Laws § 6.  *See also, e.g., Eby*, 2005 WL 1653988, at *1-2.

---

*(Continued from previous page)*

594 A.2d at 44.  *See also, e.g., Hurst v. Gen. Dynamics Corp.*, 583 A.2d 1334, 1338 n.5 (Del.Ch. 1990) (indicating that Delaware courts, in claims sounding in contract, applied a place of formation test in earlier authorities but a most significant relationship test in later authorities); *Falkenberg*, 925 F. Supp. at 235 ("Delaware applies the 'most significant relationship' approach of the Restatement (Second) Conflict of Laws to resolve choice of law issues sounding in contract.").

B.    <u>Analysis.</u>

Application of the most significant relationship test demonstrates that Delaware law, rather than the law of South Africa or Zimbabwe, should govern Mr. Christ's contract claims.  As Mr. Cormick and Elan Suisse USA concede (*see* Op. Mem. at 4-5), the facts underlying Mr. Christ's contract claims involve meetings and communications that span the globe and implicate several international jurisdictions, including Pennsylvania, the United Kingdom, Zimbabwe and South Africa.  None of these forums, however, have such a significant relationship to Mr. Christ's claims as to override Delaware's substantial interest in adjudicating a dispute involving the formation of a Delaware limited liability company and the contractual rights of the purported members of that entity.

As a preliminary matter, Mr. Christ's contract claims simply cannot be separated from the underlying fraud perpetrated through the creation of Elan Suisse USA under Delaware law.  As the Court acknowledged in denying Mr. Cormick's motion to dismiss, Elan Suisse USA was formed for the sole purpose of inducing Mr. Christ to transfer $250,000 to Mr. Cormick in exchange for the illusory prospect of owning equity shares of Elan Suisse USA.  *See Christ v. Cormick*, 2007 WL 2022053, at *5; *see also* Am. Compl. ¶¶ 18-20.  Any promissory estoppel claim arises directly from this inducement.  Moreover, Mr. Christ's breach of contract claim is a direct result of his attempt to extricate himself from the defendants' fraud.  To adjudicate the promissory estoppel and breach of contract claims under different laws than the underlying fraud risks uncertain and inconsistent judgments.  Put simply, it would be "illogical" to "allow a ... fraud claim to be governed by a different state simply because it was a tort action when it ...

only arose due to the contractual relationship of the parties." *AT&T Wireless*, 2007 WL 1849056, at *3.

Nonetheless, even if the Court should regard separately Mr. Christ's contract claims in its most significant relationship analysis, Delaware law still should govern those claims because Delaware is the forum that has the greatest interest in resolving them. As defendants acknowledge, the negotiations regarding Mr. Christ's "investment" in Elan Suisse and Elan Suisse USA took place during meetings in South Africa and London (*see* Op. Mem. at 4; Cormick Decl. ¶¶ 2-3) and through e-mails between Mr. Christ in Pennsylvania and Mr. Cormick in Zimbabwe and South Africa (*see* Op. Mem. at 4; Cormick Decl. ¶ 2; Am. Compl. at ¶¶ 16-17). Mr. Christ wired funds from his United States bank account to Mr. Cormick's personal account in London. *See* Christ Aff. Ex. B; Cormick. Decl. ¶ 4. In reliance upon Mr. Cormick's fraudulent misrepresentations, Mr. Christ also worked on developing an Elan Suisse website in Pennsylvania. *See* Op. Mem. at 4; Cormick Decl. ¶ 12; Am. Compl. ¶ 26. Mr. Cormick's subsequent agreement to repay Mr. Christ's funds similarly was negotiated via e-mails between Pennsylvania and Zimbabwe. *See* Op. Mem. at 5; Cormick Decl. ¶ 5. Since the facts underlying Mr. Christ's contract claims occurred in multiple locations, the significance of those facts in the conflict analysis is weakened. *See* Restatement (Second) Conflicts of Laws § 188, cmt. e (recognizing that "the place of performance can bear little weight in the choice of the applicable law when … performance by a party is to be divided more or less equally among two or more states" and "[place of negotiation] is of less importance when there is no one single place of negotiation and agreement, as, for

example, when the parties do not meet but rather conduct their negotiations from separate

states by mail or telephone").

By contrast, Delaware has a strong interest in policing and governing the use, or

misuse, of business entities created and organized pursuant to its laws. *See Christ v.*

*Cormick,* 2007 WL 2022053, at *5; *Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974,

980 (Del. Ch. 2000). Both Sections 6 and 188 of the Restatement recognize the

importance of this factor, particularly where, as here, no other single jurisdiction has a

significant relationship to the underlying dispute. *See* Restatement (Second) Conflicts of

Laws §§ 6, 188 (cited *supra* at 8). Application of Delaware law to Mr. Christ's contract

claims not only will advance the policy interests of this forum, but also will promote the

ease of the determination and application of the governing law as well as the certainty,

predictability and uniformity of the result. *See id.* § 6.

Delaware's overriding interest in resolving disputes concerning business entities

governed by its laws likewise supports application of Delaware law to Elan Suisse USA's

contract claim. Resolution of Count V of defendants' counterclaims necessarily will

require a determination of whether and to what extent Mr. Christ was a member of Elan

Suisse USA and, accordingly, whether he agreed to and is subject to that entity's

purported operating agreement. *See* Ans. & Counterclaims ¶¶ 146-153. Under the

internal affairs doctrine, Delaware law must govern these issues. *See Clark v. Kelly*,

1999 WL 458625, at *4 (Del. Ch. June 24, 1999) (holding that internal affairs doctrine

required application of California law to determine equity ownership of a California

corporation which was a member of a Delaware limited liability company,

notwithstanding Delaware choice of law provision in operating agreement); *see also* 6

-11-

*Del. C.* § 18-101(7) (setting forth requirements for limited liability company agreements),

§ 18-301 (governing admission of members to limited liability companies). To the extent

resolution of Elan Suisse USA's claim implicates interpretation of the operating

agreement itself (assuming *arguendo* that the agreement is, in fact, valid), the law of

Zimbabwe – to the extent such law does not conflict with the Delaware Limited Liability

Company Act – would apply pursuant to the terms of the agreement. *See Douzinas v.*

*American Bureau of Shipping, Inc.*, 888 A.2d 1146, 1148 (Del. Ch. 2006) (enforcing

Texas choice of law provision in operating agreement of Delaware limited liability

company "except when the Delaware LLC Act requires the application of Delaware

law").

## II.     MR. CHRIST'S FRAUD CLAIM SHOULD BE DETERMINED PURSUANT TO DELAWARE LAW.

### A.     The Applicable Standard.

As is the case with contract claims, Delaware courts also apply the Restatement's

"most significant relationship" test to tort claims, including those sounding in fraud. *See,*

*e.g., Christ v. Cormick*, 2007 WL 2022053, at *6; *Pig Improvement Co.*, 943 F. Supp. at

396; *David B. Lilly Co.*, 18 F.3d at 1117; *Travelers*, 594 A.2d at 47; *Hurst*, 583 A.2d at

1338 n.5. Application of the most significant relationship test is particularly appropriate

here because, as explained by the Delaware Supreme Court, the doctrine of *lex loci* fails

to address the "tendency [of the parties] to conduct their affairs across boundary lines."

*Travelers*, 594 A.2d at 44. Even if the facts underlying Mr. Cormick's fraud could be

narrowed to a single location, the application of *lex loci* inappropriately would force the

Court to "[ignore] the substantive content of a jurisdiction's legal rules and instead

[focus] on the territorial aspects" of Mr. Christ's claims. *Id.* Regardless, the multi-

national nature of the parties' actions – which at a minimum implicate the United

Kingdom, Zimbabwe, South Africa, Pennsylvania and Delaware – makes the application

of *lex loci* impracticable.

The Restatement provides a detailed test to determine the governing law for fraud

and misrepresentation claims.  This test requires a court to consider at least the following

factors:

(a)    the place, or places, where the plaintiff acted in reliance on the
defendant's misrepresentations;

(b)    the place where the plaintiff received the misrepresentations;

(c)    the place where the defendant made the misrepresentations;

(d)    the domicile, residence, nationality, place of incorporation and
place of business of the parties;

(e)    the place where a tangible thing which is the subject of the
transaction between the parties was situated at the time; and

(f)    the place where the plaintiff is to render performance under a
contract which he has been induced to enter by the false
representation of the defendant.

Restatement (Second) Conflicts of Laws § 148(2).  In addition, the policies underlying

the conflicts analysis, as set forth in Section 6 of the Restatement and described *supra*,

apply with equal force to each of this test's factors.  *See id.* cmts. b, d.  As is true with the

contract claim analysis, the relative importance of each factor in considering a fraud

claim likewise is diminished when the operative facts occurred in more than one forum.

*See id.* cmts. f (a "[p]laintiff's action in reliance provides a more important contact when

it is confined to a single state than when it is divided among two or more"), g ("[T]he

making of representations provides a more important contact when the representations

are made only in one state than when they are made in two or more ….").

**B.    Analysis.**

Application of the Restatement to Mr. Christ's fraud claim makes clear that, like

the contract claims, Delaware law should govern.  Put simply, Mr. Cormick and Elan

Suisse USA still "have failed to show why [the Court] should not consider the act of

incorporation under the laws of Delaware as an act that has one of the most, if not the

most, significant relationship to the alleged fraud upon Christ in Delaware." *Christ v.*

*Cormick*, 2007 WL 2022053, at *7.  In arguing for the application of Pennsylvania law,

defendants rely solely upon Mr. Christ's receipt of e-mails in Pennsylvania while

ignoring numerous other facts upon which Mr. Christ's fraud claim is based.  For

example, defendants fail to consider Mr. Christ's reliance on statements made by Mr.

Cormick in meetings held in South Africa and the United Kingdom. *See, e.g.,* Am.

Compl. ¶¶ 15, 18.  As discussed above, the sheer number of jurisdictions implicated by

the parties' conduct diminishes the importance of any single one in determining the

applicable law.

Most importantly, however, defendants continue to ignore the central means by

which Mr. Cormick perpetrated his fraud – the formation and use of a Delaware limited

liability company to induce Mr. Christ to furnish funds to Mr. Cormick.  As this Court

recognized previously in denying Mr. Cormick's motion to dismiss, "the state of

Delaware has a strong interest in providing a forum for the resolution of disputes relating

to not only the discharge of managerial functions within an LLC formed in Delaware but

also relating to the use of the laws of incorporation of a limited liability company."

*Christ v. Cormick*, 2007 WL 2022053, at *5.  In other words, the Delaware General

Assembly, in enacting the Limited Liability Company Act, likely did not "[intend] to

allow [Delaware] to be used as a base for manufacturing fraudulent security devices for

-14-

**B.    Analysis.**

Application of the Restatement to Mr. Christ's fraud claim makes clear that, like the contract claims, Delaware law should govern.  Put simply, Mr. Cormick and Elan Suisse USA still "have failed to show why [the Court] should not consider the act of incorporation under the laws of Delaware as an act that has one of the most, if not the most, significant relationship to the alleged fraud upon Christ in Delaware." *Christ v. Cormick*, 2007 WL 2022053, at *7.  In arguing for the application of Pennsylvania law, defendants rely solely upon Mr. Christ's receipt of e-mails in Pennsylvania while ignoring numerous other facts upon which Mr. Christ's fraud claim is based.  For example, defendants fail to consider Mr. Christ's reliance on statements made by Mr. Cormick in meetings held in South Africa and the United Kingdom. *See, e.g.,* Am. Compl. ¶¶ 15, 18.  As discussed above, the sheer number of jurisdictions implicated by the parties' conduct diminishes the importance of any single one in determining the applicable law.

Most importantly, however, defendants continue to ignore the central means by which Mr. Cormick perpetrated his fraud – the formation and use of a Delaware limited liability company to induce Mr. Christ to furnish funds to Mr. Cormick.  As this Court recognized previously in denying Mr. Cormick's motion to dismiss, "the state of Delaware has a strong interest in providing a forum for the resolution of disputes relating to not only the discharge of managerial functions within an LLC formed in Delaware but also relating to the use of the laws of incorporation of a limited liability company." *Christ v. Cormick*, 2007 WL 2022053, at *5.  In other words, the Delaware General Assembly, in enacting the Limited Liability Company Act, likely did not "[intend] to allow [Delaware] to be used as a base for manufacturing fraudulent security devices for

-14-

export." *SEC v. Kasser*, 548 F.2d 109, 11304 (3d Cir. 1977) (quoting *IIT v. Vencap, Ltd.*, 519 F.2d 974, 1017 (2d Cir. 1975)).  Delaware's obvious interest in ensuring that its business entity statutes are not used for unlawful and fraudulent purposes weighs significantly in support of applying the State's laws to Mr. Christ's fraud claim.

Mr. Cormick himself has admitted the significance of forming a Delaware limited liability company to his scheme.  In asserting counterclaims against Mr. Christ, Mr. Cormick has alleged, among other things, that (1) "it had become obvious to [him] that it would be of significant benefit if he had a dedicated U.S. office to act as the management services company for [Elan Suisse]" which would "need to handle the management services activities for [Elan Suisse's] U.S.-based asset classes" (Ans. & Counterclaims ¶ 32), and (2) since U.S. Government Bonds, the first investment product to be offered by Elan Suisse, "were going to be managed from the U.S., [Elan Suisse] needed a management services company in the U.S. which would be responsible for identifying and interfacing with the top-performing U.S. Bond managers" (*id.* ¶ 35).  Thus, whether one accepts as true Mr. Christ's allegations or Mr. Cormick's, there can be no doubt that the formation and use of a Delaware limited liability company was central to Mr. Cormick's plans, fraudulent or otherwise.  Accordingly, Delaware law applies with equal force to Mr. Christ's fraud claim as it does to his contract claims.

## III.    DEFENDANTS' DEFAMATION CLAIMS SHOULD BE DETERMINED PURSUANT TO DELAWARE LAW.

As is true with the rest of this dispute, defendants' defamation claims lack any obvious contact with one forum.  By defendants' own admission, the allegedly defamatory statements were published "for the world to see and read" (Ans. & Counterclaims ¶ 139) and purportedly injured Mr. Cormick's multi-national business

ventures (*see* Cormick Decl. ¶ 10 ("As a consequence of Mr. Christ's conduct …, my reputation throughout the African continent was shattered … any my ability to do business on the African continent (*or indeed anywhere in the world*) has been destroyed.") (emphasis added)). Therefore, defendants' claim that "the central locus of injury to Cormick's professional reputation and the reputation of Elan Suisse, is South Africa" (Op. Mem. at 8) has no basis in fact and, indeed, is belied by Mr. Cormick's own statements. Nonetheless, a comparison between the defamation laws of the United States and South Africa, undertaken pursuant to Section 6 of the Restatement, demonstrates that Delaware law should govern defendants' defamation claims.

### A.   The Applicable Standard.

Since defamation is a claim sounding in tort, the Restatement's most significant relationship test should be applied.  *See* p. 12, *supra*; *Bickling v. Kent Gen. Hosp., Inc.*, 872 F. Supp.1299, 1305 (D. Del.1994) ("To resolve choice of law issues in tort actions, Delaware adheres to the 'most significant relationship' approach.").  Delaware state courts have never specifically addressed choice of law issues as they pertain to multi-state defamation.  *Cerullo v. Harper Collins Pubs., Inc.*, 2002 WL 243387, at *4 n.7 (Del. Super. Feb. 19, 2002); *Dymond v. Nat'l Broad. Co.*, 559 F. Supp.734, 735-6 (D. Del. 1983).  Nevertheless, because the Delaware Supreme Court, in *Travelers Indem. Co. v. Lake*, 594 A.2d at 47, specifically adopted the Restatement approach to resolve conflicts of law issues in tort actions, that approach should apply here.  *See Bickling*, 872 F. Supp. at 1305 ("While no Delaware state court has applied the Restatement to a defamation action, this Court finds that the Delaware Supreme Court, if faced with this issue, would apply the Restatement to make its choice of law decision.") (citations omitted).

The Restatement provides a specific test for determining the applicable law for multi-state defamation:

(1)     The rights and liabilities that arise from defamatory matter in any one edition of a book or newspaper, or any one broadcast over radio or television, exhibition of a motion picture, or similar aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2)     When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time, if the matter complained of was published in that state.

(3)     When a corporation, or other legal person, claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation, or other legal person, had its principal place of business at the time, if the matter complained of was published in that state.

Restatement (Second) Conflicts of Laws § 150.  This test "calls for the application of the local law of the state selected pursuant to the provisions of Subsections (2) and (3) unless … some other state has a more significant relationship ….  Whether there is such another state should be determined in the light of the … principles stated in § 6." *Id*. cmt. b. Under this test, "the place of injury does not play an important role … because injury has occurred in two or more states."  50 Am. Jur. 2d *Libel and Slander* § 17 (citing Restatement (Second) Conflict of Laws § 145 cmt. e).  Likewise, the choice of law need not be the forum where plaintiff is domiciled.  *E.g., Zerman v. Sullivan & Cromwell*, 677 F. Supp. 1316 (S.D.N.Y. 1988) (applying New York law even though plaintiffs resided in Florida because alleged defamation was published in a national newspaper and addressed lawsuits that were brought mostly in New York).

Finally, as noted above, the choice of law analysis must consider the overarching conflicts of law principles set forth in Section 6 of the Restatement. *See, e.g.*, *Bickling*, 872 F. Supp at 1306. Therefore, a comparative study of South Africa's and the United States' respective defamation laws is necessary.

### 1.    South African Defamation Law.

In South Africa, the common law elements of defamation are (a) the wrongful and (b) intentional (c) publication of (d) a defamatory statement (e) concerning the plaintiff. *Khumalo v. Holomisa*, 2002 (5) SA 401 (CC) at ¶ 18 (S. Afr.). Unlike the law governing defamation in the United States (as described *infra*), South African law does not differentiate between different kinds of defamatory statements. Rather, the elements of defamation recognized by United States courts exist in South Africa only as affirmative defenses.

In South Africa, "[o]nce a plaintiff establishes that a defendant has published a defamatory statement concerning the plaintiff, it is presumed that the publication was both unlawful and intentional." *Khumalo* at ¶ 18. The defendant's only recourse is to raise a defense which rebuts either the unlawfulness of the alleged defamatory statement or the intentional nature of its publication. *Id.* That an alleged defamatory statement may be true is helpful to a defendant only in rebuttal. *See id.* ("[T]he most commonly raised defenses to rebut unlawfulness are that the publication was true and in the public benefit; that the publication constituted fair comment and that the publication was made on a privileged occasion."). Additionally, "[i]t is not an element of the delict [tort] in common law that the statement be false." *Id.* Thus, "the effect of excluding the falsity of a defamatory statements as an element … will mean that from time to time a plaintiff may succeed … even when a defamatory statement was in fact not false." *Id.* at ¶ 44.

Defendants also can rebut the unlawfulness of a publication "if, upon a consideration of all the circumstances of the case, it is found to have been reasonable to publish the particular facts in the particular way and at the particular time." *Id.* (quoting *Nat'l Media Ltd. v. Bogoshi*, 1998 (4) SA 1076 (CC) (S.Afr.)). Under South African law, defendants to a defamation claim also cannot escape liability merely by establishing the absence of knowledge of unlawfulness. *Id.* at ¶ 20.

In short, South African law governing defamation embodies a lesser regard for freedom of expression than that recognized by American courts for decades. *See id.* at ¶¶ 39-40 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)); *see also* Christopher Roederer, *The Transformation of South African Private Law After Ten Years of Democracy: The Role of Torts (Delict) in the Consolidation of Democracy*, 37 Colum. Hum. Rts. L. Rev. 447, 513 (2006) ("Neither the values of the free market nor of the marketplace of ideas is paramount in South Africa"); François du Bois and Daniel Visser, *The Influence of Foreign Law in South Africa*, 13 Transnat'l L. & Contemp. Probs. 593, 644-8 (2004); Bonnie Docherty, *Defamation Law: Positive Jurisprudence*, 13 Harv. Hum. Rts. J. 263, 278 (2000); Delisa Futh, *DuPlessis v. De Klerk: South Africa's Bill of Rights and the Issue of Horizontal Application*, 22 N.C. J. Int'l L. & Com. Reg. 1009, 1023-4 (1997); Michael S. Grimsley, Note, *Defamation of Public Figures: Is New York Times Outdated?*, 10 Fla. J. Int'l L. 293, 306 (1995). South Africa's disregard for free speech is only further demonstrated by the fact that its law recognizes *criminal* sanctions for certain acts of defamation. *See* Mohammed A. Diwan, Note, *Conflict Between State Legal Norms and Norms Underlying Popular Beliefs: Witchcraft in Africa as a Case Study*, 14 Duke J. Comp. & Int'l L. 351, 379 (2004) (citing Jonathan A. Burchell, *The*

*Law of Defamation in South Africa*, 327 (1985)); *S. v. Mmbengwa*, (1988 (3) SA 71 (VSC) (S.Afr.); *S. v. Nomgca*, (1980) (2) SA 707 (TkSC) (S.Afr.).

### 2.    Defamation Law in the United States.

Unlike the law governing defamation in South Africa, American courts seek to protect free speech and the marketplace of ideas. In *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1974), the Delaware Supreme Court succinctly defined common law defamation as "that which tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held." Moreover, unlike South Africa, the United States Supreme Court has curtailed defamation actions for matters of public interest. For example, in *Sullivan*, the Court prohibited public figure plaintiffs from recovering unless the alleged defamatory statement was made with "actual malice." *Sullivan*, 376 U.S. at 279-80. Liability to private plaintiffs for allegedly defamatory statements regarding a matter of public interest will arise only on a basis of negligence, rather than strict liability. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). Likewise, a private citizen seeking to recover in a defamation action against a media defendant for speech of public concern must show, as an element of her claim, that the alleged defamatory speech is false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990) (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 783 (1986)).

### B.    Analysis.

After applying the Restatement factors to the alleged facts underlying defendants' defamation claims, it becomes apparent that no single state or country stands out as an obvious choice of forum. First, over the relevant time period, Mr. Cormick's residence varied at any particular time among South Africa, Zimbabwe and the United Kingdom. *See, e.g.,* Christ Aff. ¶¶ 4-5 & Ex. A ¶ 7.3. Second, the alleged defamatory statements

were published over an Internet website accessible to readers worldwide. *See* Ans. &
Counterclaims ¶ 91. Third, the subject matter of the alleged defamatory statements
included, among other things, (a) Mr. Cormick's private life relating to events in multiple
countries, (b) Mr. Cormick's prior employment in Australia, the United Kingdom and
other locations, (c) purported business ventures in various locations including Zimbabwe,
South Africa, the United States, the United Kingdom and New Jersey, and (d) Mr.
Cormick's evasion of law enforcement authorities in Europe, South Africa and the United
States. *See id.* ¶ 95. Fourth, by Mr. Cormick's own admission, the allegedly defamatory
statements were published not in a single location, but "for the world to read and see."
*Id.* ¶ 139. Mr. Cormick also admits that the alleged defamation purportedly damaged his
reputation not only in South Africa but, rather, across the entire world, having completely
"destroyed his ability to practice his profession or earn a living." *Id.* ¶ 142. Defendants
further admit, however, that the alleged harm caused by Mr. Christ's website even
extends to Delaware, since Elan Suisse USA (as a Delaware limited liability company)
has been "entirely precluded … from operating and generating income." *Id.* ¶ 143.[5]

---

[5] The admittedly international scope of Mr. Cormick's purported business activities
distinguishes the authorities cited in defendants' opening memorandum of law (*see* Op.
Mem. at 8). In *Abadian v. Lee*, 177 F. Supp.2d 481, 485-86 (D. Md. 2000), the court
applied Virginia law to a multi-jurisdictional defamation claim because the plaintiff had
worked exclusively in Virginia for six years and presumably had the most significant
professional relationship in that state. In *Osby v. A&E Television Networks*, 1997 WL
338855, at *3 (E.D. Pa. June 17, 1997), the court applied Pennsylvania law to a multi-
jurisdictional defamation claim primarily because the parties stipulated to the application
of that state's law, but also because the plaintiff – a jazz musician – worked and
socialized almost entirely in Philadelphia. By contrast, Mr. Cormick maintained a
"reputation" throughout Africa and the world and did not, by his own admission, limit his
business activities to South Africa.

Given that defendants' defamation claims have insufficient physical contacts with a single forum, the Court should analyze the policies of the competing forums to determine the applicable governing law. The United States, unlike South Africa, has a significant interest in protecting the free market of ideas, especially concerning matters of public interest. *See Milkovich*, 497 U.S. at 13 ("[U]nduly burdensome defamation laws could stifle valuable public debate."). In stark contrast to South African law, the First Amendment "[places] limits on the application of the state law of defamation." *Id.* at 14 (citing *Sullivan*, 376 U.S. 279-80). Delaware courts likewise have embraced the importance of free speech principles in considering defamation claims by noting that "our society accords greater weight to the value of free speech than to the dangers of its misuse." *Doe v. Cahill*, 884 A.2d 451, 456 (Del. 2005) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995)).

Defendants' defamation claims against Mr. Christ certainly implicate interests of free speech which should be protected rather than endangered by the application of South African law. Of particular importance is the fact that Mr. Christ used the Internet to disseminate the results of his investigation of Mr. Cormick. "The internet," as the Delaware Supreme Court has explained, "is a unique democratizing medium ... [that] dramatically changed the nature of public discourse by allowing more and diverse people to engage in public debate." *Cahill*, 884 A.2d at 455. Accordingly, "speech over the internet is entitled to First Amendment protection." *Id.* at 456. Moreover, any analysis of the defamation claim cannot ignore the public interest implicated. Because Cormick is an allegedly active actor in the investment community, the public may fairly criticize him for any lack of candor or honesty. It is the nature of public markets to affect the public

welfare; therefore, those affecting the public markets also affect the public welfare.  As Mr. Christ stated to this Court previously, he created and maintains his website as a public service to ensure that others will not suffer from Mr. Cormick's actions as he has. *See* Christ Aff. dated Sept. 11, 2006 ¶¶ 6-7 (D.I. 2-3 in C.A. No. 07-60-GMS).

## **CONCLUSION**

For the foregoing reasons, plaintiff Robert D. Christ respectfully requests that the

Court enter an Order holding that Delaware law applies to all claims in these actions,

with the exception of Counts I, II and III of defendants' counterclaims.

REED SMITH LLP

/s/ Thad J. Bracegirdle
Thad J. Bracegirdle (No. 3691)
Katharine V. Jackson (No. 4800)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated:  September 10, 2007

# EXHIBIT A



Not Reported in A.2d                                                                           Page 1

Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)

**(Cite as: 2007 WL 1849056 (Del.Super.))**

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.
AT & T WIRELESS SERVICES, INC., Plaintiff,
v.
FEDERAL INSURANCE COMPANY; National
Union Insurance of Pittsburgh, PA; St. Paul
Mercury Insurance Company; and Certain
Underwriters of Lloyd's, London, and
Certain London Market Companies, Defendants.
**C.A. No. 03C-12-232 WCC.**

Submitted: April 23, 2007.
Decided: June 25, 2007.

On Defendant Federal Insurance Company's Motion
for Partial Summary Judgment. **GRANTED.**

Anthony G. Flynn, Esquire; Timothy Jay Houseal,
Esquire; Martin S. Lessner, Esquire; Young Conaway
Stargatt & Taylor, LLP; Wilmington, Delaware.
Attorneys for Defendant Federal Insurance Company.

Shand S. Stephens, Esquire; DLA Piper U.S. LLP;
San Francisco, California. Attorney for Defendant
Federal Insurance Company.

Eric S. Connuck, Esquire; Megan Shea Harwick,
Esquire; DLA Piper U.S. LLP; New York, New
York. Attorneys for Defendant Federal Insurance
Company.

Donald E. Reid, Esquire; Jason A. Cincilla, Esquire;
Morris, Nichols, Arsht & Tunnel; Wilmington,
Delaware. Attorneys for Plaintiff.

William F. Cronin, Esquire; Michael A. Moore,
Esquire; Corr Cronin Michelson Baumgardner &
Preece LLP; Seattle, Washington. Attorneys for
Plaintiff.

**MEMORANDUM OPINION**
CARPENTER, J.

*INTRODUCTION*
**\*1** Before this Court is Federal Insurance Company's
("Federal") Motion for Partial Summary Judgment
(the "Motion"). Upon review of the record and briefs
filed in this matter, the Motion is hereby GRANTED.

*FACTUAL BACKGROUND* [FN1]
> FN1. In the interest of brevity, only
> pertinent details have been included. For a
> more inclusive background of this case, see
> the Opinion issued by this Court on August
> 18, 2005.

On February 15, 2002, TeleCorp PSC, Inc.
("TeleCorp") merged with AT & T Wireless
Services, Inc. ("AWS"). Following the merger,
TeleCorp shareholders filed a derivative action in the
Delaware Court of Chancery alleging breach of
fiduciary duties by the TeleCorp directors and
officers ("Chancery Action") and by AWS due to its
control over the "timing, structuring, disclosure and
pricing of the merger." [FN2] The Court of Chancery
approved a settlement of the shareholder action in
which AWS agreed to pay $47.5 million in exchange
for a dismissal of all remaining claims against the
Chancery Action defendants (the "Shareholder
Settlement"). AWS subsequently filed this litigation
seeking reimbursement from TeleCorp's insurance
carriers--Federal Insurance Company ("Federal"),
National Union Fire Insurance Company of
Pittsburgh, PA ("National Union") and St. Paul
Mercury Insurance Company ("St.Paul") collectively,
the "TeleCorp Insurers") for its appropriate share of
the cost of the Shareholder Settlement and the fees
associated with defending the Chancery Action. In
addition, AWS sought reimbursement from its own
primary insurer, Faraday Capital Limited
("Faraday"), [FN3] and its excess carrier, National
Union (collectively, the "AWS Insurers"), relating to
the service of AWS directors on the TeleCorp board
as well as the company's own liability.

> FN2. Am. Compl., *In re TeleCorp PCS, Inc.,*
> *Shareholders Litig.* E-File 4284961 ¶ 184
> (Del. Ch. C.A. No. 19260).

> FN3. Faraday is referred to in the Amended
> Complaint as Certain Underwriters of
> Lloyd's, London and Certain London Market
> Companies.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)
**(Cite as: 2007 WL 1849056 (Del.Super.))**

AWS filed its complaint on December 23, 2003, and the Court allowed AWS to file an amended complaint on September 28, 2004 to add claims of bad faith and an alleged violation of the Washington Consumer Protection Act ("Amended Complaint"). [FN4] Shortly thereafter, the TeleCorp Insurers and the AWS Insurers each filed various motions to dismiss the Amended Complaint. In June of 2005, AWS attempted to voluntarily dismiss this case in preference for an identical action filed in the State of Washington. Both the AWS Insurers and TeleCorp Insurers contested the dismissal. In an opinion from this Court dated August 18, 2005, with respect to the AWS Insurers, the Court permitted the voluntarily dismissal of Faraday from this action, but did not dismiss National Union. [FN5] As to the TeleCorp Insurers, the Court denied AWS's voluntary motion to dismiss. [FN6]

FN4. AWS is headquartered in Redmond, Washington.

FN5. *AT & T Wireless Serv. v. Federal Ins. Co.,* 2005 WL 2155695 (Del.Super.Ct.).

FN6. *Id.*

After having resolved the motions relating to the attempted voluntary dismissal of the defendants, the Court turned its attention to the motions to dismiss filed by the various insurance carriers. In an opinion issued by this Court on January 31, 2006, the Court granted the motion to dismiss filed by National Union as it relates to the AWS directors and officers. [FN7] In the same opinion, the Court granted in part and denied in part the motion to dismiss filed by the TeleCorp primary insurance carrier, Federal. [FN8] In turn, Federal has filed this Motion for Partial Summary Judgment (the "Motion") related to certain remaining claims against Federal:

FN7. *AT & T Wireless Serv. v. Federal Ins. Co.,* 2006 WL 267135 (Del.Super.Ct.).

FN8. *Id.*

**\*2** 1. Count VII (For an Order Finding the Insurers have Waived or are Estopped from Denying Coverage);
2. Count VIII (For an Order Estopping the TeleCorp Insurers and Certain Underwriters from Denying Coverage;

3. Count IX (Violations of Washington's Consumer Protection Act by TeleCorp Insurers and Certain Underwriters). [FN9] AWS has responded to the Motion, and argument before this Court was heard on April 23, 2007. Upon review of the pleadings and record on this matter, this is the Court's decision on the Motion.

FN9. Am. Compl.

**STANDARD OF REVIEW**
A resolution via summary judgment is encouraged by the Court to dispose of litigation economically and expeditiously, if possible. [FN10] Summary judgment is a tool used to remove any factually unsupported claims, [FN11] and is appropriate when the moving party has shown there are no genuine issues of material fact, and as a result, it is entitled to judgment as a matter of law. [FN12] In considering such a motion, the court must evaluate the facts in the light most favorable to the nonmoving party. [FN13] Summary judgment will not be granted when the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. [FN14]

FN10. *Bayside Health Assoc. v. Del. Ins. Co.,* 2006 WL 1148667 (Del.Super.Ct.), at *2 (citing *Davis v. Univ. of Del.,* 240 A.2d 583 (Del.1968)).

FN11. *Durig v. Woodbridge Bd. of Educ.,* 1992 WL 301983, at *7 (Del.Super.Ct.) (citations omitted)(Summary judgment is appropriate when "the nonmoving party bears the ultimate burden of proof and the moving party can illustrate a complete failure of proof regarding an essential element of the nonmovant's case.").

FN12. *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979); *Schueler v. Martin,* 674 A.2d 882, 885 (Del.Super.Ct.1996).

FN13. *Pierce v. Int'l. Ins. Co. of Ill.,* 671 A.2d 1361, 1363 (Del.1996).

FN14. *Ebersole v. Lowengrub,* 180 A.2d 467, 468-469 (Del.1962).

**DISCUSSION**
To uphold a claim under Counts VII, VIII and IX, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 3

Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)

**(Cite as: 2007 WL 1849056 (Del.Super.))**

Plaintiff must first demonstrate Washington law is applicable to the dispute at hand. In making this determination, because Delaware is the forum state, Delaware's application of its choice of law standards applies, and the Court must determine which state has the most significant relationship to the dispute in question. [FN15] Federal argues Virginia law is applicable pursuant to the most significant relationship test of Section 188 of the Restatement of Conflicts conducted in contract disputes. Contrarily, AWS asserts Washington law is applicable through assessing the post-contract behavior of bad faith and applying the test set forth in Section 145(2) of the Restatement of Conflicts used in tort cases. Accordingly, it is important to first determine whether this dispute should be decided in the context of a contract or tort action. For the reasons set forth below, the Court finds this dispute must be resolved in a contractual setting.

> FN15. *Nat'l Acceptance Co. of Cal. v. Hurm,* 1989 WL 70953 (Del.Super.Ct.).

First, it is significant that the dispute here resonates from a contract entered into between Federal and TeleCorp of which AWS was not a party. All of Federal's obligations stem from that contractual relationship in which the State of Washington had no connection. In other words, the State of Washington had no interest in protecting any bad faith conduct relating to the TeleCorp/Federal relationship since neither party was headquartered or incorporated in that state. TeleCorp was never a "citizen" of Washington for which its legislative protection would ever have been intended to be covered, [FN16] and any rights or obligations of Federal with respect to the payment of defense costs which are at issue here are governed by the terms and conditions of that contract.

> FN16. TeleCorp directors and officers were protected by the Federal policy. Once AWS took over TeleCorp, those officers no longer existed as TeleCorp officers since the company dissolved. Thus, even if the Court determined AWS took over the rights of the insurance policy, it is still the case that the directors and officers were never citizens of Washington since they ceased to exist in that capacity once the merger was complete.

**\*3** Second, recently the Delaware courts have determined that the bifurcation between contract

actions and tort actions to resolve disputes arising out of the parties' contractual relationship is commercially "non sensible." [FN17] Specifically, in *Millett v. Truelink,* [FN18] the Court determined that it is illogical to allow a contract dispute to fall under the law chosen within the contract, while at the same time allowing a consumer fraud claim to be governed by a different state simply because it was a tort action when it had no independent basis and only arose due to the contractual relationship of the parties. The *Millett* Court found that Delaware courts "emphasizing the need for certainty in contractual rights and relations, have recently rejected plaintiffs' argument that different states' laws should be applied to claims sounding in tort and contractual claims." [FN19]

> FN17. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del.1991)( "This brings the choice of law doctrines back into conformity by eliminating the often artificially contrived tort/contract distinctions that previously existed in our law."); *Millett v. Truelink, Inc.,* 2006 WL 2583100, *3 (D.Del.) (In assessing the applicability of a choice of law provision within the contract that did not cover tort claims, the court stated that "The Delaware courts, however, emphasizing the need for certainty in contractual rights and relations, have recently rejected plaintiffs' argument that different states' laws should be applied to claims sounding in tort and contractual claims.") (citing *Abry Partners V, L.P. v. F & W Acquisition, LLC,* 891 A.2d 1032 (Del. Ch.2006)).

> FN18. 2006 WL 2583100.

> FN19. *Id.* at *3.

In addressing a similar issue, Vice Chancellor Strine, in *Abry Partners V, L.P. v. F & W Acquisition, LLC* stated:

> To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote. [FN20]

> FN20. *Abry Partners,* 891 A.2d at 1048.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)
**(Cite as: 2007 WL 1849056 (Del.Super.))**

The Court went on to cite the California opinion of *Nedlloyd Lines B.V. v. Superior Court* which states:

> We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship. Nor do we believe such a person would reasonably desire a protracted litigation battle concerning only the threshold question of what law was to be applied to which asserted claims or issues. [FN21]

FN21. 834 P.2d 1148, 1154 (Cal.1992).

The Court finds the rationale for the decisions in *Millett, Abry Partners* and *Nedlloyd Lines B.V.* persuasive, and while it recognizes that the insurance policy here does not have a choice of law provision, the same common sense and logic can be applied. The Court finds that the breach of contract claim and the bad faith claim are too intertwined and interdependent to be separated.

Lastly, the fallacy of the Plaintiff's argument is highlighted by the factual situation we have now in this case. Recently, AWS was purchased by Cingular Wireless headquartered in Georgia and the AWS operation has been moved to Texas. [FN22] Since the non-payment of benefits and the alleged bad faith of Federal continues, the logical questions would be whether the Court should now find that the state with the most significant relationship is Texas, and further, what interest does Washington have in protecting a "citizen" who has abandoned its state. In a highly mobile, sophisticated and complex commercial environment in which mergers and acquisitions often occur, it causes unnecessary havoc and an uncertain business environment to piecemeal litigation claims to determine the law to apply at any given time to any given allegation.

FN22. Cingular Wireless is operating as AT & T Mobility, LLC, a wholly-owned subsidiary of AT & T, Inc., headquartered in Texas. *See* Connuck Aff., Ex. C, D, E.

**\*4** The Plaintiff relies heavily upon the decision of *SnyderGeneral Corp. v. Great American Insurance Co.* [FN23] to support its position that a tort analysis to its bad faith claim is appropriate. In addition to being factually distinguishable [FN24] there appears

to have been no apparent challenge to the magistrate's premise that a different standard should be applied to the bad faith claim nor any discussion of the interrelationship of the contract and the tort claim or the appropriateness of applying the laws of a different state to each particular claim. In addition, the findings of the magistrate were not reviewed or adopted by a U.S. District Court Judge, nor were they substantively discussed in the appeal of the matter to the Fifth Circuit. [FN25] It appears that the *SnyderGeneral* court, and perhaps the parties, simply accepted the distinction as gospel and plowed ahead without further analysis. Regardless, this Court does not feel bound by the decision of a federal magistrate nor is it willing to ignore the contractual relationship which is at the crux of this dispute and but for which the bad faith claim would never exist.

FN23. 928 F.Supp. 674 (N.D.Tex.1996).

FN24. The insured plant continued its operation after the merger, and for all practical purposes SnyderGeneral became the insured. The insurance company was aware of the change in ownership and location and could adjust its policy accordingly. However, here the insurable interest (the directors and officers of TeleCorp) ceased to exist once AWS took over TeleCorp, and therefore Federal had no reason to believe any additional state law would apply.

FN25. *SnyderGeneral v. Continental Ins. Co.,* 133 F.3d 373 (5th Cir.1998).

As a result of the above, the Court will determine the most significant relationship test using the five factors set forth in Section 188 of the Restatement of Conflicts to determine which law to apply. Those factors are:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties. [FN26]

FN26. Restatement (Second) of Conflicts § 188(2).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 5

Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)

**(Cite as: 2007 WL 1849056 (Del.Super.))**

Each case must be decided on its particular facts and circumstances using these guidelines, and the Court should not simply sum up all of the factors and automatically apply the jurisdiction with the highest number of contacts. [FN27] With these fundamentals in place, the Court turns its attention to the enumerated factors as they relate to the facts of this case.

FN27. *Travelers,* 594 A.2d at 38, 48 n. 6.

**(a) Place of Contracting**

An Executive Protection Policy was issued by Federal to the directors and officers of TeleCorp to cover the time period of November 2000 through November 2001 (the "policy" or the "contract") [FN28] and the policy was entered into in Virginia. [FN29] It is not clear where the parties negotiated the terms of the policy, but at the time the policy was executed, according to the declaration page, TeleCorp was located in Arlington, Virginia. In addition, three "Virginia Amendatory Endorsement" pages were included within the policy and signed on April 2, 2001, which reflects an acknowledgment by the contracting parties of the significance of Virginia law to the policy. [FN30] Thus, the Court finds the place of contracting to be Virginia.

FN28. Compl., Ex. A.

FN29. *Id.*

FN30. *Id.*

**(b) Place of Performance or Lack of Performance**

AWS asserts it is the performance of Federal and how Federal handled AWS's claim for reimbursement that the Court should analyze, and that performance occurred out of the State of Washington once AWS bought TeleCorp. Since AWS was headquartered in Washington and all correspondence relating to AWS requesting reimbursement from Federal for the defense cost were sent from Washington, AWS asserts it is Washington law that should apply to a bad faith claim. However, Federal argues that it is the TeleCorp's directors and officers' actions that are in question, which is what the Chancery Action analyzed and what the policy provided protection for, and those actions took place in Virginia prior to the merger. However, as to this factor, the Court believes Delaware has the greatest interest.

*5 It is the conduct of the TeleCorp directors and officers and the defense of that conduct that forms the obligation of Federal under the contract. The representation of these directors and officers occurred in Delaware and if there was a breach of Federal's duty under the contract, that failure to perform occurred within the context of the Delaware litigation. The performance that AWS is complaining about is the failure of Federal to pay for the cost of defending TeleCorp directors and officers in the Chancery Action. If Federal failed to perform, it was because it denied payment for the representation that had occurred in Delaware. Any correspondence and discussions that followed, regardless of where they occurred, were merely the aftermath of the breach that had already occurred. As such, if this was the most significant factor the Court would find the law of Delaware would apply.

**(c) Location of Subject Matter of Contract**

The subject matter of the policy is the conduct of the directors and officers of TeleCorp in relation to the agreement to merge with AWS on October 7, 2001, which was finalized in February 2002. While AWS's headquarters was located in Redmond, Washington after the merger, it is the conduct of TeleCorp's directors and officers in Virginia that was the subject of dispute of the Chancery Action, and it is this Chancery Action which led to the request of reimbursement by AWS to Federal. Because the Chancery Action was against TeleCorp directors and officers and not AWS, it is the location of the TeleCorp directors and officers that is key, and that is Virginia.

**(d) Domicile, Residence, Place of Incorporation and Place of Business**

Federal is incorporated in Indiana, holds a principle place of business in New Jersey, and is licensed to do business in Delaware. [FN31] TeleCorp is a Delaware corporation and has its principle place of business in Virginia. [FN32] AWS was a Delaware corporation whose principle place of business was Washington at the time of the merger. [FN33] None of the parties have argued Indiana or New Jersey law should govern, nor have they argued strongly to apply Delaware law. However, the most significant factor in analyzing a choice of law question "[i]n a complex insurance case with multiple insurers and multiple risks is the principal place of business of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 6
Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)
**(Cite as: 2007 WL 1849056 (Del.Super.))**

insured because it is 'the situs which link[s] all the parties together.' " [FN34] Typically the principle place of the insured would be relatively clear, but this case proves to be more complicated.

> FN31. Am. Compl.

> FN32. *Id.*

> FN33. *Id.*

> FN34. *Liggett Group, Inc. v. Affiliated FM Ins. Co.,* 788 A.2d 134, 138 (Del.Super.Ct.2001).

At the time of contracting, TeleCorp's principle place of business was in Virginia. [FN35] In fact, the declaration page of the policy indicates TeleCorp's address as 1010 North Glebe Road in Arlington, Virginia. [FN36] However, on February 15, 2002 TeleCorp was purchased by AWS and its headquarters became the State of Washington. Then in October 2004, AWS was again purchased, this time by Cingular Wireless whose headquarters is in Georgia. [FN37] Currently, Cingular Wireless is known as AT & T Mobility, LLC and is headquartered in Texas. [FN38] Thus, since the policy was issued, there are four states through which TeleCorp, or its successors, has held a principle place of business.

> FN35. Compl. ¶ 7.

> FN36. Compl., Ex. A.

> FN37. Connuck Aff., Ex. C, D, E.

> FN38. *Id.*

*6 Ironically, the one constant state throughout the mergers and the numerous companies is Delaware. According to the *Millet* Court, the incorporation of a company in Delaware is sufficient contact to allow Delaware law to govern. [FN39] However, the Court concludes based on the facts of this particular case, the state with the most significant ties as to this factor is Virginia. While Washington may have an interest once TeleCorp was purchased by AWS, and while Delaware may have an interest as the place of incorporation, Virginia was the principle place of business of TeleCorp at the time the policy was issued, and it is the conduct of the director and officers of that company that is at issue.

> FN39. *Millett,* 2006 WL 2583100.

**(e) Conclusion**

The Court points out again that it finds that the assertion of bad faith made by AWS cannot be separated from the policy itself or the breach of contract claim. The alleged failure of Federal to reimburse AWS for the conduct of the TeleCorp directors and officers stems directly from how the policy is interpreted, the language of the policy and the parties' intent. Whether AWS has the right to reimbursement and whether Federal acted reasonably in relation to AWS's claim can only be determined by first analyzing the terms, conditions and rights within the policy between the parties. While the complaint asserts a bad faith claim, it is first a contract dispute and the breach of the contract must be determined before one can decide if Federal acted in bad faith.

While this Court appreciates that there is a diversion of opinions on how to analyze contract and tort disputes arising out of a single event, this Court is unwilling to mindlessly separate the two claims and apply different state laws to each. As previously indicated, the Delaware Courts have moved toward applying only one state law to contract and tort disputes that arise out of the same contractual relationship and that are controlled by the terms and conditions of that contract. As stated in *Abry,* the court's analysis of a choice of law issue should not be one "interpreted in a crabbed way that creates a commercially senseless bifurcation between pure contract claims and other claims that arise solely because of the nature of the relations between the parties created by contract." [FN40]

> FN40. *Abry Partners,* 891 A.2d at 1047, citing *Weil v. Morgan Stanley DW Inc.,* 877 A.2d 1024, 1032-33 (Del. Ch.2005).

While the Court acknowledges that the lack of a choice of law provision within the policy at issue in these cases is a significant distinguishing factor, this cannot circumvent the fact that neither TeleCorp nor Federal would have any reason to think Washington law would apply. At the time of contracting either party could reasonably expect Delaware, Virginia, Indiana or New Jersey law to govern a contract dispute, but not Washington. While there is no chosen state law to apply within the policy, but for AWS purchasing TeleCorp, it appears either Virginia

Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)

**(Cite as: 2007 WL 1849056 (Del.Super.))**

or Delaware law would most likely apply. Applying all the factors together, the most logical governing law for the breach of contract claim is the law of the Commonwealth of Virginia, and since these claims are so interrelated, the Court will apply Virginia law to the bad faith claim as well.

**\*7** In addition, if AWS was removed from the equation, that is if this Court looks at the picture as it was when the policy was in effect between TeleCorp and Federal, Washington has no interest in any claim or the contractual dispute. Washington became a possible locale by happenstance, and had AWS not purchased TeleCorp, that state would not be in the equation. There is simply no rational basis to allow Washington to now become the governing state over a dispute based in a contract issued to TeleCorp before the State of Washington was ever a thought.

Lastly, the Court must note that its ruling is based on the specific complex facts of this case. If the Court was to accept the rationale of AWS and applied Washington law, that same argument could now be used to suggest Georgia or Texas as the appropriate law to apply. [FN41] This has the potential of creating a choice of law nightmare either in this case or in cases that follow. To throw the possibility of Texas and Georgia into the mix is simply illogical, and clearly not contemplated by any party. Based on the circumstances and facts in this case, Virginia holds the most significant contacts and is the most appropriate governing law.

> FN41. AWS has since been purchased by Cingular Wireless, which is based out of Georgia. AWS has become AT & T Mobility, LLC, which is based out of Texas.

### CONCLUSION

Since the claims found in Counts VII, VIII and IX are unique to the Plaintiff's assertion that State of Washington law would apply and have no basis in the law of Virginia, Federal's motion for partial summary judgment is hereby GRANTED.

IT IS SO ORDERED.

Not Reported in A.2d, 2007 WL 1849056 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in A.2d                                                          Page 1

Not Reported in A.2d, 2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499

**(Cite as: 2002 WL 243387 (Del.Super.))**

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Edward CERULLO, Plaintiff,
v.
HARPER COLLINS PUBLISHERS, INC., William
Morrow & Co., Inc., Joseph Jett and
Sabra Chartrand, Defendants.
Brian FINKELSTEIN, Plaintiff,
v.
HARPER COLLINS PUBLISHERS, INC., William
Morrow & Co., Inc., Joseph Jett and
Sabra Chartrand, Defendants.
**No. CIV.A. 01C-03-21-CHT.**

Submitted: May 7, 2001.
Decided: Feb. 19, 2002.

In separate suits, plaintiffs asserted defamation
claims against authors of book and its publisher. On
defendants' motion to dismiss one case, and motion to
stay proceedings in the other, the Superior Court,
New Castle County, Toliver, J., held that: (1)
evidence was sufficient to show that one plaintiff was
a Delaware resident, exempt from the Delaware
Borrowing Statute which requires application of
foreign statute of limitations to cause of action
arising outside of the state; (2) pursuant to the
Delaware Borrowing Statute, the New York statute of
limitations applied to defamation claim which arose
in New York but which was filed in Delaware court
by non-resident plaintiff; and (3) it was appropriate to
stay proceedings in Delaware defamation action,
where plaintiff filed previous action in New York
involving the same parties and issues as the Delaware
suit, and problem of one defendant's avoidance of
service in New York, which might have prevented
New York court from doing prompt and complete
justice, had been resolved.

Motions granted.

West Headnotes

**[1] Limitation of Actions ☜2(1)**
241k2(1) Most Cited Cases
Evidence that plaintiff owned a residence in

Delaware and resided there a portion of each year,
and that he was an active member of the local
community, was sufficient to show that he was a
Delaware resident, exempt from the Delaware
Borrowing Statute which requires application of
foreign statute of limitations to cause of action
arising outside of the state. 10 Del.C. § 8121

**[2] Limitation of Actions ☜2(3)**
241k2(3) Most Cited Cases
Pursuant to the Delaware Borrowing Statute, the New
York statute of limitations applied to defamation
claim which arose in New York but which was filed
in Delaware court by non-resident plaintiff. 10 Del.C.
§ 8121; McKinney's CPLR § 215(3).

**[3] Action ☜69(5)**
13k69(5) Most Cited Cases
It was appropriate to stay proceedings in Delaware
defamation action, where plaintiff filed previous
action in New York involving the same parties and
issues as the Delaware suit, and problem of one
defendant's avoidance of service in New York, which
might have prevented New York court from doing
prompt and complete justice, had been resolved.
On the Defendants' Motion to Dismiss.

Jesse A. Finkelstein, Esquire, Peter B. Ladig,
Esquire, Richards, Layton & Finger, Wilmington,
and Andrew W. Hayes, Esquire, Boies, Schiller &
Flexner, LLP, Armonk, N.Y. 10504, for the
Plaintiffs.

Philip A. Rovner, Esquire, Potter Anderson &
Corroon LLP, Wilmington, Slade R. Metcalf, Esquire
and Katherine M. Bolger, Esquire, Squadron,
Ellenoff, Plesent & Sheinfeld, LLP, New York, N.Y.
10176, for the Defendants.

OPINION AND ORDER
TOLIVER, J.

FACTS AND PROCEDURAL POSTURE
*1 The motions before the Court arise from
defamation claims brought by the Plaintiffs, Edward
Cerullo and Brian Finkelstein, against the
Defendants, Harper Collins Publishers, Inc., William
Morrow & Co., Inc., Joseph Jett and Sabra Chartrand.
The alleged defamatory statements were included in a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
(Cite as: 2002 WL 243387 (Del.Super.))

book, "Black and White on Wall Street", authored by Mr. Jett and Mr. Chartrand and published by Morrow and later by Harper Collins. [FN1]

> FN1. "Black and White on Wall Street" was originally published in March of 1999. Later that year, Harper Collins and Morrow merged, and through this merger Harper Collins succeeded to the liability of Morrow.

The Cerullo litigation of this case was originally initiated in the State of New York by Mr. Cerullo on August 25, 1999 against the same Defendants. Mr. Cerullo's Delaware action was commenced on March 2, 2001. Mr. Finkelstein did not file suit in New York but began his grievance against the same Defendants in Delaware on the same date. On March 28, 2001, the Defendants filed the instant motions to dismiss the Plaintiffs' complaints with one exception because of Mr. Cerullo's pending motion in New York. Mr. Finkelstein and Mr. Cerullo are represented by the same attorneys. In addition, both cases have been assigned to the undersigned although they have not been formally consolidated. [FN2]

> FN2. The Defendants' alternative motion to stay the proceedings applies to Mr. Cerullo's action only and not to Mr. Finkelstein.

The Defendants' motion to dismiss is based on two contentions. First, the Delaware Borrowing Statute, 10 *Del. C.* § 8121, [FN3] requires that New York substantive and procedural law be applied. That law requires the initiation of actions in the State of New York within one year of the defamatory communication. N.Y. C.P.L.R. § 215(3). The Plaintiffs' actions are therefore barred because those actions were more than one year from the alleged defamation. The Plaintiffs have filed these lawsuits in the State of Delaware, the Defendants argue, to take advantage of the longer statute of limitations period provided by this state, which allows two years to initiate litigation. The Delaware Borrowing Statute proscribes such forum shopping and requires that the Court apply the law of the state wherein the action arose. [FN4]

> FN3. Section 8121 states:
> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this

State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action. Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.

> FN4. Section 8121.

Secondly, the Defendants argue that if the Court denies dismissal based upon their statute of limitations theory, it should nevertheless dismiss the action on the basis of *forum non conveniens.* The Plaintiffs' causes of action, they argue, have no connection with the State of Delaware other than the fact that Harper Collins is incorporated in this state. Accordingly, they should be dismissed.

Finally, as to Mr. Cerullo alone, the Defendants argue that this Court should stay the instant action until the New York Supreme Court resolves his litigation in that state because the New York action was filed first and the issues and parties are identical to those raised here.

The Plaintiffs have filed separate memorandums opposing the Defendants' motions. Mr. Cerullo contends that the Court should not dismiss the action pursuant to the Delaware Borrowing Statute because the statute requires that Delaware law be applied to residents of the State of Delaware. The two-year period as set forth in 10 *Del. C.* § 8119 would apply and the Delaware action was therefore timely filed. In addition, the law relied upon by the Defendants requires that the Court weigh certain factors and exercise its discretion in favor of finding that Mr. Cerullo's claim arose in Delaware. Therefore, and again, Delaware law, including its statute of limitations, should be applied.

*2 In response to the Defendants' contention that the case should be dismissed on *forum non conveniens* grounds, Mr. Cerullo first asserts that the Defendants have cited no Delaware case where the plaintiff was a resident of this state and the court granted dismissal based on *forum non conveniens* grounds. Moreover, analyzing the factors applicable to a *forum non conveniens* analysis, Delaware is the proper forum given the Defendants' failure to tip the scales in their favor in that regard. If dismissal is granted, Mr. Cerullo will likely be without a forum to promptly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499

**(Cite as: 2002 WL 243387 (Del.Super.))**

and completely adjudicate his claims due to the efforts of the Defendants to have the New York action dismissed by that state's courts. For this same reason, this Court should not grant the Defendants' alternative motion to have the action stayed. Stated differently, because Mr. Jett has successfully evaded service in New York, Delaware may be the only state in which Mr. Cerullo can have his claims adjudicated. [FN5]

> FN5. In the time period that has elapsed since oral arguments on these motions took place, the Defendants have notified the Court that the Supreme Court of New York denied the pending motion to dismiss. Presumably the case is now proceeding to its ultimate resolution.

Mr. Finkelstein argues that the theory upon which the Defendants' motion for dismissal is based is flawed because they rely upon the Delaware Borrowing Statute and *Dymond v. Nat'l Broadcasting Corp.*, 559 F.Supp. 734 (D.Del.1983). The *Dymond* case established that conflict of law issues should be determined on the basis of *lex loci delictus.* [FN6] Mr. Finkelstein contends that the United States Supreme Court and subsequent state court decisions have since rejected that method of determining such issues. This Court, as a result, should at least consider the circumstances of this action and therefore apply the Delaware statute of limitations.

> FN6. The law of the jurisdiction where the wrong was alleged to have occurred.

Mr. Finkelstein also contends that the Defendants' motion to dismiss based upon *forum non conveniens* should be denied because the Defendants' have failed to meet the burden imposed upon the moving party in such situations. Delaware is the proper forum in which the litigation should proceed. If the action is dismissed, he may be precluded from bringing the action in any other forum.

## DISCUSSION

A motion to dismiss a complaint pursuant to Superior Court Civil Rule 12(b)(6) for failure to state a claim upon which relief can be sustained, will not be granted unless the plaintiff will not be able to recover under any circumstances susceptible of proof given the allegations raised in that document. *Spence v. Funk*, 396 A.2d 967 (Del.1978); and *Bissel v. Papastavros' Assocs. Med. Imaging*, 626 A.2d 856

(Del.Super.1995), *appeal denied*, 623 A.2d 1142 (Del.1993). For purposes of reviewing the complaint, those allegations are accepted as true and the test of sufficiency is lenient. *State ex rel. Certain-Teed Prods. Corp. v. United Pac. Ins. Co.*, 389 A.2d 777 (Del.Super.1978). The nonmoving party is entitled to an opportunity to present material in response. Super. Ct. Civ. R. 12(b). Where matters outside the pleadings are considered, such a motion becomes a motion for summary judgment and is disposed of pursuant to Rule 56. *Shultz v. Delaware Trust Co.*, 360 A.2d 576 (Del.Super.1976).

*3 Because affidavits and exhibits were filed by the parties in support of their respective positions, the Defendants' motions will be considered as seeking summary judgment. In this regard, the burden is similar. A motion for summary judgment will only be granted where the moving party establishes that there is no genuine issue of material fact in dispute and that the movant is entitled to judgment as a matter of law. *Martin v. Nealis Motors, Inc.*, 247 A.2d 831 (Del.1968); and *Burish v. Graham*, 655 A.2d 831 (Del.Super.1994). The facts must be viewed in the light which is most favorable to the nonmoving party, *Pullman, Inc. v. Phoenix Steel Corp.*, 304 A.2d 334 (Del.Super.1973); and the motion will not be granted, even in the absence of any dispute of material fact, where it seems desirable to inquire further into the facts to clarify the application of the law to the facts. *Guy v. Judicial Nominating Comm.*, 659 A.2d 777 (Del.Super.1995). However, the role of the Court is not to weigh evidence, and uncontroverted statements are to be accepted as true. *Battista v. Chrysler Corp.*, 454 A.2d 286 (Del.Super.1982).

*The Delaware Borrowing Statute*

[1] The Delaware Borrowing Statute was designed to prevent forum shopping by out of state residents. *Pack v. Beech Aircraft Corp.*, 132 A.2d 54, 57 (Del.1957). Its general purpose "is to shorten the period of limitation applicable to actions arising in foreign jurisdictions if the foreign statute specifies a shorter period. *Id.* at 57. Notwithstanding the above, it is clear that this statute was *not* intended to prevent a resident of the state from bringing an action in this state against a defendant who is subject to the jurisdiction of the Delaware Courts, even when the cause of action arose outside of the state. The Supreme Court held:

> Our statute does not apply to a resident of this State suing on a foreign cause of action, provided he was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a resident when the cause of action arose. As to such a resident the common law rule that the *lex fori* governs the matter of limitation of actions is left in full force.
*Id.*

Mr. Cerullo asserts that his action is not barred by the Delaware Borrowing Statute because he is, in fact, a Delaware resident. His assertion of residency is based upon his sworn affidavit in which he claims to own a home in Delaware which is used exclusively by his family, that he has a Delaware driver's license, is a member of the Rehoboth Beach Delaware Planning Commission, and that he is also involved in several community organizations and committees in Delaware.

The Delaware Courts have never defined the term "state resident" as it relates to the Delaware Borrowing Statute. However, the statute, "as originally adopted, ... was almost a verbatim copy of Section 13 of the New York Practice Act." *Id.* at 58. Given the similarities of the two statutes, guidance from the New York courts on this issue is appropriate. The New York courts have determined that the issue of whether one is considered a resident for purposes of its borrowing statute "turns on whether [the individual] has a significant connection with some locality in the state as the result of living there for some length of time during the course of a year." *Antone v. General Motors Corp.,* 64 N.Y.2d 20, 484 N.Y.S.2d 514, 518, 473 N.E.2d 742 (N.Y.1984) (citing, *Matter of Newcomb,* 192 N.Y. 238, 84 N.E. 950 (N.Y.1908); and *Hurley v. Union Trust Co.,* 244 A.D. 590, 280 N.Y.S. 474 (N.Y.App.Div.1935); *see also* Reese and Green, *op. cit.,* 6 Vand.L.Rev., at p. 563, 280 N.Y.S. 474). This Court adopts the New York test as the baseline for determining Delaware residency in regards to the Delaware Borrowing Statute.

*4 As applied to the case *sub judice,* Mr. Cerullo has offered sufficient evidence of state residency to withstand a motion to dismiss under § 8121. As previously stated he owns and resides for a portion of each year at a residence in Rehoboth Beach, Delaware, and he is an active member of that community. Mr. Finkelstein makes no such claim of Delaware residency. Instead he contends that the Defendants' reliance on *Dymond v. Nat'l Broad. Corp., supra* is misplaced. *Dymond* stands for the proposition that in a multi-state defamation case, a Delaware court should apply the statute of limitations

of the state whose substantive law is applicable to the claim. Mr. Finkelstein asserts that because *Dymond* was decided before *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), the law derived from *Keeton* controls this action. He alleges that applied to his case, *Keeton* demands that "this court should at least examine the circumstances of this action, and upon doing so, apply the Delaware statute of limitations to Finkelstein's claim." Finkelstein Mem. at 2.

[2] Unfortunately, at least from his perspective, Mr. Finkelstein's Memorandum fails to cite a specific passage from *Keeton* in support of this contention. Moreover, Chief Justice Rehnquist specifically declared that the issue being decided in that case was "personal jurisdiction, not choice-of-law." *Keeton,* 465 U.S. at 778. This Court cannot therefore give *Keeton* the construction that Mr. Finkelstein proposes. *Dymond* remains the controlling law in Delaware on this issue. As a result, the plaintiff's domicile [FN7] generally controls which state's substantive law must be employed, which in turn prescribes the applicable statute of limitations.

> FN7. The *Dymond* Court held that Delaware courts must apply the foreign state's statute of limitations whenever it would apply that state's substantive law. *Dymond,* 559 F.Supp. at 736. Delaware is a *lex loci delicti* jurisdiction in regards to choice of law issues. *Id. at 737.* However, the Court noted that the issue had never been addressed in a multi-state defamation action. To determine such issues, other states have used two different tests. The first such test applies the law of the plaintiff's domicile without explicit consideration of other factors. *Id.* The second such test applies the "law of the plaintiff's domicile unless other factors strongly suggest that the laws of another state are more applicable." *Id.* at 738. The Court did not reach the issue of which test was applicable in Delaware, because under either approach the result called for was the application of the foreign state's law. *Id.*

Even if this Court were to consider other factors in making this decision as Mr. Finkelstein proposes, New York would nevertheless remain the controlling law because there are no factors, save for Mr. Finkelstein's filing of his complaint in Delaware, that would compel the Court to decide in his favor.

Not Reported in A.2d                                                                Page 5

Not Reported in A.2d, 2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499

**(Cite as: 2002 WL 243387 (Del.Super.))**

Accordingly, the filing of Mr. Finkelstein's complaint was not timely pursuant to New York law because it was filed more than one year after the cause of action arose. N.Y. C.P.L.R. § 215(3). Therefore, summary judgment must be granted in the Defendants' favor as their motion pertains to Mr. Finkelstein.

*Forum Non Conveniens*

Motions to dismiss based on *forum non conveniens* are granted only if, upon the sound discretion of the trial court, the defendant meets its heavy burden of proving inconvenience. *Parvin v. Kaufmann,* 236 A.2d 425, 427-428 (Del.1967). To do so, the defendant must show that the circumstances are such that the case is "one of the rare cases where the drastic relief of dismissal is warranted based on a strong showing that the burden of litigating in this forum is so severe as to result in manifest hardship to the defendant." *Ison v. DuPont de Nemours,* 729 A.2d 832, 842 (Del.1999). Such hardship is analyzed by the court by applying the six factors known collectively in Delaware as the *Cryo-Maid* factors. These factors are as follows:
    *5 1. The relative ease of access to proof;
    2. the availability of compulsory process for witnesses;
    3. the possibility of viewing the premises;
    4. whether the controversy is dependent upon application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;
    5. the pendency or nonpendency of a similar action or actions in another jurisdiction; and
    6. all other practical problems that would make trial of the case easy, expeditious and inexpensive.
*Id.* at 837-38 (citing *General Foods Corp. v. Cryo-Maid, Inc.,* 198 A.2d 681 (Del.1964). In reviewing these factors as they apply to the facts at hand, it is clear that the Defendants have failed to meet their burden of showing true inconvenience and hardship. Based upon *Dymond,* this court concludes that it should apply the law of the domicile of the plaintiff. *Dymond,* 559 F.Supp. at 737.

While the Court did find that Mr. Cerullo was a resident of Delaware for purposes of the Delaware Borrowing Statute only, *no* finding has been made regarding his domicile. [FN8] However, assuming *arguendo* it is determined that his domicile is in New York, this Court may nevertheless interpret another jurisdiction's laws, *Mt. Hawley Insurance Co. v. Jenny Crag,* 668 A.2d 763 (Del.Super.1995); and as

such, this factor does not present a hardship sufficient to warrant dismissal.

> FN8. This opinion addresses Mr. Cerullo's residence, not his domicile. A person may have more than one residence, but only one domicile. *Martinez v. Bynum,* 461 U.S. 321, 338-340, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983).

The Defendants have also failed to show a true inconvenience in regards to the factor of "access to proof or witnesses". It is asserted that all the relevant proof and witnesses are in the State of New York. However, this assertion alone does not demonstrate a true inconvenience or hardship. Given its proximity to Delaware as well as the advanced state of the means of transportation available between the two locations, travel from New York to Delaware would be no more of a hardship or inconvenience than would travel from one corner of the State of New York to the opposite corner.

Nor does the factor of the "availability of compulsory process" weigh heavily in favor of the Defendants. While it is true that many of the potential witnesses could not be compelled to come to Delaware to testify, the Defendants have not shown that such compulsory process would be any more likely in New York. Indeed, the Defendants do not allege that all witnesses, or even the majority of the witnesses would be subject to process in New York. All that is alleged is that all of the potential witnesses reside outside of the State of Delaware. Defs'. Mot. at 10. Furthermore, one of the coauthors of the book, who is also one of the key defendants in this matter, Mr. Jett, has yet to be located and served in New York. The fact that he has been served in Delaware appears to make this action *more* convenient, at least in terms of service of process. As such, the compulsory process factor does not demand dismissal due to *forum non conveniens.*

*6 The parties agree that the factor of "the possibility of viewing the premises" is not relevant to this action, and warrants no discussion here.

The "pendency of a similar action in another jurisdiction" is the factor that weighs most heavily in favor of the Defendants in this action. The New York action was filed prior to the Delaware action and defending this action in two different jurisdictions would likely impose some hardship on the

Not Reported in A.2d                                                                                                        Page 6
Not Reported in A.2d, 2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499
(Cite as: 2002 WL 243387 (Del.Super.))

Defendants. However, this hardship is off set by the fact that had Mr. Jett made himself available to process in New York at the outset of that litigation, it is likely that the matter would have been on track to be promptly adjudicated in that state.

Finally, the Defendants claim that the factor of "all other practical problems that would make the trial of case easy, expeditious and inexpensive" weighs in their favor because none of the allegations in Mr. Cerullo's complaint have any connection to Delaware other than Harper Collins' incorporation in Delaware. Aside from the fact that Mr. Cerullo owns a summer home in Delaware, the Defendants' contention in this regard is true. However, as is stated above, Mr. Cerullo must be considered a Delaware resident for purposes of the Delaware Borrowing Statute. Given this status, the Delaware Courts do in fact have an interest in adjudicating a claim brought by a state resident against a defendant incorporated in Delaware.

Proceeding with this matter in Delaware is likely to be less convenient to the Defendants than proceeding in the State of New York. However, in light of the New York Supreme Court's June 22, 2001 decision to deny the Defendants' motion to dismiss, that litigation will proceed. *See Cerullo v. Morrow,* N.Y.Supr., No. 99/117910, Kapnick, J. (June 22, 2001). Therefore, as will be discussed more thoroughly below, this Court will stay the Delaware proceedings pending the outcome of the New York action. Any ruling on dismissal of the Complaint against Mr. Cerullo on *forum non conveniens* grounds is therefore premature.

*Staying the Proceedings*

[3] When considering a motion to stay the proceedings, the court should freely exercise it's discretion:

... in favor of a stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties, and the same issues; that, as a general rule, litigation should be confined to the forum in which it is first commenced ...; that these concepts are impelled by considerations of comity and the necessities of an orderly and efficient administration of justice.

*McWane Cast Iron Pipe Corp. v. McDowell, Wellman Eng'g. Co.,* 263 A.2d 281, 283 (Del.1970).

The purpose of effectuating a stay is to "avoid wasteful duplication of time, effort and expense that occurs when judges, lawyers, parties and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts." *Dura Pharm. v. Scandipharm, Inc.,* 713 A.2d 925, 928 (Del.Ch.1998).

*7 The New York action was filed before the Delaware action and should therefore be considered as "first filed." In addition, the New York case involves the same parties and the same issues as does the lawsuit filed in Delaware. Notwithstanding the existence of these factors, "[t]he *McWane* 'first filed' analysis is not a bright-line rule to be applied mechanically." *Caravetta v. McKesson HBOC, Inc.,* Del.Super., C.A. No. 00C-04-214, Herlihy, J. (Sept. 7, 2000) (Mem. Op. at 3). Mr. Cerullo contends that by virtue of Mr. Jett's avoidance of process in New York, Mr. Jett has delayed and will continue to delay that action, which ultimately prevents the New York courts of doing prompt and/or complete justice. This Court agrees, but as of June 3, 2001, that issue was resolved and the matter is apparently proceeding as scheduled. Consequently, considering all of these circumstances together, this Court must find that a stay of the proceedings is appropriate to allow the New York courts to proceed first.

CONCLUSION
For the foregoing reasons, the Defendants' Motion to Dismiss against the Plaintiff, Brian Finkelstein, is hereby granted, and the Defendants' Motion to Stay the Proceedings against the Plaintiff, Edward Cerullo, is hereby granted.

IT IS SO ORDERED.

Not Reported in A.2d, 2002 WL 243387 (Del.Super.), 30 Media L. Rep. 1499

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



Not Reported in A.2d

Page 1

Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

**C**
Clark v. Kelly
Del.Ch.,1999.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
David B. CLARK, and United California Discount
Corporation, a California corporation, Plaintiffs,
v.
Phillip KELLY and La Empresa De La Mar D'Oro,
Inc., a California corporation, Defendants,
andRIVIERA FINANCE LLC, a Delaware limited
liability company, Nominal Defendant.
**No. C.A. 16780.**

June 24, 1999.

Michael D. Goldman, Stephen C. Norman and
Gregory M. Johnson, of Potter, Anderson & Corroon,
LLP, Wilmington, Delaware; for Plaintiffs.
R. Franklin Balotti, Daniel A. Dreisbach, Srinivas M.
Raju and Peter B. Ladig, of Richards, Layton &
Finger, Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*
JACOBS, Vice Chancellor.
*1 Pending are cross-motions for summary judgment
in this action, brought under 6 Del. C. § 18-110, to
determine who are the lawful managers of Riviera
Finance, LLC (" Riviera" ), a Delaware limited
liability corporation. The dispute turns upon two
issues of California law: (i) whether a 100% stock
interest in a California corporation, La Empresa De
La Mar D'Oro, Inc. (" La Empresa" ), which was
titled solely in the name of the husband, was "
community property" in which the wife had a
property right when La Empresa became a
stockholder of Riviera; and (ii) if so, whether the
wife was thereby an " equity owner" of those La
Empresa shares at the time her husband assigned
them to a trust of which the husband and wife were
the trustees. This is the Court's decision on the cross-
motions. For the reasons discussed below, both
questions are resolved in the affirmative.

I. BACKGROUND

The plaintiffs are Mr. David B. Clark (" Clark" ),

who claims to be Riviera's sole manager, and Clark's
wholly-owned firm, United California Discount
Corporation, a California corporation (" UCDC" ).
The defendants are La Empresa and Mr. Phillip
Kelly. Mr. Kelly claims to be Riviera's co-manager,
as La Empresa's manager-designee.

UCDC and La Empresa each own 50% of Riviera,
which has been the vehicle for the joint business
efforts of Clark and his friend and business partner,
the late John B. Danis (" Danis" or " Mr. Danis" ).
At all relevant times, Clark has owned 100% of
UCDC, including the time when UCDC became a
member of Riviera.

The dispute turns on who were the stockholders of La
Empresa at the time that company became a member
of Riviera. The plaintiffs contend that Mr. Danis-who
controlled La Empresa and was the holder of record
of all of its outstanding shares [FN1]-owned 100% of La
Empresa stock at the time it became a member of
Riviera. If the plaintiffs are correct, then (for reasons
that will appear *infra* ) Mr. Clark is the sole lawful
manager of Riviera. The defendants, however,
contend that at that time both Mr. Danis and his wife,
Joyceann Danis (" Mrs.Danis" ), were each equal
(50%) equity owners of the stock, because the stock
was community property under California law. If that
contention is valid, then both Mr. Kelly and Mr.
Clark are the lawful co-managers of Riviera.

> FN1. The defendants motion to amend
> paragraph 13 of their answer, which
> mistakenly omitted the term " record"
> owner (as compared, for example, to
> paragraph 4 of their answer), is hereby
> granted. Court of Chancery Rule 15; *Bokat
> v. Getty Oil Co.,* Del.Supr., 262 A.2d 246
> (1970); *Potter v. Shields Dev. Co.,* Del. Ch.,
> C.A. No. 6026, mem. op. at 3, Brown, V.C.
> (Dec. 8, 1980) (" [t]he spirit of Rule 15 is
> that leave to amend pleadings should be
> freely granted where it is designed to assist
> in the disposition of litigation on the merits,
> and where there is no serious prejudice to the
> party opposing the motion." ). Here,
> granting the motion to amend assists the
> Court's determination of the merits;
> moreover, there is no demonstrable
> prejudice to plaintiffs, who have conducted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)
(Cite as: Not Reported in A.2d)

extensive discovery on this issue.

The material facts are undisputed and not complex. Riviera was formed in March 1996, and UCDC and La Empresa became Riviera's original members (each holding a 50% interest) at that time. In 1997, Danis transferred the La Empresa shares into the Danis Living Trust (the " Trust " ), of which Mr. and Mrs. Danis were both the trustors and co-trustees. That conveyance implicated, at least arguably, Section 8.1 of Riviera's Operating Agreement (the " anti-transfer provision" ), which prohibits the transfer of direct or indirect interests in Riviera that are not approved by the non-transferring partner. Essentially, that provision states that unless a " Transfer" is approved by 75% of the remaining voting interests, the transferee will have no right to participate in Riviera's management or become a substitute Member.[FN2] Rather, in that circumstance the transferee would become entitled only to " the share of profits or other compensation by way of income and the return of contributions to which that purchaser, transferee or assignee would otherwise be entitled." [FN3]

> FN2. Section 8.1(a) of the Operating Agreement pertinently states:
>
> ....[U]nless a Transfer is approved by the vote or written consent of 75% of all Voting Interests held by remaining Members, the proposed transferee of the transferring Member's Interest will have no right to participate in the management of the business and affairs of [Riviera] or to become a Substitute Member; provided, however, that if such transferee submits a written request for admission as a Substitute Member to [Riviera] within two years after said Transfer, the Remaining Members holding Voting Interest must, within three years after such Transfer, either (1) admit such transferee as a Substitute Member, or (2) purchase (or have a third-party purchase) such transferee's interest in [Riviera] on terms reasonably acceptable to such transferee.

> FN3. Operating Agreement, § 8.1(b).

*2 The term " Transfer," as used in the anti-transfer provision, is defined as follows:
" Transfer" means, with respect to any Member, the transfer of any portion of such Member's Interest, whether by sale, gift, assignment or other mode of transfer. If such member is an Entity, " Transfer" also includes a transaction or transactions in which (1) new equity securities of, or equity interests in, such Member are issued, (2) outstanding equity securities of, or equity interests in, such Member are transferred by sale, gift, assignment or other mode of transfer, or (3) such Member merges into another Entity, such that after any such transaction or transactions, the equity owners of such Member as of the date such Member is admitted to the Company own less than 90% of the outstanding equity securities of, or equity interests in, such Member (in the case of (1) or (2)) or the surviving Entity (in the case of (3)) after such transaction or transactions. In addition, in the event a trustee, receiver, executor, administrator, guardian or other similar representative is appointed for a Member, or the majority owner of a Member, and such representative is entitled to vote such Member's Interest, such appointment will constitute a " Transfer" for purposes of this Agreement.[FN4]

> FN4. Id. § 1.1(a-e). The parties attempted to create a Buy-Sell agreement to correspond with the anti-transfer provision, but no version of that agreement was ever executed by both parties and, thus, was not an enforceable contract.

The plaintiffs contend that that definition (in particular, the second sentence) was triggered when Mr. Danis transferred to the Trust the La Empresa shares that were titled in his name. The plaintiffs' argument runs as follows: La Empresa is an " Entity" and a " Member" of Riviera. Mr. Danis " assigned" all outstanding equity securities of La Empresa to the Trust. That assignment constituted a " Transfer," because after the assignment, Mr. Danis-who was La Empresa's sole " equity owner" at the time it became a " Member" of Riviera-owned less than 90% of La Empresa's outstanding equity securities. That is so (plaintiff contends) because after the assignment, Mr. Danis and his wife, as trustees, each owned 50%; and thereafter when Mr. Danis died on August 31, 1998, his 50% interest (as trustee) was transferred to his wife by operation of law. In that manner Mrs. Danis became the sole owner of La Empresa without UCDC or Clark's consent, and as a result, (i) La Empresa (now controlled by Mrs. Danis) lost its right to participate in the management, or to remain a member, of Riviera and (ii) the only present lawful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

(Cite as: Not Reported in A.2d)

member of Riviera is UCDC, whose designee, Mr. Clark, is Riviera's sole manager.

The defendants respond that no prohibited " Transfer" ever occurred, because at all relevant times Mr. and Mrs. Danis held the La Empresa shares as community property, as a result of which Mr. and Mrs. Danis were equal " equity owners" of the La Empresa shares at the time La Empresa became a member of Riviera. When Mr. Danis transferred the La Empresa shares (50% of which belonged to his wife) to the Trust, both he and Mrs. Danis retained their equal equity ownership over those shares in their capacity as Trustees. Therefore, defendants conclude, both before and after the " transaction" the original " equity owners" of La Empresa-Mr. and Mrs. Danis-continued to own over 90% of La Empresa's outstanding shares, and after Mr. Danis died, his wife continued to own more than 90% (indeed, 100%) of the outstanding equity shares. As a consequence, defendants argue, no " Transfer" ever occurred, La Empresa remains a member of Riviera, and its designee, Mr. Kelly, remains a lawful co-manager of Riviera together with Mr. Clark.[FN5]

> FN5. Before Mr. Danis died, Mr. Clark had consented to amending the Operating Agreement to substitute La Empresa for Mr. Danis as the co-Manager of Riviera, and to the appointment of Mr. Kelly by La Empresa as La Empresa's manager-designee.

*3 These contentions frame the core issue, which is whether the assignment of the La Empresa shares into the Trust constituted a " Transfer" within the meaning of the Operating Agreement. That issue is fundamentally one of law, [FN6] and is critical to determining who are the lawful managers of Riviera. If (as plaintiffs claim) the transaction was a Transfer within the meaning of the Operating Agreement, La Empresa's interest in Riviera would have become non-voting, and UCDC would have legally become entitled to appoint Clark as Riviera's sole manager. If (as defendants urge) a Transfer did not occur, then La Empresa continues to maintain its voting interest in Riviera, Clark's attempt to remove La Empresa as co-Manager of Riviera was legally ineffective, and Mr. Kelly (as La Empresa's designee) remains as a lawful co-manager of Riviera.

> FN6. In their briefs, the plaintiffs advanced as an alternative argument that Messrs. Danis and Clark intended that the term "

equity owners" would refer only to Danis and Clark, so that it would prohibit any other party (including a spouse) that neither Danis nor Clark consented to from obtaining a voting interest in Riviera. In support of that argument, the plaintiffs proffered certain extrinsic evidence and the defendants countered with their own. But this alternative argument fails at the threshold, because all parties agree that the anti-transfer provision of the Operating Agreement is clear and unambiguous. *See e.g.,* Plaintiffs' Reply Brief at 4; Defendants' Reply Brief at 7. Moreover, nowhere does the Operating Agreement state or even suggest that Danis and Clark intended for the term " equity owners" to have that meaning. Because the undefined term " equity owners" is conceded to be unambiguous, there is no room for interpretation, and the Court will not look to extrinsic evidence or collateral circumstances to determine the meaning of " equity owners" under the Operating Agreement. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* Del.Supr., 702 A.2d 1228, 1232 (1997) (" If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary to terms of the contract or to create ambiguity." ); *Citadel Holding Corp. v. Roven,* Del.Supr., 603 A .2d 818, 823 (1992) (" It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract" and " [o]nly when there are ambiguities may a court look to collateral circumstances." ); *see also Klair v. Reese,* Del.Supr., 531 A.2d 219 (1987); *Myers v. Myers,* Del.Supr., 408 A.2d 279 (1979); *DuPont v. Wilmington Trust Co.,* Del. Ch., 45 A.2d 510 (1946). Had the original contracting parties to the Operating Agreement (Clark and Danis) intended to prevent " outsiders" from obtaining their voting interests (through, for example, a sale or devise), they could have *expressly* so provided in the Agreement. Because they did not, the sole issue is legal: whether both Mr. and Mrs. Danis' were " equity owners" in La Empresa at the time La Empresa shares were placed in trust. That question must be decided by reference to the

applicable law.

## II. THE CONTENTIONS

As previously stated, the core issue is whether Mr. and Mrs. Danis were equal equity owners of the La Empresa stock at the time Mr. Danis transferred that stock to the Trust. The plaintiffs advance two arguments why Mrs. Danis was never an " equity owner." *First*, they contend that Delaware law-not California law-controls the characterization of her interest in La Empresa, because (a) the Operating Agreement contains a Delaware choice of law provision, and (b) the internal affairs doctrine requires the application of Delaware law. Since Delaware law applies at the threshold, plaintiffs urge, the Court would not reach or decide the question of whether the La Empresa stock was community property under California law. *Second,* plaintiffs argue that even if California law does apply, (a) under California law Mrs. Danis had no recognized community property interest, and (b) even if she did, her interest was only a monetary interest in the *value* of the La Empresa stock, rather than a specific right to the stock itself.

Not surprisingly, the defendants answer that this Court must apply California law to determine the nature of Mrs. Danis's interest in La Empresa, because in determining the equity owners of a California corporation, the internal affairs doctrine requires this Court to apply California law. The defendants further argue that under California law Mrs. Danis clearly had a community property interest in the La Empresa stock, as a result of which Mrs. Danis was a 50% equity owner of the La Empresa stock at the time it was conveyed to the Trust.

I conclude, for the following reasons, that the defendants' position is correct, and will grant summary judgment in their favor.

## III. ANALYSIS

Summary judgment is appropriate only where the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[FN7] In that particular context the Court must view all the evidence in the light most favorable to the non-moving party.[FN8] That the parties have filed cross motions for summary judgment does not alter that standard.[FN9] Summary judgment is especially

appropriate where the motion is based only upon legal claims, and there are no material facts in dispute.[FN10] Because this matter involves the application of a contractual provision-- here the Operating Agreement-to undisputed facts, this is such a case.

> FN7. *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,* Del. Ch., C.A. Nos. 16584, 16588, mem. op. at 7, Jacobs, V.C. (Oct. 9, 1998).

> FN8. *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1388 (1996).

> FN9. *Bethany Village Owners Ass'n, Inc. v. Fontana,* Del. Ch., C.A. No. 1706-S, mem. op. at 5-6, Steele, V.C. (Oct. 9, 1997).

> FN10. *See e.g., Robert E. Hickman Real Estate, Inc. v. Capano Group, L.P.,* Del. Ch., C.A. No. 5576, mem. op. at 11, Hartnett, V.C. (Nov. 14, 1979).

*4 With this standard in mind, I turn to the issues.

A. California Law-Not Delaware Law-Must Be
Applied To Determine Whether Ms. Danis is an
Equity Owner of La Empresa.

The plaintiffs first contend that the choice of law provision in the Operating Agreement (which mandates the application of Delaware law without regard to conflict of law principles),[FN11] together with the internal affairs doctrine, requires this Court to disregard California law and look solely to Delaware law in determining whether Mrs. Danis was an equity owner of La Empresa. I cannot agree.

> FN11. Section 12.3 of the Operating Agreement states: " This Agreement, and the application and interpretation hereof, will be governed exclusively by its terms and by the laws of the State of Delaware, without regard to conflict of law principles."

A corporation is a creature of the state in which it is incorporated.[FN12] Even if the choice of law provision in the Operating Agreement were found to govern, the internal affairs doctrine-which is a well-established principle of Delaware *substantive* law-requires this Court to look to the law of the state of incorporation to determine the relationships between

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

the corporate entity and its directors, officers, and stockholders.[FN13] As the Delaware Supreme Court has held, the application of the internal affairs doctrine is " mandated by constitutional principles, except in the rarest of situations." [FN14]

> FN12. *In re Santa Fe Indus., Inc. v. Green,* 97 S.Ct. 1292, 1304 (1977).

> FN13. *Rosenmiller v. Bordes,* Del. Ch., 607 A.2d 465, 468 (1991).

> FN14. *McDermott, Inc. v. Lewis,* Del.Supr., 531 A.2d 206, 217 (1987) (citations omitted).

In any event, I do not view the choice-of-law provision as determinative in the sense that it would change the relevant analysis, because the issue is who are the shareholders of a California corporation. In analyzing that issue, the Operating Agreement's definition of " Transfer" requires the Court to focus upon the " equity owners of such *member"* (La Empresa) as of " the date such member is admitted to the *company"* (Riviera).[FN15] Because La Empresa is a California corporation, under the internal affairs doctrine-which is a principle of Delaware substantive constitutional law-this Court would be required to look to California law in all events to determine who are the equity owners of La Empresa.[FN16] This conclusion comports entirely with common sense: how else can this Court determine the " equity owners" of a California corporation except by looking to California law? Therefore, California, not Delaware, law governs the question of whether Mr. and Mrs. Danis' interest in the La Empresa stock was community property or separate property.[FN17]

> FN15. Operating Agreement, § 1.1(a-e) (emphasis added).
> SERSBUGS;ELVIS;10:54/06/04/2002;EA

> FN16. *See also Star Cellular Tel. Co., Inc. v. Baton Rouge CGSA, Inc.,* Del. Ch., C.A. No. 12507, mem. op. at 11, Jacobs, V.C. (July 30, 1993) (using Georgia law to determine effect of the merger of two Georgia corporations on anti-transfer provision in Delaware limited partnership agreement), *aff'd,* Del.Supr., 647 A.2d 382 (1994).

> FN17. *See In re Marriage of Johnston,* Cal.

Ct.App., 149 Cal.Rptr. 798, (1978), *cert. denied sub nom. Southern California IBEW NECA Pension Plan v. Johnston,* 444 U.S. 1035 (1980); *cf. Carvel v. Andreas Holdings Corp.,* Del. Ch., 698 A.2d 375, 379 (1995) (finding New York law governed residents' dispute over stock ownership in New York corporation).

B. Mrs. Danis Was an Equity Owner in La Empresa Under California Community Property Law.

The specific California law issues this Court must decide are (a) did Mrs. Danis have a community property interest in the La Empresa stock that was held in her (late) husband's name, and (b) if so, was that community property interest tantamount to an equity ownership interest? For the reasons next discussed, I conclude that both questions must be answered in the affirmative.

1. Mrs. Danis Had a Community Property Interest in the La Empresa Stock.

California community property law views a marriage as a partnership and the spouses as equal partners.[FN18] California has long recognized " that the marriage, in respect to property acquired during its existence, is a community of which each spouse is a member, equally contributing by his or her industry to its prosperity, and possessing an equal right to succeed to the prosperity after dissolution." [FN19] Any property acquired during marriage, except by gift, devise, or descent, belongs to the community estate regardless of which spouse took the conveyance, or the actual division of labor among the spouses, or which spouse actually earned the property.[FN20] Whether property will be characterized as community property is to be determined from the manner and time of acquisition, and the characterization will not be affected or changed by any one spouse's opinion.[FN21] If the property is acquired with community funds while the parties are married in California, the property is deemed community property regardless of where the parties may be domiciled thereafter.[FN22] While it is possible to " transmute" community property to separate property, that can be done only if an express declaration to that effect is made, joined in, and consented to by the spouse whose interest would be adversely affected.[FN23]

> FN18. *In re Marriage of Brigden,* Cal.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 6

Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

Ct.App., 145 Cal.Rptr. 716, 722-23 (1978).

FN19. *Id.* (quoting *Meyer v. Kinzer,* 12 Cal. 247, 251 (1859)).

FN20. *Mitchell v. Moses,* Cal.App., 117 P. 685, 587 (1911).

FN21. *See In re Granniss' Estate,* Cal. 75 P. 324, 325 (1904) (" The character of the estate of the decedent, whether it is separate or the community property of himself and his first wife, is not to be affected or changed by his opinion thereon, or by any declaration which he may make in reference to it, but is to be determined from the mode in which the property was acquired." ); *see also In re Marriage of Haines,* Cal.App., 33 Cal.App. 4th 277, 291 (1995) (" the most basic characterization factor is the time when property is acquired in relation to the parties' marital status" ); *In re Marriage of Buol,* Cal., 705 P.2d 354, 357 (1985) (" [t]he status of property as community or separate is normally determined at the time of its acquisition" ) (citation omitted); *In re Foy's Estate,* Cal.App., 240 P.2d 685, 687 (1952) (stating that determination of property as separate or community to be accomplished by proof of how acquired); *Bias v. Reed,* Cal., 145 P. 516, 519 (1914) (noting that on several occasions California Supreme Court found that character of ownership of property was determined by mode of acquisition, not by declaration of party).

FN22. *Grappo v. Coventry Fin. Corp.,* 235 Cal.App.3d 496, 505-06 (1991).

FN23. *See* Cal. Fam.Code § 852.

*5 Thus, in determining whether the La Empresa shares were community property under California law, the inquiry will focus upon the manner and time of the acquisition of those shares and whether the spouses ever consented to transmute the shares to separate property. Here it is undisputed that the Danises acquired the La Empresa stock in 1975 during their marriage, with funds earned by Mr. Danis during the marriage; Mr. and Mrs. Danis both were domiciled in California; Mrs. Danis never waived her community property rights in the La Empresa shares; and those shares were never

transmuted from community property to separate property. Therefore, Mr. Danis could do nothing-either unilaterally or by agreement with Mr. Clark-legally to alter Mrs. Danis' community property interest in the La Empresa stock. Accordingly, at the time it was conveyed to the Trust, the La Empresa stock was community property under California law.

2. Mrs. Danis Had an Equity Ownership Interest in the La Empresa stock.

That conclusion leads to the final issue, which is what was the precise nature of Mrs. Danis' community property interest? Because under California law it is well settled that both spouses have a " present, existing, and equal" interest in community property,[FN24] Mr. and Mrs. Danis had a " present, existing, and equal" community property interest in the La Empresa stock. The question is whether that " present, existing, and equal" interest amounted to an equity ownership interest. California case law holds that it did.

FN24. *See* Cal. Fam.Code § 751 (" The respective interests of the husband and wife in community property during continuance of the marriage relation are *present, existing and equal."* ) (emphasis added)).

The plaintiffs argue that a spouse's interest in community property is limited to an undivided general monetary claim for the *value* of half (50%) of the community property held by the married couple. Thus, plaintiffs claim, Mrs. Danis had, at most, only a 50% interest in the monetary value of the La Empresa stock, of which Mr. Danis was the 100% equity owner. That argument is incorrect. The California courts hold that a community property interest is more than just a general monetary claim on the community assets with no claim of right to specific property.[FN25] Indeed, the plaintiffs' argument that a spouse had only a general money claim against the community estate has been expressly rejected in *Kenworthy v. Hadden.*[FN26]

FN25. *See e.g., Prudential Ins. Co. of Am. v. Harrison,* 106 F.Supp. 419, 426 (S.D.Cal.1952) (" A husband is absolute owner of one-half of the community property. His wife is like owner of the other one-half." ).

FN26. Cal. Ct.App., 151 Cal.Rptr. 169

Not Reported in A.2d                                                                                          Page 7

Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

**(Cite as: Not Reported in A.2d)**

<u>(1978).</u>

In *Kenworthy,* a wife devised community property interest in a partnership between her husband and a third party, each of whom owned a 50% interest. During his life the husband consistently paid to his wife's devisees his wife's share of the profits of the partnership and the proceeds of the sale of a partnership asset. Upon the husband's death, his executor filed an action for a declaration that the devisees of the wife's interest had no claim to, or right, title or interest in, the estate of the husband. The executor contended that the interest of the wife's devisees in the partnership was a general money claim that was barred by their failure to file a creditor's claim against the husband's estate.

**\*6** The California Court of Appeal rejected the executor's position. <u>FN27</u> The court recognized that during her life, the wife had no interest in the partnership assets themselves; rather, " her interest was in [the husband's] partnership interest which was the personal property separate and distinct from the partnership assets. [The wife] thus enjoyed more than a mere money claim; she had a community property interest in present and existing personal property." <u>FN28</u> Accordingly, the court concluded, " when community property was transferred to the partnership [in exchange for a partnership interest the wife] did not divest herself of her community interest in that property in favor of a general money claim against [the husband]; she merely traded her community interest in one asset for a community interest in another asset, [the husband's] partnership interest." <u>FN29</u> Thus, the wife's devisees were claimants of specific property, not general creditors of the estate of the husband.FN30

FN27. <u>*Kenworthy,* 151 Cal.Rptr. at 172.</u>

FN28. *Id.*

FN29. *Id.*

FN30. *Compare* <u>Adams v. Janouskas, Del.Supr., 452 A.2d 148, 155 (1982)</u> (citing favorably the result in *Kenworthy* as an example of how joint property interests such as community property interests are claims on specific assets).

Thus, a spouse's interest in California community

property is not limited to a general money claim. The California courts have described a spouse's present, existing, and equal interest in community property as akin to a specific ownership interest in the assets owned by the marital community.<u>FN31</u> No California case has been cited that holds contrary. Moreover, that result is consistent with three other, and distinct, sources of California law, which also support the proposition that Mrs. Danis was an equity owner of the La Empresa shares held by Mr. Danis both before and at the time those shares were transferred to the Trust.

FN31. *See* California Practice Guide § 8.5, p. 8-4 (1998) (defining " present, existing, and equal" as " each spouse [having] ... a 50% *ownership* interest in community property, with equal rights of management and control ... but subject to intraspousal fiduciary obligations." (emphasis added)); <u>*People v. Llamas,* Cal. Ct.App., 60 Cal.Rptr.2d 357, 362 (1997)</u> (" Spousal community property interests are no longer " mere expectancies" as they were for a married woman years ago. Each community property owner has an equal *ownership* interest and, although undivided, one which the criminal law protects from unilateral non-consensual damage or destruction by the other marital partner." (emphasis added)); <u>*In re Marriage of Hillerman,* Cal. Ct.App., 167 Cal.Rptr. 240, 243 (1980)</u> (" The interest of each spouse in the assets of the marital community are " present, existing and equal" during the continuation of the marriage. Upon dissolution each spouse possesses an equal and absolute right to one-half of the community property. The division of community property by the court merely distributes *that which each party already owns* by virtue of the marriage relationship." (emphasis added)); *In re Estate of Bray,* Cal. Dist. Ct.App., <u>40 Cal.Rptr. 750, 753 (1964)</u> (" [T]he wife has a vested interest in all of the community property and her interest extends to every part and parcel of the community property estate." ).

a) California Stock Ownership Law

Under California law, stock can be held as community property. In that case each spouse

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 8
Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)
(Cite as: Not Reported in A.2d)

maintains a " present, existing, and equal" interest in the stock, regardless of who is the holder of record.[FN32] Consistent with that concept, the California Family Code grants each spouse the right to apply for an order directing that his or her name be added as an owner of record of community property titled solely in the name of the other spouse.[FN33] Where the community property is stock, each spouse is also entitled to one half of the dividends.[FN34]

> FN32. *D'Elia v. D'Elia,* Cal.App. 4 Dist., 68 Cal.Rptr.2d 324, 329 (1997).

> FN33. *See* Cal. Fam.Code § 1101(c). That statute states that
> A court may order that the name of a spouse shall be added to community property held in the name of the other spouse alone or that the title of community property held in some other title form shall be reformed to reflect its community character, except with respect to any of the following: (1) A partnership interest held by the other spouse as a general partner. (2) An interest in a professional corporation or professional association. (3) An asset of an unincorporated business if the other spouse is the only spouse involved in operating and managing the business. (4) Any other property, if the revision would adversely affect the rights of a third person.
> The plaintiffs, however, argue that a breach of fiduciary duty is a prerequisite to add the name of a spouse to the title of community property. They read § 1101(a)-which states that a spouse has a claim against another spouse for a breach of fiduciary duty when the claimant spouse's present undivided one-half interest is impaired-in conjunction with § 1101(c). But, the rights enumerated in subsection (c) are not expressly or impliedly made contingent upon any such breach. *See e.g., Schnabel v. Superior Court,* Cal., 854 P.2d 1117, 1123 (1993) (citing right under § 1101(c) to have name added to stock in case where there was no allegation of breach of fiduciary duty).

> FN34. *Rogan v. Delaney,* 110 F.2d 336, 337 (9th Cir.), cert. denied, *Delaney v. Rogan,* 311 U.S. 660 (1940).

Given the status of California law on this subject, the plaintiffs' contention that Mrs. Danis could not be an equity owner of La Empresa because she was not a holder of record, is wrong on its face.[FN35] Their argument ignores a fundamental reality of stock ownership-that one need not be the record owner of stock to be a beneficial owner or to exercise certain ownership rights. [FN36] Mrs. Danis was always entitled to exercise her beneficial ownership rights over the La Empresa shares. She could have petitioned a court to have her name added to the title of the La Empresa stock. Thereafter, as record owner, she could have (even over her husband's objection) taken action incidental to stock ownership, such as filing a lawsuit to seek inspection of La Empresa's books and records or filing a derivative action on behalf of La Empresa.[FN37] That Mrs. Danis chose not to exercise her property rights in the La Empresa stock does not mean that those rights never existed.

> FN35. *SeeD'Elia,* 68 Cal.Rptr.2d at 329.

> FN36. *SeeD'Elia,* 68 Cal.Rptr.2d at 329-30 (citing *Schnabel,* 854 P.2d at 1123 (nonrecordholder spouse had " at least as great a right of discovery from the corporation as any shareholder [or recordholder]" )); Cal. Corp.Code § 800; *Pearce v. Superior Court of Kern County,* Cal. Ct.App., 197 Cal.Rptr. 238 (1983) (construing Cal. Corp.Code § 800 and holding that beneficial owner may maintain derivative suit); *Rosenthal v. Burry Biscuit Corp.,* Del. Ch., 60 A.2d 106 (1948).

> FN37. *See supra* note 36. The fact that Mr. Danis (as the holder of record) could have-as plaintiffs contend-" disturbed" Mrs. Danis' rights (as beneficial owner) by selling the stock or taking action contrary to her wishes is simply a statement of the risk inherent to all beneficial owners, namely the risk that all beneficial owners assume by not holding stock in their name as record holders. *See e.g. Enstar Corp. v. Senouf,* Del.Supr., 535 A.2d 1351, 1354-55 (1987).

*7 The plaintiffs also argue that Section 1100(d) of the California Family Code,[FN38] which grants to one spouse the ability to exercise control over community property used in a family business, correspondingly reduces the other spouse's ownership interest in that property. This argument also lacks merit. Even if one spouse's (*i.e.,* Mr. Danis') control over the property is exclusive, that cannot alter the legal fact that Mrs.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 9
Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Danis had a property interest equal to that of her spouse, and that she was entitled to exercise all ownership rights in the shares as long as they were held as community property.[FN39]

FN38. That section pertinently provides: [A] spouse who is operating or managing a business or an interest in a business that is all or substantially all community personal property has the primary management and control of the business or interest. Primary management and control means that the managing spouse may act alone in all transactions but shall give prior written notice to the other spouse of any sale, lease, exchange, encumbrance, or other disposition of all or substantially all of the personal property used in the operation of the business ... whether or not title to that property is held in the name of only one spouse....

FN39. At worst, Mrs. Danis would be considered a beneficial owner of the stock. *See* *Schnabel,* 854 P.2d at 1123 (highlighting spouse's beneficial ownership rights in community-owned stock); *Cf* . *Anadarko v. Petroleum Corp. v. Panhandle E. Corp.,* Del.Supr., 545 A.2d 1171, 1176 (1988).

b) California Gift and Tax Law

California gift law also supports the proposition that each spouse is a 50% equity owner of community property. Under the California Probate Code which governs gifts of community property, courts have interpreted the phrase " one-half of the community property" to mean " one half of each community property asset." [FN40] As a consequence, a spouse has the right to dispose of no more than one-half of each community property asset to a person other than the surviving spouse. Thus, if a decedent devises a testamentary gift of 100% of a community property asset to a third party without the surviving spouse's consent, the gift can be avoided as to the surviving spouse's one-half interest.[FN41] An *inter vivos* gift may also be voided as to the surviving spouse's one-half interest in the asset even after the death of the donor spouse.[FN42]

FN40. *See* *In re Estate of Wilson,* Cal. Ct.App., 227 Cal.Rptr. 794, 797 (1986).

FN41. *Id.* at 798. This result rests upon the fundamental concept that each spouse has a vested one-half interest in the property that cannot be divested by a gift without the other spouse's consent. In *In re Estate of Wilson,supra,* the husband opened Totten Trusts for each of his nine children and four accounts for his wife. The wife claimed she had no knowledge of these accounts before her husband's death and filed a community property petition under the Probate Code claiming the right to the money in the children's trust accounts. Three of the children filed objections, claiming that the money in the trust accounts should not be distributed to the wife because it constituted less than half of the total value of the Wilson's community property, and therefore, the husband could validly give the money as a gift since it was his " one-half interest" to dispose. The trial court awarded the wife one-half of each of the Totten Trust accounts of the three objectors. The California appellate court affirmed, holding that even though the wife's claim was essentially for the return of money, she nevertheless had the right to reclaim the specific funds held in the trust accounts rather than be forced to accept an equivalent amount from other separate assets of the husband.

FN42. *Odone v. Marzocchi,* Cal., 211 P.2d 297, 301, *reh'g denied,* 212 P.2d 233 (1949); *see also* *Trimble v. Trimble,* Cal., 26 P.2d 477, 480 (1933) (" the deeds executed by the deceased without consideration and without the consent of his wife are valid conveyances as to one-half of property sought to be conveyed, but may be avoided by his wife as to her half of said community property" ); *Ballinger v. Ballinger,* Cal., 70 P.2d 629 (1937) (finding stock issued in husband's name only was community property and setting aside one-half of a gift of stock made without wife's consent).

Finally, California tax law is consistent with the proposition that each spouse is a 50% owner of community property. Tax liability is imposed upon each spouse for his or her respective half of the community property,[FN43] so that a spouse may

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 10

Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

(Cite as: Not Reported in A.2d)

separately report and pay tax upon one half of the taxable community property.[FN44] Consistent with that rule, when determining the taxable estate of a decedent spouse only one-half of the community property is included in the decedent's estate, because the law regards the remaining half as belonging to the surviving spouse.[FN45]

> FN43. *Brooks v. United States,* 84 F.Supp. 622, 625-26 (S.D.Cal.1949).

> FN44. *See Commissioner v. Cavanagh,* 125 F.2d 366, 368 (9th Cir.1942); *Rogan,* 110 F.2d at 337. Indeed, " [t]he division of community property between the parties is not a taxable event." *In re Marriage of Brigden,* 145 Cal.Rptr. at 727.

> FN45. *See Schoenfeld v. Commissioner,* 103 F.2d 964, 965 (9th Cir.1939).

c) California Community Property Claims

When a spouse asserts a community property claim under California law, that constitutes " an assertion of a right of ownership." [FN46] In *In Re Marriage of Johnston,* during divorce proceedings a wife petitioned the court to order direct payment to her of her portion of the husband's retirement benefits. The husband claimed that to grant such relief would constitute an assignment or alienation of pension benefits that would violate federal law. The court rejected that argument, finding that " [t]he order of the court complained of herein did not require an assignment or alienation of the employee's benefits. The order affirmed the nonemployee spouse's existing property interest. The distribution of that interest directly to the nonemployee spouse, therefore, will represent no violation of federal law." [FN47]

> FN46. *In Re Marriage of Johnston,* 149 Cal Rptr. at 806.

> FN47. *Id.* at 806.

For all these reasons, this Court is persuaded that under California law Mrs. Danis has always been an equity owner of one half of the La Empresa stock held by her late husband and titled in his name. Because Mrs. Danis (as sole remaining beneficiary and trustee of the Trust) is currently the 100% beneficial owner of La Empresa, it follows that she

continues to own more than 90% of the equity of that corporation. As a consequence, (i) no " Transfer" occurred within the meaning of the Operating Agreement when the La Empresa stock was conveyed to the Trust,[FN48] (ii) La Empresa retains its voting interest in Riviera, and (iii) Mr. Kelly, as La Empresa's designee, remains as a lawful co-manager of Riviera.

> FN48. The plaintiffs make an additional argument that the assignment of La Empresa stock to the Trust was a " Transfer" under the third sentence of the definition of Transfer in the Operating Agreement. The third sentence states that " in the event a trustee, receiver, executor, administrator, guardian or other similar representative is appointed for a Member, or the majority owner of a Member, and such representative is entitled to vote such Member's Interest, such appointment will constitute a " Transfer" for purposes of this Agreement." Under this provision a " Transfer" will have occurred if (i) a representative (trustee, receiver, guardian, etc.) for the majority owner of La Empresa is appointed, and (ii) that appointed representative must be entitled to " vote such Member's Interest," meaning La Empresa's interest in Riviera. Even assuming *arguendo* that the first requirement was satisfied by placing the shares into the Trust, the second has not. Neither after the placement of La Empresa shares in the Trust nor after the death of Mr. Danis have the trustees of the Trust had the right, qua *trustees,* to vote La Empresa's Interest in Riviera. Rather, that right has at all times has belonged to the Board of Directors of La Empresa acting in their directorial capacity.
> Mr. and Mrs. Danis' right to vote the La Empresa stock *as trustees* is not, however, equivalent to the right to vote the " Member's Interest," within the meaning of the Operating Agreement. The plaintiffs have failed to show that Mr. and Mrs. Danis acting together, or Mrs. Danis acting individually, ever had the authority or power to vote La Empresa's interest in Riviera in their capacity as trustees of the Trust.

IV. CONCLUSION

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 11
Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


**\*8** The defendants's motion for summary judgment is
granted, and the plaintiffs' cross motion is denied. IT
IS SO ORDERED.

Del.Ch.,1999.
Clark v. Kelly
Not Reported in A.2d, 1999 WL 458625 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D



Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)

**(Cite as: 2005 WL 1653988 (Del.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.
EBY
v.
THOMPSON, et al.
**No. Civ.A. 03C-10-010THG.**

Submitted Feb. 21, 2005.
Decided April 20, 2005.

Dear Counsel:

GRAVES, J.

**\*1** This is the Court's decision regarding Rental Equipment Center's request to apply Maryland law to the Plaintiffs' claims. For the following reasons, the motion is DENIED.

Rental Equipment Center (hereinafter "REC") is a Maryland corporation that rents equipment to the general public. On June 28, 2003, Allawishes Gove rented a trailer and stump grinder from the REC store in Salisbury, Maryland. Before releasing the equipment, REC required Mr. Gove to complete and authorize a written contract containing the rental terms and conditions.

The rented trailer and stump grinder were later directly involved in a motor vehicle accident in Seaford, Delaware. The accident resulted in the death and physical injuries of two Delaware residents. The Plaintiffs filed a civil action for damages arising out of the accident in the Sussex County Superior Court.

The Plaintiffs insist that the application of strict liability to a lessor, according to Delaware law, is appropriate. REC, however, requested that this Court apply Maryland law, which precludes strict liability of lessors. REC contends that Maryland law should apply since its store is located in Maryland, the rental agreement was formed in Maryland, the lease agreement requires the equipment to be used in Maryland and the contract leasing the stump grinder

to Mr. Gove specifically cites the application of Maryland law.

These arguments, however, ignore the fact that the central issue and parties in this case are essentially unrelated to the equipment rental and lease agreement. If this case was a personal injury or wrongful death action by Mr. Gove, the lessee, then the contractual formation and obligations between those parties might be more relevant. But the case before the Court centers around the death of William Eby and the physical injury of Jeanette Eby, who had no connection to the rental agreement.

The only connection between the Ebys and REC is an automobile accident that occurred in Delaware. The accident did not arise out of the contract formed in Maryland nor are the Plaintiffs in this action bound by that contract. Therefore, any breach of the agreement between REC and Mr. Gove as to usage or any expectation of the applicable law established by the leasing agreement shall have minimal effect on the choice of law in this action. Instead of focusing on the contractual agreement between Mr. Gove and REC, this Court will interpret the choice of law question in relation to the automobile accident that resulted in this wrongful death and personal injury action.

In 1991, the Delaware Supreme Court adopted the "most significant relationship" test found in RESTATEMENT (SECOND) OF CONFLICTS (1971) as the appropriate standard to apply for conflict of law disputes. [FN1] The state with the "most significant relationship" to the claim at issue is determined by balancing the following factors:

FN1. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 47 (Del.1991).

1. The needs of the interstate and international systems;
2. The relevant policies of the forum;
**\*2** 3. The relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue;
4. The protection of justified expectations;
5. The basic policies underlying the particular field of law;
6. Certainty, predictability and uniformity of result;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)
(Cite as: 2005 WL 1653988 (Del.Super.))

and
7. Ease of determination and application of the law to be applied.

First, as applied to this case, the needs of the interstate and international systems are not likely to be affected by the choice of law decision in this case. The application of strict liability to Maryland lessors whose products injure Delaware residents will not likely change the course of commerce between the two states or affect either state's liability systems.

Second, the relevant policies of the forum state, Delaware, provide for the added protection of its citizens by holding lessors strictly liable for the inspection and upkeep of rental equipment. [FN2] Holding lessors strictly liable for damages arising out of the use of its equipment creates a system whereby 1) liability is borne by the individual profiting from the rental; 2) the lessor is in the best position to inspect rental equipment and avoid the rental of defective equipment; 3) an implied representation of fitness accompanies the rental of equipment; and 4) the risk of defective equipment is lessened by the caution taken by lessors to prevent the application of strict liability. [FN3] Strict liability is not limited to the parties to a lease contract because "[t]he doctrine of strict liability in tort has been extended to injured bystanders." [FN4] Therefore, the Court sees no reason why the added protection of Delaware law should be denied to Delaware residents harmed on a Delaware roadway by equipment leased in Maryland.

> FN2. *Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581 (Del.1976).

> FN3. *Wilson v. Dover Skating Center, Ltd.,* 566 A.2d 1020 (Del.Super.1989).

> FN4. *Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581, 587 (Del.1976)

Third, Maryland's approach to lease and bailment liability is quite different from Delaware law. Maryland applies a general negligence standard to the lessor of equipment. [FN5] A lessor's liability there will depend on the Plaintiff's ability to show that the lessor knew of a defect or that a reasonable inspection of the rental equipment would have exposed a defect prior to leasing. [FN6] Maryland's interest in the application of Delaware law to a Maryland lessor lies in the potential strict liability judgments against lessors that will result under the more stringent standard.

> FN5. *Bona v. Graefe,* 285 A.2d 607, 611 (Md.1972)(finding that "the liability of the lessor of a chattel, as distinguished from that of a vendor, if it is to be imposed at all in Maryland, must be imposed in a tort action for negligence.").

> FN6. *Id. citing Smith v. Kelly,* 229 A.2d 79, 81 (Md.1967).

While Maryland lessors may be harmed by the application of strict liability to actions that arise in Delaware, they are in a better position to absorb the costs of those risks than an individual resident of Delaware. The potential harm occasioned by the application of Delaware law can only result in Maryland lessors taking greater care before releasing equipment to consumers. To avoid the application of strict liability, lessors can prohibit the transport of rental equipment across the border into Delaware. Here, the evidence supports an inference that REC knew the equipment would be used in Delaware. Delaware provided sound reasoning for its adoption of lessor strict liability. I am persuaded by the same reasons in finding that Delaware's interest in protecting its residents from injuries caused by defective leased equipment is greater than Maryland's protection of its lessors from strict liability judgments.

*3 Fourth, the justified expectations of the parties in this action are at odds. According to its lease agreement, REC required its equipment to be used in the Salisbury metropolitan area exclusively. REC contends that it expected Maryland law to encompass any action arising out of its rental, as a function of its anticipated rental area and the language contained it its lease agreements.

However, the lease agreement also put REC on notice that Mr. Gove was a Delaware resident. Mr. Gove listed a Delmar, Delaware address in the rental agreement. In Paragraph 2(b) of the lease contract, the lessee agrees to use the rental equipment "only at the address designated ..." in the agreement. By releasing the equipment to Mr. Gove, pursuant to the lease agreement, REC effectively released the property into Delaware. Plaintiffs also contend that discovery revealed numerous REC rental contracts with Delaware residents. REC's history of renting to Delaware residents, its knowledge that this specific

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)
(Cite as: 2005 WL 1653988 (Del.Super.))

lessee resided in Delaware and its lease language requiring that rental equipment be used at the address listed was sufficient to alert REC to Delaware's jurisdiction of personal injury actions involving this equipment.

Additionally, REC contends that its rental contract to Mr. Gove set forth the applicable law governing their agreement. But the fact that the agreement between REC and Mr. Gove sets forth Maryland law as governing the contract does not indicate that torts arising out of the contract will be treated similarly. Courts have previously found that broad choice of law clauses encompass tort actions that arise out of contractual agreements. [FN7] However, the choice of law clauses in those cases used broader governing language such as "any litigation arising out of or relating to [this] Agreement" [FN8] or "any claim arising out of or relating to" the agreement. [FN9]

> FN7. *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304 (2d Cir.1994); *VGS, Inc v. Castiel,* 2003 WL 723285 (Del. Ch.2003).

> FN8. *VGS, Inc,* 2003 WL 723285, at *7 & n. 29 (Del. Ch.2003).

> FN9. *Turtur v. Rothschild Registry Int'l, Inc.,* 26 F.3d 304, 309 (2d Cir.1994).

Here, the rental agreement is narrowly drawn, stating only that "[t]his Rental Contract is consummated in the State of Maryland and shall be governed by Maryland law." [FN10] Similar choice of law clauses have been rejected as encompassing tort actions. [FN11] The choice of law clause chosen by REC refers only to the terms of the agreement and is not broad enough to cover torts arising out of the rental agreement.

> FN10. Rental Contract between REC and Allawishes Gove, of 6/28/03 at 2.

> FN11. *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC,* 832 A.2d 116, 124 (Del. Ch.2003)(finding that a choice of law clause calling for Delaware law to apply "to the rights of the parties ... is simply not sufficiently broad enough to cover tort claims.").

The Ebys expected Delaware law to apply as they traveled Delaware's roadways. They never subjected themselves to Maryland jurisdiction. The Plaintiffs chose to file this action in Delaware, the location of the accident. The Plaintiffs expectations should not be altered simply because a contract unrelated to their action was formed in Maryland.

Fifth, this case involves personal injury and wrongful death claims. In personal injury actions, the law of the State where the injury occurred usually applies. [FN12] In this case, the only connection between the parties is their alleged involvement in an automobile accident in Delaware. Despite REC's contentions, Maryland's relationship to this action remains tenuous and does not override Delaware's general jurisdiction over the matter.

> FN12. *Travelers,* 594 A.2d at 47 (citing Restatement (Second) Conflicts of laws § 146 (1980)).

*4 Sixth, uniformity and predictability weigh in favor of applying Delaware law. Personal injury and wrongful death claimants expect to have their cases adjudicated according to the laws of the state where their injuries occurred. This Court will not upset that general rule to appease a lessor which subjected itself to Delaware's strict liability laws by leasing equipment into Delaware territory.

Finally, the Court must consider the ease of determination and application of the law to be applied. REC contends that if this Court applies Delaware law, it will become strictly liable, whereas Maryland law would allow the jury to attribute liability among the Defendants. It argues that "Delaware courts should always consider fault in assessing liability in tort cases." [FN13] REC also argues that applying strict liability would affect its cross-claims against other Defendants.

> FN13. *Id.* at 48.

But allowing REC to be subject to strict liability does not mean that it is instantly liable, *res ipsa loquitor,* based on a rental of equipment that is involved in a personal injury action. Nor does it mean that all other defendants are absolved of liability. Instead, the strict liability system allows that a lessor "may be held liable in tort, without proof of negligence, if the [item] it placed in circulation proved to have a defect that proximately caused personal injury or property damage to the plaintiffs." [FN14] I find that Delaware's strict liability standards may be fairly and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)

(Cite as: 2005 WL 1653988 (Del.Super.))

Page 4

appropriately applied to this claim.

> FN14. *Martin v. Ryder Truck Rental, Inc.*, 353 A.2d 581, 588-589 (Del.1976).

When determining the appropriate law to apply to a tort claim, the Court must consider additional contacts including:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered. [FN15]

> FN15. *Travelers,* 594 A.2d at 47 (citing Restatement (Second) Conflicts of laws § 145 (1980)).

These contacts are to be weighed relatively given their importance to the particular issue. [FN16]

> FN16. *Id.*

REC's alleged failure to maintain its rental equipment, its rental agreement with Mr. Gove and its Maryland incorporation and principal place of business are the only factors that connect this action to Maryland. These factors, which only relate to one Defendant, are not enough to outweigh Delaware's connection to this matter.

First, and most importantly, the only connection between the Plaintiffs and the Defendants named in this action is an automobile accident that occurred on a Delaware roadway. Generally, in actions for personal injury, the law of the State where the injury occurred applies. [FN17] Second, the conduct causing the injury may have occurred in Maryland or Delaware, depending on the jury's determinations of liability. Third, the Plaintiffs and at least one other Defendant are residents of Delaware. REC is the only Maryland corporation requesting that Maryland law apply. Finally, the relationship between the parties in this action centers on the accident that occurred in Delaware. A balance of these factors leaves Delaware with the most significant relationship to this accident and an overriding interest in ensuring that its residents are adequately compensated for any injuries they suffer on Delaware highways. Applying Maryland law to the Plaintiffs' action would unjustly strip Delaware residents of their full rights of recovery. The Court considers these factors to be the relevant and integral connections to Delaware, thereby establishing the proper application of Delaware law. For the foregoing reasons, the motion is DENIED.

> FN17. *Travelers,* 594 A.2d at 47 (citing Restatement (Second) Conflicts of laws § 146 (1980)).

Not Reported in A.2d, 2005 WL 1653988 (Del.Super.)

END OF DOCUMENT

# EXHIBIT E



Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)

**(Cite as: 1997 WL 338855 (E.D.Pa.))**

Page 1

**C**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Gregory OSBY and Kay A. Vaughn
v.
A & E TELEVISION NETWORKS AND KURTIS
PRODUCTIONS, LTD.
No. CIV. A. 96-7347.

June 17, 1997.

*MEMORANDUM AND ORDER*
SHAPIRO, NORMA L., J.

**\*1** Plaintiffs filed this action for defamation, false light, emotional distress, and loss of consortium. Defendants removed the action from Philadelphia Court of Common Pleas on the basis of complete diversity between the plaintiffs and all defendants. [FN1] Defendants moved to dismiss under F.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Rule 56. At a pretrial hearing on the motion to dismiss, plaintiffs withdrew their claim for emotional distress. Defendants' motion to dismiss will be denied; summary judgment will be granted as to all remaining claims.

> FN1. The plaintiffs Osby and Vaughn, husband and wife, live in Cinnaminson, New Jersey. Defendant Kurtis Productions, Ltd. ("Kurtis") is an Illinois corporation. Defendant A & E Television Networks ("A & E") is a joint venture with its principal place of business in New York. The partners in a joint venture must all be diverse from the plaintiff. *Kooperman v. Village One Assoc. Ltd. Partnership,* 1989 WL 71299 \*1 (E.D.Pa.1989) (citing *Stuart v. Al Johnson Construction Co.,* 236 F.Supp. 126 (W.D.Pa.1964)). The partners in A & E are: Disney/ABC International Television, Inc., a Delaware corporation with its principal place of business in New York; the Hearst Corporation, a Delaware corporation with its principal place of business in New York; and RCA Cable, Inc., a Delaware corporation with its principal place of business in New York.

Plaintiffs alleged damages greater than $50,000, the statutory minimum at the time the action was removed to federal court. 28 U.S.C. § 1332.

**I. FACTS**

Kurtis produced a television program, "Seized by Law," (the "program") for A & E's series, "Investigative Reports." The program, aired April 17, 1996, featured specific instances of law enforcement officers seizing personal property of people suspected of drug trafficking. The program's direction was that such seizures could be legal, but not fair or just. One segment of the program focused on Willie Jones, an African-American contractor traveling from Nashville to Houston on business. He was carrying a large amount of cash, paid for his tickets with cash, and had scheduled a short trip. According to the narrative of the program, that made him a suspicious person. "[Jones' attorney,] E.E. 'BO' EDWARDS: The federal agencies involved in forfeiture frequently, and in fact, routinely, pay rewards in airports, for example. Uh, they pay airline ticket agents to give them tips on someone who looks, quote, 'suspicious.' " "Seizures" final script, Defs' Mot. to Dismiss, Ex. B at 16.

The program emphasizes that men of color are more likely to be detained by law enforcement agents than white men.

> BILL KURTIS: According to Edwards, Willie Jones was the victim of an airport profile stop. He'd paid cash for his ticket, was traveling to a so-called drug city, planned a very short stay, and most importantly, was a person of color.
> E.E. "BO" EDWARDS: Had I with my white skin and my business suit on done exactly the same thing that Willie Jones did that day, I seriously doubt that I would have been bothered.
> WILLIE JONES: I showed them who I was, I showed them my business card. I showed them my checkbook, no story was--was good enough.
> BILL KURTIS: Jones' money was taken from him, no arrest made, no detainment. Jones was told to board his flight. Instead, he went to court. After more than two years, Jones got his money back, the stop deemed unconstitutional, the federal government chastised. To some, however, Jones merely represents the tip of the iceberg.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 2

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)

**(Cite as: 1997 WL 338855 (E.D.Pa.))**

E.E. "BO" EDWARDS: If a minority citizen of this country is traveling through an airport or traveling on an interstate highway, they are probably 10 times or 15 times, maybe even 20 times more likely to be stopped for the sole purpose of a law enforcement agent trying to get permission to search them to see if they have money. "Seizures" final script, Defs' Mot. to Dismiss, Ex. B at 16-17.

**\*2** The narration, including the quotes from Willie Jones and his attorney, was a voice-over accompanying pictures of an airport ticket counter, Jones' business card, newspaper headlines, and a courtroom. There were two airport crowd scenes, both showing plaintiff Osby and other people walking across an open space in an airport. The first shot of Osby appeared when Bill Kurtis said, "... most importantly, was a person of color." The second scene, showing Osby walking behind another African American man and an older African American woman, appeared as E.E. Edwards said, "If a minority citizen of this country is traveling through an airport ..."

Plaintiff, filing this action in Philadelphia Court of Common Pleas on October 4, 1996, alleged the program depicted him as involved in criminal activity and damaged his reputation. After defendants removed the action to federal court, this court heard oral argument on defendants' motion to dismiss or, in the alternative, for summary judgment.

## II. DISCUSSION

A court should grant a motion to dismiss for failure to state a claim upon which relief may be granted only if " 'it appears to a certainty that no relief could be granted under any set of facts which could be proved.' " _Schrob v. Catterson,_ 948 F.2d 1402, 1408 (3d Cir.1991) (quoting _D.P. Enterprises, Inc. v. Bucks County Community College,_ 725 F.2d 943, 944 (3d Cir.1984)), _reh'g denied_ (Dec. 24, 1991). In deciding a motion to dismiss under F.R.C.P. 12(b)(6), "all allegations in the pleadings must be accepted as true and the plaintiff ... must be given the benefit of every favorable inference that can be drawn from those allegations." _Id._ at 1405 (citations omitted).

A motion to dismiss relying on matters outside the pleadings may be treated as a motion for summary judgment under Rule 56, provided all parties have had an opportunity to present pertinent material.

Fed.R.Civ.P. 12(b). Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant moving for summary judgment bears the initial burden of demonstrating there are no facts supporting the plaintiff's claim; then the plaintiff must introduce specific, affirmative evidence that there is a genuine issue for trial. _Celotex Corp. v. Catrett,_ 477 U.S. 317, 322-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all justifiable inferences in the nonmovant's favor. _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Defendants Kurtis and A & E submitted a videotape of the "Seized by Law" television program and a transcript of the program's narration and interviews. Defendants provided sworn affidavits verifying the videotape and transcript are accurate; plaintiffs do not dispute the accuracy of the videotape and transcript. Defendants argue the videotape and transcript may be considered by the court in deciding the motion to dismiss since plaintiffs' complaint describes the program. The videotape and transcript are matters outside the pleadings, so the court will consider only defendants' motion for summary judgment. _See In re Medical Lab. Management Consultants,_ 931 F.Supp. 1487, 1491 (D.Ariz.1996) (motion to dismiss in a defamation action converted to summary judgment when defendants submitted a videotape and affidavit).

### A. Applicable Law

**\*3** Both parties assume without argument that Pennsylvania law applies to this action. Plaintiffs are residents of New Jersey, but Osby is "an international jazz recording artist who for many years has conducted business in the Philadelphia area and throughout the world as a recording artist and performer." Pl. Compl. ¶ 9. Osby has friends and business associates in Philadelphia, and was "enjoying a good name and reputation in the Philadelphia community" when the program aired in April, 1996. Pl. Compl. ¶ 10. Vaughn has "family, friends and business associates in the Philadelphia area ..." Pl. Compl. ¶ 11. The plaintiffs allege their reputation among their friends, family and business associates was damaged by defendants' airing the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)

**(Cite as: 1997 WL 338855 (E.D.Pa.))**

program.

Under a traditional choice of law analysis, the state where the plaintiff is domiciled generally, but not always, has the greater interest in a defamation case. *See* *Restatement (Second) of Conflict of Laws* § 150(2), "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time ..." In Comment e, "Multistate communication involving a natural person," the Restatement notes:

Rules of defamation are designed to protect a person's interest in his reputation. When there has been publication in two or more states of an aggregate communication claimed to be defamatory, at least most issues involving the tort should be determined,

... by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation.

* * * * *

A state, which is not the state of the plaintiff's domicil, may be that of most significant relationship if it is the state where the defamatory communication caused the plaintiff the greatest injury to his reputation. This may be so, for example, in situations where (a) the plaintiff is better known in this state that in the state of his domicil ...

*Restatement (Second) of Conflict of Laws* § 150(2) cmt e (1971).

Plaintiffs' complaint suggests, but does not state explicitly, that their reputations are based more in Philadelphia than in the New Jersey community where they live. Based on the pleadings, Pennsylvania has an interest in the outcome of this litigation, since Osby works here and his professional reputation is based here. Where the parties have agreed to apply Pennsylvania law and Pennsylvania has an interest in the outcome of the litigation, there is no reason for the court, "sua sponte, to challenge the parties' consensual choice of law." *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 269-70 (3d Cir.1980). The court will apply Pennsylvania law to this action.

B. Plaintiffs' Defamation Claim

Osby alleges the program, by suggesting he was involved in criminal activity, made false and

defamatory statements about him that "serve to disparage Plaintiff's good name, credit reputation both in his professional life as a musician and recording artist and in his private life, all of which brought Plaintiff into public ridicule and disgrace." Pl. Compl. ¶ 27. Defendants argue that the two scenes of Osby walking through an airport cannot support the meaning Osby alleges, and the program's depiction of him is not defamatory.

**\*4** Plaintiff bears the burden of establishing the program is defamatory. *Thomas Merton Center v. Rockwell Intern'l Corp.,* 497 Pa. 460, 442 A.2d 213, 215-16 (Pa.1981) *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982) (article that implied plaintiff organization was unknowing recipient of Soviet funding was not libelous). "It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Id.* citing *Restatement (Second) of Torts, § 614(1) (1977).* "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from dealing with him." *Franklin Music Co. v. American Broadcasting Co.,* 616 F.2d 528, 541 (3d Cir.1979). *See also, Thomas Merton Center,* 442 A.2d at 215; *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899, 904 (Pa.1971); *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751, 753 (Pa.1962); *Restatement (Second) of Torts* § 559 (1977). Communications must be evaluated to determine " 'the effect the [communication] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.' " *Baker v. Layfavette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987) *quoting Corabi,* 273 A.2d at 907.

Osby contends the two scenes showing him walking through an airport are defamatory because the context of the program suggests he is suspicious and involved in criminal activity. On the contrary, the program's narrative emphasizes that average African American men who were not suspicious have been at risk of being stopped and searched because of their race. In the first scene, he was one of three African American men shown walking through the airport. He was not doing anything special to single him out from the other travelers. He appeared after the narrative

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)

**(Cite as: 1997 WL 338855 (E.D.Pa.))**

stated that Willie Jones was stopped in part because he was a "person of color."

In the second scene, Osby was on screen longer, but he was seen behind another African American male and an older African American female. Osby did not appear to be travelling with the other couple; he was simply walking behind them. Edwards' voice-over explained that minority persons in an airport were at a greater risk of being stopped by law enforcement without probable cause to see if they have money.

No reasonable viewer watching the segment profiling Willie Jones and the federal agents' unconstitutional seizure of his money could have concluded Osby, or any of the four other African American men seen in the airport, was involved in criminal activity, or was suspected of criminal activity. At most, a reasonable viewer could have concluded that Osby was at greater risk of being an object of law enforcement discrimination on the basis of race.

*5 Even if, as plaintiffs contend, the program suggested some African Americans were drug traffickers, there was nothing to connect Osby to criminal activity, or allegations of criminal activity. This action is remarkably similar to *Fogel v. Forbes, Inc.,* 500 F.Supp. 1081 (E.D.Pa.1980). In *Fogel,* Forbes Magazine ran an article on the financial benefit of increased investments and purchases by Latin Americans in the Miami area. The article stated some Latin Americans were buying goods in Florida and selling them on their return to South America. Including in the article was a photograph of plaintiffs, husband and wife, standing next to a large pile of boxes at an airport ticket counter. The caption read, "The Load: Some Latins buy so much in Miami they've been known to rent an extra hotel room just to store their purchases." *Id.* at 1084. There are other people in the photograph; the plaintiffs are not identified in the caption or the article. *Id.* Plaintiffs contended their appearance in the photograph implied they engaged in buying merchandise in Miami for resale in Latin America. Dr. Fogel admitted in his deposition that no one had been deterred from dealing with them, or that their private or professional reputations had been injured by the Forbes Magazine article. *Fogel,* at 1086.

The *Fogel* court noted, "The caption to the photograph in question focuses the readers' attention to the boxes of merchandise in the photograph. The plaintiffs' appearance in the photograph is obviously

incidental and does not in any manner imply that they are participating in the activity discussed in the article ..." *Id.* at 1085.

The court finds that the picture and the article are not reasonably capable of conveying the meaning or innuendo ascribed by the plaintiffs. As the Supreme Court of Pennsylvania has said on numerous occasions, if the publication is not in fact libelous, it cannot be made so by innuendo which puts an unfair and forced construction on the interpretation of the communication. *Id.* (citing *Bogash v. Elkins,* 405 Pa. 437, 176 A.2d 677 (Pa.1962); *Sarkees v. Warner-West Corp.,* 349 Pa. 365, 37 A.2d 544 (Pa.1944)). "Furthermore, assuming that the article and the picture were reasonably capable of conveying the meaning and innuendo ascribed by the plaintiffs, the Court finds that such meaning is not defamatory" to the Fogels since they were not buying and selling merchandise.

Here, plaintiffs' claim regarding Osby's appearance in the "Seized By Law" program is less plausible than the Fogels' claim regarding the Forbes photograph. There was nothing to connect Osby with Willie Jones or any of the individuals portrayed in the program as stopped by law enforcement agents on suspicion of criminal activities. Osby is portrayed, accurately, as an African American male using an airport. The reasonable viewer would recognize that the producers had no particular reason for videotaping Osby, other than to show an innocent citizen potentially at risk of an unconstitutional seizure of his money because of his race. Osby's depiction in the program was not capable of defamatory meaning.

C. Plaintiffs' False Light Claim

*6 Pennsylvania has adopted the Restatement (Second) of Torts § 652E governing the tort of portraying someone in a "false light":

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Weinstein v. Bullick,* 827 F.Supp. 1193, 1202 (E.D.Pa.1993), *citing Restatement (Second) of Torts*

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: 1997 WL 338855 (E.D.Pa.))**

§ 652E (1977).    The "false light" cause of action differs slightly from defamation;  it involves a false statement that is not necessarily defamatory.  *Id.*

Plaintiffs allege the program depicted Osby as involved or suspected of criminal activity, and that "false and defamatory" depiction "created a highly offensive, objectionable and false public impression of [Osby] and placed him in a false light in the public eye."  Pl. Compl. ¶ 36.  Plaintiffs contend that the depiction of Osby "would be highly offensive to a reasonable person ..." Pl. Compl. ¶ 37.

To survive summary judgment, plaintiffs must show that "the publicity forming the basis for the false light claim be reasonably capable of being understood as singling out, or pointing to, the plaintiff." *Weinstein,* 827 F.Supp. at 1202.    The publicity must also be untrue.  *Fogel,* 500 F.Supp. at 1088.  As in *Fogel,* plaintiffs here place the same interpretation on the program as they did in the defamation claim, that is, that Osby was depicted as involved in criminal activity.

The defects in the defamation claim are defects in the false light claim: 1) plaintiffs' interpretation of how Osby was depicted is not reasonable; 2) defendants' program did not portray Osby as involved in criminal activity; and 3) a reasonable person could not find the two scenes of Osby walking in an airport "highly offensive."

D. Vaughn's Consortium Claim

Vaughn's loss of consortium claim relies on injuries sustained by Osby.   As Osby's claims of defamation and false publicity have not survived summary judgment, Vaughn's consortium claim cannot survive either.   An appropriate order follows.

*ORDER*
AND NOW, this 12th day of June, 1997, upon consideration of defendants' motion to dismiss or, in the alternative, for summary judgment and plaintiffs' memorandums in opposition, it is ORDERED that:

1. Defendants' motion to dismiss is DENIED;

2. Defendants' motion for summary judgment is GRANTED;

3. The Clerk of the Court is directed to enter judgment for defendants on all counts.

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F



Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 1993 WL 67202 (Del.Ch.)

**(Cite as: 1993 WL 67202 (Del.Ch.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
SUMNER SPORTS INC., Plaintiff,
v.
REMINGTON ARMS COMPANY, INC., Michel
Gravel, Gaston Gravel and the Michel
Gravel Agency Inc., Defendants.
**Civ. A. No. 11841.**

Submitted Jan. 7, 1993.
Filed March 4, 1993.
Clark W. Furlow, and Michele C. Gott, of Smith,
Katzenstein & Furlow, Wilmington; Peter Aron, of
Aron, Twomey, Hoppe & Gallanty, New York City,
of counsel, for plaintiff.

Thomas R. Hunt, Jr., and Robert J. Valihura, Jr., of
Morris, Nichols, Arsht & Tunnell, Wilmington;
Raymond Michael Ripple, of Dupont Legal D-7052,
for defendant Remington Arms Co., Inc.

MEMORANDUM OPINION
CHANDLER, Vice Chancellor.

*1 Plaintiff Sumner Sports Inc. ("Sumner"), a
Canadian sporting goods distributor, has brought this
action against defendants Michel and Gaston Gravel,
The Michel Gravel Agency Inc. (the "Agency"), and
Remington Arms Company, Inc. ("Remington").
Sumner charges that its former employees, brothers
Michel and Gaston Gravel (the "Gravels"), breached
their fiduciary duties to Sumner, as well as their
employee agreements, in conspiring with Remington
and the other defendants to divert existing and
prospective business opportunities rightfully
belonging to Sumner.

Specifically, plaintiff alleges that the Gravels and the
Agency conspired with Remington to implement a
scheme by which Michel Gravel would divert
business from Sumner towards the Agency and
Remington. Thus Sumner alleges actions of both
contractual and tortious nature against the defendants,
including:  breach of fiduciary duty by the Gravels,

aided and abetted by the Agency and Remington
(Count I);  breach of contract by the Gravels, aided
and abetted by the Agency and Remington (Count
II);  intentional interference with the Gravels'
employment contracts by Remington (Count III);
intentional interference with the contracts between
Sumner and Remington by the Gravels and the
Agency (Count III);  all defendants' intentional
interference with Sumner's prospective business
opportunities (Count III);  misappropriation of
Sumner's confidential customer records by
defendants (Count IV); and breach of the duty of
good faith and fair dealing by Remington regarding
its contract with Sumner, aided and abetted by the
Agency and the Gravels (Count V).

Remington, the only defendant who has responded to
Sumner's complaint to date, has moved to dismiss or
stay this action on the grounds of *forum non
conveniens.* [FN1] This is my decision on the *forum
non conveniens* motion.

> FN1. Remington has also moved to dismiss
> based on lack of subject matter jurisdiction
> and the failure to join a party under
> Chancery Court Rule 19.     However,
> Remington is not pursuing those defenses at
> this time.

I. BACKGROUND FACTS
Sumner is a Canadian corporation with its principal
place of business in Quebec City, Canada.  It is a
sporting goods distributor specializing in hunting,
fishing and camping equipment.  Sumner distributes
goods manufactured by many manufacturers,
including Remington, to other distributors and retail
dealers throughout Canada who then sell to the
public.

Michel and Gaston Gravel are Canadian citizens who
reside in Quebec, Canada.  The Agency, a Canadian
corporation with its principal place of business in
Quebec City, Canada, is wholly owned or controlled
by Michel Gravel.  None of these parties--Michel,
Gaston, or the Agency--have responded to plaintiff's
complaint or appeared in the present action.

Remington, a Delaware corporation, manufactures
and sells sporting goods, including shotguns, rifles,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1993 WL 67202 (Del.Ch.)

**(Cite as: 1993 WL 67202 (Del.Ch.))**

ammunition, firearm accessories and hunting apparel. Prior to 1989, it distributed its products to several Canadian wholesalers and distributors, appointed under one-year distributor agreements ("distribution agreements"). Under the distribution agreements, distributors were permitted to sell Remington products to retailers in Canada on a non-exclusive basis.

**\*2** Sumner became a Remington distributor in 1987 after purchasing an existing Remington distributorship, Distribution Chasse & Peche de Chicoutimi Inc. ("Chicoutimi"). Sumner's distribution agreement contains an unusual "court selection" clause, which purports not only to indicate a choice of law for actions arising under the contract, but goes so far as to select a particular *court:*

14. *APPLICABLE LAW:* The Agreement, these Special Conditions for Export Distributors, the Special Conditions for Export Sale, and the Standard Conditions shall be construed in accordance with the laws of the State of Delaware and the United States of America. *The Courts of the United States sitting in Wilmington, Delaware shall be [sic] exclusive jurisdiction over any question or controversy which may arise under the Agreement.*

Distribution Agreement, Plaintiff's Exhibit E at 5 (emphasis added). The distribution agreement also contains the special condition that Sumner employ Michel Gravel, a previous part-owner of Chicoutimi, or Remington could accelerate termination of the Agreement to 30 days.

Therefore, in connection with the purchase, Michel Gravel signed a three-year employment contract with Sumner. Michel Gravel was appointed first vice president of sales and was responsible for handling Sumner's Remington accounts in Canada. Gaston Gravel, who had been employed by Chicoutimi, also became a Sumner employee and entered into a 19 month contract as vice president of sales and marketing.

Remington changed its Canadian marketing strategy in late 1989. It proposed hiring an exclusive Remington agent for Canadian sales, rather than using its then-current method of distribution agreements. Michel Gravel was offered and accepted the position of exclusive Remington agent, and resigned from Sumner on November 19, 1989. Gaston Gravel, however continued to work at Sumner under the terms of his contract until April 19,

1990. [FN2] Sumner now alleges that Remington's new marketing strategy was part of a scheme orchestrated by Remington to illegally take away Sumner's largest and best Remington clients-- in effect, to remove Sumner as middleman and replace it with a Remington agent. In October, 1990 Sumner filed a suit in Quebec Superior Court against the other defendants--Michel Gravel, Gaston Gravel and the Agency. The Quebec Superior Court issued a Writ of Seizure allowing a search of the Agency's premises. Plaintiff claims that various Sumner documents were found at the Agency, including Sumner's customer lists.

FN2. Gaston Gravel tendered his resignation in mid-January, 1990, and continued to work until April 19, 1990, 90 days after the date of his resignation, as was required under his employment contract.

On December 10, 1990, Sumner brought this suit to seek injunctive relief, as well as compensatory damages, from a scheme it alleges defendants entered into to divert to themselves the Remington market which Sumner had built up in Canada. Subsequently, on September 13, 1991, Sumner filed a petition revising its October 1990 complaint in the Superior Court of the District of Quebec, Canada. The revised Canadian action sets out the same facts as the present action. It names as defendants Michel Gravel, Gaston Gravel, the Agency, Remington, as well as one other party, the Gaston Gravel Agency Inc. The Canadian complaint states that the suit was filed by the plaintiff "to protect its rights ... in the eventuality that its suit in Delaware is dismissed ..." (Canadian complaint at ¶ 12). The Canadian complaint requests the right to re-amend the petition in order to assert all remedies available to the plaintiff in this action, including preliminary and permanent injunction, monetary damages, attorneys' fees, court costs and interest.

## II. SUMNER'S ARGUMENTS

**\*3** Sumner presents two arguments why this action should proceed in Delaware: 1) because Delaware is not an inconvenient forum for this action, and 2) because of the existence of the "forum selection clause." I will address each argument in turn.

### A. *Delaware as Forum*

In evaluating a motion to dismiss or stay on the grounds of *forum non conveniens,* Delaware courts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consider six factors: 1) the applicability of Delaware law in the action; 2) the relative ease of access to proof; 3) the availability of compulsory process for witnesses; 4) the pendency or non-pendency of any similar actions in other jurisdictions; 5) the possibility of a need to view the premises; and 6) all other practical considerations which would serve to make the trial easy, expeditious and inexpensive. _Miller v. Phillips Petroleum Co. Norway,_ Del.Supr., 537 A.2d 190, 202 (1988). These six factors should be used as a guide to the Court's discretion. _American Home Prods. Corp. v. Adriatic Ins. Co.,_ Del.Super., C.A. No. 91C-04-119, Del Pesco, J. (Nov. 5, 1991) slip op. at 3. I shall therefore examine each of these factors individually. [FN3]

> FN3. Factor five, the need to view the premises, is irrelevant to an analysis of the controversy at hand. I therefore will not address it below.

### 1. Applicability of Delaware Law

Remington argues that Canadian law will apply to four of the five counts of the complaint. [FN4] It is undisputed that the breach of fiduciary duty, breach of employment contract, intentional interference with both the Remington-Sumner and the Gravel-Sumner contracts, and misappropriation claims (Counts I-IV of the complaint) will be governed by the law of the jurisdiction that has the most significant relationship to the occurrence and parties. _Travelers Indemnity Co. v. Lake,_ Del.Supr., 594 A.2d 38, 45 (1991), _citing Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,_ Del.Supr., 394 A.2d 1160, 1166 (1978).

> FN4. Count V deals with Remington's breach of good faith and fair dealing (and the Gravels' and the Agency's aiding and abetting) regarding Sumner's distribution agreement. Considering that the distribution agreement purports to specifically select Delaware and United States law, and furthermore identifies the District Court of Delaware as the proper forum, Remington does not assert that Canadian law is likely to apply to this Count.

The forum having the "most significant relationship" to the contract claims between Sumner and Gaston and Michel Gravel (Count II) is Quebec, Canada. Under the test stated in the Second Restatement of Conflict of Laws, the factors in determining the most

significant relationship are: 1) the place of contracting, 2) the place of negotiation of the contract, 3) the place of performance, 4) the location of the subject matter of the contract, and 5) the domicile, residence, nationality, place of incorporation and place of business of the parties. _Restatement (Second) of Conflict of Laws_ § 188 (1971). All of these factors weigh in favor of a Canadian disposition of the contract allegations of the complaint.

In determining which forum has the "most significant relationship" to the action regarding the tort claims, I will consider four factors, as identified by our Supreme Court and by the Second Restatement of Conflicts. They are: 1) the place of injury, 2) the place where the conduct causing the injury occurred, 3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and 4) the place where the relationship, if any, between the parties is centered. _Travelers,_ 594 A.2d at 47 _citing Restatement (Second) of Conflict of Laws_ § 145 (1971).

*4 Sumner contests Remington's conclusion that Canada has the most significant relationship to the tort claims, even though it concedes that the first factor, the place of injury, is Canada. Sumner asserts that the other factors do not necessarily weigh in favor of Canadian jurisdiction. I disagree.

Regarding the second factor, Sumner contends that Delaware is the location of the conduct which created the injury in that Remington planned and developed its illegal strategy in this state. From the facts presented in the complaint and the briefs, it is unclear where the strategy, if any, was developed. However, assuming that there was in fact a plan and that it was formulated in Delaware, the weight of this consideration is not dispositive in determining the forum with the most significant relationship to the action. No reason appears why this State would have an overriding interest in the present action if the only connection to this forum is that one of the defendants conceived an illegal plan here.

As to the third factor, it appears that all parties other than Remington are residents or nationals of Canada. Furthermore, all other business entities are incorporated in Quebec, Canada and have their principal places of business in Canada. Therefore, all parties have significant contacts in Quebec. In contrast, these parties have tenuous, if any, ties to

Not Reported in A.2d                                                                          Page 4
Not Reported in A.2d, 1993 WL 67202 (Del.Ch.)
**(Cite as: 1993 WL 67202 (Del.Ch.))**

Delaware.

The fourth factor, the center of the parties' relationship, weighs in favor of Canadian jurisdiction. The plaintiff here has had a relationship with all defendants in Canada to sell goods in Canada. While Sumner has entered into a contract with a defendant whose headquarters are in Delaware, the center of its relationship to Remington is Canada. That Sumner's distribution agreement contains a clause directing disputes to be litigated in the District Court of Delaware is not a factor in determining the centrality of Delaware to the parties' relationship in connection with the tort claims.

The place of alleged injury is admittedly Canada. The place where the conduct causing the injury is unclear, but it is arguably Delaware. Other than defendant Remington, all other parties are Canadian citizens or entities and live and work in Canada. The relationships between the parties has been centered in Canada. Therefore, under the multiple factors regarding tort claims, I determine that Quebec, Canada has the "most significant relationship" with the parties.

### 2. Ease of Access to Proof

The second factor to consider under the *forum non conveniens* test is the relative ease of access to proof in the forum. Sumner argues that Remington's plan was formulated in Delaware and that, therefore, "it is likely that Remington has numerous documents that are relevant to this litigation located in Delaware."

While Delaware may be the location of documents relating to the alleged plan, this fact alone does not weigh significantly in favor of allowing the case to proceed here. Certainly, since all other parties-- plaintiff *and* other defendants--are located in Canada, it seems more likely that many more documents would be located in Quebec than in Delaware. Sumner implicitly admits this point when it argues that "documents in the possession of the Gravels or non-party witnesses can be brought to Delaware with little or no inconvenience" and testimony of Canadian witnesses can be introduced by depositions. Ultimately, plaintiff's assertion that many documents are located in Delaware fails to convince me that their case is centered in Delaware and should be heard here. Considering that written information must be transported in regard to whatever forum is applicable to this case, I believe this factor weighs more heavily in favor of the Quebec forum.

### 3. Compulsory Process

**\*5** The third factor to consider in a *forum non conveniens* analysis similarly weighs in favor of a stay. No defendant other than Remington has appeared or responded to Sumner's complaint in this action. All defendants, including Remington, have appeared in, and are prepared to defend, the Canadian action. In addition, Quebec law appears to authorize compulsory process for the Gravels whose testimony would be at the center of a determination whether the defendants diverted or solicited Sumner's customers. (Frechette Affidavit ¶ 5). On the other hand, it is highly doubtful that this Court could issue compulsory process to foreign nationals or officials of Canadian corporations in this proceeding, especially in the absence of allegations that the claims against the foreign defendants arise out of business transacted in Delaware such that they would be amenable to service of process from a Delaware court. *See* 8 *Del.C.* § 382; *Hurst v. General Dynamics Corp.*, 583 A.2d 1334, 1339 (1990).

Finally, as Remington correctly points out, many non-party witnesses--former customers of Sumner located across Canada--will provide important testimony as to key allegations by Sumner that its customers were diverted or solicited by defendants. Since these witnesses reside in Canada, this Court cannot compel them to appear for trial in Delaware. In contrast, Quebec courts can issue compulsory process for most, if not all, of the expected non-party witnesses. *See* Frechette Affidavit ¶ 7.

Sumner argues that Remington should not be allowed to rely upon the fact that the Gravels have not submitted to this Court's jurisdiction as a basis to conclude that this Court is without jurisdiction over all the defendants and that the problem, if any, with the non-party witnesses can be cured via videotaped depositions. I am not persuaded by these arguments.

Nothing indicates that, for its own advantage, Remington has orchestrated the Gravels' refusal to appear in this action. In addition, I do not consider the relevant inquiry on this motion to be whether this Court has power, in a jurisdictional sense, over the Gravels. [FN5] What I am being asked to recognize are the practical problems likely to attend a trial in this Court. The Gravels may choose not to appear, leaving Remington in the unenviable position of defending against allegations that it aided and abetted the Gravels in violating their fiduciary duties to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1993 WL 67202 (Del.Ch.)

**(Cite as: 1993 WL 67202 (Del.Ch.))**

Sumner and conspired with the Gravels to divert business from Sumner to Remington. Additionally, many non-party witnesses who could offer direct testimony on issues that ultimately may turn on credibility determinations may be unavailable, except via deposition testimony. Deposition testimony, videotaped or otherwise, is a poor substitute for live testimony. The Quebec court, on the other hand, has all the parties before it, with few, if any, problems obtaining live testimony from all of the important witnesses. All of these considerations point overwhelmingly to Quebec as the optimal forum for resolution of this dispute.

> FN5. Thus I need not address Sumner's argument based on the conspiracy theory of jurisdiction, as articulated in *Instituto Bancario Italiano Spa v. Hunter Engineering Co.*, Del.Supr., 449 A.2d 210 (1982). This argument is misplaced. I am concerned here, instead, with what practical problems are entailed by allowing this action to proceed in favor of a pending action in Quebec, especially problems relating to the appearance of party and non-party witnesses.

### 4. Pendency of the Canadian Action

**\*6** The question remains as to how much weight should be accorded to the pendency of another action in a different jurisdiction. The plaintiff first filed an action in Canada in October 1990, revised on September 31, 1991, which involves the same parties [FN6] seeking the same relief based upon the same facts.

> FN6. As noted above, the Canadian action also names another defendant, the Gaston Gravel Agency Inc.

Plaintiff contends that the Delaware action should not be dismissed because of the general rule that the first filed action, as the plaintiff's choice of forum, deserves respect and should proceed. However, it is unclear whether the Delaware action is actually the first filed, since the plaintiffs brought a suit previously in Canada. Therefore, the general rule that the first filed action should proceed may weigh in favor of the Canadian action and not the present action. Nevertheless, I need not decide the first filed question because I have placed upon Remington the burden of proving inconvenience and hardship by demonstrating that the combination and weight of the

appropriate factors in a traditional *forum non conveniens* analysis weigh overwhelmingly in favor of its motion to dismiss or stay the action here. *See Williams Gas Supply Co. v. Apache Corp.*, Del.Supr., 594 A.2d 34, 36 (1991).

Sumner has, through filing two suits, attempted to bring virtually identical actions in two separate fora. Sumner's purpose in filing the Canadian action is, as stated in its revised complaint, to "protect its rights" if a dismissal is granted in Delaware. By filing both actions, Sumner evidently has sought the procedural benefits of two fora. Such tactical maneuvering, in my opinion, reduces the weight to which the choice of forum might otherwise be entitled. *Hurst v. General Dynamics Corp.*, Del.Ch., 583 A.2d 1334, 1340 n. 9 (1990) ("That the plaintiffs are concurrently seeking to maintain the benefits of two fora significantly reduces the weight to which the plaintiff's choice of forum might otherwise be entitled.") Accordingly, I find that the pendency of Sumner's Canadian action reduces the importance of its filing in Delaware.

### 5. Other Practical Considerations

Other practical considerations, including expense and time, do not weigh in favor of a Delaware trial. First, the plaintiff and all defendants have strong contacts with Canada. It is unlikely that a Delaware trial would be less expensive than one in Quebec, especially considering that the actions alleged to have caused it injury occurred in Canada where the business and the witnesses are all located. Second, a determination here may not fully and finally determine the rights and responsibilities of all parties involved due to the likely absence of named defendants. It is also unlikely that plaintiff will be unduly burdened if it is required to litigate in the court of its domicile, principal place of business, and nationality.

Along with the problems which would be faced in applying Canadian law to most of the claims, the likelihood of a French/English interpreter is an additional factor weighing in favor of a Quebec trial. While the language barrier is certainly a surmountable one, the added expense and inconvenience of a French/English translator, which would most probably be necessary for at least some testimony were this trial to proceed, would burden the courts of Delaware more than those of Quebec, which has dual French and English official languages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 1993 WL 67202 (Del.Ch.)

**(Cite as: 1993 WL 67202 (Del.Ch.))**

**\*7** Therefore, a desire for a comprehensive trial as to all claims, involving all named defendants and including a defendant not named in the Delaware action, leads me to conclude that the Canadian court is the most reasonable, appropriate and convenient place to litigate the entire controversy.

B. *The "Forum Selection" Clause*

Sumner argues that any actions arising from its contract with Remington must be brought in Delaware because of the "forum selection" clause existing in its distribution agreement.    As I noted above, however, the clause in the distribution agreement purports to select *more* than the forum; it purports to choose the law (Delaware and the United States) *and* a specific court ("Courts of the United States sitting in Wilmington, Delaware").

I am unsure about the validity or enforceability of a contract provision that, in effect, says that any dispute under the contract shall be litigated in a Federal District Court sitting in a particular city.    But if the "court selection" clause *is* enforceable, then claims arising under the distribution agreement must be brought in the United States District Court for the District of Delaware.    That is, the parties' agreement, if it *is* enforceable, requires them to bring actions arising under it in the Federal District Court, not the Delaware Court of Chancery or the courts of Quebec, Canada.    On the other hand, if it is *not* enforceable, the clause obviously has no relevance to the proper forum issue.    Under either possibility, therefore, the court selection clause has no relevance to the analysis undertaken here and provides no basis for concluding that this action should proceed rather than the Canadian action.

### III. CONCLUSION

The doctrine of *forum non conveniens* empowers a court "to decline jurisdiction whenever considerations of convenience, expense, and the interests of justice dictate that litigation in the forum selected by the plaintiff would be unduly inconvenient, expensive or otherwise inappropriate." *Monsanto Co. v. Aetna Casualty and Surety Co.*, Del.Super., 559 A.2d 1301, 1304 (1988).    I have analyzed the *forum non conveniens* factors--the applicability of Delaware law, the relative ease of access to proof, the availability of compulsory process, the pendency of other similar actions, and other practical considerations--and determined that they weigh overwhelmingly in favor of the trial proceeding in Quebec, Canada.    Remington has demonstrated that it would be more convenient, just and inexpensive to allow this case to proceed in the Superior Court of Quebec.

The existence of the choice of law and court selection clause in the distribution agreement also does not support plaintiff's argument that this Court is the appropriate jurisdiction to hear the present case.    On the contrary, if the clause is valid, it would indicate the parties' view that *neither* this Court *nor* the Canadian Court is the appropriate decisionmaker in this controversy.

**\*8** Because Remington has demonstrated that the factors in a traditional *forum non conveniens* analysis weigh overwhelmingly in favor of its motion to dismiss and because the court selection clause does not weigh in favor of this action or the Canadian action, I grant Remington's motion to dismiss.

An Order has been entered in accordance with this Memorandum Opinion.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that this action is DISMISSED on grounds of *forum non conveniens.*

Not Reported in A.2d, 1993 WL 67202 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

[Home] [Databases] [WorldLII] [Search] [Feedback]

**SAFLII**

# South Africa: Constitutional Court

**You are here:** SAFLII >> Databases >> South Africa: Constitutional Court >> 2002 >> [2002] ZACC 12

[Database Search] [Name Search] [Recent Decisions] [Noteup] [Download] [Help] [Context➥] [Hide Context]

## Khumalo and others v Holomisa (CCT53/01) [2002] ZACC 12; 2002 (5) SA 401; 2002 (8) BCLR 771 (14 June 2002)

CONSTITUTIONAL COURT OF SOUTH AFRICA

Case CCT 53/01

FRED KHUMALO First Applicant

SKHUMBUZO MIYA Second Applicant

FIDEL MBHELE Third Applicant

TIMES MEDIA LIMITED Fourth Applicant

NEW AFRICA PUBLICATIONS LIMITED Fifth Applicant

versus

BANTUBONKE HARRINGTON HOLOMISA Respondent

Heard on : 7 May 2002

Decided on : 14 June 2002

JUDGMENT

Oâ€™REGAN J:

[1] This is an application for leave to appeal against the dismissal of an exception by the Transvaal High Court. The respondent, a well-known South African politician and the leader of a political party, is suing the applicants whom we may assume are responsible for the publication of a newspaper, the Sunday World, for defamation arising out of the publication of an article with their newspaper. In the article it was stated, amongst other things, that the respondent was involved in a gang of bank robbers and that he was under police investigation for this involvement.

[2] The applicants excepted to the respondentâ€™s particulars of claim. Put simply, they averred that given that the contents of the statement were matters in the public interest, the failure by the respondent to allege in his particulars of claim that the statement was false rendered the claim excipiable in that it failed to disclose a cause of action. They based their exception on two separate grounds: the direct application of section 16 of the Constitution which protects the right to freedom of expression and alternatively on the common law, asserting that it should be developed to promote the spirit, purport and objects of the Bill of Rights as contemplated by section 39(2) of the Constitution.[1]

[3] The exception also stipulated that the obligation imposed upon a plaintiff to establish the falsity of a defamatory statement did not apply to all plaintiffs in all defamation actions but only in certain actions. The exception in this regard was based on two alternative formulations as the following excerpt

indicates:

> "7. It is inconsistent with s 16 of the Constitution to permit a plaintiff to recover damages for the publication of a statement relating to matters of public interest, alternatively to matters of political importance, alternatively to the fitness of a public official for public office, alternatively to the fitness of a politician for public office, in circumstances where that plaintiff does not allege and prove the falsity of the statement in question.

> Alternatively to paragrapgh7 above

> 8. It is inconsistent with s 16 of the Constitution to permit a politician, alternatively a public official, to recover damages for the publication of a statement relating to matters of public interest, alternatively to matters of political importance, alternatively to his fitness for public office, in circumstances where he does not allege and prove the falsity of the statement in question."

The exception averred therefore that the particulars were excipiable either because the defamatory statement in question relates to matters of public interest or importance or concerns the fitness of a politician for public office; or because the plaintiff is a politician or public official and the defamatory statement relates to matters of public importance or interest.

[4] The exception crisply raised the question whether the common law of defamation as developed by our courts is inconsistent with the Constitution. In particular, it raised the question whether, to the extent that the law of defamation does not require a plaintiff in a defamation action to plead that the defamatory statement is false in any circumstances, the law limits unjustifiably the right to freedom of expression as enshrined in section 16 of the Constitution. The applicants are therefore asserting that the elements of the law of defamation in South Africa should, in certain circumstances, include a requirement that the defamatory statement be false. The applicants are therefore asserting that the right of freedom of expression in section 16 is directly applicable in this case despite the fact that the litigation does not involve the state nor any organ of state. This is a matter which will be considered later in this judgment.

[5] Van der Westhuizen J in the High Court, having considered the matter fully, dismissed the exception,[2] holding himself bound by the decision of the Supreme Court of Appeal in *National Media Ltd v Bogoshi* 1998 (4) SA 1196 (SCA); 1999 (1) BCLR 1 (SCA). Prior to instituting an application for leave to appeal directly to this Court against the dismissal of the exception, the applicants then sought and were granted a certificate from the High Court. The respondent opposed their application for leave to appeal.

*Application for leave to appeal to this Court: Is the dismissal of an exception appealable?*

[6] It was common cause between the parties that the decision by the High Court was not one which could be appealed to the Supreme Court of Appeal. Appeals to that Court are governed, amongst other provisions, by section 168(3) of the Constitution and sections 20(1) and 21(1) of the Supreme Court Act 59 of 1959. The Supreme Court of Appeal has held that these provisions mean that appeals will lie against decisions which have the following three attributes: they must be final in effect and not susceptible of alteration by the court of first instance; they must be definitive in some respect of the rights of the parties; and they must have the effect of disposing of a substantial portion of the relief claimed.[3] Applying these criteria, the High Court held that where an exception which avers that a pleading does not disclose a cause of action or defence is upheld, an appeal will lie because the success of such an exception will result in the failure of the relevant cause of action or defence. However, where an exception is not upheld, an appeal will not lie because it does not meet the criteria enumerated above.[4] In a recent case, the Supreme Court of Appeal has pertinently declined to reconsider the question of the appealability of decisions dismissing exceptions.[5]

[7] The question as to what decisions may be appealed to this Court is governed by section 167(6) of the Constitution and the rules of this Court. Section 167(6) provides that:

"National legislation or the rules of the Constitutional Court must allow a person, when it is in the interests of justice and with leave of the Constitutional Court –

(a) to bring a matter directly to the Constitutional Court; or

(b) to appeal directly to the Constitutional Court from any other court."[6]

Appeals are governed by rules 18, 19 and 20 of the rules of this Court. The relevant rule for the purposes of this case is rule 18 which provides that:

"(1) The procedure set out in this rule shall be followed in an application for leave to appeal directly to the Constitutional Court where *a decision on a constitutional matter*, other than an order of constitutional invalidity under section 172(2)(a) of the Constitution, has been given by any court other than the Supreme Court of Appeal . . ." (my emphasis).

The question whether an appeal may lie to this Court against the dismissal of an exception by a High Court then depends on whether such dismissal constitutes a "decision on a constitutional matter" as contemplated by rule 18 and, if it does, whether it is "in the interests of justice" — the standard set by section 167(6) of the Constitution — for this Court to hear the appeal.

[8]Although it could be argued that the word "decision" in rule 18 should be given a meaning equivalent to the meaning given to the words "judgment or order" in section 20(1) of the Supreme Court Act by the Supreme Court of Appeal, this would not be appropriate. The Constitution intends that the interests of justice (coupled with leave of this Court) be the determinative criterion for deciding when appeals should be entertained by this Court. This Court has already developed guiding principles to interpret the phrase.[7] Were the Court to adopt a restricted meaning of "decision" in rule 18 in the light of a range of policy considerations relevant to determining when a matter should be the subject of an appeal, it would be adopting a test different to that proclaimed by the Constitution. All the

considerations which have led the Supreme Court of Appeal to adopt a limited interpretation of the words "judgment or order" as contemplated by section 20 of the Supreme Court Act can be accommodated in the "interests of justice" criterion. Thus, it will often not be in the interests of justice for this Court to entertain appeals against interlocutory rulings which have no final effect on the dispute between the parties.

[9] The question to be considered then is whether the order made by Van der Westhuizen J on 8 December 2000 dismissing the exception raised by the applicants constitutes a "decision on a constitutional matter". The exception was squarely based on the applicants' constitutional right to freedom of expression, and it raised the question of whether the common law of defamation is an unjustifiable limitation of those rights. In considering and then dismissing the applicants' contentions, the judge was clearly concerned with a constitutional matter and his order constitutes a decision on such a matter as contemplated by rule 18.

[10] The next question is whether it is in the interests of justice for leave to be granted to the applicants to appeal against the order dismissing the exception before the trial had started. In answering this question, it is necessary to take into account, amongst other things, the following considerations: the nature of the exception and, in particular, the effect that upholding the exception may have upon the trial proceedings in the High Court; the extent to which the exception raises the question of the development of the common law in which case a decision by the Supreme Court of Appeal on the matter may be desirable before the case is heard by this Court;[8] whether the matter is appealable to the Supreme Court of Appeal; the stage of the proceedings in the High Court; the importance of a determination of the constitutional issues raised by the exception; and the applicants' prospects of success upon appeal.[9]

[11] Were the exception to be upheld by this Court on appeal, the effect would be to require the respondent to amend his particulars of claim to include an allegation that the defamatory statement in

question was false. The respondent would then bear the onus of establishing that the defamatory statement was false and would have to prove it in the trial. Were the appeal to be dismissed, however, the respondent would not have to aver or prove that the defamatory statement was false and it would be for the applicants to prove its truth or the reasonableness of their having published it. The outcome of the appeal on the exception, therefore, will be determinative of the manner in which the trial is conducted in the High Court.

[12]In support of their application for leave to appeal, the applicants have lodged an affidavit by their attorney asserting that if the appeal on the exception were not to be heard now, it may well result in their deciding to settle the respondent's claim rather than defending the defamation action. In particular, they state that the defence of reasonableness now available to the media under the common law of defamation is still undeveloped and as such poses an inhibition upon defendants in defamation actions from pursuing a defence. This consideration carries no weight in determining what constitutes the interests of justice in any case. Defendants can hardly be heard to say that they would like to see further developments in the common law to protect their rights because they are unwilling to rely on existing rules which may provide protection, but which they are unwilling to pursue.

[13]Although it is clear that the exception in issue does raise the question of the development of the common law, upon which it would ordinarily be desirable to have a decision of the Supreme Court of Appeal prior to it being heard by this Court, this is a matter which cannot go to the Supreme Court of Appeal at this stage of the proceedings, as is clear from para 6 above. Be that as it may, the fact that the Supreme Court of Appeal would not entertain an appeal in this matter cannot operate as a bar to this Court hearing the appeal: it is merely a factor relevant to determining the overall interests of justice. Moreover, the Supreme Court of Appeal has recently reviewed the law of defamation in *Bogoshi*'s case.[10] In that case, the Court developed the common law in a manner which it held to be consistent with the provisions of the interim Constitution. Although there are textual differences between the interim Constitution and the 1996 Constitution, they are not material to this case. It is therefore doubtful

that the Supreme Court of Appeal would have reconsidered its judgment in *Bogoshi* in this case. In these circumstances, therefore, the fact that this matter has not been considered by the Supreme Court of Appeal is not an impediment to our hearing the matter.

[14]A further consideration relevant to the interests of justice is the question of the public interest in a determination of the constitutional issue. The applicants have argued that there is a significant public interest in the determination of the issue on the grounds that the daily business of the media, both print and electronic, are affected by the current law of defamation. They are faced regularly with difficult decisions as to what material to publish and what not. Those decisions are materially affected by the law of defamation. Accordingly, they argued, there was a great public interest in obtaining a judgment on the issue raised in the exception.

[15]Lastly, an often determinative consideration for the purposes of determining the interests of justice, is the question whether the applicants for leave to appeal have reasonable prospects of success in the appeal. In this regard, rule 18 requires the judge in the court below to provide a certificate stating, amongst other things, whether he or she thinks â€œethat there is a reasonable prospect that the [Constitutional] Court will reverse or materially alter the judgment if permission to bring the appeal is givenâ€. Van der Westhuizen J issued a certificate signifying that there was a reasonable prospect that this Court might reverse or alter his order.

[16]The extent to which the Constitution requires a development of the law of defamation is a question which has been frequently asked. The issue was raised but not answered in an early decision of this Court *Du Plessis and Others v De Klerk and Another* 1996 (3) SA 850 (CC); 1996 (5) BCLR 658 (CC) and has been considered in a considerable number of High Court judgments since.[11] It is also a matter which has received the attention of the Supreme Court of Appeal in *National Media Ltd v Bogoshi*[12] and has also troubled courts in many other jurisdictions. In all these circumstances, therefore, it seems that it

would be in the interests of justice for this Court to consider the appeal. The application for leave to appeal is therefore granted (though to avoid confusion I shall continue to refer to the appellants as applicants).

*The common law of defamation in South Africa*

[17]The law of defamation in South Africa is based on the actio injuriarum, a flexible remedy arising from Roman Law, which afforded the right to claim damages to a person whose personality rights had been impaired intentionally by the unlawful act of another.[13] One of those personality rights, is the right to reputation or fama, and it is this aspect of personality rights that was protected by the law of defamation.

[18]At common law, the elements of the delict of defamation are –

    (a) the wrongful and

    (b) intentional

    (c) publication of

    (d) a defamatory statement

    (e) concerning the plaintiff.

It is not an element of the delict in common law that the statement be false.[14] Once a plaintiff establishes that a defendant has published a defamatory statement concerning the plaintiff, it is presumed that the publication was both unlawful and intentional. A defendant wishing to avoid liability for defamation must then raise a defence which rebuts unlawfulness or intention.[15] Although not a closed list,[16] the most commonly raised defences to rebut unlawfulness are that the publication was true and in the public benefit;[17] that the publication constituted fair comment[18] and that the publication was made on a

privileged occasion.[19] Most recently, a fourth defence rebutting unlawfulness was adopted by the Supreme Court of Appeal in *National Media Ltd and Others v Bogoshi*.[20] In that case, Hefer JA, after a careful analysis of the development of a similar defence in Australia, England and the Netherlands, held that:

> ". . . the publication in the press of false defamatory allegations of fact will not be regarded as unlawful if, upon a consideration of all the circumstances of the case, it is found to have been reasonable to publish the particular facts in the particular way and at the particular time.
>
> In considering the reasonableness of the publication account must obviously be taken of the nature, extent and tone of the allegations. We know, for instance, that greater latitude is usually allowed in respect of political discussion (*Pienaar and Another v Argus Printing and Publishing Co Ltd* 1956 (4) SA 310 (W) at 318 C-E), and that the tone in which a newspaper article is written, or the way in which it is presented, sometimes provides additional, and perhaps unnecessary, sting. What will also figure prominently is the nature of the information on which the allegations were based and the reliability of their source, as well as the steps taken to verify the information. Ultimately there can be no justification for the publication of untruths, and members of the press should not be left with the impression that they have a licence to lower the standards of care which must be observed before defamatory matter is published in a newspaper." (at 1212G - 1213A).

[19] This fourth defence for rebutting unlawfulness, therefore, allows media defendants to establish that the publication of a defamatory statement, albeit false, was nevertheless reasonable in all the circumstances.

[20] In *Bogoshi*, too, the question of the rebuttal of intention was considered. One of the aspects of animus injuriandi (the intention to cause injury) is subjective intent which, amongst other things, requires the person who made the defamatory statement to have been "conscious of the wrongful character of his act".[21] In 1982, the Appellate Division held that the mass media could not avoid liability for the publication of a defamatory statement by relying on a defence that the publication was

not intentionally injurious.[22] The effect of this decision was to impose strict liability upon the media for the unlawful publication of defamatory material. In *Bogoshi*, the Supreme Court of Appeal overruled this decision.[23] Hefer JA held that the Court in *Pakendorf*'s case had failed to recognise the importance of freedom of expression and, in particular, the important role the mass media perform in a democratic society. He concluded that:

> "If we recognise, as we must, the democratic imperative that the common good is best served by the free flow of information and the task of the media in the process, it must be clear that strict liability cannot be defended and should have been rejected in *Pakendorf*." (at 1210).

Hefer JA then considered whether media defendants should be permitted to rebut the presumption of intentional harm by establishing a lack of knowledge of wrongfulness, even where that lack of knowledge was as a result of the negligence of the defendant. He concluded that they should not, reasoning as follows:

> "If media defendants were to be permitted to do so, it would obviously make nonsense of the approach which I have indicated to the lawfulness of the publication of defamatory untruths. In practical terms (because intoxication, insanity, provocation and jest could hardly arise in the present context) the defence of the lack of *animus injuriandi* is concerned with ignorance or mistake on the part of the defendant regarding one or other element of the delict. . . . The indicated approach is intended to cater for ignorance and mistake at the level of lawfulness; and in a given case negligence on the defendant's part may well be determinative of the legality of the publication. In such a case a defence of absence of *animus injuriandi* can plainly not be available to the defendant.
>
> Defendants' counsel, rightly in my view, accepted that there are compelling reasons for holding that the media should not be treated on the same footing as ordinary members of the public by permitting them to rely on the absence of *animus injuriandi,* and that it would be appropriate to hold media defendants liable unless they were not negligent in the circumstances of the case." (at 1214C-F).

Hefer JA therefore concluded that media defendants could not escape liability merely by establishing an absence of knowledge of unlawfulness. They would in addition have to establish that they were not negligent.

*Freedom of expression*

[21]Having sketched the principles of the common law of defamation, it is now necessary to consider section 16 of the Constitution. It is this provision upon which the applicants rely to assert that the existing common law rules are inconsistent with the Constitution. Section 16 provides that:

> "(1) Everyone has the right to freedom of expression, which includes –
>
>> (a) freedom of the press and other media;
>>
>> (b) freedom to receive or impart information or ideas;
>>
>> (c) freedom of artistic creativity; and
>>
>> (d) academic freedom and freedom of scientific research.
>
> (2) The right in subsection (1) does not extend to –
>
>> (a) propaganda for war;
>>
>> (b) incitement of imminent violence; or
>>
>> (c) advocacy of hatred that is based on race, ethnicity, gender or religion, and that constitutes incitement to cause harm."

The importance of the right of freedom of expression in a democracy has been acknowledged on many occasions by this Court,[24] and other South African courts.[25] Freedom of expression is integral to a democratic society for many reasons. It is constitutive of the dignity and autonomy of human beings. Moreover, without it, the ability of citizens to make responsible political

decisions and to participate effectively in public life would be stifled.

[22]The print, broadcast and electronic media have a particular role in the protection of freedom of expression in our society. Every citizen has the right to freedom of the press and the media and the right to receive information and ideas. The media are key agents in ensuring that these aspects of the right to freedom of information are respected. The ability of each citizen to be a responsible and effective member of our society depends upon the manner in which the media carry out their constitutional mandate. As Deane J stated in the High Court of Australia:

> ". . . the freedom of the citizen to engage in significant political communication and discussion is largely dependent upon the freedom of the media."[26]

The media thus rely on freedom of expression and must foster it. In this sense they are both bearers of rights and bearers of constitutional obligations in relation to freedom of expression.

[23]Furthermore, the media are important agents in ensuring that government is open, responsive and accountable to the people as the founding values of our Constitution require.[27] As Joffe J said in *Government of the Republic of South Africa v "Sunday Times" Newspaper and Another* 1995 (2) SA 221 (T) at 227H - 228A:

> "It is the function of the press to ferret out corruption, dishonesty and graft wherever it may occur and to expose the perpetrators. The press must reveal dishonest mal- and inept administration. . . . It must advance the communication between the governed and those who govern."

[24]In a democratic society, then, the mass media play a role of undeniable importance. They bear an

obligation to provide citizens both with information and with a platform for the exchange of ideas which is crucial to the development of a democratic culture. As primary agents of the dissemination of information and ideas, they are, inevitably, extremely powerful institutions in a democracy and they have a constitutional duty to act with vigour, courage, integrity and responsibility. The manner in which the media carry out their constitutional mandate will have a significant impact on the development of our democratic society. If the media are scrupulous and reliable in the performance of their constitutional obligations, they will invigorate and strengthen our fledgling democracy. If they vacillate in the performance of their duties, the constitutional goals will be imperilled. The Constitution thus asserts and protects the media in the performance of their obligations to the broader society, principally through the provisions of section 16.

[25] However, although freedom of expression is fundamental to our democratic society, it is not a paramount value. It must be construed in the context of the other values enshrined in our Constitution. In particular, the values of human dignity, freedom and equality.[28]

*The constitutional value of human dignity*

[26] It has long been recognised in democratic societies that the law of defamation lies at the intersection of the freedom of speech and the protection of reputation or good name. As Corbett CJ said:

> "I agree, and I firmly believe, that freedom of expression and of the press are potent and indispensable instruments for the creation and maintenance of a democratic society, but it is trite that such freedom is not, and cannot be permitted to be, totally unrestrained. The law does not allow the unjustified savaging of an individual's reputation. The right of free expression enjoyed by all persons, including the press, must yield to the individual's right, which is just as important, not to be unlawfully defamed. I emphasise the word 'unlawfully' for, in striving to achieve an equitable balance between the right to speak your mind and the right not to be harmed by what another says about you, the law has devised a number of defences, such as fair comment, justification (ie truth and public benefit) and privilege, which if successfully invoked

render lawful the publication of matter which is *prima facie* defamatory.â€□[29]

Under our new constitutional order, the recognition and protection of human dignity is a foundational constitutional value.[30] As this Court held in *Dawood and Another v Minister of Home Affairs and Others* 2000 (3) SA 936 (CC); 2000 (8) BCLR 837 (CC) at para 35:

> â€œThe value of dignity in our Constitutional framework cannot . . . be doubted. The Constitution asserts dignity to contradict our past in which human dignity for black South Africans was routinely and cruelly denied. It asserts it too to inform the future, to invest in our democracy respect for the intrinsic worth of all human beings. Human dignity therefore informs constitutional adjudication and interpretation at a range of levels.â€□[31]

[27] In the context of the actio injuriarum, our common law has separated the causes of action for claims for injuries to reputation (fama) and dignitas. Dignitas concerns the individualâ€™s own sense of self worth, but included in the concept are a variety of personal rights including, for example, privacy. In our new constitutional order, no sharp line can be drawn between these injuries to personality rights. The value of human dignity in our Constitution is not only concerned with an individualâ€™s sense of self-worth, but constitutes an affirmation of the worth of human beings in our society. It includes the intrinsic worth of human beings shared by all people as well as the individual reputation of each person built upon his or her own individual achievements. The value of human dignity in our Constitution therefore values both the personal sense of self-worth as well as the publicâ€™s estimation of the worth or value of an individual. It should also be noted that there is a close link between human dignity and privacy in our constitutional order.[32] The right to privacy, entrenched in section 14 of the Constitution, recognises that human beings have a right to a sphere of intimacy and autonomy that should be protected from invasion.[33] This right serves to foster human dignity. No sharp lines then can be drawn between reputation, dignitas and privacy in giving effect to the value of human dignity in our Constitution. No argument was addressed to this Court on the relevance of the right to privacy to this case and I shall not consider it further.

[28] The law of defamation seeks to protect the legitimate interest individuals have in their reputation. To this end, therefore, it is one of the aspects of our law which supports the protection of the value of human dignity. When considering the constitutionality of the law of defamation, therefore, we need to ask whether an appropriate balance is struck between the protection of freedom of expression on the one hand, and the value of human dignity on the other.

*"Horizontal application"* of section 16

[29] The applicants' exception relies directly on section 16 of the Constitution, despite the fact that none of the parties to the defamation action is the state, or any organ of state. Section 8 of the Constitution provides that:

> "(1) The Bill of Rights applies to all law, and binds the legislature, the executive, the judiciary and all organs of state.
>
> (2) A provision of the Bill of Rights binds a natural or a juristic person if, and to the extent that, it is applicable, taking into account the nature of the right and the nature of any duty imposed by the right.
>
> (3) When applying a provision of the Bill of Rights to a natural or juristic person in terms of subsection (2), a court –
>
> (a) in order to give effect to a right in the Bill, must apply, or if necessary develop, the common law to the extent that legislation does not give effect to that right; and
>
> (b) may develop rules of the common law to limit the right, provided that the limitation is in accordance with section 36(1)."

[30] The applicants argued that because, in terms of section 8(1), the Bill of Rights applies to all law and binds the judiciary, section 16 must be interpreted to have direct application to the common law of defamation. The applicants observed that in this regard the provisions of the 1996 Constitution were

distinguishable from the provisions of the interim Constitution in which the provisions of the Bill of Rights were not directly binding on the judiciary.[34] Accordingly, they argued that the conclusion of the majority of this Court in *Du Plessis and Others v De Klerk and Another*,[35] that the right to freedom of expression in that Constitution could have no direct application in a defamation action to which the state was not a party, was no longer applicable. In that case, the Court held that although the interim Constitution did not directly apply to the common law, the principles of common law would nevertheless have to be applied and developed by courts â€œwith due regard to the spirit, purport and objectsâ€ of the Bill of Rights in that Constitution.

[31] The applicantsâ€™ argument cannot succeed. It is clear from sections 8(1) and (2) of the Constitution that the Constitution distinguishes between two categories of persons and institutions bound by the Bill of Rights. Section 8(1) binds the legislature, executive, judiciary and all organs of state without qualification to the terms of the Bill of Rights. Section 8(2) however provides that natural and juristic persons shall be bound by provisions of the Bill of Rights â€œto the extent that, it is applicable, taking into account the nature of the right and the nature of any duty imposed by the rightâ€.[36] Once it has been determined that a natural person is bound by a particular provision of the Bill of Rights, section 8(3) then provides that a court must apply and if necessary develop the common law to the extent that legislation does not give effect to the right. Moreover, it provides that the rules of the common law may be developed so as to limit a right, as long as that limitation would be consistent with the provisions of section 8(3)(b).

[32] Were the applicantsâ€™ argument to be correct, it would be hard to give a purpose to section 8(3) of the Constitution. For if the effect of sections 8(1) and (2) read together were to be that the common law in all circumstances would fall within the direct application of the Constitution, section 8(3) would have no apparent purpose. We cannot adopt an interpretation which would render a provision of the Constitution to be without any apparent purpose.

[33]In this case, the applicants are members of the media who are expressly identified as bearers of constitutional rights to freedom of expression. There can be no doubt that the law of defamation does affect the right to freedom of expression. Given the intensity of the constitutional right in question, coupled with the potential invasion of that right which could be occasioned by persons other than the state or organs of state, it is clear that the right to freedom of expression is of direct horizontal application in this case as contemplated by section 8(2) of the Constitution. The first question we need then to determine is whether the common law of defamation unjustifiably limits that right. If it does, it will be necessary to develop the common law in the manner contemplated by section 8(3) of the Constitution.

[34]The next question is whether, to the extent that the common law does not require as an element of the delict of defamation in any circumstances that a defamatory statement be false, and leaves the question of truth to be raised only as an aspect of a defence, it is inconsistent with the Bill of Rights as directly applicable.

*Is the common law inconsistent with the Constitution?*

[35]The applicants argued that to the extent that the common law of defamation does not require a plaintiff to allege and prove the falsity of a defamatory statement, it is inconsistent with the Constitution. There can be no doubt that the constitutional protection of freedom of expression has at best an attenuated interest in the publication of false statements. As Cory J observed in the Canadian case, *Hill v Church of Scientology of Toronto*:

> "False and injurious statements cannot enhance self-development. Nor can it ever be said that they lead to healthy participation in the affairs of the community. Indeed, they are detrimental to the advancement of these values and harmful to the interests of a free and democratic society."[37]

Similarly, no person can argue a legitimate constitutional interest in maintaining a reputation based on a false foundation.

[36] To the extent, therefore, that the common law of defamation permits a plaintiff to recover damages for a defamatory statement without establishing the falsity of the defamatory statement, it does not directly protect a powerful constitutional freedom of expression interest, for there is no powerful interest in falsehood. Nor does it provide necessary protection for the constitutional value of human dignity. For, in the main, a person's interest in their reputation can only further constitutional values if that reputation is a true reflection of their character.[38]

[37] However, the common law delict of defamation does not disregard truth entirely. It remains relevant to the establishment of one of the defences going to unlawfulness, that is, truth in the public benefit. The common law requires a defendant to establish, once a plaintiff has proved the publication of a defamatory statement affecting the plaintiff, that the publication was lawful because the contents of the statement were true and in the public benefit. The burden of proving truth thus falls on the defendant.

[38] In considering the constitutionality of this rule, it must be realised that it is often difficult, and sometimes impossible, to determine the truth or falsity of a particular statement. As Stevens J noted in a dissenting judgment in the United States Supreme Court in *Philadelphia Newspapers, Inc v Hepps* (1985) 475 US 767 at 785-6:

> "The danger of deliberate defamation by reference to unprovable facts is not merely a speculative or hypothetical concern. Lack of knowledge about third parties, the loss of critical records, an uncertain recollection about events that occurred long ago, perhaps during a period of special stress, the absence of eyewitnesses — a host of factors — may make it impossible for an honorable person to disprove malicious gossip about his past conduct, his relatives, his friends or

his business associates.â€□

In not requiring a plaintiff to establish falsity, but in leaving the allegation and proof of falsity to a defendant to a defamation charge, the common law chooses to let the risk lie on defendants. After all, it is by definition the defendant who published the statement and thereby caused the harm to the plaintiff.

[39] The difficulty of proving the truth or otherwise of defamatory statements, and the common-law rule which lets the risk of the failure to establish truth lie on defendants, in the absence of a defence of reasonable publication, does cause â€œa chilling effectâ€□ on the publication of information. A publisher will think twice before publishing a defamatory statement where it may be difficult or impossible to prove the truth of that statement and where no other defence to defamation would be available. As Lord Keith said in *Derbyshire County Council v Times Newspapers*[39] â€“

> â€œWhat has been described as â€˜the chilling effectâ€™ induced by the threat of civil actions for libel is very important. Quite often the facts that would justify a defamatory publication are known to be true, but admissible evidence capable of proving those facts is not available. This may prevent the publication of matters which it is very desirable to make public.â€□

But this chilling effect is reduced considerably by the defence of reasonable publication established in *Bogoshi*â€™s case. For it permits a publisher who is uncertain of proving the truth of a defamatory statement, nevertheless to publish where he or she can establish that it is reasonable.

[40] In seeking to assert that the common law rule was inconsistent with the Constitution, the applicants relied upon the United States Supreme Court decision *New York Times Co. v Sullivan* (1964) 376 US 254 at 279-80 in which Brennan J held:

"A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions – and to do so on pain of libel judgments virtually unlimited in amount – leads to a comparable 'self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. . . . The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (footnote omitted).

In that case, the United States Supreme Court thus established a principle that for public figures to succeed in defamation actions they need to establish not only that a false defamatory statement has been published concerning them, but that it was published with "actual malice". This decision represents the high-water mark of foreign jurisprudence protecting the freedom of speech and many jurisdictions have declined to follow it.[40] It should be noted that the applicants do not assert the "actual malice" standard in this case. They only rely on the case to the extent that it imposes an obligation on the plaintiff to establish that the defamatory article was false.

[41]In deciding whether the common law rule complained of by the applicants does indeed constitute an unjustifiable limitation of section 16 of the Constitution, sight must not be lost of other constitutional values and in particular, the value of human dignity. To succeed, the applicants need to show that the balance struck by the common law, in excluding from the elements of the delict a requirement that the defamatory statement published be false, an appropriate balance has been struck between the freedom of expression, on the one hand, and the value of human dignity on the other.

[42] Although the applicants are right when they contend that individuals can assert no strong constitutional interest in protecting their reputations against the publication of truthful but damaging statements, the applicants can also not show that publishers have a strong constitutional speech interest in the publication of false material. At the heart of the constitutional dispute lies the difficulty of establishing the truth or falsehood of defamatory statements. Burdening either plaintiffs or defendants with the onus of proving a statement to be true or false, in circumstances where proof one way or the other is impossible, therefore results in a zero-sum game. Either plaintiffs will benefit from the difficulties of proof, as happened previously under common law rules; or defendants will win, as the applicants propose.[41] Such a zero-sum result, in whomsoever's favour, fits uneasily with the need to establish an appropriate constitutional balance between freedom of expression and human dignity.

[43] Were the Supreme Court of Appeal not to have developed the defence of reasonable publication in *Bogoshi*'s case, a proper application of constitutional principle would have indeed required the development of our common law to avoid this result. However, the defence of reasonableness developed in that case does avoid a zero-sum result and strikes a balance between the constitutional interests of plaintiffs and defendants. It permits a publisher who can establish truth in the public benefit to do so and avoid liability. But if a publisher cannot establish the truth, or finds it disproportionately expensive or difficult to do so, the publisher may show that in all the circumstances the publication was reasonable. In determining whether publication was reasonable, a court will have regard to the individual's interest in protecting his or her reputation in the context of the constitutional commitment to human dignity. It will also have regard to the individual's interest in privacy. In that regard, there can be no doubt that persons in public office have a diminished right to privacy, though of course their right to dignity persists. It will also have regard to the crucial role played by the press in fostering a transparent and open democracy. The defence of reasonable publication avoids therefore a winner-takes-all result and establishes a proper balance between freedom of expression and the value of human dignity. Moreover, the defence of reasonable publication will encourage editors and journalists to act with due care and

respect for the individual interest in human dignity prior to publishing defamatory material, without precluding them from publishing such material when it is reasonable to do so.

[44]It is true, as the applicants assert, that the effect of excluding the falsity of a defamatory statement as an element of the delict of defamation will mean that from time to time a plaintiff may succeed in a defamation claim even when a defamatory statement was in fact not false. In this regard, however, we cannot disregard the fact that it is the defendant who publishes the defamatory statement and who therefore causes any damage. So it will only be where defendants establish neither that the statement was true and its publication in the public interest, nor that the publication was reasonable in all the circumstances, that they will be held delictually liable. This outcome does not unduly burden defendants. Contrarily, to hold as the applicants argued, that plaintiffs may never succeed unless they can establish that a defamatory statement was false would clearly put plaintiffs at risk. It would destabilise the careful balance struck between plaintiffs' and defendants' interests achieved by the Supreme Court of Appeal's development of a defence of reasonable publication.

[45]In the circumstances, the applicants have not shown that the common law as currently developed is inconsistent with the provisions of the Constitution and their appeal must fail.

[46]This case did not involve the state or an organ of state. It was a dispute between private parties. The applicants have failed in the appeal and, in the circumstances, it is fair that the respondent should be awarded costs.

*Order*

[47]The following order is made:

1. The application for leave to appeal is granted.

2. The appeal is dismissed and the applicants are ordered to pay the costs including the costs of the application for leave to appeal.

Chaskalson CJ, Langa DCJ, Ackermann J, Du Plessis AJ, Goldstone J, Kriegler J, Madala J, Ngcobo J, Sachs J and Skweyiya AJ concur in the judgment of O'Regan J.

For the applicants: GJ Marcus SC and M Chaskalson instructed by Webber Wentzel Bowens, Johannesburg.

For the respondent: F Bezuidenhout instructed by Dyason Incorporated, Pretoria.

---

[1] Section 39(2) of the Constitution provides: "When interpreting any legislation, and when developing the common law or customary law, every court, tribunal or forum must promote the spirit, purport and objects of the Bill of Rights."

[2] His decision is reported as *Holomisa v Khumalo and Others* 2002 (3) SA 38 (T).

[3] See *Zweni v Minister of Law and Order* 1993 (1) SA 523 (A) at 532J - 533A; *Trakman NO v Livshitz and Others* 1995 (1) SA 282 (A) at 289B - 290C; *Moch v Nedtravel (Pty) Ltd t/a American Express Travel Service* 1996 (3) SA 1 (A) at 7J - 8D; and *Guardian National Insurance Co Ltd v Searle NO* 1999 (3) SA 296 (SCA) at 301B-D.

[4] See *Steytler NO v Fitzgerald* 1911 AD 295; *Blaauwbosch Diamonds, Ltd. v Union Government (Minister of Finance)* 1915 AD 599 at 602; *Wellington Court Shareblock v Johannesburg City Council; Agar Properties (Pty) Ltd v Johannesburg City Council* 1995 (3) SA 827 (A) at 832J - 833D; *Kett v Afro Adventures (Pty) Ltd and Another* 1997 (1) SA 62 (A) at 65G-H; and *Minister of Safety and Security and Another v Hamilton* 2001 (3) SA 50 (SCA) at 52B - 53E.

5 *Hamilton* ibid at 53E.

6 Section 16 of the Constitutional Court Complementary Act 13 of 1995 provides that the rules shall regulate access to the Court.

7 See, for example, *Member of the Executive Council for Development Planning and Local Government, Gauteng v Democratic Party and Others* <u>1998 (4) SA 1157</u> (CC); <u>1998 (7) BCLR 855</u> (CC) at para 32; *S v Boesak* <u>2001 (1) SA 912</u> (CC); <u>2001 (1) BCLR 36</u> (CC) at para 12; *Fraser v Naude and Others* <u>1999 (1) SA 1</u> (CC); <u>1998 (11) BCLR 1357</u> (CC) at para 10; and *Islamic Unity Convention v Independent Broadcasting Authority and Others* <u>2002 (5) BCLR 433</u> (CC) at paras 15-19.

8 See *De Freitas and Another v Society of Advocates of Natal (Natal Law Society intervening)* <u>1998 (11) BCLR 1345</u> (CC) at para 23; and *Amod v Multilateral Motor Vehicle Accidents Fund* <u>1998 (4) SA 753</u> (CC); <u>1998 (10) BCLR 1207</u> (CC) at para 35.

9 See *S v Pennington and Another* <u>1997 (4) SA 1076</u> (CC); <u>1997 (10) BCLR 1413</u> (CC) at para 44; *MEC for Development Planning and Local Government* above n 7 at para 32.

10 *National Media Ltd and Others v Bogoshi* 1998 (4) SA 1196 (SCA); 1999 (1) BCLR 1 (SCA). Page references in this judgment are to the South African Law Reports.

11 See, for example, *Mandela v Falati* 1995 (1) SA 251 (W); 1994 (4) BCLR 1 (W); *Government of the Republic of South Africa v 'Sunday Times' Newspapers* 1995 (2) SA 221 (T); 1995 (2) BCLR 182 (T); *Gardener v Whitaker* 1995 (2) SA 672 (E); 1994 (5) BCLR 19 (E); *Bogoshi v National Media Ltd* 1996 (3) SA 78 (W); *McNally v M & G Media (Pty) Ltd and Others* 1997 (4) SA 267 (W); 1997 (6) BCLR 818 (W); *Holomisa v Argus Newspapers* 1996 (2) SA 588 (W); 1996 (6) BCLR 836 (W); and *Hall v Welz and Others* 1996 (4) SA 1070 (C).

12 Above n 10.

13 See the full and illuminating discussion in *Holomisa v Argus Newspapers Ltd* above n 11 at 599-601. See also J Burchell *The Law of Defamation in South Africa* (Juta, Kenwyn 1985); J Neethling, JM Potgieter and PJ Visser *Law of Delict* 2 ed (Butterworths, Durban 1994); and J Burchell *Personality Rights and Freedom of Expression: The Modern Actio Injuriarum* (Juta, Kenwyn 1998) at 133ff.

14 See the recent restatement of this in *Bogoshi* above n 10 at 1218 E-F where Hefer JA held: "I should add that the falsity of a defamatory statement is not an element of the delict, but that its truth may be an important factor in deciding the legality of its publication. I find it difficult to see why (as was held in *Holomisa*) a plaintiff should, as part of his claim, allege and prove something that the defendant may rely upon in justification."

15 See *Borgin v De Villiers* 1980 (3) SA 556 (A).

16 In *Bogoshi* above n 10, Hefer JA observed as follows: " . . . it is hardly necessary to add that the defences available to a defendant in a defamation action do not constitute a *numerus clausus*. In our law the lawfulness of a harmful act or omission is determined by the application of a general criterion of reasonableness based on considerations of fairness, morality, policy and the Court's perception of the legal convictions of the community. In accordance with this criterion Rumpff CJ indicated in *O'Malley*'s case [*Suid-Afrikaanse Uitsaaikorporasie v O'Malley* 1977 (3) SA 394 (A)] at 402*fin*-403A that it is the task of the Court to determine in each case whether public and legal policy requires the particular publication to be regarded as lawful." (at 1204 D-E). It should be emphasised that the court's perception of the legal convictions of the community as a test for determining wrongfulness in delict might well have to be reconsidered in the context of our new constitutional order. See *Carmichele v Minister of Safety and Security and Another* 2001 (4) SA 938 (CC); 2001 (10) BCLR 995 (CC) para 56.

17 See *M'Pherson v Daniels* (1829) 10 B&C 263; *Sutter v Brown* 1926 AD 155; *Johnson v Rand Daily Mail* 1928 AD 190; *Caxton Ltd and Others v Reeva Forman and Another (Pty) Ltd* 1990 (3) SA 547 (A); and *Kemp and Another v*

*Republican Press (Pty) Ltd* 1994 (4) SA 261 (E).

18 See *Marais v Richard en 'n Ander* 1981 (1) SA 1157 (A); and *Johnson v Beckett and Another* 1992 (1) SA 762 (A).

19 Privilege can either be an absolute privilege or a qualified privilege. See *May v Udwin* 1981 (1) SA 1 (A).

20 Above n 10.

21 See *Maisel v Van Naeren* 1960 (4) SA 836 (C) at 840 E-G.

22 See *Pakendorf and Others v De Flamingh* 1982 (3) SA 146 (A). See also the earlier discussion in *SAUK v O'Malley* above n 16.

23 Above n 10 at 1211B-C.

24 See, for example, *South African National Defence Union v Minister of Defence and Another* 1999 (4) SA 469 (CC); 1999 (6) BCLR 615 (CC) at para 7; *S v Mamabolo (E TV and Others Intervening)* 2001 (5) BCLR 449 (CC); 2001 (3) SA 409 (CC) at para 37; and *Islamic Unity Convention* above n 7 at paras 25-30.

25 See, for example, *Bogoshi* above n 10 at 1207I - 1208F; *Holomisa v Argus Newspapers Ltd* above n 11 at 608G - 609B; and the judgment in the court below, *Holomisa v ✎Khumalo✎* above n 2 at 61E-G.

26 *Theophanous v Herald & Weekly Times Ltd and Another* (1994) 124 ALR 1 at 61.

27 Section 1 of the Constitution provides as follows:

> "The Republic of South Africa is one, sovereign, democratic state found on the following values:
>
>     . . . .
>
> (d) Universal adult suffrage, a national common voters roll, regular elections and a multi-party system of democratic government, to ensure accountability, responsiveness and openness."

See also s 36 of the Constitution.

28 See the discussion in *Mamabolo* above n 24 at paras 40-1.

29 See *Argus Printing and Publishing Co Ltd v Esselen's Estate* 1994 (2) SA 1 (A) at 25 B-E.

30 Section 1 of the Constitution.

31 See also *President of the RSA and Another v Hugo* 1997 (4) SA 1 (CC); 1997 (6) BCLR 708 (CC) at para 41; and *National Coalition for Gay and Lesbian Equality and Another v Minister of Justice and Others* 1999 (1) SA 6 (CC); 1998 (12) BCLR 1517 (CC) at paras 17-32 and paras 120-9.

32 See *National Coalition* ibid at para 30: "The present case illustrates how, in particular circumstances, the rights of equality and dignity are closely related, as are the rights of dignity and privacy."

33 See *Bernstein and Others v Bester NO and Others* 1996 (2) SA 751 (CC); 1996 (4) BCLR 449 (CC); and *Mistry v Interim National Medical and Dental Council and Others* 1998 (4) SA 1127 (CC); 1998 (7) BCLR 880 (CC).

34 See section 7(1) of the interim Constitution.

35 *Du Plessis and Others v De Klerk and Another* 1996 (3) SA 850 (CC); 1996 (5) BCLR 658 (CC) at paras 43-7.

36 See the similar line of reasoning in *Du Plessis v De Klerk* ibid at para 42-9.

37 *Hill v Church of Scientology of Toronto* (1995) 126 DLR (4th) 129 (SCC) at para 106. See also the decision of the German Bundesverfassungsgericht in 54 BVerfGE 208 (1980) (the *Böll* case).

38 However, it has long been recognised that past mistakes should not be raked up after a long period of time has elapsed. See *Graham v Ker* (1892) 9 SC 185.

39 *Derbyshire County Council v Times Newspapers* [1993] 1 All ER 1011 (HL) at 1018. See also Mason CJ's observation in the Australian High Court case of *Theophanous* above n 26 at 19-20.

40 For Canadian cases rejecting the approach, see *Hill* above n 37; *R v Keegstra* (1990) 3 CRR (2d) 193; *Committee for Commonwealth of Canada v Canada* (1991) 4 CRR (2d) 60; and *New Brunswick Broadcasting Co. v Nova Scotia (Speaker of the House of Assembly)* (1991) 6 CRR (2d) 298. In the United Kingdom, the "actual malice" standard has also been rejected. See *Derbyshire County Council* above n 39; *Reynolds v Times Newspapers Ltd and Others* [1999] 4 All ER 609 (HL); and *Berezovsky v Michaels and Others; Glouchkov v Michaels and Others* [2000] 2 All ER 986 (HL). The rule was also criticised in the United Kingdom Report of the Committee on Defamation (the Faulks Committee Report) (1975) and the Irish Law Reform Commission's Report on the Civil Law of Defamation (the Keane Final Report) (1991). Similarly, in Australia the rule was rejected in *Theophanous* above n 26 and by the Australian Law Reform Commission's Report No. 11 "Unfair Publication: Defamation and Privacy" (the Kirby Committee Report) (1979). (See the discussion in *Hill* above n 37 at para 136.) In Germany, too, the Bundesverfassungsgericht has adopted a test different to that established in *Sullivan*. Their test seeks to establish an appropriate balance between the rights of human dignity and freedom of expression. See 7 BVerfGE 198 (1958) (the *Lüth* case); 30 BVerfGE 173 (1971) (the *Mephisto* case) and the discussion thereof in BS Markesinis *The German Law of Torts: A Comparative Introduction* 3 ed (Clarendon, Oxford 1994) at 352ff and DP Kommers *The Constitutional Jurisprudence of the Federal Republic of Germany* 2 ed (Duke, London 1997) at 423ff.

41 For a discussion of the effect of burdens of proof in civil law as they relate to the right to equality, see *Prinsloo v Van der Linde and Another* 1997 (3) SA 1012 (CC); 1997 (6) BCLR 759 (CC) at paras 37-8 (per Ackermann, O'Regan and Sachs JJ) and paras 55-6 (per Didcott J).

[Context↴] [Hide Context]

---

# EXHIBIT H

[Home] [Databases] [WorldLII] [Search] [Feedback]

**SAFLII**

# South Africa: Constitutional Court

You are here: SAFLII >> Databases >> South Africa: Constitutional Court >> 1996 >> [1996] ZACC 10

[Database Search] [Name Search] [Recent Decisions] [Noteup] [Download] [Help] [Context⬎] [Hide Context]

## ⬎Du Plessis⬎ and others v De Klerk and another (CCT8/95) [1996] ZACC 10; 1996 (3) SA 850; 1996 (5) BCLR 658 (15 May 1996)

**CONSTITUTIONAL COURT OF SOUTH AFRICA**

**CASE NO CCT 8/95**

In the matter of:

**⬎DU PLESSIS⬎, D First Appellant (Defendant)**
**THE PRETORIA NEWS (PTY) LTD Second Appellant (Defendant)**
**LAUTENBACH, D Third Appellant (Defendant)**
**ALLIED PUBLISHING (PTY) LTD Fourth Appellant (Defendant)**

and

**DE KLERK, G F J First Respondent (Plaintiff)**
**WONDER AIR (PTY) LTD Second Respondent (Plaintiff)**

Heard on: 7 November 1995

Delivered on: 15 May 1996

JUDGMENT

[1] **KENTRIDGE AJ**: The Pretoria News is a daily newspaper published in Pretoria. The first appellant is the editor of the Pretoria News, the second appellant is the owner and publisher of the newspaper, the

third appellant is a journalist employed on the newspaper and the fourth appellant is its distributor. During February and March, 1993, the newspaper published a series of six articles dealing with the supply by air of arms and other material to the Angolan rebel movement, UNITA. The tenor of the articles was that South African citizens were engaged in these operations, that the operations were covert, and that they entailed the evasion of South African air control regulations. The flights were described in the articles as □illegal□ and as □pirate flights.□ The articles suggested that those responsible for the flights were □fuelling the war in Angola□, and were doing so for motives of personal gain, notwithstanding the disastrous effect of the Angolan civil war on the inhabitants of that country. The articles were published under the by-line of Dale Lautenbach, the third appellant.

[2] The last two in the series of articles, published on 9th and 11th March, 1993, mentioned by name Mr Gert de Klerk, the first respondent herein and his company Wonder Air (Pty) Ltd, the second respondent. The article published on 9th March, stated that the Department of Foreign Affairs had been calling in a number of private air operators □following suspicions that individual companies might be fuelling the war in Angola with supplies.□ The first respondent was named as one of those summoned. The article published on 11th March, again in the context of illegal flights to supply the UNITA rebels, referred to □the mystery airstrip□ owned and operated by the respondents. In consequence of these publications the respondents issued a combined summons out of the Transvaal Provincial Division of the Supreme Court claiming damages for defamation against the appellants jointly and severally. The first respondent claimed damages of R750 000.00 for injury to his reputation and his feelings; the second respondent claimed R5 million for loss of business and damage to its commercial reputation. I shall hereafter refer to the respondents as □the Plaintiffs□ and to the appellants as □the Defendants.□

[3] On 25th May, 1993, the Defendants filed a joint plea. The Defendants admitted publishing the articles, but denied that they meant that the Plaintiffs were involved in illegal activities, or that the articles were defamatory of the Plaintiffs. In the alternative the Defendants alleged that the general subject matter of the articles was a matter of public interest. On this basis they pleaded a □rolled-up□ defence of fair comment[1] - namely that in so far as the references to the Plaintiffs were expressions of opinion, those opinions constituted fair comment made in good faith on matters of public interest, and were based on facts truly stated in the articles themselves; and that in so far as the articles contained allegations of fact those allegations were true and were matters of public interest. There was a further allegation by way of defence that the Defendants had published the articles in good faith in pursuance of a duty to its readers and to the public in general to keep them informed of □facts, opinions and allegations□ concerning the civil war in Angola, that its readers had a corresponding right to be so informed and that in the premises the publication of the articles □was not unlawful.□[2] All allegations of damage were denied.

[4] I have given only a brief and simplified summary of the Defendants□ plea because it is not in issue in the proceedings in this Court. What has brought the Defendants, as appellants, to this Court is the fate of an application to amend their plea by adding a further defence. Notice of intention to amend the plea was given by the Defendants on 7th October, 1994. The significance of this date is that it was subsequent to the coming into force of the interim Constitution on 27th April, 1994, in terms of section 251(1) of the Constitution of the Republic of South Africa Act 200 of 1993. The Plaintiffs objected to the proposed amendment, and it is necessary to set out in full both the proposed amendment and the grounds on which the Plaintiffs objected to it.

[5] The notice of intention to amend read as follows -

□KINDLY TAKE NOTICE that the defendants intend to amend their plea in

the following way -

By the insertion after paragraph 12.14 of the following:

☐12.15 In addition to the aforegoing, the publication of the article was not unlawful by reason of the protection afforded to the defendants by section 15 of the Constitution of the Republic of South Africa (Act 200 of 1993) which provides:

` (15) (1) Every person shall have the right to freedom of speech and expression, which shall include freedom of the press and other media, and the freedom of artistic creativity and scientific research.☐

More particularly:

12.15.1 The articles in question were published against the background and in the circumstances described in paragraphs 12.1 - 12.9 hereof in good faith and without the intention of defaming the plaintiffs.

12.15.2 The articles concern matters of public interest and were published pursuant to a duty to keep members of the public informed of facts, opinions and allegations concerning the on-going civil war in Angola and a corresponding right or legitimate interest on the part of readers of the Pretoria News to be informed of such facts, opinions and allegations.

12.16 By virtue of the facts and contentions set out in paragraphs 12.15, the publication of the said articles were not unlawful and such publication is protected by section 15 of the Constitution.☐

The grounds of objection were the following -

☐The Plaintiffs object to the proposed amendment on the following grounds:

1. That the proposed amendment would render the Defendants☐ plea excipiable;

2. The Constitution of the Republic of South Africa, Act 200 of 1993, was at no relevant stage in force when the Defendants published the defamatory material of and concerning the Plaintiffs;

3. The damage caused to the Plaintiffs consequent upon and as a result of the publication of the defamatory material was caused prior to the promulgation introduction of Act 200 of 1993;

4. The South African Constitution is not retroactive;

5. **In the alternative,** the Constitution has no application horizontally, alternatively does not apply to disputes of the present nature;

6. **Further alternatively**, Section 15 of the Constitution does not grant any of the Defendants leave and licence to publish defamatory material, either as alleged or at all;

7. In particular, Chapter 3 of the Constitution protects the Plaintiffs☐ right to their physical and emotional integrity, reputation, unrestricted participation in public and commercial affairs and their right to an untarnished reputation;

8. These rights, inasmuch as they may come into conflict with the Defendants☐ right to publish

defamatory material (the existence of which right is denied), takes precedence over any right claimed by the Defendants; **alternatively**

9. The Defendants□ right to publish defamatory material (which is denied) is limited in terms of Section 33 of the Constitution and the common law by the Plaintiffs rights as aforesaid;

10. Consequently, the proposed amendment of the Defendants□ plea does not disclose a defence and should not be granted.□

(I have not corrected the grammatical errors in the two documents.)

[6] The opposed application to amend the plea was heard by Van Dijkhorst J in the Transvaal Provincial Division. On 10th November, 1994, he gave judgment refusing the application for amendment.[3] The learned judge□s approach to the application was that an amendment which would render a pleading excipiable should not be allowed, and he held that the proposed amendment would be excipiable on two separate grounds. The first ground was that the proceedings before the court were □proceedings which immediately before the commencement of the Constitution were pending before any court of law ... exercising jurisdiction in accordance with the law then in force ...□, in terms of section 241(8) of the Constitution, and therefore had to □be dealt with as if this Constitution had not been passed.□ This meant, according to the learned judge, that the provisions of the Constitution could not be invoked by any party to the pending proceedings. He followed his own judgment in *Kalla v The Master and Others*, [4] in which he had given extensive reasons for the conclusion □that section 241(8) precludes retrospective operation of the Constitution.□[5]

[7] The second ground on which Van Dijkhorst J held the proposed amendment to be excipiable was that set out in paragraph 5 of the Plaintiffs□ notice of objection, viz.-

> □**In the alternative** the Constitution has no application horizontally, alternatively does not apply to disputes of the present nature.□

[8] The question whether Chapter 3 of the Constitution (Fundamental Rights) has only a □vertical□ application or has in addition a □horizontal□ application has been the subject of considerable debate by commentators on the Constitution. There have been similar debates, both academic and judicial, in other countries with constitutional Bills of Rights. The term □vertical application□ is used to indicate that the rights conferred on persons by a Bill of Rights are intended only as a protection against the legislative and executive power of the state in its various manifestations. The term □horizontal application□ on the other hand indicates that those rights also govern the relationships between individuals, and may be invoked by them in their private law disputes. Although the terms □vertical□ and □horizontal□ are convenient they do not do full justice to the nuances of the jurisprudential debate on the scope of Chapter 3. Does Chapter 3 entitle a party to private litigation to contend that a statute relied on by his opponent is invalid as being inconsistent with the Constitution? To what extent does Chapter 3 have an impact on the common law in either the criminal or the civil field? Does the vertical application of the Constitution cover private law disputes between a citizen and the state? These and no doubt other related questions are open questions in this Court at least. At this point in the present judgment it is sufficient to record that Van Dijkhorst J, upon an analysis of the relevant constitutional provisions, held that Chapter 3 had only vertical and not horizontal application, and that in consequence a defendant could not invoke section 15 as a defence to a civil action for damages for defamation.

[9] In due course the Defendants applied to Van Dijkhorst J for leave to appeal to this Court. The

learned judge held that in view of conflicting decisions at first instance it was imperative that the constitutional issues which had been decided against the Defendants be resolved by the Constitutional Court. On 1st March, 1995, he accordingly referred those issues to this Court under section 102(2) of the Constitution, alternatively under section 102(8). Further in terms of Rule 18(e) of the Rules of the Constitutional Court he certified -

> (1) These two Constitutional issues are of substance and a ruling thereon by the Constitutional Court is desirable.

> (2) They can be disposed of on the pleadings and no evidence is necessary.

> (3) In view of conflicting decisions in the Supreme Court on both issues there is a reasonable prospect that another court may reach a different conclusion should permission be granted to bring the appeal.

[10] On 9th June this Court granted leave to appeal against the whole of the judgment and order of Van Dijkhorst J of 10th November, 1994. As the issue of the correct interpretation of section 241(8) of the Constitution had in the interim been resolved by this Court in its judgment in *S v Mhlungu and Others,* [6] this Court formulated the first issue on which it required argument in the appeal as follows -

> (a) Are the Defendants entitled to invoke the provisions of the Constitution notwithstanding that -

(i) publication of the offending material had already occurred; and/or

(ii) action was instituted; and/or

(iii) all relevant facts had occurred

> before the Constitution came into operation?

It also reformulated the judge s question, whether the Constitution has horizontal application. The parties were asked to address this question -

> (b) Are the provisions of Chapter 3 of the Constitution - and more particularly section 15 - capable of application to any relationship other than that between persons and legislative or executive organs of state at all levels of government?

[11] Thereafter, on 20th October, 1995, the parties were requested by the President of the Court to address the Court on the following additional matters:

i. In view of the finding by the judge in the Court *a quo* that the proposed amendment does not raise the issue whether the common law of defamation should be developed to make it consistent with the Constitution, is it competent to raise this as an issue in the appeal?; and if so

ii. Is the development of the common law within the jurisdiction of the Appellate Division or the Constitutional Court or both Courts?; and if the latter

iii. Should the appeal on this issue have been noted to the Appellate Division and dealt with by it in terms of Section 102 (4), (5) and (6) of the Constitution?

At the hearing before us on 7th November counsel addressed us on all the above issues.

[12] In their written argument the Defendants contended that the amendment which they had sought ought to have been granted. At an early stage of the oral argument, however, Mr Gilbert Marcus, who appeared for the appellant Defendants, was faced with a difficulty which proved to be insuperable. The Constitution, in terms of section 251(1), came into operation on 27th April 1994, and on that day a new legal order came into existence in the country. In *S v Mhlungu and Others, supra* n6, a case much relied on in the Defendants written argument, this Court held that from that day onward any person in South Africa was entitled to, and could invoke, the rights conferred by Chapter 3 of the Constitution. Cases such as *Kalla v The Master and Others, supra* n4, which had held, in reliance on section 241(8), that those rights were not available in proceedings which were pending immediately before the commencement of the Constitution, were overruled. The purpose of section 241(8), was held to be essentially to preserve the authority of pre-Constitution courts to continue to adjudicate in pending cases.[7] On and after 27th April the Constitutional guarantees were available to accused persons in pending cases as they were to all other persons.[8] Accordingly, Mhlungu and other persons accused in cases pending on 27th April, 1994, were entitled to invoke their constitutional rights so as to preclude the use against them of the presumption contained in section 217(1)(b)(ii) of the Criminal Procedure Act 51 of 1977, a presumption which this Court had held in *S v Zuma and Others*[9] to be unconstitutional and hence invalid.

[13] It was in that limited sense, if at all, that *S v Mhlungu and Others, supra* n6, held that Chapter 3 had retrospective operation. It most certainly did not decide that the Constitution operated retroactively in the meaning which I endeavoured to explain in my dissenting judgment in that case.[10] A statute is said to be retroactive if it enacts that as at a past date the law shall be taken to have been that which it was not, so as to invalidate what was previously valid, or *vice versa*.[11] The Constitution does not operate retroactively in that sense. I do not believe that this proposition is in any way inconsistent with the majority judgments in Mhlungus case. Thus Kriegler J said, in paragraph 99 -

In the true sense of the words it [i.e. the Constitution] is not retroactive nor retrospective. What it does mean, though, is that the moment when the judicial officer has to deal with a claim under Chapter 3 he or she has to ask whether such right exists.

Mahomed J, in paragraphs 39 and 41 also made it clear that the Constitution did not affect acts performed before its commencement. See also per Sachs J paragraphs 132 and 144.[12]

[14] Consequently, the difficulty facing the Defendants in this Court was their inability to point to anything in the Constitution which suggests that conduct unlawful before the Constitution came into force is now to be deemed to be lawful by reason of Chapter 3. Indeed, all indications in the text are to the contrary. First, there is section 251(1) itself, which fixes the date of commencement. Then there is section 7(2), which provides that Chapter 3 should apply □to all law in force and all administrative decisions taken and acts performed <u>during the period of operation of this Constitution</u>.□ (My emphasis). In this sub-section □acts□ may mean only administrative acts. Nonetheless if the provisions of Chapter 3 do not apply to administrative acts performed before the Constitution came into operation there is no reason to suppose that it was intended to apply to any other act performed before that date. Again section 98(6) provides -

> □(6) Unless the Constitutional Court in the interests of justice and good government orders otherwise, and save to the extent that it so orders, the declaration of invalidity of a law or a provision thereof -

(a) existing at the commencement of this Constitution, shall not invalidate anything done or permitted in terms thereof before the coming into effect of such declaration of invalidity; or

(b) passed after such commencement, shall invalidate everything done or permitted in terms thereof.□

That sub-section enables this Court, where the interests of justice and good government require it, to ante-date the operation of a declaration of invalidity. Although there is no express limit on the power to ante-date a declaration of invalidity, it could hardly be suggested that any such declaration could refer to a date earlier than the date of the commencement of the Constitution.[13] See the orders made by this Court in *S v Zuma and Others, supra* n9, and *S v Mhlungu and Others, supra* n6.

[15] It follows, as Mr Marcus was constrained to accept, that a pleading alleging that articles published in 1993 were, by reason of section 15 of the Constitution, □not unlawful□ and were protected by that section, must be bad in law. The appeal against the order of Van Dijkhorst J must therefore be dismissed. That, however, does not conclude the proceedings before this Court. There is the judge□s reference of the issue of □horizontality□ to this Court under section 102 of the Constitution to be considered. Further Mr Marcus on behalf of the Defendants has it in mind to apply in due course for an amendment to the plea so as to invoke section 15 of the Constitution on a different basis possibly by reference to section 35(3) of the Constitution. Whether he can invoke section 15 on any basis depends on the answer to the first issue on which this Court required argument.[14]

[16] The Defendants argued that even if the Constitution does not make lawful what was previously unlawful, the protections of Chapter 3, including section 15, are available to relieve them from the consequences of a previously unlawful act. They rely by way of analogy on the right of persons convicted and sentenced before the commencement of the Constitution to invoke their constitutional right not to undergo cruel and inhuman punishment.[15] The previous lawfulness of the sentence did not preclude their relying on their Chapter 3 rights to avoid its consequences. Similarly, they say, they are now entitled to rely on section 15 to relieve them from the obligation of paying damages for their earlier unlawful act.

[17] With all respect to the arguments of counsel, the analogy is false. This Court has held that the death penalty and the whipping of juveniles were in themselves unconstitutional and therefore unlawful by reason *inter alia* of section 11(2), which provides that no person shall be subject to cruel, inhuman or degrading punishment.[16] Although the sentences were lawful when imposed, their execution became unconstitutional once the Constitution came into operation. The obligation to pay damages is obviously not in such a category. Another fundamental difference is that the commission of the delict and the liability to pay damages cannot be separated. The right to damages accrues at the moment the defamation is published. No-one could sensibly assert that the state has an accrued right to inflict a punishment. It cannot be disputed that since 27th April, 1994, the Defendants have been entitled to exercise their right of freedom of expression and freedom of the press under section 15. If their case on the interpretation of section 15 and on its horizontal application is correct, it may allow them to repeat their allegedly defamatory publications with impunity. But it is not in that sense that the Defendants wish to invoke their right of free speech.

[18] The Defendants also argue that it would be absurd and unjust to allow the

> ☐arbitrary selection of one category of persons who would become entitled to enjoy the human rights guarantees of the Constitution and the arbitrary exclusion of another group of persons from such entitlement.☐[17]

The arbitrariness to which Mahomed J was referring related to the suggested exclusion of litigants in cases pending on 27th April, 1994, from the right to invoke constitutional guarantees after that date. As appears from section 7(2) of the Constitution, referred to above, there can be nothing arbitrary, absurd or unjust in the distinction between acts done (including delicts committed) before the Constitution commenced and those done thereafter.

[19] The Defendants also submit that the articles which are the subject-matter of the civil action could have led to a prosecution for the common law offence of criminal defamation. On the hypothesis that the existence of that common law offence is inconsistent with the right of freedom of speech under section 15, that section could be properly invoked, they say, as a defence to a prosecution notwithstanding the fact that the offence was committed before the Constitution came into force. The same principle might apply, it is suggested, to a prosecution for the common law crime of blasphemy. I shall assume for the purpose only of the present argument that that submission is correct. The attempt to extend it to civil law delictual claims is, however, unsound. At common law the statutory abolition of a criminal offence did not ordinarily affect a prosecution for an offence committed before the abolition.[18] Under the Constitution different policy considerations may apply. The state may possibly be precluded from prosecuting for an offence which has by reason of the Constitution ceased to exist.[19] The state cannot be said to have vested rights which will be affected, nor is any other person adversely affected and it may be said that to punish a person for an offence which has ceased to exist is an infringement of one or other of his protected fundamental rights.[20] It is unnecessary and would be undesirable to express any view on these arguments. What is obvious is that very different considerations must apply to a civil claim for damages for defamation. There is another party whose rights would indeed be affected by depriving him of a claim for damages which had vested in him before the commencement of the Constitution. A right of action is a form of incorporeal property.[21] Whether it is property entitled to protection under section 28 of the Constitution need not be decided.[22] What is clear is that there is no warrant in the Constitution for depriving a person of property which he lawfully held before the

Constitution came into force by invoking against him a right which did not exist at the time when the right of property vested in him. The Defendants□ citation of the well-known authorities on the need for a generous rather than a legalistic interpretation of a Constitution hardly supports an argument directed to depriving an individual of an existing right.

[20] I have dealt with the question of the retrospective or retroactive operation of Chapter 3 of the Constitution in general terms. As stated in paragraphs 13 and 14 above, the Constitution does not turn conduct which was unlawful before it came into force into lawful conduct. It does not enact that as at a date prior to its coming into force □the law shall be taken to have been that which it was not□. The consequences of that general principle are, however, not necessarily invariable. In the present case we are dealing with the right to damages for a defamation committed before the Constitution came into operation, and we hold that nothing in the Constitution impairs that right. But we leave open the possibility that there may be cases where the enforcement of previously acquired rights would in the light of our present constitutional values be so grossly unjust and abhorrent that it could not be countenanced, whether as being contrary to public policy or on some other basis. It is not necessary to spell out examples. It is sufficient to say that cases such as the one before us obviously do not fall into that category.

[21] I would therefore hold that the Defendants are not entitled to invoke section 15 as a defence to an action for damages for a defamation published before the Constitution came into operation.[23] I have reached this conclusion without reference to foreign authority, but at this stage it may be appropriate to refer to some decisions on another constitutional instrument which has given rise to problems of retrospectivity in one sense or another, namely the Canadian Charter of Rights and Freedoms.

[22] The Canadian approach is summarised as follows by Professor PW Hogg -

> □Section 58 of the Constitution Act, 1982 provides that the Act is to come into force on a day to be fixed by proclamation. That proclamation was issued by the Queen, who came to Canada for the purpose, at a ceremony in Ottawa on April 17, 1982; and the proclamation fixed April 17, 1982 as the day upon which the Constitution Act, 1982 was to come into force. The Charter of Rights accordingly came into force on that day, and operates only prospectively from that day.
>
> A statute (or regulation or by-law or other legislative instrument) which was enacted before April 17, 1982, and which is inconsistent with the Charter, will be rendered □of no force or effect□ by the supremacy clause of the Constitution, but only as from April 17, 1982. Action of an executive or administrative kind, such as search, seizure, arrest or detention, which was taken before April 17, 1982, cannot be a violation of the Charter, because the Charter was not in force at the time of the action.□[24]

[23] In *R. v. Longtin*[25] Blair JA, in the Ontario Court of Appeal, held that the Charter did not operate retrospectively. In the same Court, some years later, in *R. v. James; R. v. Dzagic*,[26] Tarnopolsky JA remarked[27] that that assertion of Blair JA had not been questioned, but added that the issue had rather been whether, in any particular case, giving effect to a Charter provision did or did not amount to a retrospective application. In that case the Ontario Court of Appeal held that section 8 of the Charter, which protects against unreasonable search and seizure had no application where the seizure took place

before the Charter came into force, and that the material seized could accordingly be used in post-Charter proceedings. The Court held that the law to be applied was that in force at the time when the act complained of occurred.[28] Our own Constitutional provisions and our own weighing of the competing public interests in South Africa may or may not produce a different approach to the admissibility in evidence of material wrongly seized. That is not the issue here. What I would take from the case and respectfully endorse are some general remarks by Tarnopolsky JA at the end of his judgment -

> □It is not an effective way to promote respect for Charter rights to apply new effects to actions taken before the Charter came into effect... it is important that actions be determined by the law, including the Constitution, in effect at the time of the action.□ [29]

An appeal from this judgment was dismissed, without written reasons by the Supreme Court of Canada. [30] In another case in the Ontario Court of Appeal, *R. v. Lucas; R. v. Neely* [31], there were two prosecutions for the statutory offence of having sexual intercourse with a female under the age of fourteen. Although the offences occurred before the Charter came into force, a lower court had acquitted the accused on the ground that the statute was invalid, being inconsistent with the equal rights provision of the Charter. On appeal by the Crown to the Court of Appeal the submission that new substantive law should not be applied to past events was upheld.[32]

[24] The generous approach of the Canadian courts to the interpretation of the Charter is well known. Perhaps, therefore, the Canadian cases put into perspective the Defendants□ contention that failure to uphold their submissions would result in absurdity and injustice.

[25] What remains to be considered, as far as the Defendants are concerned, is whether they can nonetheless derive any assistance from section 35(3) of the Constitution, a point related to the questions put to the parties by the President on 20th October, 1995.[33] Before attempting to deal with those issues it is, however, necessary to revert to the second question referred to this court by Van Dijkhorst J, namely □whether the Constitution has horizontal application.□

[26] That reference was made under section 102(8) of the Constitution which provides-

> □(8) If any division of the Supreme Court disposes of a matter in which a constitutional issue has been raised and such court is of the opinion that the constitutional issue is of such public importance that a ruling should be given thereon, it may, notwithstanding the fact that the matter has been disposed of, refer such issue to the Constitutional Court for a decision.□

In previous cases this Court has left open the precise connotation of the expression □disposes of a matter.□ [34] Whatever the precise scope of the expression, I have no doubt that in this case the learned judge had disposed of the matter before him. That matter was the application to amend the plea so as to introduce a new defence. His judgment refusing the amendment on the ground that the new plea would be bad in law, effectively eliminated that defence from the case.

[27] I find a useful analogy in the decisions of the Supreme Court on the appealability of judgments dismissing or upholding exceptions. The test applied is whether the order made has a final and definitive effect.[35] Generally, the dismissal of an exception is not regarded as final, whereas the upholding of an exception to a pleading on the ground that it is bad in law is regarded as final and appealable. The

reasons given for this distinction are instructive. In *Trakman NO v Livshitz and Others*[36] a procedural application had been made in the court below and had been dismissed. The Appellate Division held that the order dismissing the application was appealable because it -



□ ... was final and not susceptible of alteration by the court *a quo*; it was definitive of the parties□ rights in respect of the application for review; and it disposed of all the relief claimed in such application□. (My emphasis)

In *Liquidators, Myburgh, Krone & Co. Ltd v Standard Bank of South Africa Ltd and Another*[37], in explaining why an order upholding an exception was final and therefore appealable, Innes CJ said -

□Where an order, though made during the progress of a litigation is not reparable at the final stage; or to put it another way, where the final word has been spoken on the point dealt with, then that order is final and not interlocutory□.

The order of Van Dijkhorst J did dispose finally of all the relief claimed in the application for amendment. He spoke the final word on that application. The conclusion that the judge had disposed of the case before him is reinforced by the consideration that the trial of the action need not be heard by the same judge.

[28] This conclusion is not affected by the possibility that an appeal may lie against the decision of Van Dijkhorst J. Section 102(8) refers to □any division of the Supreme Court□, which indicates that the power conferred is not limited to a court of final appeal.

[29] As to policy and convenience, I cannot see why the framers of the Constitution should have wished to exclude from the operation of sub-section (8) a case such as this one, where there has been a claim for specific relief and that claim has been finally disposed of. I see no reason of policy why, before a referral, the whole of any relevant proceedings must be completed, proceedings which may be protracted and which have no bearing on the constitutional issue. The whole basis for a referral under sub-section (8) is that a constitutional issue of great public importance has been raised. As far as the proceedings before the Supreme Court are concerned the issue may be moot. The losing party may not wish to appeal, or the parties may have reached a settlement. Nonetheless, provided there is a compelling public interest, the constitutional issue may properly be referred.[38] I would add that a referral such as this does not disturb the □logic□ of the appeal routes provided in the Constitution. Theoretically, no doubt, the learned judge might have granted leave to appeal to a full bench of the Transvaal Provincial Division but, given that the constitutional issue is of such public importance as to call for a referral to this Court, that possibility can be disregarded. In practical terms this is the only Court competent to review the judgment of the learned judge on the constitutional issues. Before sending the case to this Court he had dealt fully with those issues. I can discern no ground on which his referral can be faulted.

[30] Accordingly, although the appeal has been dismissed without the necessity of dealing with the □ horizontality□ issue the referral on that issue remains to be dealt with by this Court. Whether in any circumstances this Court has a discretion to refrain from deciding an issue validly referred to it I need not now decide. Even if such a discretion exists I would not exercise it, notwithstanding the dismissal of the appeal. The issue is plainly of public importance, especially in the light of the conflicting decisions in the Supreme Court referred to by the learned judge, and has been the subject of written and oral

argument before us. (I add, in parenthesis, that the alternative referral under section 102(2) was not appropriate. See our decisions in *S v Mhlungu and Others*[39] and *S v Vermaas; S v* ☘*Du* ☘*Plessis*☘.[40])

[31] The ☐horizontality☐ issue has arisen in other countries with entrenched Bills of Rights and the parties have supplied us with a wealth of comparative material both judicial and extra-judicial, for which we are grateful.

[32] In the court below the learned judge, having endorsed the purposive approach to constitutional interpretation, analysed the purpose of the Chapter on Fundamental Rights as follows -

> ☐When interpreting the Constitution and more particularly the Bill of Rights it has to be done against the backdrop of our chequered and repressive history in the human rights field. The State by legislative and administrative means curtailed the common law human rights of most of its citizens in many fields while the Courts looked on powerless. Parliament and the executive reigned supreme.
>
> It is this malpractice which the Bill of Rights seeks to combat. It does so by laying down the ground rules for State action which may interfere with the lives of its citizens. There is now a threshold which the State may not cross. The Courts guard the door.☐[41]

Having considered the interpretation of entrenched Bills of Rights in the Constitutions of other countries, he concluded that in general, fundamental rights are protected against state action only. ☐ Horizontal protection,☐ he said,

> ☐sometimes occurs to a limited extent but when it is intended over the broad field of human rights, it is expressly so stated☐[42]

Horizontal application of Chapter 3 would in his view create an undesirable uncertainty in private legal relationships which could not have been intended by the framers of our Constitution. After an analysis of certain provisions of the Constitution he held that the fundamental rights set out in Chapter 3 were of vertical application only, and that the contrary conclusion of Van Schalkwyk J in *Mandela v Falati*[43] was clearly wrong. It should be noted that in *Motala and Another v University of Natal*[44] Hurt J refused to follow the opinion of Van Dijkhorst J and held that at least sections 8 (equality) and 32 (education) had horizontal application. In *Potgieter en ☐n Ander v Kilian*[45] the Natal Provincial Division disagreed with these two judgments and endorsed the opinion of Van Dijkhorst J.

[33] There can be no doubt that the resolution of the issue must ultimately depend on an analysis of the specific provisions of the Constitution. It is nonetheless illuminating to examine the solutions arrived at by the courts of other countries. The Court was referred to judgments of the courts of the United States, Canada, Germany and Ireland. I would not presume to attempt a detailed description, or even a summary, of the relevant law of those countries, but in each case some broad features are apparent to the outside observer. A comparative examination shows at once that there is no universal answer to the

problem of vertical or horizontal application of a Bill of Rights. Further, it shows that the simple vertical/horizontal dichotomy can be misleading. Thus under the Constitution of the United States the First to Tenth Amendments (the □Bill of Rights□) and the Fourteenth Amendment, insofar as they confer rights on individuals, would at first sight appear to be vertical, in the sense of being directed only against state power.[46] Yet the courts of that country have in some cases at least reached what is effectively a horizontal application of constitutional rights by holding that the judicial power is a state power against which constitutional protections may invoked.

[34] So, in *Shelley v. Kraemer*[47] an African-American couple had bought property which was subject to a restrictive covenant under which the seller had undertaken to sell only to whites. Owners of restricted property in the same neighbourhood sued to prevent the couple from taking possession of the property. The United States Supreme Court reiterated earlier holdings that the Fourteenth Amendment did not reach private conduct, however discriminatory, but held that official actions by state courts and judicial officials were subject to the Fourteenth Amendment, with the result that the discriminatory covenant could not be enforced by the courts. Vinson CJ said -

> □... state action in violation of the Amendment□s provisions is equally
> repugnant to the constitutional commands whether directed by state statute or
> taken by a judicial official in the absence of statute.□[48]

It was on this principle that the United States Supreme Court was able to hold in *New York Times Co. v. Sullivan*[49], an action between private litigants, that the law of defamation of the State of Alabama was an unconstitutional impairment of the right of freedom of speech. A complex case law suggests that the rule in *Shelley v. Kraemer, supra* n47, is not invariably available in private law disputes.[50] The reasoning behind the decision has also been cogently criticised.[51] It may nonetheless be accepted that by identifying some state involvement in private transactions (sometimes with great ingenuity[52]) United States□ courts have found a way of enforcing fundamental constitutional rights in disputes between private litigants.

[35] Irish cases indicate that in some instances at least, constitutional rights have been directly applied in private disputes so as to override a rule of common law. An example is *C.M. v T.M.*[53] in which Barr J held that the common law doctrine that a wife□s domicile was dependent on that of her husband was inconsistent with the principles of equality before the law and equality between husband and wife embodied in Articles 40 and 41 of the Irish Constitution.

[36] Very different models of constitutional adjudication are to be found elsewhere. There is a valuable comparative overview of the application of constitutional rights in the private law of a number of countries in *Constitutional Human Rights and Private Law*, a work by Justice A. Barak, of the Supreme Court of Israel,[54] from which it appears that there are several jurisdictions which reject the horizontal application, or at least the direct horizontal application of constitutional rights. I propose to confine my further consideration of the comparative material to the Canadian and German position, particularly as argument on these two systems was specifically addressed to us.

[37] The leading Canadian case is *Retail, Wholesale & Department Store Union, Local 580 et al. v. Dolphin Delivery Ltd.*[55] a judgment of the Supreme Court (to which I shall refer hereafter as *Dolphin Delivery*). That case arose from a labour dispute, in which the defendant trade union threatened to picket the plaintiff□s premises unless it ceased to do business with another company with which the union was

in dispute. A trial judge found that the defendant□s conduct constituted the tort of inducing a breach of contract and granted an injunction restraining the threatened picketing. The union appealed on the ground that the injunction infringed its Charter right of freedom of expression. In dismissing the appeal the court held (among other grounds) that while the Charter applied to common law as well as statute law, it did not apply in litigation between private parties in the absence of any reliance on legislation or governmental action. McIntyre J, who gave the leading judgment, based his judgment on the terms of section 32 of the Charter which expressly provide that the Charter applies to □the Parliament and government of Canada□ and to □the legislature and government of each province.□ By □government, □ he held, was meant the executive and administrative branch of government. An order of court was not to be equated with governmental action.[56]

[38] The essence of the court□s conclusion is to be found in the following passage from the judgment of McIntyre J[57] -

> □It is my view that s. 32 of the Charter specifies the actors to whom the Charter will apply. They are the legislative, executive and administrative branches of government. It will apply to those branches of government whether or not their action is invoked in public or private litigation. It would seem that legislation is the only way in which a legislature may infringe a guaranteed right or freedom. Action by the executive or administrative branches of government will generally depend upon legislation, that is, statutory authority. Such action may also depend, however, on the common law, as in the case of the prerogative. To the extent that it relies on statutory authority which constitutes or results in an infringement of a guaranteed right or freedom, the Charter will apply and it will be unconstitutional. The action will also be unconstitutional to the extent that it relies for authority or justification on a rule of the common law which constitutes or creates an infringement of a Charter right or freedom. In this way the Charter will apply to the common law, whether in public or private litigation. It will apply to the common law, however, only in so far as the common law is the basis of some governmental action which, it is alleged, infringes a guaranteed right or freedom.□

What follows from this is - (a) if a party to private litigation founds a claim or defence on some piece of legislation (whether an act of Parliament, a by-law or regulation) or on some executive act, (such as the issue of a licence) its constitutionality under the Charter is an issue which may properly be raised; (b) in litigation between private parties no inconsistency between the common law and the Charter may be relied on; but (c) the Charter applies to the common law in a dispute between government and a private litigant - for example where the government relies on a common law prerogative. (In a subsequent case [58] the Canadian Supreme Court has held that the Charter applies to the state even in respect of activities which are contractual or commercial in nature). The Defendants in the present case point to differences in wording between the Charter and our own Constitution, and deny that *Dolphin Delivery* provides any assistance in interpreting the latter. They have also referred us to the academic criticisms of *Dolphin Delivery* noted by Friedman JP in *Baloro and Others v University of Bophuthatswana and Others*.[59] I shall return to *Dolphin Delivery* later in this judgment.

[39] The German jurisprudence on this subject is not by any means easy to summarise, especially for one who does not read German. There are, however useful, accounts of the German approach in some of the South African literature, as also in the work of Justice Barak,[60] which I have mentioned above. I

have also had the benefit of reading an extensive article entitled □Free Speech and Private Law in German Constitutional Theory□ by Professor Peter E. Quint,[61] to which I am much indebted.

[40] The German model may be described as the indirect application model. The rights of individuals entrenched in the Basic Law are directly available as protection against state (including legislative) action, but do not directly apply to private law disputes. The values embodied in the Basic Law do, however, permeate the rules of private law which regulate legal relations between individuals. A constitutional right may override a rule of public law, but it is said to □influence□ rather than to override the rules of private law. Private law is therefore to be developed and interpreted in the light of any applicable constitutional norm, and continues to govern disputes between private litigants. Private law rules are not completely superseded.[62] This approach was authoritatively laid down by the German Constitutional Court in the leading case of *Lüth*, a case concerning the right of free expression under Article 5 of the Basic Law.[63] Later cases, such as the *Mephisto* case in 1971, and the *Deutschland-Magazin* case in 1976, established that it was for the ordinary courts to apply the constitutional norms to private law. This was likely to involve a balancing of constitutionally protected interests against one another (for example the right of free expression against the right of human dignity under Article 1) or against established private law rights such as confidentiality or privacy. The facts of the particular case are also to be taken into account in the balancing process. The German Constitutional Court will exercise, if necessary, a power of review, but it will do so with restraint - usually only when it is satisfied that the ordinary courts have proceeded on a seriously wrong interpretation of the basic constitutional rights under Basic Law.[64] Quint makes two comments of particular interest. One is that the deference of the Constitutional Court to the ordinary courts on questions of private law stems from the fact that, unlike the United States Supreme Court, its basic function is to decide constitutional questions only.[65] This consideration may prove in due course to have some relevance to the practical application of section 35(3) of our own Constitution. The second is that in some cases the impact of the German Basic Law upon private law under the □indirect□doctrine may be stronger than that of the United States Constitution on American common law under the □state action□ doctrine,[66] precisely because the ordinary German courts are entitled and obliged to take the Basic Law into account without searching for an element of state action.[67]

[41] The doctrine of the application of the norms of the Basic Law in the field of private law (□ Drittwirkung□) is subtle and is the subject of considerable debate in Germany itself. The analyses of Justice Barak and Professor Quint might not command universal acceptance, still less my own brief interpretation of the doctrine. It is not, however, my purpose to provide a definitive statement of German law, even if I were competent to do so. The purpose of this perhaps overlong account of constitutional adjudication elsewhere is to see what guidance it might provide in the interpretation of the South African Constitution. In my opinion there is at least one positive lesson to be learnt from the Canadian and German approaches to the problem before us. Both Canada and Germany have developed a strong culture of individual human rights, which finds expression in the decisions of their courts. Yet, after long debate, both judicial and academic, in those countries, the highest courts have rejected the doctrine of <u>direct</u> horizontal application of their Bills of Rights. On this issue, as on the retrospectivity issue, the example of these countries seriously undermines the Defendants□ contention that anything other that a direct horizontal application of Chapter 3 must result in absurdity and injustice.

[42] As I have already indicated the issue of horizontal or vertical application of Chapter 3 has been hotly debated in the South African legal literature. Arguments of substance have been deployed on both sides of the debate. I have read much of this literature,[68] I hope with advantage. It is not out of any disrespect to the authors that I refrain from listing all those to be found on each side of the controversy, or from analysing their respective arguments. I propose instead to turn without further delay to consider

what I take to be the relevant provisions of the Constitution.

[43] In relation to the application of Chapter 3 of the Constitution there are, as Professor Cockrell has explained,[69] two inter-related but nonetheless different questions to be considered. The first is to what law the Chapter applies - does it apply to the common law, or only to statute law? The second question is what persons are bound by the Chapter - do the rights give protection only against governmental action or can they also be invoked against private individuals? There are, of course, subsidiary questions, such as what bodies can be considered to be organs of government, and whether executive action in the private law sphere is □governmental.□

[44] The plain answer to the first question emerges from section 7(2) of the Constitution, which states -

> □This Chapter shall apply to all law in force and all administrative decisions taken and acts performed during the period of operation of this Constitution.□

The words □all law in force□ may have some ambiguity, in that they are capable of being read as being limited to statute law. However, any ambiguity is removed by the Afrikaans version, where the equivalent words are □alle reg wat van krag is.□ The word □reg□ (as distinct from □wet□) unambiguously embraces common law as well as statute law.[70] Although the Afrikaans version of Act 200 of 1993 was the original signed version, by virtue of section 15 of Act 2 of 1994 the English version is deemed to be the signed version.[71] The latter version would therefore prevail in case of a conflict between the two versions. But where there is no conflict between them there is another well-established rule of interpretation: if one text is ambiguous, and if the ambiguity can be resolved by the reference to unambiguous words in the other text, the latter unambiguous meaning should be adopted.[72] There is no reason why this common-sense rule should not be applied to the interpretation of the Constitution. Both texts must be taken to represent the intention of Parliament. Moreover, Afrikaans remains an official language with undiminished status in terms of section 3 of the Constitution. The term □reg□ is used in other parts of Chapter 3 as the equivalent of □law,□ for example in section 8 (□equality before the law □) and section 33(1) (□law of general application□). Express references to the common law in such sections as 33(2) and 35(3) reinforce the conclusion that the law referred to in section 7(2) includes the common law, and that Chapter 3 accordingly affects or may affect the common law. Nor can I find any warrant in the language alone for distinguishing between the common law of delict, contract, or any other branch of private law, on the one hand, and public common law, such as the general principles of administrative law,[73] the law relating to acts of state or to state privilege, on the other. By contrast, many provisions of the Constitution use the word □wet□ as the equivalent of □law□, in contexts which may assist in finding the answers to the second question.

[45] The second question too seems to have a plain answer. Section 7(1) states -

> □This Chapter shall bind all legislative and executive organs of state at all levels of government.□

Entrenched Bills of Rights are ordinarily intended to protect the subject against legislative and executive action[74], and the emphatic statement in section 7(1) must mean that Chapter 3 is intended to be binding <u>only</u> on the legislative and executive organs of state. Had the intention been to give it a more extended application that could have been readily expressed. One model which would have been available is

Article 5 of the Namibian Constitution, which provides -

> ☐The fundamental rights and freedoms enshrined in this Chapter shall be
> respected and upheld by the Executive, Legislature and Judiciary and all organs
> of the Government and its agencies and, where applicable to them, by all
> natural and legal persons in Namibia, and shall be enforceable by the Courts in
> the manner hereinafter prescribed.☐

It would be surprising if as important a matter as direct horizontal application were to be
left to be implied.

[46] Another strong indication that a general horizontal application was not intended is section 33(4) -

> ☐This Chapter shall not preclude measures designed to prohibit unfair
> discrimination by bodies and persons other than those <u>bound</u> in terms of section
> 7(1).☐ (My emphasis)

If Chapter 3 has a general horizontal application, who can the bodies and persons be who are not bound?
[75] Then there is section 35(3) -

> ☐In the interpretation of any law and the <u>application</u> and development of the
> common law and customary law, a court shall have due regard to the spirit,
> purport and objects of this Chapter.☐ (My emphasis)

Again, one asks why such a provision would be needed if the Chapter could be directly applied to
common law disputes between private litigants.

[47] Nor do I believe that the absence of reference to the judiciary in section 7(1) is an oversight. One of
its effects is to exclude the equation of a judgment of a court with state action and thus prevent the
importation of the American doctrine developed in *Shelley v. Kraemer, supra* n47. This Court, like the
provincial and local divisions of the Supreme Court, is bound to apply the law, which in a proper case
includes Chapter 3 but that does not permit the courts to ignore the limitation contained in section 7(1).
It has, I believe, sometimes been suggested that section 7(2) somehow overrides or extends section 7(1).
This reading, unpersuasive in itself, results from a failure to keep in mind the two different questions
which I earlier identified.[76] Section 7(1) answers one of them, section 7(2) the other. It may be asked
why then in private litigation a litigant may contend that a statute relied on by the other party is invalid
as being unconstitutional. That such a contention is open to a litigant is hardly disputable.[77] There are
two reasons why it must be so. First, as Chapter 3 expressly binds the legislature, every person is
protected against the operation of unconstitutional legislation. Second, section 4 of the Constitution
(which is outside Chapter 3) provides -

> ☐(1) This Constitution shall be the supreme law of the Republic
> and any law or act inconsistent with its provisions shall, unless
> otherwise provided expressly or by necessary implication in this

Constitution, be of no force and effect to the extent of the inconsistency.

(2) This Constitution shall bind all legislative, executive and judicial organs of state at all levels of government.

In this section the Afrikaans equivalent of □law□ (in the phrase □any law or act□) is not □reg□ but □wet□, which unambiguously connotes a statute. This means that any statute inconsistent with the Constitution is of no force and effect.[78] Any litigant must therefore be able to rely on this section in any litigation. To adopt the language of the reformulation of the referral issue (b) set out in paragraph 10 above, any litigant contesting the constitutionality of a statute is applying Chapter 3 to the relationship between himself and the legislature, not to his relationship to the opposing (private) litigant.

[48] Having referred to section 4 of the Constitution I should deal briefly with an argument which has been raised in the literature, namely that section 4, by nullifying any law inconsistent with the provisions of the Constitution, implies that the common law governing relations between individuals also falls to be tested directly against the provisions of Chapter 3. Quite apart from the consideration that □law□ in section 4 apparently means statute law, the argument overlooks the proviso -

□unless otherwise provided expressly or by necessary implication in this Constitution□.

If on a proper construction of Chapter 3 its operation is intended to be vertical only, the argument based on section 4 loses any force which it may have had.

[49] To recapitulate, by reason of the sections to which I have referred -

a) Constitutional rights under Chapter 3 may be invoked against an organ of government but not by one private litigant against another.

b) In private litigation any litigant may nonetheless contend that a statute (or executive act) relied on by the other party is invalid as being inconsistent with the limitations placed on legislature and executive under Chapter 3.[79]

c) As Chapter 3 applies to common law, governmental acts or omissions in reliance on the common law may be attacked by a private litigant as being inconsistent with Chapter 3 in any dispute with an organ of government.[80]

In sub-paragraph (c) I refer to □governmental acts or omissions□. For the purposes of this judgment it is unnecessary to attempt to define that concept. In particular, I leave open the question whether (as in Canada)[81] it would include state activities in the commercial or contractual sphere.

[50] In argument before us it was urged that this result was anomalous. It is fortuitous in modern times

whether a rule of private law remains a common law rule or is embodied in a statute. Examples were given of some rules of common law which may be inconsistent with the rights of the individual set out in Chapter 3. It is also pointed out that some statutes embody the common law, and that various statutes have altered the common law in some parts of South Africa but not others. Thus the statute abolishing the marital power[82] does not apply in the territories of the former Transkei, Bophuthatswana or Venda. [83] Other examples mentioned were common law crimes such as blasphemy or criminal defamation which, it was said, may be inconsistent with Chapter 3 rights; if so, they must be susceptible to attack although no statute is involved.

[51] Pausing to remark that difficulties and anomalies arise on the vertical as well as horizontal approaches,[84] I believe, with all respect to the submissions of counsel and of those writers who support them,[85] that the supposed irrationalities of the vertical interpretation are exaggerated. Such as there may be flow from the structure and wording of the Constitution. This requires further analysis. I have already pointed out that in some parts of the Constitution □law□ (□wet□ in the Afrikaans) means statute law, at whatever level. One instance is section 4, which nullifies statutes inconsistent with the Constitution, but not common law rules. This distinction between common law and statute becomes of primary importance in relation to section 98, the section which confers jurisdiction on this Court. Under section 98(2) this Court has jurisdiction, □as the Court of final instance over all matters relating to the interpretation, protection and enforcement of the provisions of this Constitution.□ Then certain specific matters are set out, including -

> □(c) any inquiry into the Constitutionality of any law, including an Act of Parliament, irrespective of whether such law was passed or made before or after the commencement of this Constitution.□

Here too the Afrikaans text has □wet□, and the reference to passing or making a law is obviously inappropriate to a rule of common law. There is no similar reference to the constitutionality of any rule of common law. Sub-sections 98(5) and 98(6) also relate to statute law only. They provide that if the Constitutional Court finds a law (□wet□) inconsistent with the Constitution it shall declare such law invalid to the extent of its inconsistency. The Court may require Parliament or any other competent authority to correct the defect in the law (again □wet□) during which time that law remains in force.

[52] The operation of a declaration of invalidity of a law (□wet□) is dealt with in sub-section (6), but section 98 nowhere provides for a declaration that a rule of common law is invalid. Such a declaration would be highly unusual, and would give rise to much difficulty. If a statute, including one embodying a private law rule, is struck down, the previous common law (or earlier statute law) is presumably restored. But what would result from holding a rule of common law to be unconstitutional? What would follow is that the relevant common law would require to be reformulated. But reformulation of the common law is the task of the Supreme Court. In *Shabalala, supra* n80, we held that the state□s claim of docket privilege was inconsistent with the Constitution. The extent of the inconsistency was defined in the order in that case, but as was stated in paragraph 58 of the judgment of Mahomed DP, □the details as to how the Court should exercise its discretion in all these matters must be developed by the Supreme Court from case to case, but always subject to the right of an accused person to contend that the decision made by the court is not consistent with the Constitution□. This Court□s jurisdiction derives only from section 98. Unlike the Supreme Court of the United States, the Australian High Court or the Supreme Court of Namibia, it has no inherent or general jurisdiction. It cannot re-write the common law governing private relations. If this is borne in mind most if not all the suggested irrationality of the vertical doctrine disappears.

[53] In many cases[86] a holding of unconstitutionality would leave a gap in the law. Take the rule of the common law referred to in the Defendants' Heads of Argument that the widow of a customary union has no action for loss of support. If that rule were held to be unconstitutional what specific rights are to be accorded the widow, having regard to other rules of customary law regarding widowhood? To take another of the examples put before us, assume that, in the absence of a statute, the marital power at common law were to be □struck down□ as unconstitutional, how would existing marriages in community of property be dealt with? Section 11(3) of the Matrimonial Property Act 88 of 1984, as amended by section 30 of Act 132 of 1993, which statutorily abolished the marital power, provided a detailed regime for the governance of marriages in community of property. This Court would have had no power to fill the gap. Defendants point out that if this is so, striking down a statute may leave an even worse common law regime in place. The lesson is to be circumspect in attacking statutes. The radical amelioration of the common law has hitherto been a function of Parliament; there is no reason to believe that Parliament will not continue to exercise that function.

[54] Where the state in its executive or administrative capacity is concerned there is no difficulty in the vertical application of Chapter 3 against it in the field of common law. If the common law offences of blasphemy and defamation[87] are incompatible with the provisions of Chapter 3, the executive action of the state in prosecuting and inflicting punishment for those offences could be called into question. This is provided for in paragraph (b) of section 98(2) which gives this Court jurisdiction in any dispute over the constitutionality of any executive or administrative act or conduct. In this regard section 98(7) provides -

> □In the event of the Constitutional Court declaring an executive or administrative act or conduct or threatened executive or administrative act or conduct of an organ of state to be unconstitutional, it may order the relevant organ of state to refrain from such act or conduct, or, subject to such conditions and within such time as may be specified by it, to correct such act or conduct in accordance with this Constitution.□

It was by reason of these provisions that we were able in *Shabalala*[88] to declare that certain practices hitherto adopted by prosecuting authorities were unconstitutional and to state what was required of them so as to ensure that an accused□s right to a fair trial was not infringed. It will not have been overlooked that there is no provision similar to section 98(7) in relation to private persons - a strange hiatus if horizontality were intended.

[55] Another pointer in the same direction is section 33(1) which provides that rights entrenched in Chapter 3 may be limited by law of general application. That □law□ may be common law, but the problem of applying section 33(1) to private relationships governed by the common law seems almost insurmountable. The common law addresses problems of conflicting rights and interests through a system of balancing. Many of these rights and interests are now recorded in the Constitution and on any view that means that as a result of the terms of the Constitution the balancing process previously undertaken may have to be reconsidered. A claim for defamation, for instance, raises a tension between the right to freedom of expression and the right to dignity. The common law compromise has been to limit both rights to a certain extent, allowing damages to be recovered for what is regarded as □unlawful expression□ but allowing □dignity□ to be infringed in circumstances considered to be privileged. Section 33(1) could hardly be applied to such a situation.

[56] I have arrived at the conclusions set out above without any reference to the drafting history of Chapter 3, and in particular of section 7. We heard no argument on that history, but it is referred to frequently in the literature which I have cited. It is perhaps sufficient to say that there is nothing in the legislative history referred to in that literature which requires the adoption of the horizontal interpretation. Nor have I so far referred in any detail to the considerations of policy which point to the vertical solution as the correct one. One consideration is adverted to by McIntyre J in *Dolphin Delivery*, *supra* at 196 -

> □While in political science terms it is probably acceptable to treat the courts as
> one of the three fundamental branches of government, that is, legislative,
> executive, and judicial, I cannot equate for the purposes of Charter application
> the order of a court with an element of governmental action. This is not to say
> that the courts are not bound by the Charter. The courts are, of course, bound
> by the Charter as they are bound by all law. It is their duty to apply the law, but
> in doing so they act as neutral arbiters, not as contending parties involved in a
> dispute. To regard a court order as an element of governmental intervention
> necessary to invoke the Charter would, it seems to me, widen the scope of
> Charter application to virtually all private litigation. All cases must end, if
> carried to completion, with an enforcement order and if the Charter precludes
> the making of the order, where a Charter right would be infringed, it would
> seem that all private litigation would be subject to the Charter.□

Those remarks seem to me to be fully applicable to Chapter 3 of our own Constitution.

[57] The limitation of the jurisdiction of this Court to constitutional matters, and the preservation of the role of the Appellate Division as the final court of appeal in other matters also appear to me to lead inexorably to the conclusion that Chapter 3 is not intended to be applied directly to common law issues between private litigants. Section 101(5) of the Constitution states-

> □The Appellate Division shall have no jurisdiction to adjudicate any matter
> within the jurisdiction of the Constitutional Court□.

Numerous provisions of Chapter 3 could and would be invoked in private litigation if direct horizontal application of the Chapter were permitted. For example, cases of *injuria* including defamation, invasion of privacy and breach of confidentiality would call for the application of sections 10, 13 and 15 of the Constitution. Section 15 would also be relevant to civil contempts of court. In employment cases sections 8 and 27 would apply. Section 26 would be applied to contracts in restraint of trade and section 29 in actions for nuisance. Section 30 would be applied in custody and maintenance cases. The consequence would be that appeals in all such cases would lie to the Constitutional Court, and the Appellate Division would be deprived of a substantial part of what has hitherto been its regular civil jurisdiction. At the very least, appeals to the Appellate Division would routinely result in referrals of common law cases to the Constitutional Court. I do not believe that such a state of affairs could ever have been intended by the framers of the Constitution.

[58] Our jurisdiction under section 98 is not suited to the exposition of principles of private law. I have made this point in relation to the Matrimonial Property Act 1984. The common law of defamation illustrates this point even more clearly. We are asked to find that the law currently applied by the courts

is inconsistent with section 15 of the Constitution. Let that be so. What regime is to replace the existing law? In the development of the common law of defamation a multitude of choices is available. The Defendants, it would seem from their written arguments, are attracted by the far-reaching revision of the common law adopted by the United States Supreme Court in *New York Times Co. v. Sullivan, supra* n49, in terms of which a □public

person□, however grossly defamed in relation to his or her public conduct, can only succeed in an action for defamation by proving that the defamatory statement was false and, what is more, by proving with □convincing clarity□ that it was made by the defendant with knowledge of its falsity or with reckless disregard whether it was false or not. I would suggest that before adopting this rule as part of our law, a court would have to consider among other things the sharp criticisms of that rule both academic and judicial,[89] within the United States, and its rejection by the Supreme Court of Canada in *Hill v. Church of Scientology of Toronto*.[90] Presumably a court would also wish to consider the rule adopted by the High Court of Australia[91] in the interests of freedom of speech, namely that in an action for defamation by a person engaged in politics or government it is a defence for the defendant to prove that he honestly and reasonably believed in the truth of what he published. The Australian rule introduces the concept of a duty to exercise care into the law of defamation. A South African court would have to consider the appropriateness of introducing such an element into a delict of intent (*injuria*) in which hitherto *culpa* has not been an element.[92] It would also doubtless consider whether the Australian rule was not right in placing the burden of proof on the defendant rather than the plaintiff - in that respect among others refusing to follow New York Times Co. v. Sullivan, *supra* n49. At least equally important would be the consideration of the development of the South African law of defamation. Unlike some of the other rights embodied in Chapter 3, freedom of speech and of the press is not a newly created right. When not suppressed or restricted by statute it was emphatically endorsed and vindicated in many judgments of South African courts.[93] Any law of defamation is a restriction on freedom of speech in the interest of other rights thought worthy of protection. More particularly, in cases of defamation, courts have tried to strike a balance between the protection of reputation and the right of free expression.[94] Presumably, too, a court would wish to take account of the fact that our Constitution, like that of Germany but unlike that of the United States, expressly recognises the right to dignity and to personal privacy, and might find guidance in the German cases to which I have referred as well as in the American cases. On the other hand a court might also wish to consider the desirability of cutting down the concept of a defamatory statement in the interests of freer political criticism.[95] It may similarly consider whether the rule that the press and the broadcasting media, unlike other litigants, cannot avail themselves of the defence of absence of *animus injuriandi*[96] ought to be varied in the light of the values embodied in section 15 of the Constitution. Those values might also require the development of a broader concept of the public interest, entailing a reconsideration of the *Neethling* case, *supra* n2. For present purposes the point is that these are not choices which this Court can or ought to make. They are choices which require consideration perhaps on a case by case basis by the common law courts. The common law, it is often said, is developed on incremental lines. Certainly it has not been developed by the process of □striking down□.

[59] The consequences which I have outlined in paragraph 57 above are well illustrated by the judgment of Cameron J in *Holomisa v Argus Newspapers Ltd* to which I referred in paragraph 21 above. The learned judge had regard to section 15 of the Constitution and to much South African and foreign case law, and considered various possible forms which a law of defamation might take. In the context of the case before him he fashioned a principle of the law of defamation which is completely novel in this country. Whether his reformulation of the law is a desirable one is a question quite outside the purview of this judgment.[97] He reached his conclusion by attempting to apply the precepts of section 35(3) - a provision to which I shall advert in a subsequent paragraph - and not by a direct application of section 15. If, however, section 15 had a direct horizontal application the task of formulating an appropriate law

of defamation would fall to this Court on appeal. But that could not be reconciled with our limited jurisdiction under section 98(2). What is in my view certain is that section 15 of the Constitution does not mandate any particular rule of common law. Our jurisdiction, which is to interpret, protect and enforce the provisions of the Constitution, cannot empower us to choose one among a number of possible rules of common law all of which may be consistent with the Constitution. It would be equally impossible, for reasons which I have already explained, for this Court simply to declare that a particular rule of the law of defamation is invalid, leaving a lacuna in the law.

[60] Fortunately, the Constitution allows for the development of the common law and customary law by the Supreme Court in accordance with the objects of Chapter 3. This is provided for in section 35(3) -

> In the interpretation of any law and the application and development of the
> common law and customary law, a court shall have due regard to the spirit,
> purport and objects of this Chapter.

I have no doubt that this sub-section introduces the <u>indirect</u> application of the fundamental rights provisions to private law. I draw attention to the words have due regard to in section 35(3). That choice of language is significant. The lawgiver did not say that courts should invalidate rules of common law inconsistent with Chapter 3 or declare them unconstitutional. The fact that courts are to do no more than have regard to the spirit, purport and objects of the Chapter indicates that the requisite development of the common law and customary law is not to be pursued through the exercise of the powers of this Court under section 98 of the Constitution. The presence of this sub-section ensures that the values embodied in Chapter 3 will permeate the common law in all its aspects, including private litigation. I incline to agree with the view of Cameron J in the judgment already referred to[98], that section 35(3) makes much of the vertical/horizontal debate irrelevant. The model of indirect application or, if you will indirect horizontality, seems peculiarly appropriate to a judicial system which, as in Germany, separates constitutional jurisdiction from ordinary jurisdiction. This does not mean that the principles evolved by the German Constitutional Court must be slavishly followed. They do however afford an example of how the process of influencing the common law may work in practice. The German Basic Law, Article 1(3) provides -

> The following basic rights shall bind the legislature, the executive and the
> judiciary as directly enforceable law.[99]

It has no equivalent to section 35(3). Yet, as I pointed out earlier in this judgment, the German courts nonetheless apply a model of indirect and not direct application of the basic rights provisions in private litigation.

[61] There is also some practical guidance to be found in the Canadian authorities, always bearing in mind that there is no separation of constitutional and ordinary jurisdiction in Canadian courts. In *R. v. Salituro*[100] Iacobucci J said -

> Judges can and should adapt the common law to reflect the changing social,
> moral and economic fabric of the country. Judges should not be quick to
> perpetuate rules whose social foundation has long since disappeared.
> Nonetheless there are significant constraints on the power of the judiciary to
> change the law. ... in a constitutional democracy such as ours it is the
> Legislature and not the courts which has the major responsibility for law



reform ... . The judiciary should confine itself to those incremental changes which are necessary to keep the common law in step with the dynamic and evolving fabric of our society.□[101]

In *Bank of British Columbia v. Canadian Broadcasting Corp.*[102], the court engaged in the process of weighing up the claims of the Charter and the common law rules of defamation, in circumstances where a bank had sued a public broadcaster for libel following reports that it was in imminent danger of failing. The court extracted what it perceived to be the core value underlying the freedom of expression, press and media provision in section 2(b) of the Charter, namely the right to gather and disseminate truthful information free from government interference. □The ultimate purpose of the Charter protection is so that truth may be uncovered and made known ... . The Charter speaks to our highest values. Truth is one of them.□ [103] What section 2(b) did not do, it was held, was to provide a special privilege to the press in the context of private litigation. In *Hill*□s case, *supra* n90, plaintiff instituted action for libel following the bringing of contempt proceedings against him by the Defendants. The court ruled out direct application of the Charter but emphasised that □the common law must be interpreted in a manner which is consistent with Charter principles. This obligation is simply a manifestation of the inherent jurisdiction of the courts to modify or extend the common law in order to comply with prevailing social conditions and values.□ [104] Having weighed up the Charter requirements and the common law rules, the court concluded that the common law of defamation complied with the underlying values of the Charter and there was no need to amend or alter it. Our courts may well reach a different conclusion: for one thing section 35(3) has no counterpart in the Canadian Charter. But the process of reasoning of the Canadian judges remains instructive.

[62] What I conclude is that Chapter 3 does not have a general direct horizontal application but that it may and should have an influence on the development of the common law[105] as it governs relations between individuals. I insert the qualification □general□ because it may be open to a litigant in another case to argue that some particular provision of Chapter 3 must by necessary implication have direct horizontal application. Section 15(1) is not such a provision. No such implication is necessary. One of the purposes of the section is to give protection against far-reaching censorship laws and other statutes restricting free speech which were common under the regime of Parliamentary supremacy. Accordingly, my response to the second issue referred to this Court by the learned judge would be that Chapter 3 of the Constitution does not in general have direct horizontal application, and more particularly that section 15(1) does not have direct horizontal application. On the other hand, the values which it embodies can and must be taken into account in the development of the common law of defamation.

[63] I should add that in my opinion the phrase □a court□ in section 35(3) means □all courts□, and includes the Appellate Division, notwithstanding the provisions of section 101(5). There is no contradiction as the □application and development of the common law□ is not a matter which falls within the jurisdiction of the Constitutional Court under section 98. This is not to say that the Constitutional Court has no control over how the common private law develops. In terms of section 98 (2) it has jurisdiction in the final instance over all matters relating to □the interpretation, protection and enforcement of the provisions of this Constitution□. It must ensure that the provisions of section 35(3) in relation, *inter alia*, to the development of the common law are properly interpreted and applied, otherwise it is not discharging its duty properly in relation to the enforcement of the provisions of the Constitution. The Constitutional Court has jurisdiction to determine what the □spirit, purport and objects□ of Chapter 3 are and to ensure that, in developing the common law, the other courts have had □due regard□ thereto. It is unnecessary, for the purposes of this judgment, to define the boundaries of its jurisdiction in this regard. Whether the Constitutional Court will exercise review powers along the

same lines as the German Constitutional Court[106] is a question for the future.

[64] What I have said above has implicitly answered the questions put to counsel by the President of the Court, set out in paragraph 11 above.

> i. The issue whether the common law of defamation should be developed to make it consistent with the Constitution, was not an issue in the appeal but fell to be considered in relation to the second issue referred to this Court by the judge.

> ii. The development of the common law is within the jurisdiction of the Appellate Division, but not of the Constitutional Court, subject to the reservation made in the previous paragraph of this judgment.

> iii. Any appeal on such an issue (the development of the common law), once it has been properly raised and dealt with in a provincial division, must be directed to the Appellate Division.

[65] In the application before him Van Dijkhorst J was not required to consider the development of the common law in terms of section 35(3) and did not do so. That section may in some instances require the Supreme Court to give a new turn to a branch of the common law. It may well follow from the answer I have given to question (a) in paragraph 10 above, that the Defendants cannot derive any assistance from section 35(3) in relation to a defamation which was published before the Constitution came into force. That issue, however, was not argued before us, and is not without its complications. In our courts a judgment which brings about a radical alteration in the common law as previously understood proceeds upon the legal fiction that the new rule has not been made by the court but merely □found□, as if it had always been inherent in the law. Nor do our courts distinguish between cases which have arisen before, and those which arise after, the new rule has been announced. For this reason it is sometimes said that □ judge-made law□ is retrospective in its operation. In all this our courts have followed the practice of the English courts. Thus in *Birmingham Corporation v. West Midland Baptist (Trust) Association*;[107] Lord Reid said -

> □We cannot say that the law was one thing yesterday but is to be something different tomorrow. If we decide that the rule [i.e. the previously accepted rule] ... is wrong we must decide that it always has been wrong□.

That is why in *Geelong Harbour Trust Commissioners v. Gibbs Bright and Co*[108] Lord Diplock said that any change in the law made by judicial decision is in effect retrospective. In their well-known book *The South African Legal System*[109] Professors Hahlo and Kahn say that (save in matters of court practice), there -

> □ ... has never been a holding ... by any South African court that the operation of a decision is to be prospective. This solution of certain American courts is unknown.□

This is no doubt correct. It may nonetheless be said that there is no rule of positive law which would

forbid our Supreme Court from departing from that practice. Indeed, in England at least two Law Lords have said that the judiciary should seriously consider exercising a jurisdiction to overrule a previous decision prospectively only,[110] as American courts have done.

[66] It is unnecessary to discuss the American practice in detail. It is described in Tribe, *American Constitutional Law*[111] and in an article, □Prospective and Retrospective Judicial Lawmaking□, by Professor M.I. Friedland,[112] which also describes English and Canadian practice. It is sufficient to refer to two decisions of the United States Supreme Court, which state the principle that courts may (not must) apply their decisions prospectively if they overrule past precedents. See *Great Northern Railway Co.* v. *Sunburst Oil and Refining Co,*[113] and *Chevron Oil Co* v. *Huson.*[114] It may be that a purely prospective operation of a change in the common law will be found to be appropriate when it results from the application of a constitutional enactment which does not itself have retrospective operation. But it follows from what I have said above that those are matters which it is for the provincial and local divisions of the Supreme Court to decide as part of their function of applying section 35(3) and developing the common law. I do no more than respectfully draw their attention to the considerations which I have outlined. Whether appeals against judgments on such matters go to the Appellate Division or this Court, need not be decided now and should be left open.

### Order

[67] The Order of the Court is as follows:

> 1. The appeal is dismissed with costs, such costs to include the costs of two counsel.
>
> 2. The two questions referred by the judge *a quo,* and reformulated by this Court as set out in paragraph 10 above are answered as follows -

a) No: The Defendants in this case are not entitled to invoke the provisions of the Constitution.

b) No: The provisions of Chapter 3 of the Constitution are not in general capable of application to any relationship other than that between persons and legislative or executive organs of state at all levels of government. In particular section 15 is not capable of application to any relationship other than that between persons and legislative or executive organs of the state at all levels of government.


S. KENTRIDGE
Acting Justice of the Constitutional Court

Chaskalson P, Langa J and O□Regan J concur in the judgment of Kentridge AJ.

[68] **MAHOMED DP**: I have had the privilege of reading and considering the main judgment of Kentridge AJ and also the separate judgments of Ackermann, Kriegler, Madala, Mokgoro and Sachs JJ. In view of the fact that I have sometimes different perspectives in regard to some of the issues articulated in those judgments, I have considered it wise to set out briefly my approach on the disputed issues.

□**Retrospectivity**□

In effect, what the amendment sought by the appellants seeks to assert is the proposition that if the disputed articles published by the Pretoria News were unlawful at the time of the publication, the effect of the subsequent enactment of the interim Constitution of 1993 (□the Constitution□) is to render such publication lawful. In my view that is an untenable proposition. The reliance by the Appellants on my judgment given in *Mhlungu□s* case[1] seems to me to be misplaced. Nothing in *Mhlungu□s* case, in any of the judgments of the majority or the minority, support the proposition contended for. What was involved in the relevant parts of the judgment in *Mhlungu□s* case was the proper interpretation of section 241(8) of the Constitution. What I did hold was that an accused person in a criminal trial was entitled to rely on any protection of the Constitution in any trial that was taking place after the commencement of the Constitution and even in circumstances where such a trial had actually begun before the commencement of the Constitution. I held that section 241(8), properly interpreted, did not operate as an obstacle in the way of an accused person who sought to assert the protection of the Constitution at a time when the Constitution was already in operation, notwithstanding the fact that the case may already have begun before the commencement of the Constitution.[2] Indeed, I held expressly that an accused person could not rely on any of the provisions of section 25(3) of the Constitution in an appeal heard after the commencement of the Constitution in which it was being asserted that a right protected by section 25(3) had not been accorded to the accused at the trial at a time when the Constitution was not yet in operation.[3] The lawfulness or unlawfulness of any conduct at the time it took place is determined by the applicable law at that time. The Constitution does not convert conduct which was unlawful at the time when it took place into lawful conduct.

[69] Notwithstanding this conclusion I would like to make one qualification which might perhaps be important in some future dispute. I would prefer to leave open the question whether or not, following on a declaration of invalidity, this Court has jurisdiction in terms of section 98(6) of the Constitution, to make an order invalidating something which was done (or permitted to be done) at a time when the Constitution was not operative at all. It may arguably be contended in some suitable case that the interests of justice and good government justify an order which invalidates anything previously done or permitted in terms of an invalid law even if the Constitution was not operative at the time when it was so done or permitted. It is unnecessary to pursue this line in the present case. Even if section 98(6) was to be construed as permitting a retrospective order of the kind I have alluded to in certain circumstances, the factual circumstances in the present case would not justify such an order.

[70] In paragraph 2(a) of the order proposed by Kentridge AJ, it is stated that □[t]he Defendants in this case are not entitled to invoke the provisions of the Constitution□ having regard to the fact that the publication of the offending material, the institution of the action and all the relevant facts had occurred before the Constitution came into operation. I am in respectful agreement with that order but I would emphasize the qualification contained in paragraph 20 of the judgment of Kentridge AJ in respect of other cases where the enforcement after the Constitution of rights acquired prior to the Constitution would be plainly inconsistent with our present constitutional values.

## Section 102(8)
[71] After some hesitation I have come to the conclusion that Kentridge AJ is correct in his interpretation of the section and it therefore follows that the matter was correctly referred to this court by the court *a quo.*

## □Horizontality□
[72] Much of the debate before us pertained to the question whether the fundamental rights provisions contained in Chapter 3 are only of □vertical□ application against the legislature and the executive or whether they are also of □horizontal□ application between private citizens *inter se.* Having examined the detailed reasons given by Kentridge AJ and those given by Kriegler J, I have come to the conclusion

that on any approach the practical consequences are substantially the same.

> 1. The debate between Kentridge AJ and Kriegler J cannot properly be characterized as a debate on the issue as to whether Chapter 3 of the Constitution is of horizontal or vertical application.
>
> 2. Where a statute or an ordinance or a by-law or a regulation is attacked on the grounds that it is inconsistent with the Constitution, there is consensus that this is a competent attack and it matters not whether such an attack is made in litigation between private individuals or whether it is made in litigation between a governmental authority and a citizen. Its effect in such circumstances can therefore be □horizontal□.
>
> 3. Even where the attack concerned is made not on any statutory enactment but on the common law, Chapter 3 can be invoked to sustain such an attack if one of the parties to the litigation is a governmental agency.
>
> 4. The only residual area of potential disagreement arises in the case where what is sought to be attacked is some or other rule of the common law in litigation between private parties not involving any legislative or executive authority. But even in this limited area the true debate is effectively not whether the rights articulated in Chapter 3 are capable of □horizontal□ effect but whether or not such □horizontality□ is to arise in consequence of the direct application of the relevant Chapter 3 right or through the mechanism of interpreting, applying and developing the common law by having regard to the spirit, purport and objects of the Chapter, pursuant to section 35(3).
>
> 5. On both approaches there is consensus that the power of all the divisions of the Supreme Court (including the Appellate Division) to interpret and develop the common law, having regard to the spirit, purport and objects of Chapter 3, is crucial and unimpaired.
>
> 6. The issue which arises in the present case is to be confined to the proper application of section 15 and the answer to that issue may not necessarily be the same as the answer which might have to be given to any other section contained in Chapter 3. (There is some force in the suggestion by Madala J that some of the fundamental rights enumerated in Chapter 3 may apply directly in litigation between private persons.[4] It is unnecessary in the present case to determine that issue or to attempt to identify the particular rights in Chapter 3 which might be suitable for such treatment.)

[73] The differences in the theoretical approaches favoured by Kriegler J and Kentridge AJ therefore seem to me to involve no substantial practical consequences, particularly if regard is had to the fact that whatever may be said about the meaning of the interim Constitution might in the future be of historical importance only, because the interim Constitution will already have been overtaken by a new constitutional text with quite different formulations impacting on the problem.

[74] In view of the fact, however, that somewhat different theoretical positions have been maintained in the judgments of Kriegler J and Kentridge AJ, I think I should express my views on this debate and the reasoning articulated in the course thereof.

[75] What is patent from the preamble, the postscript and the substance of the Constitution is a very clear and eloquent commitment to the creation of a defensible society based on freedom and equality setting its face firmly and vigorously against the racism which has dominated South African society for so long and the repression which became necessary to perpetuate its untenable ethos and premises. To

leave individuals free to perpetuate advantages, privileges and relations, quite immune from the discipline of Chapter 3, would substantially be to allow the ethos and pathology of racism effectively to sustain a new life, subverting the gains which the Constitution seeks carefully to consolidate. It is for this reason that I have found the approach of Kriegler J particularly attractive, but after some considerable hesitation I have come to be influenced by three important considerations which reduce the cogency of his arguments.

[76] The first influence is textual. Section 7(1) provides that-

> □This Chapter shall bind all legislative and executive organs of state at all levels of government.□

What section 7(1) therefore does is to isolate the bodies who are bound by the Chapter. Section 4(2) and many other Constitutions include the judiciary among the organs expressly bound. Significantly the judiciary appears in section 7(1) to have been deliberately excluded from the organs and bodies which are identified as being the organs bound by Chapter 3. The organs identified as being so bound are simply confined to □all legislative and executive organs of State.□ Why was it necessary to isolate such organs? Why was it necessary to exclude the judiciary or other organs or bodies which were not governmental in character? The issue as to whether guarantees on fundamental rights should be of horizontal application in relations between private citizens had, prior to the enactment of the Constitution, been the subject of very considerable public and academic debate, both in South Africa and abroad. Different responses were forthcoming from different constituencies. It was very much a live issue. I find it difficult to accept that if the lawmakers had intended to resolve that debate in the manner contended for by □horizontality□ advocates, they would not have said so in clear terms or at least in language which clearly permitted that inference to be made. I am not persuaded that the lawmakers would wish such a crucial issue to be left for discovery and inference by astute judicial craftsmanship and nimble argumentation. The converse would have been understandable. If the language employed in section 7(1) was language which permitted the inference of □horizontality□, but nothing was said as to whether the Chapter also bound organs of government, it might have been easy to infer that because private citizens were bound by the discipline of Chapter 3, it was *a fortiori* of application against a governmental authority. The controversy which had previously raged was not a controversy pertaining to whether governments should be bound by the fundamental rights articulated in a Constitution but whether citizens should so be bound in their relations between themselves.

[77] In dealing with the proper force and interpretation of section 7(1) I have not overlooked the argument that section 7(2) applies Chapter 3 to □all law in force... during the period of operation of this Constitution.□ I have no doubt that □all law□ must include the common law but in my respectful view Kentridge AJ is correct in concluding that what section 7(2) does is to define what law is applicable to the persons bound by Chapter 3 in terms of section 7(1). Nothing in section 4 of the Constitution is inconsistent with that conclusion. The Constitution is, in terms of section 4, manifestly the supreme law of the Republic and binding on all legislative, executive and judicial organs of state at all levels of government. But that fundamental proposition in no way extends the application of section 7(1) to bodies or persons not otherwise bound in terms of that subsection by the fundamental rights articulated in Chapter 3.

[78] The textual force of section 7(1) appears, in my view, substantially to be reinforced by the provisions of section 33(4) of the Constitution which prescribe that Chapter 3-

> □shall not preclude measures designed to prohibit unfair discrimination by bodies and persons other than those bound in terms of section 7(1).□

What this sub-section seems to me to do is to authorize substantive legislation which would extend to other bodies and persons the duties placed on government in terms of section 7(1). The answer favoured by Kriegler J to this approach follows on his understanding of the meaning of section 7(2). Section 7(2), he says, makes the Chapter applicable to all law and it matters not whether the persons seeking to apply such law are private persons or governmental organs but private persons are perfectly entitled to act without regard to the rights articulated in Chapter 3, as long as they do not invoke the law in support of their actions. On this approach section 33(4) becomes necessary to entitle Parliament to enact legislation which would prohibit actions by private persons which are inconsistent with Chapter 3 but in circumstances where the law is not being invoked by private persons in support of such actions. He puts this argument forcefully by stating that-

> □.... As far as the Chapter is concerned a landlord is free to refuse to let a flat to someone because of race, gender or whatever; a white bigot may refuse to sell property to a person of colour; a social club may to black-ball Jews, Catholics or Afrikaners if it so wishes. An employer is at liberty to discriminate on racial grounds in the engagement of staff; a hotelier may refuse to let a room to a homosexual; a church may close its doors to mourners of a particular colour or class. But none of them can invoke the law to enforce or protect their bigotry... The whole gamut of private relationships is left undisturbed.□[5]

[79] There is force in this approach but I have difficulties with it. The premise is and must be that private persons falling within the examples referred to in this quotation, who perform acts otherwise inconsistent with the rights specified in Chapter 3, are not doing so in terms of law. I think this is an incorrect premise. All the acts performed by such private persons are acts performed in terms of what the common law would allow. A landlord who refuses to let to someone because of his race is exercising a right which is incidental to the rights of the owner of property at common law; this applies equally to the white bigot who refuses to sell property to a person of colour. A social club which black-balls Jews, Catholics or Afrikaners in terms either of its own constitution or the common law pertaining to voluntary associations or freedom of contract. I am not persuaded that there is, in the modern State, any right which exists which is not ultimately sourced in some law, even if it be no more than an unarticulated premise of the common law and even if that common law is constitutionally immunized from legislative invasion. Whatever be the historical origins of the common law and the evolutionary path it has taken, its continued existence and efficacy in the modern State depends, in the last instance, on the power of the State to enforce its sanction and its duty to do so when its protection is invoked by the citizen who seeks to rely on it. It is, I believe, erroneous to conclude that the law operates for the first time only when that sanction is invoked. The truth is that it precedes it and is indeed the ultimate source for the legitimation of any conduct. Freedom is a fundamental ingredient of a defensible and durable civilization, but it is ultimately secured in modern conditions, only through the power, the sovereignty and the majesty of the law activated by the State□s instruments of authority in the protection of those prejudiced through its invasion by others. Inherently there can be no □right□ governing relations between individuals *inter se* or between individuals and the State the protection of which is not legally enforceable and if it is legally enforceable it must be part of law.

[80] The approach of Kriegler J, which I have sought to summarise, also does not explain to me satisfactorily why section 7(1) was necessary at all. If section 7(2) was to be interpreted on the basis that Chapter 3 applied to all law and that it mattered not whether those affected were governmental organs or private parties in litigation between themselves, there would have been scant reason to specially isolate governmental organs in section 7(1).

[81] The basic premise of section 7(1) is that generally Chapter 3 applies only to legislative and executive organs of State and substantially the same assumption must inform section 98(7) which contemplates restraints only upon governmental authorities performing executive or administrative acts inconsistent with the Constitution. No corresponding machinery is provided for restraints upon any private persons.

[82] The same temper is reflected by section 35(3) which requires a court to have regard to the spirit, purport and objects of Chapter 3 in the interpretation of any law and the application and development of the common law and customary law. If the law pertaining to relations between private individuals was directly subject to the substantive rights contained in Chapter 3 there would be scant need to provide that the courts should have regard to the spirit, purport and objects of the Chapter in the application and development of the common law. If Chapter 3 was of direct application to such relationships, section 35 (3) would appear to me to be only of peripheral value and relevance in the application of Chapter 3. As will appear later, on the interpretation I favour, on the other hand, the role of section 35(3) is crucial in the identification, development and enforcement of the fundamental constitutional values articulated in the Chapter.

[83] In the main judgment of Kentridge AJ he also relies on the text of section 33(1) in support of his construction of sections 7(1) and 7(2). He argues that if section 33(1) were to apply to private relationships governed by the common law, the problems which would arise appear to be □almost insurmountable.□ He contends that-

> □The common law addresses problems of conflicting rights and interests through a system of balancing. Many of these rights and interests are now recorded in the Constitution and on any view that means that as a result of the terms of the Constitution the balancing process previously undertaken may have to be reconsidered.□[6]

I agree that the text of section 33(1) may be some □pointer□ in the direction favoured by Kentridge AJ but I would not have regarded this consideration by itself to be sufficient to justify a rejection of the approach favoured by Kriegler J. In the first place, on the approach favoured by Kentridge AJ, Chapter 3 and therefore section 33(1) would in any event apply to the common law where the government or a governmental agency is involved in litigation against a private party and in which some right contained in Chapter 3 is invoked. The lawmaker therefore did not consider the problems in applying section 33(1) in such a situation to be □insurmountable□. I do not think that these problems necessarily become insurmountable in cases where it is not the government which is involved in making or resisting an attack on the common law but private parties *inter se* (although it must be conceded that where the State is a party in litigation involving the common law it would often not be asserting a □right□ which needs balancing against a □right□ claimed or asserted by its adversary). In most cases, □the balancing process previously undertaken□ in formulating the relevant rule of the common law has involved balancing some of the very rights now detailed in Chapter 3 and it may be perfectly possible, in the application of section 33(1), to do the balancing act by having regard to the other rights articulated in Chapter 3, both in identifying the contours of the particular right invoked in the attack on the common law and in seeking to define the permissible parameters of any limitation.

[84] Apart from the actual and potential textual difficulties I have in support of the interpretation favoured by Kriegler J, I agree with Kentridge AJ that □there is nothing in the legislative history... which requires the adoption of the horizontal interpretation.□[7] I am mindful of the fact, however, that

it is theoretically possible for different Parliamentarians and negotiators to support the same formula in an enactment for very different, and sometimes even conflicting reasons, but insofar as the legislative history provides an objective background which is inconsistent with a particular construction which is advanced, it is, I think, permissible to have some regard to that history, although this cannot in itself ever operate decisively.[8]

[85] Notwithstanding all these observations I would have remained profoundly uncomfortable if the construction favoured by Kentridge AJ meant, in practise, that the Constitution was impotent to protect those who have so manifestly and brutally been victimised by the private and institutionalized desecration of the values now so eloquently articulated in the Constitution. Black persons were previously denied the right to own land in 87% of the country. An interpretation of the Constitution which continued to protect the right of private persons substantially to perpetuate such unfairness by entering into contracts or making dispositions subject to the condition that such land is not sold to or occupied by Blacks would have been for me a very distressing conclusion.[9] These and scores of other such examples leave me no doubt that those responsible for the enactment of the Constitution never intended to permit the privatisation of Apartheid or to allow the unfair gains of Apartheid or the privileges it bestowed on the few, or the offensive attitudes it generated amongst many to be fossilized and protected by courts rendered impotent by the language of the Constitution. For this reason I would therefore have been compelled to ask whether the interpretation favoured by Kentridge AJ is perhaps not flawed in some respect which I might have overlooked or whether I have not perhaps accorded inadequate weight to some of the relevant considerations so forcefully articulated in the judgment of Kriegler J.

[86] Fortunately, however, none of the distressing consequences to which I have referred in the preceding paragraph, flow from the interpretation which I have now come to favour. I say this because on that interpretation most of the common law rules, upon which reliance would have to be placed by private persons seeking to perpetuate unfair privilege or discrimination, would themselves be vulnerable to invasion and re-examination in appropriate circumstances. What contracts and actions public policy would permit or enforce in the future will have to be re-examined. Such a constitutionally defensible and competent source of invasion would flow not from a direct and literal extension of the provisions of section 7(1) of the Constitution to relations between private persons *inter se*. It would flow from a source potentially no less richer and creative than such an extension. It would be sourced in section 35 (3) of the Constitution which compels the courts to have due regard to the spirit, purport and objects of the Chapter in the interpretation of any law and the application and development of the common law. The common law is not to be trapped within the limitations of its past. It needs not to be interpreted in conditions of social and constitutional ossification. It needs to be revisited and revitalized with the spirit of the constitutional values defined in Chapter 3 of the Constitution and with full regard to the purport and objects of that Chapter.[10] Thus approached section 35(3) can, in appropriate circumstances, accommodate much of the concern felt by those like me who are anxious to avoid giving to section 7 of the Constitution an interpretation which would leave the courts substantially impotent in affording the proper protection of constitutional values to those victimized by their denial to them in the past.

[87] The interpretation which I have come to favour has the advantage of giving to the different divisions of the Supreme Court, including its Appellate Division, a very clear and creative role in the active evolution of our constitutional jurisprudence by examining, and in suitable circumstances expanding, the traditional frontiers of the common law by infusing it with the spirit of Chapter 3 of the Constitution and its purport and objects. Nothing contained in section 101(5), read with section 98, of the Constitution would in any way impede the untrammelled exercise of such powers, but it would leave also to the Constitutional Court the residual power to determine, in suitable circumstances, whether in the application of its jurisdiction in terms of section 35(3) the Supreme Court has in any particular case

properly had regard to the spirit of Chapter 3 of the Constitution and its purport and objects.

[88] In the result, I am in respectful agreement with the order proposed by Kentridge AJ and the answers he gives in paragraph 64 of his judgment.


I MAHOMED
Deputy President of the Constitutional Court

Langa J and O☐ Regan J concur in the judgment of Mahomed DP.

[89] **ACKERMANN J:** I concur with Kentridge AJ☐s judgment and the order he proposes. I have also had the privilege of reading the judgment of Kriegler J, in which he reaches a different conclusion regarding the effect which the rights guaranteed in Chapter 3 of the interim Constitution have on legal relations between private persons. Because of this disagreement and the importance of the issue at stake, I should like to add briefly certain reasons of my own, some of which have been foreshadowed in Kentridge AJ☐s judgment, why I agree with his conclusion on this particular issue. A teleological approach to the construction of the Constitution gives substantial support to this conclusion.

[90] It is certainly true that our interim Constitution is textually unique and that the historical circumstances in which constitutions are adopted are never identical. In certain cases these circumstances may, for the most part, only differ in degree. Many constitutions, particularly those which come in the wake of rapid and extensive political and social change, are reactive in nature and often reflect in their provisions a response to particular histories and political and social ills.[1]

[91] Kriegler J has, in his judgment, referred eloquently to the duration, acceleration and gravity of the human rights denials and abuses to which the interim Constitution is a response and which it seeks, amongst other things, to redress. Without wishing to over-simplify the nature and extent of these abuses and denials it is, I think, fair to say that they related in general to the core values of dignity, freedom and equality. There are other constitutions which have been a response to tragic histories or episodes in the national histories of particular countries during which gross abuses of human rights have occurred.

[92] I do believe that the German Basic Law (GBL) was conceived in dire circumstances bearing sufficient resemblance to our own to make critical study and cautious application of its lessons to our situation and Constitution warranted. The GBL was no less powerful a response to totalitarianism, the degradation of human dignity and the denial of freedom and equality than our Constitution. Few things make this clearer than Art 1(1) of the GBL,[2] particularly when it is borne in mind that the principles laid down in Art 1 are entrenched against amendment of any kind by Art 79(3).[3]

[93] The provisions of Articles 1 to 19 of the GBL (which constitute its chapter on basic rights and determine the binding nature of these rights) are no more restricted than the comparable provisions in our Constitution. No distinction is made between public law and private law; statute law and common law; there is no suggestion of their being limited to the relationship between state and persons. Most important of all, Art 1(3) of the GBL states unequivocally that the basic rights ☐shall bind the legislature, the executive and the judiciary as directly enforceable law☐[4] (emphasis supplied). By specifically including the judiciary, this provision goes even further textually than section 7(1) of our Constitution.

[94] Yet in Germany it is today not seriously questioned that in deciding disputes between private persons there is no direct application of the fundamental rights by the judiciary.[5] This is particularly

noteworthy considering the extensive jurisprudence supporting the view that the basic rights entrenched by the GBL not only establish subjective individual rights but an objective order of values or an objective value system (□eine objektive Wertordnung□).[6]

> The jurisprudence of the Federal Constitutional Court is consistently to the
> effect that the basic right norms contain not only defensive subjective rights for
> the individual but embody at the same time an objective value system which, as
> a fundamental constitutional value for all areas of the law, acts as a guiding
> principle and stimulus for the legislature, executive and judiciary.[7]

Von Mηnch/Kunig[8] point out that the Federal Constitutional Court and academic opinion are in agreement that the basic rights only apply with indirect horizontality (□nur *mittelbaren Drittwirkung*□) to the legal relations of private individuals; the basic rights do not apply directly to the private law, but because the basic rights also operate as an objective value system they □influence□ (□*beeinflussen*□) the private law. The learned authors point out[9] that the basic rights do not serve to solve disputes in the field of private law in specific cases.

[95] Against this background, particularly having regard to the explicit wording of Art 1(3) of the GBL, it behoves us to consider carefully why, on textual, teleological and policy grounds, German constitutional jurisprudence has rejected the direct application of the basic rights in the GBL to private legal relationships.

[96] The impact of Art 1(3) of the GBL on the judiciary is seen as being limited generally to procedural due process, including equal access to the law and equality before the law. Where the law is completely silent, however, the basic rights can be directly applied. Thus, the general equality clause[10] requires procedural equality of arms (□Waffengleichheit□), equality □as to the outcome of the case□ (i.e. the court must be unbiassed throughout) and above all equality in the application of the law; the courts may not depart from legal norms, existing norms may not be ignored and litigants may not be discriminated against on any of the grounds mentioned in Art 3(3).[11]

[97] Direct application of the basic rights by the judiciary in ordinary civil proceedings would make the law vague and uncertain, which is contrary to the concept of the constitutional state.[12] Uncertainty is aggravated by the fact that (in contrast to a dispute between citizen and state) in a dispute between two private individuals both sides can invoke the basic rights, calling for a difficult balancing of conflicting rights which could reasonably lead different courts to different decisions.[13] Rather, direct application should take place at the law-making level, so that all laws which are being applied by the courts do already comply with the basic rights, obviating the need for direct horizontal application by the courts.[14] I consider this to be an equally, if not more compelling, consideration in the context of our own Constitution. As I pointed out in *S v Makwanyane and Another*,

> [i]n reaction to our past, the concept and values of the constitutional state, of
> the □regstaat□... are deeply foundational to the creation of the □new order□
> referred to in the preamble [of the Constitution].[15]

Our Constitution moreover commits the state, in different ways, to legislative programmes to rectify past discrimination and denial of human rights and to ensure equality, the equal protection of the law

and the protection and advancement of human rights in the future.[1][6]

[98] The fact that Art 1(3) of the GBL explicitly mentions the organs of state, and only the organs of state, as being bound by the chapter on basic rights is seen as a clear pointer that rights are not to be applied horizontally.[1][7] Furthermore, certain provisions[1][8] explicitly state that they are applicable horizontally, which would be superfluous if all provisions were applicable horizontally.[1][9] This supports the approach of and the conclusion reached by Kentridge AJ in paragraph 46 of his judgment that the provisions of sections 33(4) and 35(3) of the Constitution would be superfluous if the Chapter 3 rights were directly enforceable horizontally.

[99] The German Constitution guarantees a general right to freedom.[2][0] In areas such as the law of contract this would have to be taken into account in deciding whether parties should be bound by other sections of the basic rights chapter since the act of limiting one□s own rights by contract is itself an exercise of the right to freedom. A matter of some controversy is whether the individual can consent to the violation of his/her rights by the state.[2][1] The question whether one may allow another private person to infringe one□s constitutional rights is not dealt with in the constitutional context, because these rights are not considered binding on other private persons in the first place. In this context the objection to the direct application of basic rights to private relations is that it severely undermines private autonomy.[2][2]

[100] On a teleological approach it is argued that the purpose of the chapter on basic rights in the GBL is to confer rights on individuals. The effect of direct horizontal application would be to place duties on individuals instead.[2][3] A related point is made that if the basic rights of the GBL are directly invoked in any dispute between private individuals, the basic rights of both individuals will be at stake, necessitating the balancing of competing rights.[2][4]

[101] A further argument advanced in this context, which is also relevant to our own, is that the basic rights were developed in an historical setting of civil society struggling to free itself from the authoritarian interference of the absolute state.[2][5]

[102] A further problem which militates against the direct horizontal application of the basic rights is the fact that the Federal Constitutional Court would be thrust into the role of an appeal court for large numbers of appeals in what would otherwise be normal commercial litigation.[2][6]

[103] Any attempt at a detailed discussion on the operation of *mittelbare Drittwirkung* (indirect horizontality) in German constitutional law would be out of place here. There are some features, however, which bear on the construction of our own Constitution. The Federal Constitutional Court refers to the radiating effect (*Ausstrahlungswirkung*) of the basic rights on private law.[2][7] In the *Lηth* case[2][8] the Federal Constitutional Court held as follows:

> The influence of the scale of values of the basic rights affects particularly those
> provisions of private law that contain mandatory rules of law and thus form
> part of the *ordre public* - in the broad sense of the term - that is, rules which for
> reasons of the general welfare also are binding on private legal relationships
> and are removed from the domination of private intent. Because of their
> purpose these provisions are closely related to the public law they supplement.
> Consequently, they are substantially exposed to the influence of constitutional
> law. In bringing this influence to bear, the courts may invoke the general

clauses which, like Article 826 of the Civil Code, refer to standards outside private law. □Good morals□ is one such standard. In order to determine what is required by social norms such as these, one has to consider first the ensemble of value concepts that a nation has developed at a certain point in its intellectual history and laid down in its constitution. That is why the general clauses have rightly been called the points where basic rights have breached the [domain of] private law...2[9]

[104] Thus, in private litigation, the German courts are obliged to consider the basic rights in interpreting concepts such as □justified□, □wrongful□, □*contra bonos mores*□ et cetera.3[0] The basic rights therefore have a radiating effect on the common law through provisions such as, for example section 138 of the Civil Code, which provides that □legal acts which are contrary to public policy are void.□3[1] Stern3[2] argues that although general concepts such as the *boni mores* will be the main entry point into private law for the basic rights, there is no reason why they should not be applied to any other rule whose meaning is unclear. If, in such situations, the court does not have regard to the basic rights in interpreting the law in question, then there is a violation of rights.3[3]

[105] Stern3[4] suggests that the major advantage of indirect horizontal application is that, instead of throwing out the good parts of the existing law with the bad and setting off into unchartered waters, it embarks on a cautious reform of the existing law within its own framework. The same learned author also points out3[5] that even the highest German Federal Labour Court3[6] which initially supported a direct horizontal application of basic rights had, by 1984, come to accept the position that unless expressly provided (as in Art 9(3) of the GBL), the constitution required that these rights should only be given indirect horizontal application.

[106] That the drafters of our Constitution had recourse to or were influenced by certain features of the GBL in drafting our Constitution is evident from various of its provisions.3[7] The marked similarity between the provisions of section 35(3), enjoining courts □[i]n the interpretation of any law and the application and development of the common law and customary law□ to □have due regard to the spirit, purport and objects of [Chapter 3]□, and the indirect horizontal application of the basic rights in the GBL in German jurisprudence cannot, in my view, simply be a coincidence. It provides a final powerful indication that the framers of our Constitution did not intend that the Chapter 3 fundamental rights should, save where the formulation of a particular right expressly or by necessary implication otherwise indicates,3[8] apply directly to legal relations between private persons.

[107] The implications of direct horizontal application must be logically followed and consistently faced. If direct horizontality is to be applied to section 15(1) then it must be applied to the equality clause, section 8, unless one were to hold (quite impermissibly in my view) that for some reason, not evident in text or reason, freedom of speech and expression is in South Africa a preferred right enjoying a higher status than the right to equality.

[108] The direct horizontal application of, for example, section 8 would lead to consequences so undesirable and unsupportable that it demonstrates why, absent the very clearest indication to the contrary in our Constitution, we ought not to apply the Chapter 3 rights directly to private legal relations. I have no doubt that a similar direct application of other Chapter 3 rights would lead to similar unsupportable consequences, but examining the consequences in relation to section 8 will suffice.

[109] The direct application route is the one which the *ratio decidendi* in *Shelley v. Kraemer*[3][9] in effect followed. At least two eminent American constitutional scholars, professors Herbert Wechsler and Louis Henkin,[4][0] while applauding the <u>result</u> reached by the Supreme Court in this case, have effectively criticised the *ratio decidendi* and demonstrated how the route chosen leads to unsupportable consequences.[4][1] Professor Wechsler reasons as follows:

> Assuming that the Constitution speaks to state discrimination on the ground of race ... why is the enforcement of the private covenant a state discrimination rather than a legal recognition of the freedom of the individual? That the action of the state court is action of the state, the point that Mr. Chief Justice Vinson emphasizes in the Court□s opinion is, of course, entirely obvious. What is not obvious, and is the crucial step, is that the state may properly be charged with the discrimination when it does no more than give effect to an agreement that the individual involved is, by hypothesis, entirely free to make. Again, one is obliged to ask: What is the principle involved? Is the state forbidden to effectuate a will that draws a racial line, a will that can accomplish any disposition only through the aid of the law, or is it a sufficient answer there that the discrimination was the testator□s and not the state□s? May not the state employ its law to vindicate the privacy of property against a trespasser, regardless of the grounds of his exclusion, or does it embrace the owner□s reasons for excluding if it buttresses his power by the law? Would a declaratory judgment that a fee is determinable if a racially restrictive limitation should be violated represent discrimination by the state upon the racial ground? Would a judgment of ejection? None of these questions has been answered by the Court nor are the problems faced in the opinions.[4][2]

Professor Henkin takes the critical enquiry even further:

> If some may be prepared to go where Professor Wechsler hesitates to go, even they may hesitate to conclude that the Supreme Court would prevent a state from probating a will leaving money to a group or institution of a particular religious denomination, or from enforcing exclusion, on the basis of religious difference, from church, or church membership, or cemetery, although the state could not make or require these discriminations.

> Indeed, the difficulty may lie even deeper, as the testamentary cases would seem to prove. If *Shelley v. Kraemer* were read to hold that a state cannot enforce a discrimination which it could not itself make, the state could not probate, enforce, or administer many common bequests. The fourteenth amendment forbids discrimination not only on the basis of race or color; it also forbids discrimination on any basis which is capricious or whimsical. But any bequest which favors *A* rather than *B* may be capricious or whimsical. In such a case, the state could not by statute require the testator to leave his money to *A*. Apart, then, from bequests to special categories, to wife and children, for example - where an argument can be made that the category is reasonable - no bequest could be enforced if the enforcement were deemed to make the state responsible for the □discrimination.□ Similarly, so long as an individual may capriciously decide who may, and who may not enter upon his property, the enforcement of trespass would not be possible, even where the exclusion had

nothing to do with racial discrimination but was based on some other caprice. In the sale of land, too, the fact that the vendor arbitrarily contracted to sell to *A* rather than to *B* might be argued to prevent a court from enforcing the sale because the state would thereby make the arbitrary selection its own.[4][3]

[110] It is true that these learned authors are considering equality jurisprudence in the context of the Fourteenth Amendment □state action□ doctrine; but their criticism is in fact being directed at the highly undesirable consequences of the direct horizontal application of this constitutional right to private legal relations. I wish to make it explicitly clear that I am not arguing for a situation where the Constitution or the law in general must tolerate a situation where bigotry is perpetuated and apartheid privatized through freedom of contract and other devices of the common law. What I am contending is that the law can deal effectively with these challenges through the very process envisaged by section 35(3), namely, the indirect radiating effect of the Chapter 3 rights on the post-constitutional development in the common law and statute law of concepts such as public policy, the *boni mores*, unlawfulness, reasonableness, fairness and the like, without any of the unsatisfactory consequences that direct application must inevitably cause. The common law of this country has, in the past, proved to be flexible and adaptable, and I am confident that it can also meet this new constitutional mandate.

[111] What also needs to be considered carefully is the impact, on the legislative process, of a directly horizontal application of Chapter 3 to private legal relationships. In each case when a final pronouncement of this nature is made through this Court, Parliament will be bound by this Court□s judgment. The Court has after all pronounced on the meaning and application of the Constitution in a particular context. Should Parliament wish to alter the law, resulting from such a direct application of the Chapter 3 rights by this Court, it will have to amend the Constitution. I consider this to be a most undesirable consequence, needlessly inhibiting the normal piecemeal statutory modification of the common law. It is one which directly flows, however, from a holding which in essence constitutionalises the entire body of private law. It could never, in my view, have been the intention of the framers to constitute Chapter 3 as a super civil code, to which the private common law is directly subject.

[112] I would sum up my views as follows. For the reasons given by Kentridge AJ in his judgment and those advanced above, the text of the Constitution, properly construed, strongly favours the conclusion that the direct horizontal application of Chapter 3 to private legal relations is not intended. Whatever lingering doubts there might be on this score are resolved by teleological considerations. The German experience bears this out. Direct application of the Chapter 3 rights, quite apart from the undesirable consequences already mentioned, will cast onto the Constitutional Court the formidable ultimate task of reforming the private common law of this country, a consequence which could not have been intended by the drafters. It turns the Constitution, contrary to the historical evolution of constitutional individual rights protection, also into a code of obligations for private individuals, with no indication in the Constitution as to how clashes between rights and duties are to be resolved, or how clashing rights are to be □balanced□; section 33(1) was clearly not designed and is quite inappropriate for this purpose. It would also be undesirable in a broader constitutional sense, pre-empting in many cases Parliament□s role of reforming the common law by ordinary legislation.

LWH ACKERMANN
Justice of the Constitutional Court

[113] **KRIEGLER J**: The questions raised by this case are set out in the judgment of my colleague Kentridge AJ and repetition is unnecessary. However, two of them are of such importance that they

require emphasis.[1] They are indeed definitive of the scope of the Constitution with regard to time and subject matter: (a) Can the provisions of the Constitution be applied to events that took place before it came into force; and (b) Does Chapter 3 thereof[2] govern only the relationship between the state and the individual or does it also govern relationships between individuals where law is involved?[3]

[114] With regard to the first question I agree with Kentridge AJ that the learned judge in the court below erred in holding that section 241(8) of the Constitution was dispositive of the case. I also agree with Kentridge AJ that the decision in *Mhlungu* does not avail the defendants in this case.[4] *Mhlungu*□s case lends no support to their startling proposition that conduct which was unlawful when it was committed prior to the advent of the Constitution could be rendered lawful by such advent. The amendment the appellants sought in the court below was aimed at supporting a defence that the supervening protection of freedom of expression, afforded by section 15(1) of the Constitution, rendered lawful a publication which had taken place long before such protection was created.[5]

[115] I do not, however, agree with the reasoning of Kentridge AJ regarding the effect of sections 251 (1), 7(2) and 98(6) of the Constitution.[6] Although section 251(1) fixes the date of commencement of the Constitution, it does not purport to address the issue of retroactivity or retrospectivity. Nor do I believe that section 7(2) is really germane to that issue. Section 7 as a whole is not concerned primarily, if at all, with time, but with the scope of application, the reach, of Chapter 3.[7] Certainly subsection (2) does not relate to the possible retrospective or retroactive operation of Chapter 3.

[116] That issue is, however, specifically addressed in section 98(6) of the Constitution, which has different rules for laws that existed at the time of the commencement of the Constitution and those made thereafter.[8] With regard to pre-constitutional laws an order of invalidation does not generally operate retroactively, but the court can make its order invalidating a law to apply retroactively so as to □ invalidate anything done or permitted in terms thereof before the coming into effect of such declaration of invalidity□. With regard to post-constitutional laws however, the invalidation, as a rule, does operate retroactively to the time the law was made.

[117] Kentridge AJ acknowledges that section 98(6) gives the courts the authority □in the interests of justice and good government□ to pre-date the operation of a declaration of invalidity and contains □no express limit□ to its retroactive power, but concludes that □it could hardly be suggested□ that the date of commencement of the Constitution is not nevertheless to be read into section 98(6) as such limit.[9] I am not convinced of the correctness of that conclusion and prefer to leave open whether a court could, in the □interests of justice and good government□, invalidate something done prior to 27 April 1994 under a law struck down for its fatal inconsistency with the Constitution.[10] Such considerations manifestly do not arise here and I agree that the appeal against the order *a quo* refusing the proposed amendment falls to be dismissed. I therefore concur in paragraph 2(a) of the order proposed by Kentridge AJ.

[118] The second main question presented by this case is of greater importance for the future of our constitutional jurisprudence. It is also considerably more difficult to express with neutral precision. In the court below it was formulated too broadly.[11] This Court□s refinement of the issues still did not focus the question sufficiently clearly.[12] It was only in the course of judicial debate that the real question became starkly apparent. It is, quite simply, this: Does our constitutional law directly enforce the fundamental rights of persons proclaimed in sections 8 to 32 of the Constitution only as against the state or in all legal relationships? The learned judge *a quo* and the majority of my colleagues in this Court have concluded that the individual□s legal rights guaranteed by Chapter 3 of the Constitution are directly enforceable against the state alone. Their reasoning is cogent; the judicial and academic

authority they cite is impressive. Nevertheless I am convinced that they err - and do so fundamentally.

[119] The legal issues involved are inherently complex. The conundrum is compounded by perceptions of its social, political and economic implications, as also by inarticulate premises, culturally and historically ingrained. It is therefore necessary to strip the problem down to bedrock. To that end two basic points should be made at the outset of the discussion. The first is that the debate is not one of ☐verticality☐ versus ☐horizontality☐. As I hope to make plain shortly, it is common cause that Chapter 3 rights do not operate only as against the state but also ☐horizontally☐ as between individuals where statutes are involved. It is also common cause that where common law is involved the Chapter has a bearing. The true debate relates to the manner of its ☐horizontal☐ operation in common law relationships.

[120] The second point concerns a pervading misconception held by some and, I suspect, an egregious caricature propagated by others. That is that so-called direct horizontality will result in an Orwellian society in which the all-powerful state will control all private relationships. The tentacles of government will, so it is said, reach into the marketplace, the home, the very bedroom. The minions of the state will tell me where to do my shopping, to whom to offer my services or merchandise, whom to employ and whom to invite to my bridge club. That is nonsense. What is more, it is malicious nonsense preying on the fears of privileged whites, cosseted in the past by *laissez faire* capitalism thriving in an environment where the black underclass had limited opportunity to share in the bounty. I use strong language designedly. The caricature is pernicious, it is calculated to inflame public sentiments and to cloud people ☐s perceptions of our fledgling constitutional democracy. ☐Direct horizontality☐ is a bogeyman.

[121] One must of course, acknowledge that there are genuine jurisprudential concerns about the possible ramifications of ☐horizontality☐. Kentridge AJ adverts to a formidable body of foreign and South African learning in support of ☐verticality☐.[3] And my colleague Ackermann J, in a characteristically learned and thoughtful judgment, has analysed some of the philosophical foundations supporting the more conservative view held by the majority of this Court. His discussion of the development of the horizontality debate in Germany and of the academic vagaries of *Shelley v Kraemer*[4] provides much food for thought.

[122] That having been said, I must confess that I still cannot see the dire consequences feared by some jurists, including my esteemed colleague Ackermann J. Indeed, as I see it, it makes no fundamental difference with regard to such consequences whether the horizontal application of Chapter 3 is direct or indirect. It has little, if any, effect jurisprudentially or socially whether the Chapter 3 rights are enforced directly or whether they ☐irradiate☐ private legal relationships.[5] I stress this point not only because of the impending doom Ackermann J perceives in the direct horizontal application of Chapter 3. I do so also because it would be foolish to ignore the public utterances of political and legal commentators in similar vein.

[123] But that is beside the point. This Court did not draft the Constitution. Our duty is to interpret, protect and uphold it,[6] and to apply it without fear, favour or prejudice.[7] Obviously one will not lightly conclude that the drafters of the Constitution intended it to bear a harsh or inequitable meaning, for such would fit ill with their avowed intention declared so solemnly in the Preamble[8] and Postscript[9] thereto. More pertinently, it would be difficult to reconcile such an interpretation with the spirit of freedom, equality and justice which pervades Chapter 3. It is also trite that the Constitution is to be interpreted purposively and as a whole, bearing in mind its manifest objectives. For that reason one would hesitate to ascribe a socially harmful or disruptive meaning to an instrument so avowedly striving for peace and harmony. One also knows that the Constitution did not spring pristine from the collective

mind of its drafters. Much research was done and many sources consulted. It is therefore no surprise that the Constitution, in terms, requires its interpreters to have regard to precedents and applicable learning to be found in other jurisdictions.[20] But when all is said and done, the answer to the question before us is to be sought, first and last, in our Constitution.

[124] In that regard my approach differs radically from that of the judge *a quo*[21] and some of my colleagues who have prepared judgments in this case. The learned judge in the court below conducted extensive review of the constitutions of other countries[22] and concluded:

> The rule is that fundamental rights and freedoms are protected against State action only. Horizontal protection sometimes occurs to a limited extent but when it is intended over the broad field of human rights, it is expressly so stated.

> It would in my view, therefore, be the correct approach to the interpretation of the Bill of Rights provisions in chap 3 of our Constitution to take the view that our Constitution is a conventional constitution unless there are clear indications to the contrary, either in respect of chap 3 as a whole or in respect of individual sections thereof.

> There was a pressing need for a bill of rights, given the suppressive State action of the past. The call for a conventional bill of rights was sharp and clear. But there were no such calls for a bill of rights on a horizontal plane. The fundamental rights and freedoms now set out in chap 3 had not been curtailed by our common law. In fact they can be found enshrined therein. The removal of all authoritarian encroachment leads to their resuscitation.[23]

My colleagues have adopted basically the same approach and came to substantially the same conclusion.

[125] I make no apology for starting the exercise by examining the document with which we are concerned, the Constitution. Nor do I think one errs in commencing the exercise with an open mind, one untrammelled by subjective perceptions of evils of the past which the Constitution was intended to combat. The way I read the Preamble and the Postscript,[24] the framers unequivocally proclaimed much more sweeping aims than those identified by the judge *a quo*,[25] and apparently accepted by some of my colleagues. Our past is not merely one of repressive use of state power. It is one of persistent, institutionalized subjugation and exploitation of a voiceless and largely defenceless majority by a determined and privileged minority. The ☐untold suffering and injustice☐ of which the Postscript speaks do not refer only to the previous forty years, nor only to Bantu education, group areas, security and the similar legislative tools used by the previous government. The Postscript mentions ☐a divided society characterised by strife [and] conflict☐. That is not a reference to governmental action only, or even primarily. The ☐reconciliation and reconstruction☐ mentioned in the last paragraph relate not so much, if at all, to the oppressed and the oppressive government, but to reconciliation of whites and blacks, to reconstruction of a skewed society. Likewise, when the Preamble speaks of ☐citizenship in a sovereign democratic constitutional state☐ the emphasis immediately falls on racial equality.

[126] The Constitution bracketed by that Preamble and that Postscript is unabashedly egalitarian and libertarian;

The past was pervaded by inequality, authoritarianism and repression. The aspiration of the future is based on what is □justifiable in an open and democratic society based on freedom and equality□.²[6]

This is underscored by the very presence of the Chapter 3 rights. It is re-emphasized by the unusual length and detail of the catalogue of rights and freedoms listed, as also by the broad sweep of much of its language. Nor is it coincidental that the very first right enunciated is that of equality before, and equal protection of, the law.²[7] It is equally significant that such right is coupled with a most detailed, if not vehement, proscription of discrimination.²[8] Viewed in context, textually and historically, the fundamental rights and freedoms have a poignancy and depth of meaning not echoed in any other national constitution I have seen.

[127] It is therefore no spirit of isolationism which leads me to say that our Constitution is unique in its origins, concepts and aspirations. Nor am I a chauvinist when I describe the negotiation process which gave birth to that Constitution as unique; so, too, the leap from minority rule to representative democracy founded on universal adult suffrage; the Damascene about-turn from executive directed parliamentary supremacy to justiciable constitutionalism and a specialist constitutional court, the ingathering of discarded fragments of the country and the creation of new provinces; and the entrenchment of a true separation and devolution of powers. Nowhere in the world that I am aware of have enemies agreed on a transitional coalition and a controlled two-stage process of constitution building. Therefore, although it is always instructive to see how other countries have arranged their constitutional affairs, I do not start there. And when I do conduct comparative study, I do so with great caution. The survey is conducted from the point of vantage afforded by the South African Constitution, constructed on unique foundations, built according to a unique design and intended for unique purposes.

[128] And I respectfully suggest that if one does so logically, applying the interpretational tools with which lawyers are familiar, the Constitution holds no hidden message of so-called verticality. It is common cause that it nowhere says that Chapter 3 governs only the relationship between the state and the individual. On the contrary, section 4(1), which governs the whole of the Constitution, including Chapter 3, pronounces the Constitution to be □the supreme law of the Republic□. Perhaps the word □ supreme□ has been devalued by overuse and perhaps the word □law□ has become mundane. But in combination they have a singular ring, even more tellingly expressed in the Afrikaans text, □die hoogste reg.□ By way of emphasis the subsection expressly sets at nought □any law or act [□enige wet of handeling□] inconsistent with its provisions□. Conformably subsection (2) of section 4 bluntly declares the Constitution to be binding on □all legislative, executive and judicial organs of state at all levels of government□. The two subsections, read singly and jointly, are quite unequivocal, I would suggest. First the Constitution is elevated to supremacy over all law, and then all organs of state are enjoined to honour and enforce that supremacy.

[129] One then turns to Chapter 3, with which we are more specifically concerned here. It is immediately apparent that section 7(2), an integral part of the section which governs the scope of Chapter 3, proclaims that it applies to □all law in force . . . during the period of operation of this Constitution□. Although the Afrikaans equivalents of the word □law□ are not used consistently in the Constitution, it is of some significance that in section 7(2) the words used in the Afrikaans text is □reg □, the generic term for all kinds of law. Qualified as it is by the adjective □alle□ (□all□), the broad generality of the statement is evident.

[130] On a reading of section 7(2) alone, the scope of application of Chapter 3 with regard to law therefore seems clear: It governs all law in force during the currency of the Constitution. There is no

qualification, no exception. All means all. As the Chapter governs all administrative decisions taken and all administrative acts performed, so it governs all law. And it goes without saying that that is the law the courts of the land, the □judicial organs of state□ bound by section 4(2) of the Constitution, are obliged to apply in the performance of their duties. The manifest intention of the drafters of the subsection was to expand its scope to the widest limit their language could express.

[131] If one then reads the subsection in the context of section 7 as a whole, that conclusion is reinforced. Subsection (1), which deals with executive and legislative organs of state also casts the net as wide as language permits. All of them at all levels of government are bound.[2][9] In turn subsections (3) and (4), which determine the categories of persons entitled to invoke the protection of the Chapter, push back the perimeter. The extension of fundamental rights and freedoms to juristic persons, an unusual step in bills of rights, is consistent with the broad generality of subsections (1) and (2). So is the extension of *locus standi* in subsection (4) to representative actors, group, class and even public interest claimants.

[132] Two further points flow from a reading of section 7. Having regard to the clear intention, running throughout the section, to stretch the purview of Chapter 3 to its outermost boundaries, is it at all likely that a limitation as restrictive as that entailed in so-called verticality could have been contemplated? The Preamble of the Constitution proclaims the need to create a new order in which all citizens will be able to exercise their fundamental rights. Chapter 3 spells out those rights and the Postscript envisages a future founded on their recognition. Yet it is contended that, for instance, a woman whose right to human dignity under section 10, or to privacy under section 13, is infringed by a private individual cannot invoke the protection of those sections where there is a legal relationship involved. I find that startling. Secondly, if indeed the drafters had such a major constraint in mind, why did they not say so? Instead they wax expansive, leaving it to the microscope of a □verticalist□ to pick up hidden clues.

[133] But it is not only section 7 that points, I suggest inexorably, to my simple conclusion. It should be read with section 33(2).[3][0] It says that no legal rule of any kind whatsoever which is not saved by subsection (1), or by some other provision in the Constitution itself, limits any right entrenched in Chapter 3. The sweep of section 33(2) harks back to the generality of section 7. If the Chapter were intended to operate only vertically, or only indirectly horizontally, why was it necessary, or indeed appropriate, to declaim the preservation of rights in such unqualified terms? What makes the breadth of section 33(2) more significant is that it follows immediately upon and serves to qualify the general saving clause, section 33(1).

[134] Subsections (1), (3) and (4) of section 33 are themselves wholly consistent with the plain meaning of section 7(2) for which I contend. Nowhere in those subsections is there any suggestion that Chapter 3 does not apply to all law. Section 33(4) is seen by some as supporting a vertical reading of the Chapter. To my mind it does nothing of the sort. The subsection reads as follows:

> This Chapter shall not preclude measures designed to prohibit unfair
> discrimination by bodies and persons other than those bound in terms of section
> 7(1).

Section 7(1) applies expressly to organs of state. With or without □measures designed to prohibit unfair discrimination□, they are prohibited from doing so. But there is nothing in Chapter 3 which prohibits any body or person other than an organ of state from discriminating, unfairly or otherwise. What section 33(4) does is to keep the door open for □measures□, whether legislative or executive, prohibiting unfair discrimination in the private sphere. In short, the government is free to introduce a civil rights act, unfair

housing practices legislation and the like.

[135] Interpreting section 33(4) as pointer to verticality illustrates what I regard as a fundamental misconception of the true import of Chapter 3. The Chapter has nothing to do with the ordinary relationships between private persons or associations. What it does govern, however, is all law, including that applicable to private relationships. Unless and until there is a resort to law, private individuals are at liberty to conduct their private affairs exactly as they please as far as the fundamental rights and freedoms are concerned. As far as the Chapter is concerned a landlord is free to refuse to let a flat to someone because of race, gender or whatever; a white bigot may refuse to sell property to a person of colour; a social club may black-ball Jews, Catholics or Afrikaners if it so wishes. An employer is at liberty to discriminate on racial grounds in the engagement of staff; a hotelier may refuse to let a room to a homosexual; a church may close its doors to mourners of a particular colour or class. But none of them can invoke the law to enforce or protect their bigotry. One cannot claim rescission of a contract or specific performance thereof if such claim, albeit well-founded at common law, infringes a Chapter 3 right. One cannot raise a defence to a claim in law if such defence is in conflict with a protected right or freedom. The whole gamut of private relationships is left undisturbed. But the state, as the maker of the laws, the administrator of laws and the interpreter and applier of the law, is bound to stay within the four corners of Chapter 3. Thus, if a man claims to have the right to beat his wife, sell his daughter into bondage or abuse his son, he will not be allowed to raise as a defence to a civil claim or a criminal charge that he is entitled to do so at common law, under customary law or in terms of any statute or contract. That is a far cry from the spectre of the state placing its hand on private relationships. On the contrary, if it were to try to do so by legislation or administrative action, sections 4, 7(1) and the whole of Chapter 3 would stand as a bastion of personal rights.

[136] To all of that there is the overarching qualification contained in section 33(1), which, it should be noted, draws no distinction between different categories of law of general application (□algemeen geldende reg□). A rule of the common law which, for example, infringes a person□s right to privacy or human dignity, can be saved if it meets the section 33(1) requirements. And it is irrelevant whether such rule is statutory, regulatory, horizontal or vertical, and it matters not whether it is founded on the XII Tables of Roman law, a Placaet of Holland or a tribal custom. That is why section 33(2) makes plain, without any question, that no law of whatever kind or origin can impinge upon any Chapter 3 right unless it is saved by section 33(1) or some other provision of the Constitution.

[137] For the purpose of the present analysis one can skip section 34, which deals with suspension of rights during a state of emergency. It is not relevant to the question under consideration. That brings one to section 35, the general and final provision of Chapter 3. Section 35(1) is directed at interpretation of the Chapter itself,[3][1] and subsection (2) at the interpretation of the laws to be measured against the template of the Chapter.[3][2] Subsection (3), in turn, says how any statute is to be interpreted and how the common law and customary law are to be applied and developed. Two points should be noted. The subsection applies to the whole body of South African law, any statute and common law and customary law in general. And what is more important, the rules of statutory or other law to which it applies are not limited to those directly struck by the provisions of the Chapter. The intention of the drafters of the Constitution in enacting section 35(3), and in adding it as the last word on Chapter 3, therefore seems clear. Even in those cases where the provisions of the Chapter do not directly apply, the rules of law applicable are to be informed by the □spirit, purport and objects□ thereof.

[138] The point should also be stressed that on any reading of section 35(3) it obliges all courts to interpret every law and to apply all common law in the light of the □spirit, purport and objects□ of Chapter 3. Therefore, if the fundamental objection to my reading of Chapter 3 is that it superimposes its provisions on legal relationships between individuals, why is the performance by a court of the duty

imposed on it by section 35(3) regarded as any less ☐undesirable and unsupportable☐?3[3] Also, if the objection is, as was held in the court below, that the application of Chapter 3 to all law introduces uncertainty in what has long been settled, how can it lead to any less uncertainty for courts to ☐have due regard to the spirit, purport and objects☐ of the Chapter? In fact, resort to section 35(3) is likely to create even more uncertainty, as the phrase ☐hav[ing] due regard☐ is surely a vague concept and ☐ spirit, purport and objects☐ no less so.

[139] The internal logic and cohesion of Chapter 3 is manifest. All organs of state in all their decisions and actions are bound by the terms of the rights. So too are any resorts to law by anybody. In deciding whether one or other rights is infringed by such decision, action or law, a court interprets the Chapter in accordance with section 35(1). If the alleged infringement is caused by a statute, the court tries to read the statute down in terms of section 35(2). If, after all that, an entrenched right is indeed infringed, the multiple test contained in section 33(1) is applied. If the infringement fails to pass that test it must be invalidated to the extent that it limits the particular entrenched rights. Over and above that, all courts at all times in the application of any legal rule are obliged to consider the possible effect of the spirit, purport and objects of the Chapter 3 rights on the particular cases before them. Even where a specific right or freedom is not assailed or threatened, the Chapter is still relevant and has to be borne in mind.3 [4]

[140] I wish to dwell a little longer on the internal logic of Chapter 3. Kentridge AJ asks, in relation to section 35(3), ☐why such a provision would be needed if the Chapter could be directly applied to common law disputes between private litigants.☐3[5] The answer, he finds, is that it is needed to govern that very category of disputes. That, I would respectfully suggest, is begging the question. And that is foundational to his reasoning. I, for my part, agree that section 35(3) is manifestly intended to govern a residuary category not governed by what has gone before in Chapter 3. But I do not find it necessary to make any prior assumption regarding the nature of that category. And I do not think section 35(3) answers the question what is included in the category.

[141] Section 35(3) answers the question what courts do when there is no direct infringement or claim of an infringement of a right protected under the Chapter. This includes cases dealing with statutory law, common law and customary law. It mandates that all courts - this Court, the Supreme Court including the Appellate Division, the Land Court, the magistrates courts, the labour courts and all other courts - in interpreting statutory law and when applying and developing common and customary law, always have regard to the ☐spirit, purport and objects☐ of the Chapter. This includes courts with constitutional jurisdiction and courts without constitutional jurisdiction. The purpose is that this Constitution is to permeate all that judges do just as it is to permeate all that the legislature and the executive do, conformably under section 7(1) of the same Chapter.

[142] In what situation then is section 35(3) used? It is used in all cases before any court in which there is no direct challenge based on one or more of the rights and freedoms protected in Chapter 3. If a court case involves the interpretation of a statute and there is no claim of unconstitutionality, the judge in that case is bound to have regard to the spirit, purport and objects of Chapter 3. If a court case involves the application of customary law in which there is no claim of unconstitutionality based on a Chapter 3 right, the judge is bound to have regard to the spirit, purport and objects of the Chapter. If a matter before the Appellate Division between two private parties involves the common law, and there is no claim of a violation of a Chapter 3 right, the Appellate Division must have due regard to the spirit, purport and objects of the Chapter. This is the ☐indirect☐ application of the Chapter sought to be introduced by Kentridge AJ at paragraph 60 of his judgment. But such indirect application can neither be limited to the situation of common law where both parties are private, nor can it be expanded to include the common law where both parties are private where there is a direct constitutional challenge

based on a Chapter 3 right.

[143] Kentridge AJ, in making the category of cases to which 35(3) applies both over-inclusive and under-inclusive, is forced to argue that the □indirect□ application is limited to the jurisdiction of the Supreme Court, but reserving for this Court some overriding review power akin to that of our German opposite number.[3][6] Resort to German jurisprudence or the German constitutional model is particularly unnecessary and unhelpful here.[3][7] There the system is based on a distinction between private and public law, which is not appropriate for us. Second, there is no clear indication that section 35(3) should be read to mean that the Appellate Division as the court of final appeal does the developing and applying of the common law to the exclusion of this Court. On the contrary, section 101(5), which Kentridge AJ seems to dismiss,[3][8] to my mind establishes that such interpretation cannot possibly be correct. Furthermore, section 98(2) gives this Court the authority to apply and develop the common law in accordance with the Constitution.[3][9] This Court applies and adapts the common and customary law while directly applying the Chapter 3 rights. The Appellate Division does it with due regard to the spirit, purport and objects of the Chapter.

[144] Turning to the particular case before us, in the result, Chapter 3 rights apply to all law, including the common law of defamation. In this regard, I endorse the sentiments expressed by Kentridge AJ in the later part of paragraph 58 of his judgment regarding the manner in which the common law should be developed. Indeed, balancing the competing rights involved in defamation (freedom of expression against the right to human dignity) is not novel. Nor does the advent of the Constitution, which codifies them, warrant the wholesale importation of foreign doctrines or precedents. To be true we are to promote values not yet rooted in our traditions and we must have regard to applicable public international law. We are also permitted to have regard to foreign case law. But that does not amount to a wholesale importation of doctrines from foreign jurisdictions.

[145] My reading of Chapter 3 gives to the Constitution a simple integrity. It says what it means and means what it says. There is no room for the subtleties and nice distinctions so dear to the hearts of mediaeval theologians and modern constitutional lawyers. The Constitution promises an □open and democratic society based on freedom and equality□, a radical break with the □untold suffering and injustice□ of the past. It then lists and judicially safeguards the fundamental rights and freedoms necessary to render those benefits attainable by all. No one familiar with the stark reality of South Africa and the power relationships in its society can believe that protection of the individual only against the state can possibly bring those benefits. The fine line drawn by the Canadian Supreme Court in the *Dolphin Delivery* case[4][0] and by the US Supreme Court in *Shelley v Kraemer*[4][1] between private relationships involving organs of state and those which do not, have no place in our constitutional jurisprudence. Nor are we consigned to the hypocrisy so trenchantly excoriated by the authors of the two Canadian articles quoted in *Baloro and Others v University of Bophuthatswana and Others.*[4][2]

[146] What is more, my reading of the Constitution avoids jurisprudential and practical conundrums inherent in the vertical - but - indirectly - horizontally - irradiating interpretation. One does not need to ascertain whether a question is one of public or private law (wherever the boundary may lie in our legal system); one is not confronted with knotty problems where a private relationship is, wholly or partially, governed by statute; nor where an organ of state is a party to a manifestly private law dispute, for example flowing from contract or delict. There are no anomalies where one sues a policeman and his minister in delict or when an organ of state and a private person are co-plaintiffs or co-defendants. Nor is it of any consequence that a rule of the common law derives from an ancient statute of a former government or from the writings of a legal sage of old. The law is the law; where the Chapter fits, it is applied; where it does not, its spirit, purport and objects are duly regarded.

[147] I find it unnecessary to engage in a debate with my colleagues on the merits or demerits of the approaches adopted by the courts in the United States, Canada or Germany. That pleases me, for I have enough difficulty with our Constitution not to want to become embroiled in the intricacies of the state action doctrine, Drittwirkung and the like. I must say, however, that I agree with Ackermann J and the eminent authorities he quotes in their misgivings about the decision in *Shelley v Kraemer*.[3] I do not agree, however, that the decision in that case has any bearing on the issue now under discussion. We do not operate under a constitution in which the avowed purpose of the drafters was to place limitations on governmental control.[4] Our Constitution aims at establishing freedom and equality in a grossly disparate society. And I am grateful to the drafters of our Constitution for having spared us the jurisprudential gymnastics forced on some courts abroad. They were good enough to say what they mean. The Constitution applies to all three of the pillars of state and Chapter 3 applies to everything they do.

[148] There is a further pertinent consequence of my reading of the Constitution, more particularly of Chapter 3. That relates to jurisdiction. Section 98 of the Constitution created a new court charged with the duty to exercise jurisdiction □as the court of final instance over all matters relating to the interpretation, protection and enforcement of□ its provisions.[5] At the same time the Appellate Division of the Supreme Court retained its status and jurisdiction as the court of final instance in all non-constitutional matters.[6] Anticipating the jurisdictional confusion that could ensue, the drafters of the Constitution, although conferring constitutional jurisdiction on provincial and local divisions of the Supreme Court, expressly provided in section 101(5):

> The Appellate Division shall have no jurisdiction to adjudicate any matter
> within the jurisdiction of the Constitutional Court.

Of course, that refers back to section 98, and more specifically in this context, to subsection (2)(a) thereof. That means that in case of a claimed violation (or threatened violation) of one or other right entrenched in Chapter 3, this Court has jurisdiction to the exclusion of the Appellate Division. Where no such violation or threat is in issue the Appellate Division retains its erstwhile jurisdiction. And subsections (4) to (7), (11) and (12) of section 102 make detailed provision for the interface between the jurisdictions of the two courts of final instance. The Appellate Division has been deprived of none of its former powers. It has merely not been afforded additional jurisdiction to deal with constitutional issues, a new category introduced by the Constitution. It follows that the Appellate Division is certainly not excluded from the purview of section 35(3). It, like every other court in the land, is not merely empowered but mandated to interpret any statute, and to apply and develop the common law and customary law, with due regard to the spirit, purport and objects of Chapter 3. The appeal in every case not involving one or other of the Constitutional Court□s powers lies to the Appellate Division. Therefore, if a case turns on the alleged infringement or threatened infringement of a right specified in Chapter 3, this Court has exclusive final jurisdiction. Where the issue is whether a statute should be interpreted or the common law should be adopted to meet the exigencies of a case not falling within the protective ambit of an entrenched right, the jurisdiction of the Appellate Division is not ousted.

[149] In the instant case the appellants tried to invoke the protection of section 15(1). That was clearly a claim that the common law of defamation infringed a specific right protected by Chapter 3. That is an issue falling under section 98(2)(a), in respect of which this Court has jurisdiction and not the Appellate Division. The appellants however must fail on that issue. They are not entitled to invoke the provisions of the Constitution to validate post-constitutionally what was unlawfully done before. They had and have a direct pecuniary interest in the case and pursued it with personal, not public, motives. To mulct

them in costs would therefore be just.

[150] I would therefore make the following order:

> 1. The appeal is dismissed with costs, including the costs consequent upon the engagement of two counsel.
> 2. The two questions referred by the judge *a quo*, as reformulated by this Court, are answered as follows:

>> (a) No: The defendants in this case are not entitled to invoke the provisions of the Constitution; and
>> (b) Yes: The provisions of Chapter 3 of the Constitution are capable of application to a relationship other than that between persons and legislative or executive organs of state at all levels.

> 3. The three subsidiary questions formulated by this Court are answered as follows:

>> (a) No: It was not competent to raise in this appeal the issue whether the common law of defamation should be developed to make it consistent with the Constitution;
>> (b) The development of the common law is within the jurisdiction of both courts, but the extent to which - because of the answer to question (a) - has been left open;
>> (c) Given the answer to questions (a) and (b), it is not necessary to answer this question.

JC KRIEGLER
Justice of the Constitutional Court
Didcott J concurs in the judgment of Kriegler J.

[151] **MADALA J**: I have had the benefit of reading the various judgments which have been prepared by my colleagues in this case. I agree with the findings of Kentridge AJ on the referral and on retrospectivity. The advent of the constitutional regime did not render, and could not have been intended to render, lawful that conduct which was unlawful prior to the commencement of the interim Constitution (□Constitution□) on 27 April, 1994. Accordingly, I agree that the Defendants in this case are not entitled to invoke the provisions of the Constitution. He has also, correctly in my view, found that in this case the Defendants can place no reliance on the specific provisions of Section 15(1) of Chapter 3 of the Constitution, and that this appeal falls to be dismissed with costs.

[152] At this point I part ways with my colleague Kentridge AJ, when he states that the provisions of Chapter 3 of the Constitution <u>are not in general capable of application to any relationship other than that between persons and legislative or executive organs of the State at all levels of government</u> (my underlining). At paragraph 62 he states that he has come to the conclusion that:

> □... Chapter 3 does not have a general direct horizontal application but that it may and should have an influence on the development of the common law as it governs relations between individuals.□ (Footnotes omitted)

He has, however, left open the possibility that a litigant in another case may argue that some particular provision of Chapter 3 must, by necessary implication, have direct horizontal application. It is on the aspect of the so-called horizontality that I wish to explain my position and I shall do so briefly.

[153] The very incisive and analytical judgment of Kentridge AJ might put to rest, for the time being, at least, and in respect of this case only, the much debated and raging controversy around whether or not Chapter 3 of the Constitution has horizontal application. In my view, Kentridge AJ deals with the question referred to us on too narrow a basis, yet this is one of the most controversial issues in present day South African law.

[154] It is traditionally accepted that Bills of Rights are intended primarily to correct imbalances between the excesses of government power and individual liberty. This is the so-called vertical application of the Bill of Rights. The proponents of the verticality approach seek to confine constitutional challenges to legislative and administrative actions only, arguing that this is the primary function of a Bill of Rights, that in such a case the legal implications are predictable and that any possible abuse of private powers should be dealt with through legislation. I agree that our Constitution has vertical operation and deal with this aspect no further. However, I do not subscribe to the view that its operation is limited to verticality only. In my view, some of the rights entrenched in Chapter 3 also operate directly in the area of relations between private individuals. Those who would widen the scope of the operation of the Bill of Rights hold the view that the verticality approach is unmindful of the modern day reality - that in many instances the abuse in the exercise of power is perpetrated less by the State and more by private individuals against other private individuals. Our courts are very divided on the issue.

[155] In *Mandela v Falati* [1] Van Schalkwyk J came to the conclusion that Chapter 3 did have horizontal application and that the provisions of the Constitution could be enforced in a private dispute. His reasoning for this was based on an analysis of the right in question which, in the particular case, was freedom of expression. He found that any limitation of this right had to be necessary if the right is related to political activity. And he went on to find that political activity was not confined to that which occurred between the State and the citizen only but also between private citizens or individuals. His view was that the spirit, purport and objects of Chapter 3 were to extend fundamental rights beyond those circumstances for which the common law provides. In *Kalla v The Master & Others* [2] Van Dijkhorst J had left open the question whether the Constitution had horizontal application. In another defamation case, *Gardener v Whitaker* [3] Froneman J, held that the Constitution was obviously primarily concerned with the protection of individual rights against State action. He found, however, that the Constitution was also concerned that the entire legal system, including the common law and customary law, should accord with the broader values of the Constitution. In *De Klerk v Du Plessis*, [4] the forerunner to the present appeal, Van Dijkhorst J found that most constitutions emphasised the curtailment of State powers and argued that ours should be similarly interpreted, unless there were clear indications to the contrary. He considered that an alternative interpretation, one finding that the Constitution had horizontal application, was □an extremely unattractive□ one and would result in □ legal uncertainty on an unprecedented scale□. In *Jurgens v Editor Sunday Times and Another* [5] the question of horizontality was raised in the context of an application to amend pleadings, but there was no need to decide the issue at that stage. In *Motala and Another v University of Natal* [6] Hurt J held that Sections 8 and 32 applied horizontally. In *Potgieter en □n ander v Kilian* [7] McLaren J was faced with the problem of deciding whether the provisions of Chapter 3 of the Constitution apply not only as between the State and the individual, but also between private entities. He came to the conclusion that there was no indication in the history and origin of the Constitution that Chapter 3 was intended to have horizontal application.

[156] Because of these conflicting decisions, clarity on the issue is needed and the ruling of the Constitutional Court is eagerly awaited. The question involves a consideration of whether or not a private individual can institute action or sustain a defence against another private individual on the basis of the violation of a right contained in Chapter 3. There is no simple answer to the question whether an alleged breach of a fundamental right contained in Chapter 3 could found an action between private individuals, but the answer to this question must be sought in the provisions of the Constitution itself, having regard to the underlying values and objects of the Constitution.

[157] I begin my analysis of the matter □back-to-front□, and consider first the underlying values and objects of the Constitution in general and Chapter 3 in particular. Our Constitution has both a pre-amble and what has variously been called a post-amble, after-amble, post-script or epilogue. Whichever term one uses, both the pre-amble and the post-amble indicate the general purpose for which the people ordained and established the Constitution. The pre-amble envisages the creation of as democratic a climate as is possible in the ushering in of a democratic Constitution for a new legal order and emphasises equality, fundamental rights and freedoms, national unity and a restructuring of society. It is a document that seeks to transform the *status quo ante* into a new order, proclaiming that -

> □... there is a need to create a new order in which all South Africans will be entitled to a common South African citizenship in a sovereign and democratic constitutional state in which there is equality between men and women and people of all races so that all citizens shall be able to enjoy and exercise their fundamental rights and freedoms□;

The post-amble reminds us that the Constitution is a -

> □...historic bridge between the past of a deeply divided society characterised by strife, conflict, untold suffering and injustice, and a future founded on the recognition of human rights, democracy and peaceful co-existence and development opportunities for all South Africans, irrespective of colour, race, class, belief or sex. □

Section 35(1) provides that in interpreting the Bill of Rights a court shall promote the values which underlie an open and democratic society based on freedom and equality. Freedom and equality underlie the vision of democracy embodied in the Constitution. The Constitution sets out the values which we must uphold, and in particular enjoins us to recognise a person□s status as a human being.

[158] My colleague, Mahomed J (as he then was), dealing in *S v Makwanyane and Another*[8] with the values and objects of our Constitution, states that -

> □The South African Constitution is different: it retains from the past only what is defensible and represents a decisive break from, and a ringing rejection of, that part of the past which is disgracefully racist, authoritarian, insular, and repressive and a vigorous identification of and commitment to a democratic, universalistic, caring and aspirationally egalitarian ethos, expressly articulated in the Constitution. The contrast between the past which it repudiates and the future to which it seeks to commit the nation is stark and dramatic. The past institutionalized and legitimized racism. The Constitution expresses in its

preamble the need for a ⬜new order .. in which there is equality between ... people of all races⬜. Chapter 3 of the Constitution extends the contrast, in every relevant area of endeavour (subject only to the obvious limitations of section 33). The past was redolent with statutes which assaulted the human dignity of persons on the grounds of race and colour alone; section 10 constitutionally protects that dignity. The past accepted, permitted, perpetuated and institutionalized pervasive and manifestly unfair discrimination against women and persons of colour; the preamble, section 8 and the postamble seek to articulate an ethos which not only rejects its rationale but unmistakenly recognises the clear justification for the reversal of the accumulated legacy of such discrimination. The past permitted detention without trial; section 11(1) prohibits it. The past permitted degrading treatment of persons; section 11(2) renders it unconstitutional. The past arbitrarily repressed the freedoms of expression, assembly, association and movement; sections 15, 16, 17 and 18 accord to these freedoms the status of "fundamental rights". The past limited the right to vote to a minority; section 21 extends it to every citizen. The past arbitrarily denied to citizens on the grounds of race and colour, the right to hold and acquire property; section 26 expressly secures it.⬜

In a nutshell, these are the underlying values and objects of the Constitution. These are the imbalances which the Constitution seeks to redress. The theme of ⬜an open and democratic society based on freedom and equality⬜ runs throughout the Bill of Rights[9] - obviously to facilitate the transition from an apartheid society to a democratic society.

[159] The first question to be asked, it would seem, is whether the provisions of Chapter 3 apply to the common law. Put differently, the question at issue is whether or not a rule of common law can be attacked on the basis of Chapter 3 in litigation between private parties not involving any legislative or executive authority. In my view, there can be no doubt that the provisions of Chapter 3 do apply to the common law. Section 4(1) of the Constitution proclaims the supremacy of the Constitution and the subjection of any law or act to its provisions, stating that:

> ⬜... any law or act inconsistent with its provisions shall, unless otherwise provided expressly or by necessary implication in this Constitution, be of no force and effect to the extent of the inconsistency.⬜

In my view, this language is broad enough to include the common law. To hold otherwise would, in my view, exclude from Chapter 3 application a whole body of the common law which to a great measure, governs the rights and obligations of individuals.[10]

Section 7 (2) puts the matter beyond any doubt, that Chapter 3 of the Constitution applies to the common law. This Section states:

> ⬜This Chapter shall apply to <u>all law in force</u> and all administrative decisions taken and acts performed during the period of operation of this Constitution.⬜
> (My underlining)

In interpreting Section 7 (2), read systematically broadly and teleologically in conjunction with the pre-

amble, which proclaims □a need to create a new order□, the broad view must prevail so that □all law□ includes statutory, common and customary law. That Chapter 3 applies to the common law is further evidenced by Sections 33 (2) and (3) which state:

> □(2) Save as provided for in subsection (1) or any other provision of this Constitution, no law, whether a rule of the <u>common law</u>, customary law or legislation, shall limit any right entrenched in this Chapter.
>
> (3) The entrenchment of the rights in terms of this Chapter shall not be construed as denying the existence of any other rights or freedoms recognised or conferred by <u>common law</u>, customary law or legislation to the extent that they are not inconsistent with this Chapter.□ (My underlining)

Furthermore, in my view, certain provisions contained in Sections 33(2)-(4) would have been unnecessary as regards private law matters if the fundamental rights provisions applied only vertically. It is, therefore, my view that our Chapter 3 has not gone as far as subjecting the State to its rigours only, but that it has ventured out and colonised the common law.

[160] The second leg of the inquiry then is whether such application of Chapter 3 to the common law is to arise in consequence of the direct application of the relevant Chapter 3 right, or through the mechanism of interpreting, applying and developing the common law by having regard to the spirit, purport and objects of the Chapter in terms of Section 35(3), or both. It is my view that our Constitution provides for both.

[161] If the proposition is accepted that the basic concern of the Constitution is to transform the South African society and the legal system into one that upholds democratic principles and human rights, between, *inter alia*, the State and the individual and between individuals *inter se*, there must be instances which call, in so far as private relationships between individuals are concerned, for the direct application of the provision of Chapter 3 between such individuals. As a matter of interpretation, certain provisions of the Chapter have direct horizontal application. We should examine every enumerated right and decide whether it can sensibly be applied in the private domain. In support of this approach, it all depends on the nature and extent of the particular right, the values that underlie it, and the context in which the alleged breach of the right occurs.[1]

As stated above, Chapter 3 has several provisions that specifically regulate labour relations. Section 27 gives every person the right to fair labour practices and further gives workers the right to form and to join trade unions, to organise and bargain collectively and to strike and similar or related rights. Further, Chapter 3 provides for the establishment of private educational institutions on the one hand but prohibits discrimination on the basis of race on the other,[2] that every child shall have the right not to be subjected to neglect or abuse,[3] and that every person shall have the right to an environment which is not detrimental to his or her health or well-being.[4] It is, however, not necessary for purposes of this judgment, nor was it argued before us, that we should provide guidelines for determining which provisions of Chapter 3 apply directly horizontally or to enumerate them. Consequently I concur with Mahomed DP on this score.

[162] I have had the benefit of perusing the learning of a few foreign jurisdictions on the application of their Bills of Rights to private relations. In most instances, and that is why direct horizontality has been rejected, there were no problems in the relationships of the citizens *inter se* as they were from relatively

homogeneous societies. On this issue our Bill of Rights, because of the peculiar circumstances and the period within which it was drafted, cannot be properly or fairly compared to oft quoted instruments such as the Canadian Charter, the United States Constitution and the German Basic Law. The German Basic Law was a reaction to the genocide perpetrated on the minority by the government of the day. Canadian jurisprudence does not support direct horizontality.[5] Canadian authorities supporting this view state -

> □Such actions as an employer restricting an employee□s freedom of speech or assembly, a parent restricting the mobility of a child or a landlord discriminating on the basis of race in his selection of tenants cannot be breaches of the Charter, because in no case is there any action by the Parliament or government of Canada or by the Legislature or government of a province. In cases where private action results in a restriction of a civil liberty, there may be a remedy for the aggrieved person under a human rights code, under labour law, family law, tort law, contract law or property law, or under some other branch of the law governing relations between private persons; but there will be no breach of the Charter.□ [6]

[163] Ours is a multi-racial, multi-cultural, multi-lingual society in which the ravages of apartheid, disadvantage and inequality are just immeasurable. The extent of the oppressive measures in South Africa was not confined to government/individual relations but equally to individual/individual relations. In its effort to create a new order, our Constitution must have been intended to address these oppressive and undemocratic practices at all levels. In my view our Constitution starts at the lowest level and attempts to reach the furthest in its endeavours to restructure the dynamics in a previously racist society.

[164] I agree with Kentridge AJ on the interpretation of Section 35(3) which explicitly provides that our courts should develop the common law and customary law with due regard to the □spirit purport and objects□ of Chapter 3. This, in my view, provides for the indirect horizontal □seepage□ in those areas which are not touched directly by the provisions of Chapter 3. As Froneman J put it in *Gardener v Whitaker*:[7]

> □After all, the □past of a deeply divided society characterised by strife, conflict, untold suffering and injustice□ (words used in the □unity and reconciliation□ section of the Constitution) is not merely a history of repressive State action against individuals, but it is also a history of structural inequality and injustice on racial and other grounds, gradually filtering through to virtually all spheres of society since the arrival of European colonists some three and a half centuries ago, and it will probably take generations to correct the imbalance. But the development of the law by the courts is by its very nature dependent on litigation and therefore likely to be incremental and perhaps slow, hence the provision for State intervention also, by virtue of section 33(4), to prohibit unfair discrimination by private persons and bodies.□ (My underlining)

The provisions of Section 35(3) are in effect an express adoption of the German model of □Drittwirkung□. In my view, it is the task of the Supreme Court to oversee this development. The law is always changing. The Supreme Court has always participated on an active basis in the adjudication of

the common law rules. What is now required of it is that in disputes between private individuals it should balance their competing rights as envisaged in the Constitution.

[165] In the result and as already indicated, I agree with paragraphs 1 and 2 (a) of the order proposed by Kentridge AJ. On the question of horizontality, I am of the view that some of the rights in Chapter 3 lend themselves to direct horizontality while in respect of others, Chapter 3 is indirectly horizontally applicable. However, the defendants in the present case cannot rely on the provisions of Section 15 of the Constitution.

T MADALA
Justice of the Constitutional Court

[166] **MOKGORO J**: Having had the privilege of reading the judgments both of Kentridge AJ, and of Kriegler J, I concur in the judgment of Kentridge AJ and in the order he proposes. I also find myself in respectful agreement with the views expressed in the concurring opinion of Mahomed DP.

[167] The importance of the application question prompts me to write this brief concurring note to emphasise my view that, notwithstanding that Chapter 3 of the Constitution may not be invoked by one private litigant against another to challenge a rule of common or customary law, section 35(3) of the Constitution assigns to courts an *affirmative responsibility* to apply and develop both common law and customary law in a manner that imbues both systems of law with the values embodied in Chapter 3.

[168] The unique and stark reality in South Africa is that decades of injustice associated with apartheid gave rise to gross socio-economic inequalities that persist at every level of our society. The disparities between the beneficiaries of state-imposed racial discrimination and its victims, which will doubtless endure for many years to come, makes oppression and discrimination in the □private□ sphere both possible and likely. Indeed, in practical terms, the average South African may now be more likely on a day-to-day basis to have her or his human dignity and other fundamental rights threatened by the actions of entities and individuals who are not in any sense organs of state, than by agents clothed with public power.

[169] But however desirable it might be that Chapter 3 should have what has been termed □direct horizontal□ application, the better to swiftly mitigate the worst of those inequities which cannot be ascribed to actions or neglect of the public authorities of the present day, after considering the incisive textual analysis contained in the opinion of Kentridge AJ, I find myself persuaded that the Constitution we are called upon to interpret today simply does not make provision for such □private□ application in the ordinary course.

[170] That said, I would underscore what my brothers Kentridge and Kriegler have both made clear: the Constitution is the □supreme law of the Republic[1]", and Chapter 3 thereof applies to □all law in force [2]", which includes common and customary law, as well as statutory law. It follows that the realm of so-called private law, whether embodied in legislation, common law, or customary law, is by no means immunised from the values of the Constitution as a whole or from those articulated in Chapter 3 in particular. And by virtue of section 35(3), which is phrased in the imperative, courts are obliged to bring to bear the spirit, purport and objects of Chapter 3 in the interpretation of all law and in the development of the common law and customary law. While that obligation is imposed upon all courts, I recognise that the primary burden in that regard will fall upon the Supreme Court.

[171] How precisely courts will go about the business of giving effect to Chapter 3 pursuant to section 35(3) is not spelled out in the text of the Constitution. I note that that section must in any event be read together with Section 33(3), which provides that rights and freedoms □recognised or conferred by common law, customary law or legislation□ will continue to apply to the extent they are not inconsistent with Chapter 3. It has always been in the nature of the judicial function to fashion

appropriate remedies on a case-by-case basis, having balanced and accommodating competing rights and interests. Courts will no doubt proceed in a similar manner in giving effect to section 35(3).

[172] In that connection, I would like to draw attention briefly to a matter that has been somewhat neglected in the application debate: the implications thereof for South African customary law in particular. Under the pre-Constitutional order, customary law was lamentably marginalised, and allowed to degenerate into a vitrified set of norms alienated from its roots in the community.[3] There is hence significant scope for the dynamic application and development of customary law by the courts in a manner that has □due regard to the spirit, purport and objects□ of Chapter 3.[4] I note in that regard that the Constitution specifically provides that □[i]ndigenous law shall be subject to regulation by law.□[5] As my brother Kriegler points out,[6] the Constitution requires that judges be proactive in their application of section 35(3). Indeed, in a matter involving customary law, a court is bound to have regard to the values of Chapter 3 even where there is no claim of unconstitutionality raised.[7] I am convinced that the observations of Mahomed J in his concurring opinion in this matter, with respect to the need to actively develop the common law,[8] apply *a fortiori* to customary law.

[173] It is not within the scope of my brief concurring opinion in this matter to pass upon the precise manner in which a court is to go about applying □indirectly□ the fundamental rights provisions in the customary law setting. It suffices for present purposes to observe that, at minimum, where customary law assigns -- as often it does -- an area of discretion to a judicial officer, it is incumbent upon her or him to be fully cognisant of the values articulated in Chapter 3 in exercising that discretion.[9] Where a written decision is handed down, and fundamental constitutional values are manifestly implicated, it would be appropriate for the court to articulate in its judgment how it weighed the relevant constitutional considerations.

[174] This harmonisation exercise will demand a great deal of judicious care and sensitivity. Sections 33 (3) and 181(1) of the Constitution acknowledge the continued existence of customary law. Moreover, the guarantee of persons□ right to participate in the cultural life of her or his choice contained in section 31 of the Constitution, even if interpreted narrowly as guarding only the individual□s freedom of cultural affiliation, would appear to require that customary law, which remains integral to the domestic culture of millions of South Africans, be accorded due respect. Although harmonisation will inevitably be an incremental process -- no one should expect customary law to be transformed overnight -- the delicate and complex nature of the task cannot justify courts in avoiding their responsibility to accommodate customary law to the □values which underlie an open and democratic society based on freedom and equality.□ [10]

Y MOKGORO
Justice of the Constitutional Court

[175] **SACHS J**: Given a choice between two well-reasoned but conflicting arguments on the question of horizontality and verticality, each with considerable support in the text, I would prefer the one which leads to the outcome I regard as being most consistent with the well-functioning constitutional democracy contemplated by the Constitution.

[176] Much of the discussion on the question seems, in my view, to conflate two issues that should really be kept separate. The one is the question of the scope of Chapter 3, and the other the matter of how the framers intended the Chapter to be put into operation. By running the two issues into one, an argument in favour of the broadest possible constitutional reach is unfortunately converted into a claim for the widest possible judicial remedy.

[177] I have no doubt that given the circumstances in which our Constitution came into being, the principles of freedom and equality which it proclaims are intended to be all-pervasive and transformatory in character. We are not dealing with a Constitution whose only or main function is to consolidate and entrench existing common law principles against future legislative invasion. Whatever function constitutions may serve in other countries, in ours it cannot properly be understood as acting simply as a limitation on governmental powers and action. Given the divisions and injustices referred to in the postscript, it would be strange indeed if the massive inequalities in our society were somehow relegated to the realm of private law, in respect of which government could only intrude if it did not interfere with the vested individual property and privacy rights of the presently privileged classes. That, to my mind, is not the issue. I accept that there is no sector where law dwells, that is not reached by the principles and values of the Constitution. If there is indeed an area of human activity exempt from legal regulation in terms of constitutional principles, it is not because the Constitution must be interpreted in a negative way so as to limit its impact, but because the Constitution itself protects such a sphere from legal intervention.

[178] The real issue, in my opinion, is <u>how</u> the Constitution intends fundamental rights in the broadest meaning of the term to be protected. More particularly, is the Constitution self-enforcing in all respects, or does it require legislative intervention to make it implementable in certain areas, especially as far as positive rights are concerned? The question, then, is not only what balance we should strike between the respective roles of our Court and that of the Appellate Division, but what spheres of decision-making belong in the first place to Parliament, and what to ourselves. This is therefore a question of separate but complementary powers as well as one of separate but complementary judicial functions. Should we be in effect legislating on matters of great social and political concern, leaving it to Parliament to fill in the gaps between our judgments, or should Parliament have the principal task of deciding on appropriate legal rights and duties, with ourselves basically standing as sentinels to ensure that Parliament does not stray beyond the framework within which the Constitution requires it to function?

[179] A major advantage of following the indirect approach and allowing the Appellate Division to develop the common law in keeping with the soul of the Constitution, is that the decisions of that court would not have the entrenched permanence automatically resulting from our judgments. Parliament could, following normal procedures, opt for amending or even abrogating Appellate Division decisions, provided that it legislated within the range of possibilities permitted by Chapter 3. Such alterations, however, would be severely limited in relation to determinations by our Court, where only a constitutional amendment, or at most, cautious navigation by Parliament around the prescriptive rocks of our judgments, could produce the change.

[180] The matter is not simply one of abstract constitutional theory. The judicial function simply does not lend itself to the kinds of factual enquiries, cost-benefit analyses, political compromises, investigations of administrative/enforcement capacities, implementation strategies and budgetary priority decisions, which appropriate decision-making on social, economic, and political questions requires. Nor does it permit the kinds of pluralistic public interventions, press scrutiny, periods for reflection and the possibility of later amendments, which are part and parcel of Parliamentary procedure. How best to achieve the realization of the values articulated by the Constitution, is something far better left in the hands of those elected by and accountable to the general public, than placed in the lap of the courts.

[181] The Constitution contemplates a democracy functioning within a constitutional framework, not a dikastocracy[1] within which Parliament has certain residual powers. The role of the courts is not effectively to usurp the functions of the legislature, but to scrutinize the acts of the legislature. It should not establish new, positive rights and remedies on its own. The function of the courts, I believe, is, in the

first place, to ensure that legislation does not violate fundamental rights, secondly, to interpret legislation in a manner that furthers the values expressed in the Constitution, and, thirdly, to ensure that common law and custom outside of the legislative sphere is developed in such a manner as to harmonise with the Constitution. In this way, the appropriate balance between the legislature and the judiciary is maintained.

[182] The above points can well be illustrated by four examples. They deal with defamation, private discrimination, labour law and customary law, respectively.

[183] The first example relates to the kind of **defamation** case before us at the moment. If we followed the indirect or □diagonal□ approach to applicability, the Appellate Division would remain in the picture. Say, for purposes of argument, it decided to uphold the approach adopted in the carefully articulated judgment by Cameron J[2] in terms of which the plaintiff would have to prove negligence on the part of the publisher. Parliament could then examine the Appellate Division□s decision, decide to refer the matter to the Law Commission for investigation, and finally opt for a completely different approach.

[184] Say that Parliament eventually came to the conclusion that a better approach would be that when publishing defamatory material about someone in the public domain, the media must take reasonable steps to verify the accuracy of the statements, and that the more injurious to the personal as opposed to the political reputation of the person concerned the more stringent should the investigation be; say that the legislators felt that when there is a manifest invasion of the privacy of someone in public life, it is not for the plaintiff to prove negligence or absence of justification on the part of the publishers, but for the publishers to establish that the invasion of privacy was in all the circumstances justified in the interest of the public knowing about the lives of such figures. Legislation could then be adopted to these effects, and if any publishers felt aggrieved, they could approach this Court and ask us to strike down the offending provisions. We would then weigh up the matter, decide whether the legislation conforms to the principles of free speech and respect for dignity and privacy and make an appropriate ruling, bearing in mind a number of factors, such as the powers of reading down, severance and total invalidation subject to the discretionary power granted to us in section 98(5). Furthermore, in determining the justifiability of the legislation in terms of section 33, we would decide whether the path followed by Parliament was one of many reasonably permissible options, not whether we thought it the best one.

[185] Assume, on the other hand, that the matter was regarded as one of direct, self-enforcing horizontal application, with the result that the Appellate Division was excluded, and our Court came to the very same conclusion as that posited above for the Appellate Division. Parliament would no longer be able to pass the legislation it thought appropriate, unless it was willing to amend the Constitution for this purpose, or, unless, possibly, it could come up with an alternative proposal that met constitutional criteria and did not conflict with the ratio of the Constitutional Court□s judgment. Whatever position we adopted when confronted with the issue, our dilemma would be profound. If we made no reformulation whatsoever and simply left the matter open, the Appellate Division would be out of the picture, and each Division of the Supreme Court could develop its own rulings, with the result that a plaintiff could win in one part of the country and lose in another, the publication being exactly the same in both. If, on the other hand, we reformulated the common law ourselves in the manner we thought most consonant with the Constitution, we would solve the problem of divided decisions, but tie the hands of Parliament until death or a constitutional amendment did us part. There would be little or no scope for Law Commission enquiry, little chance for subsequent amendments in the light of experience and public opinion. Parliament would have to defer to our discretion in the matter, seeking to find some margin of appreciation left in our judgment within which it could dot i□s, cross t□s and seek alternative, not incompatible, solutions.

[186] Similar problems would arise if we were to attempt ourselves to solve difficult questions which might have to be confronted when dealing with *de facto* **discrimination**. Although considerable progress has been made in this field, our country still abounds with inequality and bigotry. It is not just a question of bad and insulting behaviour. People are denied access to jobs, facilities and accommodation on a daily basis purely because of the colour of their skin. It would be a strange Constitution indeed that had nothing to say about such flagrant denials of dignity and equality. I have no doubt that the Constitution speaks to such issues. Yet in my opinion it would be quite inappropriate to say that each and every violation of personal rights in such a situation raised a constitutional question for ultimate determination by our Court. The appropriate manner for such issues to be dealt with would be through legislation pioneered perhaps by the Human Rights Commission. Litigation is a clumsy, expensive and time-consuming way of responding to the multitudinous problems of racist behaviour. Mediation and education could produce results far more satisfactory for the injured person, and considerably more transformatory for the perpetrator. Widespread research and consultation would be needed to decide precisely where to establish the cut-off point in each situation: in many countries, persons employing only a handful of workers in a close and intimate work environment, or a landlady letting one room in her house, or social activities of a genuinely private character, are expressly excluded from anti-discrimination legislation. The problems of sex discrimination might be considerably different from those related to race discrimination, or discrimination on grounds of disability. It is Parliament, and not the courts, that investigates these matters and decides on appropriate interventions and remedies.

[187] I am not aware of what remedies in the private sphere could be invoked to enforce what are said to be directly enforceable constitutional rights. A purely defensive remedy to someone denied access to a restaurant or promotion at work, would not be very meaningful. Specific performance would not be appropriate where the complaint is refusal to enter into a contract, rather than failure to fulfill a contact. I have found nothing in the Constitution to suggest that the framers envisaged a new form of damages for violation in the private sphere of constitutional rights. In the United States, special civil rights legislation was passed to enable persons to be sued or prosecuted for violation of or conspiracy to violate the civil rights of another. The European Court of Human Rights has express power to order damages in the case of violation of individual rights, but then only against governments, not against private parties. What clearly seems to have been contemplated by Chapter 3 is that persons whose rights have been violated not by the government but by private actors, must find their remedies either through legislation [section 33(4)] or else by means of constitutionally-adapted common law. Thus, even in the absence of anti-discrimination legislation, a person turned away from a hotel because of his or her race might be able to pursue a claim for *injuria*; report the offender to the licensing authorities; or lay a complaint with the Human Rights Commission. Without such legislation, however, I have difficulty seeing this or any other court finding in the Constitution authority to entertain or develop an action for damages for violation of constitutional rights where the State itself has not been the offending party.

[188] The constitutionalizing of private relationships in the industrial sphere could also have unacceptable consequences. Much of **labour law** has a procedural and framework character, leaving it to workers and employers to establish their own agreements in the light of their respective needs and interests. Collective bargaining plays a central role in establishing appropriate balancing of interests. Granting fundamental rights of a constitutional character to individual employees could destroy decades of arrangements, formal and informal, between representatives of employers and employees. Agreements involving closed shop and stop-order facilities for union dues from salary might be regarded by some as controversial and contestable. I do not wish in any way to prejudge the interpretation of constitutional or other provisions relating to labour law. Yet it does seem to me at first sight that the remedy for such persons should be to launch any challenges they may have, either in the legislature or in the many bodies, statutory and otherwise, concerned with industrial relations, not in the Constitutional Court.

[189] Finally, sooner or later, the question of the relationship between the Constitution and customary or **indigenous law** will have to be confronted. I have difficulty in seeing how this Court could effectively examine the constitutional propriety of institutions like lobola or bohadi and each and every one of their myriad inter-related rules and practices. Patriarchy permeates many aspects of customary law as it has been developed and applied in the courts over the last century. The direct enforceability of Chapter 3 could require this Court, if asked to do so, to indulge in a wholesale striking down of customary law because of violation of the equality clause in Chapter 3. The indirect approach would permit courts closer to the ground to develop customary law in an incremental, sophisticated and case-by-case way so as progressively, rapidly and coherently to bring it into line with the principles of Chapter 3. At the same time, Parliament could throw the matter open to public debate involving all interested parties, secure investigation by the Law Commission, and come up eventually with what it considers appropriate legislation.

[190] The issue, then, is not about our commitment to the values expressed by the Constitution, but about which institutions the Constitution envisages as being primarily responsible for giving effect to those values. From the above reasoning, it should be clear that I support the judgment of Kentridge AJ on the question of horizontality/verticality. Since I agree with his approach on the other matters raised, I wish to express my overall concurrence with his judgment and with the order he proposes.

A SACHS
Justice of the Constitutional Court

**Case No : CCT 8/95**

Counsel for the Appellants (Defendants) : GJ Marcus

M Chaskalson

Instructed by : Webber Wentzel Bowens

Counsel for the Respondents (Plaintiffs) : TJ Kruger S.C.

J van der Westhuizen

N Davis

Instructed by : Van der Walt and Hugo

**Date of Hearing : 7 November 1995**

**Date of Judgment : 15 May 1996**

[Context⮯] [Hide Context]

---

[1]As deprecated in many judgments, including *Davies and Others v Lombard* 1966 (1) SA 585 (W).

[2]This defence was presumably based on the judgment in *Zillie v Johnson and Another* 1984 (2) SA 186 (W) subsequently overruled by the Appellate Division in *Neethling v du Preez and Others; Neethling v The Weekly Mail and Others* 1994 (1) SA 708 (A) at 777 - 8; and no doubt foreshadowed a submission that the *Neethling* judgment required reconsideration in the light of the provisions of the Constitution.

[3]*De Klerk and Another v ⬥Du⬥ ⬥Plessis⮯ and Others* 1994 (6) BCLR 124 (T).

[4]1994 (4) BCLR 79 (T).

[5]*Supra* n3 at 127G.

[6]1995 (3) SA 867 (CC); 1995 (7) BCLR 793 (CC) - delivered 8th June, 1995.

[7]*Id* per Mahomed J at paras 24 and 30.

[8]*Id* per Mahomed J at para 46; per Kriegler J at paras 91 and 98.

[9]1995 (2) SA 642 (CC); 1995 (4) BCLR 401 (CC).

[10]*Id* at para 65.

[11]*Shewan Tomes and Co. Ltd v Commissioner of Customs and Excise* 1955 (4) SA 305 (A) at 311; *Van Lear v Van Lear* 1979 (3) SA 1162 (W).

[12] ☐I agree fully with both Kentridge AJ and Mahomed J on the question of the non-retroactivity of Chapter 3" - *supra* n6 at para 132. ☐Chapter 3 ... is not applied retrospectively to undermine the validity of proceedings up to 27 April 1994, or to negate rights which had already accrued at that date☐ - *supra* n6 at para 144.

[13]The distinction between paragraph (a) and (b) of the sub-section is logical. A statute passed after the commencement of the Constitution and inconsistent with it, must in terms of section 4(1) never have been of any force and effect. A statute passed before the commencement of the Constitution would not have suffered from initial invalidity - inconsistency could only arise as from the commencement of the Constitution. To back-date its invalidity to a time before the Constitution existed would therefore be to deem that which was undoubtedly valid at that time to have been invalid. One would require clearer words than those in sub-section (6) to bring about such a result. See however the reservation in para 20 *infra*.

[14]Issue (a), set out in para 10.

[15]As in *S v Makwanyane and Another* 1995 (3) SA 391 (CC); 1995 (6) BCLR 665 (CC), and *S v Williams and Others* 1995 (3) SA 632 (CC); 1995 (7) BCLR 861 (CC).

[16]See the cases in n15.

[17]*S v Mhlungu and Others, supra* n6 at para 8, per Mahomed J.

[18]See section 12(2)(d) of the Interpretation Act 33 of 1957.

[19]Marais J has, however, taken the opposite view in *S v Coetzee and Others,* unreported decision of the Witwatersrand Local Division, 28 September 1995, case number 70/92.

[20]Cf. Viljoen F ☐A Perspective on Retrospectivity of Fundamental Rights under the Interim Constitution☐ Occasional Paper No. 5, Centre for Human Rights, University of Pretoria, December 1994 at 15.

[21]See any elementary textbook, such as *Maasdorp☐s Institutes of South African Law II The Law of Things*, 7th edition at 1.

[22]Cf. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422 (1982) in which the United States Supreme Court held that a cause of action was property, protected by the due process clause of the Fourteenth Amendment. See also *Hewlett v Minister of Finance and Another* 1982 (1) SA 490 (ZSC) at 494, holding that a debt is a right of property protected under the Zimbabwe Constitution.

[23]It follows that the judgment of Cameron J in *Holomisa v Argus Newspapers Ltd*, unreported decision of the Witwatersrand Local Division, 14 February 1996, case number 19883/95, was wrong on this point. As, however, appears from page 10 of the typed judgment it was not the subject of argument before him.

[24]*Constitutional Law of Canada* 3 ed (1992) at para 33.10 (Citations omitted).

[25] (1984) 8 C.R.R. 136.

[26] (1988) 33 C.R.R. 107.

[27] *Id* at 122.

[28] *Id* at 128.

[29] *Id* at 131- 2.

[30] *Supra* n26 at 108.

[31] (1986) 20 C.R.R. 278.

[32] It is right to add that the Court of Appeal observed that there was no simple principle which would govern the result in all cases (*Id* at 284). The Supreme Court of Canada approved the *Lucas* and *Neely* decision in *R v. Stevens* (1989) 35 C.R.R. 107. See also *Jack and Charlie v. The Queen* (1986) 21 D.L.R. (4th) 641 where the Supreme Court of Canada held that the freedom of religion right could not be relied upon as excusing an offence committed before the Charter came into force.

[33] *Supra* para 11.

[34] See *Zantsi v Council of State, Ciskei and Others* 1995 (4) SA 615 (CC); 1995 (10) SA BCLR 1424 (CC) at para 1; *S v Mhlungu and Others, supra* n6 at para 57.

[35] *South Cape Corporation (Pty) Ltd v Engineering Management Services (Pty) Ltd* 1977 (3) SA 534 (A) at 549-50.

[36] 1995 (1) SA 282 (A) at 289.

[37] 1924 AD 226 at 229.

[38] See *Zantsi, supra* n34 at para 6.

[39] *Supra* n6 at para 56.

[40] 1995 (3) SA 262 (CC); 1995 (7) BCLR 851 (CC) at para 12.

[41] 1994 (6) BCLR 124 (T) at 128J - 29B; Cf. the dictum of Froneman J in *Qozoleni v Minister of Law and Order and Another* 1994 (1) BCLR 75 (E) at 81; that the fundamental ☐mischief☐ remedied by the new Constitution is the old constitutional system.

[42] *Id* at 131C.

[43] 1994 (4) BCLR 1 (W).

[44] 1995 (3) BCLR 374 (D).

[45] 1995 (11) BCLR 1498 (N).

[46] The Thirteenth Amendment (outlawing slavery and involuntary servitude) has by reason of its language been held to impose direct obligations on individuals in private law relationships.

[47] 334 U.S. 1 (1948).

[48] *Id* at 16.

[49] 376 U.S. 254 (1964), especially per Brennan J at 265.

[50] See Tribe LH *American Constitutional Law* 2 ed (1988) Chapter 18; Gunther G *Constitutional Law* 12 ed (1991) at 902 -12.

[51] See e.g. Henkin L □*Shelley v Kraemer*: Notes for a Revised Opinion□, (1962) *University of Pennsylvania Law Review* 473.

[52] See e.g. *Burton v Wilmington Parking Authority,* 365 U.S. 715 (1961).

[53] [1991] I.L.R.M. 268. See also Casey J *Constitutional Law in Ireland* 2 ed (1992) at 378 - 9.

[54] We have been furnished only with a typed version of four chapters of this work (perhaps in translation), which itself appears to be part of a larger work on constitutional interpretation, published in 1994.

[55] (1987) 33 D.L.R. (4th) 174.

[56] *Id* at 196.

[57] *Id* at 195.

[58] *Lavigne v. Ontario Public Service Employees Union* (1991) 81 D.L.R. (4th) 545.

[59] 1995 (8) BCLR 1018 (B) 1018 at 1042. Friedman JP also considers the law of the United States, Germany, India, Namibia and Sri Lanka.

[60] *Supra* para 36.

[61] (1989) 48 *Maryland Law Review* 247-346.

[62] See Quint, *Id* at 263 - 4.

[63] For the facts and arguments in Lηth, *Id* Quint at 252 - 5; Barak, *supra* para 36 at 20 - 21. See also

Van der Vyver, ☐The private sphere in constitutional litigation☐ (1994) 57 *THRHR* 378 at 379 - 80.

[64]See Quint *supra* n61 at 318 ff; on *Mephisto* at 290 ff. , 302 - 3; on *Deutschland-Magazin* at 318 ff.

[65]*Id* at 327.

[66]Although the term ☐state action☐ does not appear in the Fourteenth Amendment to the United States Constitution it is principally around this Amendment that the doctrine seems to have developed.

[67]*Supra* n61 at 273-4.

[68]Including Cockrell A, *Horizontal Application of the Interim Bill of Rights,* unpublished seminar paper, U.C.T., 1995; Van der Vyver JD, *supra* n63; Strydom HA, ☐The private domain and the bill of rights☐ (1995) 10 *SAPR/PL* 52; Van Aswegen A, ☐The Implication of a Bill of Rights for the Law of Contract and Delict☐ (1995) 11 *SAJHR* 50; De Waal J, ☐A Comparative Analysis of Provisions of German Origin in the Bill of Rights (1995) 11 *SAJHR* 1; Marcus G, ☐Freedom of Expression Under the Constitution☐ (1994) 10 *SAJHR* 140 at 143; Cachalia *et al, Fundamental Rights in the New Constitution* (1994) at 19-21; Woolman S, ☐Application☐, in *Constitutional Law of South Africa,* ed. Chaskalson *et al* (1996) at 10-1.

[69]*Id* Cockrell.

[70]Hiemstra and Gonin, *Trilingual Legal Dictionary* s. v. *reg.*

[71]On the status of the Afrikaans version of the Constitution see De Waal, *supra* n68 in n4, at 4.

[72]*S v Moroney* 1978 (4) SA 389 (A) at 409.

[73]Such as the *audi alteram partem* rule.

[74]☐Traditionally Bills of Rights have been inserted in constitutions to strike a balance between governmental power and individual liberty; to constitute a precaution against State tyranny. That was the reason for its insertion in the United States☐ constitution.☐ - per Van Dijkhorst J in the court below, at 130E.

[75]Section 33(4) presumably envisages legislative measures which would apply the principles of section 8 to relationships between private persons.

[76]*Supra* para 43 above.

[77]Cf. the Canadian position, set out in paras 37 and 38 above.

[78]This must be read subject to the express provisions of section 98(5) and (6).

[79]As in *Brink v Kitshoff NO,* CCT 15/95 (argued on 9th November 1995), in which the validity of a section of the Insurance Act 27 of 1943, was contested in proceedings between the executor of an estate

and the surviving spouse.

[80]Thus in *Shabalala and Others v The Attorney-General of the Transvaal and Another* 1996 (1) SA 725 (CC); 1995 (12) BCLR 1593 (CC) , the prosecutor□s common law □docket privilege□ recognised in *R v Steyn* 1954 (1) SA 324 (A) and relied upon by the state was held by this Court to be unconstitutional.

[81]See para 38, n58 above. Cf *Swedish Engine Drivers□ Union v. Sweden* (1979-80) 1 E.H.R.R. 616.

[82]The General Law Fourth Amendment Act 132 of 1993.

[83]See section 229 of the Constitution.
[84]See Quint, *supra* n61 at 270-1; Gunther,

*supra* n50 at 902-912.

[85]Eg Woolman *supra* n68 at 10-15 to 10-18.

[86]Not in all cases. Cf the Irish case referred to in para 35 above, and cf *Shabalala□s* case, *supra* n80 where the removal of an unconstitutional accretion to the law of privilege left the previously understood law in place.

[87]Defendants□ counsel raised the problem of how a private prosecution for defamation would fit into this scheme. Whether a private prosecutor is exercising a governmental power is a point which need not now be decided. It may be argued that the private prosecutor is not vindicating a private right, but is invoking the power of the state to punish crime. Sections 12 and 13 of the Criminal Procedure Act 51 of 1977 reflect the state□s continuing interest in a private prosecution.

[88]*Supra* para 49, n80.

[89]As in the dissenting judgment of White J in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974). See also A Lewis *Make No Law* (1991). The author in general favours the *Sullivan* rule, but points out the difficulties and anomalies which surround the concept of □public person□. He also observes that whereas the confidentiality of sources had been regarded as one of the pillars of freedom of the press, the *Sullivan* rule requires that a plaintiff may minutely investigate the editorial process (at 201-2). See also Epstein, □Was *New York Times v Sullivan* Wrong?□ (1986) 53 *University of Chicago Law Review* 782.

[90](1995) 126 D.L.R. (4th) 129.

[91]*Theophanous v Herald and Weekly Times Ltd.* (1994) 124 ALR 1; *Stephens v West Australian Newspapers Ltd.* (1994) 182 ALR 211.

[92]The solitary judgment to the contrary in *Hassen v Post Newspapers (Pty) Ltd* 1965 (3) SA 562 (W) was overruled in *Suid-Afrikaanse Uitsaaikorporasie v O□ Malley* 1977 (3) SA 394 (A) at n96 *infra*.

[93]Eg in *R v Bunting* 1916 TPD 578 at 582-3; *S v Gibson NO and Others* 1979 (4) SA 115 (D);

*Government of the Republic of South Africa v Sunday Times Newspapers and Another* 1995 (2) BCLR 182 (T) at 188.

[94]As in *Farrar v Hay* 1907 T.S. 194 at 199, per Innes CJ; *Die Spoorbond and Another v South African Railways; Van Heerden and Others v South African Railways* 1946 AD 999 at 1013; *Argus Printing and Publishing Co. Ltd and Others v Esselen□s Estate* 1994 (2) SA 1 (A) at 25 and the unreported judgment of Eloff JP in *Bogoshi v National Media Ltd and Others*, Witwatersrand Local Division, 7 February 1996, case number 29433/94. See also Burchell JM, *The Law of Defamation in South Africa* (1985) at 26.

[95]Perhaps building on the remarks of Ludorf J in *Pienaar and Another v Argus Printing and Publishing Co. Ltd* 1956 (4) SA 310 (W).

[96]See *Suid-Afrikaanse Uitsaaikorporasie, supra* n92; *Pakendorf en Andere v de Flamingh* 1982 (3) SA 146 (A).

[97]I note in passing that in *Gardener v Whitaker* 1994 (5) BCLR (2) SA 19 (E) Froneman J arrived at a different reformulation of the law of defamation.

[98]*Supra* at para 21, n23, and para 59.

[99]□Die nachfolgenden Grundrechte binden Gesetzgebung, vollziehende Gewalt und Rechtsprechung als unmittelbar geltendes Recht.□

[100](1992) 8 C.R.R. (2d) 173.

[101]*Id* at 185 and 189.

[102](1994) 108 D.L.R. (4th) 178 at 185ff.

[103]*Id* at 186a-b.

[104]*Id* at 156.

[105]Including, of course, customary law. The development of customary law in accordance with section 35(3) must be one of the major tasks facing the judiciary.

[106]See para 40 above.

[107][1970] A.C. 874 (H.L.) at 898-9.

[108][1974] A.C. 810 (P.C.) at 819. See also *Morgans* v. *Launchbury* [1973] A.C. 127 (H.L.) at 137, per Lord Wilberforce.

[109](1968) at 250.

[110]*R. v. National Insurance Commissioners, ex parte Hudson* [1972] A.C. 944, per Lord Diplock at 1015, per Lord Simon at 1026.

[111]*Supra* n50 at 27-32.

[112](1974) 24 *University of Toronto Law Journal* 170.

[113]287 U.S. 363-5 (1932).

[114]404 U.S. 105-8 (1971).

[1]*S v Mhlungu and Others* 1995 (3) SA 867 (CC); 1995 (7) BCLR 793 (CC).

[2]*Id* at para 48 (paragraph 1 of the order).

[3]*Id* at paras 39 and 41.

[4]See the judgment of Madala J at paras 161 and 165.

[5]Judgment of Kriegler J at para 135.

[6]Judgment of Kentridge AJ at para 55.

[7]Judgment of Kentridge AJ at para 56.

[8]*S v Makwanyane and Another* 1995 (3) SA 391 (CC); 1995 (6) BCLR 665 (CC) at paras 17 and 19; *Westinghouse Brake & Equipment (Pty) Ltd v Bilger Engineering (Pty) Ltd* 1986 (2) SA 555 (A) at 562D-563A; *Black-Clawson International Ltd. v. Papierwerke Waldhof-Aschaffenburg A.G.* [1975] A.C. 591 H.L.(E).

[9]Cf *Shelley v. Kraemer,* 334 U.S. 1 (1948).

1[0]See, for example, *Makwanyane, supra* n7 at paras 155-6, 220-4, 262, 311-3, 322-3; *Mhlungu, supra* n1 at para 8; *Shabalala and Others v Attorney-General, Transvaal, and Another* 1996 (1) SA 725 (CC); 1995 (12) BCLR 1593 (CC) at paras 25-6 and see the judgment of Cameron J in *Holomisa v Argus Newspapers Ltd* (WLD) Case No 95/19883 14 February 1996, unreported.

[1]See Van der Vyver JD □Constitutional Options for Post-Apartheid South Africa□ (1991) 40 *Emory Law Journal* 745, 785-787, 789.

[2]"The dignity of man is inviolable. To respect and protect it shall be the duty of all public authority.□ (For English renderings of provisions of the GBL the official translation of June 1994 issued by the Press and Information Office of the Federal Government has been used).

[3]It is generally recognised that Art 1 constitutes an unmistakeable rejection of totalitarianism and the ideology of national socialism (□you are nothing , your nation is everything□). See, for example, von

Mηnch/Kunig *Grundgesetz-Kommentar* Band 1(1992) 4 Aufl Art 1 Rn 6.

[4] ☐Die nachfolgenden Grundrechte binden Gesetzgebung, vollziehende Gewalt und Rechtsprechung als unmittelbar geltendes Recht.☐ The phrase ☐unmittelbar geltendes Recht☐ (directly enforceable law) was intended to avoid repetition of experiences in the Weimar period where the numerous fundamental rights in the constitution were viewed as nothing more than non-binding guidelines for the state and were thus ignored with impunity. See Stern *Staatsrecht* III/1 (1988) 1427.

[5] See, for example, von Mηnch/Kunig *supra* n3, Vorb Art 1-19 Rn 31; Maunz/Dηrig *Grundgesetz Kommentaar* (1994) 6 Aufl Art 1(3) Rn 121; Jarass/Pieroth *Grundgesetz fur die Bundesrepublik Deutschland* (1995) 3 Aufl Art 1 Rn 22 and 24; Hesse *Grundzηge des Verfassungsrechts der Bundesrepublik Deutschland* (1993) 19 Aufl Rn 355; Hesse in Benda, Maihofer, Vogel *Handbuch des Verfassungsrechts* (1994) 2 Aufl 138 Rn 22, 152-3 Rn 59; Stern *supra* n4, 1531-33, 1547, 1553-4, 1561-2, 1578, 1582, 1583, 1586 and the authorities cited at 1531 n118; BVerfGE 7, 198[203-7]; BVerfGE 7, 230[233ff]; BVerfGE42, 143[148]. It is generally accepted that there is direct Drittwirkung in the case of Art 9(3), which specifically provides that agreements aimed at preventing the formation of ☐ associations in order to safeguard and improve working and economic conditions☐ are void; BVerfGE 73, 261[269].

[6] BVerfGE 7, 198[203-7]; BVerfGE 35, 79[112-114]; von Mηnch/Kunig *supra* n3, Vorb Art 1-19 Rn 22, 31.

[7] BVerfGE 39, 1[41].

[8] *Supra* n3, Vorb Art 1-19 Rn 31.

[9] *Id.*

[10] Art 3(1): ☐All people are equal before the law.☐

[11] Maunz/Dηrig *supra* n5, Art 1(3) Rn 119; Pieroth/Schlink *Grundrechte, Staatsrecht II* (1994) 10 Aufl 50-51 Rn 192-193; BVerfGE 54, 117.

[12] Hesse *Grundzηge supra* n5, 159 Rn 354; Stern *supra* n4, 1546, 1555-6.

[13] Hesse in Benda, Maihofer, Vogel *Handbuch des Verfassungsrechts supra* n5, 153 Rn 60; Stern *supra* n4, 1513, 1553; Rηfner in Isensee/Kirchhof *Handbuch des Staatsrechts V: Allgemeine Grundrechtslehren* (1994) 554 Rn 65.

[14] Pieroth/Schlink *supra* n11, 50 Rn 191ff.

[15] 1995 (3) SA 391 (CC); 1995 (6) BCLR 665 (CC) at para 156.

[16] See, for example, sections 8(3), 116, 119, and 121 to 123 of the Constitution.

[17] Pieroth/Schlink *supra* n11, 49 Rn 186; Jarass/Pieroth *supra* n5, Art 1 Rn 24 and Vorb Art 1 Rn 5-11.

[8]Arts 9(3), 20(4), and 38(1) read with 48(2). Although Articles 20(4) and 38(1) are not formally part of the basic rights chapter they are regarded as quasi-fundamental rights (□grundrechtsgleiche Rechte□) in terms of Art 93(1)(4a).

[9]Pieroth/Schlink *supra* n11, 49 Rn 188.

[0]Art 2(1). See *Ferreira v Levin NO and Others; Vryenhoek and Others v Powell NO and Others* 1996 (1) SA 984 (CC); 1996 (1) BCLR 1 (CC) at paras 83 to 87.

[1]See Pieroth/Schlink *supra* n11, Rn 142-152.

[2]Hesse *Grundznge supra* n5, 159 Rn 354; Hesse *supra* n13, 153 Rn 60; Stern *supra* n4, 1545, 1554. Direct application of the equality provision would forbid an employer from taking a prospective employee□s political views into account in deciding whether to employ her; a testator would not be allowed to decide to leave all his property to his sons rather than leaving equal shares to his daughters too. See Hesse *Grundznge supra* n5, 159 Rn 356.

[3]Jarass/Pieroth *supra* n5, Art 1 Rn 24 and Vorb Art 1 Rn 5-11; Pieroth/Schlink *supra* n11, 49 Rn 188.

[4]Jarass/Pieroth *supra* n5, Art 1 Rn 23.

[5]Pieroth/Schlink *supra* n11, 6-13 Rn 18-39; 49 Rn 188; Stern *supra* n4, 1515-1518; BVerfGE 7, 198 [204-5].

[6]Compare Wassermann (ed) *Alternativ Kommentar zum Grundgesetz* (1989) 245 Rn 33; Stern *supra* n4, 1498.

[7]BVerfGE 7, 198[207] (the Lnth case). The word □radiating□ seems preferable to the somewhat pejorative term □seepage□.

[8]*Id* at 206.

[9]Translation by Kommers DP in *The Constitutional Jurisprudence of the Federal Republic of Germany* (1989) 370-371.

[0]Pieroth/Schlink *supra* n11, 51 Rn 193; Rnfner in Isensee/Kirchhof *supra* n13, 557 Rn 73.

[1]BVerfGE 73, 261[269]; Maunz/Dnrig *supra* n5, Art 1(3) Rn 132. See, also sections 157, 242 and 826 of the Civil Code.

[2]*Supra* n4, 1557-1558, 1584.

[3]BVerfGE 7, 198[206ff]; BVerfGE 34, 269[280]; BVerfGE 54, 117[124]. A striking and more recent (1993) example of this approach is provided by BVerfGE 89, 214, instructively commented on by Dr HA Strydom □Freedom of Contract and Constitutional Rights: A Noteworthy Decision by the German Constitutional Court□ 1995 (58) *THRHR* 696. In this case the German Constitutional Court used the □

general☐ provisions of section 138 of the Civil Code as well as section 242 (which obliges the debtor to perform in good faith) as a medium through which indirectly to apply Article 2(1) of the Basic Law (guaranteeing a person☐s private autonomy) to a contract of suretyship. The Court struck down the suretyship, in which the surety had undertaken an exceptionally high risk without obtaining any benefit in the credit supplied, because the bank had failed to inform the surety about the nature and scope of her obligations, thus violating the principle of contractual equality.

3[4]*Supra* n4, 1556.

3[5]*Id* 1548.

3[6]The Bundesarbeitsgericht, whose first president was originally the chief champion of the idea of direct horizontal application.

3[7]Examples which readily come to mind are: the ☐essential content of the right☐ provision in section 33(1)(b); the concept of a separate constitutional court with circumscribed constitutional jurisdiction; the Constitutional Court☐s jurisdiction in section 98(2)(c),(d)(read with subsection(9)) and (e); the section 102(1) and (2) referral procedures. See further, De Waal J ☐A Comparative Analysis of the Provisions of German Origin in the Bill of Rights☐ (1995) 11 *SAJHR* 1.

3[8]For example the formulation of the rights in section 27 (labour relations) and section 30 (children).

3[9]334 U.S. 1 (1948). Kentridge AJ refers to the case in paragraph 34 of his judgment.

4[0]Both were in their day Harlan Fiske Stone Professor of Constitutional Law at Columbia University Law School.

4[1]Professor Herbert Wechsler ☐Toward Neutral Principles of Constitutional Law☐ 73 *Harvard Law Review* 1 (1959) and Professor Louis Henkin ☐*Shelley v. Kraemer*: Notes for a Revised Opinion☐ 110 *University of Pennsylvania Law Review* 473 (1962). The latter article was referred to in a different but related context in my judgment in *Ferreira supra* n20 at para 53 n60.

4[2]*Supra* n41 at 29-30, footnotes omitted.

4[3]*Supra* n41 at 477. It is interesting to note that Hesse, *supra* n22, is concerned about virtually identical applications and for the same reason.

[1]In paras 10 and 11 of the judgment.

[2]Which lists, from section 8 to section 32, the fundamental rights and freedoms of every person.

[3]The first is generally referred to as one of retrospectivity or retroactivity, and the second as one of verticality versus horizontality.

[4]*S v Mhlungu and Others* 1995 (3) SA 867 (CC); 1995 (7) BCLR 793 (CC) (delivered after the judgment below in this case).

[5]Set out in para 5 of the judgment by Kentridge AJ. See para 12.16 of the envisaged plea.

[6]Set out in para 14 of the judgment by Kentridge AJ.

[7]Section 7 of the Constitution states:

> **7. Application.**
> (1) This Chapter shall bind all legislative and executive organs of state at all levels of government.
> (2) This Chapter shall apply to all law in force and all administrative decisions taken and acts performed during the period of operation of this Constitution.
> (3) Juristic persons shall be entitled to the rights contained in this Chapter where, and to the extent that, the nature of the rights permits.
> (4) (a) When an infringement of or threat to any right entrenched in this Chapter is alleged, any person referred to in paragraph (b) shall be entitled to apply to a competent court of law for appropriate relief, which may include a declaration of rights.
> (b) The relief referred to in paragraph (a) may be sought by
>
> > (i) a person acting in his or her own interest;
> > (ii) an association acting in the interest of its members;
> > (iii) a person acting on behalf of another person who is not in a position to seek such relief in his or her own name;
> > (iv) a person acting as a member of or in the interest of a group or class of persons; or
> > (v) a person acting in the public interest.

[8]Section 98(6) of the Constitution states:

> (6) Unless the Constitutional Court in the interests of justice and good government orders otherwise, and save to the extent that it so orders, the declaration of invalidity of a law or a provision thereof
>
> > (a) existing at the commencement of this Constitution, shall not invalidate anything done or permitted in terms thereof before the coming into effect of such declaration of invalidity; or
> > (b) passed after such commencement, shall invalidate everything done or permitted in terms thereof.

[9]In para 14 of his judgment.

1[0]In paragraph 20 of his judgment, Kentridge AJ opines that the consequences of his finding with regard to retrospective application of the Constitution as to action that occurred before the commencement of the Constitution is □not necessarily invariable□. This I believe to be correct and furthermore believe that section 98(6) of the Constitution provides this Court with such authority to make such a decision in the circumstances of gross injustice and abhorrence as mentioned by Kentridge AJ.

[1]1"[W]hether the Constitution has horizontal application□.

1[2]The directions of the Court dated 9 June 1995 directed the parties to address, *inter alia*, the following issue:

Are the provisions of chapter 3 of the Constitution - and more particularly section 15 - capable of application to any relationship other than that between persons and legislative or executive organs of state at all levels of government?

[3]At paras 33-41 of his judgment.

[4]334 U.S. 1 (1948).

[5]To use the German term of art referred to by Ackermann J at para 103 of his judgment.

[6]Section 98(2) of the Constitution commences as follows:

(2) The Constitutional Court shall have jurisdiction in the Republic as the court of final instance over all matters relating to the interpretation, protection and enforcement of the provisions of this Constitution, including . . . .

[7]The judicial oath of office, contained in Schedule 3 to the Constitution, reads, in part, as follows:

. . . [to] uphold and protect the Constitution of the Republic and the fundamental rights entrenched therein and in so doing administer justice to all persons alike without fear, favour or prejudice, in accordance with the Constitution and the Law of the Republic.

[8]The first paragraph of the Preamble declares:

Whereas there is a need to create a new order in which all South Africans will be entitled to a common South African citizenship in a sovereign and democratic constitutional state in which there is equality between men and women and people of all races so that all citizens shall be able to enjoy and exercise their fundamental rights and freedoms.

[9]The opening paragraph of the Postscript reads:

This Constitution provides a historic bridge between the past of a deeply divided society characterised by strife, conflict, untold suffering and injustice, and a future founded on the recognition of human rights, democracy and peaceful co-existence and development opportunities for all South Africans, irrespective of colour, race, class, belief or sex.

2[0]See section 35(1) of the Constitution, which provides as follows:

(1) In interpreting the provisions of this Chapter a court of law shall promote the values which underlie an open and democratic society based on freedom and equality and shall, where applicable, have regard to public international law applicable to the protection of the rights entrenched in this Chapter, and may have regard to comparable foreign case law.

2[1]*De Klerk and Another v* ✎*Du Plessis*✎ *and Others* 1995 (2) SA 40 (T); 1994 (6) BCLR 124 (T).

[2]2The United States, Canada, Brazil, Germany, Ireland, India, Malaysia, Nigeria, the former Bophuthatswana and Namibia.

2[3]*Supra* n21 at 48G-I; 131C-E.

2[4]Quoted in part in n18 and n19 *supra*.

2[5]*Supra* n21 at 46E; 128J and the passage quoted in para 11 *supra*.

2[6]Per Mahomed DP in *Shabalala & Others* v *Attorney-General, Transvaal and Another* 1996 (1) SA 725 (CC); 1995 (12) BCLR 1593 (CC) at para 26.

2[7]S8(1).

2[8]S8(2).

2[9]The expansive intention is underscored by the definition of □organ of state□ in section 233 of the Constitution as including □any statutory body or functionary□.

3[0]Section 33(2) reads as follows:

> (2) Save as provided for in subsection (1) or any other provision of this Constitution, no law, whether a rule of the common law, customary law or legislation, shall limit any right entrenched in this Chapter.

3[1]*Supra* n20.

3[2]Section 35(2) reads as follows:

> (2) No law which limits any of the rights entrenched in this Chapter, shall be constitutionally invalid solely by reason of the fact that the wording used *prima facie* exceeds the limits imposed in this Chapter, provided such law is reasonably capable of a more restricted interpretation which does not exceed such limits, in which event such law shall be construed as having a meaning in accordance with the said more restricted interpretation.

[3]3The epithets used by Ackermann J in para 108 of his judgment.

3[4]I believe it is also safe to say that in such a case a court will have regard to the tenor of section 33(1). If the infringement of a specific right can be saved, the same must apply to an infringement of its spirit. But the point was not argued before us and is not at issue here. No more should therefore be said about it.

3[5]At para 46 of his judgment.

3[6]At para 63 of his judgment.

3[7]See also para 60 of the judgment of Kentridge J.

3[8]At para 63 of his judgment.

3[9]See specifically sections 98(2)(g) and (a) and generally section 98(2).

[0]*Retail, Wholesale & Department Store Union, Local 580 et al. v. Dolphin Delivery Ltd.* (1987), 33 D.L.R. (4th) 174.

[1]*Supra* n14.

[2]1995 (8) BCLR 1018 (B) at 1042A-F. See the judgment of Kentridge AJ at para 38.

[3]In para 109 of his judgment.

[4]The First Amendment, eg commences: □Congress shall make no law . . .□.

[5]See section 98(2), which reads as follows:

> (2) The Constitutional Court shall have jurisdiction in the Republic as the court of final instance over all matters relating to the interpretation, protection and enforcement of the provisions of this Constitution, including
>
>> (a) any alleged violation or threatened violation of any fundamental right entrenched in Chapter 3;
>> (b) any dispute over the constitutionality of any executive or administrative act or conduct or threatened executive or administrative act or conduct of any organ of state;
>> (c) any inquiry into the constitutionality of any law, including an Act of Parliament, irrespective of whether such law was passed or made before or after the commencement of this Constitution;
>> (d) any dispute over the constitutionality of any Bill before Parliament or a provincial legislature, subject to subsection (9);
>> (e) any dispute of a constitutional nature between organs of state at any level of government;
>> (f) the determination of questions whether any matter falls within its jurisdiction; and
>> (g) the determination of any other matters as may be entrusted to it by this Constitution or any other law.

[6]See sections 101(2) and (3), read with section 241(1).

[1]1994 (4) BCLR 1 (W) at 7C-D.

[2]1994 (4) BCLR 79 (T) at 88J.

[3]1994 (5) BCLR 19 (E) at 30G-I.

[4]1994 (6) BCLR 124 (T) at 131F-G.

[5]1995 (2) SA 52 (W).

[6]1995 (3) BCLR 374(D) at 382G-H.

[7] 1995 (11) BCLR 1498 (N).

[8] 1995 (3) SA 391 (CC); 1995 (6) BCLR 665 (CC) at para 262.

[9] See Sections 26, 33(1) and 35(1).

1[0] *Retail, Wholesale & Department Store Union, Local 580 et al. v. Dolphin Delivery Ltd* 1987 33 D.L.R. (4th) 174 at 191.

[11]1 See *Gardener v Whitaker supra* n3 at 684.

1[2] Section 32(c).

1[3] Section 30(1)(d).

1[4] Section 29.

1[5] Paras 37-38 of Kentridge AJ□s judgment.

1[6] Hogg P *Constitutional Law of Canada* 3 ed (1992) at 848.

1[7] *Supra* n3 at 31E-G.

[1] Section 4(1).

[2] Section 7(2) (emphasis added).

[3] See Dlamini CRM □The Role of Customary Law in Meeting Social Needs□ *African Customary Law* (1991) 71 at 74; Currie I in Chaskalson et al (ed) *Constitutional Law of South Africa* (1996) at para 36.1.

[4] See *S v Makwanyane and Another* 1995 (3) SA 391 (CC); 1995 (6) BCLR 665 (CC) at para 383 (□ there are many aspects and values of traditional African law which will . . . have to be discarded or developed in order to ensure compatibility with the principles of the new constitutional order.□) (*per* Sachs J).

[5] Section 181(2).

[6] At para 142 of his judgment.

[7] The application of customary law has long been subject to public policy considerations, under the so-called □repugnancy proviso.□ See Bennett TW *Human Rights and African Customary Law* (1995) 58-60. Under section 1(1) of the Law of Evidence Amendment Act, 45 of 1988, courts may not apply provisions of indigenous law that are contrary to □principles of public policy and natural justice.□ Needless to say, the legitimacy of such a constraint was dubious during the time when the legal system operated within the framework of a regime of racial domination, but a different approach may be warranted if the values against which customary law is to be tested are derived from a politically

legitimate constitution. But see Bennett at 60 (□it seems quite wrong to use the repugnancy proviso -- a mark of colonial paternalism -- as the medium for scrutinising the constitutional validity of customary law.□); Currie I, *supra* n3 at para 36.4(c) (□[m]ost post-colonial states in southern Africa have removed repugnancy clauses from the statute book, regarding them as a humiliating index of the subordination of indigenous law in the dual legal systems established under colonialism.□)

[8]"The common law is not to be trapped within the limitations of its past. It needs not to be interpreted in conditions of social and constitutional ossification. It needs to be revisited and revitalised with the spirit of the constitutional values defined in Chapter 3 of the Constitution and with full regard to the purport and objects of that Chapter.□ Per Mahomed at para 86.

[9]See Bennett *supra* at 39 (recommending adaptation of the German doctrine of *mittelbare Drittwirkung* to deal with customary law: □[i]n Germany fundamental rights become applicable where rules of private law are general and abstract in their formulation. Customary law, too, is pervaded by generalized norms, usually characterised by a requirement for reasonable behaviour, which provide a starting point for the introduction of fundamental rights.□) (footnote omitted).

1[0]Section 35(2).

[1]I have coined this word to indicate a country ruled by judges - from the Greek word dikastos = judge. The term juristocracy has also been used.

[2]Discussed in the judgment by Kentridge J at n23, where a full reference is given

[Context▾] [Hide Context]

**SAFLII:** | Terms of Use | Feedback
URL: *http://www.saflii.org/za/cases/ZACC/1996/10.html*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Thad J. Bracegirdle, hereby certify that on September 10, 2007, I caused a true and correct

copy of the foregoing *Answering Brief of Robert D. Christ Regarding the Motion of Brett J.*

*Cormick, Elan Suisse International Holdings (USA) LLC and Elan Suisse Ltd. to Determine*

*Applicable Law* to be served on counsel for defendants as listed below, via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE 19801-1155

Dated: September 10, 2007

/s/ Thad J. Bracegirdle
Thad J. Bracegirdle (No. 3691)