IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| ELAN SUISSE, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ANSWERING BRIEF OF BRETT J. CORMICK, ELAN SUISSE INTERNATIONAL HOLDINGS (USA) LLC AND ELAN SUISSE LTD. IN OPPOSITION TO ROBERT D. CHRIST'S MOTION FOR JUDGMENT ON THE PLEADINGS**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for Brett J. Cormick, Elan Suisse
International Holdings (USA) LLC and Elan
Suisse Ltd.

Dated: October 30, 2007

Of counsel:

Prof. George P. Fletcher
Columbia University School of Law
435 W. 116th St., Room 616
New York, NY 10027
(212) 854-2467

Lawrence H. Brenner, Esq.
300 Market St., Ste. 130
Box 47
Chapel Hill, NC 27516
(919) 929-5597

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.    THE UNDERLYING TRANSACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.    CHRIST'S CAMPAIGN OF DEFAMATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C.    CHRIST CAUSES CORMICK TO BE ARRESTED AND TORTURED. . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    THE COUNTERCLAIM STATES A VIABLE CLAIM UNDER THE ALIEN TORT
      STATUTE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      A.    THE ATS PERMITS CLAIMS FOR AIDING AND ABETTING. . . . . . . . . . . . 17

      B.    THE COUNTERCLAIM PLEADS SUFFICIENT FACTS TO INDICATE STATE-
            SPONSORED TORTURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      C.    UNDER THE ATS IT IS SUFFICIENT FOR AIDING AND ABETTING
            LIABILITY TO ALLEGE THAT CHRIST KNEW THAT HIS CONDUCT WOULD
            ASSIST OR ENCOURAGE ZIMBABWEAN OFFICIALS TO INCARCERATE
            AND TORTURE CORMICK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      D.    CORMICK HAS SUFFICIENTLY PLEADED A PROXIMATE CAUSAL
            CONNECTION BETWEEN CHRIST'S WRONGFUL CONDUCT AND THE
            ACTS OF TORTURE BY ZIMBABWEAN OFFICIALS. . . . . . . . . . . . . . . . . . 21

      E.    CHRIST'S AUTHORITIES ARE NOT APPLICABLE TO THIS CASE. . . . . . 24

II.   THE COUNTERCLAIM STATES A VIABLE CLAIM FOR FALSE IMPRISONMENT
      AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. . . . . . . . . . . . . . 25

      A.    ZIMBABWE LAW RECOGNIZES TORT CLAIMS ARISING FROM
            WRONGFUL ARREST, IMPRISONMENT AND LEGAL PROCEEDINGS. . 26

B.      CHRIST HAS FAILED TO ESTABLISH AS A MATTER OF ZIMBABWE LAW
        THAT THERE IS NO LIABILITY FOR HIS KNOWINGLY MAKING FALSE
        STATEMENTS TO THE POLICE, WITH MALICE, WHICH PROCURED THE
        ARREST AND TORTURE OF CORMICK. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.      THE COURT SHOULD DISREGARD AND STRIKE FROM THE RECORD THE
        AFFIDAVIT SUBMITTED BY CHRIST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.      CHRIST HAS FAILED TO ESTABLISH THAT ZIMBABWE DOES NOT OR
        WOULD NOT RECOGNIZE A CLAIM FOR INFLICT OF EMOTIONAL
        DISTRESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.    THE COUNTERCLAIM ADEQUATELY PLEADS DAMAGES FOR THE
        DEFAMATION CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.     THE LANHAM ACT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# **TABLE OF AUTHORITIES**

## **Cases**

*Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257 (E.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . 17, 20, 21

*Bando v. Muchinguri*, 1999 Z.L.R. 476 (High Court, Bulawayo). . . . . . . . . . . . . . . . . . . . . . . 26

*Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2007 WL 2348341, Illston, J. (N.D. Cal. Aug. 14, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2006). . . . . . . . . . . . . . . . 17

*Cabello v. Barreuto v. Fernandez Larios*, 205 F.Supp.2d 1325 (S.D. Fla. 2002). . . . . . . . . . . . 17

*Corrie v. Caterpillar, Inc.*, 403 F. Supp.2d 1019 (W.D. Wash. 2005). . . . . . . . . . . . . . . . . . . . 24

*Culley v. Pennsylvania R. Co.*, 244 F.Supp. 710 (D. Del. 1965). . . . . . . . . . . . . . . . . . . . . . . . 30

*Feni v. Kondzani*, (508/2006) [2007] ZAECHC 15 (South Africa High Court - Eastern Cape, Mar. 8, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Filartiga v. Pena-Irala*, 630 F.2d 876 (2nd Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174 (Del. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Guillen v. Kuykendall*, 470 F.2d 745 (5th Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Huyler's v. Ritz-Carlton Restaurant Co. Of Atlantic City*, 6 F.2d 404 (D. Del. 1925). . . . . . . . 31

*In re Agent Orange Product Liability Litig.*, 373 F.Supp.2d 7 (E.D.N.Y. 2005). . . . . . . . . . . . 17

*In re Agent Orange Product Liability Litigation*, 373 F. Supp.2d 7 (E.D.N.Y. 2005). . . . . . . . 24

*In re Motel 6 Sec. Litig.*, No. 93 Civ 2183 JFK, 2000 WL 322782, Keenan, J. (S.D.N.Y. Mar. 28, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re South African Apartheid Litig.*, 346 F.Supp.2d 538 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . 17

*In re Terrorist Attacks on September 11, 2001*, 329 F.Supp.2d 539 (S.D.N.Y. 2005). . . . . . . . 17

*Independent Newspaper Holdings Ltd. v. Suliman*, [2004] ZASCA 56 (South African Supreme Court of Appeal, May 28, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Khulumani v. Barclay Nat. Bank Ltd.*, ___ F.3d ___, 2007 WL 2985101 (2nd Cir. Oct. 12, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kiobel v. Royal Dutch Petroleum Co.*, 456 F.Supp.2d 457 (S.D.N.Y. 2006). . . . . . . . . . . . . . . 17

*Lewis v. Neal*, 905 F.Supp. 228 (E.D. Pa. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Marcus v. Funk*, C.A. No. 87C-SE-26-1-CV, 1993 WL 141864, Quillen, J. (Del. Super. Apr. 21, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322 (N.D. Ga. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Mujica v. Occidental Petroleum Co.*, 381 F.Supp.2d 1164 (C.D. Cal. 2003). . . . . . . . . . . . . . . 17

*Ores v. Willow West Condominium Ass'n*, No. 94C 4717, 1996 WL 111894, Manning, J. (N.D. Ill, Mar. 12, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y. 2003).. 17

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp.2d 633 (S.D.N.Y. 2006).. 17

*Senathirajah v. I.N.S.*, 157 F.3d 210 (3rd Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Shamrock Holdings, Inc. v. Arenson*, 456 F.Supp.2d 599 (D. Del. 2006). . . . . . . . . . . . . . . . 16, 25

*Smith v. Shaffer Stones Co.*, 28 F.R.D. 308 (E.D. Pa. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Spence v. Funk*, 396 A.2d 967 (Del. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Winokur v. Office of Court Admin.*, 190 F.Supp.2d 444 (E.D.N.Y. 2002). . . . . . . . . . . . . . . . . . 16

*Wright v. Pepsi Cola Co.*, 243 F.Supp.2d 117 (D. Del. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Zimring v. Halley*, C.A. No. 85 C 7094, 1986 WL 2621, Hart, J. (N.D. Ill. Feb. 20, 1986). . . . 29

## **Other authorities**

18 *U.S.C.* §2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 *U.S.C.* 1350. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C. Wright and A. Miller, *Federal Practice and Procedure* (2d ed.1990). . . . . . . . . . . . . . . . . . 16

*D. Del. Local R.* 9.4(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fed. R. Civ. P.* 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Fed. R. Civ. P.* 9(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

G. Feltoe, *A Guide to the Zimbabwe Law of Delict* (3rd ed. 2001). . . . . . . . . . . . . . . . . . . . . . 26

George P. Fletcher and Jens David Ohlin, "*Reclaiming Fundamental Principles of Criminal Law in the Darfur Case,*" 3 J. of Int. Crim. Justice 539 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Jonathan M. Burchell, *Personality Rights and Freedom of Expression* (Juta & Co., Ltd. 1998). 31

Jonathan M. Burchell, *The Law of Defamation in South Africa* (Juta & Co, Ltd. 1985). . . . . . . 31

*Model Penal Code* §2.06(3) (Official Draft 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Note, "*Conflict Between State Legal Norms and Norms Underlying Popular Belief: Witchcraft in Africa as a Case Study,*" 14 Duke J. Of Comparative Law 351 (2004). . . . . . . . . . . . . . . . . . . . . 26

*Restatement  (Second) of Torts* § 876. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Rome Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## NATURE AND STAGE OF THE PROCEEDINGS

On April 27, 2006, Robert D. Christ ("Christ") filed suit against Brett J. Cormick ("Cormick"), Elan Suisse International Holdings (USA) LLC ("ESUSA"), Mercari Financial Services (Pty.) Ltd., Nicogel Ltd., John Walters and Dianne Marshall (D.I. 1) in Civil Action 06-275. On March 2, 2007, Christ filed an Amended Complaint. (D.I. 29).

On January 3, 2007, Civil Action 07-60 was opened, having been transferred from the U.S. District Court for the Eastern District of Pennsylvania.

On April 24, 2007, while a motion to dismiss was pending in C.A. No. 06-275, the Court held a scheduling conference in both actions and set litigation deadlines. In addition, the Court consolidated the two actions for discovery purposes only. An implementing order was entered on May 18, 2007.

On July 10, 2007, the Court issued a Memorandum Opinion and Order in C.A. No. 06-275 dismissing all defendants except Cormick and ESUSA. (D.I. 46).

In accordance with the Scheduling Order, the parties submitted briefs on the choice of law for the various claims in both actions. (D.I. 52-54). A decision on that motion is pending.

On October 16, 2007, Christ filed in both actions a Motion for Judgment on the Pleadings and a supporting brief. (D.I. 60, 61). This is Cormick's brief in response to that motion.

1

## SUMMARY OF ARGUMENT

1.    Denied.  Christ has mis-stated the test for aiding and abetting a violation of the law of nations.  Cormick has alleged that Christ intentionally provided a knowingly false statement to the Zimbabwe authorities with knowledge or reason to know that Cormick's arrest would likely result in torture.  Cormick need not plead that Christ controlled or collaborated with the Zimbabwe police, only that he knowingly engaged in conduct which facilitated the wrong, which he has done.

2.    Denied.  Cormick has alleged that Christ intentionally and knowingly provided a false conclusory statement to the Zimbabwe authorities with knowledge or reason to know that Cormick's arrest would likely result, which it did.  Zimbabwe law allows for such a claim, which is adequately pleaded.  Christ has failed to establish that Zimbabwe law does not provide a remedy for infliction of emotional distress.

3.    Denied.  Christ has mis-stated the law regarding pleading damages in a defamation case.  Cormick is entitled to general, presumed damages for Christ's Internet defamation, which damages do not have to be pleaded specifically.  The unauthenticated "evidence" Christ points to (beyond the four corners of the Counterclaim) does not establish that Cormick's reputation was so bad that it could not have been injured by Christ's defamation.  As to Elan Suisse Ltd., as it has not dissolved, it is entitled to maintain its claim.

4.    Denied.  However, Elan Suisse Ltd. withdraws its Lanham Act claims

2

## STATEMENT OF FACTS[1]

### A.    THE UNDERLYING TRANSACTION.

From 2000-2003, Cormick developed a business idea that would market U.S. investment products to South Africa for the first time on a large scale. This included developing a prototype in Zimbabwe, securing investors and making contact with banks, investment brokers and other financial institutions. (Counterclaim, D.I. 47 ("CC") ¶¶1-31).

Part of Cormick's plan was to form a United States-based entity to act as a management services company overseeing US-based asset classes. (CC ¶¶32-35). Cormick contacted Christ, whom he knew from expeditions to the North Pole which Christ operated, to inquire whether Christ could recommend anyone. Christ expressed an interest in possibly offering his candidacy for the position, noting that he was a CPA and a highly experienced forensic accountant and that he was looking to get out of his current business as it was keeping him away from his wife and children, plus he had fallen out with one of his business associates. (CC ¶36).

Christ and Cormick agreed to meet in Cape Town, South Africa, as Christ was traveling there to attend the funeral of one of his close friends. At this point Cormick had not yet agreed that Christ would become involved with Elan Suisse at all. The parties were only in a stage of initial discussions about the need to find someone who could run the Elan Suisse management services company in the US. Promoting his qualifications as a CPA and highly experienced forensic accountant who had been employed by a Big 8 accounting firm, Christ explained to Cormick that

---

[1]

Christ attempts to "spin" the facts on this motion by citing to his own Complaint in his Statement of Facts. On a motion for judgment on the pleadings, however, the facts alleged in Cormick's Counterclaim control and are accepted as true, while any conflicting allegations in Christ's Complaint are rejected. *Lewis v. Neal*, 905 F.Supp. 228, 230 (E.D. Pa. 1995).

he was professionally qualified specifically in matters of financial due diligence. In Cape Town, Christ and Cormick went through every aspect of the proposed transaction, at length and in great detail. (CC ¶37).

During the period of due diligence, Christ and Cormick conducted a review of all of the paperwork, along with a review of: South African Financial Services Board full license and regulatory approvals of multi manager (Elan Suisse (Pty) Ltd.); South African Financial Services Board full approvals and registration of product base for national distribution; Guernsey Financial Services Commission approval and registration (International Mutual Fund PCC Ltd.) of multi-manager offshore investment structure; national product distribution channels; national institutional product approval by largest banks (ABSA IMCO)/brokers, etc; sub-manager sector performance; sub-manager profile, qualifications and experience; Cormick's qualifications and experience; absent asset classes nationally; competing market products; "white label" distribution platform; new $USD product development opportunities (10 new funds identified); marketing platforms secured; product administration facilities (redemption procedures, calculation of daily NAV, pricing, reporting, conversion procedures etc); administration provider credentials and background; product management fee tolerances (brokerage fees-placement fees-initial charges-performance fees-admin fees-custodian fees); fund subscription process; Regulation 750K investment allowance provisions, etc.  (CC ¶¶39-40).

After further discussion and negotiation, Cormick reached an agreement with Christ that Christ could purchase 50% of the Elan Suisse management services company that was to be established in the U.S. (Delaware) for $350,000, and serve as Senior Vice President.  (CC ¶42).

Upon purchasing 50% of ESUS from Cormick for the agreed discounted figure of $350.000, Christ would get 50% of all annual management fees generated by U.S. investment funds deployed by Elan Suisse (Pty) Ltd. and serviced by ESUS, as well as a beneficial participation in Elan Suisse (Pty) Ltd. ($USD component only).  (CC ¶44).

Cormick invited Christ to fly to London to meet and to attend a meeting with BNP Paribas, given the extraordinary implications of the fact that the second largest bank in Europe was pitching for the Elan Suisse (Pty) Ltd. business.  Such efforts on the part of BNP Paribas demonstrated very clearly how real, serious and immensely exciting the entire enterprise was.  Cormick also wanted to use this meeting as the final due diligence step for both himself and Christ prior to allowing Christ to become an investor in ESUS. (CC ¶51). Cormick was delighted to see that Christ's CPA training enabled him to not only understand the simple structure that had been agreed to, but he even managed to make positive contributions to the meeting. (CC ¶52).

Prior to Christ's return to the U.S., Christ and Cormick sat together and once again confirmed the simple position that they had agreed to: that Christ, for a total of $350,00, could buy 50% of ESUS and a proportional participation in the $USD business of Elan Suisse (Pty) Ltd. (IPR, or customer base, or so-called "good will").  Cormick told Christ that he would now be prepared to accept Christ's investment, as Cormick planned to incorporate the appropriate Delaware company (to be known as "Elan Suisse International Holdings LLC") immediately upon his return to Zimbabwe. (CC ¶54).

Christ agreed and subsequently returned to the U.S. to commence operations for ESUS, following which his wife, Karen Christ, transferred $250,000 of the agreed $350,000 upon his return. Cormick returned to Zimbabwe and formed ESUS in Delaware, sending copies of the incorporation

documents to Christ.  As Christ and Cormick had agreed to a total of $350,000 when in London, Cormick waited for Christ to transfer the outstanding balance of $100,000 so that Cormick could issue all of his subscription agreements as fully paid for.  (CC ¶55).

By mid-September, 2004, seven months into the project with Christ, things began to unravel. Christ suddenly seemed to be under enormous pressure (possibly from his wife), and seemed to be getting cold feet about having made the investment, and began to deliberately argue an alternative version of factual events.  For example, although he had previously argued that his experience as a forensic CPA for a Big 8 accounting firm made him uniquely qualified to handle the job, in an e-mail dated September 15, 2004, he argued that he had no specialized knowledge that would qualify him for participation in the enterprise.  Christ also began characterizing his investment as a "loan."  (CC ¶60).  In an e-mail dated September 17, 2004, Christ told Cormick that he had gotten cold feet, and asked Cormick to "liquidate" his "position." (CC ¶61).

Cormick proceeded to assure Christ that Cormick would do his best to sell Christ's investment.  Cormick was confident that this could be done in a timely fashion given the amount of interest that was being generated in the company at this point and as a result of all of Cormick's efforts.  (CC ¶62).

Cormick began efforts to market Christ's shares in good faith to third party investors.  (CC ¶63). Cormick made presentations to 30+ individuals, representing the highest echelons of the mining, law, service, commerce and banking sectors in Zimbabwe.  (CC ¶65).

At the same time, Christ continued to behave in a very erratic way.   Several e-mails were exchanged between Christ and Cormick in which it was obvious Christ increasingly misconstrued what he thought he was getting for his investment.   Then Christ suddenly decided that he had

changed his mind altogether about wanting to liquidate his position, and that he wanted to stay in ESUS after all, or even possibly re-engage after his current position had been liquidated. (CC ¶67).

On November 29, 2004, while Cormick was actually in an advanced closing negotiations with a potential investor, Cormick was informed that Christ had retained the services of an attorney in South Africa and had sued the company, misrepresenting the facts and with the false claim of a "loan" for $250.000. (CC ¶79). Given that Christ had misrepresented his position to the lawyer in South Africa and that he had also misrepresented the position of the company, deliberately distorting the actual facts, it was necessary to halt the sale of Christ's interest until this matter was sorted out given that it would be unethical, illegal and not acceptable to market his shares while forced to litigate with him. (CC ¶80).

Christ's legal action also created a very serious operational problem for Elan Suisse (Pty) Ltd. The withdrawal of Christ from the project (although in between alternating emails he was in/out/in/out), not only had the U.S. management services operation become inoperative, but Christ and Cormick were actually litigating over it. In reality, this meant that it would not be possible to launch the U.S. Government Bond Fund in the fashion in which Cormick had intended, because there would be no effective U.S. management services company in place to specifically service the escalating demand for the product. (CC ¶81).

Christ dropped his next bomb by sending a letter to a Zimbabwe financial publication suggesting wrongfully that Cormick was involved in a financial scandal unrelated to his investment. (CC ¶¶87-89). The effect of Christ's malicious and false article on marketing efforts in South Africa was devastating: anyone who entered Cormick's name on an Internet search engine during due diligence procedures would find this maliciously contrived article. This, along with the litigation

improperly initiated by Christ from South Africa, destroyed Cormick's ability to market any Elan Suisse equity stock, crushing the value of Christ's investment, as well as that of Cormick and the other investors. (CC ¶89).[2]

This event was immediately followed by what Christ described at the time as "the coming storm," which was to include aside from other things, a 2+-year long series of stalking via threatening e-mails and making his accusations to any publication that would listen. (CC ¶¶91-92).

**B.      CHRIST'S CAMPAIGN OF DEFAMATION.**

Christ continued his quest for utter and complete destruction by subsequently publishing false and defamatory statements on a website growing to over 200 printed pages. The "facts" he lists on his website are utterly false, based on either, un-named and possibly fictitious sources, or on sources with obvious biases (including but not limited to ex-wives and girlfriends), or on individuals speculating without firsthand knowledge, or on simply poor or non-existent research. (CC ¶94).

On that website, Christ falsely and outrageously accuses Cormick of the following (but not limited to this list):

      a.      being a scam artist practiced and proficient at his craft;

      b.      being a "crook";

      c.      having plastic surgery to hide;

      d.      misrepresenting his academic, military and prior employment credentials;

      e.      engaging in "theft";

---

[2]       At a later point in time, Christ wrote an apology retracting his claim in the Zimbabwean Financial Gazette, as part of a settlement of a separate lawsuit he brought over website development expenses. His retraction and apology was published as well, but by then it was too late and the damage had been done. (CC ¶90).

8

f.      operating a "pseudo-legitimate business";

g.      being fired from a prior employment with HIVEX due to allegations of fraud;

h.      operating a "boiler room type operation selling worthless (or significantly overvalued) securities to relatively unsophisticated investors";

i.      running advance fee scams;

j.      running an equity scam;

k.      running a pyramid scheme;

l.      running a ponzi scam;

m.      running a bait-and-switch scam;

n.      being a liar;

o.      having stolen Christ's money;

p.      being a deadbeat dad, not paying child support;

q.      being a pathological liar;

r.      having been in and out of jail for years;

s.      having solicited prostitutes;

t.      being let go from an earlier employer for misuse of a company credit card;

u.      being asked to cease teaching at the University of Cape Town due to questions about his qualifications and unauthorized use of official letterhead;

v.      being "fired from [HIVEX] after attempting to open a First National Bank checking account without a corporate resolution requiring only a single signature (Cormick's of course)";

w.      being fired by BZW Meares because he "disgraced himself at that firm...;

9

    x.     having "eluded the law in Europe, RSA and the USA....";

    y.     running "scams on various girlfriends"; and

    z.     being a pedophile. (CC ¶95).

Cormick tried to continue with the Elan Suisse concept notwithstanding Christ's attacks, but investor support evaporated. Doors that had taken 3 years of tremendous effort at the highest levels to open up were now closed permanently. (CC ¶93).

## C.    CHRIST CAUSES CORMICK TO BE ARRESTED AND TORTURED.

Prior to or shortly after August 1, 2006, Christ contacted Zimbabwean officials and in a sworn affidavit falsely testified that Cormick "has eluded the law in Europe, RSA and the USA," and that "the accused should be brought to justice," thereby suggesting that Cormick was a wanted international criminal fleeing from arrest. (CC ¶97).[3]

.    At the time Christ executed the false affidavit he knew or should have reasonably known that his conduct would assist or encourage Zimbabwean officials to incarcerate Cormick. (CC ¶98).

Christ further knew or should have known that by reason of executing the false affidavit, and by reason of the political climate in Zimbabwe at the time, that it was reasonably probable that Cormick would be subject to confinement that violated specific, universal, and obligatory international norms including but not limited to inhumane conditions as well as psychological and physical torture. (CC ¶99).

In the early morning hours of August 23, 2006 while Cormick was the sole adult in charge of his two youngest children in Zimbabwe, he was apprehended by unidentified individuals. These

---

[3]

Christ had made similar accusations to police agencies in other jurisdictions, who declined to act. (CC ¶96).

individuals refused to state their purpose, where they were taking Cormick, and the reason or nature of the abduction.   These unnamed individuals refused Cormick's request ro allow him to make arrangements for the health and safety of his two children.   (CC ¶100).

Cormick was placed in an unidentified vehicle with his luggage, and was repeatedly refused information about the nature, reason or purpose for the abduction.   (CC ¶101).  He was taken to an unknown location where there were no officials in police uniform or otherwise identifiable public officials.  Cormick was searched and made to sit, ignored and in isolation, for an extended period of time in a room with a window.  Following his detainment, Cormick was advised of the Christ affidavit.  He subsequently encouraged his captors, who he then believed to be Zimbabwean officials, to investigate the false allegations.   (CC ¶102).

These Zimbabwean officials refused Cormick's request to investigate the false allegations which caused Cormick to believe that he was about to become one of many Zimbabwean victims who would be executed without a formal hearing or trial.   (CC ¶103).

Cormick was put in a dark, cold room until late in the afternoon on August 23, 2006.  He was cold and had not eaten for 22 hours by that time. Cormick's passport was confiscated and he was incarcerated with the personal knowledge that inhumane confinement, torture and execution in Zimbabwean prisons were common.  He was given no reason for his incarceration despite repeated requests for an explanation.  (CC ¶104).

During the transfer to prison, the Zimbabwean officials made intimidating comments and threats to Cormick indicating that he would be in for a very, very rough time.   When Cormick requested how long he would be incarcerated, the response was "forever."   (CC ¶105).

It was winter in Harare at that time with temperatures below freezing at night. Upon arrival at the prison Cormick was informed that he would be allowed to retain only one item of clothing. This was done in order to make the inmates as uncomfortable as possible. Cormick chose to retain a very light woolen sweater next to his skin as his chosen item of clothing, which he tucked into his underwear. (CC ¶106).

The cell in which Cormick was incarcerated was meant to hold about 15 people, but held around 50 at that time. The cell also was filthy with lice and fleas; there was no toilet, food or water. Other inmates in the cell defecated and urinated wherever they were standing. Many inmates were extremely ill, comatose or dying, but because of the crowdedness of the cell, they were forced to stand throughout the incarceration. Cormick stood barefoot and semi-naked in the cell in subfreezing conditions and continued to suffer from hunger, thirst and exhaustion, becoming disoriented since he had been without food and water for 28 hours by that time. (CC ¶107).

Later that night, Cormick was moved to a "holding area" believed to be used for the torture of inmates. The wet concrete floor of the holding area contained hundreds of inmates. While sitting huddled on the wet, bare, concrete floor in that holding area, in human excrement, he was barefoot, semi-naked, and subjected to sub-freezing temperatures. He was also exposed to numerous potentially fatal, contagious diseases. Freezing wind inducing hypothermic conditions came straight into the holding area. (CC ¶108).

Cormick was subjected to aggressive and threatening gestures over the course of the night, which became increasingly menacing over time and suggested that he would not live to see the light of the next day. (CC ¶109).

Later that night Cormick was moved into yet another confinement area where the floors were concrete; there were open sewers that were overflowing and blocked by excrement, and the cells had no heat. The cell that Cormick was confined to had thirty-five inmates even though the cell could only accommodate six. Inmates were very sick (including with a variety of highly contagious diseases) and were covered with lice, fleas, ticks and excrement. Some had been brutally tortured. The bare concrete was so cold that Cormick's entire body violently shook and spasmed with hypothermia. (CC ¶110).

On or about 8:00 a.m. on August 24, 2006, Cormick was once again taken to the holding area. He had not had anything to eat or drink for 36 hours. He had not slept for 24 hours at this point. He had also not been charged with any crime. (CC ¶111).

Around 10 a.m. on August 24, 2006, Cormick was taken back to the facility where he had originally been taken after being abducted from the place where he and his children had been staying. Cormick was forced to walk from the prison to that facility through the main street of Harare, filthy, barefoot, shackled and semi-naked in plain view of all in the middle of winter. (CC ¶112).

During the night of August 24, 2006, Cormick was placed on the 4th floor holding area with hundreds of inmates, in subfreezing temperatures, semi-naked, in complete darkness lying on the concrete floor, in excrement, fluid and subject to freezing wind biting through the cracks in the walls. (CC ¶113).

During confinement, Cormick was tortured using different techniques including but not limited to:

> a.     a plastic bag was placed over his head to prevent him from breathing;

13

b.      he was repeatedly beaten in or around his eyes, nose, and head to the point of concussion-like symptoms and disorientation;

c.      he was held down while an individual sat on his chest, making him almost black-out from pain;

d.      he was made to sit in humiliating and uncomfortable stress positions;

e.      knees were placed on his throat to induce gagging and vomiting;

f.      he was restrained on a filthy, wet cement floor covered with excrement and blood, likely contaminated with contagious diseases;

g.      he was urinated on;

h.      he was repeatedly struck in the groin;

i.      his eyes were covered with a rag to keep him disoriented;

j.      his face was held to the cement floor and rubbed in dirt and excrement;

k.      his arms were placed in a stress position and his hair pulled back;

l.      he was repeatedly beaten in the kidneys and in the stomach;

m.      his fingers were bent back;

n.      death threats were repeatedly made;

o.      he was made to go 69 hours without food or water;

p.      he was made to go 57 hours without sleep (by the time of his release);

p.      he was held in sub-freezing conditions while semi-naked, and likely exposed to contagious diseases.  (CC ¶114).

During one of these torture sessions specific references to Christ were made.   (CC ¶115).

By the time Cormick was returned to the sleeping cells in the wee hours of August 25, 2006, the open sewers and hypothermic conditions of the critically overcrowded cells were worse given that the fluids had turned into ice on the filthy concrete floors. He was still semi-naked. (CC ¶116).

On or about 5:00 p.m. on August 28, 2006, Cormick was released pursuant to the intervention of the Australian ambassador and with full acknowledgment by the Zimbabwean Attorney General that the statements submitted by Christ in his affidavit were false. (CC ¶117). By the time of his release Cormick had been without food or drink for 60+ hours, and had been without sleep for 57 hours. (CC ¶118).

As a direct and proximate result of the actions and knowledge of Christ, Cormick has suffered (and continues to suffer): shock and nervous reaction; great fear and apprehension; post-traumatic stress disorder, manifesting itself in regular nightmares, insomnia (requiring the aid of sleeping pills), bouts of depression, and partial memory loss; double pneumonia coinciding with malaria; a broken nose, with resultant breathing difficulty; long-term impairment of hearing; long-term impairment of vision; soft tissue damage in the kidney region; inhibition from further visitation with his minor children in Zimbabwe during his access legal period, which has caused him extreme and permanent psychological damage and distress. (CC ¶119).[4]

---

[4]

Christ questions why Cormick never made mention of his torture in an affidavit submitted to a Zimbabwe court in connection with his divorce. (Christ Opening Brief ("COB") 9-10 n.2). It does not take much imagination to realize that it would not be a good idea to make a public accusation of government-sponsored torture in Zimbabwe before an arm of that same government, particularly when seeking relief from that same government on unrelated matters.

## ARGUMENT

In deciding a motion for judgment on the pleadings, the Court should keep in mind that such motions are disfavored and so courts have followed a restrictive standard in deciding them. C. Wright and A. Miller, *Federal Practice and Procedure* § 1368 (2d ed.1990).

On a motion for judgment on the pleadings, the Court must view the facts alleged and the inferences to be drawn from the pleadings in the light most favorable to Cormick as the non-moving party. Judgment on the pleadings should not be granted unless it is clearly established that no material issue of fact remains to be resolved and that Christ is entitled to judgment as a matter of law. *Shamrock Holdings, Inc. v. Arenson*, 456 F.Supp.2d 599, 604 (D. Del. 2006).[5]

As demonstrated below, Christ's arguments are all based on superficial and incorrect analyses of the applicable procedural and substantive law, along with attempts to introduce evidence outside of the pleadings, and should be rejected.

## I.  THE COUNTERCLAIM STATES A VIABLE CLAIM UNDER THE ALIEN TORT STATUTE.

The motion to dismiss the counterclaim is governed by general tort law or, more specifically, the law of tort applied under the Alien Tort Statute,  28 *U.S.C.* 1350 ("ATS"), which grants jurisdiction to the district courts for "an alien for a tort only, committed in violation of the law of nations."  Cormick is an alien alleging a tort for which Christ is liable as an accomplice, namely battery by Zimbabwean officials so egregious that it amounted to torture.  Torture is a violation of

---

[5]

For one, Christ attempts to supplement the factual record by adding citations to an affidavit he filed in connection with an earlier motion.  (COB 8, 9).  Such action is improper on a motion for judgment on the pleadings and so his affidavit should be disregarded.  *See Winokur v. Office of Court Admin.*, 190 F.Supp.2d 444, 342 (E.D.N.Y. 2002).

the law of nations and actionable under ATS. *Filartiga v. Pena-Irala*, 630 F.2d 876, 880 (2nd Cir. 1980); *Senathirajah v. I.N.S.*, 157 F.3d 210, 221 (3rd Cir. 1998). The basis of Christ's liability is "aiding and abetting" or "inducing" the commission of torture by making false accusations with the intention of and resulting in Cormick's arrest, and with knowledge or reason to know that torture was a reasonably probable consequence of the arrest.

### A.    THE ATS PERMITS CLAIMS FOR AIDING AND ABETTING.

Christ begins by making a passing comment suggesting that "aiding and abetting claims" are not allowed under the ATS. (COB13, citing *In re South African Apartheid Litig.*, 346 F.Supp.2d 538, 549-51 (S.D.N.Y. 2004)). Not only was *In re South African Apartheid Litig.* a minority decision, even within its own circuit [6], it has since been overruled by the Second Circuit, which has held that "aiding and abetting claims are viable under the ATS."*Khulumani v. Barclay Nat. Bank Ltd.*, ___ F.3d ___, 2007 WL 2985101, WL Op. at *2 (2nd Cir. Oct. 12, 2007) (per curiam) (Ex. A hereto).

---

[6]

The majority of courts that have addressed this issue recognize aiding and abetting claims under the ATS. *E.g., Almog v. Arab Bank, PLC*, 471 F.Supp.2d 257, 290-91 (E.D.N.Y. 2007); *Kiobel v. Royal Dutch Petroleum Co.*, 456 F.Supp.2d 457, 464 (S.D.N.Y. 2006);*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F.Supp.2d 633, 668 (S.D.N.Y. 2006); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 321-24 (S.D.N.Y. 2003); *In re Terrorist Attacks on September 11, 2001*, 329 F.Supp.2d 539, 565 (S.D.N.Y. 2005); *In re Agent Orange Product Liability Litig.*, 373 F.Supp.2d 7, 53 (E.D.N.Y. 2005); *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F.Supp.2d 86, 100 (D.D.C. 2006); *Mujica v. Occidental Petroleum Co.*, 381 F.Supp.2d 1164, 1173 n.6 (C.D. Cal. 2003); *Cabello v. Barreuto v. Fernandez Larios*, 205 F.Supp.2d 1325, 1333 (S.D. Fla. 2002); *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322, 1355-56 (N.D. Ga. 2002).

Indeed, the historical evidence shows that claims for aiding and abetting were specifically contemplated at the time the ATS was adopted. *Almog*, 471 F.Supp.2d at 286 n.34.

17

### B.    THE COUNTERCLAIM PLEADS SUFFICIENT FACTS TO INDICATE STATE-SPONSORED TORTURE.

Christ argues that the Counterclaim does not sufficiently allege that Cormick's incarceration and torture was at the hands of the Zimbabwe government. (COB 12-13).  Even if the Court were to indulge Christ's bizarre notion that there exists in the world privately-owned prisons and torture centers unaffiliated with any government, the Counterclaim asserts sufficient facts to permit a reasonable inference that Cormick's incarceration and torture were caused by the Zimbabwe government.

Specifically, the Counterclaim alleges that: (i) Christ made a complaint to the Zimbabwean police which was followed by Cormick's arrest, incarceration and torture (CC ¶¶96-99); (ii) Cormick's captors referred to Christ's complaint (CC ¶102); (iii) Cormick was transferred from a holding room to a prison cell by Zimbabwean officials (CC ¶105); (iv) Cormick was released with the aid of the Australian ambassador and knowledge of the Zimbabwean Attorney General. (CC ¶117).

Christ is, of course, free to argue to a jury that these are all mere coincidences.  On a motion for judgment on the pleadings, however, these allegations must be accepted as true, and these allegations are more than sufficient to permit an inference that Cormick's detention and torture were state-sponsored.

18

C.    **UNDER THE ATS IT IS SUFFICIENT FOR AIDING AND ABETTING LIABILITY TO ALLEGE THAT CHRIST KNEW THAT HIS CONDUCT WOULD ASSIST OR ENCOURAGE ZIMBABWEAN OFFICIALS TO INCARCERATE AND TORTURE CORMICK.**

Christ argues that the Counterclaim does not sufficiently allege "aiding and abetting," because Cormick does not allege that Christ either directly participated in such conduct or had the right to control the actions of the Zimbabwe police. (COB 14). Christ's superficial analysis is incorrect.

Understanding liability for aiding and abetting under the ATS law requires an examination of the sources of the concept of aiding and abetting – namely, criminal law. In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court held that the foundation of the ATS should incorporate the law of torts as it stood in 1789, when the Judiciary Act, including the ATS, was enacted. To do this, the Court turned to Blackstone, who published his monumental treatise 20 years earlier, in 1769. At that time, there was no crystallized body of law now referred to as "torts." Therefore, the Supreme Court cited Blackstone's three examples of criminal liability in violation of international law (piracy, violation of safe conduct, offenses against ambassadors). *Id.* at 715.

Since the revival of the ATS in 1980 in *Filartiga*, the models of liability include more egregious crimes against the law of nations. The standard examples are torture, genocide, and other crimes against humanity that are specific, universal, and binding" *See Sosa,* 542 U.S. at 762. All of these standard examples are subject to liability in the International Criminal Court. Thus, the courts – including the Supreme Court in *Sosa* – have unanimously endorsed the interweaving of criminal law and tort principles to properly interpret the meaning of the ATS.

The infusion of criminal law thinking is most evident in construing liability of third parties for torts committed in violation of the law of nations.  When one person induces or solicits or influences another to commit a tort, the former is treated as an aider and abetter, facilitator or accomplice of the torture, war crime, or other offense that violates the law of nations.[7]  Cormick, as the alien victim, alleges that Christ aided and abetted the commission of torture by Zimbabwean officials.  Thus, the allegation that Christ "encouraged" the Zimbabwean officials to incarcerate Cormick by providing a false complaint is an allegation of aiding and abetting, entirely appropriate in the context of the ATS, even if the concept originates in criminal law.

The leading contemporary case on aiding and abetting liability under the ATS is *Almog v. Arab Bank*, 471 F. Supp.2d 257 (E.D.N.Y 2007). A large group of Israeli victims succeeded in holding Arab Bank liable for aiding terrorists by providing financial services and making payments to the families of suicide bombers.  The court is explicit about the mental state required for aiding and abetting liability:

> The standards for aiding and abetting liability discussed above do not require that Arab Bank had the specific intent to cause the specific acts which injured plaintiffs; under the general standards of aiding and abetting liability it is sufficient that Arab Bank acted intentionally and with knowledge that its conduct would, as described below, facilitate the underlying violations when it engaged in the acts alleged.

*Id.* at 291.

Similarly, it is not necessary for Cormick to allege that Christ had the specific intent of torturing Cormick by swearing out a false warrant of arrest. It is sufficient to allege, as Cormick

---

[7]

The language of aiding and abetting comes directly from criminal law, *see* 18 *U.S.C.* §2, but the term "accomplice" is more common in the Model Penal Code and the Rome Statute.

does, that Christ knew that his conduct would assist or encourage Zimbabwean officials to incarcerate Cormick, and that Christ knew that by reason of executing the affidavit, and by reason of the political climate in Zimbabwe at the time, that it was reasonable and probable that Cormick would be subject to confinement that violated specific, universal, and obligatory international norms including but not limited to inhumane conditions as well as psychological and physical torture. (CC ¶¶172-28).[8]  In the language of *Almog* Christ acted "with knowledge that [his] conduct would facilitate the commission" of torture against Cormick. *Id.*

### D.    CORMICK HAS SUFFICIENTLY PLEADED A PROXIMATE CAUSAL CONNECTION BETWEEN CHRIST'S WRONGFUL CONDUCT AND THE ACTS OF TORTURE BY ZIMBABWEAN OFFICIALS.

Christ next argues that the Counterclaim does not allege adequately that his false statement to the Zimbabwe police was the cause of Cormick's detention. (COB 14).  Christ misconstrues the nexus required between his actions and the behavior of Zimbabwean police. Christ incorrectly insists that there must an allegation of "proximate cause" or of "control" or of "assistance." All of these verbal designations are false and without warrant in the law, and, not surprisingly, Christ cites no supporting authority.  An examination of the primary sources reveals that many forms of complicity short of "control" and "domination" are sufficient for aiding and abetting liability.  These forms include the use of the verbs "encourage" or "induce" or "facilitate" to state a cause of action for aiding and abetting the commission of torture.

Cormick does not allege, nor need he allege, that Christ controlled the commission of torture by the Zimbabwean officials.  An examination of the primary sources reveals how far Christ's brief

---

[8]

Knowledge may be averred generally.  *Fed. R. Civ. P.* 9(b).

on "causation and "control" has strayed from applicable legal principles. The *Restatement (Second) of Torts* § 876 holds that an accomplice is liable for the tort of another if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."[9]  Example 7 on page 318 is directly on point, clearly illustrating the principle of liability:

> A persuades B, who is not an officer, to arrest C for a crime which A tells B was committed by C but which he knows has not been committed by anyone.  A is subject to liability to C.[10]

The most salient feature of the *Restatement* example is that the critical verb is "persuades." There is no need to establish a strict causal relationship between the accomplice and the principal. Aiding and abetting is not causing, controlling or directing, it is providing some type of inducement or persuasion.  For example, in the *Almog* case, the banks did not control or direct the terrorists. They provided financial services, and that was sufficient for liability.

This analysis is convincingly supported by the primary sources of criminal law and international criminal law on the liability of accomplices. The Model Penal Code defines an accomplice as someone who " (a) with the purpose of promoting or facilitating the commission of the offense, . . . (i) solicits such other person to commit it;  or  (ii) aids or agrees or attempts to aid

---

[9]

The *Restatement (Second) of Torts* is a source used by federal courts in analyzing ATS claims. *See Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2007 WL 2349336, WL Op. at *6, Illston, J. (N.D. Cal. Aug. 14, 2007) (Ex. B hereto).

[10]

The *Restatement* is concerned that, in this example, both the principal and the accomplice were held liable for "acting in concert."  That is why the drafter mentioned that B is "not an officer." If B were an officer, he may have had a reasonable claim of immunity in relying on A's tip.  This is not important for Cormick's purposes, as he is not seeking to impose liability against the Zimbabwean officials.

such other person in planning or committing it." *Model Penal Code* §2.06(3) (Official Draft 1962). The operative language here is facilitating the offense by soliciting someone to do it by aiding or attempting to aid the commission of the offense.  The Model Penal Code also supports the conclusion in the *Almog* case that plaintiffs in ATS cases need not allege a specific intent to bring about a violation of the law of nations.  It is sufficient that the aider and abettor act "with the purpose of promoting or facilitating the commission of the offense."  This was an appropriate allegation against Arab Bank for facilitating terrorism and it is  an appropriate allegation against Christ for facilitating the arrest, detention and torture of Cormick.

The Rome Statute defining liability in the International Criminal Court[11], operative since July 2002, demonstrates that the same norms of aiding and abetting apply to international law.[12] The Rome Statute imposes criminal responsibility on anyone who "orders, solicits or induces the commission of such a crime which in fact occurs or is attempted."  Article 25(3)(b).

The most important verb used in the Rome Statute is "induces."  The substance of Cormick's allegations that Christ induced the Zimbabwean police to arrest Cormick and to impose the harshest of measures, which amounted to torture that  were, according to the allegations of the counterclaim, imposed on many other individuals subject to detention.

---

[11]

*See* http://www.un.org/law/icc/index.html (website of the Rome Statute of the International Criminal Court).

[12]

Although the United States has not ratified the Rome Statute, the policy of the State Department is to support prosecution in the ICC for egregious violations of human rights.  That was the reason the United States accepted the decision of the Security Council to initiate prosecution for genocide in Darfur.  *See* George P. Fletcher and Jens David Ohlin, "*Reclaiming Fundamental Principles of Criminal Law in the Darfur Case*," 3 J. of Int. Crim. Justice 539 (2005).

### E.    CHRIST'S AUTHORITIES ARE NOT APPLICABLE TO THIS CASE.

In his opening brief, Christ refers to a number of cases that have no bearing on this case. These are cases in which the plaintiff victim sues a corporation for having supplied the materials by someone else used in committing an offense against the law of nations. *See In re Agent Orange Product Liability Litigation*, 373 F. Supp.2d 7 (E.D.N.Y. 2005); *Corrie v. Caterpillar, Inc.*, 403 F. Supp.2d 1019 (W.D. Wash. 2005); *In re South African Apartheid Litigation*, 238 F. Supp.2d 1379 (JPML 2002).

In these cases the defendants can sometimes convincingly argue that merely supplying the means of violating international law is not sufficient for aiding and abetting liability. Their argument is that they are simply engaged in selling their product in the ordinary course of business and therefore they do not incur liability if their product is misused by the purchaser. This argument was effective in the *Agent Orange* and *Caterpillar* cases. It is totally irrelevant in the present action. There is no sense whatever in which Christ was engaged in the ordinary course of selling his product. Christ went out of his way to impose egregious and painful consequences on Cormick purely as an expression of malice and personal animosity.

The burden on Christ is higher than on the companies playing their trade in cases such as *Agent Orange* or *Caterpillar* or *Khulumani*. In those cases, the law recognizes the intrinsic value of commerce and so would impose criminal burdens on commercial activity only when it is performed with knowledge that the purchasers of the service or product would use it to engage in violations of established norms of international law. The law does not recognize any value in abusing its processes in order to further a private feud with a former business associate turned hunted enemy. There is no social value in Christ's invoking the terror of the Zimbabwe police against Cormick.

*                    *                         *

Christ's argument on this motion, at its core, is that it is impossible to believe that he would intentionally submit false information to the Zimbabwe police, or to know that Cormick's arrest would result in torture. (COB 15). This, however, is an argument that should be made to a jury at trial upon the evidence, not to the Court on a motion for judgment on the pleadings, which are to be accepted as true.[13]

## II.     THE COUNTERCLAIM STATES A VIABLE CLAIM FOR FALSE IMPRISONMENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

As noted earlier, the burden is on Christ to demonstrate that there is no material issue of fact to be resolved and that he is entitled to judgment as a matter of law. *Shamrock Holdings, Inc.*, 456 F.Supp.2d at 604. Thus, the burden was on Christ to establish that the facts alleged did not state a claim under Zimbabwean law (the law which the parties stipulated applied to these claims).

As demonstrated herein, Christ has attempted improperly to refute the alleged facts with unauthenticated documents beyond the Complaint and has failed to demonstrate that the claims are not cognizable under Zimbabwe law (which the parties agree applies to these claims). As such, his arguments should be rejected.

---

[13]

At trial, Cormick will introduce e-mail from Christ (before the dispute arose) encouraging Cormick to flee Zimbabwe because of the danger, and will testify that he and Christ had discussed the dangers.

To the extent that Christ asks this Court to find it impossible to believe that he could submit false information to the Zimbabwean police, Cormick repeats an invitation to Christ he made (through counsel) in earlier correspondence: travel to Zimbabwe and speak with the police. It is Cormick's understanding that the Zimbabwe police are interested in having a little chat with Christ about his submissions to them. To no one's surprise, Christ has thus far declined the invitation.

**A.      ZIMBABWE LAW RECOGNIZES TORT CLAIMS ARISING FROM WRONGFUL ARREST, IMPRISONMENT AND LEGAL PROCEEDINGS.**

Christ first states that "[c]ounsel for Mr. Christ has been advised by counsel in Zimbabwe, however, that Zimbabwean law does not recognize these torts *per se*." (COB 16).  Of course, an unsworn hearsay statement by an unnamed third party is not proper or worthy of credit.

Zimbabwe applies Dutch-Roman law. Note, "*Conflict Between State Legal Norms and Norms Underlying Popular Belief: Witchcraft in Africa as a Case Study*," 14 Duke J. Of Comparative Law 351 (2004).  Tort law in Dutch-Roman law is referred to as the law of "delict." *Id.*  Zimbabwe law recognizes the delict of unlawful arrest and imprisonment, as well as abuse of legal proceedings. G. Feltoe, *A Guide to the Zimbabwe Law of Delict* 56-57 (3rd ed. 2001) (Ex. C. hereto).  Of course, the label applied to a cause of action in irrelevant.  What matters is whether the facts alleged permit recovery under the applicable law.  *In re Motel 6 Sec. Litig.*, No. 93 Civ 2183 JFK, 2000 WL 322782, WL Op. at *7, Keenan, J. (S.D.N.Y. Mar. 28, 2000) (Ex. D hereto).

Zimbabwe law allows recovery where a private party improperly procures the arrest of another by the police.  *A Guide to the Zimbabwe Law of Delict* at 57.  As such, the question on this motion is whether Christ can definitively establish that Cormick is not entitled to recover under the pleaded facts.  The answer is that he cannot.

**B.      CHRIST HAS FAILED TO ESTABLISH AS A MATTER OF ZIMBABWE LAW THAT THERE IS NO LIABILITY FOR HIS KNOWINGLY MAKING FALSE STATEMENTS TO THE POLICE, WITH MALICE, WHICH PROCURED THE ARREST AND TORTURE OF CORMICK.**

Christ argues that there is no liability under Zimbabwe law simply for making factual statements to the police which result in an arrest. (COB 16-17, citing *Bando v. Muchinguri*, 1999

26

Z.L.R. 476 (High Court, Bulawayo)).  However, for *Bando* to apply, (i) there must be statements of fact without making a direct charge of a crime, and (ii) the facts provided must be true.  *Id.* at 484.

The counterclaim alleges that Christ knowingly made material false statements to the Zimbabwe police with the intent of getting Cormick arrested. (CC ¶131).[14]  Christ told the Zimbabwe police that Cormick had eluded the law in Europe, South Africa and the United States, and should be brought to justice. (CC ¶97).  This was not a true statement of objective fact, as Cormick was not a fugitive from any nation.  It was a knowing lie.  Moreover, Christ did not provide any background facts to support his claim (as there were none).  As this was nothing more than a conclusory accusation that Cormick was an international fugitive, *Bando* does not apply to this case.

The Counterclaim further alleges that (a) Christ knew or should have known that his statement to the Zimbabwean police would encourage them to arrest Cormick (and indeed, what other purpose was there for his providing the statement to them), and (b) Christ knew or should have known that an arrest in Zimbabwe could result in torture.  (CC ¶¶98-99). Cormick also alleges that Christ's misrepresentations lacked probable cause, were made with malice, and resulted in Cormick being arrested and tortured. (CC ¶¶131-34).  As such, causation, malice and all other necessary elements have been clearly pleaded.[15] and Christ has failed to establish that Cormick is not entitled to recover under these facts and under Zimbabwe law.[16]

---

[14]

Knowledge may be averred generally.  *Fed. R. Civ. P.* 9(b).

[15]

Malice may be averred generally.  *Fed. R. Civ. P.* 9(b).

[16]

Christ's citation to the *Restatement (Second) of Torts* (1965) is irrelevant in the absence of some evidence that the *Restatement* is applied in Zimbabwe (as opposed to international law ATS
(continued...)

### C.    THE COURT SHOULD DISREGARD AND STRIKE FROM THE RECORD THE AFFIDAVIT SUBMITTED BY CHRIST.

Christ attached to his motion at Exhibit B a document which he identifies in his brief as the affidavit he submitted to the Zimbabwe police, and notes that it is dated September 6, 2006, post-dating Cormick's arrest.  Christ claims that Court may consider the affidavit because it was referred to in Cormick's counterclaim. (COB 14-15 & n.15).  This is incorrect, and Cormick moves to strike this affidavit from the record on this motion.

Christ submits the affidavit without any supporting affidavit authenticating it.  More importantly, Christ does not offer an affidavit swearing that this was the *only* statement he gave to the Zimbabwe police, either directly or through a lawyer or other intermediary.  The Counterclaim alleges that, after arrest and during incarceration, Cormick was advised of Christ's statement to the police. (CC ¶102).  In Cormick's declaration, submitted herewith as Exhibit E in support of his motion to strike Christ's affidavit, Cormick fleshes out the allegation by stating that he, his Zimbabwe lawyer and others saw the statement from Christ. (Ex. E ¶¶3-5).[17]

Additionally and importantly, the fax cover page that is part of Christ's exhibit was not referred to in the Counterclaim, and so may not be considered on this motion.

_____

[16](...continued)
claims).  In any event, Christ's argument that there are no allegations that Christ knew his actions would result in Cormick's arrest is frivolous, as such knowledge is expressly averred in the counterclaim. (CC ¶133). Even without such an allegation, Christ has failed to suggest a credible alternate reason why he would make such unsolicited accusations about Cormick to the police.

[17]

Cormick asked Christ in discovery to produce all documents submitted to the Zimbabwe police.  Christ thus far has produced only the affidavit he submitted with his brief, which he produced to Cormick's counsel only the day before he filed his opening brief.  Christ has not explained his failure to produce the other documents.

Thus, it is clear that the affidavit Christ has submitted to this Court is not the statement he submitted to the Zimbabwe police which induced the police to arrest Cormick.  At best, there is a factual dispute, and, at least for the purposes of this motion, the Court should decline to accept Christ's representation that the affidavit he submitted is the one in question.

**D.**    **CHRIST HAS FAILED TO ESTABLISH THAT ZIMBABWE DOES NOT OR WOULD NOT RECOGNIZE A CLAIM FOR INFLICT OF EMOTIONAL DISTRESS.**

Christ's argument is that the Counterclaim for infliction of emotional distress fails to meet the test of the *Restatement (Second) of Torts* §46, as Cormick supposedly failed to allege an intentional act that proximately caused emotional distress to Cormick. (COB 18).  Again, there is no evidence that Zimbabwe law follows the *Restatement.*

Apart from that, Christ ignores that fact that the Counterclaim alleges that (i) Christ made knowingly false statements to the Zimbabwe police (CC ¶¶96-97, 131), which (ii) caused the police to capture and torture Cormick (CC ¶134), and that Christ knew or should have known that arrest by the Zimbabwean police includes a risk of torture.  (CC ¶¶98-99).   Although Christ argues that the allegation that Cormick "knew or should have known" of the risk of torture is insufficient (COB 18), he is overruled by Federal Rule of Civil Procedure 9(b). *Zimring v. Halley*,  C.A. No. 85 C 7094, 1986 WL 2621, WL Op. at *2, Hart, J. (N.D. Ill. Feb. 20, 1986) (allegation that defendant "knew or should have known" sufficient for pleading emotional distress claim) (Ex. F hereto).

As such, the allegations are more than adequate to defeat Christ's motion for judgment on the pleadings.

## III.    THE COUNTERCLAIM ADEQUATELY PLEADS DAMAGES FOR THE DEFAMATION CLAIM.

Christ argues that the defamation claim fails because it does not demonstrate that Cormick suffered actual pecuniary damages as a result of Christ's worldwide Internet defamation.  Christ points to affidavits filed in Cormick's Zimbabwean divorce proceedings in 2005-2006, indicating that he is impecunious (thanks to Christ's efforts).[18]  This argument reveals Christ's lack of understanding of defamation law.

The measure of damages is a substantive matter to be determined according to the governing law.  *Culley v. Pennsylvania R. Co.*, 244 F.Supp. 710, 714 (D. Del. 1965).  The sufficiency of Cormick's pleading, however, is a procedural issue governed by U.S. law.  *Guillen v. Kuykendall*, 470 F.2d 745, 747 (5th Cir. 1972); *Smith v. Shaffer Stones Co.*, 28 F.R.D. 308, 310-11 (E.D. Pa. 1961).

The parties have previously briefed their positions as to what substantive law applies to the defamation claim – Cormick maintains that South African law applies, and Christ asks the Court to apply Delaware law. (D. I. 52-54).  As to the measure of damages, however, the law is the same (unlike other potential issues such as burden of proof, truth and malice).

---

[18]

Christ claims that the affidavit was filed "months *before* Mr. Christ began publishing his Website...." (COB 19).  The date that Christ began publishing his website is not alleged in the Counterclaim, and so Christ is once again attempting improperly to introduce facts outside the Counterclaim.  Christ's statement, therefore, to the extent it is relevant to the resolution of this issue, should be ignored.

Additionally, Christ does not offer any authority for taking judicial notice of records from courts of foreign nations.

"The approach in South Africa is that in all situations of defamation general damages will be presumed." Jonathan M. Burchell, *The Law of Defamation in South Africa* 144 (Juta & Co, Ltd. 1985).[19] (Ex. G hereto). *See also Feni v. Kondzani*, (508/2006) [2007] ZAECHC 15 at 10 (South Africa High Court - Eastern Cape, Mar. 8, 2007) ("[g]eneral damages for sentimental loss will be presumed to flow from the publication of defamatory matter referring to the plaintiff")(*quoting* Jonathan M. Burchell, *Personality Rights and Freedom of Expression* 204 (Juta & Co., Ltd. 1998)). (Ex. H hereto).

Similarly, under Delaware law, general damages for defamation are presumed. *MacDonough v. A.S. Beck Shoe Corp.*, 10 A.2d 510, 514 (Del. Super. 1939); *Marcus v. Funk*, C.A. No. 87C-SE-26-1-CV, 1993 WL 141864, WL Op. at *1, Quillen, J. (Del. Super. Apr. 21, 1993) (Ex. I hereto).[20] As such, if Cormick establishes defamation, the jury will be allowed to award general damages for injury to his reputation under the law of either jurisdiction..

Under federal pleading standards, a plaintiff need not plead general damages beyond a general claim for relief. *Ores v. Willow West Condominium Ass'n*, No. 94C 4717, 1996 WL 111894, WL Op. at *5, Manning, J. (N.D. Ill, Mar. 12, 1996) (Ex. J hereto). *See also Huyler's v. Ritz-Carlton*

---

[19]

Christ cites to *Independent Newspaper Holdings Ltd. v. Suliman*, [2004] ZASCA 56 (South African Supreme Court of Appeal, May 28, 2004). This post-trial decision, however, does not stand for the proposition that, under South African law, a party must plead and prove pecuniary loss to recover damages. To the contrary, the Court stated, at paragraph 32, that the plaintiff suffers damage by virtue of the defamatory publication, and, at paragraph 64, awarded general damages for injury to reputation without any indication of specific proof.

[20]

Christ relies on a footnote in a dissenting opinion in *Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1192 n.16 (Del. 2000) (Chandler, C., dissenting), which suggests that damages is an element of a claim for defamation. (COB 18). However, this element is satisfied upon a finding of defamation. *See Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978) ("[t]he general rule is that any publication which is libelous on its face is actionable without pleading or proof of special damages").

*Restaurant Co. Of Atlantic City*, 6 F.2d 404, 406 (D. Del. 1925) (general damages are presumed while special damages must be pleaded and proven). *Cf. D. Del. Local R.* 9.4(a) ("[a] pleading which sets forth a claim for relief in the nature of unliquidated money damages shall state in the ad damnum clause a demand specifying the nature of the damages claimed, *e.g.*, 'compensatory,' 'punitive," or both, but shall not claim any specified sum").

Cormick has stated a claim for defamation (a point which Christ has implicitly conceded by failing to challenge the legal sufficiency of the claim). In the ad damnum clause of the counterclaim, he requests compensatory and punitive damages. If he otherwise establishes his claim, Cormick will be entitled to general compensatory damages for injury to his reputation in such amount as the jury may determine. Therefore, the fact that, at the time of his divorce, he was impecunious (thanks to Christ's own maneuvering which destroyed any hope of launching Elan Suisse) has nothing to do with Cormick's reputation, or his right to recover for the damage done to it.

Additionally and above that, Cormick alleged that Christ's defamatory comments damaged Cormick's ability to earn a living, and precluded Elan Suisse from operating and earning revenue. (CC ¶¶142-43). This is sufficient to meet the liberal pleading requirement of Fed. R. Civ. P. 8. *See Wright v. Pepsi Cola Co.*, 243 F.Supp.2d 117, 125 (D. Del. 2003) (mere allegation that plaintiff suffered economic loss was sufficient in defamation claim).

Finally, Christ claims that Elan Suisse, Ltd. should not be permitted to prosecute its claims because it has filed an document in England to have it dissolved. Apart from the fact that Christ again improperly attempts to introduce documents outside the Counterclaim, he demonstrates a lack of candor by failing to inform the Court that he filed an objection to such dissolution, which resulted in a suspension of dissolution proceedings, and boasted of same on his website. (Ex. K). Thus, there

is no evidence in the record that Elan Suisse has dissolved. If Elan Suisse does ever dissolve, Christ

can then file a motion for summary judgment.  On a motion for judgment on the pleadings, however,

such argument is improper, and should be rejected.

**IV.    <u>THE LANHAM ACT CLAIMS.</u>**

Elan Suisse Ltd. withdraws its claims under the Lanham Act.

33

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Brett J. Cormick, Elan Suisse International Holdings (USA), LLC and Elan Suisse Ltd. respectfully request that this Court deny Robert D. Christ's motion for judgment on the pleadings.

Dated: October 30, 2007

Respectfully submitted,

 /s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for defendants/counterclaim plaintiffs Brett J. Cormick and Elan Suisse International Holdings (USA), LLC and plaintiff Elan Suisse Ltd.

Of counsel:

Prof. George P. Fletcher
Columbia University School of Law
435 W. 116th St., Room 616
New York, NY 10027
(212) 854-2467

Lawrence H. Brenner, Esq.
300 Market St., Ste. 130
Box 47
Chapel Hill, NC 27516
(919) 929-5597



--- F.3d ----                                                                                      Page 1

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Khulumani v. Barclay Nat. Bank Ltd.
C.A.2 (N.Y.),2007.
Only the Westlaw citation is currently available.
United States Court of Appeals,Second Circuit.
Sakwe Balintulo KHULUMANI, as personal
representative of Saba Balintulo, Fanekaya Dabula,
as personal representative of Lungile Dabula,
Nokitsikaye Violet Dakuse, as personal
representative of Tozi Skweyiya, Berlina Duda, as
personal representative of Donald Duda, Mark
Fransch, as personal representative of Anton
Fransch, Sherif Mzwandile Gekiso, as personal
representative of Ntombizodwa Annestina
Nyongwana, Elsi Guga, as personal representative
of James Guga, Joyce Hlophe, as personal
representative of Jeffrey Hlophe, Nomvula Eunice
Kama, as personal representative of Mncedisi
Dlokova, Joyce Ledwaba, as personal
representative of Samuel Ledwaba, Johana Lerutla,
as personal representative of Matthews Lerutla,
Frieda Z. Lukhulei, as personal representative of
Tokkie Lukhulei, Elizabeth Maake, as personal
representative of Jackson Maake, Architon
Madondo, as personal representative of Mandla
Madondo, Benjamin Maifadi, Tshemi Makedama,
as personal representative of Lugile Makedama,
MABEL MAKUPE, as personal representative of
Andrew Makupe, Mabel Malobola, as personal
representative of Malobola Mbuso, Evelyn Matiso,
as personal representative of Pitsi Matiso, Betty
Mgidi, as personal representative of Jeffrey Mgidi,
Elizabeth Mkhonwana, as personal representative of
Obed Mkhonwana, Catherine Mlangeni, as personal
representative of Bheki Mlangeni, Cecil Mlanjeni,
as personal representative of Kele Mlanjeni, Samuel
Morudu, as personal representative of Sannah P.
Leslie, Tshidiso Motasi, as personal representative
of John and Penelope Moloke, Willie Nelani, as
personal representative of Mongezi Nelani,
Catherine Ngqulunga, as personal representative of
Brian Ngqulunga, Catherine Phiri, as personal
representative of Thomas Phiri, Elizabeth Sefolo, as
personal representative of Harold Sefolo, Maria

Sibaya, as personal representative of Jeffrey Sibaya,
Patricial M. Songo, as personal representative of
Dipulo Songo, Mpolontsi Tyote, as personal
representative of Boyboy Tyote, Nomkhango
Skolweni Dyantyi, Clifford Zixelile Fudukile,
Windovoel Gaaje, Charles Hlatshwayo, Moses
Hlongwane, Lesiba Kekana, Sanaki Mahlatshi,
Robert Makana, Zakharia Fikile Mamba, Elliot
Sithembiso Marenene, Alfred Masemola, Maureen
Thandi Mazibuko, Michael Mbele, Laetitia
Nombambo Mfecane, as personal representative of
Rubin Mfecane, Dennis Mlandeli, Tefo Mofokeng,
Motlaletsatsi Molatedi, Azariel Molebeleli, Simon
Molotsi, Lina Moreane, as personal representative
of Albert Xaba, Thabiso Samuel Motsie, Sonto
Ndlovu, Mangindiva Robert Rhenene, Thobile
Sikani, Bubele Stefane, Noluthando Biletile, Leslie
Mncedisi Botya, Leon Dukasche, Elsie Gishi,
Dorthia Gomo-Pefile, Zamikhaya Bishop Khali,
James Magabana, Nosipho Manquba, Notathu
Eugenia Matomela, Nomisa Thersia May,
Mbongeni Nelson Mbeshu, Mzuhlangena Nama,
Elias Ngamani, as personal representative of
Elizabeth Nagamani, Geshia Ngoxza, Lucas
Ndukwayibuzwa Ngwenyana, Wellinton Mtyukato
Nkosiphendule, Vuyani Nongcama, Sindiswa
Mirriam Nunu, Thulani Nunu, Boniwe Phalaza,
Pathiswa Pringane, as personal representative of
Mthozama Theophilus Pringane, Mthutuzeli Sikani,
Noluthando Siletile, Thembeka Victoria Siphaho,
Johannes Titus, Mpolontsi Tyotes, Mthuzimele
Meford Yamile, Ntunani William Zenani, Thandiwe
Shezi, Elias B. Boneng, Dennis Vincent Frederick
Brutus, Moraloki A. Kgobe, Reuben Mphela,
Lulamile Ralrala, Plaintiffs-Appellants,
v.
BARCLAY NATIONAL BANK LTD., British
Petroleum, PLC, Chevrontexaco Corporation,
Chevrontexaco Global Energy, Inc., Citigroup, Inc.,
Commerzbank, Credit Suisse Group,
Daimlerchrysler AG, Deutsche Bank AG, Dresdner
Bank AG, Exxonmobil Corporation, Ford Motor
Company, Fujitsu, Ltd., General Motors
Corporations, International Business Machines

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 2

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Corp., J.P. Morgan Chase, Shell Oil Company, and UBS AG, Defendants-Appellees,
AEG Daimler-Benz Industrie, Fluor Corporation, Rheinmetall Group AG, Rio Tinto PLC, Total-Fina-ELF and Doe Corporations, Defendants.
Lungisile Ntsebeza,[FN*] Hermina Digwamaje, Andile Mfingwana, F.J. Dlevu, Lwazi Pumelela Kubukeli, Frank Brown, Sylvia Brown, Nyameka Goniwe, Sigqibo Mpendulo, Dorothy Molefi, Themba Mequbela, Lobisa Irene Digwamaje, Kaelo Digwamaje, Lindiwe Petunia Leinana, Matshidiso Sylvia Leinana, Kelebogile Prudence Leinana, David Motsumi, Sarah Nkadimeng, Moeketsi Thejane, Moshoeshoe Thejane, Pascalinah Bookie Phoofolo, Khobotle Phoofolo, Gladys Mokgoro, Jongani Hutchingson, Sefuba Sidzumo, Gobusamang Laurence Lebotso, Edward Thapelo Tshimako, Rahaba Mokgothu, Jonathan Makhudu Lediga, Anna Lebese, Sipho Stanley Lebese, William Nbobeni, John Lucas Ngobeni, Clement Hlongwane and Masegale Monnapula, Plaintiffs-Appellants,
Sakwe Balintulo Khulumani, P.J. Olayi, Wellington Baninzi Gamagu, Violations of Pass Laws, unlawful detention 1981-1983, torture subjected to discriminatory labor practices 1981 and William H. Durham, Plaintiffs,
v.
Daimler Chrysler Corporation, National Westminster Bank PLC, Colgate Palmolive, Barclays Bank PLC, UBS AG, Citigroup Inc., Deutsche Bank AG, Dresdner Bank AG, Commerzbank AG, Ford Motor Company, Holcim, Inc., Exxon Mobil Corporation, Shell Oil Company, J .P. Morgan, Minnesota Mining and Manufacturing Co. (3M Co.), General Electric Company, Bristol-Meyers Squibb Co., E.I. Dupont de Nemours, Xerox Corporation, IBM, General Motors, Honeywell International, Inc ., Bank of America, N.A., The Dow Chemical Company, Coca-Cola Co., Credit Agricole S.A., Hewlett-Packard Company, Emschemie (North America) Inc., Chevron Texaco Corporation, American Isuzu Motors, Inc. and Nestle USA, Inc., Defendants-Appellees,
Sulzer AG, Schindler Holding AG, Anglo-American Corporation, Debeers Corporation, Novartis AG, Banque Indo Suez, Credit Lyonnais, and Unknown officers and directors of Danu International, Standard Chartered, P.L.C., Corporate Does, Credit Suisse Group, Citigroup AG, Securities Inc., as successor to Morgan Guaranty, Manufacturers Hannover, Chemical Bank & Chase Manhattan Bank, Unisys Corporation, Sperry Corporation, Burroughs Corporation, ICL, Ltd., Amdahl Corp., Computer Companies, John Doe Corporation, Holcin, Ltd., Henry Blodget, Justin Baldauf, Kristen Campbell, Virginia Syer Genereux, Sofia Ghachem, Thomas Mazzucco, Edward McCabe, Deepak RAJ, John 1-10 Doe, Oerlikon Contraves AG, Oerlikon Buhrle AG, Corporate Does 1-100, Royal Dutch Petroleum Co., Shell Transport & Trading Company PLC and Shell Petroleum, Inc., Merrill Lynch & Co. Inc., Kenneth Seymour, Defendants.
**Nos. 05-2141-cv, 05-2326-cv.**

Argued Jan. 24, 2006.
Decided Oct. 12, 2007.

**Background:** Actions were brought by three groups of plaintiffs on behalf of individuals allegedly injured by practice of apartheid in South Africa, alleging, inter alia, violations of international law, the Alien Tort Claims Act (ATCA), and the Torture Victim Protection Act (TVPA) by multinational corporations that did business in South Africa. Following transfer of the actions for coordinated pre-trial proceedings, corporations moved to dismiss. The United States District Court for the Southern District of New York, 346 F.Supp.2d 538,Sprizzo, J., dismissed, and plaintiffs appealed.

**Holdings:** The Court of Appeals held that:

(1) allegations that corporations aided and abetted regime which committed torture and extrajudicial killing failed to state claim under TVPA, but

(2) plaintiff may plead theory of aiding and abetting liability under Alien Tort Claims Act (ATCA).

Affirmed in part, vacated in part, and remanded.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 3

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Katzmann, Circuit Judge, filed concurring opinion.

Hall, Circuit Judge, filed concurring opinion.

Korman, United States District Judge sitting by designation, filed opinion concurring in part and dissenting in part.

**[1] Aliens, Immigration, and Citizenship 24☞767**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
      24k767 k. Torture Victim Protection. Most Cited Cases
Absent any link between certain multinational corporations which did business in South Africa during period when apartheid was practiced in that country, and state aid or the conduct of state officials, allegations, in action on behalf of individuals allegedly damaged by the practice of apartheid in South Africa, that those corporations aided and abetted regime which committed torture and extrajudicial killing, failed to state claim under Torture Victim Protection Act (TVPA); TVPA did not create liability for private actors not acting under color of law. Torture Victim Protection Act of 1991, § 1 et seq., 28 U.S.C.A. § 1350 note § 2(a).

**[2] Aliens, Immigration, and Citizenship 24☞767**

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
      24k767 k. Torture Victim Protection. Most Cited Cases
For purposes of the Torture Victim Protection Act (TVPA), an individual acts under color of law when he acts together with state officials or with significant state aid. Torture Victim Protection Act of 1991, § 1 et seq., 28 U.S.C.A. § 1350 note § 2(a).

**[3] Aliens, Immigration, and Citizenship 24☞**

765

24 Aliens, Immigration, and Citizenship
    24IX Alien Tort Claims
      24k765 k. Persons Liable; State Action. Most Cited Cases
A plaintiff may plead a theory of aiding and abetting liability under the Alien Tort Claims Act (ATCA). 28 U.S.C.A. § 1350.

**[4] Federal Civil Procedure 170A ☞840**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
      170AVII(E) Amendments
        170Ak839 Complaint
          170Ak840 k. Time for Amendment. Most Cited Cases
District court did not abuse its discretion, in action alleging that multinational corporations that did business in South Africa during period when apartheid was practiced in that country violated the Torture Victim Protection Act (TVPA), by denying motion to amend complaint; plaintiffs had previously amended their complaint twice, and they did not bring subsequent motion to amend until after dismissal of the case. Torture Victim Protection Act of 1991, § 1 et seq., 28 U.S.C.A. § 1350 note.

Appeal from a judgment of the United States District Court for the Southern District of New York (Sprizzo, J.), dismissing, *inter alia,* plaintiffs-appellants' claims under the Alien Tort Claims Act ("ATCA") and the Torture Victim Protection Act ("TVPA"). We affirm the district court's dismissal of the TVPA claims. We vacate that portion of the district court's judgment dismissing the plaintiffs' ATCA claims, as well as the district court's denial of the Digwamaje, and Ntsebeza motions to amend, and remand for further proceedings consistent with this opinion. Judge KATZMANN files a separate concurring opinion. Judge HALL files a separate concurring opinion. Judge KORMAN files a separate opinion, concurring in part II and dissenting from parts III, IV, and V of the per curiam opinion. Affirmed in part, vacated in part, and remanded.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 4

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for Khulumani Plaintiffs-Appellants.
Paul L. Hoffman, Schonbrun DeSimone Seplow Harris, & Hoffman LLP, Venice, CA, for Ntsebeza & Digwamaje Plaintiffs-Appellants.
Francis P. Barron, Cravath, Swaine & Moore LLP, New York, NY, for Defendants-Appellees.
Robert M. Loeb, United States Department of Justice, Washington, D.C., for Amicus Curiae United States of America.[FN**]

Before KATZMANN and HALL, Circuit Judges, and KORMAN, District Judge.[FN***]PER CURIAM.

*1 The plaintiffs in this action bring claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 (" ATCA"), against approximately fifty corporate defendants and hundreds of "corporate Does." The plaintiffs argue that these defendants actively and willingly collaborated with the government of South Africa in maintaining a repressive, racially based system known as "apartheid," which restricted the majority black African population in all areas of life while providing benefits for the minority white population.

Three groups of plaintiffs filed ten separate actions in multiple federal district courts asserting these apartheid-related claims. *See In re S.African Apartheid Litig.,* 346 F.Supp.2d 538, 542 (S.D.N.Y.2004). One group, the Khulumani Plaintiffs, filed a complaint against twenty-three domestic and foreign corporations, charging them with various violations of international law.[FN1]The other two groups, the Ntsebeza and Digwamaje Plaintiffs, brought class action claims on behalf of the "victims of the apartheid related atrocities, human rights' violations, crimes against humanity and unfair [and] discriminatory forced labor practices."The Digwamaje Plaintiffs also brought claims under the Torture Victim Protection Act of 1991, Pub.L. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note ("TVPA"), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO").

In August 2002, the Ntsebeza Plaintiffs filed a motion with the Judicial Panel on Multidistrict Litigation ("MDL Panel") to transfer all of the actions to the Southern District of New York, and in December 2002, the MDL Panel ordered that transfer for coordinated pre-trial proceedings. *See In re S. African Apartheid Litig.,* 238 F.Supp.2d 1379, 1380-81 (J.P.M.L.2002). In July 2003, thirty-one of the fifty-five defendants in the Ntsebeza and Digwamaje actions filed a joint motion to dismiss. Following the transfer of the Khulumani complaint to the Southern District of New York, eighteen of the twenty-three defendants in that action also filed a joint motion to dismiss. [FN2]

Later that month, Penuell Mpapa Maduna, who was then the Minister of Justice and Constitutional Development for South Africa, submitted an *ex parte* declaration to the district court, stating that the South African government "regarded these proceedings as interfering "with a foreign sovereign's efforts to address matters in which it has the predominant interest" and asking that the proceedings be dismissed.[FN3]After receiving the South African declaration, the district court, *sua sponte,* solicited the views of the United States Department of State.[FN4]The State Department responded by submitting a "Statement of Interest" asserting that "continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States."

Ruling on the defendants' motions to dismiss, the district court held that the plaintiffs failed to establish subject matter jurisdiction under the ATCA. The district court ruled further that the plaintiffs, having asserted diversity as an alternate basis for jurisdiction, could not establish subject matter jurisdiction on that ground. The district court also held that the plaintiffs failed to state a claim under the TVPA and failed to establish subject matter jurisdiction under RICO. *See In re S. African Apartheid Litig.,* 346 F.Supp.2d at 554-57. The district court therefore dismissed the plaintiffs' complaints in their entirety. *See id.* at 557.In March 2005, the Ntsebeza and Digwamaje Plaintiffs moved for permission to file an amended

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                           Page 5

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

consolidated complaint,[FN5] which the district court denied. *See* Part IV, *infra.*Following the district court's issuance of an amended judgment containing an amended Rule 54(b) certification, the plaintiffs filed timely notices of appeal.[FN6]

**\*2** [1][2] All members of the panel join to affirm the district court's dismissal of the Digwamaje Plaintiffs' TVPA claims. The Digwamaje Plaintiffs asserted a claim under the TVPA, alleging that the defendants "aided and abetted the apartheid regime's subjecting the Plaintiffs to torture and extrajudicial killing within the meaning of the Torture Victim Protection Act ... under actual or apparent authority, or under color of law."The TVPA provides:
An individual who, under actual or apparent authority, or color of law, of any foreign nation-
(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a). For purposes of the TVPA, an individual "acts under color of law ... when he acts together with state officials or with significant state aid."*Kadic v. Karadzic,* 70 F.3d 232, 245 (2d Cir.1995). The Digwamaje Plaintiffs, although twice having amended their complaint, failed to link any defendants to state aid or the conduct of state officials.

Further, based on the district court's discussion of the matter of diversity jurisdiction, we affirm the dismissal of the complaints insofar as they seek to assert jurisdiction under 28 U.S.C. § 1332(a)(3).

[3] Two members of this panel join to vacate the district court's dismissal of the plaintiffs' ATCA claims because the district court erred in holding

that aiding and abetting violations of customary international law cannot provide a basis for ATCA jurisdiction. We hold that in this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATCA. The respective rationales of Judges Katzmann and Hall are set forth in separate concurring opinions.

We further vacate the district court's order denying plaintiffs' motion for leave to amend. In denying this motion, the district court relied, in part, on the erroneous premise that subject matter jurisdiction did not inhere and reasoned that any additional amendments to the pleadings would be futile. Because the denial of the motion rested, in part, on this erroneous premise, we vacate that order. *See Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 177 (2d Cir.2006) ("The standard for reviewing the denial of a motion to amend a complaint is abuse of discretion ...." (internal quotation marks omitted)); *see also Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001) ("A district court 'abuses' or 'exceeds' the discretion accorded to it when ... its decision rests on an error of law (such as application of the wrong legal principle)....").[FN7] Until the district court has an opportunity to rule on the motion to amend, we cannot be sure that the pleadings in the record before us represent the final version of the plaintiffs' allegations. We therefore decline to determine whether the plaintiffs have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA and remand to the district court to allow it to address the pleadings after amendment as may be permitted has occurred.

**\*3** Moreover, we decline to affirm the dismissal of plaintiffs' ATCA claims on the basis of the prudential concerns raised by the defendants.[FN8]In *Sosa v. Alvarez-Machain,* 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), the Supreme Court identified two different respects in which courts should consider prudential concerns in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                 Page 6

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

deciding whether to hear claims brought under the ATCA. First, the Supreme Court held that courts should consider prudential concerns in the context of determining whether to recognize a cause of action under the ATCA. Specifically, the Court explained that "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."*Sosa,* 542 U.S. at 732-33 (internal footnote omitted). Second, the Supreme Court recognized that, in certain cases, other prudential principles might operate to "limit[ ] the availability of relief in the federal courts for violations of customary international law."*Id.* at 733 n. 21.[FN9]

[4] We do not, however, believe it is necessary to vacate the district court's order to the extent that it denied the plaintiffs' motion with respect to their TVPA claims. Given that the plaintiffs had previously amended their complaint twice and did not bring the present motion to amend until after the district court's order dismissing the case, the district court did not abuse its discretion in denying them leave to replead. *See, e.g., Gurary v. Winehouse,* 235 F.3d 792, 801 (2d Cir.2000) ("A district court has broad discretion in determining whether to grant leave to amend, and we review such determinations for abuse of discretion.").

One such principle specifically identified by the Court was "a policy of case-specific deference to the political branches."*Id* . This policy of "[j]udicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justiciability doctrine known as the ' political question' doctrine."*Whiteman v. Dorotheum GmbH & Co. KG,* 431 F.3d 57, 69 (2d Cir.2005). Another prudential doctrine that the defendants raise in this case is "international comity. " *See, e.g., Sosa,* 542 U.S. at 761 (Breyer, J., concurring) (suggesting that courts should consider " whether the exercise of jurisdiction under the [ATCA] is consistent with those notions of comity that lead each nation to respect the sovereign rights of other nations by limiting the reach of its laws and their enforcement"). This doctrine, the application

of which "ordinarily lies within the discretion of the district court," asks whether "adjudication of [the] case by a United States court would offend amicable working relationships with [a foreign country]."[FN10]*Bigio v. Coca-Cola Co.,* 448 F.3d 176, 178 (2d Cir.2006) (internal quotation marks omitted).

In dismissing the plaintiffs' complaints below, the district court explicitly refrained from addressing the defendants' arguments that the ATCA claim presented a non-justiciable political question.[FN11] *In re S.African Apartheid Litig.,* 346 F.Supp.2d at 543 n. 4 ("Defendants also argue that ... the matter is a non-justiciable political question. Given the Court's finding that defendants are entitled to relief on other grounds, the Court need not address these remaining grounds for defendants' motion."(internal citation omitted)). Although the district court noted some collateral consequences that might result from the adjudication of these kinds of claims, the consequences it noted were primarily those "that would result from allowing courts in this country to hear civil suits for the aiding and abetting of violations of international norms across the globe." *Id.* at 551.Furthermore, the district court expressly characterized its consideration of the collateral consequences as fulfilling its "duty to engage in ' vigilant doorkeeping.' " *Id.* at 550 (quoting from *Sosa,* 542 U.S. at 729);*see also id.* at 553.As *Sosa* makes clear, this duty is fulfilled in the decision of a federal court to exercise its judicial discretion to recognize a cause of action for a violation of customary international law, an issue distinct from whether the adjudication of a given suit is barred by political question doctrine. *Sosa,* 542 U.S. at 729. We see no reason to read the district court's citation to this part of *Sosa* as an indication that the court was also (and contrary to its explicit disclaimer) engaged in a consideration of the political question or other prudential doctrines.[FN12]To the extent that limited portions of the district court's discussion were addressed to the statements of interest submitted by the governments of the United States and South Africa, *In re S. African Apartheid Litig.,* 346 F.Supp.2d at 553-54, these statements were merely illustrative of a general concern with what the court saw as the "far-reaching" consequences of the specific norm it was then discussing (i.e., doing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 7

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

business in South Africa), *id.* at 553.The citation to *Sosa's* footnote 21 indicates only that the district court considered the views of those governments in assessing "the collateral consequences that would result from finding a new international law violation, " *id.,* and does not suffice to demonstrate that the court (again contrary to its stated intentions) adopted *sub rosa* the defendants' political question arguments.

**\*4** We decline to address these case-specific prudential doctrines now and instead remand to the district court to allow it to engage in the first instance in the careful "case-by-case" analysis that questions of this type require. This approach is particularly appropriate here because the plaintiffs have indicated that, if given the opportunity, they would narrow their claims and clarify the nature of their allegations against the various defendants, changes that may affect how the district court ultimately decides to resolve these issues. Oral Argument Tr., Jan. 24, 2006 at 7-8, 14-15; *cf. Zivotofsky v. Sec'y of State,* 444 F.3d 614, 619-20 (D.C.Cir.2006) (holding that, where the specific relief sought by the plaintiff had changed, remand was appropriate to allow the district court to develop a more complete record as to whether the revised claim presented a nonjusticiable political question).[FN13]

On remand, the district court will have an opportunity to consider the guidance provided by our prior cases regarding the relevant weight of statements of interest submitted by the United States and other governments. In *Whiteman,* for example, we addressed "when, and to what extent, ... the stated foreign policy interests of the United States [should] be accorded deference," and we held that we should be guided in this determination by "our application of the political question doctrine."431 F.3d at 69, 71. In that context, we held that "not every case 'touching foreign relations' is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights. We believe a preferable approach is to weigh carefully the relevant considerations on a case-by-case basis."*Id.* at 69 (quoting *Kadic,* 70 F.3d at 249). We have held that "even an assertion

of the political question doctrine by the Executive Branch, entitled to respectful consideration, would not necessarily preclude adjudication."[FN14]*Kadic,* 70 F.3d at 250. Likewise, although the views of foreign nations are an important consideration under the doctrine of "international comity," we have not held them to be dispositive. *See, e.g., Jota v. Texaco Inc.,* 157 F.3d 153, 159-61 (2d Cir.1998). At this stage in the litigation, we express no view as to what level of deference to their views is appropriate in this particular case. Instead, we remand to the district court so that it may carefully consider whether any of these doctrines require dismissal.

### VI

We therefore AFFIRM the district court's dismissal of the Digwamaje Plaintiffs' TVPA claims. We also AFFIRM the district court's determination that the plaintiffs have failed to satisfy the diversity requirements of 28 U.S.C. § 1332(a)(3). We VACATE the district court's dismissal of the plaintiffs' ATCA claims, as well as the district court's denial of the Digwamaje and Ntsebeza Plaintiffs' motions to amend and REMAND for further proceedings consistent with this opinion.
KATZMANN, Circuit Judge, concurring:
**\*5** This case calls upon us in principal part to determine whether the district court erred in concluding that it does not have jurisdiction over the plaintiffs' claims brought under the Alien Torts Claim Act ("ATCA"), 28 U.S.C. § 1350. I respectfully believe that the district court erred in its analysis of plaintiffs' ATCA claims in two fundamental respects. First, it conflated the jurisdictional and cause of action analyses required by the ATCA. As a result, the district court mistakenly incorporated a discretionary analysis into the determination of whether it has jurisdiction under the ATCA. Second, it erroneously held that aiding and abetting liability does not exist under international law.

The ATCA provides that "[t]he district courts shall

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 8

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."*Id.* When we last substantively grappled with the meaning of this statute, we noted that "neither Congress nor the Supreme Court ha[d] definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA." *Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 247 (2d Cir.2003). The next year the Supreme Court weighed in on the modern resurgence of the statute in *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). While the Court did not definitively resolve all of the complex and controversial questions the ATCA raises, it did clarify to a significant degree how claims brought under the ATCA should be analyzed.

*Sosa* endorsed our Court's prior approach to the ATCA to the extent that we recognized that the Act created jurisdiction for a narrow set of violations of international law, *see id.* at 720 ("Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."); *see also Filartiga v. Pena-Irala,* 630 F.2d 876, 887-88 (2d Cir.1980) (construing the ATCA "as opening the federal courts for adjudication of ... well-established, universally recognized norms of international law", and that a plaintiff's claim "must be gauged against the current state of international law,"*Sosa,* 542 U.S. at 733;*see also Filartiga,* 630 F.2d at 881 (" [I]t is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today."). The Court also generally endorsed the cautious approach that we had long applied in determining whether to hear cases brought under the ATCA. *See, e.g., Sosa,* 542 U.S. at 728-29 (noting that "great caution" must be exercised in deciding what "norms of today's law of nations may ... be recognized legitimately by federal courts"); *see also Flores,* 414 F.3d at 248 ("[I]n determining what offenses violate customary international law, courts must proceed with extraordinary care and restraint.").

**\*6** *Sosa* did, however, deviate from our case law in one crucial respect. We had allowed cases to proceed under the ATCA on the assumption that

when plaintiffs alleged violations of well-established international law, their "causes of action are statutorily authorized."*Kadic v. Karadzic,* 70 F.3d 232, 246 (2d Cir.1995); *see also Flores,* 414 F.3d at 245 (discussing the reception of " *Filartiga's* holding that the ATCA creates a private right of action for violations of United States treaties or customary international law"). The Supreme Court flatly rejected this notion. *See Sosa,* 542 U.S. at 713-14 (citing William R. Casto, *The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law Of Nations,* 18 Conn. L.Rev. 467, 479, 480 (1986)).*Sosa* construed the statute instead to be of a "strictly jurisdictional nature," in the sense that it "address[ed] the power of the courts to entertain cases concerned with a certain subject."542 U.S. at 713, 714.

This holding led the Court to explore "a new question, this one about the interaction between the [ATCA] at the time of its enactment and the ambient law of the era."*Id.* at 714.The Court rejected the argument that the First Congress passed the ATCA "as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, some day, authorize the creation of causes of action."*Id.* at 719.Rather, the historical materials suggested that "the statute was intended to have practical effect the moment it became law."*Id.* at 724.This practical effect would be achieved through the invocation of causes of action already available at common law. Because some "torts in violation of the law of nations were understood to be within the common law" of 1789, the First Congress would have "understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations."*Id.* at 720, 724.No further substantive legislation was required. *Id.* at 724 ("The jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time.").

Finding that "no development in the two centuries from the enactment of § 1350 to [today] has categorically precluded federal courts from recognizing a claim under the law of nations as an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 9

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

element of common law,"*id.* at 724-25, the Court held that federal courts retained the ability to " adapt[ ] the law of nations to private rights" by recognizing "further international norms as judicially enforceable today,"*id.* at 728, 729.Most importantly, these norms were enforceable not by virtue of this statutory creation or authorization of a private right of action, as we had previously assumed, but rather through an exercise in "residual common law discretion" to create causes of action under federal common law to remedy the violation of those norms.*Id.* at 738;*see also id.* at 728-31. Thus, *Sosa* makes clear that all ATCA litigation is in fact based on federal common law, rather than a statutory cause of action. But a federal court's power to create these causes of action is not without limits. Indeed, the Court identified a number of " good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind."FN1 *Id.* at 725, 728.Its consideration of these factors led the Court to identify a minimum requirement "for accepting a cause of action subject to jurisdiction under § 1350," namely, that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."*Id.* at 732.

**\*7** Based on the Supreme Court's holdings in *Sosa* that (1) the ATCA is purely jurisdictional and (2) the common law provides the cause of action for claims brought under that jurisdiction, a federal court faced with a suit alleging a tort in violation of international law must undertake two distinct analytical inquiries. One is whether jurisdiction lies under the ATCA. The other is whether to recognize a common-law cause of action to provide a remedy for the alleged violation of international law. Requiring this analytical separation in ATCA litigation comports with the general principle that whether jurisdiction exists and whether a cause of action exists are two distinct inquiries. *See TCG N.Y., Inc. v. City of White Plains,* 305 F.3d 67, 74 (2d Cir.2002) (noting the Supreme Court's holding that " 'the question whether a federal statute creates a claim for relief is not jurisdictional' " (quoting *Northwest Airlines, Inc. v. County of Kent,* 510 U.S.

355, 365, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994)); *cf. Rasul v. Bush,* 542 U.S. 466, 484-85, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (reversing the D.C. Circuit's holding that jurisdiction did not lie under the ATCA without engaging in a cause of action inquiry). Moreover, it reflects the fact that it is Congress, and not the courts, that possesses the power to define the scope of the courts' jurisdiction. *Cf. Whitmore v. Arkansas,* 495 U.S. 149, 155-56, 161, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (noting that "[a] federal court is powerless to create its own jurisdiction" and that a court may not " employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case"). Thus, one might question the extent to which a federal court should exercise its own judgment about the practical consequences of allowing a suit to go forward in the context of its jurisdictional inquiry when, according to the plain language of the ATCA, that inquiry is resolved solely by reference to international law. *Cf. Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 593, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980) (noting that courts should look to Congress's intent, and not policy considerations, when construing the terms of a jurisdictional statute).FN2 By contrast, it is entirely appropriate for courts to consider such concerns in the context of determining whether to recognize a cause of action under federal common law.

Having identified the two steps of the inquiry, I now elaborate on what each inquiry requires. Aside from noting that "Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations," *Sosa,* 542 U.S. at 720, the Supreme Court did not discuss the requirements for invoking this jurisdictional grant in a particular case. The ATCA, by its terms, "confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations."*Kadic,* 70 F.3d at 238. In *Flores,* we held that the law of nations, or customary international law, FN3"is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern."414 F.3d at 248;*see also The Paquete Habana,* 175 U.S. 677, 708, 20

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 10

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

S.Ct. 290, 44 L.Ed. 320 (1900) (describing a rule of international law as one reached by "general consent of the civilized nations of the world" and " founded on considerations of ... the mutual convenience of belligerent states"). In determining whether a given offense meets these requirements, we look to the sources of law identified by the Statute of the International Court of Justice ("ICJ Statute") as the proper sources of international law. *See Flores,* 414 F.3d at 250-51. These include:
**\*8** a. international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
b. international custom, as evidence of a general practice accepted as law;
c. the general principles of law recognized by civilized nations;
[and]
d.... judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law.

ICJ Statute, art. 38, June 26, 1945, 59 Stat. 1055, 1060.

If jurisdiction is established, the second inquiry is whether a common-law cause of action should be created to provide a remedy for the alleged violation of international law. Recognizing that " there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind," the Court in *Sosa*"require[d] any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized," namely, "violation of safe conducts, infringement of the rights of ambassadors, and piracy ."542 U.S. at 724-25;*see also id.* at 732 (" [W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."). In setting out this standard, the Court cited with approval our decision in *Filartiga,* noting that "[t]his limit upon

judicial recognition is generally consistent with the reasoning of many of the courts and judges who faced the issue before it reached this Court."*Id.*

The Supreme Court instructed that determining whether to recognize a new cause of action "should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."*Id.* at 732-33.I do not read *Sosa* as requiring that a court individually analyze each of the five reasons it identifies as "argu [ing] for judicial caution when considering the kinds of individual claims that might implement the jurisdiction conferred by the ... statute."*Sosa,* 542 U.S. at 725. These reasons are already captured by the "high bar to new private causes of action" set by the requirement that a claim be accepted by the civilized world and defined with a sufficient degree of specificity. *See id.* at 727-32;*see also id.* at 725 (noting that "there are good reasons for a restrained conception of [a federal court's] discretion" and that "[a]ccordingly ... courts should require any claim" to meet its standard of acceptance and specificity); David H. Moore, *An Emerging Uniformity for International Law,* 75 Geo. Wash. L.Rev. 1, 40-41 (2006) ("Those concerns, which arise whenever [customary international law] is incorporated as federal common law, are mitigated by the specific definition and mutuality requirements."). I do, however, view the Court's instruction that an element of judgment must be involved in the decision to recognize a cause of action as an invitation to lower courts to consider other prudential concerns consistent with *Sosa's* approach. As *Sosa* suggests, courts considering the " practical consequences" of recognizing a new cause of action should assess the consequences that might result from making the cause of action generally available to all potential plaintiffs.

**\*9** In sum, a district court analyzing a claim under the ATCA will normally be required to engage in a two-part analysis. The district court here erred by failing to undertake separately the two parts of this analysis. By conflating these two questions, the district court inappropriately injected a discretionary element into the determination of whether it had jurisdiction under the ATCA. *See In*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 11

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

*re S. African Apartheid Litig.,* 346 F.Supp.2d at 551, 553-54. Of greater significance to the district court's ultimate disposition of the plaintiffs' claims, though, was its error in analyzing whether the plaintiffs had alleged a "violation of the law of nations," as is required for plaintiffs to establish both jurisdiction and a cause of action. It is to this analysis that I now turn.

Asking whether "aiding and abetting international law violations ... [is a] violation[ ] of the law of nations that [is] 'accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms,' " *Id.* at 549 (quoting *Sosa,* 542 U.S. at 725), the district court concluded that it is not, noting that it found "little [in its review of international law] that would lead [it] to conclude that aiding and abetting international law violations is itself an international law violation that is universally accepted as a legal obligation," *id.*Although I believe the district court was correct to look to international law, I disagree with its analysis.

The district court's conclusion that its jurisdiction under the ATCA should depend on whether international law specifically recognizes liability for aiding and abetting violations of the law of nations is consistent with our prior case law. We have repeatedly emphasized that the scope of the ATCA's jurisdictional grant should be determined by reference to international law. *See Kadic,* 70 F.3d at 238 (requiring courts to engage in a "searching review" of international law to verify that subject matter jurisdiction lies for a particular action); *see also Flores,* 414 F.3d at 248 (noting that "courts must proceed with extraordinary care and restraint" in "determining what offenses violate customary international law"); *Filartiga,* 630 F.2d at 887 (" The paucity of suits successfully maintained under the section is readily attributable to the statute's requirement of alleging a 'violation of the law of nations' [ ] at the jurisdictional threshold.").

It is also consistent with the Supreme Court's opinion in *Sosa.*The Court observed in a footnote that "whether a norm is sufficiently definite to support a cause of action" raises a "related consideration [of] whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual." *Sosa,* 542 U.S. at 732 & n. 20. While this footnote specifically concerns the liability of non-state actors, its general principle is equally applicable to the question of where to look to determine whether the scope of liability for a violation of international law should extend to aiders and abettors. Furthermore, in *Sosa,* the Supreme Court echoed our prior cases' emphasis on the narrowness of the ATCA's jurisdictional grant. *See id.* at 720 (" Congress intended the [ATCA] to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations."); *see also id.* at 712 (describing the statute as a "limited, implicit sanction to entertain the handful of international law *cum* common law claims understood in 1789"). I believe that we most effectively maintain the appropriate scope of this jurisdiction by requiring that the specific conduct allegedly committed by the defendants sued represents a violation of international law.

**\*10** Most importantly, the district court's approach is consistent with *Sosa's* broader characterization of the relationship between federal common law and international law. The ATCA's jurisdictional grant " enable[s] federal courts to hear claims in a very limited category *defined by the law of nations.*" *Id.* at 712 (emphasis added). Once a court determines that the defendants' alleged conduct falls within one of "the modest number of international law violations with a potential for personal liability" on the defendants' part, it then considers whether "the common law would provide a cause of action" to enable the plaintiffs to bring their claim. *Id.* at 724.The common law thus permits the "independent judicial recognition of actionable international norms," but the courts must, as *Sosa* cautioned, be " vigilant doorkeep [ers]." *Id.* at 729.We recognized this important role for domestic law in *Kadic* when we explained that the "law of nations generally does not create private causes of action to remedy its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 12

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

violations, but leaves to each nation the task of defining the remedies that are available for international law violations."[FN4]70 F.3d at 246. A federal court is free, in the exercise of its common-law discretion, to decline to provide a cause of action for a violation of international law. *See Sosa,* 542 U.S. at 732-33;*Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 778 (D.C.Cir.1984) (Edwards, J., concurring) (explaining that each state may choose whether to impose civil liability for violations of international law). But to assure itself that it has jurisdiction to hear a claim under the ATCA, it should first determine whether the alleged tort was in fact "committed in violation of the law of nations,"28 U.S.C. § 1350, and whether this law would recognize the defendants' responsibility for that violation.

I conclude that the recognition of the individual responsibility of a defendant who aids and abets a violation of international law is one of those rules " that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Flores,* 414 U.S. at 248. Recognized as part of the customary law which authorized and was applied by the war crimes trials following the Second World War, it has been frequently invoked in international law instruments as an accepted mode of liability. During the second half of the twentieth century and into this century, it has been repeatedly recognized in numerous international treaties, most notably the Rome Statute of the International Criminal Court, and in the statutes creating the International Criminal Tribunal for the Former Yugoslavia (" ICTY") and the International Criminal Tribunal for Rwanda ("ICTR").[FN5] Indeed, the United States concedes, and the defendants do not dispute, that the concept of criminal aiding and abetting liability is "well established" in international law.[FN6] Brief for the United States as Amicus Curaie, at 21.

**\*11** The London Charter, which established the International Military Tribunal at Nuremberg, was entered into by the allied powers of World War II, " acting in the interests of all the United Nations," to establish a tribunal to punish violations of international law. *See* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, pmbl., Aug. 8, 1945, E.A. S. 472 (hereinafter London Charter). We have previously recognized the London Charter as an authoritative source of customary international law. *See Flores,* 414 F.3d at 244 n. 18;*United States v. Yousef,* 327 F.3d 56, 105 nn. 39-40 (2d Cir.2003) (citing the London Charter for definitions of war crimes and crimes against humanity under international law). Moreover, other courts, international bodies, and scholars have recognized that the principles set out in the London Charter and applied by the International Military Tribunal are significant not only because they have garnered broad acceptance, but also because they were viewed as reflecting and crystallizing preexisting customary international law. *See Princz v. Federal Republic of Germany,* 26 F.3d 1166, 1174 (D.C.Cir.1994) ("The trials for the first time made explicit and unambiguous what was theretofore, as the Tribunal has declared, implicit in International Law ...." (citation, alteration, and internal quotation marks omitted)); *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 715 (9th Cir.1992) ("The legitimacy of the Nuremberg prosecutions rested ... on the nature of the acts [the defendants] committed: acts that the laws of all civilized nations define as criminal. The universal and fundamental rights of human beings identified by Nuremberg ... are the direct ancestors of the universal and fundamental norms recognized as *jus cogens.*" (citations omitted)); Theodor Meron, *Reflections on the Prosecution of War Crimes by International Tribunals,* 100 Am. J. Int'l L. 551, 559 (2006) (" [T]he Nuremberg and Tokyo Tribunals drew heavily on the 1929 Geneva Prisoner of War Convention and the Fourth Hague Convention of 1907 as establishing the substantive law to be applied-that is, as customary law and general principles of criminal law, and as norms of both state responsibility and individual criminal liability." (footnotes omitted)). Indeed, shortly after the conclusion of the initial war crimes trials, the General Assembly of the United Nations unanimously approved a resolution affirming "the principles of international law recognized by the Charter of the Nürnberg Tribunal and the judgment of the Tribunal." Affirmation of the Principles of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 13

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

International Law Recognized in the Charter of the Nürnberg Tribunal, G.A. Res. 95(I), at 188, U.N. Doc. A/236 (Dec. 11, 1946) (hereinafter Nuremberg Principles Resolution I).

The London Charter extended individual responsibility for crimes within its jurisdiction not only to "[l]eaders, organizers, [and] instigators" but also to "accomplices participating in the formulation or execution of a common plan or conspiracy to commit" any of the crimes triable by the Tribunal. London Charter art. 6. While the Charter's language taken "literally ... would seem to imply that the complicity rule did not apply to crimes perpetrated by individual action," as opposed to by common plan, in practice the Tribunal "applied general principles of criminal law regarding complicity."International Law Commission, Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, with commentaries, G.A .O.R., 5th session, Supp. No. 12, U.N. Doc. A/1316, ¶¶ 126-27 (1950) ("ILC Principles"). Accordingly, when the International Law Commission ("ILC") formulated the " principles recognized in the Charter ... and in the judgment of the Tribunal" at the direction of the General Assembly, *see* Nuremberg Principles Resolution I, it omitted any indication of a limitation on accomplice liability. Principle VII provides that "[c]omplicity in the commission of a crime against peace, a war crime, or a crime against humanity ... is a crime under international law."ILC Principles, Principle VII. The ILC's formulation of the principles is considered to be an authoritative rendering of the formal holdings of the Nuremberg Tribunal and is consulted as an authoritative source of customary international law by the ICTY and ICTR. *See, e.g., Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Trial Chamber Judgment, ¶ 526 (Sept. 2, 1998) (citing Principle VII to establish that "participation by complicity in the most serious violations of international humanitarian law was considered a crime as early as Nuremberg"); *see also Prosecutor v. Milosevic,* Case No. IT-02-54, Trial Chamber Decision on Preliminary Motions, ¶¶ 29-30 (Nov. 8, 2001) (finding that "[t]he customary character of [a] rule [of individual responsibility] is further supported by its

incorporation in a wide number of other instruments, " including, *inter alia,* the ILC Principles).

**\*12** That the London Charter's use of the term " accomplice" was understood to include those who aid and abet a crime is further confirmed by the law applied in the war crimes trials held in the United States zone of occupation following World War II. War criminals in the United States zone of occupation were tried under Control Council Law No. 10, an act promulgated by the joint allied body that coordinated the governance of post-war Germany. Allied Control Council Law No. 10 (Dec. 20, 1945) *in Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10,* at XVIII (William S. Hein & Co., Inc.1997) (1949). Control Council Law No. 10 was patterned after the London Charter and enacted under its authority with the declared purpose to " give [it] effect." *Flick v. Johnson,* 174 F.2d 983, 985-86 (D.C.Cir.1949). According to Telford Taylor, the Chief of Counsel for War Crimes and the Chief Prosecutor for the United States under the London Charter, the "underlying principles" of the London Charter and Law No. 10 "are identical" and the tribunals operating under each "worked within the same framework" with respect to "the basic principles of international penal law."Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trial Under Control Council Law No. 10,* at 107 (1949), *available at* http://www. loc.gov/rr/frd/Military_Law/NT_final-report.html. Control Council Law No. 10 imposed criminal liability on anyone who was "an accessory to the commission of any such crime or ordered *or abetted* the same," Control Council Law No. 10, art. II, sec. 2 (emphasis added), and tribunals applying Control Council Law No. 10 are viewed by international bodies as having recognized aiding and abetting liability. *See Prosecutor v. Furundzija,* Case No. IT-95-17/1, Trial Chamber Judgment, ¶¶ 195-225, 236-40 (Dec. 10, 1998) (reviewing the case law).

We have previously acknowledged the contribution that Control Council Law No. 10 and the tribunals that applied it have made to customary international law. In *Flores,* to support our conclusion that "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 14

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

[c]ustomary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II,"414 F.3d at 244 n. 18, we pointed specifically to Brigadier General Taylor's assessment that "the major legal significance of the Law No. 10 judgments lies ... in those portions of the judgments dealing with the *area of personal responsibility* for international law crimes," Taylor, *supra,* at 109.*quoted in Flores,* 414 F.3d at 244 n. 18. The United States Government, as amicus in this case, similarly acknowledges the role this law has played in establishing the availability of aiding and abetting liability in modern international criminal tribunals. Brief for the United States as Amicus Curaie, at 21 n. 11.

Having been accepted as one of the core principles of the post-World War II war crimes trials, the individual criminal responsibility of those who aid and abet violations of international law was repeatedly reflected in international treaties thereafter. These treaties include major agreements addressing fundamental human rights concerns such as torture, apartheid, slavery, and genocide. *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 4, Dec. 10, 1984, 1465 U.N.T. S. 85; International Convention on the Suppression and Punishment of the Crime of Apartheid, art. III(b), Nov. 30, 1973, 1015 U.N.T. S. 243; Supplementary Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, art. 6, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T .S. 3; Convention on the Prevention and Punishment of the Crime of Genocide, art III(e), Dec. 9, 1948, 78 U.N.T.S. 277, 280 (hereinafter Genocide Convention). Aiding and abetting liability has also been recognized in treaties addressed to crimes of general international concern such as bribery of foreign officials in international business transactions and drug trafficking.[FN7]*See* Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, art. 1(2), Dec. 17, 1997, *reprinted in* 37 I.L.M. 1 (1998); United Nations Convention on Psychotropic Substances, art. 22(2)(a)(ii), Feb. 21, 1971, 32 U.S.T. 543, 1019 U.N.T.S. 175. More

recently, aiding and abetting has been included in a number of the treaties concerning organized crime and terrorism, which have become prominent concerns of the international community. *See* United Nations Convention Against Transnational Organized Crime, art. 5(1)(b), G.A. Res. 55/25, at 5-6, U.N. Doc. A/RES/55/25 (Jan. 8, 2001); International Convention for the Suppression of the Financing of Terrorism, art. 2(5)(a), opened for signature Jan. 10, 2000, 39 I.L.M. 270; International Convention for the Suppression of Terrorist Bombings, art. 2(3)(a), May 23, 2001, 2149 U.N.T.S. 256;*see also* Protocol Against the Smuggling of Migrants by Land, Sea and Air, Supplementing the United Nations Convention Against Transnational Organized Crime, art.5 (1)(b), G.A. Res. 55/25, at 40, U.N. Doc. A/RES/55/25 (Jan. 8, 2001). The United Nations Security Council ("Security Council") also appears to have recognized the importance of accomplice liability in the international response to terrorism, directing states in the wake of the September 11 attacks to "[e]nsure that any person who participates in the financing, planning, preparation or perpetration of terrorists acts or *in supporting* terrorists acts is brought to justice."S.C. Res. 1373, ¶ 2(e), U.N. Doc. S/RES/1373 (Sept. 28, 2001) (emphasis added).

**\*13** Aiding and abetting liability continues to be recognized and enforced in international tribunals. The Statutes creating the ICTY and ICTR are adopted by resolutions of the Security Council. In their respective sections on individual criminal responsibility, both statutes impose individual liability on any person "who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution" of a crime. Statute of the International Tribunal for the Former Yugoslavia, art. 7, S.C. Res. 827, U.N. Doc. S/RES/827 (May 25, 1993) (hereinafter ICTY Statute); Statute of the International Criminal Tribunal for Rwanda, art. 6, S.C. Res. 955, U.N. Doc. S/RES/955 (Nov. 8, 1994) (hereinafter ICTR Statute).

As with the London Charter, the recognition of aiding and abetting liability in the ICTY Statute is particularly significant because the "Individual

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Criminal Responsibility" section of that statute was intended to codify existing norms of customary international law. In his report to the Security Council regarding the creation of the ICTY, the Secretary-General explained that "in assigning to the International Tribunal the task of prosecuting persons responsible for serious violations of international humanitarian law, the Security Council would not be creating or purporting to 'legislate' that law. Rather, the International Tribunal would have the task of applying existing international humanitarian law."Report of the Secretary-General Pursuant to Paragraph 2 of Security Council Resolution 808, ¶ 29, U.N. Doc. S/25704 (May 3, 1993) ("Sec'y-General Report"). Indeed, international law principles "require[d]" that the Tribunal's jurisdiction be limited to "rules of international humanitarian law which are beyond any doubt part of customary [international] law."*Id.* ¶ 34.Accordingly, the provision of aiding and abetting liability in the ICTY statute reflects a determination by both the Secretary-General and the Security Council, which approved the Secretary-General's report when it enacted the statute, that such liability is firmly established in customary international law. The inclusion of substantively identical language in the statute creating the ICTR presumably reflects a similar determination.[FN8]

Consistent with its statutory authorization, the ICTY has recognized and applied aiding and abetting liability for violations of international law. *See, e.g., Furundzija,* Trial Chamber Judgment, ¶ ¶ 249, 275; *Prosecutor v. Tadic,* Case No. IT-94-1-T, Trial Chamber Opinion and Judgment, ¶¶ 689-92, 730, 735, 738 (May 7, 1997). Furthermore, it has done so only after confirming that such liability was part of customary law. As the Tribunal recognized, it was required to determine " the objective basis for such individual responsibility as a matter of customary international law ... since the International Tribunal is only empowered to apply international humanitarian law that is ' beyond any doubt customary law.' " *Tadic,* Trial Chamber Opinion and Judgment, ¶ 662 (quoting Sec'y General Report ¶ 34). The Tribunal therefore conducted a probing and thoughtful analysis of international law sources in its early decisions to

confirm that aiding and abetting liability is recognized in customary international law. *See Furundzija,* Trial Chamber Judgment, ¶¶ 190-249; *Tadic,* Trial Chamber Opinion and Judgment, ¶¶ 661-91.

**\*14** More recently, the Rome Statute of the International Criminal Court ("Rome Statute"), July 17, 1998, 2187 U.N.T.S. 90, provides that a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the ICC if that person:

(c) For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission; [or]

(d) In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or

(ii) Be made in the knowledge of the intention of the group to commit the crime[.]

*Id.* art. 25(3)(c), (d). The Rome Statute is particularly significant for the present inquiry because, unlike other sources of international legislation, it articulates the *mens rea* required for aiding and abetting liability. The Statute makes clear that, other than assistance rendered to the commission of a crime by a group of persons acting with a common purpose, a defendant is guilty of aiding and abetting the commission of a crime only if he does so "[f]or the purpose of facilitating the commission of such a crime."*Id.* art. 25(3)(c).

In drawing upon the Rome Statute, I recognize that it has yet to be construed by the International Criminal Court; its precise contours and the extent to which it may differ from customary international law thus remain somewhat uncertain. Nevertheless, the Statute has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world.[FN9] It may therefore be taken "by and large ... as constituting an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                   Page 16

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

authoritative expression of the legal views of a great number of States."*Furundzija,* Trial Chamber Judgment, ¶ 227.

Furthermore, the Rome Statute's *mens rea* standard is entirely consistent with the application of accomplice liability under the sources of international law discussed above.[FN10]For example, in the *Ministries Case* conducted under Control Council Law No. 10, the tribunal declined to impose criminal liability on a bank officer who was alleged to have "made a loan, knowing or having good reason to believe that the borrower w[ould] use the funds in financing enterprises [conducted] in violation of either national or international law," but was not proven to have made the loan with the purpose of facilitating the enterprises' illegal activities.[FN11]*United States v. von Weizsaecker (The Ministries Case), in* 14 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 308, 622 (William S. Hein & Co., Inc.1997) (1949). Meanwhile, those who assist in the commission of a crime with the purpose of facilitating that crime would be subject to aiding and abetting liability under the statutes governing the ICTY and ICTR. [FN12]My research has revealed no source of international law that recognizes liability for aiding and abetting a violation of international law but would not authorize the imposition of such liability on a party who acts with the purpose of facilitating that violation (provided, of course, that the *actus reus* requirement is also satisfied).

**\*15** With respect to the *actus reus* component of the aiding and abetting liability, the international legislation is less helpful in identifying a specific standard. However, in the course of its analysis of customary international law, the ICTY concluded that "the *actus reus* of aiding and abetting in international criminal law requires practical assistance, encouragement, or moral support which has a *substantial effect* on the perpetration of the crime."*Furundzija,* Trial Chamber Judgment, ¶ 235 (second emphasis added). My research has uncovered nothing to indicate that a standard other than "substantial assistance" should apply.

Accordingly, I conclude that a defendant may be

held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime. Furthermore, based on this review of international law's treatment of aiding and abetting liability over the past sixty years, I conclude that aiding and abetting liability, so defined, is sufficiently " well-established[ ][and] universally recognized" to be considered customary international law for the purposes of the ATCA. *See Kadic,* 70 F.3d at 239 (internal quotation marks omitted). This conclusion comports with the decisions of several other federal courts that have considered the issue.[FN13]*See Almog v. Arab Bank, PLC,* 471 F.Supp.2d 257, 287 (E.D.N.Y.2007) (noting the "vast body of law finding aiding and abetting liability available under the [ATCA]"); *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 453 F.Supp.2d 633, 668 (S.D.N.Y.2006) ("Aiding and abetting liability is a specifically defined norm of international character that is properly applied as the law of nations for purposes of the [ATCA]."); *Bowoto v. Chevron Corp.,* No. C 99-02506 SI, 2006 WL 2455752, *3-4 (N.D.Cal. Aug.22, 2006); *In re "Agent Orange" Prod. Liab. Litig.,* 373 F.Supp.2d 7, 52-54 (E.D.N.Y.2005).

While I conclude that, at present, only aiding and abetting liability imposed in accordance with the standard outlined above is sufficiently well-established and universally recognized under international law to trigger jurisdiction under the ATCA, I appreciate that this definition is not necessarily set in stone. International law, like our domestic law, can change, and the ATCA was intended to change along with it. *See Sosa,* 542 U.S. at 728 (noting Congress's intention in passing the TVPA that the ATCA " 'remain intact to permit suits based on other norms that already exist or may ripen in the future into rules of customary international law' " (quoting H.R.Rep. No. 102-367, pt. 1, p. 3 (1991)); *see also id.* at 725 (articulating the standard for courts hearing "any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

claim based on the *present-day* law of nations" (emphasis added)). In this regard, I note that there is some support, principally in tribunal decisions from the ICTY and ICTR, for a definition of aiding and abetting that would lead to liability where an individual provides substantial assistance with "the knowledge that the acts performed by the aider and abettor assist the commission of the specific crime of the principal." [FN14]*Prosecutor v. Vasiljevic,* Case No. IT-98-32-A, Appeals Chamber Judgment, ¶¶ 102(i)-(ii) (Feb. 25, 2004); *see also Furundzija,* Trial Chamber Judgment, ¶¶ 249, 275; *Tadic,* Trial Chamber Opinion and Judgment, ¶¶ 689-92, 730, 735, 738.

**\*16** To be sure, I acknowledge limitations on the extent to which we may rely on the decisions of the ICTY and ICTR for the present purposes.[FN15] Those decisions arise out of completely distinct factual contexts and often involve defendants who might have been convicted on alternate theories of liability. Moreover, as a scholar and participant in the ICTY noted, panels of that Tribunal occasionally (and consciously) engaged in discussions "peripheral to the *ratio decidendi* of a case" in order to provide "clarification [that] might have some value for the future development of international criminal law."Antonio Cassese, *The ICTY: A Living and Vital Reality,* 2 J. Int'l Crim. Just. 585, 589-90 (2004). Such clarification through dicta can be useful and is not necessarily without justification. *See id.* at 590 ("[T]he absence of an international law-maker and an international court with compulsory universal jurisdiction entails that many rules are not clear, particularly when they are of customary origin, and are thus open to differing interpretations-hence the need for courts gradually to spell out the contents of those rules, if need be through *obiter dicta.*"); *see also* 1 Oppenheim's International Law: Peace 41 (Robert Jennings & Arthur Watts eds., 9th ed.1992) (noting that "in view of the difficulties surrounding the codification of international law," international tribunals are expected to "fulfil, inconspicuously but efficiently, a large part of the task of developing international law"). But it "may also prove simply academic and sometimes also misleading for future courts pronouncing on the same matters."Cassese, *supra,* at 590.

Nevertheless, the opinions of the ICTY and ICTR provide evidence of the state of customary international law. As a leading treatise explains, " decisions of international tribunals ... exercise considerable influence as an impartial and considered statement of the law by jurists of authority in light of actual problems which arise before them." 1 Oppenheim's, *supra,* at 41;*see also* Ian Brownlie, Principles of Public International Law at 19 (noting that "the practical significance of the label 'subsidiary means' in Article 38(1)(d) is not to be exaggerated"). The ICTY has been specifically recognized as having provided "a number of significant findings on issues of law." Brownlie, *supra,* at 23;*see also* Cassese, *supra,* at 591-93 (arguing that the ICTY "clarified the contours of many notions of international criminal law," including "the notion of aiding and abetting"); *cf. Sosa,* 542 U.S. at 734 (" '[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators, who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects of which they treat.' " (quoting *The Paquete Habana,* 175 U.S. at 700) (alteration in original)). While I am unable to find that liability predicated on the definition of aiding and abetting offered in the decisions of the ICTY and ICTR is sufficiently well-established and universally recognized to trigger jurisdiction for a tort suit under the ATCA, particularly in light of the higher standard articulated in the Rome Statute, I am mindful of the conclusions of these tribunals. [FN16]

**1.**

**\*17** Judge Korman argues that it is insufficient to inquire whether aiding and abetting is generally recognized under customary international law and that the appropriate inquiry is instead to engage in a "norm-by-norm analysis" to determine whether aiding and abetting liability exists for the violation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 18

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

of a particular rule. Opinion of Judge Korman at 134. Yet this is not how the inquiry is undertaken by international tribunals whose jurisdiction is limited by customary international law.

In *Tadic,* the Appeals Chamber of the ICTY considered whether a defendant could be held criminally responsible under international law on a common purpose or joint criminal enterprise (JCE) theory of liability. *Prosecutor v. Tadic,* Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 185 (July 15, 1999). After concluding that the ICTY Statute permitted such liability, the tribunal turned to customary law.[FN17]The Appeals Chamber reviewed relevant sources of customary law including case law from post-World War II war crimes cases, international treaties, and the domestic law of many countries. It then concluded that "the notion of common design as a form of accomplice liability is firmly established in customary international law."*Id.* ¶ 220.The Appeals Chamber made no effort, though, to distinguish among the different crimes (or even broad categories of crimes) over which it had jurisdiction or to verify the existence of JCE liability at customary law for each individual crime. Later panels have confirmed that *Tadic's* review of " state practice and *opinio juris...* was sufficient" to establish that "such a norm existed under customary international law."*Prosecutor v. Milutinovic,* Case No. IT-99-37-AR72, Appeals Chamber Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction-*Joint Criminal Enterprise,* ¶ 29 (May 21, 2003); *see also Prosecutor v. Brdjanin,* Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 363 (Apr. 3, 2007).

These tribunals took the same approach with respect to the application of aiding and abetting liability. In *Tadic,* the ICTY trial chamber viewed international treaties and trials following the Second World War as "establish [ing] the basis in customary international law for both individual responsibility and of participation in the various ways provided by Article 7 of the [ICTY] Statute."*Tadic,* Trial Chamber Opinion and Judgment, ¶ 669. In *Furundzija,* the trial chamber consulted post-World War II case law, as well as modern authoritative international instruments, to "establish the content"

of aiding and abetting liability under customary international law.*Furundzija,* Trial Chamber Judgment, ¶¶ 191, 195-231. In neither case did the Tribunal engage in the norm-specific inquiry advocated by Judge Korman. Indeed, the *Furundzija* Trial Chamber concluded that "[t]he definitions and propositions concerning aiding and abetting [it] enunciated ... apply ... to all crimes," even though it had not purported to identify sources relating to every crime over which it had jurisdiction. *Id.* ¶ 250.Yet these analyses are recognized as authoritative by other chambers of the Tribunals. *See, e.g., Prosecutor v. Aleksovski,* Case No. IT-95-14/1-A, Appeals Chamber Judgment, ¶ 162 (Mar. 24, 2000) (noting that "[t]he liability of a person charged with aiding and abetting another person in the commission of a crime was extensively considered by Trial Chamber II in the *Furundzija* Judgment" and adopting its conclusions); *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T, Trial Chamber Judgment, ¶ 32 n. 22 (June 7, 2001) (citing *Tadic* for discussion of " the customary nature of the[ ] principles" of aiding and abetting liability).

**\*18** The international tribunals' approach is consistent with the understanding that aiding and abetting is a theory of liability for acts committed by a third party. As we have recognized in our domestic criminal law, "aiding and abetting 'does not constitute a discrete criminal offense but only serves as a more particularized way of identifying persons involved' " in the underlying offense. *United States v. Smith,* 198 F.3d 377, 383 (2d Cir.1999) (quoting *United States v. Oates,* 560 F.2d 45, 54 (2d Cir.1977) (internal quotation marks omitted)); *see also Hefferman v. Bass,* 467 F.3d 596, 601 (7th Cir.2006) (explaining that "aiding and abetting is a theory for holding the person who aids and abets liable for the tort itself"). International law is consistent with domestic law on this point. *See, e.g., Prosecutor v. Kunarac,* Case Nos. IT-96-23-T & IT-96-23/1-T, Trial Chamber Judgment, ¶ 391 (Feb. 22, 2001) ("As opposed to the 'commission' of a crime, aiding and abetting is a form of accessory liability."); *Akayesu,* Trial Chamber Judgment, ¶ 527 (defining an accomplice as "someone who associates himself in an offence committed by another"); *see also Hamdan,* 126

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 19

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

S.Ct. at 2785 n. 40 ("The International Criminal Tribunal for the former Yugoslavia (ICTY), drawing on the Nuremberg precedents, has adopted a 'joint criminal enterprise' theory of liability, but that is a species of liability for the substantive offense (akin to aiding and abetting), not a crime on its own."). Because aiding and abetting is a generally applicable means of identifying who should be held responsible for a particular act, rather than a necessary element of the act itself, it is more reasonable to consider whether the theory is accepted as a general principle of customary international law than to ask whether each substantive norm that proscribes a specific conduct encompasses liability for aiding and abetting. *See, e.g.,* Rome Statute (including the provision on individual criminal responsibility in "Part III: General Principles of Criminal Law" and the definition of the substantive offenses in Part II); ICTR Statute (segregating the article defining individual criminal responsibility from the articles describing the substantive offenses); ICTY Statute (same); Draft Code of Crimes Against the Peace and Security of Mankind, Report of the International Law Commission on the work of its forty-eighth session, U.N. GAOR, 51st Sess., Supp. No. 10, U.N. Doc. A/51/10 (1996) (including the article on individual responsibility in "Part One: General Provisions" and the definitions of crimes in "Part Two: Crimes Against the Peace and Security of Mankind").

### 2.

Viewing aiding and abetting in this way, as a theory of identifying who was involved in an offense committed by another rather than as an offense in itself, also helps to explain why a private actor may be held responsible for aiding and abetting the violation of a norm that requires state action or action under color of law. It is true, as we held in *Kadic,* that "certain forms of conduct" violate the law of nations only when undertaken by state actors or those acting under color of law. *Kadic,* 70 F.3d at 239. But imposing liability on private actors who aid and abet such conduct does not, contrary to Judge Korman's suggestion, detract in any way from this requirement. Indeed, the imposition of aiding

and abetting liability under international law requires "a predicate offence committed by someone other than the accomplice," in this case, a state actor or someone acting under color of law. *Akayesu,* Trial Chamber Judgment, ¶ 529. Recognizing the responsibility of private aiders and abettors merely permits private actors who substantially assist state actors to violate international law and do so for the purpose of facilitating the unlawful activity to be held accountable for their actions.

**\*19** It is of no moment that a private actor could be held liable as an aider and abettor of the violation of a norm requiring state action when that same person could not be held liable as a principal. In our domestic law, it is "well settled that one may be found guilty of aiding and abetting another individual in his violation of a statute that the aider and abettor could not be charged personally with violating."*In re Nofziger,* 956 F.2d 287, 290 (D.C.Cir.1992); *see also United States v. Tannenbaum,* 934 F.2d 8, 14 (2d Cir.1991) ("The fact that the accused does not possess the legal capacity to commit the substantive offense does not mean that he cannot be convicted ... of aiding and abetting the commission of the substantive offense by another. Thus, the inability to commit the substantive offense is immaterial."(citations omitted)). Indeed, "[t]he doctrine is of ancient origin ."*Nofziger,* 956 F.2d at 291. International law, too, recognizes that criminality is assessed by reference to the actions of the principal, not the aider and abettor. *See Akayesu,* Trial Chamber Judgment, ¶ 528 ("[I]t should be understood that the physical act which constitutes the act of complicity does not have its own inherent criminality, but rather it borrows the criminality of the act committed by the principal perpetrator of the criminal enterprise.... The accomplice has not committed an autonomous crime, but has merely facilitated the criminal enterprise committed by another.").

The defendants and the government argue that the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), precludes us from recognizing aiding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                 Page 20

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

and abetting liability for claims brought under the ATCA because "where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred."*See In re S. African Apartheid Litig.,* 346 F.Supp.2d at 550. The Court's holding in *Central Bank* was primarily premised on a recognition that § 10(b) does not prohibit aiding and abetting, and "the private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)."*Central Bank,* 511 U.S. at 173. Here, however, the ATCA provides jurisdiction for the courts to hear torts "committed in violation of the law of nations."The Supreme Court's instruction in *Central Bank* that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors,"511 U.S. at 182, is thus inapposite. Under the ATCA, the relevant norm is provided not by domestic statute but by the law of nations, and that law extends responsibility for the violations of its norms to aiders and abettors. *See* William R. Casto, *The New Federal Common Law of Tort Remedies for Violations of International Law,* 37 Rutgers L.J. 635, 650 (2006) (noting that "[t]he precise holding in *Central Bank*... does not translate easily to [ATCA] litigation," and that "at a fundamental level" *Central Bank* in fact suggests that a theory of aiding and abetting liability may be recognized if "a norm of international law forbids private persons to assist violators"). Thus, I conclude that customary international law recognizes liability for aiding and abetting violations of international law, and that the district court erred when it reached the contrary conclusion.

### 3.

**\*20** Judge Korman further argues that the defendants cannot be held liable as aiders and abettors because the sources that establish accessorial liability do not extend that liability to corporations. Opinion of Judge Korman at 118. This argument was not raised by the defendants on appeal and therefore the issue was not briefed by the parties. It is perhaps not surprising that neither

the defendants nor the United States raised this issue as a bar to liability: We have repeatedly treated the issue of whether corporations may be held liable under the ATCA as indistinguishable from the question of whether private individuals may be. *See Bigio v. Coca-Cola Co.,* 239 F.3d 440, 447 (2d Cir.2000) (asking "whether Coca-Cola can have violated 'the law of nations' if it acted solely as a non-governmental entity"); *see also Flores,* 414 F.3d at 244 (making no distinction between private individuals and corporations and noting that "certain activities are of 'universal concern' and therefore constitute violations of customary international law not only when they are committed by state actors, but also when they are committed by private individuals" (citing *Kadic,* 70 F.3d at 239-40)); *cf. Sosa,* 542 U.S. at 732 n. 20 (classifying both corporations and individuals as " private actor [s]"). Regardless, because the defendants have not objected to the imposition of liability on this basis, we need not reach the issue at this time.

The Ntsebeza and Digwamaje Plaintiffs argue that the district court also erred in focusing on whether allegations of accessorial liability would support jurisdiction under the ATCA because they also brought claims of direct liability. To the extent that the court did confront these direct liability claims, it appears to have rejected them either on the ground that the plaintiffs failed to allege state action or on the ground that the treaties upon which the claims were based were not self-executing and therefore could not satisfy the ATCA's jurisdictional prerequisite. Both of these bases appear to rest on misunderstandings of our ATCA jurisprudence.

First, it appears that the district court did not distinguish between norms of international law that apply only to state actors and those norms that proscribe conduct even when not taken under the color of law. For example, the district court held that the plaintiffs in this case "do not allege actions by the defendants that elevate them to the status of state actors in the commission of torture, genocide, killings, and other serious crimes."*In re S. African*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 21

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

*Apartheid Litig.,* 346 F.Supp.2d at 548-59. As we squarely held in *Kadic,* however, "the proscription of genocide [by customary international law] has applied equally to state and non-state actors," and " acts of rape, torture, and summary execution ... are actionable under the [ATCA], without regard to state action, to the extent that they were committed in pursuit of genocide or war crimes."70 F.3d at 242, 244. It is therefore not relevant whether the plaintiffs sufficiently allege that the defendants acted under color of law in the commission of genocide as long as they sufficiently allege that the defendants committed genocide.

**\*21** Second, I believe that the district court overstated the weight we have placed on the self-executing status of a treaty in our consideration of its weight as evidence of customary international law. In *Flores,* we explained that "a treaty that is self-executing or that has been executed through an Act of Congress-and therefore gives rise to rights legally enforceable in our courts-provides greater evidence of the customs and practices of the United States than a treaty that has not been executed."414 F.3d at 257. We did not hold that non-self-executing treaties are without any evidentiary value with regard to the state of current customary international law, much less that "no liability based upon any alleged violation of the[ ] norms [articulated in such treaties] can form an adequate predicate for jurisdiction under the ATCA."*In re S. African Apartheid Litig.,* 346 F.Supp.2d at 552. Indeed, in *Kadic* we relied on the Genocide Convention to determine the shape of the international proscription of genocide and made clear that "the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the [ATCA]." [FN18]*Kadic,* 70 F.3d at 241-42. The relevant inquiry for establishing jurisdiction under the ATCA, as our case law makes clear, is whether the conduct alleged by the plaintiffs violates a norm " that States universally abide by, or accede[ ] to, out of a sense of legal obligation and mutual concern." *Flores,* 414 F.3d at 248. Whether a treaty that embodies that norm is self-executing is relevant to, but is not determinative of, that question.

For the foregoing reasons, I join in the per curiam opinion.

HALL, Circuit Judge, concurring:

As reflected in the per curiam opinion, I agree with Judge Katzmann with respect to the ultimate disposition of this appeal. The district court erred when it ruled that it lacked jurisdiction under the ATCA to determine plaintiffs' claims based on defendants' accessorial liability. In ruling that it lacked subject matter jurisdiction under the ATCA, the district court required that "aiding and abetting international law violations [be] itself an international law violation that is universally accepted as a legal obligation."*In re S. African Apartheid Litig.,* 346 F.Supp.2d 538, 549 (S.D.N.Y.2004). In other words, the district court assumed that a federal court must look to international law to divine not only the applicable primary violation of international law cognizable under the ATCA, but also the standard for aiding and abetting liability. The district court went on to conclude that aiding and abetting liability did not exist as a matter of customary international law and thus that federal subject matter jurisdiction did not lie. This conclusion was error. As *Sosa* makes clear, a federal court must turn to international law to divine standards of primary liability under the ATCA. To derive a standard of accessorial liability, however, a federal court should consult the federal common law.

**\*22** We begin with the text. In its entirety, the ATCA provides:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

28 U.S.C. § 1350. The First Congress enacted the statute as part of the Judiciary Act of 1789. Over the course of the last 200-odd years, the text of the statute has changed only slightly, but "little is known of the framers' intentions in adopting it-the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 22

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

legislative history of the Judiciary Act does not refer to section 1350."*Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 304 (S.D.N.Y.2003). Few parties invoked the ATCA until our decision in *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), which heralded the modern era of ATCA litigation. But from the very beginning, the ATCA's straightforward text belied complex and controversial problems of exegesis and praxis. Struggling with these problems in the wave of litigation that followed *Filartiga,* we observed that "neither Congress nor the Supreme Court ha[d] definitively resolved the complex and controversial questions regarding the meaning and scope of the ATCA."*Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 247 (2d Cir.2003).

One year later, in an attempt to clarify the problems posed by the ATCA, the Supreme Court issued *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Principally, *Sosa* resolved that the ATCA was not "a jurisdictional convenience to be placed on the shelf for use by a future Congress ... that might, someday, authorize the creation of causes of action."*Id.* at 719.Instead, the ATCA recognizes "claim[s] based on the present-day law of nations" so long as they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms."*Id.* at 725.

In their complaints, the plaintiffs make claims that rest on such norms "defined with a specificity comparable to the features of the 18th-century paradigms."The allegations include genocide, torture, cruel and degrading treatment, systematic racial discrimination, forced removals, and various other avowed crimes against humanity. In essence, the plaintiffs assert that apartheid itself is a crime against humanity,[FN1] on a par with genocide [FN2] and slavery, and that the depredations of the apartheid system (such as torture, sexual assault, extrajudicial killing, and forced labor) were perpetrated in the course of genocide and crimes against humanity. In their brief and at oral argument, the corporations did not contest that such allegations reflected violations of customary international law.[FN3]Though their complaints are not models of precision, the plaintiffs, if given the opportunity to replead, likely would allege primary violations of international law cognizable under the ATCA.

**\*23** In addition to its delineation of the standard by which federal courts derive primary violations of international law, the *Sosa* opinion also contains numerous dicta. In his concurring opinion, Judge Katzmann thoroughly summarizes these dicta. It remains inescapable, however, that *Sosa* at best lends Delphian guidance on the question of whether the federal common law or customary international law represents the proper source from which to derive a standard of aiding and abetting liability under the ATCA. Lacking the benefit of clear guidance, I presume a federal court should resort to its traditional source, the federal common law, when deriving the standard. Because I find that federal common law provides a standard by which to assess aiding and abetting liability, I do not address the alternative argument that such a standard may be derived from international law.[FN4]

It is a "hornbook principle that international law does not specify the means of its domestic enforcement."Brief for the International Law Scholars as Amici Curiae at 5-6; *see also* Brief for the United States of America as Amicus Curiae at 5 ("[A]lthough the substantive norm to be applied is drawn from international law or treaty, any cause of action recognized by a federal court is one devised as a matter of federal common law."). As Judge Edwards has explained, "the law of nations never has been perceived to create or define the civil actions to be made available by each member of the community of nations."*Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 778 (D.C.Cir.1984) (Edwards, J., concurring); *see also Kadic v. Karadzic,* 70 F.3d 232, 246 (2d Cir.1995) ("The law of nations generally does not create private causes of action to remedy its violations, but leaves to each nation the task of defining the remedies that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                              Page 23

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

are available for international law violations."); *Xuncax v. Gramajo,* 886 F.Supp. 162, 180 (D.Mass.1995) ("While it is demonstrably possible for nations to reach some consensus on a binding set of principles, it is both unnecessary and implausible to suppose that, with their multiplicity of legal systems, these diverse nations should also be expected or required to reach consensus on the types of actions that should be available in their respective courts to implement those principles. "); Restatement (Third) of Foreign Relations Law § 703 cmt. c ("In general, individuals do not have direct international remedies against a state violating their human rights except where such remedies are provided by international agreement. Whether they have a remedy under the law of a state depends on that state's law."(internal citation omitted)); *Beth Stephens, Sosa v. Alvarez-Machain: "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts,* 70 Brook. L.Rev. 533, 558 (2004) ("*Sosa* does not require that every ancillary rule applied in an AT[CA] case meet the level of international consensus required for the definition of the underlying violation. As in any case in which the federal courts exercise discretion to recognize federal common law, the courts will fashion rules to fill gaps, borrowing from the most analogous body of law.").

**\*24** Numerous international law scholars have described this principle. *See* L. Henkin, Foreign Affairs and the Constitution 224 (1972); Oppenheim, 1 International Law 44-46 (8th ed.1955); L. Henkin, R. Pugh, O. Schachter & H. Smit, International Law 116 (1980); 4 Blackstone's Commentaries 72 (Welsby ed., 1854) (noting that the law of nations recognized certain universal offenses but that accessorial liability is made available "by statute"). As amicus International Law Scholars persuasively argue, these "means of domestic enforcement" encompass at least some theories of accessorial liability, including aiding and abetting. Brief for International Law Scholars as Amici Curiae at 6. I believe our Court should stand by this principle. Moreover, when international law and domestic law speak on the same doctrine, domestic courts should choose the latter. Oppenheim, *supra,* at 44-46.This, too, is a principle our Court should respect. Here, customary

international law and the federal common law both include standards of aiding and abetting. In a situation such as this, I opt for the standard articulated by the federal common law.

Supreme Court precedent commands the same result. As Judge Reinhardt noted when concurring in *Doe I v. Unocal Corp.,* 395 F.3d 932 (9th Cir.2002), the ATCA is silent "as to what body of law applies to ancillary issues that may arise, such as whether a third party may be held liable in tort" for a violation of international norms. *Id.* at 965 (Reinhardt, J., concurring). Typically, federal courts look to the federal common law to fill such an interstice. *Id.* at 966 (citing *United States v. Kimbell Foods,* 440 U.S. 715, 727, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)); *see also Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (stating that courts should apply the federal common law "in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations"). Until the Supreme Court provides us more explicit guidance regarding accessorial liability than it has to date, I remain convinced that our federal common law embodies a clearly extant standard of aiding and abetting liability. *See Unocal,* 395 F.3d at 967. It is to this standard that federal courts should resort and to which I now turn.

The Supreme Court has described *Halberstam v. Welch,* 705 F.2d 472 (D.C.Cir.1983) as "a comprehensive opinion on the subject [of aiding and abetting]."*Cent. Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).*Halberstam* relied heavily upon the **Restatement** (Second) of **Torts** to set the parameters of aiding and abetting liability. Section 876(b) of the Restatement provides: "For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Based on the Restatement, *Halberstam* held that aiding and abetting included three elements: **\*25** (1) the party whom the defendant aids must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 24

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam,* 705 F.2d at 477. The *Halberstam* Court then adopted and applied the factors enumerated in § 876 to assess whether the defendant's encouragement or assistance was sufficiently substantial to support liability. "The Restatement suggests five factors in making this determination: 'the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind. ' " *Id.* at 478 (quoting **Restatement** (Second) of **Torts** § 876 cmt. d) (alteration omitted). In the almost quarter-century since *Halberstam* was decided, many state courts and Circuit Courts, including the Second Circuit, have adopted the Restatement's aiding and abetting standard. Following the lead of the *Halberstam* Court, I believe that § 876 provides the proper standard under which to assess whether a particular defendant may be held liable for aiding and abetting a primary violation of **international law.**[FN5] I also agree with the *Halberstam* Court that "a person who assists a tortious act may be liable for other reasonably foreseeable acts done in connection with it." *Id.* at 484.

Under a proper application of § 876 to ATCA civil aiding and abetting claims, liability should be found only where there is evidence that a defendant furthered the violation of a clearly established international law norm in one of three ways: (1) by knowingly and substantially assisting a principal tortfeasor, such as a foreign government or its proxy, to commit an act that violates a clearly established international law norm; (2) by encouraging, advising, contracting with, or otherwise soliciting a principal tortfeasor to commit an act while having actual or constructive knowledge that the principal tortfeasor will violate a clearly established customary international law norm in the process of completing that act; or (3) by facilitating the commission of human rights

violations by providing the principal tortfeasor with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services will be (or only could be) used in connection with that purpose.

All members of this panel understand that corporations must transact business in a less than perfect world. I do not understand defendants to argue, however, that business imperatives require a license to assist in violations of international law. Rather, I understand defendants to express the concern that the recognition of ATCA aiding and abetting liability could expose corporations to liability for merely doing business in countries with repressive regimes or for participating in activities that, with twenty-twenty hindsight, can be said to have been indirectly linked to human rights abuses. I share Judge Katzmann's understanding, however, that private parties and corporate actors are subject to liability under the ATCA. I therefore concur in Part II.D.2 of Judge Katzmann's opinion to the extent that it recognizes the general legal principle that aiding and abetting liability obtains even where the culpable actor is incapable of violating the relevant legal norm as a principal, and I concur in Part II.D.3 of his opinion in full. Defendants raise important concerns about such liability, but those concerns do not counsel in favor of the per se rejection of corporate liability, private party liability, and aiding and abetting liability under the ATCA. Instead, they require the narrow and careful extension of such liability to cases in which a defendant played a knowing and substantial role in the violation of a clearly recognized international law norm. Furthermore, the collateral consequences predicted by defendants and the dissent remain relevant considerations when making these judgments, as the common law nature of the inquiry allows for a limited but meaningful consideration of the practical consequences of extending ATCA liability in the context of each particular case.

**\*26** Because I intend aiding and abetting liability to attach only in this limited way, I think it helpful to provide examples illustrating the three ways in which I believe a defendant may incur liability for aiding and abetting violations of customary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 25

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

international law. The first type of aiding and abetting liability is designed to capture the case of a principal tortfeasor who seeks assistance from a defendant to commit an act that violates international law norms, such as the extrajudicial killing of an opposition political figure. The second is designed to cover circumstances where the alleged aider and abettor is accused of having purchased security services with the knowledge that the security forces would, or were likely to, commit international law violations in fulfilling their mandate. The allegations raised in the cases of *Unocal,* 395 F.3d 932, and *Wiwa v. Royal Dutch Petroleum Co.,* No. 96-Civ-8386, 2002 WL 319887 (S.D.N.Y. Feb.28, 2002), would be reached by this prong. In *Unocal,* the alleged aider and abettor corporation was accused of having purchased security services from a military government to further develop its oil operations, with the knowledge that the security forces would likely commit international law violations in fulfilling this mandate. 395 F.3d at 938-42. In *Wiwa,* the plaintiffs alleged that the defendants directed and aided government security forces in violating plaintiffs' rights by providing logistical support, transportation, and weapons to government security forces to ensure that the corporation's business activities could proceed "as usual." *Wiwa,* No. 96-Civ-8386, 2002 WL 319887, at *2.

The Zyklon B Case provides a clear example of when liability would attach in the third circumstance, when a defendant provides "the tools, instrumentalities, or services to commit [human rights] violations with actual ... knowledge that those tools, instrumentalities or services will be (or only could be) used in connection with that purpose. "*See* Trial of Bruno Tesch and Two Others (The Zyklon B Case), 1 Law Reports of Trials of War Crim. 93 (1947) (British Military Ct., Hamburg, Mar. 1-8, 1946). In that case, Bruno Tesch was the sole owner of a firm that distributed Zyklon B, a highly dangerous poison gas, to Auschwitz and other concentration camps from 1941 to 1945. Zyklon B previously had been used as a disinfectant in public buildings. The evidence showed that Tesch himself proposed using the gas to exterminate human beings, undertook to train the S.S. in this "new method of killing," and was aware

that, by June 1942, the gas was being used for such a purpose. *Id.* at 95.The Prosecutor successfully argued that "knowingly to supply a commodity to a branch of the State which was using that commodity for the mass extermination of Allied civilian nationals was a war crime, and that the people who did it were war criminals for putting the means to commit the crime into the hands of those who actually carried it out."*Id.* at 94.

**\*27** These examples are illustrative rather than exhaustive, and I offer them in an effort to provide greater substantive content for a doctrinal framework that, like most common law rules, is " vague" and abstract in its articulation of legal obligations and culpable conduct. Opinion of Judge Korman at 133 (criticizing Restatement aiding-and-abetting standard as "vague and inappropriate in the present context"). Standards such as "substantial assistance" and "actual or constructive knowledge" are hardly "newly minted," however, and judicial decisions interpreting the meaning of these standards in the context of individual cases will provide guidance to courts considering accessorial liability under the ATCA. *See, e.g., Henry v. Lehman Commercial Paper, Inc.,* 471 F.3d 977, 993 (9th Cir.2006) (applying California law on the "knowledge" requirement of § 876); *Aetna Cas. & Sur. Co. v. Leahey Constr. Co .,* 219 F.3d 519, 535-37 (6th Cir.2000) (applying knowledge and substantial assistance requirements of § 876); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.,* 113 F.3d 1484, 1496 (8th Cir.1997) (addressing "substantial assistance" requirement in context of products liability litigation); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 886 (3d Cir.1975) ("It has been held that liability for aiding and abetting may be found on less than actual knowledge of the illegal activity. How much or how little knowledge would seem to vary with the facts of each case."(citation omitted)). Common law decisionmaking proceeds through the incremental, analogical application of broadly-stated principles, and it is therefore not amenable to the formulation of finely detailed rules in the manner of a regulatory code. Contrary to the dissent's suggestions, however, the contextual nature and factual sensitivity of common law judicial rulemaking takes account of the "practical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 26

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

problems" that can result from ill-designed legal rules, and the flexibility of the common law process allows those problems to be addressed and avoided as they arise.

In the case at bar, plaintiffs have alleged, albeit in insufficiently specific terms, that the defendant corporations (a) knowingly and substantially assisted a principal tortfeasor to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the principal tortfeasors with the tools, instrumentalities, or services to commit those violations with actual or constructive knowledge that those tools, instrumentalities, or services would be (or only could be) used in connection with that purpose. Such allegations, if proven, clearly satisfy the standard for asserting ATCA liability under an aiding and abetting theory.

As to the arguments raised by the Ntsebeza and Digwamaje plaintiffs regarding direct liability claims and the district court's treatment of them, I concur with and join in Part II.E of Judge Katzmann's concurring opinion.

**\*28** This case has confronted our panel with a number of difficult and unsettled questions in a controversial area of the law. As have other courts, *see, e.g., Tel-Oren,* 726 F.2d at 775, we have struggled with these issues in an effort to find some ground on which a majority of our panel could fully agree. Unfortunately, despite tireless debate, we remain diverse in our perspectives. Though our already lengthy opinions scarcely demand lengthening, I wish to articulate in a bit more detail, one objection to the dissent covered in part in footnote 14 of the per curiam opinion.

The dissent contends that the district court lacked subject matter jurisdiction as a result of certain justiciability doctrines, such as case specific deference, the political question doctrine, and international comity. Respectfully, this contention is in error. In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court

distinguished between the two. The existence, *vel non,* of subject matter jurisdiction is simply a question (with few exceptions not relevant here) of whether a claim arises under federal law. *Id.* at 198. If subject matter jurisdiction exists, a court may then-and only then-inquire as to the applicability of any of the various justiciability doctrines:

The District Court was uncertain whether our cases withholding federal judicial relief rested upon a lack of federal jurisdiction or upon ... "[ ]justiciability." The distinction between the two grounds is significant. In the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded. In the instance of lack of jurisdiction the cause either does not "arise under" the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. III, § 2), or is not a "case or controversy" within the meaning of that section; or the cause is not one described by any jurisdictional statute.

*Id.* (citations omitted). As this quote makes clear, the dissent errs in conflating the anterior question of the existence of subject matter jurisdiction with the posterior question of justiciability. *Cf. Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,* --- U.S. ----, ----, 127 S.Ct. 1184, 1191, 167 L.Ed.2d 15 (2007) (" [A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit...."). The dissent's error is not a minor one. By conflating these questions, the dissent provides itself the opportunity to discuss case specific deference, the political question doctrine, and international comity. This discussion, in turn, contains a number of missteps, at least two of which merit our attention in this context. The dissent suggests a district court-or even an appellate court, sitting in review-must dismiss a case when the executive branch, through a State Department Statement of Interest or other document, deems a case to be a political "irritant." This is not so. Mere executive fiat cannot control the disposition of a case before a federal court. Our principle of separation of powers not only counsels

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

the judiciary to conduct an independent inquiry-it requires us to do so. Regardless of what else *Sosa* holds, it did not doubt that ATCA suits are *law suits* constitutionally entrusted to the judiciary. *Cf. Whiteman v. Dorotheum GmbH & Co. KG,* 431 F.3d 57, 69 (2d Cir.2005) ("[N]ot every case touching foreign relations is nonjusticiable and judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights."(quoting *Kadic,* 70 F.3d at 249 (internal quotation marks omitted))). Thus a district court must weigh the Statement of Interest, as well as other relevant facts, in applying the *Baker v. Carr* factors and exercising its own discretion before deciding whether to dismiss a complaint.

**\*29** For the foregoing reasons, I join in the per curiam opinion.

KORMAN, District Judge, concurring in part and dissenting in part:

Today, the majority allows three class actions on behalf of all persons who lived in South Africa between 1948 and the present and who suffered damages as a result of apartheid to go forward in a United States court against American, Canadian, and European corporations that sold goods and materials or made loans to the Union of South Africa during the apartheid era. It does so over the vigorous objections of the United States, its allies, and, most notably, the Republic of South Africa, which is justifiably proud of the ability of its legal system to adjudicate legitimate human rights claims. In doing so, the majority also ignores a direct signal from the Supreme Court of the United States regarding the non-viability of these claims. The majority also declines to dismiss the case, even though the legal foundation of the complaints was expressly rejected by a judgment rendered in Nuremberg that "[l]oans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime."*United States v. von Weizsaecker* ("*The Ministries Case*"), 14 *Trials of War Criminals*

*Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 308, 622 (William S. Hein & Co., Inc.1997) (1949). Indeed, the defendant in that case was an officer of the Dresdner Bank, which is a named defendant in this case. The theory of liability was that the Dresdner Bank provided loans to businesses knowing that the funds would be used to finance enterprises that employed slave labor. In acquitting the corporate officer of the charges relating to slave labor, the tribunal at Nuremberg observed that:

The real question is, is it a crime to make a loan, knowing or having good reason to believe that the borrower will us[e] the funds in financing enterprises which are employed in using labor in violation of either national or international law?... A bank sells money or credit in the same manner as the merchandiser of any other commodity. It does not become a partner in enterprise and the interest charged is merely the gross profit which the bank realizes from the transaction, out of which it must deduct its business costs, and from which it hopes to realize a net profit. Loans or sale of commodities to be used in an unlawful enterprise may well be condemned from a moral standpoint and reflect no credit on the part of the lender or seller in either case, but the transaction can hardly be said to be a crime. Our duty is to try and punish those guilty of violating international law, and we are not prepared to state that such loans constitute a violation of that law ...

*Id.*Indeed, the theory of liability rejected by the tribunal is the same as that alleged here against Dresdner Bank. A00211-12. Specifically, along with other banks, it is accused of providing " [f]oreign capital in the form of trade loans, large international bonds and credits, direct loans ... to South African borrowers, and project financing [that] supported the apartheid regime."A00194.

**\*30** Instead of deferring to this reasoned judgment, one member of the majority, Judge Hall, eschews any reference to sources of customary international law and applies a principle of aiding-and-abetting in civil cases that the Supreme Court observed "has been at best uncertain in application ... with the common-law precedents 'largely confined to isolated acts of adolescents in rural society.' " *Cent.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                          Page 28

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

*Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 181, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting *Halberstam v. Welch,* 705 F.2d 472, 489 (D.C.Cir.1983)). The second member of the majority, Judge Katzmann, concludes that a defendant's liability for aiding-and-abetting a crime against humanity must be determined by reference to customary international law, and he then goes on to articulate the standard for determining such liability. While the standard he enunciates is entirely consistent with the holding in the Ministries Case, and also reflects an emerging consensus on the appropriate standard for holding a private party liable for aiding-and-abetting, he joins Judge Hall in voting to vacate the judgment dismissing the case without deciding whether the allegations in the complaints are sufficient to satisfy that standard, and without addressing the objections of the United States and the Republic of South Africa to the exercise of jurisdiction over the complaints.

### Background

Because the allegations in the complaint go unmentioned in the *per curiam* and concurring opinions, it is necessary to provide an overview of the case beyond describing the procedure by which the case made its way here. Judge Sprizzo's opinion in the district court contains a detailed and accurate description of the hundreds of pages of allegations contained in the three voluminous complaints. *See In re South African Apartheid Litig.,* 346 F.Supp.2d 538, 543-46 (S.D.N.Y.2004). This enables me to provide the following brief background.

In 1948, the National Party came to power in South Africa. From then until the early 1990s, that ruling party imposed and enforced a set of laws under which the non-white population was the subject of disenfranchisement, state-sponsored discrimination, and repression. These laws, establishing what became known as apartheid, included severe curtailments on the liberty of nonwhites with respect to residency, travel, assembly, education, employment, and marriage. Apartheid's restrictions were enforced by members of South Africa's military and police, and the history of apartheid includes many instances of arbitrary detention,

torture, and killings by those state actors. The complaints recount many of those instances of wrongful conduct by apartheid government officials, including the Sharpeville Massacre of 1960, the Soweto Massacre of 1976, and the killing of the Craddock Four in 1985.

The allegations are very different with respect to the defendants. The portions of the complaints relating to defendants' alleged conduct focus principally on their trade with South Africa. Thus, car companies are accused of selling cars, computer companies are accused of selling computers, banks are accused of lending money, oil companies are accused of selling oil, and pharmaceutical companies are accused of selling drugs. The theory of the complaints is that in this way defendants facilitated or "aided-and-abetted" apartheid and its associated human rights violations. To support that theory, the complaints allege generally that defendants knew of the racist policies of apartheid; that they nevertheless so engaged in the transactions in and with the Union of South Africa; and that, had they not done so, the apartheid regime would have collapsed, apartheid would have ended sooner, and plaintiffs would not have suffered some or all of their injuries. The causal theory advanced by the Khulumani plaintiffs is even weaker: "Apartheid would not have occurred *in the same way* without the participation of defendants."A00166 (emphasis added). Typical of the allegations are:
**\*31** • "Apartheid needed the cooperation, financing and supplies from the defendant financial institutions and companies and/or their predecessors or successors to ensure that they had the technology, equipment, systems, infrastructures and weaponry to insure that their system could function." A00304.
• "Without oil, the police and military could not have functioned and the economy of South Africa would have come to a standstill."A00171.
• "More than any other single technological advancement, the computer fostered the concentration of administrative power in the hands of Africa's white elite."A00427.
• "Many computer uses were crucial for the apartheid regimes' *[sic]* keeping track of political activists who were later targeted for assassinations." A00430.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                          Page 29

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

• "[A]ny transfer of capital to South Africa had military implications: loans to the railways and harbors systems assisted in the mobilization of the armed forces; trade financing provided the computers and telecommunications equipment necessary to the efficient functioning of a modern army; financing for housing project perpetuated the segregated housing of apartheid."A00201.

• "The money from defendant German banks directly benefitted and supported the apartheid reign of terror in South Africa."A00440.

• "Limitations on the employment of non-whites in salaried, administrative jobs puts a premium on automating such tasks. In this sense, U.S. computer firms helped to solve the skilled white labor problem."A00428; *see also* A00306-07.

• "Defendant vehicle manufacturers knowingly supplied vehicles, parts, and other equipment to the South African Police (SAP), South African Defense Force (SADF) and South African Army.... These vehicles were used to patrol African townships, homelands, and other areas and were used to suppress dissent."A00216; *see also* A00312.

The complaints themselves seek relief on behalf of all persons who lived in South Africa between 1948 and the present who suffered damages as a result of apartheid. Moreover, they seek to hold responsible each of the defendants, whom they characterize as aiders-and-abetters, liable for "all acts comprising the entire system of apartheid-a criminal enterprise." A00255. Nevertheless, they fail to link the conduct of a specific defendant to an injury suffered by a particular plaintiff. On the contrary, the gravamen of the complaints is not that individuals should recover from particular defendants in tort, but that millions of people who "lived under the apartheid system", A00095, should recover from all the defendants for having been "subject to ... the overwhelming injustices that characterized apartheid."*Id.* In sum, these are reparations cases, seeking at least $400 billion in reparations, rather than torts cases for damages. They fail to allege a cognizable cause of action.

Moreover, the plaintiffs conceded at oral argument that they are not anxious to amend their complaints to link a particular plaintiff to injuries caused by a

particular defendant. Tr. at 64. Indeed, the attorney for the Khulumani plaintiffs acknowledged that he would not necessarily be satisfied with such an amendment, but that he would "accept it because it would be a beginning."Tr. at 80. Nevertheless, he confessed that "[w]hat's at stake here is almost by definition of the crime an inability to make that exact trace or that degree of particularity."Tr. 80-81. This concession alone establishes that the allegations in any amended complaints would be insufficient "to raise a reasonable expectation that discovery will reveal evidence" to support them. *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Instead, these complaints would simply provide a vehicle to coerce a settlement. Nevertheless, the *per curiam* opinion reverses the order dismissing the complaints and orders Judge Sprizzo to rule again on plaintiffs' motions for leave to replead, because plaintiffs have indicated "that, if given the opportunity, they would narrow the claims and clarify the allegations against the various defendants. "*Per Curiam* Op. *ante* at 13-14.

**\*32** I dissent from the holding keeping these claims alive for the reasons alluded to earlier and because (1) the Supreme Court, in *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), has instructed us that this is the very sort of case in which jurisdiction should not be exercised; (2) the State Department has filed a persuasive Statement of Interest in this matter urging dismissal because of the adverse effect the continued prosecution of these cases would have on the interests of the United States and our relations with other countries; and (3) the Republic of South Africa, a democratically elected government representative of all South Africans, including the victims of apartheid, has asserted the right to define and finalize issues related to reparations for apartheid-era offenses within its own legal framework-thus making this lawsuit an insult to the post-apartheid, black-majority government of a free people. These grounds, among others, reinforce the compelling policy argument articulated that a decision to hear these cases would "reflect[ ] the worst sort of 'judicial imperialism' ... [and] send the message that the United States does not respect the ability of South African society to administer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 30

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

justice by implying that U.S. courts are better placed to judge the pace and degree of South Africa's national reconciliation."Elliot J. Schrage, *Judging Corporate Accountability in the Global Economy,* 42 Colum. J. Transnat'l L. 153, 166 (2003).

## Discussion

### 1. Deference to the United States and the Republic of South Africa

This appeal is unique. Departing from its usual practice, the Supreme Court, in the context of deciding a different case, has already given us guidance as to how this appeal should be decided. In *Sosa,* it held that, in determining whether the Alien Tort Claims Act (the "ATCA") provides a basis for the exercise of jurisdiction over an alleged tort in violation of the law of nations, courts must apply "principle[s] limiting the availability of relief" beyond the requirement that the international law norm whose violation is alleged be sufficiently defined. 542 U.S. at 733 n. 21. Specifically, because the decision to permit a case to proceed involves "an element of judgment about the practical consequences of making that cause available to litigants,"*id.* at 732-33, the Supreme Court suggested that "case-specific deference to the political branches,"*id.* at 733 n. 21, provided one limitation on the exercise of jurisdiction under the ATCA in certain instances.

Among the reasons for such deference is that the recognition of private rights of action for violations of international law may give rise to "collateral consequences." *Id.* at 727.Specifically, the Court cautioned that "the potential implications for the foreign relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."*Id.* The Court continued: "Since many attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences, they should be undertaken, if at all, with great caution."*Id.* at

727-28.Then, focusing on the case before us on this appeal, the Supreme Court continued:

**\*33** For example, there are now pending in Federal District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. *See In re South African Apartheid Litigation,* 238 F.Supp.2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which " deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill." Declaration of Penuell Mpapa Maduna, Minister of Justice and Constitutional Development, Republic of South Africa, reprinted in App. to Brief for Government of Commonwealth of Australia et al. as *Amici Curiae* 7a, ¶ 3.2.1 (emphasis deleted). The United States has agreed. *See* Letter of William H. Taft IV, Legal Adviser, Dept. of State, to Shannen W. Coffin, Deputy Asst. Atty. Gen., Oct. 27, 2003, reprinted in *id.,* at 2a.In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy. *Cf. Republic of Austria v. Altmann,* 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004) (discussing the State Department's use of statements of interest in cases involving the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*).

*Id.* at 733 n. 21.

The Executive Branch's view of the impact of these cases on foreign policy is set forth at some length in a letter to the district court, dated October 27, 2003, from the Legal Advisor of the Department of State. The letter advises "that continued adjudication of the above-referenced matters risks potentially serious adverse consequences for significant interests of the United States."A01090. After outlining the objections of the Republic of South Africa to the continued prosecution of these cases in the United States and noting the "extensive steps" it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 31

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

has taken "to promote reconciliation and redress for apartheid-era injustices," the Legal Advisor observed that the Republic of South Africa "is broadly representative of the victims of the apartheid regime" and "is uniquely charged with a popular mandate to deal with the legacy of apartheid."*Id.* He then concluded his discussion of this aspect of the Executive Branch's concern as follows:

Support for the South African government's efforts in this area is a cornerstone of U.S. policy towards that country. For that reason, we are sensitive to the view of the South African government that adjudication of the cases will interfere with its policy goals, especially in the areas of reparations and foreign investment, and we can reasonably anticipate that adjudication of these cases will be an irritant in U.S.-South African relations. To the extent that adjudication impedes South Africa's on-going efforts at reconciliation and equitable economic growth, this litigation will also be detrimental to U.S. foreign policy interests in promoting sustained economic growth in South Africa.

**\*34** *Id.*

The State Department also voiced other concerns. For one thing, the Legal Advisor wrote, "[v]arious other foreign governments, including those of the United Kingdom and Canada, have also approached us via diplomatic channels to express their profound concern that their banks, corporations and other entities have been named as defendants." A01090-91. Because of those governments' "strong belief that the issues raised in the litigation are most appropriately handled through South Africa's domestic processes," the State Department " anticipat[ed] possible, continuing tensions in our relations with these countries over the litigation." A01091.

Moreover, the Legal Advisor expressed concern over the chilling effect that actions of this kind may have on future foreign investment in developing countries:

The United States relies, in significant part, on economic ties and investment to encourage and promote positive change in the domestic policies of

developing countries on issues relevant to U.S. interests, such as respect for human rights and reduction of poverty. However, the prospect of costly litigation and potential liability in U.S. courts for operating in a country whose government implements oppressive policies will discourage the U.S. (and other foreign) corporations from investing in many areas of the developing world, where investment is most needed and can have the most forceful and positive impact on both economic and political conditions. To the extent that the apartheid litigation in U.S. courts deters such investment, it will compromise a valuable foreign policy tool and adversely affect U.S. economic interests as well as economic development in poor countries.

*Id.*

In *Whiteman v. Dorotheum GmbH & Co. KG,* 431 F.3d 57 (2d Cir.2005) (Cabranes, J.), we recognized that "[j]udicial deference to the Executive Branch on questions of foreign policy has long been established under the prudential justiciability doctrine known as the 'political question' doctrine... ."*Id.* at 69.In deciding what deference to accord the position of the Executive Branch, we referenced the foundational case of *Baker v. Carr,* which identified six independent tests for recognition of a political question. 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). In *Whiteman,* we directed the dismissal of the complaint without examining each of the *Baker* tests because it was clear that the case met the fourth test, namely that " 'a court's undertaking independent resolution' of this claim is impossible 'without expressing lack of the respect due' the Executive Branch."431 F.3d at 72 (emphasis deleted) (citations omitted).

We need not examine any of the six independent tests identified in *Baker* because *Sosa* plainly held that the determination of whether to exercise jurisdiction over a cause of action for a violation of the law of nations is subject to "case-specific deference to the political branches."542 U.S. at 733 n. 21. More than that, the Supreme Court advised us that in the *instant* cases "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."*Id.* Indeed, one commentator, who

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                      Page 32

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

has emphasized the need for a "searching review" of the Bush administration's positions in human rights cases, has acknowledged that the present cases are different:
**\*35** [These] cases reflect the unique history of South Africa and its transition from apartheid to democracy. The government that replaced the apartheid regime was recognized internationally as representative both of the majority of the nation and, in particular, of the victims of past human rights abuses. The transition included a negotiated process by which abuses would be investigated and perpetrators given the opportunity to testify about their actions in return for amnesty. When the democratically elected, representative government of South Africa objected to the impact of the U.S. litigation on the negotiated transition process, the executive branch asked the courts to defer to this judgment. All of these factors provide support for the Court's suggestion that there is a "strong argument" that executive branch views "in such cases" are entitled to "serious weight."

Beth Stephens, *Sosa v. Alvarez-Machain, "The Door Is Still Ajar" for Human Rights Litigation in U.S. Courts,* 70 Brook. L.Rev. 533, 562 (2005). (Professor Stephens and a fellow academic coauthored an *amicus curiae* brief on behalf of international human rights organizations and bar associations in support of the plaintiffs-appellants. While it urges reversal of the judgment of the district court, her *amicus* brief does not address the effect of footnote 21 in *Sosa.*)

In any event, the force of the advice of the State Department is enhanced by the fact that, under the doctrine of international comity, dismissal would be justified solely out of deference to the Republic of South Africa. Comity, a doctrine more easily invoked than defined, may be viewed as either "the degree of deference that a domestic forum must pay to the act of a foreign government not otherwise binding on the forum,"*Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 937 (D.C.Cir.1984), or as "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts."*In re Maxwell Commc'n Corp.,* 93 F.3d 1036, 1047

(2d Cir.1996). A court's exercise of discretion to dismiss a suit on comity grounds is independent of its treatment of the views of the Executive Branch. *See Ungaro-Benages v. Dresdner Bank AG,* 379 F.3d 1227 (11th Cir.2004) (dismissing a claim on the grounds of international comity after declining to defer to the Executive Branch).

The decision whether to dismiss on this basis depends on the degree to which the interests of a foreign sovereign are "legitimately affronted by the conduct of litigation in a United States forum,"*Jota v. Texaco, Inc.,* 157 F.3d 153, 160 (2d Cir.1998), steps the foreign sovereign may have taken to address the issues in the litigation, and the extent of our own interest in the underlying issues. *See generally Bi v. Union Carbide Chems. & Plastics Co.,* 984 F.2d 582 (2d Cir.1993) (Newman, J.). Perhaps the most significant factor is whether the foreign sovereign to which we defer is a democratically elected government with an independent judiciary. *Id.* at 585-86.

**\*36** In the present cases, the extent of the affront to the legitimate interests of the Republic of South Africa, the steps it has taken to address the issue of reparations, and the depth of feeling underlying its concern are amply reflected in the record. On April 15, 2003, in response to the Report of the Truth and Reconciliation Commission ("TRC"), the President of the Republic, Thabo Mbeki, announced the programs that would be implemented to assist the victims of apartheid:
[W]ith regard to specific cases of individual victims identified by [the] TRC Act, the government has put in place and will intensify programmes pertaining to medical benefits, educational assistance and provision of housing and so on. From time to time, Ministers have elaborated and will continue to expatiate on the implementation of these and other related programmes.
The TRC has reported that about 22,000 individuals or surviving families appeared before the Commission. Of these, about 19,000 required urgent reparations, and virtually all of them, where the necessary information was available, were attended to as proposed by the TRC with regard to interim reparations.
With regard to final reparations, government will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 33

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

provide a once-off grant of R30,000 to those individuals or survivors designated by the TRC. This is over and above other material commitments that we have already mentioned.

We intend to process these payments as a matter of urgency, during the current financial year. Combined with community reparations, and assistance through opportunities and services we have referred to earlier, we hope that these disbursements will help acknowledge the suffering that these individuals experienced, and offer some relief.

A00745. President Mbeki then addressed the issue of "civil suits against corporations that benefitted from the apartheid system," specifically this litigation. A00747. After reiterating "that the South African Government is not and will not be a party to such litigation," he continued: "[W]e consider it completely unacceptable that matters that are central to the future of our country should be adjudicated in foreign courts which bear no responsibility for the well-being of our country and the observance of the perspective contained in our Constitution of the promotion of national reconciliation."*Id.* While recognizing "the right of citizens to institute legal action," President Mbeki also emphasized that the government's approach is informed by "the desire to involve all South Africans, including corporate citizens, in a co-operative and voluntary partnership to reconstruct and develop South African society."*Id.* Accordingly, he also rejected the once-off wealth tax on corporations suggested by the TRC. *Id.*

Likewise, in an address to Parliament on the same day, Alec Erwin, the Minister of Trade and Industry, emphasized that the government's rationale for its rejection of the once-off wealth tax applied equally to its opposition to the cases at issue:
**\*37** It is for all the above reasons that we are opposed to and indeed contemptuous of attempts to use unsound extra-territorial legal precepts in the [United States of America] to seek personal financial gain in the [United States of America] to seek personal financial gain in the [United States of America] to seek personal financial gain in the South Africa it is an abuse to use the law, unsound law at that, of another land to undermine our sovereign right to settle our past and

build our future as we see fit. South Africans involved in this break that indefinable collectivist identity that was the origin of our strength. The government rejects the actions of legal practitioners in the USA to exploit our history and will not allow any judgment made in the USA or elsewhere to be carried out in South Africa.

A00754-55.

Professor Kader Asmal, the Minister of Education, also assailed the prosecution of these cases. He told the Parliament:
South Africa must settle this issue for themselves and does not need the help of ambulance chasers and contingency fee operators, whether in Switzerland, the Netherlands, or the United States of America. As South Africans, we have effectively dealt with our own historical challenges and we will continue to do so. It is part of our sovereign right.

A00758.

On April 16, 2003, the day after the addresses quoted above, the Cabinet of the Republic of South Africa resolved that "[i]t remains the right of the [G]overnment [of South Africa] to define and finalise issues of reparations, both nationally and internationally."A00803. Against this backdrop, the then-Minister of Justice, Penuell Mpapa Maduna, filed a declaration in the district court which set forth the Republic of South Africa's view of various cases pending in the United States against corporations that did business with and in South Africa during the apartheid period, including the cases at issue here. The statement summarizes the actions undertaken by the Republic of South Africa "to repair the damage caused by the apartheid system through a broad programme of socioeconomic reparations which has at its heart, the betterment of the lives of the previously disadvantaged."A00801. Then, addressing the prosecution of these cases, he argued that the remedies sought-including "the demand for billions of dollars in damages to be distributed by the U.S. courts"-are "inconsistent with South Africa's approach to achieving its long term goals."A00805. Specifically, he continued:
Permitting this litigation to go forward will, in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 34

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

government's view, discourage much-needed direct foreign investment in South Africa and thus delay the achievement of our central goals. Indeed, the litigation could have a destabilising effect on the South African economy as investment is not only a driver of growth, but also of employment. One of the structural features of the South African economy, and one of the terrible legacies of apartheid, is its high level of unemployment and its by-product, crime. Foreign direct investment is essential to address both these issues. If this litigation proceeds, far from promoting economic growth and employment and thus advantaging the previously disadvantaged, the litigation, by deterring foreign direct investment and undermining economic stability will do exactly the opposite of what it ostensibly sets out to do.

**\*38** A00805-06. The last paragraph of Minister Maduna's declaration invoked the doctrine of international comity. He observed that under United States law, courts may abstain from adjudicating cases in deference to the sovereign rights of foreign countries to legislate, adjudicate and otherwise resolve domestic issues without outside interference, particularly where the relevant government has expressed opposition to the actions proceeding in the United States, and where adjudication in the United States would interfere with the foreign sovereign's efforts to address matters in which it has the predominant interest. The government submits that its interest in addressing its apartheid past presents just such a situation.

A00806.

Most recently, on this appeal, the Republic of South Africa filed an *amicus curiae* brief, which is not addressed in the *per curiam* and concurring opinions and is not specifically listed among the parties filing briefs on this appeal, arguing that these actions "fundamentally interfere with South Africa's independence and sovereignty and intervene in its internal affairs, including its right under international law to address its apartheid past and to develop policies for its future in the manner it deems most appropriate, subject to the support and approval of the democratic electorate."Br. for

S. Afr. as *Amicus Curiae* at 1-2. Specifically, it emphasized that the continuation of this litigation would discourage business investment and, thereby, disrupt the growth of the South African economy. *Id.* at 3-4.In a statement appended to the brief, the current South African Minister of Justice, Brigitte Sylvia Mabandla, repeated verbatim the earlier statement of former Minister Maduna, adding that " another country's courts should not determine how ongoing political processes in South Africa should be resolved."*Id.* annex at 1.

In light of the consistent and considered policy of the Republic of South Africa and the programs it has put in place to provide reparations and assistance to the identifiable victims of apartheid, it is difficult to conceive of any policy reason for exercising jurisdiction over these cases. On the contrary, "[m]ost judges would not want, by asserting their own jurisdiction in a doubtful case, to undermine efforts to rebuild national sovereignty, democratic institutions, and self-respecting courts, in countries that have lately suffered from catastrophic events that include international crimes. "Michael Kirby, *Universal Jurisdiction and Judicial Reluctance: A New "Fourteen Points", in Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes Under International Law* 240, 255 (Stephen Macedo, ed.2004). Indeed, Professor William R. Casto, whose scholarship was cited repeatedly by the Supreme Court in *Sosa,* has written that the apartheid regime in South Africa may be an example of a situation "in which a nation's prior government has engaged in the most despicable misconduct, but the current government is making an honest, perhaps faltering, but nevertheless real effort to rectify the past misdeeds... . If apartheid were determined to be a violation of clearly established international law, a tort remedy for the victims of that evil system might nevertheless be inappropriate."William R. Casto, *The New Federal Common Law of Tort Remedies for Violations of International Law,* 37 Rutgers L.J. 635, 656 (2006).

**\*39** Particularly apposite here is the characteristically thoughtful opinion of Judge Newman in *Bi v. Union Carbide Chemicals & Plastics Co., 984 F.2d 582.* The case arose out of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 35

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

the devastating Bhopal industrial accident, in which deadly gas from a plant operated by Union Carbide India Ltd. ("UCIL") blew into a densely populated part of India. Some 145 class actions were filed in federal district courts across the United States and consolidated in the Southern District of New York. After the case was dismissed on the grounds of *forum non conveniens,* the Indian government, to which its parliament granted the exclusive authority to represent the victims of the disaster in India and elsewhere, filed suit in India on behalf of all claimants. India and Union Carbide ultimately agreed to a court-approved settlement, by which the latter agreed to pay $470 million to the Indian government for the benefit of all victims of the disaster.

After the settlement of the class actions in India, two cases were filed in Texas state courts on behalf of other victims of the Bhopal disaster. The cases were transferred to the Southern District of New York, where Judge Keenan dismissed both actions on the ground of *forum non conveniens.*We affirmed the dismissal, although on different grounds. Judge Newman described the appeal as presenting "an interesting issue of comity among nations in the resolution of claims arising from torts occurring within a foreign country."*Bi,* 984 F.2d at 583. The precise issue he identified

is whether the federal and state courts of this country should defer to the judgment of a democratic foreign government that disputes arising from a mass tort occurring within its borders can be best resolved by according the foreign government exclusive standing to represent the victims of the disaster in the courts of the world.

*Id.* We declined to permit the plaintiffs to prosecute the class actions in federal or state court, notwithstanding their arguments that settlement of their claims by the Indian government was unfair and improper because, among other things,the Indian Government had an unacceptable conflict of interest as part owner of UCIL, most of the victims oppose the settlement as grossly inadequate, and their due process rights were violated because they received inadequate notice and inadequate representation in the proceedings and because they could not opt out of the settlement.

*Id.* at 584.

After describing in detail the structure of the Indian government, pursuant to a Constitution that " provides for a republican form of parliamentary government and guarantees the fundamental rights of the people, including equal protection and procedural due process,"*id.* at 585, Judge Newman observed that India had chosen "to represent exclusively all the victims in a suit against Union Carbide and to use the money it received in settlement of that suit to fund a plan framed ... to process the claims of all the victims."*Id.* at 586.Under these circumstances, he wrote, "[t]o grant the victims of the Bhopal disaster, most of whom are citizens of India, access to our courts where India has set up what it believes to be the most effective method of dealing with a difficult problem would frustrate India's efforts."*Id.*"[W]ere we to pass judgment on the validity of India's response to a disaster that occurred within its borders," Judge Newman continued, "it would disrupt our relations with that country and frustrate the efforts of the international community to develop methods to deal with problems of this magnitude in the future."*Id.*

**\*40** Moreover, it was not relevant whether "under our constitutional standards, our Government could pass an act similar to the Bhopal Act" pursuant to which the Indian government settled the claims that the plaintiffs sought to prosecute. *Id.* Instead, he wrote that:

when a recognized democracy determines that the interests of the victims of a mass tort that occurred within its borders will be best served if the foreign government exclusively represents the victims in courts around the world, we will not pass judgment on that determination, and we will permit only the foreign government access to our courts to litigate those claims, subject of course to our own requirements for standing. This conclusion is especially compelling in a case such as this where almost all of the victims are Indian citizens.

*Id.*

The present cases involve a stronger basis for dismissal under the doctrine of international comity.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 36

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Like India, the Republic of South Africa is a sovereign democratic state whose policies broadly reflect the interests of its people. Moreover, it has adopted policies and programs designed to address the effects of apartheid and compensate its victims. However, unlike the plaintiffs in *Bi,* whose claims were wiped out under Indian law and who had no alternative forum, the plaintiffs here may have a competent alternative forum in their home country that, by all accounts, is prepared to hear their grievances. Indeed, the plaintiffs have themselves acknowledged that relief would be available in the courts of the Republic of South Africa. *See* Khulumani Reply Br. at 27 ("No relief from civil or criminal liability was enacted for those who did not apply for and obtain amnesty from the TRC, ... South Africa's approach leaves open the possibility for individual citizens to take up any grievance related to human rights violations with the courts .... ") (internal quotation marks omitted); Ntsebesa Reply Br. at 28 ("The acts alleged in plaintiffs' complaints are illegal and would subject the defendants to suit in both the United States and South Africa....").

Significantly, President Mbeki has stated, "[the] Government recognizes the right of citizens to institute legal action." A00747. Likewise, in criticizing the prosecution of these cases in the United States, Minister Erwin noted that the plaintiffs "have an inviolate right to recourse in law" -just not in the United States. A00754. Thus, unlike the victims of the Bhopal disaster, there is every indication they may have their day in court, in their home country, before an independent judiciary, in a manner consistent with traditional notions of due process. As Minister Maduna stated in his declaration to the district court:
Under the Constitution, the judicial authority of the Republic is vested in the courts, which are independent and subject only to the Constitution and the law, which they must apply impartially and without fear, favour or prejudice. No person or organ of state may interfere with the functioning of the courts, while all other organs of the state, through legislative and other measures, must assist and protect the courts to ensure their independence, impartiality, dignity, accessibility and effectiveness. An order or decision of a court binds all persons to whom and organs of state to which it applies. South Africa has a well developed judicial system, with the Constitutional Court at its apex and the Supreme Court of Appeal as the final court of appeal in non-constitutional matters. Judgments of the Constitutional Court and, indeed, the Supreme Court of Appeal, are widely admired for their independence and incisiveness and are frequently referred to in judgments of other final courts of appeal internationally.

**\*41** A00798-A00799. Similarly, as one scholar of South African law has observed,[t]he new constitutional law not only introduced the ethos of a democratic *Rechtsstaat,* but also enacted an extensive array of socioeconomic rights that are designed to change South African society fundamentally. These can be and indeed already have been used to secure, through litigation, the interests of the traditionally marginalised groups and to ensure their place on the political agenda.

François du Bois, *Introduction: History, System and Sources, in Introduction to the Law of South Africa* 1, 3-4 (C.G. van der Merwe & Jacques E. du Plessis eds., 2004).

While I have assumed the availability of a forum in the Republic of South Africa, *Bi* makes clear that such an alternative forum is not always required before the doctrine of comity may be invoked. *See also Jota,* 157 F.3d at 160 ("[C]ases might be imagined where a foreign sovereign's interests were so legitimately affronted by the conduct of litigation in a United States forum that dismissal is warranted without regard to the defendant's amenability to suit in an adequate foreign forum...."). Nevertheless, even if the availability of an alternative forum were an absolute prerequisite to dismissal on the ground of international comity, and one were not available in these cases, deference to South African law would be justified under a traditional choice-of-law analysis. Indeed, although he did not *in haec verba* invoke such analysis, Judge Newman's opinion in *Bi* is entirely consistent with it.

We have previously held that the assumption of subject matter jurisdiction over a cause of action under the ATCA does not preclude a choice-of-law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 37

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

analysis resulting in dismissal of the case. *Filartiga v. Pena-Irala,* 630 F.2d 876, 889 (2d Cir.1980). This inquiry is separate from the jurisdictional analysis. Indeed, we have read *Filartiga* as " requiring the district court to perform a traditional choice-of-law analysis to determine whether international law, [the] law of forum state, or [the] law of state where events occurred should provide substantive law in such an action."*Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 105 n. 12 (2d Cir.2000).

I engage in a hypothetical choice-of-law analysis here, because it focuses on the governmental interests of South Africa and the United States and serves to reinforce the argument against exercising jurisdiction over these cases. As we have observed,
[t]he federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation.... The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent.

*In re Koreag, Controle et Revision S.A.,* 961 F.2d 341, 350 (2d Cir.1992). In this case, the Republic of South Africa has the greatest interest, if not the only interest, in the application of its laws. The conduct alleged took place in South Africa and the victims were its own citizens. The remedies that its citizens should have as a result of the injuries they suffered at the hands of the apartheid regime are matters exclusively for its democratically elected post-apartheid government.

**\*42** Moreover, the tenuous interest of the United States in the issues raised by these cases is also reflected in the fact that, under customary international law, we could not exercise subject matter jurisdiction over a cause of action against the primary tortfeasor-the officials of the Union of South Africa-or the foreign corporate defendants. This is so, because apartheid, however abhorrent it may have been, has not been regarded as an offense subject to the exercise of universal jurisdiction. This concept, as its name implies, "recognize[s] that international law permits any state to apply its laws to punish certain offenses although the state has no

links of territory with the offense, or of nationality with the offender (or even the victim)."*Restatement (Third) of Foreign Relations Law* § 404 cmt. a (1987); *see also Matter of Extradition of Demjanjuk,* 612 F.Supp. 544, 555-58 (N.D.Ohio 1985). Universal jurisdiction is dependent not only on " substantive agreement as to certain universally condemned behavior," which transforms the behavior into a violation of customary international law, but also "procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior ."*Sosa,* 542 U.S. at 762 (Breyer, J., concurring in part and concurring in the judgment).

There is no agreement with respect to the latter issue. Although the *Restatement (Third) of Foreign Relations Law* cites racial discrimination, "when [ ] practiced systematically as a matter of state policy, e.g., apartheid," as a violation of customary international law, *id.* § 702 cmt. i (emphasis deleted), it omits apartheid from the list of offenses subject to universal jurisdiction. Instead, the Restatement states that universal jurisdiction exists only for "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism."*Id.* § 404. Indeed, while the Reporters of the Restatement observed that the International Convention on the Suppression and Punishment of the Crime of Apartheid, *adopted* Nov. 30, 1973, 1015 U.N.T.S. 243 (the "Apartheid Convention"), provided for universal jurisdiction, they stated that it did so only "[a]mong [the] parties to the Convention."*Restatement (Third) of Foreign Relations Law* § 702 reporters' note 7. *See also* Antonio Cassese, *Crimes Against Humanity, in* 1 *The Rome Statute of the International Criminal Court: A Commentary* 353, 376 (Antonio Cassese et al., eds ., 2002) (observing that the Rome Statute, enacted in 1998, is broader than customary international law and "expands general international law" insofar as it, *inter alia,*"broadens the classes of conduct amounting to crimes against humanity" to include "the crime of apartheid").[FN1] Likewise, the European Commission, the executive body of the European Union, has stated explicitly that, while " apartheid[ ] is widely condemned by states ... at least at present, it does not give rise to universal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 38

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

jurisdiction because, among other reasons, the [Apartheid Convention] ... has not been widely ratified."Br. for the European Commission as *Amicus Curiae* Supporting Neither Party, *Sosa v. Alvarez-Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (No. 03-339), 2004 WL 177036, at * 16 n. 35. Another reason is that jurisdiction is limited to certain universally condemned crimes which "by their nature occur either outside of a State or where there is no State capable of punishing, or competent to punish, the crime (as in a time of war)."*United States v. Yousef,* 327 F.3d 56, 105 (2d Cir.2003). Of course, with respect to the conduct alleged here, there is now a State capable of providing redress in a competent manner.

**\*43** Under these circumstances, particularly the failure of the United States to sign or ratify the Apartheid Convention, denying a forum for these cases at this point cannot be said to undermine any interest of the United States. To the contrary, as the United States argues in its *amicus* brief, the prosecution of these cases harms significant interests of the United States. Obviously, the congressional interest in making available a forum under the ATCA would be undermined if we denied a forum where the regime, which violated the norm, was the same one that decided that such a cause of action should not be pursued. *See Tachiona v. Mugabe,* 234 F.Supp.2d 401, 415 (S.D.N.Y.2002) (declining deference to law of the foreign state in action alleging actionable conduct by a sitting government). But that is not the case here, for as the State Department has observed, the laws of the Republic of South Africa reflect policy judgments made by a government that "is broadly representative of the victims of the apartheid regime " and "uniquely charged with a popular mandate to deal with the legacy of apartheid."A01090. We have no interest in undermining its law or policy.

In sum, to quote again from one learned commentary:
A court decision to hear an Alien Tort Statute claim over action in South Africa reflects the worst sort of "judicial imperialism." It would send the message that the United States does not respect the ability of South African society to administer justice by implying that U.S. courts are better placed to judge

the pace and degree of South Africa's national reconciliation. In contrast, U.S. intervention to block such a suit sends a different signal to South Africa and other countries struggling through difficult political transitions. It would communicate our recognition of the respected position that the justice system holds in South Africa and reinforce the importance of having those claims judged in that country.

Schrage, *supra,* at 166.[FN2]

The majority declines to address the aspect of *Sosa* directing courts to determine the deference owed to the Executive Branch's view of the case, notwithstanding the facts that both parties and *amici* devote many pages of argument to this issue and that the issue goes directly to whether subject matter jurisdiction should be exercised over the cause of action alleged by the plaintiffs. The principal reason given for this silence is that "the district court explicitly refrained from addressing the defendants' arguments that the ATCA claim presented a non-justiciable political question."*Per Curiam* Op. *ante* at 12 (citing *In re S. African Apartheid Litig.,* 346 F.Supp.2d at 543 n. 4) (parenthetical omitted). The footnote in Judge Sprizzo's opinion, from which the *per curiam* opinion quotes an incomplete excerpt, reads as follows:
Defendants also argue that there is no case or controversy for this Court to hear under Article III of the Constitution because plaintiffs cannot establish that they have standing to bring this action and because the matter is a non-justiciable political question. *See* Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at 3-4. Given the Court's finding that defendants are entitled to relief on other grounds, the Court need not address these remaining grounds for defendants' motion.

**\*44** *In re S. African Apartheid Litig.,* 346 F.Supp.2d at 543 n. 4.

Contrary to the *per curiam* opinion, a careful reading of the record shows that Judge Sprizzo did not explicitly refrain from addressing the issue of the deference to be accorded to the position of the State Department under *Sosa.*Indeed, the Memorandum of Law in Support of the Defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 39

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Joint Motion to Dismiss ("Joint Motion"), which Judge Sprizzo expressly referenced in the part of his opinion declining to address the argument that the ACTA claim presented a non-justiciable political question, argued (in relevant part) that the " adjudication of plaintiffs' claim would require a court to pass on the merits of political questions that were resolved by the executive and legislative branches of the United States government in favor of commerce with South Africa."*Id.* at 3. The defendants did *not* argue that the case should be dismissed in deference to the Statement of Interest filed by the United States, nor did they rely on the advice of the Supreme Court in *Sosa* that the views of the United States *in this case* "certainly deserve[d] great weight." *Sosa,* 542 U.S. at 733 n. 21. Indeed, the defendants' motion was filed before the Statement of Interest and a year before the Supreme Court suggested that it be afforded deference.

More significantly, an objective reading of Judge Sprizzo's opinion demonstrates that he did rely on the Supreme Court's advice in *Sosa.See In re S. African Apartheid Litig.,* 346 F.Supp.2d at 547, 551, 553-54. Nevertheless, I am unwilling to burden this opinion any further on this score because, even if Judge Sprizzo did not rely expressly on the Supreme Court's guidance in *Sosa* as a basis for his holding, this would not be an excuse for avoiding the issue. While cases may be found where we declined to reach an issue not addressed by the district court, *see, e.g., Bigio v. Coca-Cola Co.,* 239 F.3d 440 (2d Cir.2000), we have held expressly that we are "free to affirm a district court decision ... even [on] grounds not relied upon by the district court."*In re Methyl Tertiary Butyl Ether* ("*MTBE* ") *Prods.Liab. Litig.,* 488 F.3d 112, 134 (2d Cir.2007) (quoting *Gmurzynska v. Hutton,* 355 F.3d 206, 210 (2d Cir.2004)). Thus, in *Bi,* 984 F.2d 582, a mirror image of *Bigio,* the district court had dismissed a complaint on the grounds of *forum non conveniens* -a ground on which the defendant had not moved to dismiss, presumably because of the unavailability of another forum. *See In re Union Carbide Corp. Gas Plant Disaster,* MDL No. 626, 1992 WL 36135 (S.D.N.Y. Feb.18, 1992). We affirmed the dismissal, applying the principle of international comity, even though that issue had not been

addressed by the district court. *Bi,* 984 F.2d at 586. Similarly, in *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir.1995) (Newman, J.), the district court dismissed the two related cases before it solely on the ground of lack of subject matter jurisdiction under the ATCA. *See Doe v. Karadzic,* 866 F.Supp. 734, 736 (S.D.N.Y.1994). On appeal, however, the parties briefed three different grounds for dismissal, even though two of them had not been addressed by the district court, and Judge Newman considered each of them in turn. *Kadic,* 70 F.3d at 238.

**\*45** There is a good reason to reach the issue here. Prosecution of these cases undermines significant interests of the United States and our relations with the Republic of South Africa, as well as allies of the United States, who have expressed concern over the exercise of jurisdiction over these cases. Under these circumstances, it is an issue that should be resolved at the threshold. Particularly apposite here are the words of the Court of Appeals for the Seventh Circuit addressing a motion to dismiss a Sherman Act claim on the ground that the conduct alleged did not have a substantial effect on commerce within the United States. (The "effect on commerce" requirement was enacted as part of the Foreign Trade Antitrust Improvements Act of 1982 ( "FTAIA").) In holding that subject matter jurisdiction was implicated, the Seventh Circuit observed:

There are good policy reasons for [this conclusion]. The extraterritorial scope of our antitrust laws touches our relations with foreign governments, and so, it seems, it is prudent to tread softly in this area. If FTAIA sets out an issue on the merits, resolution of the issue could be delayed until late in the case, and the potential for a lawsuit to have an effect on foreign markets would exist while the case remained pending.... Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations. In short, FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong. And the power of the courts is precisely what subject matter jurisdiction is about.

*United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 952 (7th Cir.2003); *see also In re BDC*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 40

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

*56 LLC,* 330 F.3d 111, 118 (2d Cir.2003) (finding that a particular issue was jurisdictional because it implicated "a threshold determination that should be made at the earliest possible stage of the proceedings").

While I rely on these cases simply to demonstrate the force of the policy favoring the exercise of our discretion to decide this issue, they also support the argument that the issue here should be treated as one going to subject matter jurisdiction-which we must resolve-even if it would not necessarily be so treated in other contexts. This argument derives from the language of the ATCA and the Supreme Court's analysis of the manner in which the threshold jurisdictional question should be resolved. Specifically, *Sosa* stated that "[a]ll Members of the Court agree that § 1350 is only jurisdictional" and " that the jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority."542 U.S. at 729.

The Supreme Court then observed that "it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms...."*Id.* at 730. *Sosa* went on to discuss "the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350,"*id.* at 732, while making it clear that the criteria it was setting forth were not exclusive. One consideration " involve[s] an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."*Id.* at 732-33.Since subject matter jurisdiction under the ATCA depends on whether the defendants have violated an international law norm *which federal courts are prepared to recognize, accept and make available to litigants,* the application of the criteria for making that determination is one that by definition goes to the issue of subject matter jurisdiction.

**\*46** The *per curiam* opinion argues that subject matter jurisdiction under the ATCA is established simply by virtue of an allegation that the defendant's conduct violated a norm of international law and

that the decision to provide a remedy for the alleged violation simply relates to the issue of "whether a cause of action exists."*Per Curiam* Op. *ante* at 19.The latter issue, this argument continues, does not implicate subject matter jurisdiction. *Id. ante* at 19-20.While this may be so with respect to 28 U.S.C. § 1331, which confers jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States," the *per curiam* opinion ignores the language of the ATCA, which is one of a number of statutes in which "Congress has exercised its prerogative to restrict the subject-matter jurisdiction of federal district courts based on a wide variety of factors, some of them also relevant to the merits of a case."*Arbaugh v. Y & H Corp.,* 546 U.S. 500, 516 n. 11, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). Where Congress has done so, subject matter jurisdiction turns on whether the complaint states a cause of action. *See id.* at 515-16 ("If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue.").FN3 Indeed, in *Members For a Better Union v. Bevona,* 152 F.3d 58 (2d Cir.1998), we vacated a judgment entered after trial for failure of the complaint to state a cause of action, *id.* at 61, without regard to the trial record and the assertion of the parties "that the district court had subject matter jurisdiction."*Id.* at 67 n. 1.FN4

More significantly, even before *Sosa* reaffirmed the jurisdiction-conferring nature of the ATCA, we " distinguish[ed][the] Alien Tort Claims Act, with its general pleading requirement, from general federal question jurisdiction, which is 'not defeated by the possibility that the averments in the complaint may fail to state a cause of action.' " *Bigio,* 239 F.3d at 447 (citing *Filartiga v. Pena-Irala,* 630 F.2d 876, 887-88 (2d Cir.1980) (citing *Bell v. Hood* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946))). Indeed, as early as the very " birth of the modern line of cases" construing the ATCA, *Sosa,* 542 U.S. at 724-25, we acknowledged that, because of "the statute's requirement of alleging a '*violation* of the law of nations' ... at the jurisdictional threshold[,][c]ourts have ... engaged in a more searching preliminary review of the merits than is required, for example, under the more

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 41

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

flexible 'arising under' formulation." *Filartiga,* 630 F.2d at 887-88 (comparing *O'Reilly de Camara v. Brooke,* 209 U.S. 45, 52, 28 S.Ct. 439, 52 L.Ed. 676 (1907) (question of ATCA jurisdiction disposed of "on the merits") (Holmes, J.), with *Bell,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (general federal question jurisdiction not defeated by the possibility that the averments in the complaint may fail to state a cause of action)) (emphasis in original); *accord Kadic,* 70 F.3d at 238;*Bigio,* 239 F.3d at 447. After *Sosa,* "a more searching preliminary review of the merits" necessarily includes determining whether the plaintiffs have adequately pled a violation of the law of nations over which it is appropriate for the district court to exercise subject matter jurisdiction.

**\*47** Again, even if I am wrong on this score, we should consider the issue of case-specific deference at this juncture because "the continued adjudication of the ... matters risks potentially serious adverse consequences for significant interests of the United States,", A01090, threatens our relations with the Republic of South Africa, and poses "continuing tensions in our relations" with the other countries where many of the defendants are incorporated A01091. Just as the Seventh Circuit treated the FTAIA as a jurisdictional statute in order to avoid "offending the economic policies of other nations" during the pendency of the case, *United Phosphorous,* 322 F.3d at 952, we should do so here.

Moreover, the *per curiam* opinion offers no good reason for failing to do so. It suggests that its "approach is particularly appropriate here because plaintiffs have indicated that, if given the opportunity, they would narrow their claims and clarify the nature of their allegations against various defendants, changes that may affect how the district court ultimately decides to resolve these issues."*Per Curiam* Op. *ante* at 13-14 (citing Tr. 7-8, 14-15). The Khulumani plaintiffs, however, did not seek leave to file an amended complaint and Judge Sprizzo has previously granted the Ntsebesa and Digwamaje plaintiffs leave to file a second amended complaint alleging that the defendants aided and abetted the violation of norms of customary international law.[FN5]Moreover, the *per

*curiam* opinion does not identify a single flaw in the current complaints that would need to be cured by an amended complaint, and the transcript of the oral argument does not reflect any offer by the plaintiffs to amend their complaints in any significant way. Indeed, the plaintiffs expressly argued against the standard that Judge Katzmann adopts in section II.B of his concurring opinion (which I have joined) for imposing liability on the defendants for aiding-and-abetting in violation of the norm of international law.

Nevertheless, relying on the amended complaints that the plaintiffs may be permitted to file, the *per curiam* opinion declines "to determine whether the plaintiffs have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA...."*Per Curiam* Op. *ante* at 10.The *per curiam* opinion does so in the face of our holding in *Bigio* that the failure to properly plead a violation of the law of nations means that "neither [the district court] nor we may consider the matter further...."239 F.3d at 447. Instead of upholding its obligation to determine whether subject matter jurisdiction exists, *see In re MTBE,* 488 F.3d at 121-22, the *per curium* opinion offers up an advisory opinion that a plaintiff may allege that a private party aided and abetted a violation of a norm of customary international law without so much as a reference to the factual allegations in the complaint or citation to the specific norm in which the defendants were allegedly complicit.

**\*48** Under these circumstances, it is difficult to understand the disposition of the appeal, a judgment that "vacate[s] the district court's order denying plaintiffs' motion for leave to amend."*Per Curiam* Op. *ante* at 9. The majority does say that, "[i]n denying this motion, the district court relied, in part, on the erroneous premise that subject mater jurisdiction did not inhere and reasoned that any additional amendments to the pleadings would be futile."*Id.* I pass over the incomplete and inaccurate description of the grounds for the denial of the motion to amend.[FN6] Nevertheless, I do not understand how the majority can say that Judge Sprizzo denied the motion to amend the complaint on the "erroneous premise" that subject matter

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 42

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

jurisdiction was lacking, while declining to rule on the basic jurisdictional issue of whether the plaintiffs "have adequately pled a violation of international law sufficient to avail themselves of jurisdiction under the ATCA."*Id.* at 10.

I decline to join in this peculiar disposition, by which my colleagues seek desperately to avoid the easiest ground on which to resolve this appeal-that of deference to the judgment of the Republic of South Africa, supported by our State Department, that these cases are none of our business-and go on to grapple unnecessarily with difficult issues relating to the ATCA and customary international law without being able to agree on the rationale for the result they reach. Nevertheless, since the majority has chosen to do so, I address the issue whether the scope of liability for violations of the international law norms at issue here extends to private actors, such as corporations, for aiding-and-abetting. I then turn to the separate opinions of Judges Hall and Katzmann.

## 2. The Scope of Liability Under the ATCA

*Sosa* indicates that this inquiry requires consideration of two separate principles. First, the Court held that the ATCA should not be read to create jurisdiction over "violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."542 U.S. at 732. Second, the Court observed that "[a] related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."*Id.* at 732 n. 20.To that end, immediately thereafter, the Court contrasted two opinions, one finding no consensus that torture by a private actor violated international law, *Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 791-95 (D.C.Cir.1984) (Edwards, J., concurring); another finding such a consensus that genocide by a private actor did violate international law, *Kadic,* 70 F.3d at 239-41. Justice Breyer, in a separate opinion, agreed with the Court that the international law norm invoked "must extend liability to the type

of perpetrator (*e.g.,* a private actor) the plaintiff seeks to sue."*Sosa,* 542 U.S. at 760 (Breyer, J., concurring in part and concurring in the judgment) (citing *id.* at 732 n. 20).

**\*49** As did the Supreme Court in *Sosa,* we have held that, "[i]n order to determine whether the offenses alleged by the [plaintiffs] in this litigation are violations of the law of nations that may be the subject of Alien Tort Act claims against a private individual, we must make *a particularized examination of these offenses....*"*Kadic,* 70 F.3d at 241 (emphasis added). In that case, Judge Newman then proceeded to engage in such an exercise. *Id.* at 241-44 (discussing independently genocide, war crimes, and torture and summary execution). More recently, in *Wiwa,* we reiterated our holding in *Kadic* that "the ATCA reaches the conduct of private parties provided that their conduct is undertaken under the color of state authority or violates a norm of international law that is recognized as extending to the conduct of private parties."226 F.3d at 104.

These holdings are consistent with the position of the European Commission, which clearly influenced Justice Souter's majority opinion and Justice Breyer's concurrence in *Sosa.*Specifically, in its *amicus* brief in *Sosa,* the Commission urged the Supreme Court to hold, as it ultimately did, that in determining whether a non-state actor was complicit in a violation of customary international law by a state actor, courts should apply international, rather than domestic, legal standards. 2004 WL 177036, at \*4. Significantly, and again consistent with our holding in *Kadic,* the Commission argued that only a subset of norms recognized as customary international law applies to non-state actors and " hence only that subset may form the basis of liability against such actors. For example, non-state actors may be liable for genocide, war crimes, and piracy, while torture, summary execution, and prolonged arbitrary detention do not violate the law of nations unless they are committed by state officials or under color of law."*Id.* at \*11 (citations omitted).

Consistent with this analysis, I first address whether the complaint here makes allegations against

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 43

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

defendants sufficient to hold them liable as acting under the color of law. I next turn to whether, at the time the alleged crimes were committed, there was a well established and universally recognized international norm providing for liability of private parties who aid and abet apartheid. Finally, while officers and employees of a corporation may be held responsible for using the entity as the vehicle for the commission of crimes against humanity, I address the issue whether the entities themselves may be held responsible.

**(a) Private Party Liability under Color of Law**

Judge Sprizzo held that the allegations against the defendants were not sufficient to "elevate them to the status of state actors...."*In re S.African Apartheid Litig.,* 346 F.Supp.2d at 548-49. This aspect of his decision is challenged in the briefing of only one group of appellants. The state action element derives from the principle that violations of international human rights norms, including apartheid, are violations of customary international law only if practiced, encouraged, or condoned by the government of a state as a matter of state policy. *Restatement (Third) of Foreign Relations Law* § 702 & cmt. b (discussed in *Sosa,* 542 U.S. at 737).*See United States v. Josef Altstoetter* ("*The Justice Case* "), 3 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 954, 982 (William S. Hein & Co., Inc.1997) (1947) (Crimes against humanity committed against German nationals are subject to punishment "only where there is proof of conscious participation in systematic government organized or approved procedures....").FN7 Indeed, this explains why *Sosa* specifically held that, before jurisdiction is accepted over an ATCA cause of action against a private actor, it must be determined "whether international law extends the scope of liability for a violation of a given norm to ... a private actor...."542 U .S. at 732 n. 20. *Cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (linking the color-of-law element of 42 U.S.C. § 1983 to the underlying state-action requirement of the Fourteenth Amendment, and holding that both exclude from their reach "merely private conduct, no matter how discriminatory or

wrongful") (internal quotation marks and citation omitted).

**\*50** We have held that case law construing 42 U.S.C. § 1983 is "a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act." *Kadic,* 70 F.3d at 245. As Judge Newman observed, "[a] private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid." *Id.* (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). Subsequently, the Supreme Court has cautioned that the language from *Lugar,* which Judge Newman paraphrased, "must not be torn from the context out of which it arose,"*Sullivan,* 526 U.S. at 58, namely, an *ex parte* application for a writ of attachment. This admonition is a useful reminder that the "under color of law" cases arise in varying contexts. Many, including cases on which plaintiffs rely, have been limited to their facts. *Id.* at 55-59.

Perhaps the largest single category of cases under color of law are those in which the primary offender or tortfeasor is a private party, and the issue turns on whether "seemingly private behavior 'may be fairly treated as that of the state itself.' " *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting *Jackson v. Met. Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) ). Because the cases on this appeal do not fit in this category, I am reluctant to discuss them in detail. Nevertheless, because plaintiffs rely on general language from the cases "torn from the context out of which it arose," *Sullivan,* 526 U.S. at 59, I borrow from Professor Schwartz's treatise, first, one significant caveat, and second, his useful synthesis of the Supreme Court's holdings in this area.

The caveat is that, in analyzing the large body of decisional law concerning state action, "it is important to consider the era in which the decision was rendered." 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.12, at 5-85 (4th ed.2003). Professor Schwartz explains that the Warren Court took an expansive view of state action in its effort to combat racial discrimination in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                          Page 44

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

society, but that the subsequent Burger and Rehnquist courts reversed this trend in order to shield private behavior from the reach of the Constitution. *Id.* § 5.12, at 5-85-5-86. This reversal was undertaken not by explicitly overturning any earlier state-action decisions, but through a series of decisions finding no state action despite heavy government involvement in private conduct. *Id.* § 5.12, at 5-86. The unmistakable messages sent by these decisions are that the concept of state action is to be given only limited berth, and that federal courts must assess the continued vitality of earlier state-action precedents in light of more recent decisional law.*Id.*[FN8]

Professor Schwartz then supplemented this perceptive analysis by stating the principles that have emerged as the Supreme Court has narrowed the scope of its state-action jurisprudence:
*51 1. Mere state regulation of private conduct, even if extensive, is insufficient to support a finding of state action.
2. State authorization of private conduct does not make the private party a state actor; to find state action, the state must participate in, coerce, or significantly encourage the contested activity.
3. State assistance to a private party, even if substantial, will not support a finding of state action, whether that assistance is in the form of direct financial aid, tax exemptions, monopoly power, government mortgage insurance, or the grant of a license.
4. The mere importance of the function carried out by the private sector is an insufficient basis upon which to find state action; for state action to be found, the function must be historically, traditionally, and exclusively governmental.

*Id.* § 5.12, at 5-87-5-88 (footnotes omitted). Professor Schwartz continues,[t]he Supreme Court in some cases has found no state action, even when all four of these government involvements coalesced in the same case. Thus, the Court has found on more than one occasion that an entity was not engaged in state action even though it was extensively regulated, obtained governmental approval, received substantial governmental assistance, and performed an important societal function.

*Id.* § 5.12, at 5-88 (citing *San Francisco Arts & Athletics v. United States Olympic Comm.,* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); *Rendell-Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)).

In analyzing the subgroup of state-action cases of which the instant cases are representative-those where the primary offender or tortfeasor is a state actor, and the question is whether a private party who is alleged to be an accessory may be deemed a state actor-it is useful to discuss the facts of the leading Supreme Court cases because they illustrate the kind of showing that must be made before a private party may be deemed a state actor in this context. The case most directly on point is *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), in which a private party bribed a judge to issue an order enjoining the production of minerals from certain oil leases. In holding that the private actor was acting "under color of law," the Supreme Court observed that "[p]rivate persons, jointly engaged with state officials in a challenged action, are acting 'under color' of law for purposes of § 1983 actions."*Id.* at 24.Specifically, "the allegations were that an official act of the defendant judge was the product of a corrupt conspiracy involving bribery of the judge. Under these allegations, the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability."*Id.* at 28. On the other hand, if the private actor had merely resorted to the courts and prevailed in the lawsuit, he would not have been acting under color of law.

*52 *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), which arose out of one of the saddest episodes of the civil rights movement, provides another compelling example of this subgroup. *Price* involved the arrest and subsequent murder of three civil rights workers in Mississippi. The facts are described as follows in the opinion of the Court:
On June 21, 1964, Cecil Ray Price, the Deputy Sheriff of Neshoba County, Mississippi, detained

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 45

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Michael Henry Schwerner, James Earl Chaney and Andrew Goodman in the Neshoba County jail located in Philadelphia, Mississippi. He released them in the dark of that night. He then proceeded by automobile on Highway 19 to intercept his erstwhile wards. He removed the three men from their automobile, placed them in an official automobile of the Neshoba County Sheriff's office, and transported them to a place on an unpaved road.

These acts, it is alleged, were part of a plan and conspiracy whereby the three men were intercepted by the 18 defendants, including Deputy Sheriff Price, Sheriff Rainey and Patrolman Willis of the Philadelphia, Mississippi, Police Department. The purpose and intent of the release from custody and the interception, according to the charge, were to " punish" the three men. The defendants, it is alleged, "did wilfully assault, shoot and kill" each of the three. And, the charge continues, the bodies of the three victims were transported by one of the defendants from the rendezvous on the unpaved road to the vicinity of the construction site of an earthen dam approximately five miles southwest of Philadelphia, Mississippi.

*Id.* at 790.The Supreme Court held that private individuals who participated directly with state actors pursuant to a common design were acting under color of law. "In effect, if the allegations are true, they were participants in official lawlessness, acting in willful concert with state officers and hence under color of law."*Id.* at 795. *Price* is a classic example of the rule that private parties act under color of law when they are "engaged in a conspiracy with state officials to violate the Fourteenth Amendment."*Conway v. Vill. of Mount Kisco,* 750 F.2d 205, 214 n. 12 (2d Cir.1985) (Oakes, J.); *accord Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 272-73 (2d Cir.1999); *Alexis v. McDonald's Rests. of Mass. Inc.,* 67 F.3d 341, 352 (1st Cir.1995); *Mershon v. Beasley,* 994 F.2d 449, 451 (8th Cir.1993); *Annunziato v. The Gan, Inc.,* 744 F.2d 244, 251 (2d Cir.1984).

There is good reason to require direct participation with a state actor pursuant to a conspiracy or common design before holding a private party, who is not the primary wrongdoer, liable as a state actor.

Where the issue is whether a public official can be held liable for the primary wrongdoing of a private actor, the public office he holds suffices to satisfy the state-actor requirement; the only issue is whether his conduct in that capacity constitutes a proximate cause of the plaintiff's injury. Thus, "a state actor may be subject to liability for an action physically undertaken by private actors in violation of the plaintiff's liberty or property rights if the state actor directed or aided and abetted the violation." *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). On the other hand, where the primary actor is a public official, for a private actor to be deemed a state actor, he must jointly participate in the wrongful conduct, pursuant to a common design or plan. As the Supreme Court explained in *Adickes v. S.H. Kress & Co.,*"[t]he involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights.... Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983."398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

**\*53** This holding finds support in the law of agency. "When two persons engage jointly in a partnership for some criminal [or legitimate] objective, the law deems them agents for one another. Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint objective." *United States v. Russo,* 302 F.3d 37, 45 (2d Cir.2002). Thus, a private party who conspires with a state actor becomes his agent, and his actions in that capacity are sufficient to make him an actor under color of law. Similarly where a private party induces an otherwise innocent public official to commit an offense, he has effectively made that person his or her agent.

This doctrine is an outgrowth of common law principles of criminal responsibility dating at least as far back as *Regina v. Saunders,* 2 Plowd. 473 (1575); and of principles of civil responsibility established, by force of the maxim *qui facit per alium facit per se* [he who acts thorough another acts for himself], at least as early as the 14th century.

*United States v. Lester,* 363 F.2d 68, 72 (6th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.1966). On the other hand, there is no legal framework or precedent for holding that a private party, merely selling goods or materials to a state actor, is himself acting under color of law.

Consistent with this precedent, we have held that a conspiracy to violate an **internationallaw** norm is necessary to render a private party liable for conduct in which the state is the primary actor. *Bigio,* 239 F.3d at 447. Indeed, there we rejected a cause of action alleging that Coca-Cola Co. was acting "under color of law" where there was "no allegation in the complaint, let alone any hint of evidence ... that Coca-Cola had any role as a participant or co-conspirator in the confiscation of the Bigios' property."*Id.* at 449;*cf. In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831, 841 (2d Cir.1992) (holding that joint participation pursuant to an agreement-express or implied-to commit a tort is necessary to impose liability on those acting in concert); ***Restatement (Second) of Torts*** § 876(a) (imposing liability on one who "does a tortious act in concert with the other or pursuant to a common design with him").

Neither Judge Katzmann nor Judge Hall takes issue with my analysis of section 1983 cases defining circumstances under which a private party may be deemed to have acted under color of law. Judge Katzmann, however, relying on cases applying the general criminal aiding-and-abetting statute applicable to all federal crimes, 18 U.S .C. § 2, argues that a private person may be liable for aiding-and-abetting a public official in the commission of a crime even though he may be incapable of committing the crime himself and even though his conduct would not satisfy the standard set out in § 1983 for treating him as a state actor. Op. of Judge Katzmann *ante* at 47 (citing *In re Nofziger,* 956 F.2d 287, 290 (D.C.Cir.1992); *United States v. Tannenbaum,* 934 F.2d 8, 14 (2d Cir.1992) ). The fact that a person may be convicted of aiding-and-abetting an offense of which he could be found guilty as a principal-because Congress has so provided-does not provide a basis for imposing such liability in the present context. Because Congress has not enacted a comparable civil aiding-and-abetting statute, a private party could not be subject to such liability in a civil action under 42

U.S.C. § 1983. *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 181-82, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

**\*54** Significantly, when Congress enacted the Torture Victims Protection Act of 1991 ("TVPA") to comply to with the Torture Convention, it provided for civil causes of action *only* against " [a]n individual who, under actual or apparent authority, or color of law, of any foreign nation," undertakes conduct prohibited by the Act. TVPA § 2(a), Pub.L. No. 102-256, 106 Stat. 73 (1992). Moreover, the Senate Report accompanying the legislation provides that "[c]ourts should look to principles of liability under U.S. civil rights laws, in particular section 1983 of title 42 of the United States Code, in construing 'under color of law' as well as interpretations of 'actual or apparent authority' derived from agency theory in order to give the fullest coverage possible."S. Rep. 102-249, at 8 (Nov. 26, 1991). To the extent that the Senate Report speaks to the issue of aiding-and-abetting, it addresses the issue of supervisory liability and makes the point that "a higher [public] official need not have personally ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts [to] anyone with higher authority who authorized, tolerated, or knowingly ignored those acts."*Id.* at 9 (citing *In re Yamashita,* 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499;*Forti v. Suarez-Mason,* 672 F.Supp. 1531 (N.D.Cal.1987)).

Nevertheless, even if 18 U.S.C. § 2 applied in this context, the standard for imposing liability for aiding-and-abetting pursuant to this section is not satisfied by the complaints in this case. Specifically, the Supreme Court has held that, "[i]n order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed."*Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 93 L.Ed. 919 (1949) (internal quotation marks and citation omitted). This element is also essential to a cause of action for aiding-and-abetting. *See, e.g., E. Trading*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 47

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

*Co. v. Refco,* 229 F.3d 617, 623 (7th Cir.2000) (Posner, J.) (observing "that one who aids and abets a fraud, in the sense of assisting the fraud and wanting it to succeed, is himself guilty of fraud"). Indeed, in *United States v. Blankenship,* Judge Easterbrook, after citing to the Model Penal Code for the proposition that a "supplier [is] culpable only if he has 'the purpose of promoting or facilitating' the crime," observed that a similar approach has been adopted to aiding-and-abetting in civil cases. 970 F.2d 283, 286 (7th Cir.1992). Moreover, in *Boim v. Quranic Literacy Institute,* the same court held that 18 U.S.C. § 2339A, which created a civil cause of action for those injured by terrorist acts against individuals who provided support to terrorist groups, survived a First Amendment challenge "so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping. "291 F.3d 1000, 1028 (7th Cir.2002).*Cf. Halberstam v. Welch,* 705 F.2d 472, 488 (D.C.Cir.1983) (holding that "desire to make the venture succeed" is a factor in determining aiding-and-abetting liability).

**\*55** There is no allegation here that the defendants acted with the intent to make the violation succeed. On the contrary, plaintiffs strenuously argued in their briefs and at oral argument that they were not required to make such a showing. Ntsebesa Reply Br. at 19; Khulumani Reply Br. at 11; Tr. at 13. They argue that a private party who knowingly facilitates the commission of an international law violation by a state actor acts under color of law. I use the term "facilitates" because "[o]ne who merely sells goods to a buyer is not an aider and abettor of crimes that the buyer might commit, even if the seller knows that the buyer is likely to use the goods unlawfully, because the seller does not share the specific intent to further the buyer's venture." *Corrie v. Caterpillar, Inc.,* 403 F.Supp.2d 1019, 1027 (W.D.Wash.2005) (citing *Blankenship,* 970 F.2d at 285-87),*aff'd* on other grounds, *Corrie v. Caterpillar, Inc.,* ---F.3d----, 2007 WL 2694701 (9th Cir. Sept.17, 2007); *see also*N.Y. Penal Code § 115.05 (criminal facilitation). Indeed, such conduct does not violate customary international law. *See The Ministries Case,* 14 *Trials of War Criminals*

*Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 621-22.

Nevertheless, plaintiffs suggest that the relevant inquiry is not whether the relationship between the State and the private actor is of a commercial nature, but rather-much like aiding-and-abetting under the substantial assistance prong of section 876 of the **Restatement** (Second) of **Torts**-whether the private actor had sufficient prior knowledge of the government's plans to commit violations of **internationallaw** and of the ways in which the goods or services procured by the government would aid in those illicit actions that the private actor can be said to have become party to the government's actions. The issue, however, is not whether the private actor has become "a party to the government's actions"-whatever that means. Instead, it is whether by engaging in this conduct he acted "under color of law." *Adickes,* 398 U .S. at 150;*Ginsberg,* 189 F.3d at 273. A holding that he does, in the circumstances described in the complaints, strains both the phrase and the concept to the breaking point.

Indeed, notwithstanding the division on the panel with respect to other issues, the *per curiam* opinion, reflecting the agreement of all members of the panel, holds that the allegations of criminal facilitation alleged in the complaint are insufficient to render the defendants liable under the color of law for violation of the TVPA. Specifically, it rejects the cause of action under the TVPA, alleging that the defendants "aided and abetted the apartheid regime's subjecting the Plaintiffs to torture and extra judicial killing within the meaning of the [TVPA] ... under actual or apparent authority, or under color of law."A-00505. Applying principles of liability under section 1983, the *per curiam* opinion properly concludes that the complaint "failed to link any defendants to state aid or the conduct of state officials."*Per Curiam* Op. *ante* at 8. The same is true with respect to the other causes of action.

### (b) Aiding-and-abetting Liability of Private Parties

**\*56** Ordinarily, the fact that the defendants' conduct

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 48

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

is not sufficient to hold them liable for acting under color of law would compel the dismissal of the causes of action alleging various crimes against humanity that were not committed during war or an armed conflict. *See Kadic,* 70 F.3d at 244. Nevertheless, Judge Sprizzo identified two potentially applicable international agreements that contemplated liability for private actors. The first and most obvious source of such liability is the Apartheid Convention, which was expressly drafted to cover all of the conduct of the Union of South Africa that the defendants allegedly aided and abetted. Of this Convention, the Reporters of the Restatement write:

The Convention [ ] creates obligations beyond those imposed by customary international law. It attaches personal criminal responsibility to all individuals who commit, participate in, incite, abet, encourage or co-operate in the crime. Art. III. The Convention also requires states to suppress, prevent any encouragement of, and punish apartheid. Among parties to the Convention, apartheid is also effectively made a subject of universal jurisdiction. Art. IV.

*Restatement (Third) of Foreign Relations Law* § 702 reporters' note 7. Thus, the Reporters recognize that the Apartheid Convention's imposition of liability on private parties not acting under color of law represented a departure from customary international law.[FN9] Moreover, while it may be an overstatement to describe the list of countries that have ratified the Convention as a rogues' gallery of human rights violators, the Convention has not been ratified by the United States, most other mature democracies, or other states that play a significant role in international affairs, including three of the five permanent members of the United Nations Security Council-the United States, the United Kingdom, and France. Indeed, it has not been ratified by the post-apartheid Republic of South Africa. Thus, it is not a persuasive source of customary international law on this point. *See Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 257 (2d Cir.2003) (Cabranes, J.) ("[T]he more States that have ratified a treaty, and the greater the relative influence of those States in international affairs, the greater the treaty's evidentiary value."). Dean Koh made a similar point in an analogous

context when he wrote:[T]hose who advocate the use of international and foreign sources in U.S. constitutional interpretation [as he does] are not urging U.S. courts to defer automatically to some kind of global "nose count." Instead, they are suggesting that the practices of other mature democracies-not those that lag behind developmentally-constitute the most relevant evidence of ... the "evolving standards of decency that mark the progress of a maturing society."

Harold Hongju Koh, *International Law as Part of Our Law,* 98 Am. J. Int' l L. 43, 56 (2004). Under these circumstances, for the same reason that the Apartheid Convention is not a source for the exercise of universal jurisdiction, Judge Sprizzo properly rejected it as a source for extending the scope of liability to private actors who aided and abetted apartheid in South Africa.

**\*57** The other international agreement identified by Judge Sprizzo that expressly recognizes liability for private persons is the Convention on the Prevention and Punishment of the Crime of Genocide, *opened for signature* Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277 ("Genocide Convention"). The near-unanimous adoption of the convention constitutes concrete evidence of a peremptory norm that has become part of customary international law. The problem with the invocation of the Genocide Convention-aside from the issue whether the complaints here sufficiently allege activity constituting genocide-is that when Congress enacted legislation to implement the agreement, *see* Genocide Convention Implementation Act of 1987, Pub.L. 100-606, Nov. 4, 1988, 102 Stat. 3045, *codified at* 18 U.S.C. § 1091 *et seq.,* it expressly provided that the Act shall not "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." 18 U.S.C. § 1092.

In *Kadic,* which was decided prior to *Sosa,* we held that "the legislative decision not to create a new private remedy does not imply that a private remedy is not already available under the Alien Tort Act." 70 F.3d at 242. As Judge Newman explained:

Nothing in the Genocide Convention Implementation Act or its legislative history reveals

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 49

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

an intent by Congress to repeal the Alien Tort Act insofar as it applies to genocide, and the two statutes are surely not repugnant to each other. Under these circumstances, it would be improper to construe the Genocide Convention Implementation Act as repealing the Alien Tort Act by implication.

*Id.*

After *Sosa,* however, the issue for us to decide is not whether the Genocide Convention Implementation Act implicitly repealed the ATCA insofar as it applies to genocide. As Judge Katzmann acknowledges, "*Sosa...* deviate[d] from our case law in one crucial respect. We had allowed cases to proceed under the ATCA on the assumption that when plaintiffs alleged violations of well-established international law, their 'causes of action are statutorily authorized.' " Op. of Judge Katzmann *ante* at 17 (quoting *Kadic,* 70 F.3d at 246).*Sosa* "flatly rejected this notion." *Id.* Instead, we are now required to determine "whether to recognize a common-law cause of action to provide a remedy for the alleged violation" of international law. *Id. ante* at 19.Thus, we have to address the threshold question of whether to recognize a civil cause of action under the ATCA for genocide where Congress has quite plainly indicated its intention that such a cause of action should not be available.

Judge Katzmann appears to acknowledge that, notwithstanding *Kadic,* the issue whether to recognize a cause of action for genocide based on the ATCA must be considered anew in light of *Sosa.* Nevertheless, he would "leave it to the district court to address in the first instance should it undertake to decide whether to recognize a cause of action."Op. of Judge Katzmann *ante* at 51 n. 32.While leaving it to Judge Sprizzo to resolve the issue, however, Judge Katzmann goes on to suggest to him that such a cause of action should be recognized. *Id.* Instead of deciding an issue that we should and must resolve, Judge Katzmann's disposition of this issue invites a game of ping-pong with Judge Sprizzo, in which I decline to participate.

**\*58** The Genocide Convention Implementation Act should shut the door to the recognition of a cause of action under the ATCA for violation of the international law norm that it implements, because it would be an abuse of our discretion to expand the scope of ATCA liability to causes of action that Congress indicated its intent to proscribe. We should not "override a clear indication from the political branches that a 'specific, universal, and obligatory' norm against genocide is *not* to be enforced through a private damages action[ .]"*Sosa,* 542 U.S. at 749 (Scalia, J., concurring in part and concurring in the judgment).

### (c) Liability of Corporations

In *Sosa,* the Supreme Court directed federal courts to determine "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or an individual." *Id.* at 732 n. 20.Judge Katzmann, who agrees with me that the issue of the scope of liability is governed by international law, draws no distinction between a corporation and an individual. Nor do our decisions in cases invoking jurisdiction under ACTA. Nevertheless, the specific issue of corporate liability under customary international law was not discussed, nor was it raised by the parties, in any of those cases. *See, e.g., Bigio,* 239 F.3d 440;*Flores,* 414 F.3d 233. Consequently, they are simply not apposite here, because "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925).

There is a significant basis for distinguishing between personal and corporate liability. Where the private actor is an individual, he is held liable for acts which he has committed and for which he bears moral responsibility. On the other hand, "legal entities, as legal abstractions can neither think nor act as human beings, and what is legally ascribed to them is the resulting harm produced by individual conduct performed in the name or for the benefit of those participating in them or sharing in their benefits."M. Cherif Bassiouni, *Crimes Against Humanity in International Criminal Law* 378 (2d ed.1999). Thus, the issue here is whether an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 50

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

artificial entity that is allegedly used as a vehicle for the commission of a crime against humanity may be held vicariously liable.

The sources evidencing the relevant norms of international law at issue plainly do not recognize such liability. While the London Charter, which created the International Military Tribunal (the " IMT") at Nuremberg, does not explicitly limit its jurisdiction to "natural persons," it seems clear from its language and context that it conferred jurisdiction only over the prosecution of individuals. Specifically, the Nuremberg Tribunal was empowered "to try and punish *persons* who, acting in the interests of the European Axis countries, whether as *individuals* or as *members* of organizations," committed any of several enumerated crimes. Charter of the IMT art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U .N.T.S. 279 (the " London Charter" or the "Charter") (emphasis added).FN10 Moreover, in rejecting the defense argument that "international law is concerned with the actions of sovereign states, and provides no punishment for individuals," the Nuremberg Tribunal held that "[c]rimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced."*The Nuremberg Trial,* 6 F.R.D. 69, 110 (1946); 1 *Trial of the Major War Criminals* 223 (William S. Hein & Co., Inc.1995) (1947).*See also* Ernst Schneeberger, *The Responsibility of the Individual under International Law,* 35 Geo. L.J. 481, 489 (1947) ("[I]n the last resort responsibility under international law can only be responsibility of an individual....").

**\*59** Indeed, the distinction between corporate and individual responsibility is illustrated by *The I.G. Farben Case* in which corporate officers were charged with "acting through the instrumentality of Farben" in committing various crimes against humanity. *United States v. Krauch ("The I.G. Farben Case"), 7 Trials of War Criminals Before the Nu ern b erg Military Tribunals Under Control Council Law No. 10* 14, 39, 50, 59 (1952). Nevertheless, the notorious I.G. Farben was not named as a defendant. *Id.* at 11-14.Nor were any other corporations charged with crimes at Nuremberg. "In fact, in the Nuremberg trials, this point of lack of corporate liability appeared to have been explicitly stated."*In re Agent Orange Product Liab. Litig.,* 373 F.Supp.2d 7, 57 (E.D.N.Y.2005) (Weinstein, J.).

In 1948, the United Nations General Assembly asked the International Law Commission (the "ILC" ), a United Nations body, to study the possibility of creating an international judicial tribunal, which ultimately emerged in the form of the International Criminal Court (the "ICC"), to prosecute genocide and other crimes. Under the auspices of the ILC, the Committee on International Legal Jurisdiction began to study the issue in 1951, and it released its report in 1953. *See* U.N. GAOR, 9th Sess., Supp. No. 12, U.N. Doc. A/2645 (1954). The Committee considered a proposal by Australia to grant the international court jurisdiction over corporations. *Id.* ¶ 85.The proposal was soundly defeated because " it was undesirable to include so novel a principle as corporate criminal responsibility in the draft statute. "*Id.*

More than forty years later, during negotiations for the Rome Statute, pursuant to which the ICC was created, France proposed bringing corporations and other juridical persons (though not States) within the jurisdiction of the ICC. That proposal was again rejected, for three principal reasons: (1) "from a pragmatic point of view it was feared that the ICC would be faced with tremendous evidentiary problems when prosecuting legal entities"; (2) " from a more normative-political point of view it was emphasized that the criminal liability of corporations is still rejected in many national legal orders, and international disparity which could not be brought in concord with the principle of complementarity"; and (3) "it was felt morally obtuse for States to insist on the criminal responsibility of all entities other than themselves." Albin Eser, *Individual Criminal Responsibility, in* 1 Antonio Cassese et al., *The Rome Statute of the International Criminal Court: A Commentary* 767, 778-79 (2002) (footnotes omitted). Thus, the Rome Statute provides for jurisdiction over only "natural persons." The Rome Statute of the ICC art. 25(1), *opened for signature* July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002) ("The Rome

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 51

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Statute").

Similarly, Article III of the Apartheid Convention provides that "[i]nternational criminal responsibility shall apply, irrespective of the motive involved, to individuals, members of organizations and institutions and representatives of the State...." Article 4 of the Genocide Convention is to the same effect. Specifically, it provides that "[p]ersons committing genocide or any of the other acts enumerated in [a]rticle 3 shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."The statutes for the International Criminal Tribunal for the former Yugoslavia ("ICTY") and International Criminal Tribunal for Rwanda ("ICTR") also confer jurisdiction only over "natural persons." *See* Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991 art. 25(1), *adopted* May 25, 1993, S .C. Res. 827, U.N. Doc. S/RES/827 (the "ICTY Statute"); Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for the Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States Between 1 January 1994 and 31 December 1994 art. 5, *adopted* Nov. 8, 1994, S.C. Res. 955, U.N. Doc. S/RES/955 (the "ICTR Statute" ).

**\*60** Likewise, the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("Torture Convention"), contemplates violations by "persons," which in the agreement's textual context can only mean natural persons. *See* Torture Convention arts. 4(1), 6(1), 6(3), *adopted* Dec. 10, 1984, 1465 U.N.T. S. 85, 23 I.L.M. 1027. The language of the TVPA, which executed in part the Torture Convention, *Flores,* 414 F.3d at 247 n. 20, provides further support for the fact that customary international law has not recognized corporate liability. Under the TVPA, the term " individual" describes both those who can violate its proscriptions against torture, as well as those who

can be victims of torture. Specifically, the TVPA provides that "[a]n *individual* who ... subjects an *individual* to torture shall ... be liable for damages to that *individual*," and it defines "torture" as "any act, directed against an *individual*... by which severe pain or suffering ... is intentionally inflicted on that *individual*." *Id.*§§ 2(a)(1), 3(b)(1) (emphasis added). As Judge Weinstein recently wrote:

[b]oth from context and common sense only natural persons can be the "individual" victims of acts that inflict "severe pain and suffering." *See* [TVPA § 3(b)1]. Because the TVPA uses the same term " individual" to identify offenders, the definition of " individual" within the statute appears to refer to a human being, suggesting that only natural persons can violate the Act. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 101, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (noting that "[a]bsent some congressional indication to the contrary, [courts] decline to give the same term in the same Act a different meaning depending on whether the rights of the plaintiff or the defendant are at issue"); *see also Beanal v. Freeport-McMoRan, Inc.,* 969 F.Supp. 362, 381-82 (E.D.La.1997) ("[T]he plain meaning of the term ' individual' does not ordinarily include a corporation."), *aff'd by*197 F.3d 161 (5th Cir.1999).

*In re Agent Orange Product Liab. Litig.,* 373 F.Supp.2d at 56.

The same is true with respect to the statute making torture committed outside the United States a federal offense. 18 U.S.C. § 2340 *et seq.*Section 2340 provides that, "[a]s used in this chapter ... ' torture' means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering ... upon another person within his custody or physical control...."*Id.* § 2340(1). Because here, as in the TVPA, the context indicates that the word "person" refers to natural persons, the general rule that the word "person" when used in any Act of Congress includes corporations, unless the context indicates otherwise, 1 U.S.C. § 1, is not applicable here. *See Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 199, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (" 'Context' here means the text of the Act of Congress surrounding the word at issue, or the texts of other related

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 52

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

congressional Acts....").

**\*61** These sources are not undermined by Professor Henkin's suggestion that, "[a]t this juncture[,] the Universal Declaration [of Human Rights (G.A. Res. 217A (III), U.N. Doc. A/180 (1948) ] may also address multinational companies."Louis Henkin, *The Universal Declaration at 50 and the Challenge of Global Markets,* 25 Brook. J. Int'l L. 17, 24 (1999). Relying on the Preamble to the Declaration, Professor Henkin argued that it "is 'a common standard for all people and all nations.'It means that 'every individual and every organ of society shall strive-by progressive measures ... to secure their universal and effective recognition and observance among the people of member states.'Every individual includes juridical persons."*Id.* at 24-25. The Supreme Court, however, has held that the Declaration "does not of its own force impose obligations as a matter of international law."*Sosa,* 542 U.S. at 734. Moreover,

it is [also] important to keep in mind what exactly the Preamble expects of such individuals and organs: that they "promote" respect for the rights set forth in the Declaration by 'teaching and education' and by supporting "progressive national and international measures." The language is thus consistent with the idea that legal obligations bind corporations only to the extent that further "national and international measures" are taken.

Carlos M. Vázquez, *Direct vs. Indirect Obligations of Corporations Under International Law,* 43 Colum. J. Transnat'l L. 927, 942 (2005).

Nor are the sources rejecting corporate liability undermined by two international conventions and a Security Council resolution, all of which post-date the dismantling of apartheid. *See* The United Nations Convention Against Transnational Organized Crime art. 5(1)(b), Jan. 8, 2001, U.N. GAOR, 55th sess., Supp. No. 49, U.N. Doc. A/45/49; Convention on Combating Bribery of Foreign Public Officials in International Business Transactions arts. 1(2) & 2, Dec. 18, 1997, 37 I.L.M. 1 (1998); S.C. Res. 1566, U.N. Doc. S/RES/1566 (Oct. 8, 2004); Mandatory Action to Fight Terrorism, S.C. Res. 1373 ¶ 1(d), U.N. Doc. S/RES/1373 (Sept. 28, 2001); International

Convention for the Suppression of the Financing of Terrorism, *adopted* Dec. 9, 1999, G.A. Res. 109, U.N. GAOR 54th Sess., 76th plen. mtg., U.N. Doc. A/RES/54/109, 39 I.L.M. 270 (2000). While each of these sources call upon parties to enact measures to impose some kind of liability on legal persons in accordance with their own domestic legal principles, none of them directly impose any liability on corporations. Without an analysis of the laws enacted by the various signatories, it is impossible to draw any conclusions regarding the practice of states with regard to the issue of the degree of corporate liability for violation of international law norms.[FN11]Indeed, as Professor Bassiouni has observed, although "contemporary international efforts to deal with organized crime, corruption, and drug trafficking" are moving in the direction of corporate liability "these new concepts of corporate criminal responsibility have not yet found their way into [customary international law]." Bassiouni, *supra,* at 377 (internal quotation marks and footnotes omitted).*See also* Steven R. Ratner & Jason S. Abrams, *Accountability for Human Rights Atrocities in International Law: Beyond the Nuremberg Legacy* 16 (2d ed. 2001) ("It remains unclear [ ] whether international law generally imposes criminal responsibility on groups and organizations.").

**\*62** In sum, the issue here is not whether policy considerations favor (or disfavor) corporate responsibility for violations of international law. *Cf.* Carlos M. Vásquez, *Direct v. Indirect Obligations of Corporations Under International Law,* 43 Colum. J. Transnat'l L. 927, 932-959 (2005) (acknowledging that very few norms apply directly to corporations under "international law as it exists today" and outlining arguments for why " international law should move in the direction of generally extending human rights obligations of states to private corporations"). Instead, it involves a determination of what the law was during the relevant period. Indeed, the Supreme Court has held that the retroactive application of statutes enacting civil liability is presumptively inappropriate even where the conduct giving rise to liability was already proscribed and the newly enacted legislation simply increased the scope of liability for damages. *Landgraf v. USI Film Prods.,* 511

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                          Page 53

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

U.S. 244, 281-86 (1994).

"[T]he presumption against retroactive legislation is [not only] deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic,"*id.* at 265, but is also reflected in customary international law. As one scholar has noted, "[a] further traditional corollary of the *nullum crimen sine lege* principle-namely, the notion of non-retroactivity-views the principle of legality from a temporal perspective: conduct may be punished only on the basis of a norm that came into force *prior* to when the conduct occurred." Susan Lamb, *Nullum Crimen, Nulla Poena Sine Lege in International Criminal Law, in* Cassese et al., *supra,* at 733, 751 (emphasis in the original). Indeed, "[t]he applicability of the *nullum crimen* principle to serious breaches of international humanitarian law was by 1998 sufficiently well-accepted that its inclusion within the Rome Statute was seen as necessary...."*Id.* at 755. *See also Prosecutor v. Tadic,* 36 I.L.M. 908, 945,Case No. IT-94-1-T, Opinion and Judgment ¶ 654 (Trial Chamber May 7, 1997) (the International Tribunal " must apply customary international law as it stood at the time of the offences").

Although the precise date on which the heart of the apartheid regime stopped beating may be difficult to pinpoint, the executive order by President George H.W. Bush on July 10, 1991, terminating United States sanctions against the country, provides one guidepost. Exec. Order No. 12,769, 56 Fed.Reg. 31855 (July 10, 1991), *reprinted in*22 U.S.C. § 5061 (2004). By that order, the President concluded as of that date that the Government of South Africa had: (1) released all persons persecuted for their political beliefs or detained unduly without trial and Nelson Mandela from prison; (2) repealed the state of emergency in effect on the date of enactment of [the "Comprehensive Anti-Apartheid Act of 1986"] and released all detainees held under such state of emergency; (3) unbanned democratic political parties and permitted the free exercise by South Africans of all races of the right to form political parties, express political opinions, and otherwise participate in the political process; (4) repealed the Group Areas Act and the Population Registration Act and instituted no other measures with the same

purposes; and (5) agreed to enter into good faith negotiations with truly representative members of the black majority without preconditions. *See* Comprehensive Anti-Apartheid Act of 1986, Pub.L. No. 99-440 § 311(a) (1986). Because the only sources of customary international law that suggest some movement toward the recognition of corporate liability post-date the collapse of the apartheid regime, and because the established norm during the apartheid era was that corporations were not responsible legally for violations of norms proscribing crimes against humanity, the complaints are subject to dismissal on this ground alone.

### 3. The Concurring Opinions

### (a) Judge Hall's Concurring Opinion

**\*63** Judge Hall flatly ignores the holding of the Supreme Court that the second consideration in deciding whether to accept jurisdiction over a cause of action alleging a violation of the law of nations " is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."*Sosa,* 542 U.S. at 732 n. 20. Instead of undertaking an analysis of a given norm of international law to determine the scope of liability of a private actor, Judge Hall concludes that international law is irrelevant and that once a violation of a given norm is alleged, ATCA subjects a private party to liability if he aided-and-abetted that violation.

Judge Hall's concurring opinion is premised on the assumption that, even though the ATCA does not by its terms encompass aiding-and-abetting liability, it should be construed as if it contains such language. This aspect of Judge Hall's opinion not only contradicts *Sosa* and *Kadic,* it does disservice to the holding of the leading Supreme Court case addressing the issue of accessorial liability for violations of statutes that create civil causes of action, *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In that case, the Supreme Court observed that:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Congress has not enacted a general civil aiding and abetting statute-either for suits by the Government (when the Government sues for civil penalties or injunctive relief) or for suits by private parties. Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.

*Id.* at 182. *Central Bank,* to be sure, only stands for the proposition that when Congress enacts a law creating a private right of action for violation of a statute, "there is no general presumption that the plaintiff may also sue aiders and abettors."*Id.* That decision, however, does not preclude civil liability for aiding-and-abetting in cases "where Congress' intent is clear from the language and structure of the statute itself as well as from the legislative history." *Boim,* 291 F.3d at 1019.

*Boim,* upon which Judge Hall relies, concerns the issue of liability for aiding-and-abetting international terrorism in violation of 18 U.S.C. § 2333(a). While the statute, creating the civil cause of action, 18 U.S.C. § 2339A, did not *in haec verba* provide for aiding-and-abetting liability, accomplice liability was implicit in the definition of international terrorism. Thus, in distinguishing *Central Bank,* the Seventh Circuit held that:
Unlike section 10(b) [the statute at issue in *Central Bank],* Congress also expressed an intent in section 2333 to make civil liability at least as extensive as criminal liability. The statute defining "international terrorism" includes activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State."18 U.S.C. § 2331(1). This language, embracing activities that "involve" violent acts, taken at face value would certainly cover aiding and abetting violent acts. Remember, too, the criminal laws include 18 U.S.C. § 2, which creates liability for aiding and abetting violations of any other criminal provisions. By incorporating violations of any criminal laws that involve violent acts or acts dangerous to human life, Congress is expressly including aiding and abetting to the extent

that aiding and abetting "involves" violence.

**\*64** *Id.* at 1020.

The language of the ATCA, like the language of the statute at issue in *Boim,* can support the recognition of a cause of action for aiding-and-abetting. Nevertheless, it does so only if the plaintiff invokes an international law norm that provides for such liability. Nothing in the language of the ATCA supports the broad holding that Congress intended to provide a forum to adjudicate causes of action for aiding-and-abetting the violation of a norm when such conduct did not fall within the scope of the norm. Indeed, the same Congress that enacted the ATCA, without reference to aiding-and-abetting liability, explicitly made it a crime to aid-and-abet acts of piracy, a violation of the law of nations. *See* Act of April 30, 1790, ch. 9, § 10, 1 Stat. 112, 114 (1790). This shows that, despite Judge Hall's suggestion to the contrary, Op. of Judge Hall *ante* at 59 n. 37, the First Congress "knew how to impose aiding and abetting liability when it chose to do so," *id.*(quoting *Central Bank,* 511 U.S. at 174), with respect to violations of the law of nations.

In the absence of either statutory language or legislative history to support his interpretation of the ATCA, Judge Hall's opinion argues that "the Founding Generation nevertheless understood that ATCA encompassed aiding and abetting liability." Op. of Judge Hall *ante* at 59 n. 37.This contention is beside the point, for the reasons discussed above, and it is also wrong. In *Central Bank,* the plaintiff argued that "Congress legislated with an understanding of general principles of tort law and that aiding and abetting liability was 'well established in both civil and criminal actions by 1934,' " the year the statute at issue was adopted. 511 U.S. at 181 (citation omitted). The Court's opinion suggested that the plaintiff there relied on the principle derived from the Restatement (Second) of Torts (1979), which provides that a person is liable for another's torts if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself...." *Id.* § 876(b); *see Central Bank,* 511 U.S. at 181. The principle of " substantial assistance," which Judge Hall adopts,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                    Page 55

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

initially appeared in the Restatement (First) of Torts in 1939, of which Prosser wrote:

The form of the Restatement is perhaps unfortunate, in that it seeks to reduce the law to a definite set of black-letter rules or principles, ignoring all contrary authority-since the law of torts in its present stage of development does not lend itself at all readily to such treatment. There is room for suspicion that the courts have tended to cite the Restatement when they are already in agreement with it, and to ignore it when they are not, so that the impressive list of references to it in the cases may be somewhat misleading; and there are those who have disagreed with many of its conclusions, and even denounced the whole project.

**\*65** William L. Prosser, *Law of Torts* § 4, at 20-21 (4th ed.1971).[FN12] Perhaps for this reason, the Supreme Court could write fifty-five years after the publication of the first Restatement that the doctrine of aiding-and-abetting in civil cases "has been at best uncertain in application ... with the common-law precedents 'largely confined to isolated acts of adolescents in rural society.' " *Central Bank,* 511 U.S. at 181 (quoting *Halberstam,* 705 F.2d at 489). If there was no general understanding that civil aiding-and-abetting liability was "well established in ... civil ... actions by 1934," *id.* at 181 (citation omitted), it is difficult to understand how it can be asserted that such an understanding was present in 1789 when Congress enacted the ATCA.

The historical support for the proposition that "[t]he Founding Generation nevertheless understood that civil liability for aiding and abetting international law violations was contemplated under the ATCA," Op. of Judge Hall *ante* at 59 n. 37, is ambiguous at best. The lynchpin for this argument is Attorney General William Bradford's 1795 opinion, *Breach of Neutrality,* 1 Op. Atty. Gen. 57 (1795). In his opinion, Bradford specifically addressed whether American citizens who "voluntarily joined, conducted, aided, and abetted a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast" could be subject to criminal prosecution in the United States. *Id.* at 58.Bradford expressed some doubt about a criminal prosecution, but he

stated that

there can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the law of nations, or a treaty of the United States....

*Id.* at 59.

Because Bradford did not distinguish between primary and secondary liability, it is not possible to discern that, when he said a cause of action would lie for "these acts of hostility," he was focusing on aiding-and-abetting as opposed to direct participation in the conduct that violated a treaty of the United States. Indeed, because the conduct involved direct participation by American citizens, who acted with the intent to make the attack succeed, it seems likely that Bradford recognized all of the perpetrators as joint tortfeasors, as that term was understood at the time. As the D.C. Circuit explained in *Halberstam:*

Prosser notes that "[t]he original meaning of 'joint tort' was that of vicarious liability for concerted action. All persons who acted in concert to commit a trespass, in pursuance of a common design, were held liable for the entire result."W. Prosser, *Law of Torts* § 46, at 291 (4th ed.1971). His illustration portrays a standard situation that involved this "joint tort": combined action by tortfeasors on the scene together-"one might have battered the plaintiff, while another imprisoned him, and a third stole his silver buttons."*Id.* (footnote omitted). Each was responsible for the others' actions.

**\*66** 705 F.2d at 476-77. Moreover, Prosser goes on to explain that the essential element of a joint tort was "the pursuance of a common plan or design to commit a tortious act."Prosser, *supra,* at 292.

Two early cases cited in Judge Hall's opinion, *Talbot v. Jansen,* 3 U.S. (3 Dall.) 133, 1 L.Ed. 540 (1795), and *Henfield's Case,* 11 F. Cas. 1099 (C.C.D.Pa.1793), neither of which involved the ATCA, bear out Prosser's analysis. Both cases arose from the seizure of a vessel not by pirates, but by privateers, "armed vessels that are owned, equipped

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                      Page 56

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

and officered by one or more private persons, but sailing under a commission, usually called letters of marque, from a belligerent state, which empowers the person or persons to whom it is granted to attack and seize, at sea, vessels or other property of its enemy." 3 James Fairbanks Conley, *Privateering, in Cyclopdia of Political Science, Political Economy, and the Political History of the United States* 361 (John J. Lalor ed., 1899). The use of privateers in this way was recognized under international law. *Id* . Nevertheless, Talbot's and Henfield's legal problems in these cases derived from the fact that they were United States citizens engaged in acts of war against nations with which the United States was at peace.

*Talbot* was an admiralty case. Talbot himself was the captain of a privateer commissioned by the Republic of France. *Henfield's Case* was a criminal prosecution, and a most unusual one at that, of the prize-master of a privateer also commissioned by France. Henfield was not charged with conduct proscribed by an act of Congress. The undelivered grand jury charge of Chief Justice Jay, upon which Judge Hall relies, Op. of Judge Hall *ante* at 59 n. 37, appears to reflect the practice of most of the early justices "to create crimes by judicial fiat[, which] was particularly infuriating to the vast majority of citizens who believed the Constitution had established a government of limited powers." Jean Edward Smith, *John Marshall: Definer of a Nation* 284 (1996). The Supreme Court repudiated the practice in *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812). Under these circumstances, it is not surprising that Henfield, who was not charged with aiding-and-abetting, was acquitted because "he was ignorant of the unlawfulness of his undertaking."*Henfield's Case,* 11 F. Cas. at 1122 n. 7. Nor is it surprising, given Henfield's role as a principal (or as a joint tortfeasor in the civil context), that Jay's grand jury charge, which was written to apply "to the class of offenders, of whom Henfield was one,"*id.* at 1105 n. 2, did not define aiding-and-abetting, and that the judge who actually charged the Henfield grand jury did not allude to the concept altogether. *Id.* at 1105-09.

In sum, Bradford's opinion and the cases cited by

Judge Hall do not support the extraordinary proposition that Congress intended the ATCA to permit jurisdiction to be exercised over claims of aiding-and-abetting without regard to whether the conduct at issue violated an **internationallaw** norm. Moreover, Judge Hall compounds his flawed discussion of this issue by adopting a standard for aiding-and-abetting that is vague and inappropriate in the present context. As if the language of section 876(b) of the **Restatement** (Second) of **Torts** imposing liability for "substantial assistance" was not vague enough, he endorses a five-factor test, first suggested by the Restatement and then adopted in *Halberstam,* to "assess whether the defendant's encouragement or assistance was sufficiently substantial to support liability."Op. of Judge Hall *ante* at 58.These factors are "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other tortfeasor and his state of mind."*Id.*

**\*67** The "state of mind" factor, as applied in *Halberstam,* includes a "desire to make the venture succeed."705 F.2d at 488. Nevertheless, despite his reliance on *Halberstam,* Judge Hall's opinion fails to even allude to this critical state-of-mind element. Moreover, even under *Halberstam's* formulation, it is only one factor among five for determining whether "substantial assistance" was provided. Such a five-prong test for determining whether assistance was substantial hardly provides the clear guidance necessary to those engaging in commercial transactions.

By incorporating a vague "substantial assistance" standard, this newly minted theory of aiding-and-abetting liability will create many practical problems harmful to the political and economic interests of the United States. As the United States observes in its *amicus* brief, the decision to embrace this broader scope of liability under the ATCA will generate tremendous uncertainty for private corporations, who will be reluctant to operate in countries with poor human rights records for fear of incurring legal liability for those regimes' bad acts. Br. for the U.S.A. as *Amicus Curiae* at 13. This uncertainty, in turn, will undermine efforts by the United States to encourage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 57

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

reform in those countries through active economic engagement, *id.,* and will deter the free flow of trade and investment more generally. *Id.* at 18.

### (b) Judge Katzmann's Concurring Opinion

Unlike Judge Hall, Judge Katzmann looks to international law to resolve the issue of whether a private party or a corporation (he draws no distinction between the two) can be held liable for aiding-and-abetting a violation of international law otherwise applicable to state actors or to private parties acting under color of law. While Judge Katzmann properly looks to international law, he disregards the holding in *Sosa* and our own holdings in *Kadic* and *Wiwa,* which I have already discussed at some length, *ante* at 101-02, that require a norm-by-norm analysis to determine whether "international law extends the scope of liability for a violation of a *given* norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."*Sosa,* 542 U.S. at 732 n. 20 (emphasis added). Judge Katzmann declines to undertake this analysis because that "is not how the inquiry is undertaken by international tribunals whose jurisdiction is limited by customary international law."Op. of Judge Katzmann *ante* at 43.

Contrary to Judge Katzmann's suggestion, the jurisdiction of the international tribunals-he relies principally on the ICTY-are conferred by the Security Council resolutions creating them-or in the case of the ICC by the Treaty of Rome. Indeed, in one significant respect the statute creating the ICTY is inconsistent with the evolving standards of customary international law. *Post* at 140. C.f. Rome Statute art. 25(3)(e) (expanding the liability for genocide beyond that provided for other crimes against humanity). More significantly, in the cases on which Judge Katzmann relies-those of the ICTY-the tribunal was not required to make any inquiry regarding the issue of whether "international law extends the scope of liability for a given norm to the perpetrator being sued if the defendant is a private actor such as a corporation ."*Sosa,* 542 U.S. at 732 n. 20.

***68** The Statute of the ICTY, article 5, followed the London Charter, the Judgment of the Nuremberg Tribunal, construing it, and the tribunals empaneled pursuant to CCL 10, all of which required a connection between crimes against humanity and war crimes.[FN13]Because private parties are individually responsible for crimes committed in the course of a war, this connection made it unnecessary for the CCL 10 tribunals to address the scope of liability of private actors as aiders-and-abetters. *See Kadic,* 70 F.3d at 239-41; *see also id.* at 242-43 ("Plaintiffs also contend that the acts of murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities, violate the law of war. Atrocities of the types alleged here have long been recognized in international law as violations of the law of war.... The liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II."). Thus, ICTY cases provide no support for failing to follow the instruction of the Supreme Court, one that is consistent with our own holding in *Kadic* and *Wiwa,* which requires an analysis of the particular norm the defendant is accused of violating to determine whether a private party may be held responsible as an aider-and-abettor.[FN14]

While Judge Katzmann erroneously concludes that there was-during the period when the crimes alleged here took place-an independent norm of customary **international law**, making private actors legally responsible as aiders-and-abetters without regard to whether the particular norm they allegedly violated imposed such liability, he correctly rejects the " substantial assistance with knowledge" standard for this newly minted norm that Judge Hall finds in section 876(b) of the **Restatement** (Second) of **Torts**. Instead, he "conclude[s] that a defendant may be held liable under **international law** for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime."Op. of Judge Katzmann *ante* at 38-39.The basis for this formulation is article 25 of the Rome Statute. Rome Statute of the ICC, *opened for signature* July 17, 1998, 37 I.L.M. 999, 1016

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 58

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

(entered into force July 1, 2002).

Specifically, article 25 of the Rome Statute provides that a person shall be criminally responsible and liable for punishment for specified crimes against humanity if that person:
(c) For the purpose of facilitating the commission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission;
(d) In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:
**\*69** (i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or
(ii) Be made in the knowledge of the intention of the group to commit the crime;

*Id.* art. 25(3)(c), (d).

This article is significant because it makes clear that, other than assistance rendered to the commission of a crime by a group of persons acting with a common purpose, a defendant is guilty of aiding-and-abetting the commission of a crime *only* if he does so "[f]or the purpose of facilitating the commission of such a crime ... including providing the means for its commission."*Id.* The same standard was adopted by the United Nations Transitional Administration in East Timor ("UNTAEAT").*See* UNTAET, June 6, 2000, Reg. No.2000/15 § 14.3(c). As one commentator has observed:
With regard to *facilitating* the commission of a crime, the aider and abettor must act with '*purpose.*' ...This means more than the mere knowledge that the accomplice aids the commission of the offence, as would suffice for complicity according to the ICTR and ICTY Statutes, rather he must know as well as wish that his assistance shall facilitate the commission of the crime.

Albin Eser, *Individual Criminal Responsibility, in* 1 *The Rome Statute of the International Criminal Court* 767, 801 (Antonio Cassese et al., eds.2002) (emphasis in original).

The Rome Statute has been signed by 139 countries and ratified by 105, including most of the mature democracies of the world. I agree that it reflects an international consensus on the issue of the appropriate standard for determining liability for aiding-and-abetting, it is consistent with our own domestic law, *see ante* at 111-12, and addresses the concern over the adoption of a "substantial assistance with knowledge" standard raised in the *amicus* brief filed by the United States. Br. for the U.S.A. as *Amicus Curiae* at 13. Indeed, the *amicus* brief appears to endorse the elements set out in article 25(3).*Id.* at 26 (arguing that "the standard the plaintiffs propose differs materially from the most re cent formulations adopted in international practice" ) (citing article 25(3) of the Rome Statute). Perhaps more significantly, the standard in article 25(3)(c) of the Rome Statute is consistent with the *Ministries Case,* discussed at the outset, that holds that the conduct which the defendants allegedly engaged in here was not a violation of customary international law. *The Ministries Case,* 14 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* 622. These considerations also obviate any concern regarding the failure of the United States to ratify the Treaty of Rome for reasons unrelated to the definition of aiding-and-abetting. *See Yousef,* 327 F.3d at 92 n. 25.

My point of disagreement with Judge Katzmann relates to the narrow issue of whether there was *any*" 'well established[ ][and] universally recognized" definition of aiding-and-abetting sufficient to be considered customary international law for the purposes of the ATCA during the apartheid era when the defendants allegedly violated customary international law. Op. of Judge Katzmann *ante* at 39 (quoting *Kadic,* 70 F.3d at 239). Nevertheless, I concur in section II.B of his opinion that articulates the customary international law standard for aiding-and-abetting based on the Rome Statute. I do so because it provides a clear standard, adopted by a majority of the panel, for Judge Sprizzo to apply, in deciding whether to grant the plaintiffs' motion to file amended complaints.[FN15]Moreover, as applied

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 59

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

to the facts in this case, the standard Judge Katzmann adopts is consistent with the *Ministries Case*-the validity of which has never been questioned.

**\*70** Judge Katzmann's opinion, however, does not end with section II.B. Thus, while he does not rely on post-apartheid decisions of the ICTY or the ICTR to support the standard that he enunciates for determining aiding-and-abetting liability, he does rely on those cases to suggest that the "substantial assistance with knowledge" standard for aiding-and-abetting may provide a foundation for future development of the law in this area. I discuss the cases on which he relies to demonstrate why, contrary to Judge Katzmann's gratuitous suggestion, they do not provide a reliable basis for a broader definition than the one proscribed in the Rome Statute.

**(a) The ICTY**

By way of background, the ICTY was created by United Nations Security Council Resolution 827, which was passed on May 25, 1993, to prosecute individuals responsible for serious violations of international humanitarian law committed in the former Yugoslavia beginning on January 1, 1991. Under the ICTY Statute, the tribunal has jurisdiction over four clusters of crimes: grave breaches of the 1949 Geneva Conventions, violations of the laws or customs of war, genocide, and crimes against humanity. *See* ICTY Statute arts. 2-5. Significantly, as previously noted, the ICTY criminalizes crimes against humanity only "when committed in armed conflict." While this connection with armed conflict is consistent with the London Charter and the Judgement of the Nuremberg Tribunal, *ante* at 135, the ICTY Statute undermines "subsequent developments de-coupling 'crimes against humanity' from the initiation and waging of an aggressive war...."*Bassiouni, supra,* at 194.Indeed, if we applied this retrograde statute here, it would require the dismissal of the complaints.

Against this backdrop and my earlier discussion of the ICTY statute, I turn to the specific ICTY

decisions relied upon by Judge Katzmann. The gruesome facts in the *Furundzija* case, the principal case which Judge Katzmann cites, are illustrative of the circumstances under which the ICTY chose to address aiding-and-abetting liability. There, two victims, identified as A and D, were apprehended and were brutally interrogated. The ICTY made the following finding with respect to the defendant and his co-defendant, who it identified as Accused B: " There is no doubt that the accused and Accused B, as commanders, divided the process of interrogation by performing different functions. The role of the accused was to question, while Accused B's role was to assault and threaten in order to elicit the required information from Witness A and Witness D."*Prosecutor v. Furundzija,* 38 I.L.M. 317, 363, Case No. IT-95-17/1-T, Judgment ¶ 130 (Trial Chamber Dec. 10, 1998). While this was an open-and-shut case of joint participation in a violation of international law by members of an armed group in an international conflict, the ICTY panel entered into a confused and rambling discussion of aiding-and-abetting.

**\*71** This theme animates the other ICTY cases cited by Judge Katzmann. In *Tadic,* the Trial Chamber found that the defendant, as part of a group proclaiming the creation of an independent Bosnian Serb republic, played an active role in the attack on a majority Muslim town in a predominantly Serb region by, *inter alia,* beating civilians and forcibly transferring them to concentration camps. *E.g., id.,* Judgement ¶¶ 397, 455, 461. He was also among a group of men who beat, stabbed, and/or killed a number of individuals at such concentration camps in the context of the armed conflict. *E.g., id.* ¶¶ 235-36, 261, 303, 316, 435, 448.Again, this is a classic case of joint participation in criminal conduct by state actors in an armed conflict who provided direct and substantial assistance to the " common purpose" of effecting a violation of an international law norm. *Id.* ¶¶ 730, 735, 738.Indeed, *Tadic* was expressly cited in *Furundzija,* as holding that "the accused ' intentionally assisted directly and substantially in the common purpose of the group' to commit the offence."*Id.* Judgment ¶ 226 (internal citations omitted).*See also Prosecutor v. Vasiljevic,* Case No. IT-98-32-A, Judgment ¶ 134 (App. Chamber

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                    Page 60

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Feb. 25, 2004) (The evidence showed that " Appellant knew that the seven Muslim men were to be killed; that he walked armed with the group from the place where they had parked the cars to the Drina River; that he pointed his gun at the seven Muslim men; and that he stood behind the Muslim men with his gun together with the other three offenders shortly before the shooting started.").

Similarly, in *Prosecutor v. Kvocka,* Case No. IT-98-30/1-T, Judgment (Trial Chamber Nov. 2, 2001), the defendants were employees of a camp created by Serb Forces in Bosnia Herzegovina, where non-Serbs were detained, killed, and otherwise gravely mistreated. The administrative aide to the commander of the camp was found to have participated in the joint criminal enterprise because his "administrative duties constituted one of many integral cogs in the wheel of a system of gross mistreatment."*Id.* Judgment ¶ 460. The other two defendants held individually responsible were both guard shift leaders at the camp. One defendant was convicted on the basis of "substantial evidence presented that the guards on [his] shift beat detainees, sometimes in his presence, and he not only failed to object, but participated on occasion." *Id.* ¶ 497.The other guard leader also permitted serious crimes to be committed by those under his command and he personally "perpetrated a number of serious crimes, particularly sexual violence."*Id.* ¶ 566.This case is the mirror image of the Dachau Concentration Camp case in which

there was in the camp a general system of cruelties and murders of the inmates (most of whom were allied nationals) and that this system was practiced with knowledge of the accused, who were members of the staff, and with their active participation. Such a course of conduct, then, was held by the court in this case to constitute "acting in pursuance of a common design to violate the laws and usages of war."Everybody who took any part in such common design was held guilty of a war crime, though the nature and extent of the participation may vary.

**\*72** *Trial of Martin Gottfried Weiss and thirty-nine others,* 11 *Law Reports of Trials of War Criminals* 5, 14 (William S. Hein & Co., Inc.1997) (1945). [FN16]

These cases hardly provide a foundation upon which a norm of international law, of the kind Judge Katzmann suggests, can be constructed. Nor do the opinions of the ICTR, to which I now turn.

### (b) The ICTR

The ICTR was created on November 8, 1994, by the United Nations Security Council Resolution 995 in order to judge those individuals responsible for serious violations of international law in Rwanda and nearby states, between January 1 and December 31, 1994. Specifically, the defendants there were accused of genocide, crimes against humanity, and violations of Article 3 common to the Geneva Conventions and of Additional Protocol II. The ICTR Statute did not require a connection between a crime against humanity and an armed conflict. While the ICTR and ICTY are separate tribunals they shared the same Appeals Chamber, Op. of Judge Katzmann *ante* at 40 n. 28.Not surprisingly, as Judge Katzmann observes, there was little to distinguish judgments of one from the other. *Id.* These judgments, as I proceed to show, are equally useless precedent on the issue of liability of private parties for violations of customary international law.

In *Prosecutor v. Akayesu,* Case No. ICTR-96-4-T, Judgement (Trial Chamber Sept. 2, 1998), the defendant, serving as the local "bourgmestre," was charged with executing the laws adopted by the communal legislature, had control over the appointment and removal of communal employees, and had ultimate authority over the communal police and any gendarmes put at the communes disposal. Judgement ¶¶ 61-71. Bourgmestres also had significant *de facto* powers over their constituents, like those of a tribal chief. *Id.* ¶¶ 72-74.Indeed, the indictment only charges Akayesu with violations performed during his time as a public official. Given the widespread use of public employees and facilities in this conduct, it is clear that Akayesu was a state actor and a joint participant with other state actors.

Similarly, in *Prosecutor v. Bagilishema,* Case No. ICTR-95-1A-T (Trial Chamber June 7, 2001), and *Prosecutor v. Musema,* Case No. ICTR-96-13-T

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 61

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

(Trial Chamber Jan. 27, 2000), the defendants were not only charged with acts of direct criminal participation in crimes in which they were joint participants, they were significant public officials. Bagilishema, the Mayor of a Rwandan commune, was accused of, *inter alia,* arming individuals and directing them to attack, personally attacking and killing persons, as well as other official acts encouraging mass killings. *See Bagilishema,* Judgment annex A. Musema was the director of a state-owned tea factory, under the authority of the Rwandan Ministry of Agriculture, who led and participated in attacks on non-Hutus using factory employees and equipment, personally shot at refugees, ordered the rape of one Tutsi woman, and personally raped another woman. *See Musema,* Judgment § 5.

**\*73** Finally, in *Prosecutor v. Ntakirutimana,* Case No. ICTR 96-10-A, ICTR-96-17 (App. Chamber Dec. 13, 2004), the Appeals Chamber summarized the Trial Chamber's findings of facts, in part, as follows:
The Trial Chamber found 1) in relation to the Mugonero Indictment that, in addition to killing Charles Ukobizaba and shooting at Tutsi refugees at the Complex, Gérard Ntakirutimana's participation in the attacks included procuring ammunition and gendarmes for the attack on the Complex and participation in the attack on Witness SS; and 2) in relation to the Bisesero Indictment that, in addition to killing Esdras and the wife of Nzamwita, pursing and shooting at the refugees, he transported attackers at Kidashya, headed a group of armed attackers at Muyira Hill in June 1994, was at Mutiti Hill in June 1994 with *Interahamwe* where they shot at refugees in a forest by a church, and participated in attacks in Bisesero during the period April to June 1994.

*Id.* ¶ 491.This is a classic example of joint participation of persons acting pursuant to a common design. Moreover, the defendants were also direct participants in the offenses for which they were convicted.

Judge Katzmann concedes that the defendants in the ICTR and ICTR cases he cites involved joint participants in violations of international law.

Indeed, virtually all of the defendants in these cases were state actors. They hold, at most, that " substantial assistance with knowledge" satisfies the participation necessary for the imposition of liability on joint participants sharing the common purpose of violating a norm of customary international law. This is entirely consistent with the Rome Statute.

Moreover, to the extent that any language in these opinions suggest more than that, it rises only to the level of *dicta,* of which peremptory norms of international law are not made. Indeed, the leading treatise Judge Katzmann cites explains that " decisions of international tribunals ... exercise considerable influence as an impartial and considered statement of the law by jurists of authority *in light of actual problems which arise before them.*" 1 *Oppenheim's International Law: Peace* 31 (Robert Y. Jennings & Arthur Watts eds. 9th ed.1962) (emphasis added).*Dicta* unrelated to the actual problems which arise before them do not warrant such deference. This is all the more so where *dicta* are inserted by judges who are using their positions to make law with respect to matters with which they have preconceived views. Yet, a leading jurist and commentator has observed that the practice of "deal[ing] through *obiter dicta* with legal issues that were incidental, as it were, to the main questions," was a regular practice of ICTY panels. Antonio Cassese, *The ICTY: A Living and Vital Reality,* 2 J. Int'l Crim. Just. 585, 589 (2004). The excuse given for this practice is that it provided "clarification [that] might have some value for the future development of international criminal law [.]" *Id.*As Antonio Cassese, the President of the ICTY and Presiding Judge of the ICTY Trial Chamber, who was one of the judges on the ICTY panel in *Furundzija,* goes on to explain:
**\*74** In this connection, one may find much merit in the witty remark reportedly made by a senior member of the ICTY Office of the Prosecutor in 1995, after the Appeals Chamber handed down its lengthy judgment in *[Prosecutor v. Tadic,* Case No. IT-94-1 (App. Chambers Oct. 2, 1995) (Cassese, Presiding J.) ]: 'We had gone for a steak,' he said, ' and have got a whole cow.'However, international courts operate in a legal system that is notably lacking in many respects. Among other things, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 62

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

absence of an international law-maker and an international court with compulsory universal jurisdiction entails that many rules are not clear, particularly when they are of customary origin, and are thus open to differing interpretations-hence the need for courts gradually to spell out the contents of those rules, if need be through *obiter dicta.*

*Id.* at 590.

Nevertheless, Judge Cassese cautioned that "one should not be oblivious of the possible flaws or abuses. Courts may indulge in legal discussions that not only are peripheral to the *ratio decidendi,* but may also prove simply academic and sometimes also misleading for future courts pronouncing on the same matters."*Id.* This accurately describes the aiding-and-abetting *dicta* in the ICTY opinions. They do not constitute a foundation strong enough to provide a future basis for rejecting the international consensus achieved by the Rome Statute on the elements of aiding-and-abetting.

### Conclusion

I dissent from judgment reversing the dismissal of the complaint for the reasons I have elaborated above. Nevertheless, I concur in section II.A of Judge Katzmann's opinion that rejects Judge Hall's argument that the scope of liability for the violation of the norm of international law must be decided by reference to our own domestic law. I concur as well in section II.B of Judge Katzmann's opinion that articulates the elements of aiding-and-abetting liability as defined in article 25(b) & (c) of the Rome Statute. These elements are consistent with, if not mandated by, customary international law. I also concur in section II of the *per curiam* opinion dismissing the TVPA cause of action for the reasons stated in the *per curium* opinion and for the additional reason that only natural persons are subject to liability under it.

FN* We direct the Clerk of Court to amend the official caption to reflect this spelling of Ntsebeza's name, which is consistent with the spelling used in his

briefs and complaint.

FN** A dozen entities participated as *amici,* but only the United States participated in oral argument of the appeal.

FN*** The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

FN1. The Khulumani Plaintiffs include the Khulumani Support Group, a South African non-governmental organization that "works to assist victims of apartheid-era violence and has 32,700 members who are survivors of such violence," as well as ninety-one individual plaintiffs who are "the personal representatives of victims of extrajudicial killing, or were themselves tortured, sexually assaulted, indiscriminately shot, or arbitrarily detained by the apartheid regime."

FN2. Apparently, not all of the named defendants in the three actions have been served with complaints, and some defendants have indicated that they plan to contest personal jurisdiction. The district court's order granting the motion to dismiss stated that it was "limited to those defendants as to whom the Court's personal jurisdiction is not contested."*In re S. African Apartheid Litig. .,* 346 F.Supp.2d at 543 n. 3. In addition, eleven of the defendants who joined the motion to dismiss filed separate motions to dismiss on the ground that the plaintiffs' claims were conclusory and failed to meet the pleading standards of Fed.R.Civ.P. 8(a). The district court did not reach those arguments in deciding the motion to dismiss.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

FN3. The Ntsebeza and Digwamaje Plaintiffs moved to strike Maduna's declaration and submissions, asserting that the declaration contained "legal argument by a non-party" and "conclusory allegations not supported by any creditable citation to the record," and recited " disputed evidentiary facts." They also argued that international comity could only be raised by a party as an affirmative defense, and even if comity were available, "it would be inappropriate for the Court to dismiss this case without making fact-bound determinations that cannot be made on this record...." The docket sheet indicates that the district court never ruled on this motion.

FN4. Specifically, the district court inquired whether "adjudication of these cases would have an adverse impact on the interests of the United States and, if so, the nature and significance of any such impact. "

FN5. The plaintiffs sought to provide particularized allegations directed at particular defendants, to "meet the new *Sosa* standard," and to clarify for the district court that their ATCA claims were not based upon the corporations "merely doing business" in South Africa.

FN6. The Digwamaje Plaintiffs have not challenged the dismissal of their RICO claim.

FN7. Although the district court rested its decision to deny the plaintiffs' motion to replead on several grounds, it is not clear from the district court's order that it would have reached the same result in the absence of its erroneous belief that any amendment would be futile. It seems most respectful of the district court's considerable discretion in this area to allow it to determine in the first instance whether to allow the plaintiffs to replead. In that same vein, we also leave to the

district court on remand the first opportunity to consider any motion that may be filed by the Khulumani plaintiffs seeking permission to amend their complaint.

FN8. In his dissent, Judge Korman adamantly asserts that our opinion fails to show deference to the position of the Republic of South Africa, a position that also commands the support of the United States Department of State. Opinion of Judge Korman at 92-100. He presents an analysis of prudential considerations, the strength of which we decline to address, that may well suggest a roadmap for future motion practice before the district court on remand. *Id.* at 73-92.Implicit throughout is the suggestion that by correcting the district court's error and clarifying the applicability of accessorial liability to violations of international law, we have somehow irrevocably, and to the derogation of South Africa's sovereignty, relegated the plaintiffs' claims to the judicial processes of the United States. With all due respect, Judge Korman's position in this regard is overstated and ignores the fact that well before any steps can be taken to address the merits of plaintiffs' claims, the district court may allow for a full airing of prudential concerns and, if it so chooses, engage in an analysis of, and decision regarding, those and other issues, something that has been heretofore lacking.

FN9. We reject the proposition endorsed by Judge Korman that the Supreme Court, in a footnote written while deciding a different case, would instruct us on how to decide this case, which was not before it. Opinion of Judge Korman at 73. Instead, we take the Supreme Court's language in footnote 21 of *Sosa* at face value, as simply observing that there is a strong argument that the views of the Executive Branch *on the issue of the case's impact on foreign policy* should be given "serious

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                          Page 64

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

weight." *Sosa,* 542 U.S. at 733 n. 21. We view summary dismissal at the behest of a footnote as premature. *See Cent. Va. Cmty. College v. Katz,* 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006).

FN10. The parties agree that *Sosa's* reference to "case-specific deference" implicates either the political question or international comity doctrine.

FN11. Judge Korman suggests that the content of the Defendant's Joint Motion to Dismiss ("Joint Motion"), cited by the district court, supports the view that the issue of deference to other political branches was addressed below. Opinion of Judge Korman at 93. We fail to see how the content of a motion, the basis for which Judge Korman concedes the district court " declin[ed] to address," *id.,* lends any support to the proposition that the district court reached the issues addressed therein.

FN12. It was error for the district court to consider these collateral consequences in the context of deciding preliminarily whether it had jurisdiction to hear this case under the ATCA. However, even if we construed the district court's discussion of the "collateral consequences" as a decision not to recognize a cause of action for plaintiffs' claims, in which context consideration of these consequences would have been appropriate, remand would still be necessary because the district court's decision not to recognize a cause of action might still have rested, in part, on its erroneous view that the ATCA does not allow for claims of aiding and abetting liability. Because we cannot know whether the district court would have declined to recognize the cause of action plaintiffs bring in the absence of that error, we believe it is appropriate to remand, so it can have the opportunity to decide this issue in the first instance.

FN13. While we cannot know how these

developments will affect the positions of the United States and South Africa with respect to this litigation, the district court may wish to solicit anew the views of these governments, and thus that fact, too, counsels against us reaching these issues at this time.

FN14. We do not believe the Supreme Court's statement in *Sosa* is to the contrary. *Sosa,* 542 U.S. at 733 n. 21 (noting only that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"). Indeed, to give dispositive weight to the Executive Branch's views would likely raise serious separation-of-powers concerns. *Cf., e.g., First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 763, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Powell, J., concurring) ("I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction. Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with that very doctrine.").

FN1. This "series of reasons" comprises (1) a change in the "prevailing conception of the common law" such that there is now "a general understanding that the law is not so much found or discovered as it is either made or created,"*Sosa,* 542 U.S. at 725; (2) a "rethinking of the role of the federal courts in making it,"*id.* at 726; (3) the recognition that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases,"*id.* at 727; (4) the fact that " attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences,"*id.* at 727-28; and (5) the lack of a " congressional mandate" to engage in judicial lawmaking in this area, *id.* at 728.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                              Page 65

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

FN2. Federal courts may, of course, decline to accept jurisdiction over a particular case in appropriate circumstances and in accordance with the well-established principles that guide such decisions. I merely suggest that because federal courts "have only the jurisdiction granted to them by Congress,"*Carlyle Towers Condo. Ass'n, Inc. v. FDIC,* 170 F.3d 301, 306 (2d Cir.1999), their exercise of common-law discretion is better viewed as creating a cause of action than jurisdiction. *Cf. Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 974 (5th Cir.2000) (holding that Congress's grant of authority to the Supreme Court to make rules that affect only the timing of appeals does not constitute an improper delegation of its power to confer jurisdiction).

FN3. In *Flores* we noted that the law of nations, as used in the ATCA "refers to the body of law known as customary international law."414 F.3d at 247.

FN4. In *Kadic* we assumed that the ATCA itself created the cause of action, *see*70 F.3d at 246, but the same principle applies to the common law following *Sosa.*

FN5. The district court seems to have dismissed the significance of some of these sources because they imposed criminal and not civil responsibility. *See In re S. African Apartheid Litig.,* 346 F.Supp.2d at 550. This distinction finds no support in our case law, which has consistently relied on criminal law norms in establishing the content of customary international law for purposes of the ATCA. In *Kadic,* for instance, we held that a defendant could be held liable under the ATCA based on international criminal law norms prohibiting genocide and war crimes. *Kadic,* 70 F.3d at 241-42. In concluding that genocide was actionable under the ATCA, the *Kadic* court relied on a United Nations resolution declaring that genocide is a "crime under international law," G.A.

Res. 96(I), at 188-89, U.N. Doc. A/64 (Dec. 11, 1946), the London Charter, Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, E.A.S. 472, and the Genocide Convention, Convention on the Prevention and the Punishment of the Crime of Genocide, Dec. 9, 1948, 102 Stat. 3045, 78 U.N.T.S. 277, which confirms that "genocide, whether committed in a time of peace or in time of war, is a *crime under international law* which [the contracting parties] undertake to prevent and to punish,"*id.* at art. I (emphasis added); *see Kadic,* 70 F.3d at 241. *Kadic* also held that jurisdiction existed under the ATCA for "claims of war crimes" because "[t]he liability of private individuals for committing war crimes has been recognized since World War I and was confirmed at Nuremberg after World War II,"*id.* at 243, notwithstanding that the Nuremberg trials were criminal proceedings and that the proscription of war crimes is self-evidently criminal in nature.

Our past reliance on criminal law norms seems entirely appropriate given that, as Justice Breyer observed in *Sosa,* international law does not maintain the kind of hermetic seal between criminal and civil law that the district court sought to impose. *See Sosa,* 542 U.S. at 762-63 (Breyer, J., concurring)."[T]he criminal courts of many nations combine civil and criminal proceedings, allowing those injured by criminal conduct to be represented, and to recover damages, in the criminal proceeding itself."*Id.* Moreover, the ICTY has recognized the propriety of civil remedies for violations of international criminal law in certain circumstances, noting for example that a torture victim might "bring a civil suit for damage in a foreign court."*Prosecutor v. Furundzija,* Case No. IT-95-17/1, Trial Chamber Judgment, ¶ 155 (Dec. 10, 1998).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN6. The United States also notes that the law governing the initial military commissions established to prosecute acts of international terrorism following the September 11 attacks recognized aiding and abetting as a mode of liability. *See* Crimes and Elements for Trials by Military Commission, 32 C.F.R. § 11.6(c)(1) (2003). The jurisdiction of the military tribunals was limited to established violations of the law of war or to "offenses that, consistent with that body of law, are triable by military commission."32 C.F.R. § 11.3(a). The law of war has long been recognized as a subset of international law. *See Ex parte Quirin,* 317 U.S. 1, 27-28 (1942) ("From the very beginning of its history this Court has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals."). While the Supreme Court eventually found that the military commissions lacked the power to proceed, *see Hamdan v. Rumsfeld,* --- U.S. ----, ----, 126 S.Ct. 2749, 2759, 165 L.Ed.2d 723 (2006), nothing in that decision addressed the propriety of including aiding and abetting liability as part of the commissions' jurisdiction.

FN7. The fact that some of these treaties do not directly criminalize aiding and abetting, but instead require state parties to criminalize it in their domestic law, *see, e.g.,* United Nations Convention Against Transnational Organized Crime, art. 5, G.A. Res. 55/25, at 5-6, U.N. Doc. A/RES/55/25 (Jan. 8, 2001) ("Each State Party shall adopt such legislative and other measures as may be necessary to establish as criminal offences ... aiding, abetting, facilitating or counselling the commission of serious crime involving an organized criminal group."), does not limit their value as relevant sources of customary international law. Customary international law addresses "those wrongs that are of

mutual, and not merely several, concern to States,"*Flores,* 414 F.3d at 249 (internal quotation marks and emphases omitted), and where states join a binding agreement to enforce a mode of liability in their domestic law, that decision reflects a matter of mutual, not several, concern and is thus properly considered a subject of customary international law. *See id.* (" Matters of mutual concern between States are those involving States' actions performed towards or with regard to the other.... Matters of several concern among States are matters in which States are separately and independently interested." (citation and internal quotation marks omitted)).

FN8. The Security Council did "elect[ ] to take a more expansive approach to the choice of the applicable law" with respect to punishable violations by providing for liability for violations of Additional Protocol II and common article 3 of the Geneva Convention despite the fact that Additional article II had "not yet been universally recognized as part of customary international law," and violations of common article 3 had never before been criminalized. Report of Secretary-General Pursuant to Paragraph 5 of Security Council Resolution 955, ¶ 12, UN doc. S/1995/134 (Feb. 13, 1995). With respect to individual responsibility, though, the Security Council adhered to customary law by adopting the language used in the ICTY Statute.

FN9. The United States has not ratified the Rome Treaty for reasons unrelated to any concern over the definition of aiding-and-abetting. *See* Brief for the United States as Amicus Curaie, at 24 n. 14; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F.Supp.2d 331, 339-40 (S.D.N.Y.2005) ("[T]he United States feared 'unchecked power in the hands of the prosecutor' that could lead to 'politicized prosecution.' ").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                    Page 67

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

Indeed, the Amicus Brief appears to endorse the elements set out in Article 25(3). Brief for the United States as Amicus Curaie, at 26.

FN10. The same standard was also adopted by the United Nations Transitional Administration in East Timor ("UNTAET" ).*See* UNTAET Reg. No.2000/15 § 14.3(c).

FN11. There are occasions when this intent could be inferred from such sales. In *Direct Sales Co. v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943), the Supreme Court held that the sale of restricted goods with an inherent capacity for harm, such as the opiates involved in that case, combined with other factors, may be sufficient to prove that the seller was engaged in a conspiracy with the buyer. *Id.* at 711.Nevertheless, it observed that "not every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy."*Id.* at 712.For example, the Court held that a conspiracy charge might not lie against a company engaged in a " continuous course of sales, made either with strong suspicion of the buyer's wrongful use or with knowledge, but without stimulation or active incitement to purchase."*Id.* at 712 n. 8. On the other hand, sales of unlimited quantities stimulated "by all the high-pressure methods, legal if not always appropriate in the sale of free commodities,"*id.* at 712, would suffice to support such a charge. Another example that would suffice is the *Zyklon B* case, *Trial of Bruno Tesch and Two Others, in* 1 *Law Reports of War Criminals* 93 (William S. Hein & Co., Inc.1997) (1946), where the principal defendant not only supplied prussic acid to the S.S. but undertook to train its members how it could be used to kill human beings. *Id.* at 95.

FN12. These Tribunals would also extend

liability to individuals who merely had " knowledge that [their] acts assist the commission of the specific crime of the principal."*Prosecutor v. Vasiljevic,* Case No. IT-98-32-A, Appeals Chamber Judgment, ¶ 102(ii) (Feb. 25, 2004). Any individual who acts with the purpose to facilitate the commission of a crime would necessarily act with such knowledge. Thus, I do not view the articulation of a broader definition by the ICTY as detracting from my position that liability in accordance with the purposefulness standard is well-established and universally recognized under international law. The critical question is whether there is a discernable core definition that commands the same level of consensus as the 18th-century crimes identified by the Supreme Court in *Sosa.See Sosa,* 542 U.S. at 732. I believe that the standard I adopt is such a definition. *Cf. United States v. Smith,* 18 U.S. (5 Wheat.) 153, 161, 5 L.Ed. 57 (1820) (noting that "whatever may be the diversity of definitions, in other respects, all writers concur, in holding, that robbery, or forcible depredations upon the sea, animo furandi, is piracy").

FN13. In light of this conclusion, I need not address the plaintiffs' argument that a theory of aiding and abetting liability could be supplied by domestic federal common law even if such liability did not exist under international law.

FN14. The Appeals Chamber, which is shared by both the ICTY and the ICTR, has made clear that the same law relating to modes of liability applies in both Tribunals. *See Prosecutor v. Ntakirutimana,* Case Nos. ICTR-96-10-A, ICTR-96-17-A, Appeals Chamber Judgment, ¶ 468 (Dec. 13, 2004) ("Given the fact that both the ICTY and the ICTR have mirror articles identifying the modes of liability by which an individual can incur criminal responsibility, the Appeals Chamber is satisfied that the jurisprudence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 68

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

of the ICTY should be applied to the interpretation of Article 6(1) of the ICTR Statute.").

FN15. I note a possible tension in the tribunals' definition aiding and abetting under which the necessary *mens rea* is knowing assistance, *Vasiljevic,* Appeals Chamber Judgment, ¶ 102(ii), yet requires that the act of assistance be " specifically directed to assist ... the perpetration of a specific crime,"*id.* ¶ 102(i). I express no view on how, if at all, this possible tension might be resolved.

FN16. I note further that other federal courts have consulted decisions of the ICTY and ICTR in determining whether various rules are part of customary international law. *See, e.g., Hamdan,* 126 S.Ct. at 2785 n. 40 (ICTY); *Sosa,* 542 U.S. at 762 (Breyer, J. concurring) (ICTY); *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1290-93 (11th Cir.2002) (ICTY and ICTR); *Tagaga v. INS,* 228 F.3d 1030, 1035 n. 10 (9th Cir.2000) (ICTY); *Almog,* 471 F.Supp.2d at 286 (noting that "[s]tandards for imposing liability where a non-primary actor is alleged to be liable for a violation of the law of nations emerge from," in part, the ICTY and ICTR case law); *Presbyterian Church of Sudan,* 453 F.Supp.2d at 666-68 (analyzing ICTY cases to determine the elements of aiding and abetting liability under international law); *In re "Agent Orange" Prod. Liab. Litig.,* 373 F.Supp.2d at 54 (same); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1356 (N.D.Ga.2002).

FN17.*See Prosecutor v. Milutinovic,* Case No. IT-99-37-AR72, Appeals Chamber Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction-*Joint Criminal Enterprise,* ¶ 17 (May 21, 2003) (noting that each chamber has a "duty to ascertain that a ... form of liability charged in the indictment is both provided for under the Statute and that it existed at the relevant

time under customary international law.").

FN18. Apparently recognizing that the Genocide Convention may be used to support the existence of genocide as a violation of the law of nations, Judge Korman nonetheless suggests that the district court should not recognize a cause of action for genocide because "Congress has quite plainly indicated its intention that such a cause of action should not be available" through its passage of the Genocide Convention Implementation Act, 18 U.S.C. § 1091. Opinion of Judge Korman at 116-17; *see also*18 U.S.C. § 1092 (providing that nothing in the Act should be "construed as creating any substantive or procedural right enforceable by law by any party in any proceeding"). It is unnecessary to resolve this issue as part of the jurisdictional analysis, and I would leave it to the district court to address in the first instance should it undertake to decide whether to recognize a cause of action.

FN1. The Charter of the International Military Tribunal (Nuremberg Tribunal) describes crimes against humanity as:
murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of domestic law of the country where perpetrated.
Charter of the International Military Tribunal, art. 6(c), *in* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, E.A.S. No. 472.

FN2. The Genocide Convention defines genocide as:
any of the following acts committed with intent to destroy, in whole or in part, a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 69

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

national, ethnical, racial or religious group, as such:
(a) Killing members of the group;
(b) Causing serious bodily or mental harm to members of the group;
(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part.
Convention on the Prevention and Punishment of the Crime of Genocide, art. 2, Jan. 12, 1951, 78 U.N.T.S. 277.
Notably, the Apartheid Convention echoes the definition of genocide, in that it applies to "murder of members of a racial group or groups," "the infliction upon the members of a racial group or groups of serious bodily or mental harm," and the "[d]eliberate imposition on a racial group or groups of living conditions calculated to cause its or their physical destruction in whole or in part." Convention on Apartheid, art. 2, Nov. 30, 1973, 1015 U.N.T.S. 243.

FN3. At oral argument, counsel for the corporations added that he did not accept the premise that the plaintiffs had actually pled those allegations, as the complaints did not allege that particular plaintiffs suffered particular injuries at the hands of specific South African officials whom the corporations aided and abetted in a specific way at a specific time and place. As reflected in the per curiam opinion, plaintiffs may have an opportunity to replead these violations with greater specificity on remand.

FN4. I note that Judge Katzmann, in his concurring opinion, declines to address whether federal common law provides a standard by which to determine aiding and abetting liability in this case. Opinion of Judge Katzmann at 39 n. 12. It is thus left to a future panel of this Court to determine whether international or domestic federal common law is the exclusive source from which to derive the applicable standard.

FN5. I agree with Judge Katzmann that *Central Bank,* 511 U.S. at 164, poses no bar to finding aiding and abetting liability under the ATCA, albeit for a different reason. In *Central Bank,* the Supreme Court held that the Securities Acts of 1933 and 1934 did not encompass aiding and abetting liability. 511 U.S. at 171. Noting that the Acts provided for some forms of "indirect" liability, the Supreme Court reasoned that "Congress knew how to impose aiding and abetting liability when it chose to do so." *Id.* at 176. This same reasoning cannot apply to the ATCA, whose textual brevity and dearth of legislative history leave us with inconclusive evidence of Congress's intent to include or exclude aiding and abetting liability. It would appear, however, that the Founding Generation nevertheless understood the ATCA encompassed aiding and abetting liability. For example, in Attorney General Bradford's 1795 opinion, *Breach of Neutrality,* 1 Op. Att'y Gen. 57, 59 (1795), he opined that the ATCA allowed civil suits for damages for those who had "taken part" in violating international law. *Sosa,* 542 U.S. at 721. In fact, Bradford's opinion specifically covered those American citizens who "voluntarily joined, conducted, *aided and abetted* " the French fleet in their attack on a British settlement. *Breach of Neutrality,* 1 Op. Att'y Gen. at 58 (emphasis added). Attorney General Bradford furthermore referred to an April 1793 Proclamation issued by George Washington which declared that "all those who should render themselves liable to punishment under the laws of nations, by committing, aiding or abetting hostilities" against the merchants of foreign nations at peace with the United States would not receive the protection of the United States. *Id.* at 59. Cases from that era, moreover, indicate that secondary liability was recognized as an established part of the federal common law. *See Talbot v. Jansen,* 3 U.S. (3 Dall.) 133, 1 L.Ed. 540 (1795) (holding a defendant liable for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 70

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

aiding the unlawful capture of a neutral ship and ordering restitution); *Henfield's Case,* 11 F. Cas. 1099, 1103 (C.C.D.Pa.1793) (Chief Justice John Jay) (charging a grand jury that United States citizens may be held liable under the laws of the United States for "committing, aiding or abetting hostilities" in violation of the law of nations); *see also* Congress's Act of April 30, 1790, which deemed "an accessary [sic] to ... piracies" anyone who " knowingly and willingly aid[ed]" piracy. 1 Stat. 114 (1790).

FN1. The Rome Statute does not apply to " conduct prior to the entry into force of the Statute."Rome Statute of the International Criminal Court art. 24(1), *open for signature* July 17, 1998, 37 I.L.M. 999, 1016 (entered into force July 1, 2002). As one commentator explained, "[t]o be acceptable to the broadest possible majority of countries, many of which had dark experiences in the past and had to resort to amnesties or similar solutions to achieve national reconciliation, criminal responsibility under the Rome Statute could not be made retroactive...." Per Saland, *International Criminal Law Principles, in The International Criminal Court: The Making of the Rome Statute-Issues, Negotiations, Results* 189, 196 (Roy S. Lee ed., 1999). This may explain why the Republic of South Africa, which never ratified the Apartheid Convention, ratified the Rome Statute.

FN2. The Khulumani plaintiffs also argue that, "[t]he ATS aside, there are independent grounds for jurisdiction in federal court", namely, diversity of citizenship pursuant to 28 U.S.C. § 1332. Br. for App. at 56. These causes of action, however, are also subject to dismissal based on deference to the Executive Branch's view of the foreign policy impact of allowing them to proceed, and on the doctrine of international comity. *See Bi.,* 984 F.2d at 586-87;*Doe v. Exxon Mobil*

*Corp.,* 473 F.3d 345, 357 (D.C.Cir.2007) (Kavanaugh J., dissenting from denial of writ of mandamus.) The point of disagreement in *Exxon,* as the majority acknowledged, *id.,* turned on the availability of a writ of mandamus to review the denial of the defendant's motion to dismiss where the Executive Branch did not unequivocally seek such relief.

FN3. The jurisdictional statutes cited by the Supreme Court as examples in which Congress has exercised its prerogative to restrict the subject matter jurisdiction of federal district courts include statutes that contain jurisdiction-conferring language identical to that in 28 U.S.C. § 1350. *See, e.g.,*28 U.S.C. § § 1345 & 1348 (cited in *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 516 n. 11, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006)). Indeed, in *Robinson v. Government of Malaysia,* 269 F.3d 133 (2d Cir.2001), in which Judge Katzmann concurred, we said that the "Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, which provides that '[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States,' similarly identifies certain substantive law violations as jurisdictional pleading requirements."*Id.* at 144 n. 13.

FN4. The statute at issue in *Bevona,* section 102 of the Labor-Management Reporting and Disclosure Act, 28 U.S.C. § 412, did not by its terms restrict the exercise of subject matter jurisdiction. Nevertheless, we held that it had been so construed by the Supreme Court. *Bevona,* 152 F.3d at 62 (citing *Calhoon v. Harvey,* 379 U.S. 134, 138, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964)).

FN5. On April 28, 2003, before *Sosa* was decided, Judge Sprizzo permitted the Ntsebeza plaintiffs to file a third amended complaint. *In re S. African Apartheid*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                Page 71

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

*Litig.,* 346 F.Supp.2d at 544 n. 8. While some defendants received a copy of such a complaint on May 19, 2003, Joint Motion at 5 n. 2, "[t]hat Complaint was never properly filed."*In re S.African Apartheid Litig.,* 346 F.Supp.2d at 544 n. 8. Nevertheless, it was virtually identical to the one previously filed. *Id.*

FN6. Judge Sprizzo denied the motion to amend because (1) he had previously provided the plaintiffs leave to replead; (2) the plaintiffs' request came "four months after this Court dismissed these actions and more than three months after plaintiffs noticed their appeal"; (3) allowing them to replead would interfere with "ensuring a speedy appeal"; and (4) the proposed amendments would have been "fruitless" in light of his ruling that aiding-and-abetting is not recognized under the ATCA. A01139.

FN7. The ICTY held recently that "[w]hile this may have been the case during the Second World War ... the law in relation to crimes against humanity has developed to take into account forces which, although not those of the legitimate government, have de facto control over, or are able to move freely within, defined territory." *Prosecutor v. Tadic,* 36 I.L.M. 908, 945, Case No. IT-94-1-T, Opinion and Judgment ¶ 654 (Trial Chamber May 7, 1997); *see also* Antonio Cassese, *Crimes Against Humanity, in* Cassese et al., *supra,* at 353, 357.

FN8.*Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), which provides the basis for the so-called "symbiotic relationship test" between public and private actors and upon which plaintiffs rely, was one of the Warren Court cases that took an expansive view of state action. The Supreme Court did not employ the " symbiotic relationship" language in *Burton,* though in a subsequent case, it referred to

"the symbiotic relationship between lessor and lessee ... present in *Burton.*"*Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)." Although neither *Burton* nor the symbiotic relationship doctrine has been overruled, they have been severely narrowed in scope and diminished as precedent. Supreme Court decisional law has given *Burton* a very narrow interpretation and, with the possible exception of its decision that a civil litigant's exercise of a racially based peremptory challenge constitutes state action *[Edmondson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) ], has rejected every attempt to establish state action on the basis of *Burton.*" 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.13[A], at 5-90-5-91 (4th ed.2003); *see also Sullivan,* 526 U .S. at 57-58; Laurence Tribe, *American Constitutional Law* § 18-3, at 1701 n. 13 (2d ed.1988).

FN9. The Chief Reporter of the Restatement was Professor Louis Henkin of Columbia University. Associated with Professor Henkin as Reporters were Professors Andreas F. Lowenfeld of New York University, Louis B. Sohn of the University of Georgia, and Detlev F. Vagts of Harvard University.

FN10. Article 9 of the London Charter provided that "[a]t the trial of any individual member of any group or organization the Tribunal may declare (in connection with any act of which the individual may be convicted) that the group or organization of which the individual was a member was a criminal organization." 1 *Trial of Major War Criminals* 255-57. The consequence of a finding in the main trial that organizations, such as the Schultzstaffeln (more commonly referred to as the S.S.) and the Gestapo, were criminal in nature was that it permitted a finding of guilt against other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                          Page 72

--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))
**(Cite as: --- F.3d ----)**

members of the organization in subsequent trials. *See The Nuremberg Trial,* 6 F.R.D. at 131-33.

FN11. As a general rule, treaties, like contracts, "are legally binding on States that become parties to them by consenting to be bound", and may constitute evidence of a norm of customary international law only if "an overwhelming majority of States have ratified the treaty *and* those States uniformly and consistently act in accordance with its principles."*Flores,* 414 F.3d at 256.

FN12. Judge Learned Hand shared Prosser's concern. Hand "repeatedly ... urged that the Restatements confine themselves to articulating the law 'as it is,' not as it should be; repeatedly, he insisted that the ALI's task was to 'restate, not legislate'...." Gerald Gunther, *Learned Hand: The Man and the Judge* 411 (1994) (internal citations omitted). Indeed, although Hand was a founding member of the ALI and held major positions in it for the rest of his life, he rarely cited the Restatements. *Id.* at 413.The most that he was willing to say about them was that he found them to be useful " 'on questions which were not controversial and [otherwise took] a long time to look up.' " *Id.* (internal citations omitted).

FN13.*See The Nuremberg Trial,* 6 F.R.D. 69, 131, 1*Trial of the Major War Criminals* 253-54, Brigadier General Telford Taylor, *Final Report to the Secretary of the Army on the Nuerenberg War Crimes Trials under Control Council Law No. 10,* app. B at 224, 228 (William S. Hein & Co., Inc.1997) (1949). A useful discussion of art. 6(c) of the London Charter, which provided the basis for these holdings, may be found in Bassiouni, *supra,* 19-30.

FN14. Another reason the ICTY cases are silent on this score is that, while the defendants in these cases may not have

been officials of formally recognized states, they were state actors. As we have held, "the state action concept ... requires merely the semblance of official authority. The inquiry, after all, is whether a person purporting to wield official power has exceeded internationally recognized standards of civilized conduct, not whether statehood in all its formal aspects exists." *Kadic,* 70 F.3d at 245.

FN15. In deciding this motion, Judge Sprizzo should also consider applying the pleading standard enunciated in *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The standard seems particularly appropriate to the class actions in this case, which are intended to coerce a settlement rather than provide the framework for a trial which we all know will never take place.

FN16. The citation is to the United Nations War Crimes Commission summary of the case based on the indictment, the evidence and arguments of counsel. *See Foreword* 1 *Law Reports of Trials of War Criminals,* at x. The General Military Government Court of the United States Zone itself reached a guilty verdict without any opinion.

C.A.2 (N.Y.),2007.
Khulumani v. Barclay Nat. Bank Ltd.
--- F.3d ----, 2007 WL 2985101 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

Bowoto v. Chevron Corp.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Larry BOWOTO, et al., Plaintiffs,
v.
CHEVRON CORPORATION, et al., Defendants.
**No. C 99-02506 SI.**

Aug. 14, 2007.

Michael Steven Sorgen, Law Offices of Michael Sorgen, Cindy Ann Cohn, Electronic Frontier Foundation, Elizabeth C. Guarnieri, Green Welling LLP, Richard Roy Wiebe, Law Office of Richard R. Wiebe, San Francisco, CA, Anne Kendrick Richardson, Barbara Enloe Hadsell, Lauren Teukolsky, Patrick Mark Dunlevy, Law Office of Hadsell & Stormer, Inc., Bert Voorhees, Theresa M. Traber, Esq., Traber & Voorhees, Pasadena, CA, Jennifer M. Green, Center for Constitutional Rights, New York, NY, Jose Luis Fuentes, Siegel & Yee, Oakland, CA, Judith Brown Chomsky, Law Offices of Judith Brown Chomsky, Elkins Park, PA, Marco Simons, Richard Lawrence Herz, Earthrights International, Washington, DC, Paul Lindsey Hoffman, Schonbrun Desimone Seplow Harris & Hoffman, Venice, CA, Robert Dexter Newman, Jr., Los Angeles, CA, for Plaintiffs.
Caroline Nason Mitchell, Robert Allan Mittelstaedt, Adam Richard Sand, Esq., David L. Wallach, Elaine Wallace, Katherine Salo Ritchey, Lara T. Kollios, Jones Day, Eric Danoff, Emard Danoff Port Tamulski & Paetzold LLP, Jordan Cunningham , Martha A. Boersch, Attorney at Law, San Francisco, CA, David M. Bays, Huston, TX, Joseph P. Shereda, Chicago, IL, Lucas W. Andrews, Atlanta, GA, Noel J. Francisco, Washington, DC, for Defendants.

SUSAN ILLSTON, United States District Judge.

**\*1** On March 2, 2007, the Court heard argument on defendants' motion for summary judgment on plaintiffs' claims 10 through 17. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby rules as follows.

Plaintiffs filed this suit in 1999, seeking to recover for a series of brutal attacks that plaintiffs allege occurred in Nigeria in mid-1998 and early 1999. The following is a summary of the relevant context, and of the parties' conflicting versions of the incidents giving rise to plaintiffs' lawsuit.

**I. Nigeria**

The report of plaintiffs' expert Michael Watts is helpful in providing the general historical, cultural and geographical context of this case. It states:
Nigeria is unquestionably one of the most important countries on the African continent. Located in West Africa, it has the largest population (roughly 140 million people by current estimates) [of any] African state. It accounts for almost half of West Africa's population and 40% of the region's GDP. Nigeria is approximately 923,768 skms-that is to say, roughly twice the size of California. Located north of the equator, Nigeria is fully within the tropics.... The southern part of Nigeria is entirely coastal with a coastline of 853 kms; that part of the Atlantic Ocean is customarily referred to as the Bight of Benin or more expansively the Gulf of Guinea. The coastline is dominated in its eastern part by the River Niger, which empties into the Atlantic Ocean through an enormous delta (the Niger Delta).
While Nigeria is, in climatic and ecological terms, a tropical country, the northern part of Nigeria is dry and dominated by savanna (mixed woodland and grassland), while the south is wetter, more humid

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

and overwhelmingly forested.... The Delta is ... a monsoon regional, in which rainfall is distributed throughout the year, and in which hot and humid conditions predominate (relative humidity is always above 80%). Mean monthly temperatures vary between 24 degrees C [ (75.2 degrees F) ] and 32 degrees C [ (89.6 degrees F) ] throughout the year. Mean annual rainfall varies from 2000-4500 mm [ (78-177 inches) ]. Rain falls every month of the year with a short dry spell in January-March.

The vegetation of the Niger Delta is overwhelmingly forest of different ecological types. In the immediate coastal regions, mangrove forests predominate.... Mangrove ecosystems are integral parts of both marine life and human food systems because many types of species of fish and marine life depend upon and reproduce in the unique mangrove environment that characterizes the Niger Delta. Like tropical rainforest environments in general, the mangrove ecosystem is particularly fragile. The Niger Delta contains the world's third largest mangrove forest and the most extensive freshwater swamp forests in West and Central Africa. The Niger Delta also contains one of the last and largest remaining areas of primary tropical rainforest on the African continent, and is therefore a critical region for the preservation of biodiversity.

**\*2** Further inland in the Delta, in areas that are not saline, freshwater swamps and tropical rainforest interspersed with areas cleared for intensive agriculture-most in the hands of small family farmers-is the dominant vegetation type.

A key dimension of understanding the Niger Delta is understanding the balance between fresh and saltwater. In areas close to the Atlantic Ocean, the presence of salinity (which may change seasonally in relationship to precipitation and the volume of river flow) fundamentally shapes vegetation and human livelihood strategies. The maintenance of zones of fresh water in these areas is therefore particularly important. The effect of changes in land use and human intervention (for example, dredging or deforestation) can fundamentally alter the balance of fresh and saltwater. Accordingly, saltwater intrusion into freshwater areas can deleteriously affect agriculture and livelihood systems in the Delta.

The mangrove forests and the geography of the Delta make human movement difficult, and,

accordingly, most people travel by boat through the many creeks, rivers and channels that constitute the Niger Delta. Since 1960, the Nigerian government has provided modern forms of transportation infrastructure such as roads and bridges, but large parts of the Niger Delta (especially the southern and coastal regions) remain largely without road transportation and dependent upon boat traffic.

The current boundaries of Nigeria and its constitution as a modern nation-state, is a product of the so-called imperial Scramble for Africa of the last quarter of the 19th century. In the context of intense competition between European colonial powers, Great Britain carved Nigeria out of a complex mosaic of indigenous political systems. For example, the northern boundary of Nigeria bisected one of the largest and most powerful traditional states in West Africa. By the early twentieth century, Britain had created two Protectorates covering the northern and southern parts of what is now Nigeria. They were amalgamated in 1914 and so secured the current borders of Nigeria. These borders included a vast number of different cultures, ethnic groups and traditional political systems, which, prior to this time, had no identification with an entity called " Nigeria."

According to the World Bank, Nigeria currently comprises about 200 different ethnic groups, 500 indigenous languages and two major religions (Islam and Christianity). This diversity is entirely a product of the process by which Nigeria was created as a colonial entity. To that extent, Nigeria is entirely the product of external imposition, drawing together people of very different cultural, religious and ethnic affiliation who, prior to 1900, may have had very little in common. At Independence one of its most important leaders Obafemi Awolowo, said that Nigeria was not a country but a "mere geographical expression". Nigeria is a classic case of an African multi-ethnic state created by the often violent process of colonization.

**\*3** While English is Nigeria's national language (a legacy of colonial rule), the country is nonetheless characterized by enormous linguistic diversity. For most Nigerians, their first language remains their indigenous tongue. For example, as it applies to this case, the first language of the Ijaw people is Ijaw,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 3

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

and the first language of the Ilaje people is Ilaje. The Niger Delta is an area of especially diverse languages, perhaps the most diverse in all of Nigeria.

Nigeria was a British colony for almost 50 years after amalgamation, gaining independence in 1960. Throughout the colonial period, Nigeria was administered Through colonial indirect rule. In practice, this meant that the British established regional systems of government that were associated with the largest ethnic groups and ruled through local ethnic elites; the Hausa in the north, the Yoruba in the west, the Ibo in the east. The effect of colonial rule, therefore, was to establish a strongly regional and ethnic system of politics, in which local regional ethnic elites worked on behalf of the colonial administration through systems of Native Administration. As a consequence, the many and smaller ethnic groups (in Nigerian parlance, " ethnic minorities"), were largely marginal to the process of colonial economic and political development.

At independence, the new Nigerian federal system was dominated by three powerful ethnic-religious groups. The country had a relatively weak central system of federal authority. From the moment of its birth, Nigeria was accordingly characterized by intense ethnic political competition and deep political instability. This took the form of struggles and conflicts between the regional (meaning ethnic and religious) political parties over access to government revenues and development initiatives.

At Independence Nigeria was born as a federal system comprised of five regions. In 1968, a twelve-state system came into effect and over time the number of states has grown to thirty six. This growth of states is a reflection of the attempt to create a sort of political stability by granting to key ethnic communities their own states through which they can gain access to government revenues, which after 1970 increasingly meant oil wealth.

At independence and for a decade thereafter, the primary source of government revenues, and therefore the object of political activity, were agricultural export commodities.... Commercial production of petroleum began in the late 1950s, but was an insignificant part of Nigeria's exports at this time (amounting to about 1% of government revenues and 1.8% of total exports).

.... Nigerian post-independence politics were highly unstable and quickly degenerated into crisis. Amidst a series of deep political conflicts among the regions and political parties between 1960 and 1966, the Nigerian military claimed power in a 1966 coup led by Major General Ironsi. Shortly thereafter, the eastern region, which included the Niger Delta, seceded from the nation, declaring themselves the independent state of Biafra. One of the contributory factors to the secession by the eastern region was the realization that oil located in the Niger Delta promised enormous wealth for those who controlled it. So began the bloody Nigerian civil war between 1967-1970.

**\*4** The civil war, which resulted in the defeat of the Biafran forces and the reincorporation of the eastern region into the federation, marked the beginning of a long and almost uninterrupted 30-year period of military rule in Nigeria. Until the election of President Obasanjo in 1999, Nigeria was ruled over by a succession of autocratic military junta (with the exception of a brief democratic opening between 1979 and 1983). Each state in the federation was presided over by a military governor appointed by the Supreme Military Council. Elections were abolished, the military and security forces expanded, freedom of the press and of speech was radically compromised, arbitrary detention and extrajudicial killings were commonplace, and, in a number of widely-publicized cases, the military were deployed to quell popular dissent.

It is widely held in the scholarly arena that military rule under President Babangida in the [period] from 1985-1993 and especially in the 1990s during the rule of General Abacha['s] government (1993-1998), was the most violent and dictatorial in the long history of Nigerian military rule. This deepening of autocratic rule and the willingness of military government to subject all manner of political opponents to intimidation, imprisonment, torture and murder went hand in hand with a proliferation of state mismanagement and increasing corruption.

Watts Expert Report (Hoffman Decl. 185) ¶¶ 15-30.

**II. The history of oil production in Nigeria**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

In the wake of Biafra's defeat, oil output increased markedly.... Especially after 1973, when world oil prices increased dramatically as a result of the actions of OPEC, of which Nigeria is a member, Nigerian oil revenues exploded. In 1970, government revenue from oil was 66 million Naira (the Nigerian currency then roughly equal to one US$); by 1980 it was 10 billion naira. As a consequence, Nigeria was transformed from an agricultural exporting country to an oil nation. Since 1974, oil has annually produced over 90 percent of Nigeria's export income. According to UCLA Professor Michel Ross, one of the leading scholars of the oil industry, in 2000, Nigeria received 99.6 percent of its income from oil, making it the world's most oil-dependent country. [citation]. Currently, as of 2004, oil accounts for 98% of Nigerian exports, 87% of government revenues, and almost half of gross domestic product.
....

The heart of Nigerian oil production is in the Niger Delta. Both Ondo State and Delta State are located in the Niger Delta.

Oil and gas exploration rapidly intensified in the 1970s, which increased the physical presence of oil companies in the Niger Delta. In practice, this meant that the region became cris-crossed by thousands of kilometers of pipeline, became the location for hundreds of well heads and numerous flow stations and rigs, and witnessed the construction of oil refineries, tankering facilities and other oil infrastructure (most recently liquefied natural gas plants). The operations of the oil companies and the oil service companies brought local communities into direct contact with all aspects of the oil industry.

*5 ....

It is estimated by the World Bank that 80 percent of the oil revenue is accounted for by 1 percent of the Nigerian population. Almost three quarters of Nigerians live on roughly $1 per day according to the World Bank.

*Id.* ¶¶ 32-37.[T]he oil-producing region of Nigeria is known as the Niger Delta, which encompasses eight states within the Nigerian federation, including Ondo and Delta states, where the plaintiffs in this case are primarily located.

The population of the Delta is difficult to estimate because of a lack of reliable census data. According to the 1991 census, the population of the main oil states-Ondo, Delta, Rivers, Bayelsa-was roughly 12 million. While roughly one-third of the population reside in large industrial centers ..., the majority of the population is rural.

.... Only 30% of inhabitants of the Delta region have access to potable water; primary and secondary school attendance in the riverine areas is well below the national average; and child and maternal mortality rates are exceptionally high. [citation]. Most rural Delta inhabitants depend for their livelihoods on small scale agriculture, fishing, artisanal and trading activities.

Unemployment in the remote areas of the Niger Delta is high.... [U]nemployment estimates in the riverine areas of Delta state vary, but can be as high as 90 or 95 percent in areas. [citation]. Particularly for the region's youth, employment opportunities are nonexistent. According to information provided by the state development agencies, youth unemployment rates are, on average, in excess of 75 percent [citation].
....

Although accurate date on poverty rates in the Niger Delta does not exist, one estimate is that the GNP per capita is below the national average of USD 260, and even lower in the riverine and coastal areas. [citation].

Statistics provided by the Nigerian government show that ... the average life expectancy at birth in the Delta is around 40 years, which is substantially lower than the national average of 46.7 years.
....

Transportation infrastructure in the rural areas is extremely undeveloped. There are very few roads linking rural communities. Rural electrification for the most part does not exist. Hospitals and pharmacies are typically under-equipped and understaffed ...

*Id.* ¶¶ 65-74.

**III. Plaintiffs' version of the incidents giving rise to their claims**

**A. The context of the attacks at issue**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                               Page 5

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

According to plaintiffs, during the military regimes governing Nigeria in the 1990s, Nigerian government security forces regularly engaged in the use of excessive force in repressing any perceived threat to oil production in the Niger River Delta region of Nigeria. Plaintiffs' expert, Professor Watts, states in his declaration that:

during the successive military regimes of the 1990s, and especially in the period of the Abacha government between 1993 and 1998, the Nigerian government security forces engaged in a course of conduct involving a pattern of violent repression of individuals and communities who organized to oppose or protest aspects of petroleum development in the Niger Delta, and of individuals and communities who were alleged or perceived to be associated with such opposition.... A number of military and paramilitary activities ... caused untold personal harm, large-scale physical displacement of communities, the destruction of property, large numbers of deaths (including extra-judicial killings) and instituted what can only be called a culture of terror.... I believe this is widely recognized and understood by the vast majority of scholars of Nigeria and by the human rights and foreign policy establishment.

**\*6** Watts Decl. ¶ 18 (citations omitted).

In 1999, the Nigerian civilian government formed the "Human Rights Violations Investigation Commission" (the "Oputa Commission"), to investigate human rights abuses committed by prior military regimes. The Commission was headed by Justice Chukwudifu A. Oputa. *See* Watts Decl. ¶ 19. The Commission held a series of public hearings, in "five centers" throughout the country, on the issues it was investigating. *See* Oputa Comm. Report (Watts Decl., Ex. 1), Vol. I ¶ 2.123. Many of the hearings were nationally televised. *See id.,* Vol. I ¶ 2.124-2.125. The Commission also enlisted "reputable research Centres and other experts drawn from equally reputable civil society organizations and the academia" to conduct "fieldwork" over a period of nine months in the year 2000. *See id.,* Vol. III, "Introduction". In the Niger Delta, an area populated by approximately 12 million people, according to the report, the Commission employed twelve researchers. *See id.,*

Vol. III at 30.

On the basis of its investigation, the Oputa Commission concluded that the oil companies' "interests became 'State interest,' which must be protected. This logically led to the *systematic and generalized violations and abuses,* which occurred in the Niger-Delta during the dark period of military rule in the country, as detailed in ... this Report."*Id.,* "Overview" ¶ 1.50 (emphasis added). The report also states that "[t]he politics of oil foregrounds the historical narration of rights violations in Nigeria's Niger Delta (South-South), *the standard practice being the use of maximum force against the people of this region* by an alliance of Trans National Oil Corporations, the state and the indigenous elite."*Id.,* Vol. 3 at 9 (emphasis added). The report also noted [i]nhuman treatment, violence and repression meted out to communities when they protest against environmental degradation, and neglect of their area by the Nigerian state and the oil-producing companies. The violence, which is usually effected by the police or the military, may be at the instance of the state or the oil multinational corporations. The latter often prefer inviting the security agencies whenever their operations are threatened by the local people, rather than engaging them in genuine dialogue.
....
In virtually all parts of the Niger-Delta, an army of occupation is stationed by the federal government to "keep peace" and facilitate the oil exploitation by the oil companies. These fierce-looking military officers largely deny the rights of the citizens to free movement, association and speech. In several instances, those forces unleash terror on the local people. They kill, maim, rape and destroy properties in those communities in the real tradition of an army of occupation.

*Id.,* Vol. 3 at 43-44.

In addition to these general conclusions from various sources regarding the systematic and widespread nature of government security forces ("GSF") attacks on civilian communities, plaintiffs also present evidence of several emblematic attacks. For example, in the fall of 1990, GSF killed eighty people and destroyed almost 500 houses in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

repressing protests at a Shell Oil facility near the village of Umuechem, Rivers State. *See* Watts Decl. ¶ 25; Oputa Comm. Report, Vol. III at 50; Watts Decl., Ex. 19 at 2-3; Watts Decl., Ex. 35 at 69. A Nigerian Judicial Commission of Enquiry investigated the Umuechem incident, and concluded that the protest was peaceful, the demonstrators were neither violent nor armed, and the GSF displayed "a reckless disregard for lives and property."*See* Chomsky Decl., Ex. 15. In another incident, in 1992, "one person was killed, 30 shot and 150 beaten when local villagers from Bonny demonstrated against Shell."Watts Decl., Ex. 7 at 19; Ex. 13 at 33.

**\*7** As another example of the violence characterizing the Niger Delta during the period, Professor Watts describes Ogoniland in the 1990s as one of "three main theatres in which human rights violations by the army and security occurred." Watts Decl. ¶ 26. "[I]t is clear that thousands were displaced, and many hundreds killed and arrested" in Ogoniland, as a result of military repression of oil protestors in the 1990s. *Id.; see generally* Plaintiffs' Corrected Affirmative Statement of Facts in Opposition to Defendants' Motion for Summary Judgment on Crimes Against Humanity ("PASOF") (Docket No. 1418) ¶¶ 93-116. The Oputa Commission received over 8,000 complaints concerning human rights abuses in Ogoniland. Watts Decl. ¶ 26. In November 1999, GSF attacked the community of Odi in Bayelsa State, and killed between 250 and 2483 civilians. Watts Decl. ¶ 28.

### B. Parabe (plaintiffs' version)

In 1998, defendants' Nigerian subsidiary, Chevron Nigeria Ltd. ("CNL"), operated the Parabe offshore platform in Nigerian territorial waters approximately 15 kilometers off the coast of the Niger Delta. (Undisputed). Adjacent to the platform was a construction barge, the CBL-101, which was being used for a project to upgrade the platform. (Undisputed).

The group involved in the Parabe incident, the Ilaje, are a small tribe of Nigerians most of whom live in relatively remote swamplands and river areas in the southwest delta region of Nigeria, in Ondo State. Plaintiffs' Corrected Opposition to Defendants' Statement of Facts (hereinafter "Docket 1417") at 13. The vast majority of people living in these rural Ilaje communities traditionally make their living and feed their families by agriculture and by fishing from the sea, rivers, swamps and swamplands of the Niger Delta. *Id.* at 13-14.The coastal communities immediately surrounding or close to the Parabe platform were in the catchment area and were Ilaje. *Id.* at 14.The traditional way of living and working in Ilajeland has been severely disrupted by the work of CNL in the region. CNL's activities have depleted the supply of fish and other seafood, have caused erosion and pollution of agricultural lands, and have destroyed sources of fresh water. *Id.* Around the time of the protests, CNL employed only two Ilaje workers out of approximately 2,500 Nigerian employees, despite the fact that as much as 20% of CNL's oil production came from Ilajeland or sites immediately off the coast thereof.*Id.*

In 1998, members of 42 Ilaje communities affected by CNL's activities formed a group called the Concerned Ilaje Citizens ("CIC"). Hoffman Decl., Ex. 125 (Declaration of Ola-Judah Ajidibo) ¶ 8. The CIC wrote to CNL on several occasions, detailing the problems facing the communities. *Id.* ¶ 10.After further meetings, the Ondo State Government Administrator joined with the CIC in requesting that CNL meet with the CIC. CNL failed to attend any of the meetings. *Id.* After holding a series of meetings, without any response from CNL, the CIC decided to conduct a peaceful protest at the Parabe platform in order to draw attention to their grievances. *Id.* ¶ 12.

**\*8** On May 25, 1998, more than 100 members of the CIC boarded the Parabe platform. Hoffman Decl., Ex. 127 (Bowoto Decl.) ¶ 15. According to one of the leaders of the CIC, Ola-Judah Ajidibo:
Before the men left for the Parabe Platform, they were given instructions by the eldersand by me at the direction of the elders. The elders and I told them that no one was to carry any firearms or other weapons onto the platform, that no one was to drink alcoholor use other drugs, and that the protest was to be orderly and entirely peaceful. Bola Oyinbo

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

was appointed to lead those men who traveled out to the platform in boats onMay 25, 1998. With the approval of the chiefs and leaders, I told Bola that he was to speak with the naval security on the Parabe Platform at his arrival, explain the reason for the protest, and provide the naval officers with copies of our recent letters to Chevron. Again with the approval of the chiefs and elders, I told Bola that he was then to request a meeting with whomever was in charge for Chevron on the platform and that he was to ask that individual to contact [CNL managing director] George Kirkland in order to setup a meeting between Mr. Kirkland and the elders and chiefs onshore.

*Id.* ¶ 13.

The first group of Ilaje, comprised of approximately 25 people, arrived in one speedboat, and five smaller "motorized local boats." *Id.* ¶ 14.None of them were armed. Approximately five Nigerian Naval officers and four Nigerian Mobile Police were stationed on the platform when the Ilaje arrived; the officers were armed. *Id.* As instructed, the first group of Ilaje to arrive at the platform spoke with the naval security and explained the reasons for the protest. *Id.* ¶ 15.They gave Lieutenant Afolayah copies of the recent letters to Chevron. After speaking with the Ilaje and reviewing the letters, Lieutenant Afolayah allowed the protestors to board the platform. *Id.* The Ilaje then asked the CNL employee in charge to contact George Kirland to arrange a meeting. *Id.*

The following day, May 26, CNL personnel Deji Haastrup and James Neku arrived at the platform along with military personnel. *Id.* ¶ 14.CIC leaders who had remained ashore traveled to the platform to meet with Haastrup and Neku. *Id.* Deji agreed on CNL's behalf to a meeting with the CIC leadership on land, at Ikorigho, the following day. *Id.* On May 27, as arranged, Haastrup and another CNL employee met with community leaders at Ikorigho. The community leaders continued to pressure CNL for a direct and personal response from Mr. Kirkland. At the end of the meetings at Ikorigho, Deji agreed to return to Ikorigho on May 29 with a final response from Mr. Kirkland. *Id.* ¶ 17.Based on this progress, the community elders instructed

Ajidibo to tell Deji that the protestors would leave the barge on May 28. Ajidibo did so. Ajidibo and several others then traveled to the barge to tell the protestors to leave the following morning, May 28. *Id.*

**\*9** At no time during the protest did the Ilaje take any hostages. Hoffman Decl., Ex. 127 ¶ 18. The protestors told the CNL workers that they were free to leave. *Id.* At some point during the protests, a CNL employee fell ill, and a CNL helicopter arrived and took him away, without incident. *Id.* None of the protestors were armed, and none threatened or harmed any of the workers. *Id.* ¶ 19.

The Ilajes did not request that work on the platform be stopped, and did not attempt to stop work on the platform. Docket 1417 at 17.Oil continued to flow from Parabe during most of the protest. *Id.* at 18.Communications within CNL and between CNL and Chevron USA reflected that the Parabe protest was peaceful. *See id.*Armed members of the Navy and military police remained on the barge and in control at all times. *See id.* at 19.At some point during the protests, additional military personnel arrived at the platform in a "Dolphin Flyer" boat. The navy lieutenant in charge on the platform told them they were not needed, and the boat left. Hoffman Decl., Ex. 297 (Boyo Dep.) at 61-64. Workers and protestors played games, shared meals, watched videos, fished, chatted together, and established friendships during the three-day protest. Docket No. 1417 at 20.

Very early on the morning of May 28, while many Ilaje were still asleep, and before they had begun to leave the platform, CNL security personnel and GSF arrived in several CNL-leased helicopters and attacked the protestors. *Id.* ¶ 21.One of the helicopter pilots testified that the GSF began firing from his helicopter before it even landed on the barge helideck. Hoffman Decl., Ex. 302 (Crowther Dep.) at 150:20-152:2, 154:18-156:9. To escape, the Ilaje ran towards shelter or jumped into the sea. Teukolsky Decl. (re: claims 10-17), Ex. 18 at 76:6-16; Ex. 30 at 604:14-605:21. Boats had already left the Ilaje villages on shore to pick up the protestors, as planned, when the attacks began. *See* Hoffman Decl., Ex. 293 at 115-116.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 8

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

The GSF and CNL personnel involved in the attack flew to the Parabe platform in helicopters leased by CNL. The helicopter pilots who flew to Parabe received their instructions from the CNL personnel on board, and not the GSF. *See* Hoffman Decl., Ex. 328 (Ogunjobi Dep.) at 211:1-212:17; Ex. 302 at 79:21-80:8. CNL Escravos Security Coordinator James Neku flew in one of the helicopters. Hoffman Decl., Ex. 325 (Neku Dep.) at 250:21-251:25. In his report on the incident, Neku stated that the GSF were "closely supervised by CNL security." *Id.,* Ex. 84 (C50-53) at C51. When the helicopters landed on the helideck at Parabe, Neku opened the boot of his helicopter and gave the soldiers whatever was in there, then directed the GSF towards the helideck stairs. *See id.,* Ex. 321 at 63:19-64:4. Neku then went up to the radio room, and gave the soldiers directions using an electric bullhorn. *See id.,* Ex. 338 (Peace Dep.) at 65:6-11, 67:6-68:6.

**\*10** Two individuals, including decedent Arolika Irowarinun, were shot and killed by the GSF at Parabe. Mr. Irowarinun was not attacking the soldiers or posing any threat when he was shot. Docket 1417 at 38-39.He was shot in the side of the chest, which is consistent with turning away from the gunfire before being shot. Teukolsky Decl., Ex. 29 at 55:11-59:13, 65:3-68:10.

Two other plaintiffs, Larry Bowoto and Bassey Jeje, were also shot. Jeje was shot in the arm, and subsequently was hit with a rifle butt. Filios Decl. (filed Nov. 13, 2006), Ex. 2 (Jeje Dep.) at 366:17-22, 492:2-15. Bowoto was shot while running towards the GSF, with his hands up, screaming that they were all peaceful protestors, and screaming "What's going on? What's going on?" *See id.,* Ex. 3 (Bowoto Dep.) at 597:4-7, 607:22-608:22.

Many of the protestors were subsequently arrested and beaten by the GSF. One group of 11 protestors was locked in a small container, and beaten with gun buts and horse whips. *See* Hoffman Decl., Ex. 363 at 78-82. They were then taken by the GSF to Escravos by boat. During the boat ride, a GSF told them they were going to be killed. *See id.* at 92:12-94:1.Many of the prisoners were crying

during the boat ride. *See id.* at 94:2-8.From Escravos, the prisoners were taken by boat to Warri. *See id.* at 94:9-16;*see also* Hoffman Decl., Ex. 313 (Irowarinu Dep.) at 141:18-142:13, 144:11-153:6. After arriving at Warri, the prisoners were placed in a jail cell at a naval base, and told to remove their clothes. *Id.,* Ex. 363 at 94:17-96:8. After removing their clothes, the GSF beat the prisoners with horse whips and gun butts. *Id.* at 97:7-16.After the beating, the prisoners were placed together in a small room, where they were kept for three days. *Id* . at 97:17-24.The GSF then took the prisoners to Akungba, then to Akure. *Id.* at 106:16-107:9; Ex. 313 at 163:4-8, 163:23-164:13. At Akure, the GSF continued to beat the prisoners, and pressured them to confess to crimes. *Id.,* Ex. 363 at 111-115. Among those beaten was Bola Oyinbo, on whose behalf several claims are brought in this case.[FN1]

FN1. Bola Oyinbo died three years later in Lagos, Nigeria.

**C. Opia and Ikenyan (plaintiffs' version)**

Opia and Ikenyan are two small villages located in the Niger Delta. (Undisputed). In late 1998, the Searex drilling rig, under contract to CNL, was located in the general vicinity of Opia and Ikenyan. (Undisputed). On January 3, 1999, members of the Opia village went to the Searex rig to demand compensation for pollution caused by CNL in the community; none of the plaintiffs were among this group. *See* Hoffman Decl., Ex. 367 at 257:4-9, 258:3-259:24; Ex. 360 at 318:4-25, 321:19-24, 340:2-5. The villagers were unarmed. The GSF stationed at the rig detained and beat the villagers with whips and guns. *See id.,* Ex. 304 at 169:20-170:1; Ex. 352; Ex. 353; Ex. 360 at 340, 344; Ex. 367 at 257-259.

The following day, another group of villagers from Opia went to the Searex rig. A group of women approached the rig first, and were told by GSF on the rig to go back. *See id.,* Ex. 317 (Lawuru Dep .) at 408. Behind the women was a group of community leaders. As one of the community leaders stood in his canoe to identify the group, the GSF fired gunshots. *See id.* at 409-412; Ex. 314

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 9

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

(Iteimor Dep.) at 235-236; Ex. 306 (Edekou Dep.) at 94, 97.

**\*11** Apparently having heard of the incident at the Searex rig, GSF Captain Kaswe demanded the use of CNL-leased helicopters to take him and his men to the area from Escravos. *See* Hoffman Dec., Ex. 339 (Pell Dep.) at 120:12-121:19. The Captain and his men were extremely agitated, and strongly demanded that CNL transport them. *See id.;*Ex. 304 at 135:24-136:4. The CNL personnel informed the Captain that he and his men could not be transported until any violence at the Searix rig dissipated. *See id.,* Ex. 339 at 123-124.

One or two hours later, at around 12:30 p.m., a CNL-leased helicopter was dispatched by CNL to fly to the Searex rig. Hoffman Decl., Ex. 323 (Meier Dep.) at 32. The helicopter, piloted by Alan Meier, picked up Captain Kaswe and his men from the airstrip, along with Reuben Osazuwa, a high-level CNL security employee. Osazuwa sat in the co-pilot's seat. *Id.,* Ex. 282 (Meier Dep.) at 126. The GSF onboard were fully armed, despite a CNL policy or practice requiring GSF traveling in CNL-leased helicopters to place all ammunition in the boot of the helicopter. *Id.* at 37-38; Ex. 335 (Osazuwa Dep.) at 175.

The Searex rig was located about 5 to 7 miles from Escravos. During the flight towards the rig, Osazuma instructed Meier to deviate from the course and fly over a river. *See id.,* Ex. 323 at 40. The passengers then spotted three canoes on the river. Osazuma exclaimed "they are hiding, they are hiding," and he instructed Meier to circle around the canoes and slow down. *Id.* at 41-42; Ex. 282 at 148. Captain Kaswe then fired five to seven shots in rapid succession. *See id.,* Ex. 282 at 155; Ex. 323 at 42; Ex. 88. Osazuwa's report on the incident stated that the shots were fired immediately after "flying through Opia" and "observ[ing] people ... hurrying out of the village in their canoes."*Id.,* Ex. 65 at C116; Ex. 335 at 233. Villagers observed the helicopter over the village, and fled into the bush when shots were fired from the helicopter. *See* Hoffman Decl., Ex. 317 at 426.

Later in the day, a military gun boat and a "sea

truck attached to the military" left Escravos for the Benin River. The military engaged in a "mopping up exercise with their gun boat," during which they went to both Opia and Ikenya. *Id.,* Ex. 65 at C117-119. Sea Truck is a company from which CNL leased boats during the relevant time period. *Id.,* Ex. 307 at 24:19-24. The Sea Truck involved in the mopping up exercise was stationed at CNL's Escravos facility. Fourteen or fifteen GSF boarded the Sea Truck and told the boat crew that they were going on patrol. *Id.* at 5:23-7:9; Ex. 315 at 36:9-38:25. The crew contacted CNL and received approval to take the GSF on patrol. Hoffman Decl., Exs. 315 & 359 at 39-40, 65-66; Ex. 307 at 7-23. The boat went first to the Searex rig, then to Opia. The boat docked at Opia and the GSF exited and went into the village with their rifles. The GSF were gone for over an our. The Sea Truck crew heard shooting in the village and observed smoke and fire coming from the village. *See* Hoffman Decl., Ex. 315 at 44-47; Ex. 307 at 11-14. The crew also observed a man "lying down," not moving, not far from the water's edge. *See id.,* Ex. 315 at 68; Ex. 307 at 19.

**\*12** The GSF shot unarmed villagers, killing at least four-Timi Okoro, Kekedu Lawuru, Shadrack Oloku, and Bright Pabulogba-and burned the villages of Opia and Ikenyan to the ground. *See* Hoffman Decl., Ex. 317 at 426, 435-438, 442, 492; Ex. 314 at 169, 190, 192; Ex. 306 at 104, 112-113, 206, 277, 306; Ex. 337 at 280, 283, 313, 345-349, 350, 358, 360-361; Ex. 312 at 123, 373-374, 379, 386-387; Ex. 294 at 62-65, 67-69, 74-75.

At the time of the attack, Opia had approximately 200 to 300 inhabitants and between 50 to 100 houses. *See* Hoffman Decl., Ex. 360 at 91; Ex. 367 at 117, 333; Ex. 358 at 40-41. Ikenyan had 200 to 300 inhabitants, and approximately 80 to 100 houses. *See id.,* Ex. 364 at 51-52.

### IV. Defendants' version of the facts[FN2]

> FN2. Most of the following language is taken directly from defendants' statement of facts in supportof defendants' motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

summary judgment on plaintiffs' claim for crimes against humanity (Docket No. 1261). As with plaintiffs' various summaries of fact, the Court has reviewed the evidence cited by defendants and omitted any unsupported propositions and irrelevant citations.

### A. Parabe

Prior to the incident at issue in this case, in March 1998, a group of more than 100 members of the Itsekeri tribe overtook the Parabe barge. Rodriguez Decl., Ex. D. ¶¶ 8-9; Ex. E ¶¶ 16-17; Ex. F ¶¶ 7-8; Filios Decl., Ex. 1 at 56-58, 98-99. CNL requested GSF assistance to prevent the Itsekiri from taking over the platform, and the siege ended peacefully. Rodriguez Decl., Ex. A ¶¶ 7-8; Kollios Decl., Ex. 75 at C22873-C22874; Ex. 76 at MB005-MB006. CNL and the construction contractor provided additional jobs to the Itsekiri and, to head off similar action by the rival Ilaje tribe, voluntarily provided additional jobs to the Ilaje as well. Rodriguez Decl., Ex. B ¶¶ 4-5; Kollios Decl., Ex. 77 at C24529-C24530; Ex. 76 at MB005-MB006.

Plaintiff Larry Bowoto and a group of other Ilajes were dissatisfied with the manner in which their leaders allocated the jobs. Filios Decl., Ex. 6 at 434-441; Ex. 7 at B16-B17. Bowoto and his group complained to CNL that the Itsekiri had "pirated" and held the CBL-101 for ransom and that the Itesekiri had no reason to claim any jobs. Id., Ex. 8 at C12-C14. The representatives of the Ilaje communities advised CNL that Bowoto's group was not authorized to represent the Ilajes. Id., Ex. 9 at C24033.

On May 25, 1998, more than 100 Ilaje tribesmen took over the CBL-101 barge, the Parabe platform and the Cheryl Ann tug. CNL reported the invasion to the Nigerian authorities, as it was required to do by law. Id., Ex. 19 at 206-207, 226-227; Babalakin Decl. ¶¶ 39-45. The workers believed they were being held hostage. Filios Decl., Ex. 2 at 70-75; Ex. 20 at 55-58; Ex. 21 at 78-79; Ex. 22 at 61-63; Ex. 23 at 370-371; Ex. 24 at 35-37. The Ilajes did not have permission for over 100 Ilajes to board and

stay for three days. Id., Ex. 27 at 32-35; Ex. 28 at 492-493; Ex. 29 at 326-327, 452. Work on the barge and platform ceased because the Ilajes' presence endangered the workers' safety.Id., Ex. 17 at 67; Ex. 18 at 90; Ex. 4 at 52-53; Ex. 3 at 48-49. The Ilajes blocked the barge and platform helidecks and threatened to burn the barge and tugboat. Id., Ex. 24 at 43; Ex. 21 at 55; Ex. 27 at 100; Ex. 20 at 61; Ex. 30 at 47-48. Some of the Ilajes engaged in violence against the workers.Id., Ex. 2 at 70, 74, 374; Ex. 24 at 30-31, 252; Ex. 22 at 47, 63.

**\*13** After three days of negotiations, CNL's crisis management team decided to seek the assistance of the Nigerian GSF to free their workers, based on reports that the workers on the barge were being held hostage, they were under emotional strain and had been subjected to physical abuse, and CNL's negotiator had been threatened and briefly held hostage by the Ilaje. Id., Ex. 1 at 232-240, 269; Rodriguez Decl., Ex. A ¶ 17. On May 27, 1998, CNL reported the situation to Captain Ita, the head of GSF in Delta State. Filios Decl., Ex. 19 at 227-228, 238. Lieutenant Sadiq told James Neku that he needed use of CNL-leased helicopters to travel to the barge and platform. Id. at 243.

On the morning of May 28, 1998, approximately seventeen Nigerian military and police led by Lieutenant Sadiq flew to the barge in three helicopters. Id. at 243-262; Kollios Decl., Ex. 78 at C21798; Ex. 79 at C21806-C21807; Ex. 80 at C21799. CNL employee James Neku flew to the barge with Lieutenant Sadiq to observe the situation, but he did not have authority to control Lieutenant Sadiq or his men. Filios Decl., Ex. 19 at 237-238, 250; Ex. 32 at 228-229.

CNL requested that the hostages' rescue be handled peacefully and thought it would be handled peacefully. Rodriguez Decl., Ex. A at ¶¶ 19, 21; Ex. D ¶¶ 15-18, 21-24; Filios Decl., Ex. 19 at 248-249. The two Ilajes who were shot to death were advancing on the military with pipe spools raised above their heads in a threatening manner. Filios Decl., Ex. 23 at 69-71; Ex. 22 at 74-82; Ex. 27 at 87-92; Ex. 20 at 86-90.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 11

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

### B. Opia and Ikenyan

On December 11, 1998, the Ijaws issued the so-called Kaiama Declaration ordering CNL and other oil companies to vacate all the territories claimed by the Ijaws. Rodriguez Decl., Ex. A ¶ 24; Filios Decl., Ex. 43 at C0257. In late 1998, CNL withdrew its operating employees and contractors from, among other places, the Searex rig. CNL also suspended operations at the Searex rig. Filios Decl., Ex. 1 at 128; Kollios Decl., Ex. 85 at C46646.

On January 3, 1999, villagers from Opia came to the Searex rig demanding money from CNL. Rodriguez Decl., Ex. A ¶ 26; Filios Decl., Ex. 41 at 44-46; Ex. 44 at 322-327; Ex. 45 at 147-151; Ex. 46 at 259; Ex. 47 at C284; Ex. 85 at C20361-C20362. On January 4, 1999, CNL's operations manager in Escravos, Scott Davis, heard an SOS call from the Searex rig. Filios Decl., Ex. 1 at 135. The CNL employee stationed at the Searex rig reported that armed villagers were attacking the GSF providing security for the rig, and that at least one attacker was armed with a gun and dynamite, threatening to blow up the rig and set it ablaze. *Id.,* Ex. 47 at C284.

The GSF demanded that CNL immediately provide them with helicopters to take military reinforcements to the rig. *Id.,* Ex. 1 at 135-136; Ex. 42 at 120-121; Rodriguez Decl., Ex. A ¶¶ 27-28; Ex. 48 at 22-24; Ex. 49 at 27. CNL persuaded the GSF to wait until the gunfire had stopped at the Searex rig before allowing the GSF to use helicopters to transport reinforcements to Searex. Filios Decl., Ex. 1 at 135-140; Ex. 42 at 121-127; Rodriguez Decl., Ex. A ¶ 27. Around 12:30 p.m., on January 4, a Nigerian Army Captain fired five to ten rounds out of a CNL-leased helicopter enroute to the Searex rig without any direction or prior knowledge on behalf of CNL. Filios Decl., Ex. 50 at 41-45; Ex. 51 at 171-175; Rodriguez Decl., Ex. A ¶ 28, 31-37; Ex. G ¶¶ 7-8; Kollios Decl., Ex. 86 at C21985. The helicopter was not near any village when the shots were fired. Filios Decl., Ex. 50 at 41-45; Ex. 51 at 172.

**\*14** No employee of defendants or CNL was present at Opia or Ikenyan on January 4, 1999.

Rodriguez Decl., Ex. A ¶ 27; Ex. B ¶ 36; Ex. C ¶ 26; Ex. G. ¶ 12. No employee of defendants or CNL intended, requested or authorized any person, including the Nigerian authorities, to discharge any firearm from a helicopter, to attack or burn the villages of Opia or Ikenyan, or to shoot or injure any of their residents. *Id.,* Ex. A ¶¶ 31, 34; Ex. B ¶ 36; Ex. C ¶ 26; Ex. G ¶ 12; Ex. H ¶ 13; Ex. I ¶ 17.

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c).

On a motion for summary judgment, "[i]f the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.' " *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103-04 (9th Cir.), *cert. denied,*479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the nonmoving party. *T.W. Electric,* 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991). The evidence the parties present must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 12

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. Niagara Falls,* 754 F.2d 49 (2nd Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979). Hearsay statements found in affidavits are inadmissible. *See, e.g., Fong v. American Airlines, Inc.,* 626 F.2d 759, 762-63 (9th Cir.1980). The party who will have the burden of proof must persuade the Court that it will have sufficient admissible evidence to justify going to trial.

### I. Secondary liability

The first dispute between the parties is whether, and to what extent, plaintiffs can hold CNL liable for the actions of the GSF. Plaintiffs present several theories of secondary liability.

### A. Aiding and Abetting

**\*15** "California courts have long held that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." *Casey v. U.S. Bank Nat'l Ass'n,* 127 Cal.App.4th 1138, 1145, 26 Cal.Rptr.3d 401 (Cal.Ct.App.2005). Under Nigerian law, aiding and abetting liability similarly "requires actual knowledge of the crime being committed and intent to facilitate commission of that crime."Mot. at 4:13-15, citing Babalakin Decl. ¶¶ 167-170.

Defendants contend that CNL had no intent or knowledge that the GSF would engage in the alleged attacks at Parabe or Opia and Ikenyan. In response, plaintiffs present a large quantity of circumstantial evidence, showing that:
(1) CNL knew of the GSF's general history of committing abuses, including against oil protestors, *see* Plaintiffs' Corrected Affirmative Statement of Facts in Opposition to Defendants' Motion for Summary Judgment on Crimes Against Humanity ("

PASOF") (Docket No. 1418) ¶¶ 183-254; *see also supra* BACKGROUND section.
(2) CNL brought the GSF to Parabe even though the protestors had already agreed to leave, *see id.* ¶ ¶ 301-304, 26 Cal.Rptr.3d 401;
(3) CNL failed to adhere to its practice of requiring GSF to place ammunition in the "boot" of the helicopter, *see*Docket 1417 at 36:13-26, 50:27-51:10;
(4) One of the GSF, Captain Kaswe, who boarded the helicopters bound for Opia and Ikenyan was "in a high state of agitation," and was "hot-headed," *id.* at 50:15-26, 26 Cal.Rptr.3d 401;
(5) CNL personnel, specifically James Neku, " closely supervised" the GSF who landed at Parabe, *see id.* at 8:2-9:22, 26 Cal.Rptr.3d 401;
(6) CNL personnel, specifically Reuben Osazuwa, directed the pilot of one of the Opia and Ikenyan helicopters to approach and circle canoes present on the river around the villages; GSF onboard the helicopter subsequently fired at those canoes, *see id.* at 51:1124, 26 Cal.Rptr.3d 401; PASOF ¶¶ 337-339;
(7) CNL paid the GSF generally, and for their services in connection with the incidents at issue, *see* PASOF ¶¶ 458-474; Docket 1417 at 58:10-59:9;
(8) CNL only paid GSF for services that were " incidental to normal CNL activities" and requested by a CNL "end-user," *see*Docket 1417 at 39:25-40:16;
(9) Later on the day that GSF fired from the helicopter on Opia and Ikenyan, CNL authorized the GSF to use the CNL-leased Sea Trucks to travel to Opia and Ikenyan, see Docket 1417 at 58:10-14; PASOF ¶¶ 342-350; and
(10) CNL provided transportation to the GSF for all of the incidents at issue here, *see* PASOF ¶¶ 327-328, 343-350, 437-457; Docket No. 1417 at 8:2-9:2.

The Court finds that a jury could reasonably infer from this evidence that CNL knew the GSF intended to, and would, commit the torts at issue here. Plaintiffs' aiding and abetting liability theory therefore survives summary judgment.

### B. Conspiracy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 13

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

Under California law, conspiracy requires knowledge of a plan to engage in the specific wrongful conduct at issue, and agreement to participate in that plan. *See Kidron v. Movie Acquisition Corp.,* 40 Cal.App.4th 1571, 1582, 47 Cal.Rptr.2d 752 (1995).“[T]he requisite concurrence and knowledge ‘may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.’ “ *Wyatt v. Union Mortgage Co.,* 24 Cal.3d 773, 785, 157 Cal.Rptr. 392, 598 P.2d 45 (Cal.Sup.Ct.1979) (quoting case).

**\*16** Defendants argue that, as with the aiding and abetting theory, plaintiffs cannot show that CNL knew of any plan or intent on the part of the GSF to commit the acts at issue, and cannot show that CNL agreed to such a plan. Plaintiffs argue that the same evidence of aiding and abetting, discussed above, would allow a jury to reasonably infer knowledge and agreement. The Court agrees with plaintiffs. As discussed, plaintiffs present evidence that CNL personnel were directly involved in the attacks; CNL transported the GSF; CNL paid the GSF; and CNL knew that GSF were prone to use excessive force. These facts, among, other, are sufficient to raise a triable issue as to whether CNL knew that GSF planned to attack, and whether CNL agreed with that GSF should commit the attacks.

## C. Agency

The parties also dedicate a great deal of briefing to the issue of whether CNL can be held vicariously liable for the actions of the GSF through a *respondeat superior* theory.

To establish actual agency a party must demonstrate the following elements: “(1) there must be a manifestation by the principal that the agent shall act for him; (2) the agent must accept the undertaking; and (3) there must be an understanding between the parties that the principal is to be in control of the undertaking.”*Rubin Bros. Footwear, Inc. v. Chemical Bank,* 119 B.R. 416, 422 (S.D.N.Y.1990).“There is no agency relationship where the alleged principal has no right of control over the alleged agent.”*Morgan Guar. Trust Co. of*

*N.Y. v. Republic of Palau,* 657 F.Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); *see also Rubin Bros.,* 119 B.R. at 422.

Plaintiffs here argue that there is sufficient evidence for a jury to find that the GSF who committed the alleged atrocities at issue in this case were the agents of CNL, rather than traditional, independent, military and police officers. Defendants counter that, at all times, the GSF acted as independent government security, and were not under the control of CNL. Plaintiffs' evidence shows the following:

• “Chevron regularly made decisions about where GSF officers should provide protection and the number of GSF needed for each assignment.”Opp. at 25:5-6, citing PASOF ¶¶ 540-548.

• “Chevron had the power to require its assigned GSF officers to attend training and did so when it served the company's purposes.”Opp. at 25:8-9, citing PASOF ¶ 399.

• CNL decided when the GSF would be permitted to use CNL-leased boats and helicopters, and when they would not. PASOF ¶¶ 387-398.

• Communications with Nigerian officials after the Parabe incident suggest that the GSF involved acted under the control of the CNL, and not superior military or government authority. For example, a Nigerian military advisor “chewed out” CNL mangers after the Parabe incident for three hours. Hoffman Decl., Ex. 304 at 335:13-336. Similarly, at a June 26, 1998 meeting between CNL managers and Nigerian government officials, the government officials “frowned at the use of force rather than dialogue in all conflict resolutions,” and “appealed to CNL to involve Government Agencies in any future dialogue with the communities ....“ Hoffman Decl., Ex. 211.

**\*17** • In a March 11, 1998 letter from CNL's managing director, George Kirkland, to a Human Rights Watch investigator, Kirkland stated that when CNL utilizes GSF, “CNL Security insists on exercising reasonable control over those deployed to assist, ensuring that no more than the minimum force required to bring a situation under control is applied.”Hoffman Decl., Ex. 169, at C28912 ¶ 9.

• CNL security personnel often reported “leading” or “supervising” GSF in the course of 20 various operations, including the Parabe operation. *See e.g.,* plaintiffs' opposition to defendants' statement of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 14

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

facts ("POSOF") (Docket No. 1417) at 7-10.
• CNL paid the GSF for their services, above and beyond their government salaries.
• CNL "had the power to rid itself of incompetent or problematic officers and ... it did so on several occasions."Opp. at 23-25, citing Hoffman Decl., Ex. 335, Osazuwa Dep., at 42:24-43:13 (On whether or not a police official was an employee of CNL: "I won't say that he is an employee, I will not say that he is not an employee.... We can't sack him, if he does anything bad, if we were to discipline him we turn him back to the police.... We can't fire him, we return him."); *see also* POSOF at 5-6.
• CNL provided food and lodging to the GSF.

In response to plaintiffs' evidence, defendants first argue that "[p]laintiffs cite no case holding that a law enforcement agency responding to reports of unlawful conduct can be found to be the agent of the private person who requested intervention." Reply at 12:8-10. In support of their argument, defendants cite *O'Quin v. Baptist Memorial Hospital,* 184 Tenn. 570, 201 S.W.2d 694, 697 (Tenn.1947), in which a Tennessee court ruled that a police officer "cannot be adjudged the agent of one who calls him to aid in preventing a breach of the peace, even though it may be threatened upon private premises."This argument relies on an inaccurate characterization of the relationship between the GSF and CNL. It is apparent that CNL and GSF had a much closer relationship than the traditional relationship between private parties and law enforcement officials in this country. The GSF were on the CNL payroll, and engaged in extensive security work for CNL. CNL did not simply "dial 911."

Another case cited by defendants, *Mahon v. Bethlehem Musikfest Assoc.,* 898 F.Supp. 310 (E.D.Penn.1995), is instructive. In *Bethlehem,* plaintiff sued a music festival organizer, the City of Bethlehem, and Bethlehem police officers who worked security at the music festival, for injuries arising out of his arrest for disorderly conduct at the music festival. On summary judgment, the court addressed the issue of "whether Musikfest is vicariously liable for the Police Officer Defendants' actions due to an agency or independent contractor

relationship."*Id.* at 312.The court made the following factual determinations: "Musikfest paid the City for the Police Officer Defendants' services" ; the officers "knew that Musikfest paid the City for their police services of crowd control and safety"; " Musikfest had certain rules of its own ... that the Police Officer Defendants were supposed to enforce ... along with local and state ordinances and laws"; each officer's "Musikfest work assignment was made via a roster system by the Fraternal Order of Police and the Police Department"; and "Musikfest did not have discretion over enforcement decisions, and ... the [officers] did not have to report or clear arrests with Musikfest."*Id.* The court concluded that "[n]one of this evidence ... indicates that Musikfest had any control over the manner in which the Police Officer Defendants performed their duties ."*Id.* at 312-13.The court did find, however, "that there are genuine issues of material fact as to whether Musikfest hired the Police Officer Defendants as independent contractors," in which case, in some circumstances, Musikfest could still be vicariously liable for the officers' actions. *Id.* at 313.

**\*18** Notably, the court in *Bethlehem* did not rule, as defendants suggest the Court should do here, that hiring police officers to enforce the law can never form an agency relationship. To the contrary, *Bethlehem'* s analysis suggests that under certain circumstances, even on-duty police officers can become agents of private parties. Furthermore, there are more facts in this case suggesting an agency relationship than in *Bethlehem.*Unlike in *Bethlehem,* here there is evidence that CNL determined the work schedules and assignments of the GSF. Also, there is evidence that CNL had the discretion to decide if, when, and how the GSF would participate in security operations. In *Bethlehem,* it appears that the festival hired the officers to conduct security, then let the officers do so how they desired, exercising their own discretion. Unlike in *Bethlehem,* here there is "evidence ... indicat[ing] that [CNL] had [ ] control over the manner in which the [GSF] performed their duties."*Id.* at 312-13. *Bethlehem* therefore does not compel the Court to find an absence of agency.

Defendants also argue that "if it were possible to make an entire police department or branch of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 15

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

military one's agent, no evidence exists that CNL did so."Reply at 12:19-20. Again, defendants mischaracterize plaintiffs' argument. Plaintiffs do not seek to show, and are not required to show, that the entire Nigerian military served as CNL's agent. Plaintiffs seek only to show that the particular GSF members CNL paid, housed, and allegedly controlled, were agents of CNL, rather than traditional, independent government security forces. As discussed above, plaintiffs have provided evidence of such a relationship. The Court finds that plaintiffs have raised a triable issue of fact as to whether CNL had "a right of control" over the GSF it hired. Plaintiffs' agency theory therefore survives.

## II. Law enforcement reporting privilege

Defendants' second overarching argument is that CNL's communications with, and support of, the GSF, are absolutely privileged under California law. Defendants are correct that under California law, "the overwhelming majority of cases conclude that when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond, the communication also enjoys an unqualified privilege under section 47(b)" of the California Civil Code. *Hagberg v. Cal. Fed. Bank FSB,* 32 Cal.4th 350, 364, 7 Cal.Rptr.3d 803, 81 P.3d 244 (Cal.Sup.Ct.2004). This privilege also appears to apply to communications with foreign law enforcement personnel. *See Beroiz v. Wahl,* 84 Cal.App.4th 485, 100 Cal.Rptr.2d 905 (Cal.Ct.App.2000). However, unqualified immunity applies in the foreign context only "to police reports that may trigger proceedings governed by adequate procedural safeguards. Absent such safeguards, only reports made in good faith, and without malice, merit protection as privileged."*Id.* at 496, 100 Cal.Rptr.2d 905.

**\*19** This California Civil Code section 47 privilege is an affirmative defense. Here, defendants have made no showing that CNL's communications with, and support of, the GSF, "trigger[ed] proceedings governed by adequate procedural safeguards." Defendants also fail to make any showing that their interactions with the GSF were "in good faith, and

without malice."As such, the Court cannot grant summary judgment for defendants based on the law enforcement reporting privilege defense.

## III. Claims 11 and 12: assault and battery

### A. Parabe (Nigerian law)

Nigerian law applies to the incidents that occurred on the Parabe barge. The parties appear to agree that under Nigerian law, assault is intentionally putting another person in fear of an imminent battery, and battery is the intentional application of force to another person. The parties disagree, however, about the burden of proof. Defendants contend that even in civil cases, the plaintiff must prove assault and battery beyond a reasonable doubt. Plaintiffs respond that the burden of proof is simply a preponderance of evidence. Defendants appear to be correct. In *Okuarume v. Obabokor,* NSCC 286, ¶ ¶ 35-40 (1965), the Supreme Court of Nigeria held that the plaintiff, seeking damages in a civil suit for assault, had to prove the assault beyond a reasonable doubt, based on the Nigerian Evidence Act.[FN3]*See* Defs.' Appendix of Foreign Authorities, Ex. 15. The provisions of the Nigerian Evidence Act relevant to this case state:

> FN3. This Court respectfully disagrees with the Nigerian Supreme Court's holding in *Okuarume,* as it appears to be inconsistent with the Nigerian court's explanation of the relevant provision of the Nigerian Evidence Act in *Ikoku v. Oli,* All N.L.R. 194, 199-200 (1962).*See* Defs.' Appendix of Foreign Authorities, Ex. 2 at 205 (quoting passage from *Ikoku* ). Nonetheless, *Okuarume* appears to be controlling Nigerian law.
> The Court is also troubled by the fact that defendants did not cite *Okuarume* until the reply brief. In their motion, defendants stated that "[a]ssault and battery must be proved beyond reasonable doubt, even in civil cases," and cited the Babalakin Declaration in support. The Babalakin

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 16

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

Declaration did not cite *Okuarume,* or any equivalent case. Thus, while defendants technically raised this legal argument in the original motion, the Court is troubled that they did not cite *Okuarume,* which is clearly on point, until the reply. It is, of course, possible that defendants did not become aware of *Okuarume* until after filing their motion. If, however, defendants were aware of *Okuarume* at the time they filed this motion, withholding it for reply would be unfair and improper.

138. (1) If the commission of a crime by a party to any proceeding is directly in issuein any proceeding civil or criminal it must be proved beyond reasonable doubt.
(2) The burden of proving that any person has been guilty of a crime or wrongful act is, subject to the provisions of section 141 of this Act, on the person who asserts it ....

Teukolsky Decl., Ex. 28. It thus appears that, under Nigerian law assault and battery must be proved beyond a reasonable doubt.

Defendants here do not contend that plaintiffs cannot make out a prima facie case of assault and battery. Instead, they focus on various defenses available to the GSF under Nigerian law. *See* Mot. at 12-14. Nigerian Police Force Order No. 237 states:
3. A Police may use firearms under the following circumstances:
(a) When attacked and his life is in danger and there is no other way of saving his life;
(b) When defending a person who is attacked and he believes no [sic-on?] reasonable grounds that he cannot otherwise protect that person attached[sic] from death;
(c) When necessary [to] disperse rioters or to prevent them from committing serious offences against life and property; N.B. Remember that 12 ormore people must remain riotously assembled beyond a reasonable time after the reading of the proclamation before the use of firearms can be justified;
....
(e) If he cannot by any other means arrest a person

who takes to flight in order to avoid arrest; provided the offence is such that accused may be punished with death or imprisonment for 7 years or more.
**\*20** 4. With regard to 3(a) above, a Police Officer would have to prove that he was in danger of losing his life or of receiving an injury likely seriously to endanger his life. It would be most difficult to justify the use of firearms if attacked by an unarmed man.... If attacked by an individual with a heavy stick or machets [sic], he would have to prove that he could not disable him with his baton or rifle butt and that other means available to him were not sufficient to protect his life.
....
6. Fire should be directed at the knees of the rioters...
..
....
8. As to 3(c) [sic-3(e) ] above, .... firearms should only be used if there are not other means of effecting his arrest, and the circumstances are such that his subsequent arrest is unlikely. A constable who cannot effect such a criminal's arrest by any other means should warn the criminal that unless he stops and surrenders, he will fire upon him. If the criminal fails to stop, the constable is then justified in firing at the criminal.

Babalakin Decl., Ex. 36.

The Nigerian Criminal Procedure Act provides, in relevant part:
3. In making an arrest the police officer or other person making the same shall actually touch or confine the body of the person to be arrested, unless there be a submission to the custody by word or action.
....
53. (1) Every police officer may interpose for the purpose of preventing, and shall to the best of his ability prevent, the commission of any offence.

Babalakin Decl., Ex. 34.

The Nigerian Criminal Code Act provides, in pertinent part:
69. When three or more persons, with intent to Carry out some Common purpose, assemble in such a manner or, being assembled, conduct themselves in such a manner, as to cause persons in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

neighbourhood to fear on reasonable grounds that the persons so assembled will tumultuously disturb the peace, or will by such assembly needlessly and without any reasonable occasion provoke other persons tumultuously to disturb the peace, they are an unlawful assembly.
....
72. Any magistrate or, in his absence, any police officer, of or above the rank of assistant superintendent, or any commissioned officer in the Naval, Military or Air Forces of Nigeria in whose view a riot is being committed, or who apprehends that a riot is about to be committed by persons assembled within his view, may make or cause to be made a proclamation in the name of the Federal Republic in such form as he thinks fit, commanding the rioters or persons so assembled to disperse peaceably.
Dispersion of rioters after Proclamation made.
73. If upon the expiration of a reasonable time after such proclamation made, or after the making of such proclamation has been prevented by force, twelve or more persons continue riotously assembled together, any person authorised to make proclamation, or any police officer, or any other person acting in aid of such person or police officer, may do all things necessary for dispersing the persons so continuing assembled, or for apprehending them or any of them, and if any person makes resistance, may use all such force as is reasonably necessary for overcoming such resistance, and shall not be liable in any criminal or civil proceeding for having, by the use of such force, caused harm or death to any person.
**\*21** ....
261. It is lawful for a person ... in making any arrest, and for any person lawfully assisting him, to use such force as may be reasonably necessary to overcome any force used in resisting such execution or arrest.
271. When a peace officer or police officer is proceeding lawfully to arrest, with or without warrant, a person for an offence which is a felony, and is such that the offender may be arrested without warrant, and the person sought to be arrested takes to flight in order to avoid arrest, it is lawful for the peace officer or police officer and for any person lawfully assisting him, to use such force as may be reasonably necessary to prevent the

escape of the person sought to be arrested, and, if the offence is such that the offender may be punished with death or with imprisonment for seven years or more, may kill him if he cannot by any means otherwise be arrested.
....
276. It is lawful for any person to use such force as is necessary to suppress a riot, and is reasonably proportioned to the danger to be apprehended from its continuance.
....
277. It is lawful for a peace officer to use or order to be used such force as he believes, on reasonable grounds, to be necessary in order to Suppress a riot, and is reasonably proportioned to the danger which he believes, on reasonable grounds, is to be apprehended from its continuance.
....
279. When any person, whether subject to military law or not believes on reasonable grounds, that serious mischief will arise from a riot before there is time to procure the intervention of a peace officer, it is lawful for him to use such forceas he believes, on reasonable grounds, to be necessary for the suppression of the riot and as is reasonably proportioned to the danger which he believes on reasonable grounds, is to be apprehended from [ ] its continuance.
....
280. It is lawful for a person who is bound by the laws in force relative to the armed forces of Nigeria or to the police forces to obey the lawful commands of his superior officer, to obey any command given him by his superior officer, in order to the suppression of a riot, unless the command is manifestly unlawful. Whether any particular command is or is not manifestly unlawful is a question of law.

Babalakin Decl., Ex. 25.

Section 239 of the Nigerian Armed Forces Act provides:
No action, prosecution or other proceeding shall lie against a person subject to service law under this Act for an act done in pursuance or execution or intended execution of this Act or any regulation, service duty or authority or in respect of an alleged neglector default in the execution of this Act,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 18

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

regulation, duty or authority, if it is done in aid to civil authority or in execution of military rules.

Babalakin Decl., Ex. 3.

With respect to the incidents on the Parabe barge, defendants contend that "in each shooting on the barge, the [victims] were approaching the military, screaming, running or with raised objects in their hands. In the context of a riot, that conduct is sufficiently threatening to justify the military's decision to shoot. Plaintiffs cannot establish to [sic] contrary beyond a reasonable doubt."Mot. at 13:21-24. This argument misconstrues the burdens of the parties. Under Nigerian law, defendants have the burden of proving self-defense. *See* Nigerian Evidence Act § 141(1) (Teukolsky Decl., Ex. 28) (" Where a person is accused of any offence the burden of proving the existence of circumstances bringing the case within any exception or exemption from, or qualification to, the operation of the law creating the offence with which he is charged is upon such person.").

**\*22** Moreover, defendants' self-defense theory relies on the fact that plaintiffs were engaged in a riot, or unlawful assembly. Just as plaintiffs must prove assault and battery beyond a reasonable doubt, so must defendants prove the crime of unlawful assembly beyond a reasonable doubt. At this stage, therefore, defendants have the burden of establishing that there is no issue as to whether the GSF acted properly in self-defense, in the context of a riot.<sup>FN4</sup> Under Nigerian Law, to establish that the protest on the barge constituted a "riot," defendants must establish that the protestors caused reasonable fear that they would "tumultuously disturb the peace. ..." *See* Criminal Code Act § 69 (Babalakin Decl., Ex. 25). Defendants have not provided the Court with a definition of "tumultuously disturb the peace, " under Nigerian law. Furthermore, the parties clearly dispute whether the protestors on the barge were peaceful. *See, e.g.,*Docket 1417 at 21:15-23:5, 26:12-27:28.This alone prevents a finding of summary judgment in favor of defendants on the basis of their affirmative defense.

FN4. Defendants also mistake the burdens

with respect to Bassey Jeje, stating "Jeje cannot show that the military did not believe that he posed a threat when they found him hiding."Mot. at 13:24-25. It is defendants' burden to establish that the GSF believed Jeje to be a threat justifying use of force. *See* Nigerian Evidence Act § 141(1) (Teukolsky Decl., Ex. 28).

Moreover, even if defendants can establish that the protest on the barge constituted a riot, they also have the burden of establishing that the GSF only " used such force as he believes, on reasonable grounds, to be necessary in order to Suppress a riot, and is reasonably proportioned to the danger which he believes, on reasonable grounds, is to be apprehended from its continuance."Criminal Code Act § 277 (Babalakin Decl., Ex. 25). Again, the parties provide conflicting evidence as to whether the force used by the GSF was "necessary" and " reasonably proportioned to the danger." *See, e.g.,* Docket 1417 at 36:27-37:14, 38:12-39:2; PASOF ¶ ¶ 268-270.

For example, with respect to Arolika Irowarinun, who was shot and killed by the GSF, defendants contend that the undisputed evidence establishes that he was shot while "advancing with [a] metal bar[ ] raised in a 'strike position.' " Reply at 5:5-6. Plaintiffs respond with evidence that Irowarinun was shot in the side of the chest, "from which a jury could infer that the was turning away from impending gunfire just before being shot." Opp. at 7:19-21. Defendants reply with evidence that Irowarinun was "moving in on the soldier at an angle" when the soldier shot him. Reply at 5:14 (citing evidence that the "military man was facing ' at a different angle' and turned just in time to fire," and that the victim came "in from the military person's 'right side.' "). That he was shot in the side, defendants contend, is therefore consistent with the self-defense theory. However, defendants' interpretation of the evidence is not the only reasonable one. The only way Irowarinun could have been shot in the side while running at the shooter is if he was running sideways, which is unlikely. That he was approaching the shooter "at an angle," suggests only that the shooter had to pivot in order to shoot him. Plaintiffs have thus

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                       Page 19

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

raised a triable issue as to whether the GSF acted in self-defense when they shot Irowarinun.

**\*23** With respect to Larry Bowoto, it appears undisputed that he was unarmed when the soldiers shot him. Even taking as true defendants' assertion that Bowoto "ran toward the soldiers with arms extended screaming," Reply at 7, there is a triable issue as to whether this justified the GSF's use of force against him under the Criminal Code Act and other provisions of Nigerian law discussed above.

It also appears that under Nigerian law, before force is used to disperse rioters, a "proclamation" must be made. *See* Criminal Code Act §§ 72-73 (Babalakin Decl., Ex. 25). Defendants here present no evidence of any such proclamation. There are, therefore, many issues of material fact which preclude summary judgment.

Defendants also argue that, as to the alleged beating of Bola Oyinbo by the GSF after he was arrested on the barge, plaintiffs present no evidence connecting CNL to the beatings.[FN5] The Court finds that the evidence discussed above, in the general aiding and abetting discussion, is sufficient to allow a jury to reasonably conclude that CNL had knowledge that arrested protestors would be abused.

> FN5. The parties discuss the beating of Oyinbo under the Nigerian law section. Though probably irrelevant at this point, it appears to the Court that California law should apply to the alleged beating of Oyinbo, as it occurred on land. *See* Order 1204.

In sum, defendants have failed to establish that there is no issue of material fact as to their law enforcement privilege and self-defense affirmative defenses, and summary judgment is therefore inappropriate.

### B. Opia and Ikenyan (California law)

California law applies to the tort claims arising from the incidents at Opia and Ikenyan. *See* Order 1204.

The parties agree that California law on assault and battery mirrors that of Nigeria, except that California law's burden of proof is only a preponderance of the evidence.

### 1. John Ikenyan, Smart Iteimor, Benson Edekou, Henry Pabulogba and Anthony Lawuru

Defendants argue that the claims of John Ikenyan, Smart Iteimor, Benson Edekou, Henry Pabulogba and Anthony Lawuru are time barred. In the concurrently pending motions to dismiss and strike portions of plaintiffs' Eighth Amended Complaint ("EAC"), defendants make the same argument, except as to John Ikenyan. The Court addresses this issue in the Order on those motions. This issue is therefore moot with respect to all but John Ikenyan. As to John Ikenyan, the Court agrees with defendants that his claims are time-barred, for the same reasons discussed in the concurrent Order with respect to the other four individuals.

### 2. Survival claims

Defendants argue that only personal representatives can bring survival claims on behalf of the decedents. The Court addresses and rejects this argument in the Order on defendants' motion to dismiss and strike portions of the EAC.

hDefendants also contend that there is no evidence of an assault and battery on decedent Timi Okoro. In opposition, plaintiffs present evidence that Benson Edekou (Timi Okoro's brother) saw Okoro in a canoe as the Sea Trucks carrying the GSF approached Opia and Ikenyan (which were subsequently burned to the ground by the GSF in the Sea Trucks). Edekou then fled into the bush in fear. *See* Teukolsky Decl., Ex. 23 at 300:1-22, 323:25-324:23. Okoro was never seen again. *Id.* at 348:2-349:13, 344:1-346:21; Filios Decl., Ex. 47 at 126-132, Ex. 17 at 542-543. This evidence, plaintiffs contend, coupled with general evidence of the attacks by the GSF on Opia and Ikenyan, is sufficient to allow a reasonable jury to infer that the GSF in the Sea Trucks were responsible for Okoro's death or disappearance. The Court agrees. *See, e.g.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                    Page 20

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

*People v. Scott,* 176 Cal.App.2d 458, 1 Cal.Rptr. 600 (Cal.Ct.App.1959) (upholding a murder conviction based solely on circumstantial evidence, where the victim's body was not recovered, there was no confession, and no other direct evidence of death or murder).

**\*24** In support of summary judgment on Timi Okoro's claim, defendants cite *Wolf v. Reynolds Elec. and Eng'g Co.,* 304 F.2d 646 (9th Cir.1962), in which the Ninth Circuit upheld the trial court's entry of judgment of dismissal in favor of defendants. In *Wolf,* the plaintiff sought to recover damages for personal injuries arising from a collision between plaintiff's truck and defendant's flatbed truck, upon which a crane was sitting. After plaintiff put on his case to the jury, defendant moved for entry of judgment pursuant to Federal Rule of Civil Procedure 41. The court granted defendant's motion. On appeal, the Ninth Circuit stated:

Each of appellant's contentions is predicated upon the assumption that the crane must have protruded beyond the left side of defendants' truck and trailer and thereby caused the accident. Before plaintiff may recover, however, there must be substantial proof that the crane did in fact protrude and cause the accident. True, this may be established by circumstantial evidence; but we agree with the trial court that there was insufficient evidence, either direct or circumstantial, to justify a finding by a jury that the accident was caused in this manner.

The most a jury could conclude from the evidence was the possibility that the accident was caused by something overhanging from defendants' trailer. There is evidence which tends to negative that possibility. The marks and scratches on the front outside dual and the trailer bed, as well as the lack of evidence of any marks or damage to the crane or the steel I-beam structure, are inconsistent with appellant's theory. The evidence suggests other possibilities equally as credible as that advanced by appellant. The finding of negligence by a jury would be a choice of possibilities based on a foundation of speculation and conjecture.

*d.* at 649.

*Wolf* is distinct from this case. In *Wolf,* there was

evidence "tend[ing] to negative" the inference plaintiff wished the jury to draw from the circumstantial evidence. In contrast, here defendants have provided no evidence inconsistent with the reasonable inference that the Sea Trucks seen driving past Timi Okoro's canoe caused her death or disappearance. Plaintiffs' circumstantial evidence is therefore sufficient to defeat summary judgment.

### IV. Negligence (Claims 14 and 15)

Plaintiffs' claim 14 alleges negligent infliction of emotional distress; claim 15 alleges negligence and negligence per se. Under California law, "[i]n order to prevail in an action based upon a defendant's alleged negligence, a plaintiff must demonstrate that the defendant owed the plaintiff a legal duty, that the defendant breached the duty, and that the breach was a proximate or legal cause of his or her injuries." "*Morris v. De La Torre,* 36 Cal.4th 260, 264, 30 Cal.Rptr.3d 173, 113 P.3d 1182 (Cal.Sup.Ct.2005). Here, plaintiffs' negligence claims proceed under two general theories: (1) that CNL is directly liable for its own negligent actions-its direct participation in the attacks and its hiring of the GSF; and (2) that CNL is vicariously liable for the negligent actions of the GSF.

### A. Duty

**\*25** Defendants' principal argument is that plaintiffs cannot establish that defendants owed plaintiffs any duty. In determining whether a defendant owed a plaintiff a duty, courts in California look at several factors.

These factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant'sconduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 21

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

*Id.* at 276, 30 Cal.Rptr.3d 173, 113 P.3d 1182 (quoting *Rowland v. Christian,* 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561 (Cal.Sup.Ct.1968)).

Defendants do not explicitly argue these factors, but instead focus on a largely policy-based argument that "the law imposes no duty to refrain from reporting crime or providing assistance to the law enforcement authorities."[FN6]Mot. at 16:20-21. Under California law, however, it appears that in certain circumstances, a defendant may have a duty to "refrain from reporting crime." As the Supreme Court of California explained in *Morris,* 36 Cal.4th at 277, 30 Cal.Rptr.3d 173, 113 P.3d 1182,"neither a business proprietor nor his or her employees have an absolute obligation to call 911 in the face of ongoing criminal conduct: in some situations, doing so actually might increase the danger to customers or invitees or might unreasonably place proprietors or their employees in danger."Thus the act of seeking help from, or providing help to, law enforcement, under circumstances where doing so " might increase the danger" to those to whom a duty is owed, might constitute negligence.

> FN6. Though defendants frame this argument as relating to whether they had a duty to plaintiffs, it relates also to the question of breach.

This conclusion, however, does not answer whether defendants had any duty towards plaintiffs. With respect to the Parabe protestors, defendants argue that they owed plaintiffs no duty "because [under Nigerian law] the occupier of premises owes no duty of care to trespassers save to refrain from deliberately or recklessly causing harm."Mot. at 15-16. Defendants' argument, however, stops there. They do not argue that plaintiffs have failed to present evidence that defendants "deliberately or recklessly" caused harm to plaintiffs. There is therefore a genuine issue as to whether defendants deliberately or recklessly caused harm to plaintiffs by seeking the assistance of, and providing assistance to, the GSF in relation to the Parabe incident.

Defendants also attack plaintiffs' allegation that

CNL negligently supervised and failed to train the GSF. *See* EAC ¶ 186. Defendants argue that plaintiffs cannot show that a private party has a legal obligation to supervise and train public law enforcement personnel. Defendants also argue that plaintiffs cannot show that CNL's alleged failure to adequately train or supervise the GSF proximately caused plaintiffs' injuries. In opposition, plaintiffs blend the supervision and training issues into their argument that defendants negligently hired and retained the GSF. In order for this theory to succeed, plaintiffs must establish that CNL had hiring and supervisory power over GSF. As discussed above, plaintiffs present evidence that the GSF were the equivalent of employees or private security contractors for CNL. CNL paid the GSF, housed them, supervised them, transported them, and had the authority to train them and remove particular individual soldiers from service. *See* PASOF ¶¶ 437-460, 475-503, 387-399; Docket 1417 at 5:15-6:25, 7:3-12:4.From this evidence, a jury could conclude that CNL had the power to hire, supervise, and train the GSF, and that CNL did so, or failed to do so, negligently. A jury could also conclude from this evidence, and all of the evidence related to the attacks, that CNL's hiring, and failure to properly train and supervise, the GSF, proximately caused the alleged injuries of the victims.

### B. Negligence per se

*26 Plaintiffs base their negligence per se theory on a provision of the Nigerian Civil Aviation Regulations which requires that all "weapons of war and munitions of war" be "[s]towed in the aircraft in a place which is inaccessible to passengers during flight; and ... unloaded ...." Teukolsky Decl., Ex. 36. In response, defendants contend, and the Court agrees, that the Nigerian Armed Forces Act exempts soldiers from the Civil Aviation Regulations.[FN7] Section 237 of that Act provides: "A member of the Armed Forces shall for the purposes of the Armed Forces be exempt from a provision of any enactment relating to the storage, possession or transmission of firearms, explosives, gun-powder or ammunition of war." *See* Babalakin Decl., Ex. 3. The Court therefore GRANTS defendants' motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 22

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

for summary judgment on plaintiffs' negligence per se theory.

> FN7. Defendants also complain that as evidence of the Regulations, plaintiffs have provided only an excerpt from the Pan African Airlines operating manual, rather than a copy of the actual Regulation. This argument is moot.

### C. Negligent Infliction of Emotional Distress (NIED)

Under California law, "there is no duty to avoid negligently causing emotional distress to another." *Potter v. Firestone Tire and Rubber Co.,* 6 Cal.4th 965, 984, 25 Cal.Rptr.2d 550, 863 P.2d 795 (Cal.Sup.Ct.1993)."[D]amages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff."*Id.* In other words, a negligent infliction of emotional distress ("NIED") claim is a negligence claim, where the breach of duty proximately causes emotional distress. "The tort is negligence, a cause of action in which a duty to the plaintiff is an essential element."*Id.*"[U]nless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty. Even then, with rare exceptions, a breach of the duty must threaten physical injury, not simply damage to property or financial interests."*Id. Potter* thus established two ways in which a plaintiff can establish NIED: (1) a "direct" claim, where the defendant assumes a duty to avoid causing emotional distress (such as in a psychiatrist-patient relationship); and (2) an "indirect" claim, where the defendant breaches some other duty, and that breach proximately causes emotional distress (such as a "bystander" case). Defendants here challenge plaintiffs' ability to proceed under either theory.

With respect to "direct" claims, the Court agrees with defendants that plaintiffs have not presented evidence that defendants owed plaintiffs a special duty toward their emotional condition. The Court

finds that plaintiffs, have, however, provided sufficient evidence to proceed under a bystander theory of NIED. To establish a claim for emotional distress caused by observing the negligently inflicted injury of a third person, plaintiffs must prove: (1) that plaintiffs are closely related to the victim; (2) that plaintiffs were present at the scene of the injury-producing event, at the time it occurred, and were then aware that it was causing injury to the victim (as opposed to learning of the accident from oothers after its occurrence); and (3) that as a result, plaintiffs have suffered serious emotional distress beyond that which would be experienced by a disinterested bystander. *See Thing v. LaChusa,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 771 P.2d 814 (1989).

**\*27** Defendants first argue that defendants owed no duty to the victims whose injuries were witnessed. As discussed above, this argument fails. Defendants also argue, generally, that "plaintiffs still cannot recover for witnessing the injury of someone other than their 'relatives residing in the same household, or parents, siblings, children or grandparents.' " Mot. at 23:20-22. Defendants' argument, however, stops there. Defendants do not identify which claims, of which plaintiffs, fail to meet this element. As such, defendants have not met their burden of production, "of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Service,* 809 F.2d at 630. Plaintiffs' NIED claim therefore survives.[FN8]

> FN8. In the concurrent Order regarding the EAC, the Court dismisses the Parabe plaintiffs' claims for NIED, IIED, civil conspiracy, and loss of consortium. As discussed above, the Court holds in that Order that the tort claims of John Ikenyan, Smart Itiemor, Anthony Lawuru, Henry Pabulogba, and Benson Edekou are time barred. Plaintiffs also concede that Ola Oyinbo does not assert an NIED claim. *See* Opp. at 23 n. 28.

### V. Intentional Infliction of Emotional Distress (IIED)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

Under California law, "the elements of the tort of intentional infliction of emotional distress [ ("IIED" ) ] are (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.... The defendant must have engaged in 'conduct intended to inflict injury or engaged in with the realization that injury will result.' " *Christensen v. Superior Court,* 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991) (*quoting Davidson v. City of Westminster,* 32 Cal.3d 197, 209-10, 185 Cal.Rptr. 252, 649 P.2d 894 (1982). "It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen,* 54 Cal.3d at 903, 2 Cal.Rptr.2d 79, 820 P.2d 181.

In order for conduct to be considered "extreme and outrageous," the "[c]onduct [ ] must be so extreme as to exceed all bounds of that usually tolerated in a civilized community."*Cervantez v. J.C. Penney Co.,* 24 Cal.3d 579, 593, 156 Cal.Rptr. 198, 595 P.2d 975 (Cal.Sup.Ct.1979). This standard sets a very high bar; it is "the California rule that 'it is not enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.' " *Pardi v. Kaiser Permanente Hosp., Inc.,* 389 F.3d 840, 852 (9th Cir.2004). This "rule is of course easy to state but only can be applied with certainty in light of the holdings in decided cases which have determined that the questioned conduct before them was or was not outrageous." *Soto v. Royal Globe Ins. Co.,* 184 Cal.App.3d 420, 229 Cal.Rptr. 192 (Cal.Ct.App.1986).

Defendants first argue that the conduct of CNL, alone, does not constitute "extreme and outrageous" conduct. Neither party cites any case to which they claim CNL's conduct is analogous.[FN9]Applying the plain language of the "extreme and outrageous"

rule, as described by the courts, the Court finds that plaintiffs have presented sufficient evidence for a reasonable jury to find that CNL's conduct " exceed[ed] all bounds of that usually tolerated in a civilized community."As discussed, plaintiffs present evidence that CNL provided the GSF with food, money, transportation, and supervision, all while knowing that the GSF were likely to engage in the use of excessive force against civilians. A civilized community does not tolerate actively helping others, even law enforcement officials, to perpetrate unnecessary violence against innocent civilians-and plaintiffs have presented sufficient evidence to allow a jury to find that this is what CNL did.

> FN9. In their Reply brief, defendants cite *Davidson v. City of Westminster,* 32 Cal.3d 197, 210, 185 Cal.Rptr. 252, 649 P.2d 894 (1982), in support of their argument that CNL's conduct was not extreme and outrageous. In *Davidson,* however, the court found there was no "extreme and outrageous" conduct because the defendants did not intend to harm the plaintiff. Here, as discussed below, there is evidence of intent. Furthermore, the defendants in *Davidson* were accused of merely failing to prevent a crime that was occurring; they were not accused, as here, of aiding in the commission of the crime.

**\*28** Defendants also argue that plaintiffs cannot establish the requisite intent for IIED liability. IIED liability attaches where the defendant intended to cause emotional distress, or "when the defendant is aware, but acts with reckless disregard, of the plaintiff and the probability that his or her conduct will cause severe emotional distress to that plaintiff. "*Christensen,* 54 Cal.3d at 905, 2 Cal.Rptr.2d 79, 820 P.2d 181. "It is enough that defendant 'devoted little or no thought' to the probable consequences of his conduct."*KOVR-TV, Inc. v. Superior Court,* 31 Cal.App.4th 1023, 1031-32, 37 Cal.Rptr.2d 431 (Cal.Ct.App.1995) (quoting case). Here, defendants submit the statements of CNL employees involved in the incidents, swearing that they did not intend for anyone to be injured. In opposition, plaintiffs

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 24

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

argue that they have presented sufficient evidence for a jury to find that CNL acted in "reckless disregard," or "devoted little or no thought to the probable consequences" of their conduct. The Court agrees with plaintiffs. As discussed, plaintiffs present evidence that CNL knew of the likelihood that the GSF would respond with unnecessary violence, and despite this knowledge, CNL provided active support to the GSF.

A reasonable jury could also find that the conduct of the GSF itself was "extreme and outrageous." Plaintiffs' claim therefore also survives based on secondary liability theories, as discussed above.

### VI. Loss of consortium

In light of the concurrently issued Order re: plaintiffs' Eighth Amended Complaint, this issue appears to be moot.

### VII. Survival Actions

#### A. The Irowarinuns (Nigerian law)

Defendants argue that under Nigerian law, because the actions of defendants caused Arolika Irowarinun's death, the damages recoverable for his death through the survival claims are limited to funeral expenses. Under the Administrations of Estates Law (AEL) of Ondo State, damages recoverable for the benefit of the decedent "shall not include any exemplary damages."Babalakin Decl., Ex. 84, § 15(2)(a). Furthermore, "where the death of that person has been caused by the act ... which gives rise to the cause of action," then damages "shall be calculated without reference to any loss or gain to his estate consequent on his death, except that the sum in respect of funeral expenses may be included."*Id.* § 15(2)(c). Both parties also cite Chapter 34 of *McGregor on Damages,* in which the author confirms that, with the exception of funeral expenses, in a survival action the estate cannot collect for "losses of the deceased which are still in the future at the time of his death .... " Babalakin Decl., Ex. 169 ¶ 1251.

However, although the estate cannot recover loss of prospective earnings, loss of prospective amenities of life, or loss of prospective expectation of life, the estate can collect for damages to the decedent accruing between the time of the injury and death. *See id.* ¶¶ 1251-1264, 37 Cal.Rptr.2d 431; Babalakin Decl., Ex. 84, § 15. Here, plaintiffs present evidence that Arolika Irowarinun was not immediately killed when the GSF shot him. An eyewitness, Damilohun Osupayojo, testified at deposition that he saw Irowarinun get shot, then saw him grasp the clothes on his chest, and fall. *See* Teukolskly Decl., Ex. 18 at 70:18-71:25, 72:12-17. In reply, defendants contend that Osupayojo testified that he did not actually see Irowarinun get shot, but only saw him grasp his clothes and fall. Osupayojo also testified that he did not immediately recognize the person who he saw grasp his clothes and fall. Instead, Osupayojo identified the person as Irowarinun only after Osupayojo emerged from his hiding place. *See* Filios 1/19/07 Decl., Ex. 205 at 589:12-22. The person Osupayojo saw grasp his clothes and fall, defendants contend, therefore could have been the other shooting victim, Joli, who is not a plaintiff. The credibility and weight deserved by Osupayojo's testimony are determinations the jury must make. Osupayojo's testimony that he saw Irowarinun get shot, saw him grasp his chest, and saw him fall, is sufficient to raise a triable issue as to whether Irowarinun suffered any pain before he died. The Court cannot therefore grant defendants' motion for summary judgment on the Irowarinun plaintiffs' request for pain and suffering damages.

#### B. Opia and Ikenyan survival claims

**\*29** Defendants first argue that plaintiffs present no evidence that Timi Okoro was injured or killed. As discussed above, there is sufficient circumstantial evidence of Timi Okoro's forced disappearance to support tort claims on her behalf. With respect to the other three individuals killed in the attacks, defendants argue that plaintiffs have no evidence that decedents did not die immediately from their wounds. As plaintiffs point out, however, there is sufficient evidence for a jury to conclude that all residents of Opia and Ikenyan, including decedents, were put in fear of battery, i.e., were assaulted, by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 25

**Slip Copy, 2007 WL 2349336 (N.D.Cal.)**
**(Cite as: Slip Copy)**

the GSF. Plaintiffs may therefore bring survival claims for assault on behalf of the Opia and Ikenyan decedents.

Defendants also argue that plaintiffs have no evidence that any of decedents' property was destroyed before they were shot and killed. The Court agrees. Plaintiffs present evidence that houses in the villages began to catch fire as a result of the helicopter attack, see Teukolsky Decl., Ex. 20 at 574:21-575:3, 578:1-14; Ex. 22 at 427:20-428:5; Ex. 23 at 291:2-6, 292:1-22, 294:17-295:8, but plaintiffs' evidence does not specifically establish that decedents' houses caught on fire before they hwere killed. Plaintiffs cannot therefore seek damages for lost property under their survival claims.

### VIII. Wrongful Death Claims

Defendants contend that plaintiffs' wrongful death claims fail because plaintiffs cannot show that CNL caused the deaths of decedents. As discussed above, plaintiffs have presented sufficient evidence to raise a triable issue whether CNL is liable both for its own negligence, and for the GSF's actions, which resulted in the deaths at issue. The Court therefore DENIES defendants' motion for summary judgment on plaintiffs' wrongful death claims.

### IX. Releases

Defendants' final argument is that, in exchange for 450,000 Naira, Sunday Johnbull Irowarinun and his family released CNL from all liability arising out of the Parabe incident. In support of this argument, defendants present a document entitled "Chevron Nigeria Limited: Receipt and Indemnity," which was signed by "Sunday Sebi Irowaninnu," on August 14, 1998. *See* Filios Decl ., Ex. 68. The document describes the Parabe incident, from CNL's perspective, then states:
As a result of discussions between representatives of Chevron, the Ondo State Government and the Ilaje Community and appeals for assistance in aid of the injured youths and the bereaved families of the youths who died, Chevron has agreed to make an ex

gratia donation to the families of the deceased.
....
It is understood that this payment is a goodwill gesture on the part of Chevron and that Chevron is not responsible for and has denied liability for the loss suffered by the affected families. We hereby UNDERTAKE on behalf of the Irowarinun family that no claim shall be made against Chevron as a result of this incident ....
Further, we hereby INDEMNIFY AND HOLD HARMLESS, Chevron, its contractors and their agents and servants from and against all proceedings, claims, expenses, liability and costs (including attorney's fees) arising out of the said incident as described above.

**\*30** *Id.*

There are numerous problems with defendants' contention that this document constitutes a valid and enforceable release of claims. First, it is apparent that Sunday Irowarinun does not speak or read English, and certainly not to the degree necessary to understand a complex legal document such as this one. *See* Teukolsky Decl., Ex. 26 at 135:15-137:2, 141:1-10, 143:1-13, 144:7-15, 150:1-15. Nobody translated the document for him before he signed it, and CNL did not tell him that it contained a release. *See id.* at 148:4-149:12, 263:2-10, 37 Cal.Rptr.2d 431. Mr. Irowarinun therefore could not have had the intent to release claims against CNL. Furthermore, there is evidence that Mr. Irowarinun signed the document under duress or undue influence. He signed the document at a meeting with Chevron, which he attended in order to request the return of his son Arolika's corpse. *See id.* at 122-134, 37 Cal.Rptr.2d 431. He testified that he was told at the meeting that if he did not accept the money from CNL, his son's body would not be returned to him and instead they would "just dump that corpse somewhere." *Id.* at 129:2-6, 37 Cal.Rptr.2d 431.

Defendants also argue that, in exchange for 15,000,000 Naira and rice, beans, blankets, and other relief materials, the "representatives of the Opia and Ikenyan villages released CNL from all liability arising from" the attacks on Opia and Ikenyan. Mot. at 20-22, citing Filios Decl., Ex. 73.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 26

Slip Copy, 2007 WL 2349336 (N.D.Cal.)
**(Cite as: Slip Copy)**

As with the Irowarinun release, the Opia and Ikenyan release suffers from several serious questions as to its validity and enforceability. First, though the agreement is purportedly "signed on behalf of Opia and Ikenyan communities" by six community leaders, defendants present no definitive evidence that the signers of the document had the authority to bind all the members of the community. In response, defendants argue that the community members "ratified the releases by accepting their share of the 15 million Naira," Reply at 18:20-21. However, defendants provide no legal authority for the proposition that by accepting the proceeds of a purported settlement agreement, the villagers agreed to a settlement agreement which they did not sign.

Secondly, the Opia and Ikenyan release is only an agreement by the "Communities" to release Chevron from liability. *See id.*It says nothing of the claims of individual community members. The document could thus be interpreted as analogous to an agreement by the City of Oakland to release its claims against a corporation. Such an agreement would not constitute a release of any individual claims brought by residents of the Oakland community.

Additionally, there is some indication that the Opia and Ikenyan release was signed under duress or undue influence. As the supplies provided along with the money (blankets, pillows, and mattresses) indicate, at the time the document was signed, the communities and their members may have been literally fighting for survival. *See* Teukolsky Decl., Ex. 22 at 538:11-21, 540:1-6; Ex. 23 at 425:1-10; Ex. 24 at 459:7-14, 497:4-12.

**\*31** Regardless of whether Nigerian or California law applies to analyzing the validity of the agreements, there are serious questions as to their enforceability. Summary judgment, based on the two "releases," is therefore inappropriate.

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART

defendants' motion for summary judgment on plaintiffs' claims 10 through 17 of the Eighth Amended Complaint, as discussed above.

**IT IS SO ORDERED.**

N.D.Cal.,2007.
Bowoto v. Chevron Corp.
Slip Copy, 2007 WL 2349336 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 5005 00966 341%

# A GUIDE TO THE ZIMBABWEAN LAW OF DELICT

Third Edition, 2001

by

G Feltoe



*A Guide to the Zimbabwean Law of Delict*

when cattle or other livestock wander on the roads and persons driving on the roads are in collision with them. The duties of the driver to guard against hitting these animals and the duties of the owners of the livestock or persons in control of them (such as herders) are set out in the cases listed in the cases section under this heading.

# Delicts arising out of arrest, imprisonment and legal proceedings

## Unlawful arrest and imprisonment (false imprisonment)
This delict is committed when the defendant, without lawful justification, restrains the liberty of the plaintiff by arresting or imprisoning him.

In our law it would seem that for this action it has to be proved only that the arrest or imprisonment was illegal and not that there was intention to act illegally or there was intention to cause harm to the plaintiff. Thus, the view of McKerron at p 160 that inevitable mistake is no defence would seem to be correct in our law. On the other hand, it is argued in Lee & Honore p 286 that this action falls under the *actio injuriarum*, but such *animus* is presumed. In our law, as opposed to South African law, *animus injuriarum* is still a totally fictional requirement and therefore intention is not a requirement for this delict.

Force is not a pre-requisite for this delict and neither is pecuniary loss. Damages can be awarded for affront or humiliation stemming from the arrest and imprisonment of the plaintiff.

Obviously, if the arrest or detention is legal, such as arrest and detention under the Criminal Procedure and Evidence Act [*Chapter 9:08*] or detention under the Emergency Powers Regulations, then this action cannot be brought.

This action is usually brought against the Ministry of Home Affairs arising out of illegal arrests and detention by the police.

For further commentary on this delict, see 1987 Vol 5 Z L Rev 26 at 30-38.

*A Guide to the Zimbabwean Law of Delict*

## Abuse of legal proceedings

This delict is committed when a defendant maliciously and without reasonable and probable cause brings legal proceedings against another. Every citizen has a right to use legal proceedings legitimately for the purpose of upholding and protecting his rights. He does not, however, have the right to abuse the legal process for the purpose, not of upholding and furthering his rights, but instead solely for the purpose of causing harm to the plaintiff because he has malice towards him. Thus, it constitutes a delict if the defendant, actuated by malice and with no reasonable and probable grounds for doing so does any of the following:

- procures the arrest or detention of the plaintiff by the proper authorities (malicious arrest or detention); or

- institutes against the plaintiff unsuccessful civil or criminal proceedings resulting in injury to reputation or pecuniary loss (malicious prosecution); or

- issues execution against the plaintiff's property, which writ has been set aside (malicious execution).

Whereas with unlawful arrest or imprisonment, it is normally the police which is sued for the wrongful actions of their employees (servants), with abuse of legal proceedings the defendant is a private citizen who has used the agency of the police or the courts to cause harm to the plaintiff.

For further commentary on this delict, see 1987 Vol. 5 *Z.L. Rev* 26 at 38-40.

## Assault

This delict is committed when a person unlawfully and intentionally applies force to the person of another or has threatened to do so in a manner that inspires a reasonable fear of immediate danger in the mind of the person threatened.

Damages are awarded under this action both for patrimonial loss (e.g. hospital expenses) and for injury to feelings (e.g. humiliation and degradation). The main defences that are raised in this action are:

The harm was inflicted when the defendant was acting under some



Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

In re Motel 6 Securities Litigation
S.D.N.Y.,2000.

United States District Court, S.D. New York.
In re MOTEL 6 SECURITIES LITIGATION
**No. 93 Civ. 2183 JFK.**

March 28, 2000.

Nagler & Associates, Los Angeles, California, Lawrence H. Nagler, Robert M. Zabb, for Third Party Plaintiff, of counsel.
Gartenberg Jaffe Gelfand & Stein LLP, Los Angeles, California, Edward Gartenberg, for Third Party Defendant, of counsel.

*OPINION and ORDER*
KEENAN, J.
**\*1** Before the Court is Defendant and Third Party Defendant Jeffrey Sanker's motion to dismiss all third party claims asserted by Defendant and Third Party Plaintiff Jonathon S. Hirsh against Sanker, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim. For the reasons discussed below, the motion to dismiss is denied in its entirety.

*Background*

The factual background of the events leading up to this lawsuit have been set forth in numerous opinions of this Court. *See, e.g.,In re Motel 6 Sec. Litig.,* No. 93 Civ. 2183, 1997 WL 154011 (S.D.N.Y. April 2, 1997); *In re Motel 6 Sec. Litig.,* No. 93 Civ. 2183, 1995 WL 431326 (S.D.N.Y. July 20, 1995). As a result, the Court will review only the facts specifically relevant to the instant motion to dismiss. In sum, the Plaintiffs in this class action allege a nationwide insider trading scheme by persons who possessed material, nonpublic information concerning the proposed acquisition of Motel 6, L.P., a Dallas-based national chain of

owner-operated economy motels, by Accor, S.A. (" Accor"), a French-based company. *SeeIn re Motel 6 Sec. Litig.,* 1997 WL 154011,\*1. Plaintiffs were the holders of call options on Motel 6 securities. Plaintiffs assert that Defendants were part of a conspiracy to trade on highly sensitive inside information about tender offer negotiations occurring in New York between Motel 6's largest shareholder, Kohlberg Kravis Roberts & Company (" KKR"), and Accor. Defendant Hugh Thrasher (" Thrasher") was executive vice-president of Motel 6 in charge of communication at the time of the tender offer negotiations. Thrasher allegedly tipped Carl V. Harris ("Harris") about the tender offer negotiations in May 1990. Harris then allegedly told nine others, including Defendant Jeffrey Sanker. Sanker allegedly tipped Defendant Jonathan Hirsh, who then purchased Motel 6 call options and realized illegal profits from these transactions in his personal securities accounts. Hirsh also allegedly entered into a partnership with Defendant Lee Rosenblatt to trade Motel 6 securities through Rosenblatt's securities account and split the illegal profits. Hirsh is also alleged to have tipped Defendant Roger Odwak. *See id.*

The Third Party Complaint, titled "Cross-claims of Defendant Jonathon S. Hirsh," alleges the following facts, which the Court presumes to be true for purposes of this motion. On or about May 1990, Sanker told Hirsh that Sanker's roommate, Carl Harris, had informed Sanker that Harris's father thought Motel 6 was going to be sold. *See* Third Party Compl. ¶ 11. Sanker told Hirsh that Harris was a "trust fund baby" who received checks from his trust, and was "hocking" his assets to purchase Motel 6 stock. Sanker advised Hirsh to purchase Motel 6 stock and continued to mention Motel 6 in conversations with Hirsh between May and July of 1990. *See id.*Hirsh alleges that he told his broker, Roger K. Odwak, then employed by Bear Stearns & Co., Inc., the information he learned from Sanker concerning Motel 6. Odwak allegedly performed " due diligence"and informed Hirsh that he could

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

legally proceed to trade in interests in Motel 6. *See id.* ¶ 7. Hirsh purchased Motel 6 options in his own account on June 8, July 6, and July 13, 1990 and purchases were made in Lee Rosenblatt's accounts on June 19, 21, 26, and July 5, and 13. *See id.* ¶ 9.

**\*2** Hirsh claims that Sanker failed to disclose material facts in his possession to Hirsh, bearing upon whether Sanker had inside information about Motel 6, and that Hirsh would not have purchased Motel 6 options, either directly or through Lee Rosenblatt, had he known those material facts. Hirsh claims that Sanker failed to tell him that Carl Harris's source for information about Motel 6 was a member of the board of directors of Motel 6's parent company and/or Hugh Thrasher, which Harris had allegedly told Sanker. *See id.* ¶ 12. Hirsh claims that Sanker also failed to disclose that Harris was associating with individuals in connection with a scheme to trade Motel 6 securities based on inside information although Sanker allegedly overheard at least one conversation between those parties to that effect. *See id.* Hirsh further alleges that, assuming that Sanker knew that Harris obtained the inside information regarding Motel 6 from an insider in breach of the insider's fiduciary duty to the company, Sanker also failed to disclose that fact to Hirsh. *See id.* Hirsh alleges that at the time of the May 1990 conversation between Hirsh and Sanker, and at all times between May 1990 and July 12, 1990, Sanker knew of the above information and omitted to inform Hirsh of the same. Hirsh alleges that Sanker omitted to inform Hirsh of this information in order to induce Hirsh to trade, so that Sanker could share in Hirsh's trading profits. As a result, Hirsh claims that Sanker knew or recklessly disregarded that what he told Hirsh about Motel 6 was materially untrue and misleading, that Sanker knew of or was reckless in not knowing of his duty to disclose the omitted facts, and that Sanker intentionally or recklessly concealed the undisclosed information.

Based on the above allegations, Hirsh asserts four claims against Sanker. Hirsh's first claim asserts that Sanker violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), SEC Rule 10b-5, 17 C.F .R. §

240.10b-5, promulgated thereunder, Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and SEC Rule 14e-3, 17 C.F.R. § 240.14e-3, promulgated thereunder. Second, Hirsh asserts a claim for contribution under Section 10(b) and Rule 10b-5 against Sanker if Hirsh is found liable for insider trading. Third, Hirsh asserts a claim for contribution under Section 14(e) and SEC Rule 14e-3 if Hirsh is found liable for insider trading. Hirsh's fourth claim is for common law fraud, alleging that Sanker's statements between May 1990 and July 1990 were materially false and misleading, and that Hirsh relied on those statements by purchasing Motel 6 options. Hirsh seeks compensatory and punitive damages.

Subject matter jurisdiction is premised upon a federal question, 28 U.S.C. § 1331, and principles of supplemental jurisdiction, 28 U.S.C. § 1367(a). Both Hirsh and Sanker are residents of California.

Sanker now moves to dismiss all claims asserted against him by Hirsh for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). Sanker argues that Hirsh's claims for contribution are barred because Hirsh fails to allege that he and Sanker are joint tortfeasors. Sanker next argues that all of Hirsh's claims must be dismissed under the doctrine of *in pari delicto.* Sanker additionally contends that Hirsh's claim for attorneys' fees and costs are barred by the "American Rule." Finally, Sanker argues that Hirsh's first and fourth claims fail to plead fraud with particularity, as required by Fed.R.Civ.P. 9(b).

*Discussion*

Standard of Review Under Rule 12(b)(6)

**\*3** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) should be granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)). The factual allegations set forth in the complaint must be accepted as true, *see Zinermon v. Burch,* 494 U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

113, 118, 110 S.Ct. 975, 979 (1990), and the court must draw all reasonable inferences in favor of plaintiff. See*Thomas v. City of New York,* 143 F.3d 31, 36 (2d Cir.1998). The issue on a motion to dismiss "is not whether ... plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."*Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citation omitted). Nevertheless, the complaint must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory. See*Connolly v. Havens,* 763 F.Supp. 6, 9 (S.D.N.Y.1991).

### A. Claim for Contribution

Sanker claims that Hirsh's claims for contribution are barred under *Fromer v. Yogel,* 50 F.Supp.2d 227 (S.D.N.Y.1999), because Hirsh fails to allege that Hirsh knowingly committed fraud or that he and Sanker are joint tortfeasors, which Sanker argues is necessary in order for Hirsh to assert a claim for contribution. "Contribution provides that one of two or more joint wrongdoers should not be required to pay more than its share of a common burden ."*Fromer,* 50 F.Supp.2d at 234. In finding that an implied right to contribution exists under § 10(b), the Supreme Court stated that "parties against whom contribution is sought are, by definition, persons or entities alleged to have violated existing securities laws and who share joint liability for that wrong under a remedial scheme established by the federal courts."*Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 292, 113 S.Ct. 2085, 124 L.E.2d 194 (1993). Accordingly, contribution is allowed only among " joint tortfeasors" under federal securities laws. *See Fromer,* 50 F.Supp.2d at 235;*Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* No. 92 Civ. 6879, 1998 WL 647167,[*]3 (S.D.N.Y. Sept. 22, 1998)."A third-party plaintiff seeking contribution for liability under the federal securities laws must set forth sufficient allegations in the third-party complaint to demonstrate that the third-party defendant itself violated the federal securities laws."*See id.* at [*]2. While contribution exists only between joint tort feasors, a third-party plaintiff may plead in the alternative as permitted by the Federal Rules of

Civil Procedure. *SeeEpstein v. Haas Sec. Corp.,* 731 F.Supp. 1166, 1186-87 (S.D.N.Y.1990). Thus, third-party plaintiffs "need not concede their liability to the plaintiffs in order to assert a claim for contribution against a third-party defendant or cross-claim defendant. It is enough that third-party plaintiffs assert that if they are adjudged liable to plaintiffs, then they and third-party defendants are joint tortfeasors."*Seeid.* at 1187.

**[*]4** In *Fromer,* plaintiffs brought suit against parties with whom they had been co-defendants in a prior action seeking reimbursement of money the plaintiffs had paid to settle the prior action. The court dismissed the plaintiffs' claims for contribution because the plaintiffs refused to concede that they were joint tortfeasors with the defendants. *See*50 F.Supp.2d at 235. *Fromer* reached this result, however, because of the settlement agreement in the case. As the *Fromer* court explained:

While the *Epstein* court did not require a concession of liability at the pleading stage, it did require that to prevail on the claim, defendant (third-party plaintiff) must be "found" liable or concede its own liability.... Because the underlying action was pending, an issue remained as to whether each of the parties would be found liable. Here, a judicial finding of liability is precluded as the parties have settled the [earlier] action and the statute of limitations on related actions has run. A finding of liability here can only occur through an admission.

*Fromer,* 50 F.Supp.2d at 235-36. Thus, unlike the case presently before this Court, the underlying action in *Fromer* had already been resolved and the third party plaintiffs had not conceded liability in the settlement agreement.

In the present case, Hirsh denies any liability for insider trading under § 10(b) and Rule 10b-5 in the Third Party Complaint. However, the Third Party Complaint goes on to allege that "[n]evertheless, based upon Sanker's material misrepresentations and omissions inducing Hirsh to purchase Motel 6 options, Sanker shares in the responsibility of Hirsh, if any responsibility is found, for any such insider trading."*See* Third Party Compl. ¶¶ 19, 22. As a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

result, the Court concludes that Hirsh is not barred from asserting his claims for contribution at the present time. Although Hirsh does not allege that he and Sanker are joint tortfeasors in the Third Party Complaint, he does allege that Sanker violated the federal securities laws and further alleges that if Hirsh is found liable to Plaintiffs for insider trading, Sanker shares in that liability. Pursuant to *Epstein,* I find that this is sufficient to survive Sanker's motion to dismiss.

### B. The Doctrine of *In Pari Delicto*

Sanker next argues that all of Hirsh's third party claims should be barred under the doctrine of *in pari delicto.*

The equitable defense of *in pari delicto,* which literally means "in equal fault," is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct. Traditionally, the defense was limited to situations where the plaintiff bore "at least substantially equal responsibility for his injury" and where the parties' culpability arose out of the same illegal act.

*Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 2070, 100 L .E.2d 658 (1988) (citations omitted). In *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), the U.S. Supreme Court addressed the scope of the *in pari delicto* defense in the context of a § 10(b) and Rule 10b-5 action. In *Bateman Eichler,* securities investors brought suit alleging that the broker-dealer and corporate insider defendants had fraudulently induced investors to purchase securities by misrepresenting that they were conveying material nonpublic information about the issuer. The district court had dismissed the complaint for failure to state a claim reasoning that the plaintiffs had traded on inside information in violation of Rule 10b-5 and that they were *in pari delicto* with the defendants and therefore barred from recovery. *See id.* at 304; 105 S.Ct. at 2625. The Supreme Court reversed. The *Bateman Eichler* Court held that the *in pari delicto* defense was available to bar an action on the grounds of the plaintiff's own culpability "only where (1) as a direct result of his own actions, the plaintiff bears at

least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public."*See id.* at 310-11, 105 S.Ct. at 2629. The Supreme Court noted that it was inappropriate to resolve the question of the parties' fault solely on the basis of the allegations in the complaint, *see*472 U.S. at 311 n. 21;105 S.Ct. at 2629 n. 21, but indicated that an investor, or tippee, who engages in insider trading may not be as blameworthy as a corporate insider, or tipper, who discloses the information. *Seeid.* at 312; 105 S.Ct. at 2630. The *Bateman Eichler* court also found that allowing the *in pari delicto* defense in such cases would undermine the important goals of effectively prosecuting false tipping and deterring insider trading by denying any incentive to a defrauded tippee to bring suit against the defrauding tipper. The Court "therefore conclude[d] that in tipper-tippee situations such as the one before us the factors above preclude recognition of the *in pari delicto* defense."*Seeid.* at 315-17, 105 S.Ct. at 2631-32.

**\*5** Hirsh argues that *Bateman Eichler* generally voids an *in pari delicto* defense for tippers such as Sanker, finding that tippers are usually more culpable than tippees. The Court disagrees. As Sanker correctly points out, the tippers in *Bateman Eichler* were insider security professionals-the corporate president and a securities broker. The Supreme Court found that significant:

We agree that the typically voluntary nature of an investor's decision impermissibly to trade on an inside tip renders the investor more blameworthy than someone who is party to a contract solely by virtue of another's overweening bargaining power. We disagree, however, that an investor who engages in such trading is necessarily as blameworthy as a corporate insider or broker-dealer who discloses the information for personal gain. Notwithstanding the broad reach of § 10(b) and Rule 10b-5, there are important distinctions between the relative culpabilities of tipper, securities professionals, and tippees in these circumstances.

*Bateman Eichler,* 472 U.S. at 312-13, 105 S.Ct. at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

2630. In the present case, however, Sanker is not alleged to have been a corporate insider or a security professional. Rather, Sanker allegedly received a tip from another individual, Harris, who was not a corporate insider, which Sanker then allegedly passed on to Hirsh. In addition, the Court notes that Hirsh is also alleged to have been a tipper to other Defendants in this action. Nonetheless, the Court finds that at this stage in the litigation it cannot dismiss Hirsh's claims on the grounds of *in pari delicto.*The Court must accept all the facts set forth in the Third Party Complaint as true and cannot make any determinations of fault based solely on the allegations in the Third Party Complaint. Hirsh alleges that Sanker failed to disclose that his source for information regarding Motel 6 was a corporate insider or that Harris was involved in a scheme to trade Motel 6 securities based on inside information. Hirsh further alleges that Sanker intentionally did not disclose this information in order to induce Hirsh to trade so Sanker could share in Hirsh's trading profits. As a result, the Court must reject Sanker's motion to dismiss all of Hirsh's third party claims pursuant to the doctrine of *in pari delicto.*

### C. Hirsh's Claim for Attorneys' Fees

Hirsh seeks to recover attorneys' fees and costs as an element of damages under his claim for common law fraud. Sanker argues that Hirsh cannot recover attorneys' fees pursuant to the "American Rule," the general rule that attorneys' fees are incidents of litigation and that a prevailing party may not collect them from the loser unless an award is authorized by agreement between the parties, statute or court rule. *See Hooper Assoc. v. AGS Computers,* 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 366, 548 N.E.2d 903 (1989); *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.E.2d 141 (1975). Hirsh argues that California law should govern this claim and that, under California law, attorneys' fees are recoverable.

**\*6** Although it appears that under either New York or California law the American Rule would preclude recovery of attorneys' fees, *see Hooper Assoc. v. AGS Computers,* 74 N.Y.2d at 491, 549

N.Y.S.2d at 366;Cal. Civ. Proc. § 1021 (West 2000); *Schneider v. Friedman, Collard, Poswall & Virga,* 232 Cal.App.3d 1276, (Cal.Ct.App.1991) (noting that California follows the American Rule, which generally precludes the award of attorneys' fees to a successful party), the Court need not decide this issue at the present time. Rather, where a plaintiff has "sought relief to which he was not entitled ... [he] should be afforded the opportunity to prove his claim; if successful, his recovery should be limited to the proper amount."*Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 794 (2d Cir.1986) (citing *Rosenwald v. Goldfein,* 3 A.D.2d 206, 209-10, 159 N.Y.S.2d 333, 337 (1st Dep't 1957)). Thus, the Court concludes that it is premature to consider Sanker's claim that Hirsh cannot recover one element of his claimed damages, attorneys' fees, on this motion to dismiss.

### D. Fraud

Sanker additionally argues that Hirsh's claims for fraud must be dismissed because they are not pled with the specificity required by Rule 9(b). Hirsh must satisfy the enhanced pleading requirements of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. §§ 78u-4(b)(1), (2) (1995). Rule 9(b) provides: "In all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity."[FN1]Although Rule 9(b) also provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the Second Circuit has established that plaintiffs must nonetheless "allege facts that give rise to a strong inference of fraudulent intent."*See Chill v. General Elec. Co.,* 101 F.3d 263, 266 (2d Cir.1996) (quoting *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995))."To state a claim with the required particularity, a complaint 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ' *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito,* 47 F.3d at 51). A complaint may satisfy the necessary strong inference of fraudulent intent either (a) by alleging

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 6

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *See Stevelman,* 174 F.3d at 84;*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994).

> FN1. The PSLRA provides that where the plaintiff alleges that a defendant made a misstatement or omission of material fact, " the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."15 U.S.C. § 78u-4(b)(1).

In the Third Party Complaint, Hirsh alleges that Sanker failed to tell him that Carl Harris's source for information about Motel 6 was a member of the board of directors of Motel 6's parent company and/or Hugh Thrasher, which Harris had allegedly told Sanker. Hirsh also claims that Sanker failed to disclose that Harris was involved in a scheme to trade Motel 6 securities based on inside information. Hirsh further alleges that, assuming that Sanker knew that Harris obtained the inside information regarding Motel 6 from an insider in breach of the insider's fiduciary duty to the company, Sanker also failed to disclose that fact to Hirsh. Hirsh claims that at the time of the May 1990 conversation between Hirsh and Sanker, and at all times between May 1990 and July 12, 1990, Sanker knew of the above information and omitted to inform Hirsh of the same. Hirsh contends that Sanker omitted to inform Hirsh of this information in order to induce Hirsh to trade, so that Sanker could share in Hirsh's trading profits. Thus, the Third Party Complaint sets out who made the alleged fraudulent statements, when the statements were made and why they were fraudulent. The Third Party Complaint also alleges facts that constitute evidence of conscious misbehavior in satisfaction of the fraudulent intent requirement-that Sanker misled Hirsh in order to induce him to trade

so that Sanker could share in his trading profits. The Court concludes that the above allegations are sufficient to satisfy Rule 9(b)'s enhanced pleading requirements.

### E. Request to Amend the Third Party Complaint

**\*7** Finally, Hirsh seeks leave to amend the Third Party Complaint to include a claim for indemnification. Hirsh alleges that facts alleged in the Third Party Complaint already include a claim for indemnity. Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires."Under the liberal rules of federal pleading, the label of a claim is not dispositive. Rather, "[t]he issue is whether a plaintiff has alleged sufficient facts to state a claim.... [A] plaintiff should be given some latitude so that a valid claim is not prejudiced by counsel who puts the wrong label on a claim."*Aquilone v. Republic National Bank of New York,* No. 98 Civ. 5451(SAS), 1998 WL 872425,*5 (S.D.N.Y. Dec. 15, 1998)."Indemnification is the flip side of contribution. Whereas contribution involves claims among joint tortfeasors, indemnification may arise when one party claims not to be a tortfeasor.... Indemnification shifts the cost of tortious conduct to another party."*Fromer,* 50 F.Supp.2d at 237-38. Indemnification is not available where a party has knowingly violated the federal securities laws. " [I]ndemnity claims under the Exchange Act may proceed where the wrong committed by those seeking indemnity is not greater than ordinary negligence."*See*id. at 238 (citing *Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1288 (2d Cir.1969)). In the Third Party Complaint, Hirsh alleges that he did not himself violate the federal securities laws. The Court concludes that, based on the facts alleged in the Third Party Complaint, Hirsh may amend the pleading to include a claim for indemnity.

### Conclusion

For the reasons discussed above, Sanker's motion to dismiss is denied in its entirety. Hirsh is granted leave to amend his Third Party Complaint in order

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 322782 (S.D.N.Y.), Fed. Sec. L. Rep. P 90,927
**(Cite as: Not Reported in F.Supp.2d)**

to include a claim for indemnification. The
amended pleading shall be filed no later than April
21, 2000.

SO ORDERED.

S.D.N.Y.,2000.
In re Motel 6 Securities Litigation
Not Reported in F.Supp.2d, 2000 WL 322782
(S.D.N.Y.), Fed. Sec. L. Rep. P 90,927

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,                            )
                                             )
                 Plaintiff,                  )
                                             )
         v.                                  )     C.A. No. 06-00275 GMS
                                             )
BRETT J. CORMICK, ELAN SUISSE                )
INTERNATIONAL HOLDINGS (USA)                 )
LLC,                                         )
                                             )
                 Defendants.                 )

## DECLARATION OF DR. BRETT J. CORMICK

1.      My name is Dr. Brett J. Cormick. I make this declaration in support of my brief in

opposition to Mr. Christ's Motion for Judgment on the Pleadings.

2.      Mr. Christ attaches to his brief an affidavit dated September 6, 2006, and claims

that he cannot have been the cause of my arrest because that affidavit post-dates my arrest.

3.      Mr. Christ's September 6, 2006 affidavit is not the document I saw when I was

under arrest. I saw a different document. As alleged in paragraph 102 of my counterclaim, I was

informed of Mr. Christ's statement to the police while I was incarcerated.  Moreover, as I stated

in paragraph 115 of my counterclaim, I heard Christ's name mentioned during one of the torture

sessions.

4.      The document originating from Christ that I saw on the 23rd of August when

arrested was reviewed by amongst others, myself, my attorney Mr Bruce Mujeyi, the three

arresting officers and the Civil Division of the Office of the Attorney General. In this document

Christ falsely claimed without any substance or facts, that I was an international fugitive fleeing

justice.

5.      Additionally his lawyer in Zimbabwe who took the opportunity to attempt to improperly interrogate me with the police, gloatingly confirmed to me in front of the police, other prisoners and my attorney, that he was actively working directly for Christ on my prosecution in a confrontation on the morning of the 24th of August, being my second day of incarceration. Christ's lawyer then produced a handwritten piece of paper in front of all of the above, with a list of names that he stated that Christ had specifically provided him of people that were willing to come forward to testify against me.

6.      We have asked Mr. Christ to produce all communications to the Zimbabwe police both directly and indirectly, personally or through agents or representatives. He has only produced the affidavit attached to his brief. I believe strongly that he is improperly withholding other documents.

7.      My lawyer has not yet taken Mr. Christ's deposition because we are waiting for full production of documents and answers to interrogatories, as required by the Court in a recent discovery conference. If the Court allows in Mr. Christ's affidavit and cover sheet, and other documents attached to his brief that are beyond the four corners of the Counterclaim, then I request that, pursuant to Federal Rule of Civil Procedure 56(f), the Court defer resolution of this motion until such time as discovery is completed to address the unanswered questions posed by the introduction of such documents.

8.      I declare, under penalty of perjury under the laws of the United States and of Delaware, pursuant to 28 U.S.C. § 1748, that the foregoing is true and correct. Executed on this 26th day of October, 2007.



_____
Dr. Brett J. Cormick



Not Reported in F.Supp.                                              Page 1

Not Reported in F.Supp., 1986 WL 2621 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Zimring v. Halley
N.D.Ill.,1986.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Marda ZIMRING, Plaintiff,
v.
Officer HALLEY, of the City of Highland Park,
Department of Police, Defendant.
**No. 85 C 7094.**

Feb. 20, 1986.

MEMORANDUM OPINION AND ORDER
WILLIAM T. HART, District Judge.
**\*1** Plaintiff Marda Zimring brings this § 1983
action against defendant Highland Park police
officer Halley, alleging that the officer used
excessive force before, during, and after he arrested
her. Actual, compensatory, and punitive damages
are sought. Defendant has moved to dismiss Count
VI of the amended complaint for failure to state a
claim upon which relief can be granted.
Fed.R.Civ.P. 12(b)(6).

FACTS

Plaintiff alleged that she was lawfully in the
premises located at 54 Lakeview Terrace in
Highland Park, Illinois, on August 12, 1983. She
alleges that defendant entered those premises
without a search warrant and beat her without cause.
Defendant allegedly then arrested plaintiff and
transported her to the Highland Park police station,
whereupon exiting the officer's vehicle, defendant
began dragging the plaintiff into the police station,
causing her further injury.

The complaint further avers that the State's Attorney
of Lake County dismissed all charges against
plaintiff on his own motion. Plaintiff alleges that

these assaults constituted an excessive use of force
by the defendant and as such violated her rights
under 42 U.S.C. § 1983 to be free from such
excessive use of force.

In Count VI, plaintiff alleges that defendant
intentionally inflicted emotional distress on her.
She alleged that defendant's conduct went beyond
all possible bounds of human decency and that
defendant knew or should have known that such
conduct would inflict emotional distress on plaintiff.

DISCUSSION

When a motion to dismiss is filed under Rule
12(b)(6) of the Federal Rules of Civil Procedure,
the complaint is to be liberally construed, all factual
allegations are deemed to be true, and doubts are to
be resolved in favor of the pleader. Dismissal is
not favored unless it appears that in no instance
would the pleader be able to prove her claim is
actionable. *See Brandt v. Grounds,* 687 F.2d 895,
896 n. 1 (7th Cir.1982); *see also Parr v. Great
Lakes Shipping Co.,* 484 F.2d 767 (7th Cir.1973).

The elements of a cause of action for intentional
infliction of emotional distress are: (1) that
defendant's conduct was extreme and outrageous
and (2) that the conduct was intended to cause and
(3) did cause (4) severe emotional distress on the
part of plaintiff. *See Sherman v. Field Clinic,* 74
Ill.App.3d 21, 27, 392 N.E.2d 154, 159 (1st
Dist.1979).

Defendant argues that the complaint fails to state a
cause of action for two reasons. First, he claims
that conduct giving rise to a cause of action for
intentional infliction of emotional distress must be
so extreme and so outrageous as to go beyond the
bounds of human decency and argues that plaintiff
has not alleged facts that demonstrate such extreme
and outrageous conduct. Second, defendant
contends that plaintiff's complaint is defective

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2

Not Reported in F.Supp., 1986 WL 2621 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

because it fails to state the mental element of the tort.

Defendant asserts that the conduct involved here is not so extreme and so outrageous as to give rise to a cause of action for intentional infliction of emotional distress. Whether conduct is extreme and outrageous depends upon the specific facts in each case. *Farnor v. Irmco Corp.,* 73 Ill.App.3d 851, 855, 392 N.E.2d 591, 594 (1979). Plaintiff alleges that defendant entered her home without probable cause, beat her, arrested her, and then dragged her into the police station. Such conduct is arguably beyond all bounds of human decency and therefore constitutes a question of fact to be decided at trial.

**\*2** Defendant further argues that defendant's actions must involve repeated incidents of the alleged outrageous conduct and that defendant's conduct is therefore not actionable as it arises out of a single incident. There are, however, cases in which a single incident has been held to constitute extreme and outrageous conduct. In *Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157 (1961), for example, defendant threatened plaintiff, claiming he would murder plaintiff's husband. Defendant then carried out the threat. The court held that such behavior was extreme and outrageous.[FN1]

Defendant's second challenge to the complaint refers to the mental element of the tort and avers that plaintiff has failed to properly allege intent. Defendant asserts that plaintiff has not made statements of fact in her complaint but only conclusions. Thus, according to defendant, the complaint is insufficient as a matter of law.

The Federal Rules of Civil Procedure govern the rules of pleading in federal court as to state claims. *See, e.g., Paul v. Premier Electric Construction Co.,* 581 F.Supp. 721, 724 (N.D.Ill.1984). Federal Rule of Civil Procedure 9(b) provides that intent may be averred generally. Therefore plaintiff's allegation that defendant "knew or should have known that his aforementioned conduct would inflict emotional distress on plaintiff," is sufficient for purposes of pleading. *See, e.g., Hokama v. E.F. Hutton,* 566 F.Supp. 636, 645 (C.D.Cal.1983) (conclusions are

acceptable when alleging intent); *Haynes v. Anderson & Strudwick, Inc.,* 508 F.Supp. 1303, 1316-17 (E.D.Va.1981) (a deficiency could be cured by a single terse statement that defendant performed an act with intent to deceive, manipulate, or defraud).

IT IS THEREFORE ORDERED that defendant's motion to dismiss Count VI of the amended complaint is denied.

> FN1 Furthermore, the outrageous character of a person's conduct "may arise from an abuse of a position or a relation with another which gives the actor actual or apparent authority over the other or power to affect his interests." *Public Finance Corporation v. Davis,* 66 Ill.2d 85, 89-90, 360 N.E.2d 765, 767 (1976). A police officer holds such a position in relation to a private citizen.

N.D.Ill.,1986.
Zimring v. Halley
Not Reported in F.Supp., 1986 WL 2621 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# THE LAW OF

# DEFAMATION

# IN SOUTH AFRICA

## JONATHAN M BURCHELL

BA LLB (Natal) LLB Diploma in Comparative Legal Studies (Cantab)
PhD (Witwatersrand)

*Advocate of the Supreme Court of South Africa*

*Professor of Law in the University of the Witwatersrand,
Johannesburg*



# JUTA & CO, LTD

CAPE TOWN          WETTON          JOHANNESBURG

# CHAPTER 12

# *Causation*

THE ELEMENT of causation in defamation has not received the attention of the South African courts. This is entirely understandable, because, on the publication of defamatory matter referring to the plaintiff, the latter is presumed to have suffered injury to his reputation. Damages for such injury are recognized essentially as a recompense (solatium) for wounded feelings and not as compensation for patrimonial loss.[1] However, the causal link between the publication of the defamatory words or conduct referring to the plaintiff and the consequence of the lowering of the plaintiff in the estimation of others is essential.[2]

The South African law does not draw the English distinction between slander that is actionable per se (where special damage does not have to be proved) and slander that is not per se actionable (where proof of special damage is required).[3] Where slander is not actionable per se, the plaintiff must give evidence 'to connect the special damage with words complained of'.[4]

The approach in South Africa is that in all situations of defamation general damage will be presumed. Because of this presumption, in most cases the causal link between the defamatory words or conduct and the lowering of the plaintiff in the estimation of others will not be in issue. Usually no evidence will be led to rebut this presumption. However, it is theoretically possible that the defendant may be able to lead evidence that the words or conduct which he published were not the factual cause of the plaintiff's loss of reputation. It is possible that the imputation in question had no real effect on the estimation which the plaintiff's associates had of him;[5] either because they already held him in low esteem or conversely because they retained their high estimation of

---

[1] See generally De Villiers JA in *Matthews & others v Young* 1922 AD 492 at 503.
[2] See, for instance, Strauss, Strydom & Van der Walt 216.
[3] See generally Gatley paras 143 and 144.
[4] Gatley para 1322.
[5] There is a passage in *Bester v Calitz* 1982 (3) SA 864 (O) at 873 which appears to support this approach:

'Dat verweerder nie daarop kan steun dat sy *fama*, uit die oogpunt van die enigste toehoorder, tewete Van der Nest, gekrenk is nie, is duidelik. Van der Nest, wat soos onthou sal word valslik voorgee dat eiser se skeltaal nie deur enige gedrag of woorde van verweerder voorafgegaan is nie, sê self, vir wat dit werd is, dat hy gesien het dat eiser baie kwaad was en dat die skeltaal hom nie minder van verweerder laat dink het nie. Afgesien van wat Van der Nest sê is dit ook duidelik dat enige redelike omstandiger, ten aanhore en aanskoue van die gebeure, soos ek dit bevind te gebeur het, nie minder van verweerder sou gedink het bloot omdat eiser, armswaaiend en klaarblyklik buite homself van woede, hom die hierbo vermelde skeltaal toegevoeg

144

him despite the imputation. It is also possible to argue that since the defendant published a prompt unqualified and effective retraction and apology the plaintiff did not in fact suffer a diminution in reputation. Of course, the court may conclude that this evidence does not reflect a representative view of the community and that the presumption of general damage has not been effectively rebutted. In other words, the conclusion may be that the probabilities favour the plaintiff. However, such evidence might be relevant in mitigation of damages.[6]

If the approach to juristic personality suggested in *Universiteit van Pretoria v Tommie Meyer Films (Edms) Bpk*[7] were adopted, the action instituted by a legal person would be classified as Aquilian in nature and the essential element of causation (as determined in the Aquilian action) would have to be proved by the plaintiff.

---

het nie. Verweerder se goeie naam is dus nie deur eiser se woorde of gedrag op inbreuk gemaak nie en dit volg dat eiser nie op grond van laster aanspreeklik gehou kan word nie' (at 873).

Admittedly, however, the last part of this passage might indicate that the reason why the words or conduct of the plaintiff were not actionable was because they were regarded as mere abuse. *Bester's* case involved a question of provocation as well and is dealt with below 266ff. The fact that the plaintiff's reputation did not actually suffer from the imputation may affect the assessment of damages: *Salzmann v Holmes* 1914 AD 471 at 482.

[6] See below 296. However, the fact that the deputy attorney-general who, it had been alleged, had deliberately misled the court, was afterwards promoted to attorney-general (so achieving 'a life's dream') was held in *SA Associated Newspapers Ltd v Yutar* 1969 (2) SA 442 (A) not to prevent a high award of damages to him (at 456–7).

[7] 1977 (4) SA 376 (T). Cf the old English case of *Harrison v Pearce* (1858) 1 F and F 567; 175 ER 855 where the defamatory matter had been published by way of newspaper advertisement and by way of placards. The plaintiff had suffered an ascertained loss of circulation of his newspaper (ie special damage) and the judge reminded the jury that the part of the circulation loss attributable to the placard publication should not be visited upon the newspaper publisher who was not responsible for the placard; Lord Denning in *Associated Newspapers Ltd v Dingle* [1964] AC 371 (HL) approved of *Harrison v Pearce* (at 410). See further below 296–7.

[Home] [Databases] [WorldLII] [Search] [Feedback]

# South Africa: High Courts - Eastern Cape

**You are here:** SAFLII >> Databases >> South Africa: High Courts - Eastern Cape >> 2007 >> **[2007] ZAECHC 15**

[Database Search] [Name Search] [Recent Decisions] [Noteup] [Download] [Help] [Context↘] [Hide Context]

---

# Feni (born Mlengana) v Kondzani (508/2006) [2007] ZAECHC 15 (8 March 2007)

*FORM A*
**FILING SHEET FOR EASTERN CAPE JUDGMENT**

ECJ no   : 88

PARTIES:

**NOKUZOLA ELIZABETH FENI (born MLENGANA)**          **Plaintiff**

**AND**

**ZANELE KONDZANI**                              **Defendant**

REFERENCE NUMBERS -
- Registrar:       **508/2006**
- ☐   Magistrate:
- ☐   High Court:      **Eastern Cape Division**

DATE HEARD: **1st and 2nd March 2007**
DATE DELIVERED:       **8 March 2007**

JUDGE(S): **Pickering J**

LEGAL REPRESENTATIVES -
*Appearances*

- ☐   for the State/Applicant(s)/Appellant(s):**Adv Dela Harpe**
- ☐   for the accused/respondent(s): Adv. Cole

*Instructing attorneys:*
- ☐   Applicant(s)/Appellant(s): **Wheeldon Rushmere and Cole**
- ☐   Respondent(s): **Mili Attorneys (Mr. Mili)**

CASE INFORMATION -

☐   *Nature of proceedings*   : **Damages Claim**

☐   *Topic*:

☐   Keywords:

**IN THE HIGH COURT OF SOUTH AFRICA
(EASTERN CAPE DIVISION)**

**CASE NO: 508/2006**

In the matter between

**NOKUZOLA ELIZABETH FENI (born MLENGANA)          Plaintiff**

**AND**

**ZANELE KONDZANI                                    Defendant**

**JUDGMENT**

**PICKERING J:**

In consequence of an unedifying incident which occurred on 29 November 2004 plaintiff
instituted action for damages against defendant. The relevant portion of claim 1 is to the effect
that on 30 November 2004 (such date being incorrectly cited) and at Extension 7, Joza
township, Grahamstown, plaintiff was "*wrongfully, unlawfully and intentionally assaulted by the
defendant when she sprayed the plaintiff with teargas repeatedly in the face*"

In claim 2 it is alleged that defendant had alienated the affection of plaintiff's husband inasmuch
as during 2002 defendant had "*enticed and persuaded plaintiff's husband to desert the common
home and live with the defendant*"

The particulars of claim then proceed to conflate the two claims in dealing with the issue of
damages in respect of each such claim and it is accordingly somewhat difficult to deduce which
alleged sequelae relate to which claim. For present purposes, however, nothing turns on this
inasmuch as at the commencement of the trial Mr. De la Harpe, who appeared for plaintiff (and
who, I hasten to add, did not draft the particulars of claim) and Mr. Cole, who appeared for
defendant, requested me to make an order in terms of Rule 33(4) separating the issues of
liability and quantum and the trial accordingly proceeded on the issue of liability only. Mr. De la
Harpe furthermore withdrew claim 2, such withdrawal being accompanied by a tender by
plaintiff to pay such wasted costs occasioned in respect thereof as may be determined on
taxation.

In her plea defendant admits having sprayed pepper spray at the plaintiff. She denies, however, that the incident occurred at Extension 7, Joza and alleges that it in fact occurred at Extension 4, Joza. She pleads further that she sprayed plaintiff once with pepper spray but that her actions were justified "*in that plaintiff swore at her continuously including reference to her private parts and further threatened to kill her while approaching her in an aggressive manner. The defendant pleads that the force used was reasonable under the circumstances.*" This plea was amended at the outset of the trial by the deletion of the allegation relating to the alleged threat to kill defendant and by the substitution of the following paragraph:

"*The defendant pleads that her actions were justified in that the plaintiff     swore at her continuously including reference to her private parts by     threatening to make her shit through her vagina, and by behaving in     such an aggressive manner that the defendant believed that she was     at risk of attack. The defendant pleads that the force used was     reasonable in the circumstances.*"

Defendant further filed a claim in reconvention in which she claims damages from plaintiff in the sum of R10 000,00 in consequence of plaintiff having allegedly referred to her as a "whore" in the presence of "two police officers being Inspector Mbunge and a Ms. Mthetho."

It is now common cause that Ms. Mthetho is not in fact a police officer.

In her evidence plaintiff testified that at the time of the incident on 29 November 2004 she was estranged from her husband, a certain sergeant Feni. She and Feni had a child who had been born on 6 August 2002 by which time Feni had already left the common home, the marital relationship between herself and Feni having broken down at that stage. It is common cause that plaintiff and Feni were divorced during November 2005.
Plaintiff stated that during 2002 she knew defendant only as a police colleague of her husband's but knew nothing more of her. She stated that she met defendant personally for the first time during 2004 and that it was only during 2004 that she discovered that defendant had been having an affair with Feni. This discovery came about in the following way. At some time prior to 29 November 2004, the precise date of which plaintiff could not recall, but which it is now common cause was 5 August 2004, plaintiff was, so she said, walking from her home to a shop when she took a short cut past a certain block of flats. In the yard of one of these flats she happened to see washing hanging on the washing line. She had no idea to whom the flat belonged but she recognised some of the items of washing as clothes belonging to her husband which she herself had bought for him. According to her her attorney needed evidence for purposes of her divorce action against Feni and she accordingly removed the washing from the line and took it to her attorney, although she had no idea to whom the flat belonged. Her attorney, not unexpectedly, was very angry with her and told her to take the washing back. She decided, however, to take it to the police station. It is common cause, as appears from a police docket (Exhibit D) that on the same day as plaintiff took the clothing from the line defendant opened a case of theft of the clothes. It is further common cause that after plaintiff handed in the clothing at the police station the charge of theft was withdrawn.

Plaintiff conceded under cross examination that at that stage she had already charged Feni with rape and assault and had obtained an interdict against him and had caused him to be arrested. In these circumstances she conceded that the attorney had ample evidence at his disposal for purposes of the divorce action but she stated that in her view the clothing would have constituted additional evidence.

A statement, exhibit C5-11, made by plaintiff under oath to a police inspector on 8 December

2004 was put to her under cross-examination. It appears clearly therefrom that at the time plaintiff removed the washing from the line she in fact well knew that the flat belonged to defendant. In attempting to evade the consequences of this contradiction between her evidence and the contents of the statement plaintiff alleged that after the incident on 29 November her mind "*did not function properly*" and that she "*lost 100% functioning of mind*" She alleged further at one stage in her evidence that defendant might have caused this averment to be put into her statement but then she retracted this allegation.

She insisted in her evidence in chief that despite the contretemps concerning the washing there was, prior to 29 November 2004, no friction whatsoever between herself and defendant. She initially maintained this stance under cross-examination before conceding that there was "a little bit of friction" over the issue of her husband's clothing but "not much friction." She reiterated that she had no idea that the flat where the washing was hanging belonged to defendant and that it was purely "*by chance or luck*" that she happened upon the flat.

She testified that between 8 and 9 pm on the night of 29 November 2004 she travelled alone by car to extension 7 in Joza in order to visit a sick child at the home of the Antonie family. She stopped to ask directions to the house before continuing on her way. Whilst driving in extension 7 she noticed in her rear view mirror that a police motor vehicle was driving behind her flicking its lights. It also hooted. Because it was a police motor vehicle she stopped her own car and the police motor vehicle stopped opposite her on the other side of the road, facing in the same direction. Defendant was seated in the passenger seat of the police vehicle. Another police woman, one Nomhle Mbunge, was the driver of the motor vehicle. Defendant got out of the police vehicle and approached plaintiff's vehicle, folding her arms in front of her chest as she did so. Plaintiff wound down her side window in order to talk to her at which defendant suddenly unfolded her arms, produced a canister of pepper spray which she had been holding under her armpit, and sprayed a strong burst of pepper spray into plaintiff's face. At the same time defendant swore at her in extremely crude and vulgar terms adding also that plaintiff was a rubbish and, in a reference to Feni, saying "*when will you give up on this man.*" According to plaintiff she ducked in an unsuccessful attempt to avoid the spray. She managed to wind up the window and drive away. Although the spray did not immobilise her she suffered great pain and could not breathe or see properly and was obliged to seek treatment at the hospital. Thereafter she reported the matter to Superintendent Moyake and laid a charge of assault against defendant which charge is apparently still pending.

Under cross-examination she was taxed as to her reason for having visited extension 7 on the night in question. She was referred in this regard to a further statement Exhibit C14-15, made by her under oath to inspector Fetman at 00h50 on 30 November 2004, some three to four hours after the incident. In this statement plaintiff stated:

"*On Monday 2004-11-29 at approx 21:45 I went to Ext. 7 to the house      where my husband Ncebisile Feni stays. I went to attend the      appointment which I have made with Zanele Kondzani. I was going      with my car. When I was there waiting for Zanele Kondzani they   arrived with Nomhle Mbunge. They were driving the state vehicle      which      was driven by Nomhle. Zanele came to me with folded arms. I      opened the window of my car. When it was half way open Zanele took      a spray and sprayed me with it on my face. She said that she was      going to shoot me because I do not want to surrender to be with my husband.*"

Plaintiff denied having told Fetman that she had made an appointment to meet defendant and said that the contents of the statement had been manufactured by somebody. She said further

that at the time of making the statement she had been nervous, could not see properly, signed the statement under pressure and did not read it properly. She initially denied having said anything about defendant having threatened to shoot her but then said that although it was not true she might have mentioned it because, so she reiterated, she was not "100% right" in her mind and could not remember everything.

She insisted that her visit to extension 7 had been in order to visit a sick child. Her later statement, exhibit C 5-11, was again put to her. In this statement plaintiff stated as follows:

"*Last week Monday I saw Zanele in Shoprite. She greeted and said hi      sisi and want to see you. I said what is wrong. She said she wanted      to see me later. I asked her where and she said at my husband's flat      and I said I could not go there and she said no outside at 20h00. At      about 19h45 I left the house and I went to Joza. I parked a distance      away from flat. At 20h00 I saw a Crime Prevention combi. My      husband parked the car and went to him. I waited to before 20h00 and      Zanele did not come. I then saw a police van stop. I saw my husband      go to the van chatting. The van drived to me and the man said they      have a problem and my husband phoned them and said I was waiting      and I must leave. I asked them what I was doing wrong because I am      far from the house, they said please I must leave because we are      separated. I then said it was municipality ground but I did not want to      make problems and loose my dignity. I then left on my way home.      While driving on the road I noticed a police vehicle. Mbunge was      driving and Zanele was next to her in the vehicle. Mbunge hooted.      Kondzani winked me to follow them. I followed them to Feni's house.      They      parked next to the gate. I then parked far away again. I waited      in the car. Zanele approached me with folded arms. I winded my      window down. When the window was down, she took out a spray can      and sprayed me.*" (sic)

Plaintiff denied that the contents of this statement were correct but was quite unable to furnish any rational explanation for the fundamental contradictions existing between her evidence and the contents of the statement beyond reiterating that her mental faculties had been impaired in consequence of having been sprayed with the pepper spray. She added that she had in fact been hospitalised at a mental institution for some time. She stated that she was astounded by the contents of the statement.

For good measure Mr. Cole raised with plaintiff her claim for R5 000,00 per month in respect of past loss of earnings calculated from 30 November 2004. I should mention that although the summons was issued some 15 months after the incident had occurred the claim for past loss of earnings was inexplicably calculated in respect of a period of two years. Be that as it may, plaintiff averred that had it not been for the pepper spray incident she would have been able to work. In the light of this averment Mr. Cole drew to her attention the particulars of claim in a High Court action instituted by plaintiff in July 2006 against Harry's Laundry in case no 2066/06. (Exhibit B) In that matter plaintiff had claimed an amount in respect of past loss of earnings "calculated at the rate of R2 000,00 per month from October 2003 when the plaintiff lost her employment at Telkom because of health problems until date of issue of summons" (i.e. July 2006). Confronted with this plaintiff resorted to evasiveness, stating repeatedly that she was not in Court to talk about the Harry Laundry's case. She was quite unable to explain, in the light of the averments contained in her particulars of claim in the Harry Laundry's case, as to why she had stated that she would have been able to work had she not been sprayed with pepper spray. She was similarly quite unable to explain why her claim for past loss of earnings against defendant was greater than the claim by her against Harry's Laundry save for eventually stating that the claim against the present defendant was larger because she had been temporarily "mentally retarded" and had spent time in a mental hospital.

With regard to defendant's counter claim she denied having called defendant a whore or having sworn at her in any way.

In her evidence defendant stated that she is an Inspector in the South African Police Services and presently station commander of Fort Brown police station. She has 15 years experience in the South African Police Services.

She stated that she knew plaintiff, having first met her during June 2004 when plaintiff had stopped her on the pavement outside her flat and had told her that it had come to her attention that defendant was involved with her husband. Defendant had denied this and had told plaintiff that it was untrue. Although defendant had admitted that she was presently living with Feni she stated that her relationship with him had only begun during November 2005 after his divorce from plaintiff.

As to the incident involving the removal of the clothes from her washing line defendant stated that the clothing in fact belonged to her nephew and not to Feni.

She stated that on Monday 29 November 2004 she had been at work. She was intending to visit Nomhle Mbunge and Queenie Mthetho and she obtained a lift in a combi with Feni and sergeant Yalo. As they left the police station she noticed plaintiff's motor vehicle following them. They proceeded to extension 5 in Joza to drop off sergeant Yalo and then went to extension 4 to Mbunge's house where she was dropped off. Plaintiff's motor vehicle followed them the entire way. At Mbunge's house they watched a television programme. Mbunge was intending to take a police motor vehicle back to the police station and it was accordingly agreed that she would drop defendant off at the house of one Andiswe in extension 4, Joza, on the way. As they proceeded towards Andiswe's house defendant again noticed plaintiff's car following them. Mbunge parked the motor vehicle on the right hand side the road opposite Andiswe's gate facing towards a cul-de-sac some 10 metres further down the road. Plaintiff's motor vehicle had pulled up on the left hand side of the road opposite the police vehicle. Plaintiff shouted at defendant calling her "*a rubbish*" and "*a whore*" and saying that defendant was "*not going to get her man tonight.*" She further said, and it is unfortunately necessary to record this, that defendant would "*shit through your vagina.*"

Defendant asked Mbunge to fetch Queenie Mthetho whilst she looked after the police vehicle. Mbunge left and came back in the company of Mthetho. They both got into the police vehicle and the three of them sat there trying to decide what to do. Throughout this time plaintiff was yelling at defendant. According to defendant plaintiff appeared to be in an uncontrollable rage and she abused defendant and threatened her. Although in her original particulars of claim and in her evidence in chief the allegation had been made that plaintiff had threatened to kill her, defendant stated under cross-examination that plaintiff had not directly threatened to kill her but that the nature of the threats made by her were such that defendant had deduced therefrom that she might be killed.

Defendant was concerned about the police vehicle, thinking that the situation was such that plaintiff might damage it. She accordingly suggested that Mbunge remove the vehicle and take it to the police station.

She took a canister of pepper spray from her handbag and gave her handbag to Mthetho to take inside the house and she herself alighted from the police vehicle and went to stand outside Andiswe's house whilst Mbunge proceeded in the police vehicle to the cul-de-sac in order to

make a u-turn. At this plaintiff drove her own motor vehicle next to the pavement in front of Andiswe's gate and stopped some two metres away from defendant. Plaintiff's upper body was protruding through the open window of the motor vehicle whilst she continued to hurl abuse at defendant. Plaintiff then withdrew her body from the window and, whilst seated behind the steering wheel, looked down. She was making certain movements inside the car and appeared to defendant to be attempting to open the door of her vehicle although defendant could not actually see what she was doing. Defendant stated that because of plaintiff's violent rage, her continuous swearing and the nature of the plaintiff's threats she felt intimidated and threatened and was concerned that she would be badly assaulted. She said that she could not run away because she was wearing high heeled shoes and the gravel pavement was uneven. The gate to Andiswe's yard was closed and defendant did not want to turn her back on plaintiff in order to open it. It was also clear to her that plaintiff was not going to leave the area of her own accord. Defendant accordingly stepped forward one pace and sprayed one burst of pepper spray through the open window at plaintiff's face. Plaintiff reacted by screaming and covering her face before winding up the window of the car. She then started her car and drove down to the cul-de-sac where she turned. In the meantime Mbunge had already turned her car at the cul-de-sac and had passed by and left the scene. Plaintiff then returned in her motor vehicle from the cul-de-sac, stopped her car and again swore at defendant in crude terms. She then left.

Defendant stated that she had no other option but to spray the pepper spray at plaintiff's face in order to subdue her. She stated that the means used by her were commensurate with the threat faced by her. She accordingly averred that in spraying plaintiff she had acted in self defence.

Nkosazana Queenie Mthetho also testified on behalf on defendant. She is an administrative clerk in the South African Police Services. She confirmed that Mbunge and defendant arrived at Andiswe's house in extension 4, Joza at approximately 9 pm on 29 November 2004. She stated that she was called from the house by Mbunge. When she went out to the street she saw that plaintiff's car was parked adjacent to the police motor vehicle. She did not know plaintiff at that stage. She confirmed that the woman in the vehicle was screaming a torrent of abuse at defendant and shouting at the top of her voice that defendant was "*a rubbish*" and "*a whore*" who was going "*shit through her vagina*" Defendant was sitting silently in the police motor vehicle. Mthetho and Mbunge joined defendant in the police motor vehicle. The woman continued to hurl abuse at defendant and eventually Mthetho took defendant's handbag and went back into the house. Defendant disembarked from the car as well but stopped at the gate. Mthetho knew nothing more of the incident.

Plaintiff was an appallingly bad witness. Her evidence was fraught with inconsistencies, improbabilities and contradictions and was, in very material respects, contradicted by the statements made by her shortly after the incident under oath to police officers. She was also extremely evasive and refused to answer questions which were entirely proper and relevant stating that she was only in Court to testify as to the actual spraying incident. It is not necessary to set out here details of such evasions, contradictions and inconsistencies insofar as they do not appear from the summary of her evidence which I have set out above because Mr. De la Harpe very fairly and properly conceded at the outset of his address to the Court on the merits that he was unable to submit that her evidence should be accepted in preference to that of defendant. Indeed, plaintiff's evidence was, in my view, in many respects clearly a fabrication.

In contrast defendant was, in my view, a good witness. She testified in a calm composed manner and, although there were certain inconsistencies in her evidence she was able to explain these in a satisfactory manner. I have no hesitation in accepting her evidence. I accept too the evidence of Mthetho who was similarly a good witness.

## Claim 1

Mr. De la Harpe submitted, however, that even on an acceptance of defendant's version she had failed to discharge the onus upon her of establishing that in spraying plaintiff with the pepper spray she was acting in self defence.

The requirements to be satisfied before a plea of private defence will be upheld are well known and are neatly summarised in <u>Ntsomi v Minister of Law and Order</u>1990 (1) SA 512 (C) at 526H as follows:

"*(1)    There must have been unlawful attack or threatened attack and        the victim must have reasonable grounds for believing that he        was in physical danger.*

*The means of defence must have been commensurate with the        danger and dangerous means of defence must not have been        adopted when the threatened injury could have been avoided in    some other reasonable way.*"

The second such requirement has been formulated as follows by Madlanga AJP in <u>Ntamo and Others v Minister of Safety and Security</u>2001 (1) SA 830 (Tk) at 836H-J:

"*To state something trite, where the threatened harm can be avoided        without the use of force, private defence cannot succeed. Where force    is necessary to neutralise the threat of harm, the force used must not   be more than is reasonably necessary to achieve that purpose (the        proportionality principle or doctrine – see <u>R v Molife</u> 1940 AD 202 at    204; <u>R v Attwood</u> 1946 AD 331 at 340).*"

Mr. De la Harpe submitted that the defendant's belief that plaintiff was about to disembark from her motor vehicle in order to assault her was unreasonable and that defendant accordingly had no reasonable grounds for believing that she was in imminent danger. I disagree. It appears from defendant's evidence that plaintiff, who was in an uncontrollable rage, was leaning half way out of her car window hurling violent abuse at defendant. Included in the torrent of abuse was the threat that defendant would "*shit through her vagina*", a threat which carried with it the implication of serious bodily harm being occasioned to the person of defendant. Plaintiff thereafter withdrew her body inside the car and made movements such as to cause defendant to think that she was about to open the car door. In my view the circumstances were such that a reasonable person in the position of the defendant would have had reasonable grounds for believing that plaintiff was attempting to open the car door in order physically to attack her. That, however, is not the end of the matter.

The defence of private defence can only succeed if the use by defendant of the pepper spray in order to subdue plaintiff was commensurate with the danger she was facing and if she could not have avoided the threatened attack by some other means. In deciding this question I bear in mind that I "*must be careful to avoid the role of the armchair critic wise after the event, weighing the matter in the secluded security of the Courtroom*" (N<u>tanjana v Vorster and Minister of Justice</u>1950 (4) SA 398 (C) at 406 A) and that persons "*faced in moments of crisis with a choice of alternatives are not to be judged as if they had both time and opportunity to weigh the pros and cons*" (<u>Union Government v Buur</u>1914 AD 273 at 286).

Mr. De la Harpe suggested that defendant had reasonable alternatives open to her other than to spray plaintiff with the pepper spray. He submitted that defendant could have fled the scene by

retreating into Andiswe's house or by getting back into the police motor vehicle which had not yet left or that she could have summoned assistance from her police colleagues.

Defendant in her evidence stated that she could not flee because of the uneven terrain and the fact that she was wearing high heeled shoes and because the gate to Andiswe's house was closed although she did not know whether or not it was bolted shut. She stated further that it was quite clear that plaintiff was in any event not going to leave the scene of her own volition. In these circumstances the probabilities are, in my view, overwhelming that had defendant retreated into Andiswe's house she would have been pursued there by plaintiff who had tracked defendant's movements all evening and who was clearly seeking a confrontation with her. To flee would have been merely to postpone that confrontation.

In my view defendant has established that the use of force was the only reasonable remaining option to her.

The force used by her was further, in my view, reasonably commensurate with the threat and danger. In other words it was proportional to the threatened harm. Defendant had received training in the use of pepper spray and stated that it was used by members of the police services in order to subdue and control persons who were otherwise uncontrollable. In the present case the pepper spray had the desired effect of subduing plaintiff and of putting an end to the threatened attack. I am satisfied that in spraying one regulation burst of pepper spray at plaintiff defendant did not in the circumstances use excessive force.

In the circumstances defendant has satisfied the requirements for the upholding of her plea of private defence and plaintiff's claim must therefore be dismissed.

## Claim in reconvention

Defendant has proved that plaintiff said of her that she was a whore. It was common cause between counsel that it is *per se* defamatory to call a woman a whore. The only issue therefore to be decided is whether there was publication of the defamatory statement, publication being the act of making known the said statement. In her claim in reconvention defendant alleged that the defamatory statement had been made in the presence of Mbunge and Mthetho. No averment is made of there having been any wider publication of the statement.

It is clear from the authorities that a plaintiff must, as a general rule, state the names of the persons to whom the defamatory words were uttered or identify them in some way. See <u>Benson and Simpson v Robinson</u> 1917 WLD 126 at 130; ↶**Burchell: The Law of Defamation**↴ in South Africa page 70-71.

In <u>Benson and Simpson v Robinson</u> *supra* Wessels J stated the following with regard to pleading in a case where the plaintiff does not know the identities of the persons to whom the statement was uttered:

>    "*If the words are addressed by the defendant to the plaintiff himself in          the presence of a crowd of people whom the plaintiff does not know,       then it is sufficient to say that the words were addressed to the          plaintiff in the presence and hearing of divers persons unknown to the   plaintiff. The occasion must, of course, be clearly stated.*"

This requirement as to pleading puts paid to Mr. Cole's submission that the statement was published to the residents of the neighbouring houses in extension 4 who, so he submitted,

must have heard what was being said. Such publication has, quite simply, not been pleaded. In this regard Mr. Cole referred, however, to the evidence of Mthetho that after the incident someone arrived and asked what the shouting had been about. Even on the assumption that such evidence was covered by the pleadings there was, however, no evidence to the effect that this unknown person had actually heard the content of the shouting and this evidence does not therefore assist defendant.

Mbunge did not testify. It is clear from defendant's evidence, however, that Mbunge was present throughout most of the incident and that she was clearly within earshot of the defamatory statement at the times that it was uttered by plaintiff. In Whittington v Bowles 1934 EDL 142 the words "*you bloody whore*" were spoken in a loud voice within the earshot of certain persons standing at a bus stop 15 yards away. In these circumstances Pittman J, with whom Gutsche J concurred, stated as follows at 146:

"*Since, therefore, the evidence at its lowest is that these people were   within earshot, then on the authorities cited by Mr. Back the   presumption is that they actually heard the words uttered – see   Spencer Bower, Actionable Defamation (2nd Ed, p 6) and Holdt v   Meisel ([1927] SWA 45). It was for the defendant to establish that they         did not hear the words.*"

In the present matter plaintiff has not established that Mbunge did not hear the defamatory statement and accordingly publication of the statement to her has been proved.

Mthetho testified to the effect that she heard the defamatory statement but that she did not believe it. In Burchell: Personality Rights and Freedom of Expression at p204 the following is stated:

"*The element of causation in defamation, unlike the element of    causation in the Aquilian action, has not deceived the attention of the         South African Courts. This is entirely understandable because, on the   publication of defamatory matter referring to the plaintiff, the latter is       presumed to have suffered injury to reputation. General damages for        sentimental loss will be presumed to flow from the publication of         defamatory matter referring to the plaintiff.*
        *The fact that general damages for sentimental loss are presumed does     not detract from the principle that the defamatory conduct must cause    the plaintiff loss of reputation. The presumption of general damage for         loss of reputation simply means that the plaintiff is considerably       assisted in the task of proving that the conduct of the defendant caused loss*
        *It is, strictly speaking, possible for the defendant to argue that the   imputation in question had no real effect on the estimation which the    plaintiff's associates had of him, either because they already held him   in low esteem or, conversely, because they retained their high estimation of him despite the imputation. It may be extremely difficult         for the defendant to rebut the presumption of general damage suffered    by the plaintiff in the end, but the theoretical possibility of doing so         exists. If the defendant does not succeed in rebutting this presumption,        the evidence that the plaintiff's reputation has not in fact been impaired may be relevant in mitigation of damages.*"

In the circumstances the statement by Mthetho to the effect that she did not believe the defamatory statement is of no assistance to plaintiff at this stage of the trial. That evidence may be relevant in mitigation of damages at the stage when the issue of quantum is considered. The fact remains, however, that defendant has proved the publication to Mbunge and Mthetho of the defamatory statement of and concerning her and plaintiff is accordingly liable to defendant for

such damages as defendant may eventually prove she has suffered.

## Costs

Defendant has been successful in her defence of plaintiff's action on claim 1. She has also succeeded on the merits in respect of her claim in reconvention. Although the quantum of her damages in respect of the latter claim will in all probability fall far below the jurisdiction of the High Court the fact remains that the defendant was obliged to litigate thereon in the High Court by virtue of plaintiff having instituted her claims against defendant in this Court. In these circumstances defendant is, in my view, entitled to all the costs of the trial on the merits on the High Court scale.

As mentioned above plaintiff withdrew claim 2 at the outset of the trial and tendered the wasted costs occasioned by such withdrawal.

Accordingly the following order will issue:

1.      Plaintiff's claim in respect of claim 1 is dismissed.

2.      In respect of defendant's claim in reconvention it is ordered that plaintiff     is liable to defendant for such damages as defendant may prove she     has suffered in consequence of the defamatory statement made by        plaintiff of and concerning defendant in the presence of Nomhle        Mbunge and Nkosazana Queenie Mthetho on 29 November 2004.

3.      Plaintiff is ordered to pay the costs of the trial on the merits, including     the wasted costs occasioned by the withdrawal of claim 2, on the High    Court scale.


_____
**J.D. PICKERING**
**JUDGE OF THE HIGH COURT**

[Context↴] [Hide Context]

**SAFLII:** | Terms of Use | Feedback
URL: *http://www.saflii.org/za/cases/ZAECHC/2007/15.html*



Not Reported in A.2d                                                                                          Page 1

Not Reported in A.2d, 1993 WL 141864 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

C

Marcus v. Funk
Del.Super.,1993.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
William H. MARCUS
v.
Vance A. FUNK, et al.
**Civ. A. No. 87C-SE-26-1-CV.**

April 21, 1993.

Thomas Stephen Neuberger, Steven J. Stirpano,
Wilmington, for plaintiff.
James S. Green, Duane, Morris & Heckscher,
Wilmington, for defendants.

OPINION AND ORDER
BALICK, Judge.
**\*1** This is a libel action in which the jury awarded
$1 nominal damages and $37,000 punitive
damages. Both sides have filed post-trial motions.
Defendants renew their claim of conditional
privilege and their contention that there is
insufficient evidence of recklessness. They also
seek relief from the award of punitive damages.
Plaintiff seeks relief from the jury's failure to award
compensatory damages.

I will adhere to the ruling at trial on the sufficiency
of the evidence to support a finding of recklessness.
Since recklessness is an abuse of a conditional
privilege, the jury's finding of recklessness makes
the issue of conditional privilege moot.
Restatement (Second) of Torts § 600 (1976).

The defendants argue that the award of punitive
damages may not stand because it is not
proportional to an award of compensatory damages.
The Supreme Court has stated, in discussing
damages under the Consumer Fraud Act, that an "

award of punitive damages cannot be made unless
the plaintiff also receives compensatory damages."
*Stephenson v. Capano Development, Inc.,*
Del.Supr., 462 A.2d 1069 (1983). I do not
understand the court's opinion to mean that nominal
damages are necessarily insufficient to support an
award of punitive damages. There is a division of
authority on the issue in other jurisdictions. *See
generally* Richard C. Tinney, Annotation,
*Sufficiency of Showing of Actual Damages to
Support Award of Punitive Damages-Modern Cases,*
40 A.L.R. 4th 11. In the absence of controlling
precedent to the contrary, I will follow the
Restatement rule that nominal damages or
compensatory damages in a trifling amount and
substantial punitive damages in the same verdict are
not necessarily inconsistent. Restatement (Second)
of Torts § 908 cmt. c (1979).

A substantial award of punitive damages will
necessarily be many multiples of nominal damages.
Although proportionality is one of the factors to be
considered, the Supreme Court does not require any
particular proportion between punitive and
compensatory damages. *Jardel Co., Inc. v. Hughes,*
Del.Supr., 523 A.2d 518, 528 n. 6 (1987); *see also,
Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111
S.Ct. 1032 (1991); *Sheats v. Bowen,* D.Del., 318
F.Supp. 640 (1970). After pointing out that "no
particular ratio can be fixed in the abstract,"
*Stephenson* says, "Instead, the relative size of the
awards depends on the facts of the particular case."
*Stephenson,* 462 A.2d at 1077.

Plaintiff did not seek special damages for pecuniary
loss, but only general damages for injury to
reputation and emotional distress. Such damages
were presumed for libel at common law.
Restatement (Second) of Torts §§ 569, 623.
Special considerations are present in such cases.
Injury to reputation and emotional distress cannot
be accurately measured. Where compensatory
damages may include an amount for emotional
distress, such as humiliation or indignation, there is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 2

Not Reported in A.2d, 1993 WL 141864 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

no clear line of demarcation between punishment and compensation, and a verdict for a specified amount frequently includes elements of both. Restatement (Second) of Torts § 908 cmt. c. A number of jurisdictions hold that the presumption of damages in defamation cases satisfies the rule requiring a showing of actual damages before an award of punitive damages may be made. Tinney, *Sufficiency,* 40 A.L.R. 4th 11 at § 10.

**\*2** I agree with those courts that have refused to disturb a jury's award in a libel case, based on the ratio between general and punitive damages, unless the total award is shocking. *Newson v. Henry,* Miss.Supr., 443 So.2d 817 (1983); *Laniecki v. Polish Army Veterans Ass'n,* Pa.Super., 480 A.2d 1101 (1984). If the jury had awarded $18,500 as compensatory damages and $18,500 as punitive damages, there would be no basis to challenge its verdict. Viewing the evidence from the plaintiff's perspective, as we must, and considering all of the relevant factors, the award of punitive damages does not shock the conscience of the court. Restatement (Second) of Torts § 908 cmt e (1979).

For these reasons, it is ORDERED that Defendants' motions are DENIED and Plaintiff's motion is MOOT.

Del.Super.,1993.
Marcus v. Funk
Not Reported in A.2d, 1993 WL 141864 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                      Page 1

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

Ores v. Willow West Condominium Ass'n
N.D.Ill.,1996.

United States District Court, N.D. Illinois.
Paul ORES, Kirk Ores, Warren Ores, Louise Ores,
and Anna Niemer, Plaintiffs,
v.
WILLOW WEST CONDOMINIUM
ASSOCIATION, et al., Defendants.
**No. 94 C 4717.**

March 12, 1996.

MANNING, District Judge.
**\*1** This matter is before the court on motions by the defendants challenging the plaintiffs' Second Amended Complaint ("Complaint") in their suit for violations of the Fair Housing Act. For the reasons stated below, defendants' motions are denied.

BACKGROUND

Because we address the defendants' motions at the pleadings stage, all facts herein are from plaintiffs' allegations and are assumed to be true. *South East Lake View Neighbors v. Department of Housing and Urban Development,* 685 F.2d 1027, 1034 (7th Cir. 1982). Plaintiffs Paul Ores and Kirk Ores are adults who suffer from a developmental disability, fragile X syndrome. In 1994, with the aid and encouragement of their parents, Warren and Louise Ores, Paul and Kirk sought to purchase a condominium at 344 Sheridan Drive in Willowbrook, Illinois. Plaintiff Anna Niemer ("Niemer") also assisted Paul and Kirk in her capacity as a real estate broker between them and the owner of the condominium.

According to the Complaint, in or around March 1994, Frank Urban and Smilja Gladich, as

representatives or agents of the Willow West Condominium Association ("Association"), made discriminatory inquiries and statements concerning Paul and Kirk's handicap condition in violation of 42 U.S.C. § 3604(f) and 42 U.S.C. § 3604(c) (1988) . Plaintiffs further complain that on or about March 1994 members of the Association promulgated rules or policies concerning the approval of the sale of the condominium unit at issue which discriminated against Paul and Kirk because of their condition. The Complaint separately pleads that on or about March 18, 1994, defendants Image Control Property Management, Inc., ("Image Control") as an agent of the Association, and Jean M. Wojcik, as an agent for Image Control and the Association, adopted and participated in advancing these discriminatory rules and additionally took steps to disguise alleged violations of the Fair Housing Act. Finally, the Complaint alleges that the Association requested that Paul and Kirk, because of their handicap, submit to an interview in a hostile and intimidating setting with the Association's members.

In sum, the Complaint pleads that, through the conduct set forth above, the defendants discriminated against Paul and Kirk in the sale of the condominium or otherwise made the condominium unavailable to Paul and Kirk because of their handicap in violation of 42 U.S.C. § 3604(f) . The Complaint further alleges that the defendants coerced, intimidated and interfered with Paul and Kirk's exercise of their fair housing rights in violation of 42 U.S.C. § 3617 [FN1] . Defendants include Urban, Gladich, Image Control, Wojcik, the Association, several named[FN2] and unnamed members of the Association, and First Illinois Bank and Trust ("Banc One"), as trustee for Association member, trust number 10233. In addition to injuries arising from humiliation and mental distress, Paul and Kirk claim that because the defendants' conduct rendered the condominium unavailable to them, they lost potential financing for housing pledged by the Consumer Owned and Controlled Housing Program as well as $50,000 per year for living

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

expenses pledged by the Illinois Department of Mental Health.

**\*2** As to the remaining plaintiffs, the Complaint asserts that the defendants coerced, intimidated and interfered with Warren, Louise and Niemer because of their efforts to aid Paul and Kirk in exercising their rights granted under the Fair Housing Act in violation of 42 U.S.C. § 3617. The Complaint alleges that, as a result of the defendants' misconduct, Warren and Louise suffered financial and emotional injuries arising from their own lost opportunity for "physical, financial and emotional independence." Warren and Louise also plead that they suffered lost peace of mind because of their sons' inability to obtain housing. Niemer alleges that she suffered injury through the loss of her commission from the anticipated sale.

In response, defendants Image Control and Wojcik and other defendants, including the Association, several named Association members and Banc One ( "Certain Defendants"), each filed two separate but overlapping motions challenging the sufficiency of the Complaint. First, Certain Defendants move to dismiss defendant Banc One because it does not have the capacity to be sued. Second, Certain Defendants move to dismiss plaintiffs Warren, Louise and Niemer for lack of standing, or in the alternative, move for a more definite statement to demonstrate their standing. Third, Certain Defendants move to strike the Complaint's general claim for damages or, in the alternative, for a more definite statement describing the alleged special damages. Finally, all defendants move for a more definite statement as to the alleged conduct that violated the Fair Housing Act.

### DISCUSSION

#### I. *Motion to Dismiss Defendant Banc One.*

Certain Defendants move to dismiss defendant Banc One because Illinois law generally does not permit a trustee to be sued as a representative for the beneficiaries of the trust. *Schmitd v. Kellner,* 307 Ill. 331, 138 N.E. 604 (1923); Ill. Rev. Stat. Ch.

735, para. 616(e); *see*Fed. R. Civ. Pro. 17(b) (capacity to be sued is determined by the law of defendant's domicile). However, Illinois law permits a plaintiff to name a land trustee as a defendant until it has ascertained, with reasonable diligence, the identities of the underlying beneficiaries of the trust. *See*Ch. 735, para. 616(e). In their response to the defendants' motion, plaintiffs attest that they have submitted discovery requests to Banc One and the Association in order to identity the beneficiaries of trust no. 10233. Consequently, the court finds that the plaintiffs have been reasonably diligent in their efforts to identify and name the beneficiaries. Certain Defendants' motion to dismiss Banc One is denied pending the outcome of plaintiffs' efforts to identify and join the true parties in interest.

#### II. *Warren, Louise and Niemer's Standing.*

Certain Defendants also argue that Warren, Louise and Niemer should be dismissed as plaintiffs for lack of standing to pursue their claims. In the alternative, Certain Defendants ask the court to order plaintiffs to furnish a more definite statement as to their standing under Federal Rules of Civil Procedure 8(a) and 12(e).

**\*3** Defendants argue that the Fair Housing Act does not confer standing on parents or other third parties to pursue a claim for harm that arises from another's inability to obtain housing because of alleged discrimination. Consequently, the defendants contend that the Complaint fails to plead facts to support Warren's or Louise's standing to sue as parents of Paul and Kirk in light of the fact that they were not formal parties to the real estate transaction. As to Paul and Kirk's real estate broker, Niemer, defendants argue that the alleged misconduct could not have caused her any injury because, even after Paul and Kirk abandoned the purchase, Niemer remained legally entitled to her commission from the seller of the real estate. *See Gordon v. Bauer,* 172 Ill.App.3d 1073, 532 N.E.2d 855 (5th Dist. 1988). Rather, defendants claim that Niemer must have lost her commission because either the seller breached the brokerage contract or, Niemer or her employer waived the condominium owner's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

obligation to pay the commission.

Because the question of standing goes to the court's subject matter jurisdiction, we treat defendants' motion under Federal Rule of Civil Procedure 12(b)(1). A plaintiff bears the burden of establishing that he or she meets the required elements of standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). However, at the pleadings stage, a plaintiff's general factual allegations of injury resulting from the defendants' conduct may satisfy this burden. *Id.* at 561, 2137;*South East Lake View,* 685 F.2d at 1034 (in motion to dismiss for lack of standing, court must accept all of a plaintiff's factual allegations and liberally construe complaint in his favor).

To raise a claim in federal court, Article III of the Constitution requires that a plaintiff (1) have suffered a particular and concrete injury, (2) that was caused by the defendants' alleged misconduct, and (3) is fairly likely to be redressed by the court if the plaintiff receives a favorable holding. *See Lujan,* 504 U.S. at 560, 112 S.Ct. at 2135. Because " Congress intended standing under [the Fair Housing Act] to extend to the full limits of Article III", courts may not create additional prudential barriers to standing against a fair housing plaintiff. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1194, 1119, 71 L.Ed.2d 214 (1982). Rather, a fair housing plaintiff need only allege "distinct and palpable injuries that are 'fairly traceable' to [the defendants'] actions." *Id.* at 375-76, at 1122-23.

Furthermore, to raise a suit under the Fair Housing Act, a plaintiff need not allege that the defendant violated his own substantive rights under the statute. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103, 99 S.Ct. 1601, 1609, 60 L.Ed. 66 (1979). As an "aggrieved person" who has suffered an injury because of a violation of the underlying provisions of the Fair Housing Act, a plaintiff may raise a suit to enforce another party's rights.*Id.*

**\*4** Plaintiffs' pleadings in support of Warren and Louise satisfy the Fair Housing Act's permissive standing requirements. First, the Complaint pleads particular and concrete injuries: Warren and Louise

suffered mental distress and financial hardship arising from Paul and Kirk's failure to attain anticipated independence. Although somewhat vague, the Complaint alleges that Warren and Louise "lost physical, financial and emotional independence" because Paul and Kirk did not obtain the housing or concomitant funds from the public service agencies. From this allegation of lost independence and Paul and Kirk's pled handicapped status, it is appropriate to infer Paul and Kirk's dependence upon their parents. The Federal Housing Act protects not only those who are excluded from housing by discrimination, "but also those whose complaint is that the manner of managing a housing project affects 'the very quality of their daily lives.'"*Trafficante v. Metropolitan Life Ins.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367-68, 34 L.Ed.2d 415 (1972) (citation omitted). Consequently, emotional damages arising from parents' physical burden of continuing to care for their sons because they did not attain independent living, though not economic or tangible in character, may constitute an injury-in-fact implied by the statute. *See also Havens,* 455 U.S. at 376, 102 S.Ct. at 1123 (deprivation of social benefits of living in an integrated neighborhood constitutes an injury-in-fact under the Fair Housing Act). Similarly, Warren and Louise's loss of financial independence because Paul and Kirk did not obtain the housing or attendant financial assistance states a 'distinct and palpable' injury. *Cf. Growth Horizons, Inc. v. Delaware County, Pennsylvania,* 983 F.2d 1277, 1282 (3d Cir. 1992) (finding standing for housing corporation for the disabled that paid clients' rents because defendant refused to assume those rents in alleged violation of Fair Housing Act).

Second, the Complaint adequately pleads that Warren and Louise's injuries were caused by the defendants' alleged misconduct. The Complaint alleges that Paul and Kirk's failure to purchase the home undermined their ability to obtain the prospective funding. From the Complaint's pleadings, it is appropriate to infer that Paul and Kirk's failure to purchase the condominium prevented them from obtaining the pledged funding long enough to place some burden on Warren and Louise. *See also South East Lake View,* 685 F.2d at 1034-45 (even very slight injuries satisfy the low

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 4

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

constitutional threshold for standing). If defendants engaged in conduct which, under the Federal Housing Act, intimidated and interfered with Warren and Louise's efforts to aid their sons, and also prevented their sons from purchasing the condominium, Warren and Louise's alleged emotional and financial burden of caring for their sons would be fairly traceable to that misconduct.

Third, assuming that Warren and Louise obtain a favorable holding that the defendants violated the Fair Housing Act, the court may redress their loss through compensation. *See* 42 U.S.C. § 3614(d)(1)(B) (the court "may award such relief as [it] deems appropriate, including monetary damages to persons aggrieved"); *see also* H.R. Rep. No. 711, 100th Cong., 2d Sess., at 40 (1988) ( "relief may be awarded to all persons affected by the discriminatory housing practice"). After discovery or at trial, defendants still may challenge the existence of damages arising from Warren's and Louise's financial and emotional burden as well as whether those damages were in fact legally caused by the alleged misconduct. *See Havens,* 455 U.S. at 379 n. 21, 102 S.Ct. at 1125 n. 21.

**\*5** Because the Complaint pleads that Warren and Louise Ores suffered distinct and palpable injuries that are fairly traceable to the defendants' alleged misconduct, the defendants' motion to dismiss Warren and Louise as plaintiffs due to lack of standing is denied. *See Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136. For these same reasons, defendants' motion for a more definite statement as to Warren's and Louise's standing is denied.

The Complaint also sufficiently pleads facts alleging plaintiff Niemer's standing. The Complaint alleges Niemer lost her anticipated commission; clearly an injury-in-fact. The Complaint further alleges that Niemer suffered this loss because of the defendants' alleged misconduct which allegedly prevented Paul and Kirk from purchasing the condominium. Defendants respond that Niemer's loss of her commission was not due to the defendants' alleged discrimination. Because a real estate agent is generally entitled to her commission from the seller if she presents a willing buyer, defendants argue that Niemer's loss was due to

either the seller's illegal refusal to pay the commission or Niemer's own waiver of the commission. *See Gordon,* 172 Ill.App.3d at 1094, 532 N.E.2d at 868.However, this argument at least assumes that the Niemer's brokerage contract contained no special conditions on the sale and that the parties did not sign a buyer's broker agreement. *See id.,* at 1094-95, at 868-70.Consequently, it presents a factual issue not appropriately resolved on the pleadings. Defendants' motions to dismiss Niemer as a party plaintiff and for a more definite statement of Niemer's standing are denied[FN3].

III. *Specificity of Plead Damages.*

Defendants move to strike the Complaint's single prayer for relief or, in the alternative, move for a more definite statement as to special damages under Federal Rule of Civil Procedure 9(g). General damages are damages of the type that necessarily flow from the defendants' alleged violation. Special damages arise naturally, but not necessarily, from the alleged conduct.*Moore v. Boating Industry Ass'n,* 754 F.2d 698, 716 (7th Cir.), *vacated on other grounds,* 474 U.S. 895, 106 S.Ct. 218, 88 L.Ed. 218 (1985). A plaintiff need not specifically plead general damages outside of a general claim for proper relief. However, Federal Rule of Civil Procedure 9(g) requires that any special damages " be specifically stated."

Defendants argue that plaintiffs' damages arising from emotional distress and lost funding each constitute special damages. In particular, they assert that the Complaint must indicate why the plaintiffs did not obtain the lost financing by locating alternative housing. Defendants also assert that plaintiff Niemer's damages arising from her lost commission constitute special damages requiring specific pleading.

Damages arising from embarrassment, humiliation and emotional distress are contemplated by a violation of the Fair Housing Act as general damages. *See Gore v. Turner,* 563 F.2d 159, 164 (7th Cir. 1978) (award of damages for emotional distress for Fair Housing Act violation is proper where plaintiff demonstrates illegal conduct caused

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 5

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

distress); *Seaton v. Sky Realty Co., Inc.,* 491 F.2d 634, 636-37 (7th Cir. 1974) (damages for humiliation is appropriate under Fair Housing Act where established by testimony); *Bryan v. Jones,* 519 F.2d 44, 46 (5th Cir. 1975). Such injury necessarily flows from being subject to discriminatory conduct, and certainly flows from discriminatory coercion or intimidation. *See Seaton,* 491 F.2d at 636-37. Consequently, plaintiffs' claim for damages for emotional distress is sufficient.

**\*6** On the other hand, plaintiffs' request for actual damages arising from their lost opportunity to acquire financing for housing and living costs are not of the type that necessarily flow from a violation of the Fair Housing Act. Damages arising under the Fair Housing Act sound basically in tort. *See Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Lost profits, earnings or other more speculative injuries are generally considered special damages in tort. *See Great American Indem. Co. v. Brown,* 307 F.2d 306 (5th Cir. 1962). Plaintiffs' claims for damages arising from lost financing are similar to lost profits or wages and, consequently, also constitute special damages. *See also McNeil v. P-N & S, Inc.,* 372 F.Supp. 658, 659 (N.D.Ga. 1973) (damages that require greater degree of proof, such as lost equity due to lost housing, constitute special damages under Fair Housing Act).

However, the Complaint pleads these damages with sufficient specificity.Rule 9(g) does not require that the plaintiff set forth his or her entire legal theory underlying asserted special damages. Instead, it requires that the plaintiff plead facts that adequately reveal the nature of the claimed damages to permit the defendant to respond in his answer and further delineate the claim during pretrial discovery. *Everco Industries, Inc. v. O.E.M. Products Co.,* 63 F.R.D. 662, 666 (N.D.Ill. 1974); *see Suarez Matos v. Ashland Presbyterian Community Hosp., Inc.,* 4 F.3d 47, 52 (1st Cir. 1993) (Rule 9(g) is intended to provide defendant with adequate notice of damages); *In Continental Nut Co. v. Robert L. Berver Co.,* 345 F.2d 395, 397 (5th Cir. 1965) (special damages are pled with sufficient specificity if they notify defendant of the nature of damages); *Diaz v. Irizarry v. Ennia,* 678 F.Supp. 957, 959 (D. Puerto Rico 1988). The Complaint alleges the facts

underlying the plaintiffs' claim for these damages: (1) the Illinois Department of Mental Health and the Consumer Owned and Controlled Housing Program pledged financial assistance to Paul and Kirk for the purchase of the condominium and subsequent living expenses, and (2) the defendants' alleged misconduct prevented Paul and Kirk from purchasing the condominium. This information provides the defendants with ample information to pursue their mitigation theory through pre-trial discovery[FN4].

Consequently, Certain Defendants' motion to strike plaintiffs' claim for damages and motion for a more definite statement as to damages are denied.

### IV. *Alleged Violations.*

All defendants also move for a more definite statement under Federal Rule of Civil Procedure 12(e) as to the alleged conduct that violated the Fair Housing Act. First, defendants argue that the Complaint fails to put each defendant on notice of which misconduct they are accused. Second, defendants maintain that the Complaint fails to adequately identify the nature of the alleged misconduct.

Federal Rule of Civil Procedure 8(a) only requires that a complaint provide sufficient notice to the opposing party through a "short and plain statement of the claim showing that the pleader is entitled to relief."Under Federal Rule of Civil Procedure 12(e), however, a defendant is entitled to a more definite statement only if "a pleading is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."*See American Nurses Ass'n v. Illinois,* 783 F.2d 716, 723 (7th Cir. 1986). Defendants may not use a motion under 12(e) to test a plaintiff's case by requiring them to allege certain facts or retreat from their allegations. *Juneau Square Corp. v. First Wisconsin Nat. bank,* 60 F.R.D. 46, 48 (E.D. Wisc. 1973). Rather, a more definite statement is required if, after the complaint and likely answer are filed, " the court would have no clear notion of the essence of the case."*Teradyne, Inc. v. Clear Communications Corp.,* 707 F.Supp. 353, 354

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

(N.D.Ill. 1989).

**\*7** In light of the Rule 8(a)'s minimal requirements, the Complaint adequately alerts each defendant of their alleged connection with the alleged misconduct. Each pleading alleging conduct in violation of the statute accuses either specific defendants, "members of the Association", or "all" defendants. Where the Complaint refers to members collectively, it clearly alleges that all of the Association's members are implicated[FN5]. On its face, the Complaints' references to defendants in its claims for damages and assertion of intentional misconduct denote all of the named defendants unless otherwise indicated. *See Resolution Trust Corp. v. Gershman,* 829 F. Supp. 1095 (E.D.Mo. 1993). Consequently, there is no ambiguity as to which defendants are accused of involvement in each misconduct.

Moreover, the Complaint sets forth the conduct complained of with adequate specificity for the defendants to form responsive answers. It provides the essence of the lawsuit: plaintiffs allege that defendants prevented Paul and Kirk from purchasing a condominium because of their handicap status. It alleges that these acts occurred around March 1994 and were composed of such conduct as discriminatory inquiries, statements, instituted policies, and a requested interview. It alleges that around March 18, 1994, defendants Image Control and Wojcik, as agents for the Association, adopted and advanced alleged discriminatory policies instituted by the Association and later attempted to disguise violations of the Fair Housing Act. Further, through this conduct, and possibly additional conduct, all of the defendants coerced, intimidated and interfered with Paul and Kirk in their efforts to purchase the condominium as well as intimidating and interfering with the other plaintiffs' in their efforts to aid Paul and Kirk. Finally, the Complaint alleges that all of the defendants' misconduct prevented Paul and Kirk from purchasing the condominium.

In contrast to Certain Defendants' assertion, *Hope, Inc. v. County of Dupage,* 738 F.2d 797, 815 (7th Cir. 1984) (en banc), does not stand for the broad proposition that a fair housing plaintiff need allege "

specific and particular discriminatory acts" in order to satisfy the requirements of notice pleading. In *Hope,* plaintiffs sued the County of DuPage asserting that it engaged in exclusionary zoning practices which prevented the construction of any low income housing in DuPage. *Id.* at 799.The Seventh Circuit dismissed the plaintiffs for their failure to establish standing because neither their pleadings nor proof at trial evidenced specific discriminatory acts that were fairly traceable to their alleged injury. *Id.* Therefore, *Hope* did not address the adequacy of the plaintiffs' complaint but rather their failure to produce any evidence of specific discrimination at trial. *See id.* at 807-808 & 815-16.In fact, the plaintiffs were allowed to proceed to trial based upon an allegation of a conspiracy among defendants to perpetuate zoning practices that excluded the construction of low income housing. *See id.* at 808.Moreover, the Seventh Circuit required the plaintiffs to identify particular discriminatory acts to establish their standing, not to satisfy the requirements of notice pleading. *See id.* at 815.

**\*8** Although the defendants did not raise this issue in their briefs, *Hope* does not require the plaintiffs to plead more particular discriminatory conduct to demonstrate the standing of Warren, Louise or Niemer. As noted, *Hope* did not address whether the plaintiffs' complaint satisfied the requirements for standing. It addressed whether the plaintiffs succeeded in demonstrating standing at trial. In addition, *Hope* required the plaintiffs to demonstrate particular misconduct because they could not point to a single concrete housing project allegedly impeded by the defendants' zoning practices. *See id.* at 807, 812 & 815.Without any specific proposed housing project at issue, plaintiffs could not demonstrate that their alleged injury, the absence of any low income housing in DuPage County, was fairly traceable to the defendants' zoning practices. *Id.* at 810 & 815.Consequently, the court required the plaintiffs to identify some specific discriminatory conduct indicating that the defendants hindered housing developers from ever proposing a low income housing project in DuPage. *See id.* at 815-16.In contrast, the instant Complaint alleges that the defendants rendered the condominium at 344 Sheridan Drive unavailable to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 7

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

Paul and Kirk. Furthermore, the Complaint adequately pleads particular conduct at this stage in the proceedings through its allegations that the defendants impeded the availability of the condominium through discriminatory statements, inquiries and official policies all occurring around March 1994.

Although the precise statements, inquiries and policies are not described, plaintiffs are not required to plead all of the facts logically entailed by a claim. *American Nurses,* 783 F.2d at 727; *see also U.S. v. Metro Development Corp.,* 61 F.R.D. 83, 87 (N.D.Ga. 1973) (fair housing complaint that pleads violations substantially in statutory language adequately puts defendants on notice). Exploration of the plaintiffs' ability to substantiate their claims is reserved for pre-trial discovery. *See Juneau,* 60 F.R.D. at 48.

Accordingly, defendants' and Certain Defendants' motions for a more definite statement as to the plaintiffs' allegations are denied.

CONCLUSION

For the reasons set forth above, Certain Defendants' motion to dismiss Banc One is denied, Certain Defendants' motion to dismiss Warren Ores, Louise Ores and Anna Neimar is denied, Certain Defendants' motion for a more definite statement as to standing is denied, Certain Defendants' motions to strike and for a more definite statement as to special damages is denied, and defendants' motions for a more definite statement of alleged violations is denied[FN6].

> FN1.§ 3617 provides that:
> It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617 (1988).

FN2. Named defendants who are members of the Association are Mary Fratto, Mohammed Ghousedin, Terry E. Maly, and Lana Baima.

FN3. The Federal Rules of Civil Procedure also do not require the plaintiffs to attach any documentation or evidence related to alleged damages to substantiate their pleadings. Defendants do not require this information to frame their answer. Further, the Federal Rules provide the defendants with liberal discovery for precisely this purpose.

FN4. The Complaint also adequately pleads Niemer's claim for her lost commission even though it may constitute special damages. The Complaint puts the defendants on notice of the nature and elements of the claim. As Certain Defendants' brief reveals, they have already constructed a theory to attack the merits of Niemer's asserted damages. Defendants may develop these facts through discovery and pursue this theory at trial or through summary judgment.

FN5. Plaintiffs are not required to identify specific members of the Association involved in devising or instituting the alleged discriminatory policies or interview. Prior to discovery, such information is outside the ambit of the plaintiffs' knowledge. The pleadings indicate that the plaintiffs accuse all named members of the Association of participating directly or through agents.

FN6. With leave of the court, plaintiffs amended their complaint first on October 5, 1994, and then again on January 23, 1995. Defendants Image Control, Wojcik, and the Association filed a motion for a more definite statement against the First Amended Complaint. Certain Defendants also filed a motion to dismiss and a motion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 8

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: Not Reported in F.Supp.)**

       for a more particular statement against the First Amended Complaint. In light of defendants' similar motions challenging the superseding Complaint, these previous motions are moot.

N.D.Ill.,1996.

Ores v. Willow West Condominium Ass'n

Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# UPDATED PUBLIC NOTICE



**Note:** **To the best of my knowledge and belief, the information contained on this web site is, in its entirety, true and correct.**
**Bob Christ**

# Due Diligence Results of Dr. Brett Cormick Marketing
# For Investment Capital
# In "The Elan Suisse Group of Companies"

**Elan Suisse (Pty) Ltd** (RSA Registration No.2003/000050/07)
**Elan Suisse International Holdings (USA) LLC** (a Delaware LLC)
**Elan Suisse Jersey** (Purportedly Operated by BNP Paribas Fund Services Jersey Limited)
**International Corporate Development SA** (Cormick UK Trading Name)
**Elan Suisse Ltd.** (UK Corporate Registered No. 04998672)
Elan Suisse Capital (Unclear as to which of these shell companies this moniker is attached)
Aquacine Ltd. – UK Registration No. 5613063
Nicotea (reportedly operated by Aquacine – which is now Nicogel Ltd.)
Nicogel Ltd. (Operated by John Walters in the UK – now Registration No. 05190095)
"The Aquacine Group" (Unclear as to what organization this moniker attaches - Aquacine Ltd. was renamed)
**Please Note:** Anthony Carter is now with Econet Wireless in Harare, Zimbabwe

**Note to Reader:** **This case arose out of an investment scam staged out of the republic of South Africa by a group of scam artists located throughout the world. These pages are linked to all of the underlying documents so that the reader can understand the source(s) so as to form his/her own conclusions. For a complete**

http://www.companyregistrations.co.uk/dissolution-and-restoration.asp

chap 1 para 8

and chap 2 para 3<<

I submitted the following request to the Companies House in the UK as an objection to the strike-off of Elan Suisse Ltd.:
>> My name is Robert D. Christ.  I am a citizen of the USA [this part of sentence omitted].  I am a defendant in a lawsuit instituted by the above referenced company through the County of Montgomery in the State of Pennsylvania.  That suit was transferred to Federal Court in the Eastern District of Pennsylvania then again transferred to Federal Court in Delaware to be combined with a civil fraud suit I had previously instituted against the main shareholder/accomplice of Elan Suisse Ltd. - one Brett J. Cormick (Australian Citizen).

According to Companies House notifications, the above referenced company has been slated for strike-off.  I object to that strike-off on the following grounds:
1) "some form of action is being taken, or is pending, to recover any money owed (such as a winding-up petition or action in a small claims court)"
For a complete copy of the suit filed by Elan Suisse Ltd. in Montgomery County Pennsylvania, please refer to this URL:
http://www.elan-suisse.com/PASuit/ES_PASuit.pdf
I have entered a motion to dismiss that lawsuit brought about by Elan Suisse Ltd. (Registered No.04998672) and expect that the motion will be granted with costs.  The motion is still pending and should stay the dissolution of this company pending the outcome of that motion.

2) "other legal action is being taken against the company"
My suit against the main shareholder of Elan Suisse Ltd. (Registered No.04998672) is one for civil fraud and should stay the dissolution of the company pending the results of the case slated for trial in May 2008 in Federal Court in Delaware (Case Number C.A. No. 06-275-GMS).

3) "the directors have wrongfully traded or committed a tax fraud or some other offence"
I brought the above referenced case against Director Brett J. Cormick for fraud.  This will be decided next May in Federal Court in Delaware.

I respectfully submit my objection to the strike-off application filed by director Cormick of Elan Suisse Ltd. (Registered No.04998672).<<

**October 12, 2007 Update**
This notification today from the UK Companies House with regards to the Elan Suisse Ltd strike-off application filed by Brett Cormick:
>>12/10/2007 - DISS6 - Notice of striking-off action suspended.<<

**October 16, 2007 Update**
I filed this "Motion for Judgment on the Pleadings".  The purpose of the motion is to get rid of all of the various red herrings thrown up by Cormick over the past two years.  This motion lacks the exhibits - which I will post over the next few days upon receipt.

**October 21, 2007 Update**
My attorney and I are baffled by the sloppiness of Cormick.  There are Undeniable Lies about Nicotea and RTD medicines etc that expose Cormick as a crook.  Yet this guy keeps clinging to