IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 06-275-GMS |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 07-60-GMS |
| v. | ) | |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

**ROBERT D. CHRIST'S OPENING MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR ENTRY OF DEFAULT JUDGMENT AND ATTORNEYS' FEES**

Robert D. Christ respectfully submits this memorandum of law in support of his motion, pursuant to Federal Rules of Civil Procedure 54(d)(2) and 55(b)(2), for entry of judgment against Brett J. Cormick, Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"), and Elan Suisse Ltd. ("Elan Suisse UK") awarding compensatory and punitive damages plus costs, interest, attorneys' fees and expenses:

## Background

On May 8, 2008, the Court held a hearing to consider Mr. Christ's Motion for Sanctions (D.I. 115 in C.A. No. 06-275; D.I. 73 in C.A. No. 07-60). At the conclusion of that hearing, the Court granted Mr. Christ's unopposed motion and awarded default judgment in Mr. Christ's favor on his claims in Civil Action No. 06-275. *See* Ex. A hereto (Transcript of May 8, 2008

Hearing) at 16. The Court further dismissed all counterclaims against Mr. Christ in Civil Action No. 06-275 as well as the claims alleged against him in Civil Action No. 07-60. *See id.* at 16, 19-20. On May 12, 2008, the Court entered an order implementing its rulings (D.I. 127 in C.A. No. 06-275; D.I. 83 in C.A. No. 07-60).

As the Court and counsel discussed at the May 8, 2008 hearing, the only remaining issue for the Court to resolve is the amount of damages awarded to Mr. Christ in his default judgment against Mr. Cormick and Elan Suisse USA. *See* Ex. A at 17-19. Related to that issue is whether Mr. Christ is entitled to an award of attorneys' fees and expenses he incurred in defending against the claims brought by Elan Suisse UK, and later abandoned, in Civil Action No. 07-60. *See id.* at 19-20. Accordingly, Mr. Christ has moved pursuant to Rule 55(b)(2) for entry of judgment in an amount to be set by the Court. Mr. Christ respectfully requests that the Court enter judgment in the total amount set forth and discussed below.

## <u>Argument</u>

In all cases where the clerk is not authorized to enter default judgment "for a sum certain," a party seeking judgment by default is required to apply to the Court. *See* Fed. R. Civ. P. 55(b). The Court is then authorized to conduct hearings or consider such evidence as it deems necessary to determine the appropriate amount of damages. *See id.*; 10 *Moore's Fed. Practice* § 55.30[4] (3d ed. 2007 Supp.).

As the parties' counsel represented to the Court on May 8, 2008, there is no dispute that Mr. Christ is entitled to, at a minimum, an award of $250,000 to compensate him for the funds he initially wired to Mr. Cormick and which form the basis for Mr. Christ's claims. *See* Ex. A at 16. In addition to that sum, Mr. Christ seeks: (1) further compensatory damages flowing from the wrongs alleged in Mr. Christ's amended complaint; (2) punitive damages; (3) an award of attorneys' fees and expenses; and (4) pre-judgment interest.

I.    **Compensatory Damages.**

The purpose of compensatory damages is to make the plaintiff whole.  *Calhoun v. Yamaha Motor Corp.*, 216 F.3d 338, 347 (3d Cir. 2000).  Therefore, compensatory damages include consequential damages for harm that "does not flow directly and immediately from the act of the party, but only some of the consequences or results of such act."  *Deisler v. McCormack Aggregates Co.*, 54 F.3d 1074, 1083 n.16 (3d Cir. 1995).  In tort cases (such as Mr. Christ's fraud claim for which Mr. Cormick has been found liable in default), the measure of damages includes "those reasonably foreseeable at the time of the commission of the tortious act or omission."  *Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1412-13 (3d Cir. 1985).  It is by these standards that the Court should determine the compensatory damages to which Mr. Christ is entitled.  As explained below, in addition to the $250,000 that is undisputed, there are several categories of damages that Mr. Christ suffered as a proximate result of defendants' conduct and for which he should be compensated.

A.    **Expenses Incident to Mr. Christ's "Investment."**

Prior to making his "investment," Mr. Christ incurred additional expenses as a direct result of Mr. Cormick's fraud.  For example, Mr. Christ spent $5,000 in travel expenses in order to meet with Mr. Cormick and representatives of BNP Paribas in London in early March 2004. *See* Affidavit of Robert D. Christ, dated May 30, 2008 ("Christ Aff.") ¶ 4.  This meeting was called at Mr. Cormick's insistence and was intended by Mr. Cormick to induce Mr. Christ to "invest" with Mr. Cormick's business venture.  Mr. Christ also spent $225.00 on a durable Pelican hard case which Mr. Cormick needed to transport embroidered "Elan Suisse" shirts (also purchased at Mr. Christ's expense) to Zimbabwe in an effort to promote the purported business. *See id.*

In 2004, when Mr. Christ reasonably believed, in reliance on Mr. Cormick's fraudulent statements, that he was working with Mr. Cormick toward launching the Elan Suisse business, he personally incurred $4,000 in communications expenses related to that venture. *See* Christ Aff. ¶ 5. At the same time, Mr. Christ also devoted significant amounts of time to Elan Suisse that he otherwise would have spent earning revenues for his underwater robotic exploration business, SeaTrepid. Based on Mr. Christ's then-current billing rate ($1,125 per day), he lost $315,000 in revenues in 2004 by spending 280 days working on the Elan Suisse business which later turned out to be fraudulent and illusory. *See id.* ¶ 6.

**B.    Expenses Relating to Mr. Christ's Investigation of Mr. Cormick and Elan Suisse.**

Once Mr. Christ realized that he had been defrauded by Mr. Cormick, he undertook nearly four years of investigation into Mr. Cormick, his past and other victims of his fraudulent scams. This investigation not only was a reasonable consequence of defendants' actions, it also formed the basis for the claims alleged in this action – claims for which Mr. Cormick ultimately conceded liability.

Specifically, Mr. Christ estimates that he has spent the equivalent of 400 working days investigating Mr. Cormick and supporting his legal claims against him, time which otherwise could have been spent on SeaTrepid business. *See* Christ Aff. ¶ 8. Therefore, based on Mr. Christ's current billing rate of $1,475 per day, defendants' actions have cost Mr. Christ $590,000 in lost income. *See id.* Mr. Christ also incurred $4,500 in expenses for traveling to the United Kingdom in June 2007 in order to interview fellow victims of Mr. Cormick and further his investigation. *See id.*

II.    **Punitive Damages.**

When considering tort or breach of contract claims, federal courts look to applicable state law to determine whether and to what extent to award punitive damages. *See, e.g.*, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 196 (3d Cir. 1992); *Sterner v. Wesley College, Inc.*, 747 F. Supp. 263, 268-70 (D. Del. 1990). Under Delaware law, an award of punitive damages is appropriate in cases of "particularly reprehensible" conduct where a defendant acted recklessly or was motivated by malice or fraud. *Jardel Co. v. Hughes*, 523 A.2d 518, 529 (Del. 1987). *Accord 2600 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 2002 U.S. Dist. LEXIS 439, at *12 (D. Del. Jan. 10, 2002), *aff'd in part, rev'd in part on other grounds*, 2004 U.S. App. LEXIS 10230 (3d Cir. May 25, 2004). Punitive damages may be awarded for breach of contract claims if a defendant's misconduct was "wanton and willful." *American Original Corp. v. Legend, Inc.*, 652 F. Supp. 962, 969 (D. Del. 1986).

There can be little question that punitive damages should be awarded here, where Mr. Cormick has, by his default, admitted to liability for intentionally and maliciously defrauding Mr. Christ. After he had misappropriated $250,000 from Mr. Christ, Mr. Cormick then agreed to repay those funds to Mr. Christ but intentionally breached that contract (even having Mr. Christ search his bank account for the promised funds which were never sent). Mr. Cormick's misconduct then was compounded by four years of obstruction, during which time Mr. Cormick deliberately and continually threw up roadblocks in legal proceedings pending in two countries in an effort to hinder Mr. Christ's legal efforts at reclaiming Mr. Cormick's ill-gotten gains. The last of these roadblocks was Mr. Cormick's refusal to submit to a deposition in this litigation, an act of defiance that ultimately led to the Court's entry of default. In sum, Mr. Cormick's wanton and willful misconduct justifies an award of punitive damages, which Mr. Christ respectfully requests in an amount to be set by the Court.

III.     **Attorneys' Fees.**

Under its inherent equitable powers, the Court may award attorneys' fees when an opposing party has conducted litigation "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). Here, Mr. Cormick's conduct in defending against Mr. Christ's claims – as well as asserting baseless counterclaims against Mr. Christ – has been nothing but an exercise in bad faith. First, when Mr. Christ originally filed suit in South Africa, Mr. Cormick contested that forum's personal jurisdiction by claiming that the challenged conduct did not take place there. *See* Christ Aff. ¶ 9. Later, in the litigation before this Court, Mr. Cormick took the complete opposite position, arguing that his presence in South Africa required that South African law be applied to certain of the parties' claims. *See Op. Mem. in Support of Motion to Determine Applicable Law* (D.I. 52 in C.A. No. 06-275).

Unfortunately, this was not the only time Mr. Cormick was untruthful to this and other tribunals. When Elan Suisse Ltd. (at Mr. Cormick's direction) filed its own action against Mr. Christ in Pennsylvania – an action which Judge Pratter of the Eastern District of Pennsylvania already has found was filed in a bad faith attempt to avoid this Court's jurisdiction, *see Elan Suisse Ltd. v. Christ*, 2006 WL 3838237, at *4 n.13 (E.D. Pa. Dec. 29, 2006) – it alleged that it was a South African corporation. At oral argument before the U.S. District Court for the Eastern District of Pennsylvania, counsel for Elan Suisse Ltd. confirmed that it was, in fact, Elan Suisse *(Pty)* Ltd., the South African corporation that was a defendant before this Court. *See id.* at *3. Once that action was transferred to this Court, however, Mr. Cormick abruptly changed course, arguing instead – contrary to the admissions of his counsel and his own pleadings – that Elan Suisse Ltd. was domiciled in the *United Kingdom*. *See Mem. in Opp. to Motion to Consolidate Actions* (D.I. 20 in C.A. No. 07-60). As Mr. Christ later pointed out, however, Mr. Cormick has twice sought to dissolve that British entity, an act that would render its claims a nullity. It was

for these reasons, as well as Elan Suisse Ltd.'s voluntary dismissal of its entirely baseless

Lanham Act claims in the face of Mr. Christ's motion for judgment on the pleadings, that Mr.

Christ previously requested that the Court award his fees expended in defending against Elan

Suisse Ltd.'s frivolous claims, a request that remains pending before the Court. *See Reply Br. in*

*Support of Motion for Judgment on the Pleadings* (D.I. 42 in C.A. No. 07-60). At a minimum,

therefore, Mr. Christ should be awarded $40,661.46 to compensate him for the fees and expenses

incurred in connection with Civil Action No. 07-60. *See* Christ Aff. ¶ 13.

Mr. Cormick's bad faith has not been limited to that single action, however. In fact, Mr.

Cormick's entire strategy in defending against Mr. Christ's allegations – whether in South Africa

or in this Court – appears to have been to avoid resolution of the merits at all costs, by whatever

procedural means necessary. As discussed above, Mr. Cormick convinced a South African court

that it lacked personal jurisdiction over him, through factual arguments which were inconsistent

with statements he later made to this Court under oath. Mr. Cormick then unsuccessfully moved

to be dismissed from this action on personal jurisdiction grounds. Once this Court denied that

motion and subjected Mr. Cormick to its jurisdiction, Mr. Cormick finally was faced with

confronting discovery into his fraudulent conduct. Mr. Cormick's subsequent attempts to evade

that discovery through a series of ever-changing excuses were well-documented in Mr. Christ's

motion for sanctions, which the Court granted in awarding a default against Mr. Cormick.

The fact that Mr. Cormick then completely abandoned his defense of this action, and

ceased all communications with his counsel, confirms that he never intended to try the merits of

Mr. Christ's claims. Instead, Mr. Cormick strung out adjudication of Mr. Christ's allegations as

long as possible, while at the same time wasting this Court's time and resources, for more than

two years. Once it became clear that he could no longer delay giving a deposition under oath,

Mr. Cormick simply gave up and consented to a default rather than challenge Mr. Christ's allegations – or pursue the counterclaims he brought against Mr. Christ. Nonetheless, there can be no doubt that Mr. Cormick will continue his deliberate strategy of evasion, given the statement to his counsel that he facetiously wishes Mr. Christ "good luck trying to collect" any judgment awarded by the Court. Ex. A at 14.

These actions epitomize the very type of bad faith litigation for which the Court is authorized to award fee-shifting under its inherent powers. Viewing it differently, Mr. Cormick would have been subject to a default judgment for $250,000 had he never appeared in response to Mr. Christ's original complaint more than two years ago. Instead, he undertook a lengthy campaign of delay and obfuscation designed solely to drive up Mr. Christ's legal costs. Awarding Mr. Christ no more than $250,000 now would effectively justify and reward Mr. Cormick for this conduct. Accordingly, Mr. Christ respectfully requests that any judgment against Mr. Cormick, Elan Suisse USA and Elan Suisse UK include the fees and expenses he incurred in connection with his South African litigation ($43,233.31) as well as those incurred in connection with the two actions in this Court ($275,756.74). These fees and expenses are itemized in Mr. Christ's affidavit submitted herewith. *See* Christ Aff. ¶¶ 9, 13.

## IV.    Pre-Judgment Interest.

Under applicable Delaware law, pre-judgment interest is awarded on damages in tort cases where the injury consists of depriving the plaintiff of "property having definite or ascertainable value." *Miller v. Newsweek, Inc.*, 675 F. Supp. 872, 876-77 (D. Del. 1987). Here, default has been entered against defendants on Mr. Christ's claim for fraud, in which Mr. Christ alleges that defendants deprived him of, at a minimum, $250,000. *See* Am. Compl. ¶¶ 30-33. Therefore, even if the Court awards Mr. Christ nothing more than his original $250,000 investment, that amount is clearly ascertainable and Mr. Christ should be awarded pre-judgment

interest in order to compensate him for the lost value of that sum over time.  Any additional damages awarded by the Court will be similarly ascertainable and subject to pre-judgment interest.  In accordance with 6 *Del. C.* § 2301, that interest should be awarded at the legal rate – *i.e.*, five percent over the Federal Reserve discount rate as of March 16, 2004, the date on which Mr. Christ completed his $250,000 payment to Mr. Cormick.[1]

---

[1] Attached hereto as Exhibit B is a spreadsheet, downloaded from the Federal Reserve Discount Window's website (*www.frbdiscountwindow.org*), which indicates that the primary discount rate in March 2004 was 2.00%.  The applicable legal rate of pre-judgment interest therefore would be 7.00%.

## Conclusion

For the foregoing reasons, Mr. Christ respectfully requests that the Court enter judgment against Mr. Cormick, Elan Suisse USA and Elan Suisse UK and award him damages and reasonable attorneys' fees and expenses in the amounts summarized below, plus pre-judgment interest:

| | |
|---|---|
| Original "Investment" | $250,000.00 |
| Damages Incident to the "Investment" | |
| Travel Expenses | $5,000.00 |
| Communications Expenses | $4,000.00 |
| Pelican Hard Case | $225.00 |
| Lost Revenues | $315,000.00 |
| Damages From Subsequent Investigation | |
| Lost Revenues | $590,000.00 |
| Travel Expenses | $4,500.00 |
| Attorneys' Fees & Expenses – South Africa | $43,233.31 |
| Attorneys' Fees & Expenses – United States | |
| C.A. No. 06-275 | $235,095.28 |
| C.A. No. 07-60 | $40,661.46 |
| **TOTAL** | **$1,487,715.05** |
| | **(plus punitive damages as set by the Court)** |

REED SMITH LLP

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated:  May 30, 2008

# Exhibit A

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT

 2             IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
     ROBERT D. CHRIST,                :      Civil Action
 5                                     :
                  Plaintiff,           :
 6                                     :
            v.                         :
 7                                     :
     BRETT J. CORMICK and ELAN SUISSE  :
 8   INTERNATIONAL HOLDINGS (USA)      :
     LLC,                              :
 9                                     :
                  Defendants.          :      No. 06-275-GMS
10

11                          - - -

12   ELAN SUISSE, LTD.,                :      Civil Action
                                       :
13                Plaintiff,           :
                                       :
14          v.                         :
                                       :
15   ROBERT D. CHRIST,                 :
                                       :
16                Defendant.           :      No. 07-60-GMS

17                          - - -

18                    Wilmington, Delaware
                     Thursday, May 8, 2008
19                       9:30 a.m.

20                          - - -

21   BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge

22   APPEARANCES:

23          THAD J. BRACEGIRDLE, ESQ.
            Reed Smith LLP
24
                      Counsel for Robert D. Christ
25
</pre>

2

1    APPEARANCES CONTINUED:

2              DAVID L. FINGER, ESQ.
           Finger & Slanina, LLC
3
                         Counsel for Defendants in
4                        C.A. No. 06-275-GMS

5
                         - - -
6

7              THE COURT:  Good morning, counsel.  Be seated,

8    please.

9              Counsel, just for the record, why don't you

10   identify yourselves.

11             MR. FINGER:  Your Honor, David Finger for Fred

12   Cormick and the Elan Suisse entities.

13             MR. BRACEGIRDLE:  Your Honor, Thad Bracegirdle

14   on behalf of Robert Christ.

15             THE COURT:  All right.  Counsel.

16             We have the matter of, Brett J. Cormick and --

17   is Elan Suisse here?

18             MR. BRACEGIRDLE:  No, Your Honor.  There was one

19   Elan Suisse entity that the Court dismissed earlier in

20   motion to dismiss briefing.  There are two Elan Suisse

21   entities which are still parties to the action.  There is a

22   Delaware LC called Elan Suisse International Holdings USA,

23   LLC, and then there was just a defendant in the primary

24   action.  And then there is an entity called Elan Suisse,

25   Ltd., which is a U.K. entity, which is the plaintiff in the

1   consolidated action, which is C.A. No. 07-60.

2           THE COURT:  I must say, before we go on, it

3   never ceases to amaze me, Mr. O'Sullivan, the things that

4   interest your editors.  Some of the actions that go on over

5   here that we don't see you in on, I got to wonder.

6           Okay.  So we have two motions.  We will take up

7   first Mr. Bracegirdle's motion on behalf of the plaintiff

8   for sanctions.

9           MR. BRACEGIRDLE:  Thank you, Your Honor.

10          Before I begin, I will just note for the record,

11  Your Honor, there are some highly confidential details

12  regarding this motion which are set forth in the papers,

13  which I assume Your Honor has.  But in light of the audience

14  in the Court, I will not make reference to those details and

15  try to be as little detailed as I can in the presentation.

16          THE COURT:  Understood.

17          MR. BRACEGIRDLE:  Your Honor, the reason for the

18  motion for sanctions, at least at the time that it was

19  filed, related to the failure of Dr. Cormick, who is the

20  defendant in the primary action, to appear for a properly

21  noticed deposition.

22          Going back a little bit in history, Your Honor,

23  we first attempted to try to set up depositions, and

24  specifically Dr. Cormick's deposition, last fall.  As Your

25  Honor may recall, there was some issue with respect to Dr.

4

1    Cormick's ability to travel out of the country where he was

2    currently living at the time.  They had his passport.  That

3    did not arise until this past January.  Once that issue

4    arose, counsel for the parties attempted to work out an

5    arrangement whereby we would either take Dr. Cormick's

6    deposition in that country or conduct it by video

7    conference.  Ultimately, I opted to travel myself to the

8    country where Dr. Cormick was located to take his deposition

9    myself.

10              After some back-and-forth, then, we ultimately

11    agreed on two days when Dr. Cormick's deposition would be

12    taken, in late March, it was March 26th and 27th, I believe.

13    Based on an agreement between counsel, I then made

14    arrangements to travel overseas and take the deposition in

15    that country.

16              A couple weeks before that deposition was

17    scheduled to go forward, an issue then arose with respect to

18    Dr. Cormick's ability to then travel from where he was

19    living to where the deposition was going to take place.

20              As Your Honor may recall, there is an issue in

21    this case as to Dr. Cormick's financial status.  My client

22    was working out, per the Court's order, paying for Dr.

23    Cormick's travel expenses.  But Dr. Cormick raised an issue

24    as to the reliability of public transportation to get him to

25    and from the deposition location on the days that we had

1    originally agreed to.

2            As counsel for Dr. Cormick and I were working

3    out that issue, matters were further complicated when Dr.

4    Cormick, despite his financial condition, then took a week's

5    trip the week before the depositions were supposed to take

6    place, thereby rendering his counsel unable to get in touch

7    with him concerning this issue, which led to the parties

8    having a teleconference with Your Honor in late March, the

9    day before I was supposed to fly overseas to take the

10   deposition.

11           If Your Honor will recall, at that time Your

12   Honor made it clear to the parties that we were permitted to

13   take Dr. Cormick's deposition after the date when the

14   pretrial order was initially due and have an opportunity to

15   make supplemental changes based on the deposition testimony.

16           So based on that, Your Honor, we attempted to

17   again reschedule Dr. Cormick's deposition.  Again, he

18   conveyed to his counsel that he was then available for two

19   days in April, which were, we agreed to, April 16th and

20   17th, again, in the same country, where Dr. Cormick was

21   located.

22           I properly re-noticed the deposition again for

23   that location and time, and once again, made nonrefundable

24   travel arrangements to travel overseas to take the

25   deposition.

6

1          Once those arrangements were made on April 7th,

2    which was, again, less than one week before I was scheduled

3    to travel overseas to take the rescheduled deposition, Mr.

4    Finger informed me that he had heard from Dr. Cormick, and

5    was told that there was another issue that had come up.

6    This time Dr. Cormick's passport had been returned to him,

7    so he was able to travel outside of that country, but

8    unfortunately, the bad news was that country was now no

9    longer allowing him to stay.  And according to Mr. Finger,

10   what he was told is that Dr. Cormick had to leave

11   immediately and had made plans to travel outside of that

12   country to another country, and so as a result was unable to

13   appear for his deposition the following week.

14          Mr. Finger and I then attempted to flush that

15   out a little more.  I had contacted counsel in the country

16   that Dr. Cormick was leaving, and had learned that the way

17   the immigration laws work there is that typically a person

18   who has applied for residency status would have -- in Dr.

19   Cormick's position normally would have been given some sort

20   of documentation to state that his application had been

21   denied, and typically would have been given some period of

22   time, normally 28 days, in which to leave the country.

23          So I had some questions as to whether or not Dr.

24   Cormick could actually stay within the country to permit his

25   deposition to go forward.

1        I asked Mr. Finger to try to obtain some sort of

2   documentation from Dr. Cormick.  What I then found out from

3   Mr. Finger is that, apparently, Dr. Cormick just on his own

4   up and left the first country right away before his

5   deposition was scheduled, went to the second country, and as

6   far as I know, despite asking for it, Mr. Finger was never

7   provided with any proof or documentation of this immigration

8   issue which Dr. Cormick claims to have caused him to leave

9   the one country for the other.

10       And that was what prompted the filing of the

11  motion, Your Honor.  We had on two occasions properly

12  noticed the deposition based on agreement of Dr. Cormick to

13  appear at certain times and places.  He has on two occasions

14  unilaterally decided that he couldn't appear for various

15  reasons.  The most recent occasion being, I think, the most

16  egregious, because I still have no proof one way or the

17  other as to the legitimacy of his claim of having an

18  immigration problem.

19       Now, since the motion has been filed, it appears

20  as though Dr. Cormick has now ceased communicating with

21  counsel.  So we really have no ability at this point to

22  schedule a deposition.

23       Based on what Mr. Finger has told me, I now know

24  where he is located, but there is no way of knowing whether

25  he can travel, whether we can get there and take his

1   deposition.  And at this point he appears to have ceased all

2   communications with his counsel.

3            As we laid out in the motion, Your Honor, it's

4   appropriate, under Rule 37(d), for the Court to impose

5   sanctions when we have a situation like this, where a party

6   has failed to appear for properly noticed depositions.

7            As the authorities we have put forth in our

8   motion make clear, it's not --

9            THE COURT:  I wanted to ask you about that, Mr.

10  Bracegirdle.  Is it the case that there is no Third Circuit

11  authority or any District of Delaware Court has dealt with

12  this before?  Because I don't believe any of the authorities

13  cited are from the District of Delaware Courts.

14           MR. BRACEGIRDLE:  You are correct, Your Honor.

15           My research on the matter has not revealed any

16  specific Third Circuit law on the particular issue of

17  whether or not the deponent must actually not show up and --

18  whether I would have had to travel, sit in a room and wait

19  in vain for him to show up.

20           THE COURT:  Regardless, I was just curious, the

21  authority that you have cited from other circuits and

22  district courts, as well as the rule, Rule 37 makes clear,

23  made clear that the Court has broad discretion in this area.

24           MR. BRACEGIRDLE:  Yes, Your Honor.  I would

25  submit in this situation, Your Honor, it is within the

1    Court's discretion to impose sanctions.  This has been a

2    course of months in which we have tried to schedule this

3    deposition.  We have come up with various roadblocks, the

4    most recent of which now appears to completely preclude us

5    from taking the deposition, in fact, it appears jeopardizes

6    the trial entirely.

7                    THE COURT:  Speaking of which, the pretrial

8    conference is scheduled for when?

9                    MR. BRACEGIRDLE:  It was scheduled for right

10   now, Your Honor.

11                   THE COURT:  We saved this for today.

12                   MR. BRACEGIRDLE:  It was converted at Your

13   Honor's order.

14                   THE COURT:  When are we due to go to trial?

15                   MR. BRACEGIRDLE:  May 27.

16                   Your Honor, one of the sanctions which is within

17   the Court's authority under Rule 37 to impose for actions

18   such as this is entry of judgment, dismissal of claims.

19   And, Your Honor, those kinds of sanctions are appropriate

20   here specifically because Dr. Cormick has raised the issue

21   of his ability to make any payments at all, his financial

22   status.  So in that situation, Your Honor simply awarding my

23   client the costs that we have incurred to try to take the

24   deposition really would have no effect, because I suspect we

25   would just run into the problem with Dr. Cormick saying he

1  can't pay it.

2        What I think is required, Your Honor, is the

3  full sanction, such as dismissal of Dr. Cormick's

4  counterclaims in the primary action, entry of judgment in my

5  client's favor on his affirmative claims.  And I think

6  that's even more warranted, Your Honor, now that we know

7  that Dr. Cormick has apparently disappeared, and appears

8  unwilling, by Mr. Finger's estimation, to proceed with his

9  case.

10        Since Dr. Cormick is the only individual through

11  which the Elan Suisse entities operate, and he controls

12  them, he is the only person who controls them, Your Honor

13  also would be -- it also would be within the Court's

14  discretion, I think appropriately, to enter judgment against

15  those entities as well both on the affirmative claims and

16  the counterclaims that the Elan Suisse entities have against

17  my client.  That is why, Your Honor, last week we had

18  indicated to the Court that the motion was unopposed.

19        Dr. Cormick's time for responding to the motion

20  has long since come and gone.

21        According to what Mr. Finger has filed with the

22  Court, it appears as though Dr. Cormick has no intent on

23  responding or opposing the motion, which is why we submitted

24  to the Court a proposed order which would enter judgment

25  against those parties and grant the motion.

1          THE COURT:  Okay.  Thank you, Mr. Bracegirdle.

2          Mr. Finger, are you able, in sum, to concur in

3    the views just expressed by Mr. Bracegirdle?  Not just the

4    views, but the factual averments?

5          MR. FINGER:  I would like to supplement a little

6    bit, Your Honor.  My supplemental recitation will of

7    necessity be facts pertaining to my motions as well.  I ask

8    the Court a little bit of indulgence in that regard.

9          It is correct, Your Honor, that while Dr.

10   Cormick was in the first country, he informed me that he had

11   received, A, his passport was returned, B, notification that

12   he was required to leave, and he promptly left thereafter.

13   When Mr. Bracegirdle advised me of the 28-day rule, I sent

14   an e-mail -- my only way to communicate with Dr. Cormick has

15   been by e-mail -- saying, well, given this rule, why did you

16   leave now?  The only answer I got was that the party who was

17   sponsoring his -- paying for his leaving required it.

18         I asked him to flesh that out, and I got no

19   response to it.

20         However, notwithstanding his leaving and going

21   to a second country, we were still negotiating his coming to

22   Delaware or to the United States, to Washington, I think we

23   were talking about, because the flights could go to

24   Washington, D.C. or New York.

25         Then a new wrinkle emerged.  Dr. Cormick went to

1    talk to someone about -- at an embassy.  As a citizen of

2    Australia, he was allowed to come to the U.S. without a

3    visa.  There is a visa waiver program.  However, when one

4    does it, there is a form one has to fill out.  One of the

5    questions on that form is have you ever been arrested.

6            Dr. Cormick had been arrested, we claim falsely,

7    because Mr. Christ filed a document in Zimbabwe, accusing

8    him of being a fugitive, and he was arrested.  He was let go

9    a few days later.  No charges were filed.

10           He had also been arrested about a decade earlier

11   in England.  Again, it was a disgruntled investor.  Again,

12   he was let go that same day.  No charges were ever filed.

13   No prosecution.

14           Nonetheless, even without a prosecution or even

15   a charge, you have to put down, have you been arrested.

16           I called the State Department to learn about

17   this process.  They said what happens is when a foreigner

18   comes to the U.S., when he gets to the U.S., or she gets to

19   the U.S., it has on the form, when the Immigration officer

20   sees that there was an arrest, they will take the person

21   aside and do a mini-interview and make a determination on

22   the spot, non-appealable, whether that person can come in or

23   not. And there is no pretest -- there is nothing you can do

24   in advance to get that determination.  So there was an issue

25   about, well, what if he comes and has to go back.

1          We were pretty close to working through that.

2          However, I then got an e-mail from my client, a

3     rather long e-mail, expressing -- being upset about several

4     different things.  One thing was he had reviewed Mr.

5     Christ's website for the first time in a while and was upset

6     that Mr. Christ had repeatedly violated the confidentiality

7     order by posting information noted as confidential on his

8     website.  Whenever that happened I would call Mr.

9     Bracegirdle, and Mr. Bracegirdle would attempt to have his

10    client remove it, maybe not always successfully.

11         Mr. Bracegirdle indicated he couldn't control

12    his client, who has something of anger issue here.

13    Sometimes he would replace it and say, "Dr. Cormick's lawyer

14    haughtily and angrily required that I remove it," and made

15    comments like that and so forth.

16         Another thing that upset Dr. Cormick was that

17    Mr. Christ's website had now taken to attacking me

18    personally, calling me a "slimy attorney," "unethical,"

19    threatening to file an ethics action.  So be it.

20         The essence of that later was while he was

21    trying for some time so he could raise money to be able to

22    come to trial and living for that period, he was

23    unsuccessful.

24         Given that, given all these other complaints he

25    had, which I won't go into whether or not they were valid or

14

1    not, and given his concern, based on Mr. Christ's website,

2    that he may be planning to have him arrested when he comes

3    here, he said to me -- he indicated to me that he didn't see

4    any point in continuing with the thing, just let him get his

5    judgment, and good luck trying to collect it.

6            Mr. Christ in his deposition testified that he

7    believes his $250,000 is hidden somewhere, and he wants to

8    be able to go after it.  From what I know, it's not there.

9    It's gone.  I don't know where it is.

10           That is the representation that has been made to

11   me, it's been gone.

12           Getting this information, I called Mr.

13   Bracegirdle.  I said, it looks like we may be at the end of

14   this.  Let's see how we want to do this.  Maybe we can do a

15   stipulation.  So I then sent an e-mail to my client, giving

16   him his options -- you can stipulate, you can default, the

17   hearing, the pros and cons of each.

18           Mr. Bracegirdle then sent me an e-mail with a

19   proposed stipulation, which I thought was a little

20   outrageous because it wasn't for the $250,000, it was for

21   over a million dollars.  He wanted all of his legal fees in

22   this case, in his case in South Africa, and all his other

23   incidental expenses in finding out everything bad he could

24   about Dr. Cormick.  But I forwarded it to the client with my

25   e-mails.

1          At that point, Your Honor, the e-mails bounced

2  back as undeliverable.  I sent them, resent them.  They

3  bounced back as undeliverable.  And I figured, he's gone.

4          So I waited a couple of days, and then I filed

5  the motion to withdraw, because there is nothing more that I

6  can do.

7          THE COURT:  There has been no communication

8  between the two?

9          MR. FINGER:  The last point is, yes, I did a

10  couple of days ago receive an e-mail from him at a new

11  e-mail address, saying that the reason he changed -- shut

12  down the other e-mails is Mr. Christ had been sending him

13  harassing e-mails, profanity-laden.  That's the nature of

14  the communication between the two of them.  So he knew that

15  once a judgment was entered he would be getting more of

16  those e-mails, crowing and such.

17          So to avoid it, he shut down those e-mail

18  addresses and created a new one.  So I wrote back and said,

19  here are the e-mails I have been trying to get to you.  It

20  is important that we resolve this.

21          To date, I have heard nothing back.  I am in a

22  position where I can do little.  I believe that it is Dr.

23  Cormick's belief that all that is left to do is to enter

24  judgment.

25          Thank you, Your Honor.

16

1          THE COURT:  All right.  It seems, then, that

2     there is ample reason for the Court, given what I have seen

3     in writing and the submissions we just heard from counsel,

4     to at least in part render relief.  I will order the

5     dismissal of the counterclaims and enter the default.

6          But I think that the rule may require -- it

7     depends upon what we are talking about in terms of the

8     amount.  Rule 55(b) is actually the governing rule.  If it's

9     a sum certain that's been agreed upon, it seems to me that

10    the Clerk can enter the default judgment.  That's done by

11    the mere filing of proper paperwork with an affidavit,

12    according to rule.  But I think I am now hearing that there

13    is not an agreement.

14          The original sum at issue was $250,000.  There

15    was no controversy about that.  Right?

16          MR. BRACEGIRDLE:  Yes.

17          THE COURT:  Is Mr. Finger correct --

18          MR. BRACEGIRDLE:  That's correct, Your Honor.

19    Just to clarify for the Court, the amount that we have put

20    into the proposed judgment constituted the special damages

21    which we had outlined in the pretrial order.  It does not --

22    just to clarify for the Court, it does not include my

23    attorneys' fees for this action.  I realize that that would

24    have to be a separate application to the Court.

25          It incorporates or encompasses the special

1    damages which we laid out in the pretrial order which we

2    believe flow from the underlying fraud, not just the

3    $250,000 originally at issue.

4              MR. FINGER:  Your Honor, if I may make one

5    point.  I still feel a compulsion to try to protect --

6              THE COURT:  The Court appreciates that, quite

7    frankly.

8              MR. FINGER:  We objected in the pretrial order.

9    And, Your Honor, those special damages were never stated in

10   the complaint.  And it's a longstanding rule that if it is

11   not in the complaint you don't get them.

12             THE COURT:  I think that's correct.  If it is

13   your belief that that is incorrect, Mr. Bracegirdle, I

14   think -- and I will not, if we should need another

15   proceeding, require Mr. Finger to attend that, because I am

16   going to grant your motion to withdraw.  But if you want to

17   pursue that, we can, Mr. Bracegirdle.  But we will need to

18   schedule, I think, another proceeding, particularly in light

19   of what Mr. Finger has just asserted.

20             What is your pleasure?

21             MR. BRACEGIRDLE:  Well, Your Honor, I guess it

22   sounds as though there is no dispute as to $250,000.  And

23   anything over that we would have to get the Court's

24   approval --

25             THE COURT:  Which, given the dispute, would --

1          MR. BRACEGIRDLE:  Correct.  It sounds like there

2   is a dispute.  Sitting here today, I don't believe my client

3   would consent to judgment of just $250,000 without at least

4   consulting with him and figuring out how we were to proceed

5   with the Court.

6          So I anticipate that it's more than likely we

7   would make an application for additional damages.  My only

8   question is --

9          THE COURT:  How to do it?

10          MR. BRACEGIRDLE:  Not only how to do it, but how

11   and to what extent we can ensure that Dr. Cormick is

12   properly notified and given an opportunity to deal with

13   this.

14          THE COURT:  Mr. Finger.

15          MR. FINGER:  Your Honor, I will be happy to

16   assume responsibility for responding to any written

17   submission he has, just so that Your Honor has the benefit

18   of an adversarial --

19          THE COURT:  That is appreciated, Mr. Finger.

20   Much appreciated.

21          All right.  Then that's what we will do.  You

22   file your motion for the entry of a default judgment with

23   the appropriate supporting affidavits or evidence.  And Mr.

24   Finger has graciously agreed to respond.  And we will

25   schedule it for a brief proceeding, take the evidence in the

1    form offered, and make a ruling.

2              MR. BRACEGIRDLE:  Thank you, Your Honor.  One

3    point of clarification -- actually, two.

4              There are two actions at issue here.  Your Honor

5    did mention that you were going to dismiss the counterclaims

6    in the first action.  In the second action, we have

7    affirmative claims by an Elan Suisse entity against my

8    client which we would also request be dismissed.  I wanted

9    to make sure, with that clarification, as to whether or not

10   those are also dismissed.

11             THE COURT:  Mr. Finger, any opposition to that?

12             MR. FINGER:  No, Your Honor.

13             MR. BRACEGIRDLE:  Thank you.

14             THE COURT:  Is that part of your proposed order?

15             MR. BRACEGIRDLE:  It is, yes, Your Honor, yes.

16             Related to that, among the motions which are

17   before the Court in this case, one of them is a motion for

18   judgment on the pleadings, which we had filed, with respect

19   to that second case.  In connection with that, we had --

20             THE COURT:  How about I dismiss that as moot.

21             MR. BRACEGIRDLE:  Before you do that, Your

22   Honor, in part of that motion we had requested an award of

23   fees for defending against that case.  That still is an open

24   issue.  If it pleases Your Honor, I can include that,

25   perhaps, in what we believe would be an appropriate judgment

1    amount.   That is maybe the easiest way to handle it.

2              THE COURT:   I have no difficulty with that.

3              Mr. Finger?

4              MR. FINGER:   That is fine Your Honor.   We will

5    respond in writing to that.

6              THE COURT:   Does your order that you have asked

7    me to sign contemplate that.

8              MR. BRACEGIRDLE:   That order does not, Your

9    Honor.

10             THE COURT:   Do you want to submit a revised

11   order?

12             MR. BRACEGIRDLE:   I suppose I will submit a

13   revised order when I make the motion for default.   That's

14   probably the most efficient way to handle this.

15             THE COURT:   What has been proposed is sufficient

16   and adequate to the extent that I rule today insofar as

17   dismissing the counterclaims, dismissing the affirmative

18   action by Elan Suisse, and entering the default.

19             MR. BRACEGIRDLE:   Correct.   Then the only issue,

20   Your Honor, would be the amount of damages.

21             THE COURT:   The default damages.

22             MR. FINGER:   Your Honor, because lawyers like to

23   make the obvious explicit, I assume this means the trial is

24   off.

25             THE COURT:   Indeed, it is.   It's been an

21

1      interesting experience, gentlemen.

2                    (Hearing concluded at 10:04 a.m.)

3

4                              -   -   -

5

6      Reporter:   Kevin Maurer

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit B

| Rate Type | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Primary* Credit | Secondary** Credit | Boston | New York | Philadelphia | Cleveland | Richmond | Atlanta | Chicago | St. Louis | Minneapolis | Kansas City | Dallas | San Francisco |
| 2.25% | 2.75% | 01-May-08 | 30-Apr-08 | 01-May-08 | 30-Apr-08 | 01-May-08 | 30-Apr-08 | 30-Apr-08 | 01-May-08 | 01-May-08 | 30-Apr-08 | 01-May-08 | 30-Apr-08 |
| 2.50% | 3.00% | 18-Mar-08 | 18-Mar-08 | 20-Mar-08 | 18-Mar-08 | 19-Mar-08 | 19-Mar-08 | 18-Mar-08 | 19-Mar-08 | 19-Mar-08 | 18-Mar-08 | 18-Mar-08 | 18-Mar-08 |
| 3.25% | 3.75% | 17-Mar-08 | 17-Mar-08 | N/A | N/A | 17-Mar-08 | N/A | 17-Mar-08 | N/A | 17-Mar-08 | 17-Mar-08 | N/A | 17-Mar-08 |
| 3.50% | 4.00% | 30-Jan-08 | 30-Jan-08 | 30-Jan-08 | 30-Jan-08 | 31-Jan-08 | 30-Jan-08 | 30-Jan-08 | 31-Jan-08 | 31-Jan-08 | 30-Jan-08 | 31-Jan-08 | 30-Jan-08 |
| 4.00% | 4.50% | 22-Jan-08 | 22-Jan-08 | 22-Jan-08 | 22-Jan-08 | 22-Jan-08 | 24-Jan-08 | 22-Jan-08 | 23-Jan-08 | 22-Jan-08 | 24-Jan-08 | 22-Jan-08 | 22-Jan-08 |
| 4.75% | 5.25% | 12-Dec-07 | 11-Dec-07 | 11-Dec-07 | 11-Dec-07 | 11-Dec-07 | 11-Dec-07 | 11-Dec-07 | 12-Dec-07 | 12-Dec-07 | 13-Dec-07 | 12-Dec-07 | 11-Dec-07 |
| 5.00% | 5.50% | 01-Nov-07 | 31-Oct-07 | 01-Nov-07 | 01-Nov-07 | 31-Oct-07 | 01-Nov-07 | 31-Oct-07 | 01-Nov-07 | 01-Nov-07 | 01-Nov-07 | 01-Nov-07 | 31-Oct-07 |
| 5.25% | 5.75% | 18-Sep-07 | 18-Sep-07 | 20-Sep-07 | 18-Sep-07 | 19-Sep-07 | 19-Sep-07 | 20-Sep-07 | 19-Sep-07 | 18-Sep-07 | 18-Sep-07 | 19-Sep-07 | 20-Sep-07 |
| 5.75% | 6.25% ^ | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 | 18-Sep-07 | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 | 17-Aug-07 |
| 6.25% | 6.75% | 29-Jun-06 | 29-Jun-06 | 29-Jun-06 | 29-Jun-06 | 29-Jun-06 | 29-Jun-06 | 29-Jun-06 | 30-Jun-06 | 29-Jun-06 | 06-Jul-06 | 29-Jun-06 | 29-Jun-06 |
| 6.00% | 6.50% | 11-May-06 | 10-May-06 | 10-May-06 | 10-May-06 | 10-May-06 | 10-May-06 | 10-May-06 | 10-May-06 | 10-May-06 | 11-May-06 | 10-May-06 | 10-May-06 |
| 5.75% | 6.25% | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 28-Mar-06 | 30-Mar-06 | 28-Mar-06 | 28-Mar-06 |
| 5.50% | 6.00% | 31-Jan-06 | 31-Jan-06 | 31-Jan-06 | 31-Jan-06 | 31-Jan-06 | 31-Jan-06 | 31-Jan-06 | 01-Feb-06 | 02-Feb-06 | 31-Jan-06 | 31-Jan-06 | 31-Jan-06 |
| 5.25% | 5.75% | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 | 14-Dec-05 | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 | 13-Dec-05 |
| 5.00% | 5.50% | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 | 01-Nov-05 |
| 4.75% | 5.25% | 20-Sep-05 | 20-Sep-05 | 20-Sep-05 | 22-Sep-05 | 20-Sep-05 | 22-Sep-05 | 20-Sep-05 | 21-Sep-05 | 20-Sep-05 | 20-Sep-05 | 22-Sep-05 | 20-Sep-05 |
| 4.50% | 5.00% | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 | 10-Aug-05 | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 | 09-Aug-05 |
| 4.25% | 4.75% | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 | 01-Jul-05 | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 | 30-Jun-05 |
| 4.00% | 4.50% | 03-May-05 | 03-May-05 | 03-May-05 | 03-May-05 | 03-May-05 | 03-May-05 | 03-May-05 | 04-May-05 | 03-May-05 | 03-May-05 | 03-May-05 | 03-May-05 |
| 3.75% | 4.25% | 22-Mar-05 | 22-Mar-05 | 22-Mar-05 | 22-Mar-05 | 22-Mar-05 | 22-Mar-05 | 22-Mar-05 | 23-Mar-05 | 22-Mar-05 | 23-Mar-05 | 24-Mar-05 | 22-Mar-05 |
| 3.50% | 4.00% | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 | 03-Feb-05 | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 | 02-Feb-05 |
| 3.25% | 3.75% | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 | 15-Dec-04 | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 | 14-Dec-04 |
| 3.00% | 3.50% | 10-Nov-04 | 10-Nov-04 | 10-Nov-04 | 10-Nov-04 | 10-Nov-04 | 10-Nov-04 | 10-Nov-04 | 12-Nov-04 | 10-Nov-04 | 10-Nov-04 | 12-Nov-04 | 10-Nov-04 |
| 2.75% | 3.25% | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 | 22-Sep-04 | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 | 21-Sep-04 |
| 2.50% | 3.00% | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 | 10-Aug-04 |
| 2.25% | 2.75% | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 | 01-Jul-04 | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 | 30-Jun-04 |
| 2.00% | 2.50% | 25-Jun-03 | 25-Jun-03 | 25-Jun-03 | 26-Jun-03 | 25-Jun-03 | 25-Jun-03 | 25-Jun-03 | 26-Jun-03 | 26-Jun-03 | 25-Jun-03 | 25-Jun-03 | 25-Jun-03 |
| 2.25% | 2.75% | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 | 09-Jan-03 |

*Primary credit is available to generally sound depository institutions on a very short-term basis, typically overnight, at a rate above the Federal Open Market Committee's target rate for federal funds. Depository institutions are not required to seek alternative sources of funds before requesting occasional short-term advances of primary credit. The Federal Reserve expects that, given the above-market pricing of primary credit, institutions will use the discount window as a backup rather than a regular source of funding.

**Secondary credit is available to depository institutions not eligible for primary credit. It is extended on a very short-term basis, typically overnight, at a rate that is above the primary credit rate. Secondary credit is available to meet backup liquidity needs when its use is consistent with a timely return to a reliance on market sources of funding or the orderly resolution of a troubled institution. Secondary credit may not be used to fund an expansion of the borrower's assets.

^ On August 17, 2007, the primary credit program was temporarily changed to allow primary credit loans for terms of up to 30 days, rather than overnight or for very short terms as before. Also, the spread of the primary credit rate over the FOMC's target federal funds rate has been reduced to 50 basis points. These changes will remain until the Federal Reserve determines that market liquidity has improved.

# Exhibit C

Page 1

LEXSEE 2002 U.S. DIST. LEXIS 439



Caution
As of: May 30, 2008

**2660 WOODLEY ROAD JOINT VENTURE, et al., Plaintiffs and Counterclaim Defendants, v. ITT SHERATON CORPORATION, et al., Defendants and Counterclaim Plaintiffs.**

**Civil Action No. 97-450-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 439; 2002-1 Trade Cas. (CCH) P73,601*

**January 10, 2002, Decided**

**SUBSEQUENT HISTORY:** Subsequent appeal at, *Remanded by 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 2004 U.S. App. LEXIS 10230 (3d Cir. Del., May 25, 2004)*

**PRIOR HISTORY:** *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 1999 U.S. Dist. LEXIS 20860 (D. Del., Dec. 2, 1999)*

**DISPOSITION:** [*1] Defendants' Motion For A Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or Amendment Of The Judgment GRANTED in PART and DENIED in PART.

**COUNSEL:** James P. Hughes, Jr., Esquire, and John W. Shaw, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, for Plaintiffs and Counterclaim Defendants.

William E. Wallace III, Esquire, Thomas J. O'Brien, Esquire, William M. Bosch, Esquire, and Derek A. Cohen, Esquire, Of Counsel, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Plaintiffs and Counterclaim Defendants.

Allen M. Terrell, Jr., Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware, for Defendants and Counterclaim Plaintiffs.

John S. Kinzey, Esquire, Scot C. Gleason, Esquire, and Nicholas W.C. Corson, Esquire, Of Counsel, LeBOEUF, LAMB, GREENE [*2] & MacRAE, LLP, New York, New York, for Defendants and Counterclaim Plaintiffs.

**JUDGES:** JOSEPH J. FARNAN, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOSEPH J. FARNAN

**OPINION**

*MEMORANDUM OPINION*

January 10, 2002

Wilmington, Delaware

**Farnan, District Judge.**

Presently before the Court is Defendants' Motion For A Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or Amendment Of The Judgment (D.I. 352). For the reasons set forth below, the Court will grant Defendants' Motion insofar as it seeks a remittitur of the jury's punitive damages award and deny Defendants' Motion in all other respects.

Page 2

2002 U.S. Dist. LEXIS 439, *2; 2002-1 Trade Cas. (CCH) P73,601

## BACKGROUND

Plaintiffs 2660 Woodley Road Joint Venture, John Hancock Mutual Life Insurance Company, Sumitomo Life Realty, and Woodley Road Associates, Inc. (collectively "Plaintiffs") filed the instant suit against Defendants ITT Sheraton Corporation and Sheraton Operating Corporation (collectively "Defendants"), seeking damages and other relief for breach of a management contract (the "Management Contract") between the parties, breach of fiduciary duty, RICO violations, and violations of the Robinson-Patman Act. Defendants filed counterclaims against [*3] Plaintiffs for failure to make specified structural repairs and for breach of contractual and fiduciary duties. Washington Sheraton Corporation was subsequently included in this litigation as a counterclaim plaintiff.

After a trial on the merits, the jury returned a verdict in favor of Plaintiffs on their claim under the Robinson-Patman Act, on three of their eight breach of contract claims, on their claims for breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and intentional or negligent misrepresentation, and on their claim for punitive damages. The jury also found in favor of Plaintiffs on all of Defendants' counterclaims. Defendants subsequently filed the instant motion for judgment as a matter of law under *Rule 50(b)*, or in the alternative, for a new trial under *Rule 59* (D.I. 352).

## STANDARD OF REVIEW

### I. Motion For Judgment As A Matter Of Law

To prevail on a renewed motion for judgment as a matter of law under *Federal Rule of Civil Procedure 50(b)*, the movant "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they [are], that the legal conclusions implied [by] the jury's [*4] verdict cannot in law be supported by those findings." *Lifescan, Inc. v. Home Diagnostics, Inc., 103 F. Supp. 2d 345, 350 (D. Del. 2000)* GUI is offering suggestions that appear to be paralleled but are not(citations omitted), *aff'd, 13 Fed. Appx. 940, 2001 U.S. App. LEXIS 7314, 2001 WL 345439 (Fed. Cir. 2001)*. In assessing the sufficiency of the evidence, the court must afford the non-movant, as the verdict winner, the benefit of all logical inferences that can be drawn from the evidence, resolve all conflicts in the evidence in the non-movant's favor, and view the record in the light most favorable to the non-movant. *Id. at 350* (citations omitted). The court may not evaluate the credibility of the witnesses, may not re-weigh the evidence, and may not substitute its own interpretation of the evidence in place of the jury's interpretation. *Id.* Rather, the court must determine whether evidence exists in the record to reasonably support the jury's verdict. *Id.*

### II. Motion For A New Trial

Pursuant to *Federal Rule of Civil Procedure 59(e)*, the court may grant a new trial on all or part of the issues in an action "for any of the reasons for which new trials have heretofore been granted at law in the courts of the United States. [*5] " *Fed. R. Civ. P. 59(a)*. Among the most common reasons for granting a new trial are the following: (1) the jury verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) new evidence has been discovered that would likely alter the outcome of the trial; (3) an attorney acted improperly or the court unfairly influenced the jury's verdict; or (4) the jury's verdict was facially inconsistent. *Lifescan, 103 F. Supp. 2d at 351*.

The decision to grant or deny a new trial is committed to the sound discretion of the trial court. *Id.* (citations omitted). However, where the ground for a new trial is that the jury's verdict is against the clear weight of the evidence, the court should proceed cautiously, because such a ruling would, by its nature, supplant the court's judgment for that of the jury. *Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993)*. In determining whether a new trial should be granted, the court need not view the evidence in the light most favorable to the verdict winner. A new trial should only be granted where the verdict results in a miscarriage of judgment or shocks [*6] the conscience. *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)*.

### III. Motion For Remittitur

As an alternative to granting a new trial, the court may also reduce a damages award if it deems the award to be clearly excessive. *Spence v. Board of Educ. of Christina Sch. Dist., 806 F.2d 1198, 1201 (3d Cir. 1986)*. Like the decision to grant a new trial, the decision to order a remittitur rests within the sole discretion of the trial court. *Id.*

## DISCUSSION

2002 U.S. Dist. LEXIS 439, *6; 2002-1 Trade Cas. (CCH) P73,601

**I. Whether Defendants' Are Entitled To Judgment As A Matter Of Law, A New Trial, Or A Remittitur Regarding The Jury's Award Of Contractual Damages In Favor Of Plaintiffs**

A. *Whether The Jury's Verdict And Award Of Contractual Damages Based On Defendants' Breach Of The Agency Provision Is Against The Weight Of The Evidence Or Shocking To The Conscience*

By their Motion, Defendants contend that the jury's award of $ 10.26 million for breach of the Management Contract due to Defendants' failure to act as the Owners' agent ("Agency Provision") is against the weight of the evidence, or in the alternative, shocking to the conscience, such that Defendants' [*7] are entitled to judgment as a matter of law or a remittitur of the jury's damages award. Specifically, Defendants contend that Plaintiffs presented no evidence that Defendants breached their duty to act as the agent of the Owners' outside of the specific contractual duties separately enumerated in the jury interrogatories. (D.I. 352 at 8). Defendants point out the that jury rejected all of Plaintiffs' contract claims except for their claims relating to purchasing and workers' compensation for which the jury awarded Plaintiffs a total of $ 472,000. Thus, Defendants contend that Plaintiffs presented no evidence for the jury to infer additional damages for a breach of the Agency Provision, and therefore, Defendants contend that the jury used this contract damage category as "a way to punish [Defendants] for [their] conduct, rather than to compensate Plaintiffs for any losses suffered." (D.I. 353 at 8). Accordingly, Defendants contend that the jury's award is excessive, improper and duplicative of the jury's punitive damages award.

After reviewing the record as it pertains to this claim, the Court concludes that Plaintiffs presented sufficient evidence at trial to support the jury's [*8] verdict regarding damages for breach of the Agency Provision. First, the Court disagrees with Defendants' premise that the jury's failure to award damages under the other contract provisions necessarily means that the jury should not have awarded damages for breach of the Agency Provision. The Agency Provision is a separate contractual provision in the Management Contract and the jury could have separately awarded damages to Plaintiffs if they found that Defendants breached that provision.

Further, after reviewing the record, the Court concludes that Plaintiffs presented substantial evidence to support the jury's verdict regarding the Agency Provision. Plaintiffs' experts repeatedly testified regarding instances in which Defendants put their interests ahead of Plaintiffs' interests, thereby violating the Agency Provision of the Management Contract. For example, Plaintiffs presented evidence detailing Defendants' improper receipt of kickbacks and their failure to disclose their activities, despite their role as Plaintiffs' agent. (Tr. 287-290, 464-465, 1296). Further, Defendants' experts did not refute Plaintiffs' evidence concerning Defendants' breach of their agency duties, because [*9] they testified that they did not consider the agency issue in their opinions. (Tr. 1102, 1196). In light of this evidence and in the circumstances of this case, the Court cannot conclude that the jury's verdict was erroneous. Further, in light of Plaintiffs' evidence that Defendants' received over $ 68 million in fees during the life of the contract, the Court cannot conclude that the jury's damages award was so grossly excessive as to shock the conscience. Accordingly, the Court concludes that Defendants are not entitled to judgment as a matter of law, a new trial or a remittitur with regard to the jury's verdict and award of damages related to breach of the Agency Provision.

B. *Whether Defendants Are Entitled To A New Trial As A Result Of Allegedly Misleading And/Or Confusing Jury Instructions*

In the alternative to their request for judgment as a matter of law or a remittitur, Defendants contend that a new trial is warranted because the Court's jury instructions were misleading and/or confusing to the jury. Specifically, Defendants contend that the Court should have added the following to the jury instructions, "When the agency agreement takes the form of a contract it is assumed [*10] that the document represents the entire understanding of the parties." (D.I. 352 at 9). According to Defendants, "the lack of such an instruction or any instruction differentiating between breach of contract for failure to act as owner's agent and breach of fiduciary duty confused the jury and caused the jury to grant the Plaintiffs a large damage award which . . . was not supported by the evidence." (D.I. 353 at 10).

Where the basis for seeking a new trial is an alleged error in the Court's jury instructions, the error must be "so substantial that, viewed in light of the evidence in the case and the charge as a whole, the instruction was capable of confusing and thereby misleading the jury." *Link v. Mercedes-Benz of North America, Inc., 788 F.2d*

2002 U.S. Dist. LEXIS 439, *10; 2002-1 Trade Cas. (CCH) P73,601

*918, 922 (3d Cir. 1986).* After reviewing the jury charge as a whole in light of the evidence in this case, the Court cannot conclude that its jury instructions confused or misled the jury such that a new trial is warranted. Contrary to Defendants' suggestion that the Court's jury instructions prevented the jury from differentiating between breach of contact and breach of fiduciary duty, the Court instructed the jury separately [*11] regarding both concepts, and both instructions properly stated the law. Further, the General Verdict Form Accompanied by Special Interrogatories highlighted the distinction between the claims, by providing separate interrogatories for breach of fiduciary duty and breach of contract as a result of the failure to act as the Owners' agent. Given these circumstances, the Court cannot conclude that the jury was confused or misled by the Court's jury instructions, and therefore, the Court will deny Defendants' request for a new trial based on the Court's jury instructions.

**II. Whether Defendants' Are Entitled To Judgment As A Matter Of Law, A New Trial, Or A Remittitur Regarding The Jury's Award Of Punitive Damages To Plaintiffs**

A. *Whether Plaintiffs Presented Sufficient Evidence To Support A Punitive Damages Award*

By their Motion, Defendants contend that Plaintiffs failed to present sufficient evidence to support the jury's punitive damages award. Specifically, Defendants contend that "the jury recognized that there was insufficient evidence to support Plaintiffs' claims for intentional torts when they rejected Plaintiffs' claims based on alleged violations of the RICO [*12] statute and common law fraud." (D.I. 353 at 2).

Punitive damages are unavailable as a matter of law for contract claims, however they are available for tort claims. To support an award for punitive damages, the plaintiff must present sufficient evidence for a jury to conclude that the tortfeasor "engaged in conduct evincing an evil motive, malice or a reckless or callous disregard of plaintiff's rights." *See e.g. Servino v. The Medical Center of Delaware, Inc., 1997 Del. Super. LEXIS 274,* at *10, C.A. No. 94 C-08-077-WTQ (Del. Super. Aug. 1, 1997) (citations omitted).

After reviewing the record, the Court concludes that Plaintiffs presented sufficient evidence to support the jury's decision to award punitive damages. Although the

jury found against Plaintiffs on their fraud and RICO claims, the jury found for Plaintiffs on their breach of fiduciary duty and intentional and negligent misrepresentation claims, all of which are sufficient to form the basis of a punitive damages award. Moreover, in the circumstances of this case, the Court cannot conclude that the jury's decision to award punitive damages was against the weight of the evidence presented by Plaintiffs. [*13] Plaintiffs presented the testimony of both lay and expert witnesses supporting their contention that Defendants received unlawful kickbacks and provided false and/or misleading information to Plaintiffs. For example, Plaintiffs presented the expert testimony of Donald Winter concerning the impropriety of Defendants' conduct and its deceptive nature (Tr. 290-316) and the testimony of Defendants' employees and outside vendors concerning the nature and mechanics of the "rebate" program. (Tr. 186-204, 217-220). In addition, Plaintiffs presented documents reflecting the higher prices charged to the hotels and illustrating Defendants' failure to inform the Owners that they were paying for these "rebates." (Tr. Ex. 7, 114). In light of this evidence, the Court cannot conclude that the jury's decision to award punitive damages award was unsubstantiated, and therefore, the Court will deny Defendants' motion for judgment as a matter of law as it pertains to the jury's decision to award punitive damages.

B. *Whether Defendants Are Entitled To A New Trial On The Grounds That The Jury Failed To Follow The Court's Jury Instructions On Punitive Damages*

Defendants next contend that the amount [*14] of the punitive damages award indicates that the jury failed to follow the Court's jury instructions and that the award was based on the jury's passion and/or prejudice such that a new trial is warranted. Defendants further contend that this prejudice was exacerbated by Plaintiffs' counsel during closing arguments. Specifically, Defendants point out that during closing arguments, Plaintiffs' counsel suggested that punitive damages should properly be "two, three, or four times the amount of compensatory damages awarded," including contractual damages (D.I. 353 at 3) (citing Tr. 1551). Plaintiffs' counsel then presented a demonstrative exhibit that included contractual damages as a part of the total $ 12.5 million in compensatory damages that Plaintiffs sought from Defendants. (D.I. 353 at 3). Defendants contend that, because the jury returned a punitive damages award of $ 37.5 million, exactly three times the amount of compensatory damages sought by

2002 U.S. Dist. LEXIS 439, *14; 2002-1 Trade Cas. (CCH) P73,601

Plaintiffs, the jury must have ignored the jury instruction that punitive damages are only available for breaches of fiduciary duty and negligent and/or intentional misrepresentation, or were otherwise confused by the Court's instructions. [*15] (D.I. 353 at 3-4).

After reviewing the record in this case, the Court concludes that Defendants are not entitled to a new trial as a result of the jury's alleged failure to follow the Court's instructions in awarding punitive damages. Defendants suggest that the jury may have been confused by the Court's instructions and the arguments presented by Plaintiffs' counsel. However, Defendants did not object to the Court's instructions as they pertained to punitive damages or counsel's argument concerning punitive damages, and therefore, the Court concludes that Defendants are precluded from pressing these arguments post-trial. *See Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc., 181 F.3d 446, 463 (3d Cir. 1999)* (holding that the failure to timely object to jury instructions results in a waiver of any objection).

In the alternative, even if the Court were to consider Defendants' argument, the Court would conclude that Defendants have not established that a new trial is warranted in the circumstances of this case. As in *Inter Medical Supplies*, the tortious conduct giving rise to the punitive damages award in this case is intertwined with Defendants' contractual [*16] obligations to Plaintiffs, such that the Court cannot conclude that it was erroneous for the jury to consider the total amount of compensatory damages in awarding Plaintiffs' punitive damages. *Id.*

To the extent that Defendants suggest that the jury's punitive damages award was based on passion and prejudice, the Court likewise concludes that Defendants are not entitled to a new trial. The sheer size of the jury's award is insufficient to establish that the award was the result of the jury's passion or prejudice. *Id. at 464.* Moreover, the jury's verdict itself demonstrates that the jury did not blindly favor Plaintiffs over Defendants such that its decision was the product of an improper bias against Defendants. Indeed, the jury did not find in favor of Plaintiffs on all of their causes of action, and the jury did not award Plaintiffs the full amount of damages they sought against Defendants. Accordingly, in the circumstances of this case, the Court concludes that Defendants are not entitled to a new trial on the grounds that the jury failed to follow the Court's instructions or awarded damages based on the improper motives of passion and prejudice.

C. *Whether* [*17] *The Jury's Punitive Damage Award Is Excessive And Unreasonable Such That Defendants Are Entitled To A New Trial Or A Remittitur Of the Jury's Punitive Damages Award*

By their Motion, Defendants further contend that the jury's award of punitive damages in the amount $ 37.5 million is so excessive and unreasonable that the Court should order a remittitur of the award. In the alternative, Defendants contend that a new trial is warranted, because the jury's award is excessive.

In determining whether a punitive damages award is unconstitutionally excessive and unreasonable, the Court should apply three "guideposts" set forth by the United States Supreme Court in *BMW of North America v. Gore, 517 U.S. 559, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996).* Specifically, the Court should consider: (1) the degree of reprehensibility of the wrongdoer's conduct; (2) the disparity between the harm or the potential harm suffered by the injured party and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *Id. at 574-575.*

Elaborating on these guideposts, courts have [*18] recognized the reprehensibility of the wrongdoer's conduct as the most significant factor. In assessing the reprehensibility of the wrongdoer's conduct, the court should consider (1) whether the harm was economic or physical; (2) whether the conduct would be unlawful in all states; (3) whether the conduct was a single act or repeated acts; (4) whether the conduct was intentional; (5) whether the conduct involved deliberate false statements rather than omissions; and (6) whether the conduct was aimed at a vulnerable target. *See e.g. Inter Medical Supplies, 181 F.3d at 467.*

Applying these guideposts in the circumstances of this case, the Court concludes that the jury's punitive damages award is unreasonably excessive such that a remittitur is required. Specifically, the Court concludes that while Defendants' conduct is sufficiently reprehensible to justify a punitive damages award, it is not so reprehensible as to justify the size of the award in this case. Further, the Court finds the ratio of punitive damages to compensatory damages to be unjustifiably excessive in light of the other guideposts and the circumstances of this case such that a reduced punitive

Page 6

2002 U.S. Dist. LEXIS 439, *18; 2002-1 Trade Cas. (CCH) P73,601

damages [*19] award is appropriate. The Court also concludes that the third *BMW* guidepost favors an award of punitive damages to some extent, but that it is not so persuasive given the other guideposts as to justify or support the size of the jury's award in this case. Consistent with these conclusions, the Court will analyze each of the *BMW* factors in turn.

1. Whether Defendants' conduct is sufficiently reprehensible to justify the punitive damages award

With regard to the reprehensibility of Defendants' conduct, the Court concludes that Plaintiffs presented sufficient evidence to support a finding that Defendants' conduct was sufficiently reprehensible to justify a punitive damages award; however the conduct is not so reprehensible as to justify the amount of the award in this case. The harm in this case was economic harm rather than physical harm, which the Supreme Court has recognized to be a less reprehensible type of harm. On the other hand, Defendants' conduct involved deceit, which the Supreme Court has recognized to be more troublesome than ordinary negligence. *BMW, 517 U.S. at 576* (recognizing that "the infliction of economic injury, especially when done intentionally [*20] through affirmative acts of misconduct or when the target is financially vulnerable, can warrant a substantial penalty"); *see also Ballen v. Martin Chevrolet*, 1999 WL 1045735, *4 (D. Del. Aug. 7, 1997) (discussing Supreme Court's decision in *BMW* and noting that the Supreme Court found "trickery or deceit" to be "more troublesome" than negligence). Thus, in the Court's view, the first *Inter Medical* factor supports some amount of punitive damages, but not the amount awarded in this case.

As for the remaining *Inter Medical* factors, the Court likewise concludes that they support a finding that Defendants' conduct was sufficiently reprehensible to justify a punitive damages award, but they are not so egregious or so clearly favorable to Plaintiffs that they justify the amount of the award in this case. For example, Plaintiffs presented evidence that, while serving as Plaintiffs' fiduciaries, Defendants received unlawful kickbacks against Plaintiffs' interests over several years. Plaintiffs also presented evidence demonstrating that Defendants conduct was intentional and that Defendants deliberately made misleading statements regarding their rebate program to [*21] conceal their wrongdoing and the harm it caused Plaintiffs. (Tr. 186-205, 212-214,

217-220, 220-238, 290-316). However, as the jury's verdict demonstrates, the evidence was not so persuasive as to establish that Defendants were engaged in fraud. Further, in the Court's view, Plaintiffs evidence concerning their vulnerability was "borderline." While it is true that Plaintiffs had less experience than Defendants in the hotel business, they were also not entirely naive in such business matters. And thus, the Court cannot conclude that Defendants' were so vulnerable as to be at a complete disadvantage in their dealings with Defendants. Accordingly, after weighing these considerations in light of the remaining guideposts, the Court, in its discretion, concludes that it is appropriate to reduce the jury's punitive damages award.

2. Whether the ratio of punitive damages to compensatory damages is excessive

As for the second *BMW* guidepost concerning the ratio of punitive damages to the harm suffered by Plaintiffs, Defendants contend that the ratio is disproportionate, because the Court should consider only those damages awarded for Plaintiffs' breach of fiduciary duty and intentional [*22] or negligent misrepresentation claims, i.e. approximately $ 1.1 million. Using this $ 1.1 million figure, Defendants contend that the punitive damages award represents a 37:1 ratio which is sufficiently shocking to the conscience to warrant a new trial or remittitur.

While the Court disagrees with Defendants' rationale insofar as it limits the punitive damages award to the $ 1.1 million portion of the jury's verdict, the Court agrees with Defendants' that, in the circumstances of this case, the ratio of compensatory damages to punitive damages is excessive. As the Court previously noted, Defendants' contractual breaches are sufficiently intertwined with their tortious conduct such that the Court cannot conclude that it would be inappropriate to consider the contractual damages in awarding punitive damages. *Inter Medical Supplies, 181 F.3d at 463*. However, as the Court also pointed out, the harm in this case, while reprehensible, is not so reprehensible as to justify the size of the jury's punitive damages award. As the Supreme Court restated in *BMW*, the proper inquiry for considering the reasonableness of the ratio between compensatory and punitive damages is [*23] "'whether there is a reasonable relationship between the punitive damages and the harm likely to result from the defendant's conduct as well as the harm that actually occurred.'" *517 U.S. at 581*

2002 U.S. Dist. LEXIS 439, *23; 2002-1 Trade Cas. (CCH) P73,601

(quoting *TXO Prod. Alliance Corp. v. Alliance Resources Corp., 509 U.S. 443, 460, 125 L. Ed. 2d 366, 113 S. Ct. 2711 (1993))*. Further, the purpose of punitive damages is to punish a tortfeasor and deter future conduct, while not exceeding the boundaries of punishment. *BMW, 517 U.S. at 568* (citations omitted). While the Court finds support for the punishment purpose of punitive damages in the record, the Court finds little support for the deterrence purpose. Plaintiffs suggest that deterrence is necessary, because Defendants' former Director of Purchasing, Mr. Hathorn, stated that he would set up the rebate program the same way in the future. However, the record also indicates that Mr. Hathorn is no longer employed with or has contact with Defendants. (Tr. 1375-1377). Moreover, there is nothing in the record to suggest that Defendants would be likely to engage in this conduct in the future, particularly in light of the jury's verdict in this case. [*24] Further, in the Court's view, a reduced punitive damages award would still serve a deterrent function while comporting more with the boundaries of punishment warranted by the conduct in this case. Accordingly, after weighing these considerations in light of the other *BMW* guideposts, the Court concludes that it is appropriate to reduce the jury's punitive damages award. [1]

> 1    In addition to the foregoing, the Court observes that there is scarce support in other cases for the size of the punitive damages award in this case. Plaintiffs direct the Court to *Daka, Inc. v. Breiner, 711 A.2d 86, 100-101 (D.C. 1988)*, in which the Court upheld a punitive damages award that was 39 times the compensatory damages award. However, *Daka* is distinguishable from this case, because the plaintiff's injury was a physical injury and not solely an economic injury.

3.  Whether the difference between the punitive damages award and the civil or criminal penalties imposed in comparable cases weighs in favor of the [*25] punitive damages award in this case

Lastly, with regard to the third *BMW* guidepost, the Court should consider the difference between the punitive damages award and the civil or criminal penalties authorized or imposed in comparable cases. As the parties point out, this factor is designed to determine whether reference to the possible civil or criminal penalties would put one on notice that particular conduct could result in an adverse monetary judgment in an amount approximating the punitive damages award. Plaintiffs direct the Court to the Massachusetts Commercial Bribery statute as the relevant criminal penalty to consider, and Defendants oppose Plaintiffs' reliance on that statute contending that there is no evidence indicating that the jury found a violation of that statute. However, even if the Court were to consider the penalty under the Massachusetts Commercial Bribery statute as the relevant gauge, the Court would conclude that the punitive damages award in this case is not proportionate to the penalties imposed by that statute. A violation of the Massachusetts Commercial Bribery statute carries a penalty of up to five years in prison and/or up to a $ 10,000 fine. [*26] *Mass. Gen. Laws ch. 271 § 39(a)*. In this case, the amount of punitive damages far exceeds the maximum monetary fine under that statute.

On the other hand, however, Plaintiffs suffered over $ 11 million in damages as a result of Defendants' conduct, and Defendants received over $ 68 million in fees from the Management Contract. Given the amounts of money involved and the nature of Defendants' conduct, including their duties as Plaintiffs' agents, the Court cannot conclude that Defendants lacked notice that their questionable conduct could result in the imposition of a substantial financial penalty. Accordingly, after weighing the competing considerations relevant to this factor in light of the Court's analysis regarding the other *BMW* guideposts, the Court concludes that it is appropriate to reduce the jury's punitive damages award.

4.  Summary

Given the circumstances of this case and weighing the considerations relevant to the *BMW* guideposts, the Court concludes that the guideposts weigh in favor of a punitive damages award; however, the scale is not tipped so far in favor of Plaintiffs that the Court can conclude that the size of the jury's punitive damages award in this case [*27] is justifiable and/or supportable. Accordingly, while the Court will deny Defendants' Motion insofar as it seeks a new trial, the Court will order a remittitur of the jury's punitive damages award so that the award is one and one-half times the amount of the relevant compensatory damages awarded to Plaintiffs in this case. [2]

> 2    The amount of compensatory damages the Court will use for this computation is the amount stated by Plaintiff to be the "correct amount," i.e.

2002 U.S. Dist. LEXIS 439, *27; 2002-1 Trade Cas. (CCH) P73,601

$ 10.26 million (breach of agency), plus $ 250,000 (purchasing activities), plus $ 1.1 million (common law damages) for a total of $ 11.61 million. (D.I. 357 at 15). Plaintiffs did not use the amount for breach of workers' compensation in their computation, and thus, the Court will not consider that portion of the award for its calculation.

**III. Whether Defendants' Are Entitled To Judgment As A Matter Of Law On Plaintiffs' Claims Under Section 2(c) Of The Robinson-Patman Act Or A Remittitur Of The Jury's Damage Award Relating To Those Claims**

[*28] Defendants next contend they are entitled to judgment as a matter of law on Plaintiffs' claims under Section 2(c) of the Robinson-Patman Act, because there is no evidence to support an anti-trust injury. Specifically, Defendants contend that Plaintiffs did not prove by a preponderance of the evidence "that payments from vendors to [Defendants] 'injured Plaintiffs by virtue of the fact that Plaintiffs are in the same business or are in competition with Sheraton.'" (D.I. 352 at 10) (quoting Final Jury Instructions at p. 22). In the alternative, Defendants request the Court to reduce the jury's damage award of $ 750,000 to $ 250,000.

To establish a violation of the Robinson-Patman Act in this case, Plaintiffs were required to prove, by a preponderance of the evidence, that (1) Defendants received payments from vendors that constituted or were given in lieu of, commissions, brokerage or other compensation and not for services rendered in connection with a sale or purchase from a vendor; (2) such payment injured Plaintiffs by virtue of the fact that Plaintiffs are in the same business as or are in competition with Defendants; and (3) Defendants were acting as agents for Plaintiffs. [*29] Because Defendants' challenge relates solely to the second element of a Robinson-Patman claim, the Court will not discuss the remaining elements.

According to Defendants, Plaintiffs "suggested that they suffered a competitive injury because owners of managed hotels 'footed the bill for Sheraton's rebate scheme' and incurred higher purchasing costs than did Sheraton-owned hotels;" however, Plaintiffs failed to present evidence from which a reasonable jury could infer such an injury. (D.I. 352 at 11). After reviewing the record in the light most favorable to Plaintiffs, the Court disagrees with Defendants' argument and concludes that

Plaintiffs presented sufficient evidence for a reasonable jury to conclude that the second element of Plaintiffs' Robinson-Patman claim was satisfied. For example, Plaintiffs presented the expert testimony of Donald Winter, suggesting that Plaintiffs and other owners of hotels managed by Defendants were treated differently than hotels owned by Defendants with whom they were in competition. (Tr. 299-302, 1297-1298). Further, Plaintiffs presented evidence that John Hancock and Sumitomo owned hotels that were also in the "same business" as Defendants. (Tr. [*30] 140-141). Because the Court concludes that Plaintiff presented sufficient evidence from which a reasonable jury could conclude that Plaintiffs were in the same business as or in competition with Defendants, the Court concludes that Defendants are not entitled to judgment as a matter of law regarding the jury's verdict on Plaintiffs' Robinson-Patman claim.

As for Defendants' argument that the jury's Robinson-Patman award should be reduced, the Court likewise concludes that Defendants are not entitled to relief. Defendants' argument regarding a reduction of the jury's damage award is based upon an alleged improper comment by Plaintiffs' counsel during his closing argument. Specifically, Defendants contend that "it appears that the jury has already tripled the $ 250,000 amount," because Plaintiffs' counsel stated in closing argument, "In the Antitrust Laws, in the Robinson-Patman Act, for example, if a defendant is found guilty in a Robinson-Patman Act case, they would triple damages." (D.I. 352 at 12) (citing Tr. 1550). However, Defendants failed to object to counsel's statement at any time during the trial, and therefore, the Court concludes that Defendants waived their argument insofar [*31] as it is premised on the closing remarks of Plaintiffs' counsel. [3] *See e.g. Brenner v. Local 514, 927 F.2d 1283, 1298 (3d Cir. 1991).*

> 3    In the alternative, even if the Court were to consider Defendants' argument, the Court would conclude that Defendants' are not entitled to a reduction of damages. The Court did not instruct the jury to treble damages, and thus, in the Court's view, Defendants' argument about the jury's reasoning in calculating the award is speculative.

**IV. Whether The Jury's Award For Contractual Damages For Breach Of Contract For Purchasing Services And Workers' Compensation Are Supported**

2002 U.S. Dist. LEXIS 439, *31; 2002-1 Trade Cas. (CCH) P73,601

**By The Evidence**

By their Motion, Defendants contend that the jury's award of $ 250,000 for Defendants' purchasing practices and $ 222,000 for Defendants' worker's compensation program should be set aside because, "Plaintiffs offered no evidence quantifying the alleged impact of these programs on Plaintiffs' hotel." (D.I. 352 at 12). With regard to the workers' compensation program, [*32] Defendants specifically contend that "the management contract demonstrates that the purchasing of insurance was the *owners'* responsibility and that the owner was free at any time to replace [Defendants'] program with its own." (D.I. 352 at 12) (emphasis in original). As for the jury's award based on Defendants' purchasing practices, Defendants contend that this award should be set aside because it is duplicative of the jury's Robinson-Patman award.

After reviewing the record as it relates to this issue, the Court concludes that Defendants are not entitled to relief, and that Plaintiffs presented sufficient evidence to support the jury's verdict. With regard to the workers' compensation program, Plaintiffs presented the expert testimony of Robert Patterson. Mr. Patterson testified at length about the way in which Defendants improperly profited through their workers' compensation program. In particular, Mr. Patterson testified that Defendants made certain accounting adjustments that yielded extra management fees for themselves in the amount of $ 15,000 for 1995 and $ 115,000 for 1996. Given that Plaintiffs presented evidence establishing approximately $ 230,000 in workers' compensation [*33] abuses, the Court cannot conclude that the jury's award of $ 222,000 on Plaintiffs' workers' compensation claim is unsupported by the evidence, or otherwise shocking, so as to justify granting Defendants' request for judgment as a matter of law, a new trial or a remittitur.

As for Defendants' argument that the jury's award for breach of contract arising from Defendants' purchasing services should be set aside as duplicative of the jury's Robinson-Patman award, the Court likewise rejects Defendants' argument. Defendants suggest that the fact that the Robinson-Patman award is triple the amount awarded by the jury for breach of contract for purchasing services means that the award is duplicative. In the Court's view, however, Defendants' argument is speculative, and thus, insufficient to support an order setting aside the jury's $ 250,000 breach of contract award.

Moreover, the record in this case demonstrates that Plaintiffs breach of contract claim related to Defendants' purchasing activities was a separate claim from its Robinson-Patman claim, based on separate activity and requiring separate proof. (D.I. 298 at Section I, P 8, Section II, PP 10, 11, 14, 17, 21, 22). Further, after [*34] reviewing the record, the Court concludes that Plaintiffs presented sufficient evidence to support the jury's verdict on their breach of contract claim. Plaintiffs presented evidence establishing that Defendants engaged in purchasing abuses, did not maintain adequate records of their purchasing program, took deliberate steps to conceal the details of their program, and ultimately received over $ 30 million in "rebates" over a six year period. Given Plaintiffs' evidence, the Court cannot conclude that the jury's award of $ 250,000 for breach of contract related to purchasing services was unsupported by the evidence or otherwise shocking or improper so as to warrant the relief Defendants request in their Motion. Accordingly, the Court will deny Defendants' Motion in so far as it seeks judgment as a matter of law, a new trial or a remittitur of the jury's damages awards for Plaintiffs' breach of contract claims based on worker's compensation and purchasing abuses by Defendants.

**CONCLUSION**

For the reasons discussed, Defendants Motion For Judgment As A Matter Of Law, Or In The Alternative, For A New Trial Or Amendment Of The Judgment (D.I. 352) will be granted insofar as it seeks [*35] a remittitur of the jury's punitive damages award, and will be denied in all other respects.

An appropriate Order will be entered.

***ORDER***

At Wilmington this 10 day of January 2002, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendants' Motion For A Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or Amendment Of The Judgment (D.I. 352) is GRANTED insofar as it requests a remittitur of the jury's punitive damages award.

2002 U.S. Dist. LEXIS 439, *35; 2002-1 Trade Cas. (CCH) P73,601

2. The jury's punitive damages award will be reduced from $ 37,500,000 to $ 17,415,000, said sum reflecting one and one-half times the relevant compensatory damages award of $ 11.61 million.

3. Defendants' Motion For A Judgment As A Matter Of Law Or, In The Alternative, For A New Trial Or Amendment Of The Judgment (D.I. 352) is DENIED in all other respects.

JOSEPH J. FARNAN, JR.

UNITED STATES DISTRICT JUDGE

# Exhibit D



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.))

Page 1

**C**Elan Suisse Ltd. v. Christ
E.D.Pa.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
ELAN SUISSE LTD., Plaintiff,
v.
Robert D. CHRIST, Defendant.
**Civil Action No. 06-3901.**

Dec. 29, 2006.

Nicholas Casamento, Media, PA, for Plaintiff.
Andrew J. Soven, Reed Smith, LLP, Philadelphia, PA, Thad J. Bracegirdle, Reed Smith LLP, Wilmington, DE, for Defendant.

**Memorandum and Order**

GENE E.K. PRATTER, J.
*1 Defendant Robert D. Christ has filed a Motion to Dismiss plaintiff Elan Suisse Ltd.'s Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) and (b)(3) for lack of personal jurisdiction and improper venue, and in the alternative, a Motion to Transfer this action to the U.S. District Court for the District of Delaware or the U.S. District Court for the Eastern District of Louisiana.

**FACTS AND PROCEDURAL BACKGROUND**

On April 27, 2006, Robert D. Christ filed a complaint in the U.S. District Court for the District of Delaware against Brett J. Cormick, Elan Suisse (Pty) Ltd., Elan Suisse International Holdings (USA) LLC and other defendants (the "Delaware Action").FN1 In the Delaware Action, Mr. Christ alleges that Mr. Cormick induced Mr. Christ to invest in a holding company that would operate to promote and sell United States-based financial products and investment vehicles to investors in South Africa.FN2Mr. Christ alleges that, based on misrepresentations by Mr. Cormick, Mr. Christ wired $250,000 to Mr. Cormick, purportedly as an initial capital infusion to help launch the venture. In exchange for this investment, Mr. Christ was to receive an equity interest in Elan Suisse (Pty) Ltd., a

South African corporation, and Elan Suisse International Holdings (USA) LLC, a Delaware limited liability company. In short, Mr. Christ alleges that despite assurances from Mr. Cormick as to the use of the purported "investment," Mr. Cormick never gave Mr. Christ any equity shares of the Elan Suisse entities, returned the funds that Mr. Christ initially invested or provided any return on Mr. Christ's investment.

> FN1.*Robert D. Christ v. Brett J. Cormick et al.,* Civil Action No. 06-275.

> FN2. The complaint in the Delaware Action consists of four counts, including claims of promissory estoppel, breach of contract, fraud and civil conspiracy. *See* Def. Mem. Supp. Ex. A.

On May 22, 2006, the defendants in the Delaware Action, including Mr. Cormick and the two Elan Suisse entities, moved to dismiss that proceeding based on, among other grounds, the District Court for the District of Delaware's alleged lack of personal jurisdiction over the defendants, some of whom are citizens of, or corporations formed in, foreign countries.FN3

> FN3. Mr. Christ's complaint in the Delaware Action states that Brett J. Cormick is a citizen of Australia who resides in the United Kingdom and the Republic of Zimbabwe, Elan Suisse International Holdings (USA) LLC is a Delaware limited liability company, and Elan Suisse (Pty) Ltd. is a South African corporation. Def. Mem. Supp. Ex. A ¶¶ 2-4.

A month after the Elan Suisse entities filed the Motion to Dismiss for lack of personal jurisdiction in the District of Delaware, plaintiff "Elan Suisse Ltd." filed a complaint in the present action against Mr. Christ in the Court of Common Pleas of Montgomery County, Pennsylvania on June 23, 2006. On September 1, 2006, Mr. Christ removed the case to this Court based on federal question jurisdiction inasmuch as the Complaint alleges violations of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.))**

Lanham Act, 15 U.S.C. §§ 1125, et seq.[FN4] In the present action, Plaintiff Elan Suisse Ltd. alleges, and Mr. Christ admits, that he maintained a website, www.elansuisse.co.za, based on an Internet server located in South Africa, in order to publish his "findings" as to Mr. Cormick's "misdeeds" and in order to prevent others from being misled by Mr. Cormick as Mr. Christ had been. On his website, Mr. Christ describes in detail Mr. Cormick's alleged misrepresentations and fraudulent dealings that are the subject of the pending Delaware Action that Mr. Christ initiated.

> FN4. Plaintiff's Complaint here contains three counts, including allegations of commercial disparagement and violations of two sections of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) and (d)(1) (A).

*2 In the Delaware Action, Mr. Christ's complaint stated that he was a citizen of Pennsylvania residing in Pottstown, Pennsylvania. See Def. Mem. Supp. Ex. C ¶ 2. Quite appropriately then, when Elan Suisse Ltd. filed its Montgomery County state court complaint less than two months later, Plaintiff identified Mr. Christ as a resident of Pottstown, Pennsylvania.

Following his removal of this action to this Court, Mr. Christ filed a Motion to Dismiss or Transfer (Docket No. 2), Plaintiff filed a Memorandum in Response (Docket No. 3), and Mr. Christ filed a Reply Memorandum in Support of his Motion to Dismiss or Transfer (Docket No. 6). On December 21, 2006, the Court heard oral argument on these motions.

In his Motion to Dismiss or Transfer, Mr. Christ claims that on or about June 2, 2006, approximately 21 days before Elan Suisse Ltd. filed its complaint in this action, he moved from Pennsylvania to Abita Springs, Louisiana. Def. Mem. Supp. 4. Mr. Christ asserts that he sold his house and relocated his business to Louisiana so that, at the time Elan Suisse Ltd. filed this current action, he did not reside or operate a business in Pennsylvania. Id. at 5. Thus, Mr. Christ argues that this Court lacks personal jurisdiction over him. Mr. Christ also moves to dismiss the Complaint for improper venue. As an alternative to his Motion to Dismiss, Mr. Christ requests the Court to transfer this action to either the District of Delaware, to be consolidated with the Delaware Action that is currently pending, or to the Eastern District of Louisiana, where Mr. Christ currently resides. Plaintiff opposes both dismissal and transfer of this action. Elan Suisse Ltd. argues that Mr. Christ was a resident of Pennsylvania through at least early June 2006 which allows an inference that Mr. Christ operated the website in question from his home in Pennsylvania from October 2005 through June 2006. Thus, Plaintiff argues that personal jurisdiction is appropriate and venue is proper in the Eastern District of Pennsylvania.

For the reasons stated below, the Court will grant Mr. Christ's Motion to Transfer and will transfer this action to the U.S. District Court for the District of Delaware to be consolidated with the related action pending in that court. Because such a transfer is appropriate, the Court will not address Mr. Christ's argument that this Court lacks personal jurisdiction over him and will deny Mr. Christ's Motion to Dismiss without prejudice.[FN5]

> FN5. The Court of Appeals for the Third Circuit has held that a district court may transfer venue to another district court even if the transferor court lacks personal jurisdiction over the defendant. In *United States v. Berkowitz*, 328 F.2d 358, 361 (3d Cir.1964), the Court of Appeals cited the Supreme Court's decision in *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), which held that a court may transfer venue under § 1406(a) notwithstanding the court's lack of personal jurisdiction over the defendant. The Court of Appeals held that the Supreme Court's "rationale applies equally to § 1404(a), for these are companion sections, remedial in nature, enacted at the same time, and both dealing with the expeditious transfer of an action from one district or division to another." *Berkowitz*, 328 F.2d at 361.

## DISCUSSION

Mr. Christ asserts that venue should be transferred pursuant to 28 U.S.C. § 1400,[FN6] § 1404(a) or § 1406(a).[FN7] Section 1406(a) permits a district court to transfer venue when a case is "filed ... in the wrong division or district." 28 U.S.C. § 1406(a). Mr. Christ

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.))**

argues that under 28 U.S.C. § 1391,[FN8] venue is "wrong" here in this district because Mr. Christ does not reside in this district and a "substantial part of the events or omissions giving rise to the claim" did not occur in this district. However, § 1406(a), by its own terms, only applies to cases that were "filed" in this Court, which is not the case here; rather, Mr. Christ properly removed this action to this Court pursuant to 28 U.S.C. § 1441(a) after it had been "filed" elsewhere. *See* Notice of Removal ¶ 4 (Docket No. 1). As the Supreme Court has clearly stated, once a case is properly removed to district court, transfer of venue pursuant to 28 U.S.C. § 1406(a) is not available. *See Polizzi v. Cowles Magazines, Inc.,* 345 U.S. 663, 665, 73 S.Ct. 900, 97 L.Ed. 1331 (1953) (holding that 28 U.S.C. § 1406(a) and § 1391 had no application to an action that had been removed from state court pursuant to 28 U.S.C. § 1441(a)); *see also Wallace v. Mercantile County Bank,* 2006 U.S. Dist. LEXIS 82565 at *9 (E.D.Pa.2006) ("If a case is properly removed pursuant to § 1441(a), venue is properly laid, and the removed action may not be challenged under § 1391." Thus, § 1406(a), which governs improper venue, does not apply to a properly removed action."(citation omitted)). Therefore, this Court may not transfer or dismiss this case pursuant to § 1406(a).[FN9]

> FN6. Mr. Christ asserts that venue is appropriate in Louisiana due to 28 U.S.C. § 1400, which defines the appropriate venue for copyright claims. This statute provides that "[c]ivil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found."28 U.S.C. § 1400(a). Courts have held that the tests for where a defendant "may be found" under this statute is the same as the test for whether personal jurisdiction exists. *See Kogan v. Longstreet,* 374 F.Supp. 47, 50 (N.D.Ill.1974) ("As a practical matter, the test for determining whether a non-resident corporation or its agent is "found" within a district, pursuant to 28 U.S.C. § 1400(a), is the same as that for determining whether a corporation is amenable to suit in a jurisdiction other than that in which it is incorporated."); *John Wiley & Sons, Inc. v. Fuchs,* 1981 U.S. Dist. LEXIS 16043 at *8

(SD.N.Y.1981) ("The copyright statute does not require a stronger presence of the defendant in the district to determine venue than to establish personal jurisdiction."). Since the Court declines to address Mr. Christ's personal jurisdiction claims and instead will transfer this action to the District of Delaware, the Court need not address Mr. Christ's § 1400 argument with respect to Louisiana. The Court notes that Mr. Christ "may be found" in the District of Delaware for purposes of § 1400 because Mr. Christ initiated the Delaware Action within that district and Mr. Christ, by requesting such transfer, consents to venue lying in Delaware.

> FN7.28 U.S.C. § 1406(a) states that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."28 U.S.C. § 1406(a).

> FN8.28 U.S.C. § 1391(b) states:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

> 28 U.S.C. § 1391(b).

> FN9. In addition to transfer, Mr. Christ seeks dismissal of this action due to improper venue. Because § 1406(a) cannot be applied here, dismissal on the grounds of improper venue is off the table as well. *See Jumara,* 55 F.3d at 878 (noting that while either § 1404 or § 1406 provide a basis for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transfer, only § 1406 can support a dismissal).

*3 In a case that has been removed from state court, a district court may, however, entertain a motion to transfer venue pursuant to § 1404(a).[FN10] *Wallace*, 2006 U.S. Dist. LEXIS 82565 at *9. Requests for transfer under § 1404(a) may be granted when venue is proper in both the original and the requested venue. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 878 (3d Cir.1995); *Schiller-Pfeiffer, Inc. v. Country Home Prods.*, 2004 U.S. Dist. LEXIS 24180 at *28 (E.D.Pa.2004). Under § 1404(a), district courts have broad discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). The Court of Appeals for the Third Circuit has outlined several factors for the district court to consider when adjudicating a motion to transfer.[FN11] The Court acknowledges the familiar maxim that in considering a transfer request, "a plaintiff's choice of forum is entitled to great weight and is not to be disturbed unless the balance of convenience strongly favors the defendants' forum." *Blanning v. Tisch*, 378 F.Supp. 1058, 1060 (E.D.Pa.1974) (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir.1970), *cert. denied,*401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). However, the pendency of a related case in its early phases in the transferee forum is a powerful reason to grant a change of venue. *Blanning*, 378 F.Supp. at 1061.

FN10.28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."28 U.S.C. § 1404(a).

FN11. In *Jumara,* the Court of Appeals noted that various considerations include "private interests," such as (a) the plaintiff's forum preference as manifested in the original choice, (b) the defendant's preference, (c) whether the claim arose elsewhere, (d) the relative convenience of the parties as indicated by their relative physical and financial condition, and (e) the

location of the witnesses, books and records (but only to the extent that the witnesses, books or records may actually be unavailable for trial in one of the fora).*Jumara,* 55 F.3d at 879-80 (citations omitted). The considerations also include "public interests," such as (a) the enforceability of the judgment, (b) practical considerations that could make the trial easy, expeditious or inexpensive, (c) the relative administrative difficulty in the two fora resulting from court congestion, (d) and the local interest in deciding local controversies at home. *Id.* (citations omitted).

Pursuant to § 1404(a) a court may transfer a case: (1) to a district where the case could have been brought; and (2) where the convenience of parties and witnesses, and the interest of justice weigh in favor of the transfer.*Wallace,* 2006 U.S. Dist. LEXIS 82565 at *9 (citing28 U.S.C. § 1404(a)). With respect to the first requirement, this case clearly could have been brought in the Eastern District of Louisiana, where Mr. Christ currently resides. *See*28 U.S.C. § 1391(a) (providing that an action may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State"). However, Mr. Christ argues that Plaintiff's claims also could have been brought as counterclaims in the pending action in the District of Delaware. *See*Fed.R.Civ.P. 13. Mr. Christ claims that the parties to this action are also parties to the Delaware Action and that the claims pending in both actions revolve around the same nucleus of facts.

Notwithstanding the statement in Plaintiff's Memorandum of Law that "the parties in the State of Delaware District Court action, are not the same as the parties in [Plaintiff Elan Suisse Ltd.'s] current action," at oral argument on this motion, counsel for Elan Suisse Ltd. admitted that "Elan Suisse (Pty) Ltd.," one of the defendants in the Delaware Action, is in fact the same entity as "Elan Suisse Ltd.," the Plaintiff in this case. Pl.'s Mem. Response 5. At oral argument, counsel for Mr. Christ argued that although Plaintiff's claims in the current action pertain to Mr. Christ's alleged defamatory statements on his website, because Mr. Christ created the website as a result of Mr. Cormick's alleged fraudulent activity, which is the basis of Mr. Christ's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Delaware Action, the facts and circumstances surrounding the two actions are the same. Counsel for Plaintiff Elan Suisse Ltd. agreed that Plaintiff's current claims could have been brought as counterclaims in the Delaware Action. Counsel for Elan Suisse Ltd. stated that one of the reasons Plaintiff elected not to bring counterclaims in the Delaware Action was because of concerns that the Delaware court lacked personal jurisdiction over the Elan Suisse defendants. With respect to Plaintiff's choice of forum in the current action, rather than submitting to the Delaware court's jurisdiction and bringing counterclaims against Mr. Christ, the Elan Suisse defendants filed a motion to dismiss the Delaware Action for lack of personal jurisdiction, and then one month later, one of the same Elan Suisse defendants filed suit in this Court against Mr. Christ, now, ironically, defending itself against a motion to dismiss for lack of personal jurisdiction.

**\*4** Mr. Christ argues that because a similar case is currently pending in Delaware, in the interest of conserving the courts' time and resources, this action should be transferred to the District of Delaware for consolidation with the Delaware Action. The Court agrees. Rather than having this Court and the District Court for the District of Delaware each address one of the dueling motions to dismiss for lack of personal jurisdiction, the Court finds that the appropriate course would be to transfer this action to the District Court for the District of Delaware to be consolidated with the related action currently under way there.

As noted above, the presence of a related case in the transferee forum is a powerful reason to grant a change of venue. *Blanning*, 378 F.Supp. at 1061. In addition, at oral argument, counsel for the Plaintiff could not provide any reason why this action should not be transferred to Delaware, aside from Plaintiff's argument that venue is proper here and because of the motion to dismiss that is pending in the Delaware court.

It would be no less convenient or more burdensome for Elan Suisse Ltd. to assert its claims as counterclaims in the Delaware Action than it would be to conduct a separate action here. If anything, it should be both more convenient and less burdensome for all parties to litigate these issues on a consolidated basis. Elan Suisse Ltd. is a South African corporation whose principal, Mr. Cormick, is citizen of Australia.

The non-Elan Suisse parties in the Delaware Action are all foreign nationals or foreign business entities.[FN12] Mr. Christ is a resident of Louisiana. Thus, whether or not these cases continue separately or on a consolidated basis in Delaware, extensive travel during discovery and trial will likely be required. Pursuing consolidated litigation will at least decrease the need for multiple depositions of the same parties involving the same factual issues. In addition, in response to Mr. Christ's motion, Plaintiff has not offered a single reason why venue is more convenient for the parties or witnesses in Pennsylvania than in Delaware (or for that matter, why venue would be less convenient in Delaware than in Pennsylvania). Plaintiff has not argued that Elan Suisse Ltd. has any ties to Pennsylvania that necessitate conducting litigation here. The Court surmises that Plaintiff chose Pennsylvania as a forum because Mr. Christ resided in Pennsylvania when he created and, at least to some extent, maintained the website in question.[FN13] Although the legal claims in the current action and the Delaware Action are different, upon consideration of a careful reading of the complaint in the Delaware Action, the Court agrees that the facts and circumstances surrounding both actions sufficiently align such that consolidation of these actions would be appropriate. *See Schiller-Pfeiffer*, 2004 U.S. Dist. LEXIS 24180 at \*31 (transferring venue pursuant to § 1404(a), even though the claims of the two cases were not exactly the same, because the claims arose from the same set of facts and occurrences). Furthermore, at oral argument in this case counsel for both parties noted that discovery had not begun in either the current action or the Delaware Action. As such, by transferring this action to Delaware, the Delaware district court would be able to set a consolidated schedule for carrying out discovery and other matters and address discovery disputes. All things being equal, since Wilmington, Delaware and Philadelphia, Pennsylvania are approximately 30 miles apart, if Elan Suisse Ltd. (or Elan Suisse (Pty) Ltd.) is able to maintain a lawsuit in the Eastern District of Pennsylvania, then that entity should be able to defend a lawsuit in the District of Delaware. Conversely, if Mr. Christ is able to bring an action in the District of Delaware, then he should be able to defend an action there as well.

FN12. To the extent such non-Elan Suisse parties remain as defendants in the Delaware Action, the Court assumes that discovery

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

related to such parties will commence. To the extent that any of these parties should succeed in their motion to dismiss in the Delaware Action, such parties may still be required as witnesses. In either event, Plaintiff has not proposed any reason why Wilmington, Delaware is any less convenient than Philadelphia, Pennsylvania in this regard.

FN13. Because Mr. Christ has not raised any argument alleging bad faith on the part of Elan Suisse Ltd., the Court will resist concluding that Elan Suisse Ltd. chose to file suit in Pennsylvania solely to avoid submitting to the district court's jurisdiction in Delaware.

**CONCLUSION**

*5 For the reasons stated above, Mr. Christ's Motion to Dismiss will be denied and Mr. Christ's Motion to Transfer this action to the U.S. District Court for the District of Delaware will be granted.[FN14] An appropriate Order follows.

FN14. The Court also notes that the "first-filed rule," although not addressed by either party, mitigates in favor of transfer to the District of Delaware. Approximately 65 years ago, the Third Circuit Court of Appeals stated that "in all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it."*Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir.1941)* (*quoting Smith v. M'Iver, 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)*), cert. denied, 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211 (1942); *see also EEOC v. Univ. of Pennsylvania, 850 F.2d 969, 971 (3d Cir.1988)* (quoting same). The first-filed rule "gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court."*EEOC, 850 F.2d at 971.* Although this Court's injunctive powers are not implicated by the pending motions, the Court notes the "first-filed rule" in this case to note that transfer to the District Court for the District of Delaware is appropriate

because the action first filed by Mr. Christ in Delaware is based on the same facts as the action filed two months later by Elan Suisse Ltd. in state court in Pennsylvania.

**ORDER**

**AND NOW** this 28th day of December, 2006, upon consideration of Defendant Robert D. Christ's Motion to Dismiss or Transfer (Docket No. 2), Plaintiff Elan Suisse Ltd.'s Response to Defendant's Motion to Dismiss or Transfer (Docket No. 3), and Defendant's Reply Memorandum (Docket No. 6), for the reasons stated in the attached Memorandum, it is **ORDERED** as follows:

1. Defendant Robert D. Christ's Motion to Dismiss is **DENIED** without prejudice;

2. Defendant Robert D. Christ's Motion to Transfer is **GRANTED** and this action is transferred to the United States District Court for the District of Delaware, to be docketed as related to *Robert D. Christ v. Brett J. Cormick et al.,* Civil Action No. 06-275.

E.D.Pa.,2006.
Elan Suisse Ltd. v. Christ
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT D. CHRIST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 06-275-GMS |
| BRETT J. CORMICK and ELAN SUISSE | ) |
| INTERNATIONAL HOLDINGS (USA), | ) |
| | ) |
| Defendants. | ) |
| ELAN SUISSE LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 07-60-GMS |
| | ) |
| ROBERT D. CHRIST, | ) |
| | ) |
| Defendant. | ) |

## CERTIFICATE OF SERVICE

I, Thad J. Bracegirdle, hereby certify that on May 30, 2008, I caused a true and correct copy of the foregoing ***Robert D. Christ's Opening Memorandum of Law in Support of His Motion for Entry of Default Judgment and Attorneys' Fees*** to be served on the counsel listed below, electronically via CM/ECF:

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE 19801-1155

Dated: May 30, 2008

         */s/ Thad J. Bracegirdle*
         Thad J. Bracegirdle (No. 3691)

WILLIB-58324.6